# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------x

Yucaipa American Alliance Fund I, L.P., a   :
Delaware limited partnership, and Yucaipa   :
American Alliance (Parallel) Fund I, L.P., a   :
Delaware limited partnership,   :
  :
      Plaintiffs,   :
  :
  -against-   :
  :
Richard A. Ehrlich, Stephen H. Deckoff, Leslie  :   Case No.
A. Meier, Jeffrey A. Schaffer, BDCM   :
Opportunity Fund II, L.P., a Delaware limited  :   **COMPLAINT**
partnership, Black Diamond CLO 2005-1 Ltd.,  :   **(Jury Trial Demanded)**
a Cayman Islands limited liability company,   :
and Spectrum Investment Partners, L.P., a   :
Delaware limited partnership,   :
  :
      Defendants.   :
  :
  :
  :
  :

---------------------------------------------------------x

## I.    INTRODUCTION

1.      From at least in 2009 and continuing today, Defendants—sophisticated hedge funds and principals of hedge funds with great expertise in bankruptcy and trading distressed debt, and a reputation for aggressive tactics—have engaged in a carefully orchestrated series of lies, payoffs and legal maneuvers designed to wrongfully enrich themselves at the expense of Plaintiffs Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (collectively, "Yucaipa").  Defendants' scheme culminated in (A) the wrongful filing of an involuntary bankruptcy petition against Allied Systems Holdings, Inc. ("Allied"), one of the largest transporters of new passenger vehicles in North America, (B) the attempt to fraudulently subordinate Yucaipa's recoveries on approximately $170 million in claims against Allied at issue in the bankruptcy proceedings, and (C) the hijacking of "Requisite Lender" status from Yucaipa under a First Lien Credit Agreement,[1] despite being a minority debtholder, and then using that Requisite Lender status to engage in blatantly discriminatory treatment of Yucaipa, all with the goal of further enriching themselves at Yucaipa's expense.

2.      Defendants Black Diamond CLO 2005-1 Ltd., BDCM Opportunity Fund II, L.P. (together, "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum," and, collectively with Black Diamond, "BD/S"), along with Defendants Richard A. Ehrlich, Stephen H. Deckoff, and Leslie A. Meier, as principals of Black Diamond, and Jeffrey A. Schaffer, as a principal of Spectrum, and their agents, led this conspiracy.  The motivation for their misconduct and scheming was simple greed—to increase their share of the pie by knowingly making false accusations of misconduct on the part of Yucaipa in order to "equitably subordinate"[2] Yucaipa's

---

[1]   As discussed in this Complaint, "Requisite Lender" is defined under the First Lien Credit Agreement as a lender or group of lenders collectively holding more than 50% of all outstanding First Lien Claims.  The Requisite Lender is empowered to control the exercise of certain material remedies by all First Lien Lenders.

[2]   Equitable subordination is a remedy set forth in Bankruptcy Code section 510, which provides for the reordering of recoveries among creditors based on allegations of inequitable conduct by a creditor who holds more than 20% of the voting control of a borrower or is otherwise an "insider."

$170 million in First Lien Claims.[3]  Specifically, Yucaipa's First Lien Claims represent approximately 56% of the total First Lien Claims against Allied.  Defendants Black Diamond's and Spectrum's claims (for which they paid mere cents on the dollar) represent 22% of the total First Lien Claims.  By subordinating Yucaipa's debt, Black Diamond and Spectrum would recover a substantially larger percentage of any value flowing to the First Lien Claims than they would otherwise be entitled to recover if Yucaipa's debt were not equitably subordinated.

3.     In fact, if Defendants are ultimately successful in fully implementing their equitable subordination scheme and knocking out Yucaipa's 56% share of the First Lien Claims, they will increase their share of the Allied "pie" in bankruptcy from 22% to 50%,[4] as follows:

**Without Defendants' Scheme**       **If Defendants' Scheme Succeeds**




Thus, Defendants seek a dramatic increase in ownership at Yucaipa's expense, which would allow them to reap a windfall in the form of a significant multiple on their original investment.

4.     In order to carry out this scheme, Defendants committed various frauds on the United States Bankruptcy Court for the District of Delaware, intentionally violated Federal Bankruptcy Rules and hurled false allegations at Yucaipa and its employees.  These acts constitute an illegal racketeering scheme under the Racketeer Influenced and Corrupt

---

[3]  This Complaint refers to capitalized terms that are defined in the attached Appendix of Technical and Defined Terms.

[4]  The following equation illustrates how BD/S would go from owning 22% of Allied's estate to 50% by wiping out Yucaipa's 56% share:  $22/(100-56) = 22/44 = 50\%$.

Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and § 1962(d) involving conspiracy, bankruptcy fraud, and wire and mail fraud.  That conspiracy was intended to and has in fact injured Yucaipa to the tune of more than $175 million.

5.     Allied was no stranger to bankruptcy.  It had filed for voluntary bankruptcy in 2005 after years of declining revenue and rising expenses (the "Prior Bankruptcy Case"). Yucaipa first became involved with Allied by sponsoring Allied's exit from the Prior Bankruptcy Case in May 2007 with a plan of reorganization that deleveraged the balance sheet and preserved approximately 5,000 jobs.  Pursuant to that plan of reorganization, Yucaipa became majority owner of Allied in May 2007 and was authorized to and did appoint a majority of Allied's board of directors (which included as members several Yucaipa employees and designees).

6.     In 2008, however, the Great Recession caused another severe contraction in Allied's revenue and cash flow and later forced two of Allied's largest customers (General Motors and Chrysler) into bankruptcy.  Allied went into material default under its credit agreements in August 2008 and stopped making required interest payments on its outstanding debt beginning on August 1, 2009.  Through these hard times, Yucaipa increased its support for Allied by acquiring 56% of Allied's debt under the First Lien Credit Agreement and 80% of its debt under the Second Lien Credit Agreement.  Yucaipa later converted tens of millions of dollars of Second Lien Debt into equity to deleverage Allied's balance sheet.  Defendants Black Diamond and Spectrum had also taken debt positions in Allied under the First Lien Credit Agreement.  (*See* First Lien Credit Agreement, Ex. 1.)

7.     Yucaipa's negotiations over its purchases of Allied's debt set the stage for Defendants' scheme to turn their relatively small investment in the First Lien Claims into big profits by attempting to fraudulently demolish Yucaipa's right to collect on its debt.  Defendants Black Diamond's and Spectrum's respective purchase prices for their Allied debt were at such a deep discount—as little as five cents on the dollar—that they had nothing to lose in embarking on this scheme.  Even in a worst-case scenario, such as the liquidation of Allied, Defendants would have recouped their investment.  But that wasn't enough for them.  Instead, Defendants

3

plotted to turn a modest investment into a tremendous windfall that would pay a substantial multiple on their original investment by deceiving the Bankruptcy Court and Yucaipa.  The principal steps involved in Defendants' fraudulent scheme were as follows:

8.     ***Step 1***:  <u>Encourage Yucaipa to acquire as much Allied debt as possible by providing false assurances of cooperation and support</u>.  This meant encouraging Yucaipa to purchase Allied debt from a separate entity, ComVest Investment Partners III, L.P. ("ComVest"), which held a majority of Allied debt.  Defendants needed Yucaipa, and not ComVest, to own a majority of the First Lien Debt in order to accomplish their scheme—among other things, because ComVest was not an Allied insider, it would have been virtually impossible to equitably subordinate the debt while it was in the hands of ComVest under prevailing case law.  But if Yucaipa (which had appointed a majority of Allied's board of directors) acquired the majority of the First Lien Debt from ComVest, Yucaipa's status as an insider would create an opening for Defendants to pursue the "equitable subordination angle" by jointly pushing Allied into an involuntary bankruptcy and then attempting to equitably subordinate Yucaipa's claims by falsely accusing the Yucaipa designees on the Allied board of misconduct.

9.     Defendants became aware of Yucaipa's interest in acquiring the Allied debt held by ComVest in February 2009 and they encouraged Yucaipa's acquisition of that debt.  Indeed, Defendant Deckoff, knowing that a transaction between Yucaipa and ComVest was on the horizon, traveled from New York to Los Angeles on August 18, 2009, for the sole purpose of meeting with Yucaipa and pledging to work in partnership with Yucaipa once it completed the acquisition of the Allied debt from ComVest.  Defendant Deckoff repeated this pledge again and again (both in person and in writing) although it is now clear that he was simply attempting to lull Yucaipa into a false sense of security about the transaction with ComVest.

10.    Step One in Defendants' scheme was successful.  As of May 2012, when Defendants wrongfully forced Allied into an involuntary bankruptcy, Allied owed approximately $305 million in principal and accrued but unpaid interest under the First Lien Credit Agreement (the "First Lien Claims").  Yucaipa held approximately $170 million (approximately 56%) of

those First Lien Claims, all of which it had acquired from ComVest on August 21, 2009.  Black Diamond held approximately $40 million (approximately 13%) of the First Lien Claims, which it had purchased at a deep discount for between five and fifteen cents on the dollar.  Spectrum held approximately $26 million (approximately 8.5%) of the First Lien Claims.

11.     Further, as part of its acquisition of the First Lien Claims from ComVest, Yucaipa relied upon modifications to the First Lien Credit Agreement—contained in the Fourth Amendment to the First Lien Credit Agreement (the "Fourth Amendment")—to permit existing lenders to sell First Lien Claims to Yucaipa and to authorize Yucaipa to vote the debt it acquired just like any other lender under the First Lien Credit Agreement.  (*See* Fourth Am., Ex. 2.)  The Fourth Amendment modified restrictions on the amount of debt that Yucaipa could hold and also modified the restriction prohibiting Yucaipa from becoming the "Requisite Lender" under the First Lien Credit Agreement.[5]  The term "Requisite Lender" is defined under the First Lien Credit Agreement as a lender or group of lenders collectively holding more than 50% of all outstanding First Lien Claims.  As Requisite Lender, Yucaipa would be empowered to control the exercise of certain material remedies by all First Lien Lenders.

12.     In addition, Yucaipa relied upon Black Diamond's conduct in encouraging Yucaipa to complete the deal with ComVest, including the pledges made by Defendant Deckoff at an August 18, 2009, meeting in Los Angeles with representatives of Yucaipa and the assurances that the purpose of the trip was to find "mutually beneficial strategies" with respect to Allied.  As described in further detail below, Black Diamond and Spectrum later attacked the Fourth Amendment despite being fully aware that it was a condition of Yucaipa's acquisition of ComVest's debt.

---

[5]  The Fourth Amendment was the subject of state court litigation as will be described below.  The Fourth Amendment was invalidated by the New York State Supreme Court with respect to Defendant Spectrum but not with respect to Defendant Black Diamond because the New York Court of Appeals found that there is a triable issue of fact as to whether Defendant Black Diamond waived the right to challenge the validity of the Fourth Amendment and Yucaipa's status as Requisite Lender.

13.     ***Step 2***:  Prevent Yucaipa from serving as Requisite Lender under the First Lien

Credit Agreement.  Once Black Diamond and Spectrum succeeded in getting the majority of the

Allied First Lien Debt into Yucaipa's hands, they next surreptitiously instructed the

Administrative Agent under the First Lien Credit Agreement to refuse to recognize directions

from Yucaipa in its capacity as Requisite Lender and to challenge the validity of Yucaipa's

status as Requisite Lender.  At that time, the Administrative Agent was CIT Group/Business

Credit Inc. ("CIT").

14.     Immediately following the closing of the transaction between ComVest and

Yucaipa, CIT (acting as the Administrative Agent) entered all the First Lien Claims held by

Yucaipa on the loan register in compliance with its duties under Section 10.6(b) of the First Lien

Credit Agreement and began working cooperatively with Yucaipa in its capacity as Requisite

Lender.  (First Lien Credit Agreement § 10.6(b), Ex. 1.)  However, by letter dated September 18,

2009—less than one month after Yucaipa closed on the ComVest transaction—Defendants Black

Diamond and Spectrum secretly directed CIT to refuse to recognize Yucaipa as Requisite

Lender, which resulted in years of expensive litigation in Georgia state court (the "Georgia

Action") among Allied, Yucaipa, and the Administrative Agent.  (*See* Sept. 2009 Letter, Ex. 3.)

15.     Although Defendants secretly directed CIT to refuse to recognize Yucaipa as

Requisite Lender, they deliberately decided not to ask CIT in its capacity as Administrative

Agent to refrain from settling the trade between Yucaipa and ComVest because, as they

described in contemporaneous emails, they wanted the First Lien Claims in the hands of

Yucaipa—an insider—to pursue the "equitable subordination angle."  Having CIT recognize

Yucaipa as a lender would not be objectionable, but having Yucaipa act with the rights of the

Requisite Lender could thwart Defendants' scheme.

16.     CIT eventually agreed as part of a settlement to recognize Yucaipa's status as

Requisite Lender.  Within weeks of that settlement being reached, however, Defendants

commenced their own separate litigation in New York State Supreme Court in January 2012 (the

"New York Action") seeking a declaration that the Fourth Amendment was void and that Yucaipa could not serve as Requisite Lender.

17.     Step Two in Defendants' scheme was ultimately successful—they have been able to hijack Requisite Lender status from Yucaipa.  As described in further detail below at Paragraph 142, the New York trial court entered an order in 2013 invalidating the Fourth Amendment to the First Lien Credit Agreement, and declaring that Yucaipa is not the Requisite Lender (an appellate court later partially reversed that order as to Black Diamond).  Then, relying in part on the New York decision, the Bankruptcy Court for the District of Delaware entered a summary judgment order declaring Black Diamond and Spectrum to be the Requisite Lenders (that order suffers from several fatal flaws and is now on appeal to this Court, *see Yucaipa Am. Alliance Fund II, LP v. BDCM Opportunity Fund II*, Case Nos. 13-cv-1580-SLR, 13-cv-1583-SLR, D. Del., Sept. 19, 2013).

18.     ***Step 3***:  <u>File an involuntary bankruptcy petition to force Allied before the jurisdiction of the Bankruptcy Court and submit false statements to the Bankruptcy Court to support that involuntary bankruptcy petition</u>.  Meanwhile, it was critically important to Defendants for Yucaipa to hold First Lien Claims as of the commencement of the bankruptcy case.  If Yucaipa no longer held such claims during the bankruptcy case, Defendants would not be able to subordinate Yucaipa's recoveries under Bankruptcy Code Section 510.  At the time of the involuntary bankruptcy filing, as was well-known to Defendants, Yucaipa and Jack Cooper Transport Company Inc. ("JCT"), a Kansas City, Missouri-based competitor to Allied, were pursuing an agreed-upon plan for the sale of Yucaipa's debt to JCT, which JCT intended to use to acquire Allied's assets through a voluntary bankruptcy.

19.     Black Diamond and Spectrum had every interest, however, in scuttling the JCT deal.  The JCT deal would have required the transfer of certain First Lien Claims to JCT (including all the First Lien Claims held by Yucaipa) before the commencement of any bankruptcy.  This would have left Yucaipa without a debt claim that Defendants could seek to subordinate.  And if Yucaipa had no debt to subordinate, then Black Diamond and Spectrum

could not have filed a claim for equitable subordination, which would have increased their share of the first lien pie from 22% to 50%.  Moreover, at no time during the six-plus months that the parties were negotiating a deal with JCT did they agree on terms that would have given Black Diamond and Spectrum par plus accrued interest for their First Lien Debt, or any other certain recovery that would have approached the amount they stood to gain through their equitable subordination scheme.

20.     Therefore, Defendants decided to commence an *involuntary* bankruptcy to kill the deal between JCT and Yucaipa, which would ensure that Yucaipa held First Lien Claims during the bankruptcy case that were eligible for equitable subordination.  Their bet was that by knocking out the 56% of First Lien Claims held by Yucaipa through a systematic campaign of spreading lies about inequitable conduct on the part of the Yucaipa employees who served on the Allied board of directors, they would increase their share of the pie from 22% to 50%.  At the time, no exigencies required the extraordinary remedy of filing an involuntary bankruptcy: money was not leaving the company for improper purposes, Allied had sufficient liquidity to continue operating, and it was paying its suppliers in the ordinary course.  Indeed, Allied had been in default of its First Lien Credit Agreement for nearly four years before the commencement of the involuntary bankruptcy, and no lender had sought to exercise any remedies against it during that period despite having the express right to do so.  Thus, there was no logical reason to file an involuntary bankruptcy, particularly when Defendants knew that Allied was planning a voluntary bankruptcy in connection with the sale of Yucaipa's First Lien Claims to JCT, and they had been previously advised by CIT as Administrative Agent that an involuntary bankruptcy was "not a good option" for the bank group.  The only rational reason to push Allied into involuntary bankruptcy at that time was to further Black Diamond and Spectrum's scheme to equitably subordinate Yucaipa's 56% share of First Lien Claims.

21.     On May 17, 2012, as Yucaipa and JCT laid the groundwork for effectuating the sale of the First Lien Claims held by Yucaipa pursuant to the March 2012 Term Sheet for $155 million, Defendants executed their plan and filed an involuntary bankruptcy case against Allied.

(*See* March 2012 Term Sheet, Email from T. Ciupitu, JCT, to D. Walker, Yucaipa, Mar. 8, 2012, Ex. 4; Involuntary Pet., Case No. 12-11564-CSS, Bankr. D. Del., May 17, 2012, D.I. 1 ("Involuntary Pet."), Ex. 5.)

22.     To implement their scheme, Black Diamond and Spectrum needed to qualify as "petitioners" for purposes of commencing an involuntary bankruptcy case.  Under Bankruptcy Code Section 303, an involuntary bankruptcy petition may be filed only by three or more holders of claims.  While Black Diamond and Spectrum individually could not have satisfied this requirement, together they could (Black Diamond, by virtue of its ownership structure, qualified as two holders of eligible claims).

23.     As set forth in greater detail below, and as part of the conspiracy, Black Diamond paid a bribe to Spectrum (the "Involuntary Petition Payoff").  Although Spectrum already held sufficient claims to qualify as a petitioner under Bankruptcy Code Section 303, Spectrum understood its leverage given the lack of interest among other lenders in joining forces with Black Diamond.  (Indeed, no lender had sought to exercise remedies against Allied even though it had been in default of the First Lien Credit Agreement for nearly four years.)  Defendant Spectrum, therefore, required Black Diamond to sell it approximately $4 million (in face amount) of Black Diamond's First Lien Claims at Black Diamond's low discounted purchase price (a price otherwise not readily available to Spectrum, which lacks Black Diamond's trading prowess).  The Involuntary Petition Payoff—nothing more than a bribe—was confirmed in a March 21, 2012 email from Defendant Schaffer of Spectrum to Defendant Ehrlich of Black Diamond (the "Schaffer Email") sent nearly two months before the involuntary bankruptcy filing.  In that email, marked "high" in importance, Schaffer made it crystal clear that the closing of this trade was a prerequisite to the filing of the involuntary bankruptcy petition:  According to Schaffer, "we cannot file an involuntary" without such closing.  (*See* Schaffer Email, Ex. 6.)  It is clear that this bribe had a nefarious purpose—the bankruptcy rules allow for trading in claims after the commencement of bankruptcy cases (and Defendants in fact continued to trade in claims after the commencement of the case).  Accordingly, no reason existed for Spectrum to

9

demand the closing of a trade before the involuntary filing—other than to allow Black Diamond and Spectrum to commence the involuntary bankruptcy itself.

24.     Instead of focusing on the billions of dollars that Black Diamond managed, Defendant Meier (the managing principal of Black Diamond), who had been urgently advised of the Schaffer Email by Defendant Ehrlich, got involved with the minutiae of closing a tiny trade by immediately sending a terse email to a Black Diamond employee charged with closing the trade—"Neal—WTF?"  (Email from L. Meier, Black Diamond, to N. Clemens, Black Diamond, Mar. 21, 2013 ("Meier Email"), Ex. 7.)  That the most senior executives of Black Diamond and Spectrum inserted themselves in the ministerial aspects of closing a small trade like the Involuntary Petition Payoff is an indicator of the importance of that bribe to Spectrum's joining the involuntary petition.

25.     This bribe, however, presented a problem for Black Diamond and Spectrum. Namely, in failing to disclose their agreement to trade claims and pay the bribe associated with it, they violated the unambiguous disclosure requirements of the Federal Rules of Bankruptcy Procedure.

26.     First, Bankruptcy Rule 1003(a) prohibits the assignment, acquisition, or purchase of claims for the purpose of commencing an involuntary bankruptcy case.  Rule 1003(b) requires the filing of an affidavit confirming that each petitioner has complied with Rule 1003(a).  No matter—as part of the involuntary bankruptcy filing involving Allied, Defendants coordinated through their joint counsel the submission of affidavits under Bankruptcy Rule 1003 in which (i) Defendant Ehrlich swore that Black Diamond had not "acquired" any claims in Allied for the purpose of commencing the involuntary bankruptcy case (the "Black Diamond Affidavit") and (ii) Defendant Schaffer falsely swore that no claims were "assigned to Spectrum for the purposes of commencing the bankruptcy cases" (the "Spectrum Affidavit").  (*See* Black Diamond Affidavit, Case No. 12-11564-CSS, Bankr. D. Del., May 17, 2012, D.I. 7, Ex. 8; Spectrum Affidavit, Case No. 12-11564-CSS, Bankr. D. Del., May 17, 2012, D.I. 8, Ex. 9.)  The Schaffer Email ("we cannot file an involuntary without it done") makes clear that the Spectrum Affidavit

was a lie and that the Black Diamond Affidavit intentionally contained a material omission by failing to disclose the assignment of approximately $4 million in claims to Spectrum.

27.     Second, Defendants expressly violated the disclosure requirements of Bankruptcy Rule 2019, which requires that "an entity that represents multiple creditors . . . acting in concert to advance their common interests" is required to file a statement disclosing, among other things, "the nature and amount of each disclosable economic interest held in relation to the debtor" and "the date of acquisition by quarter and year of each disclosable economic interest . . . ."  Rule 2019 further defines "disclosable economic interest" as "any claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest." Defendants intentionally failed to disclose their intended secret claims trade or, more importantly, the existence of the secret "Cooperation Agreement" that governed their relationship relative to Allied, all in direct violation of Rule 2019.[6]  This Cooperation Agreement contractually bound Black Diamond and Spectrum to offer to each other the opportunity to acquire a ratable share of any acquired First Lien Debt, which in fact meant Black Diamond would share its proprietary debt purchasing opportunities with Spectrum.  In light of the fact that Black Diamond and Spectrum discussed an involuntary bankruptcy filing on numerous occasions, including on the eve of signing the Cooperation Agreement, it is clear that the language referenced in the Cooperation Agreement was referring to an anticipated involuntary filing.

28.     Step Three in Defendants' scheme was a success.  As a result of the involuntary bankruptcy, substantially all of Allied's assets were sold to JCT for $135 million in cash in December 2013—with approximately $102 million in net proceeds from that sale being made

---

[6]   As set forth in greater detail below, Defendants also failed to produce the Cooperation Agreement in discovery, notwithstanding the fact that requests for production were served that required its production.

available to the First Lien Lenders.[7]  Even without the equitable subordination angle, Defendants

Black Diamond and Spectrum still profited by recovering a multiple of their original investment

for which they paid only a small fraction of the face value.  For example, on information and

belief, Black Diamond is entitled to recover approximately $13 million (13%) of the net

proceeds, even though Black Diamond had invested at most $4.9 million to acquire its First Lien

Claims.[8]  Thus, even without equitably subordinating Yucaipa, Black Diamond and Spectrum

would recover a tidy profit on their investment.  But they wanted more.  The final step in Black

Diamond and Spectrum's scheme would set them up to achieve an even higher return on their

original investment, at Yucaipa's expense.

29.     **Step 4**:  Attempt to wipe out Yucaipa's First Lien Claims with an objectively

baseless complaint for equitable subordination.  Defendants' final step was to file a complaint for

equitable subordination of Yucaipa's First Lien Claims based on false assertions about Yucaipa's

role in the management of Allied, in an attempt to wipe out Yucaipa's position in the First Lien

Claims and illegally enrich the RICO co-conspirators.  (*See* Am. Compl., Adv. Pro. Case No. 13-

50530-CSS, Bankr. D. Del., Mar. 14, 2013, D.I. 76 ("Am. Compl."), Ex. 10; Compl., Adv. Pro.

Case No. 14-50971-CSS, Bankr. D. Del., Nov. 19, 2014, D.I. 1 ("BD/S Compl."), Ex. 11.)  This

final step has already harmed Yucaipa, and it is ongoing to this day, representing the culmination

of Defendants' scheme.  Indeed, the record is clear that Defendants were scheming to equitably

subordinate Yucaipa's debt *even before Yucaipa acquired its First Lien Claims on August 21,*

*2009.*

30.     Simultaneous with the filing of their involuntary bankruptcy petition on May 17,

2012, and in furtherance of their scheme, Defendants immediately began an effort to publicly

---

[7]     The amount of net proceeds takes into account, among other things, repayment of Allied's debtor-in-possession
financing and certain reserves.

[8]     Black Diamond invested a total of between $1.6 million and $4.9 million to acquire its 13% stake in the First
Lien Claims; it paid between five and fifteen cents on the dollar as measured against the $32.9 million in face
value of the First Lien Claims it acquired (the face value of Black Diamond's claims is now approximately
$40 million because of accrued and unpaid interest through the filing of bankruptcy).

portray Yucaipa as a bad actor.  Among other things, they moved for the appointment of a bankruptcy trustee over Allied's estate.  (Expedited Mot. of Petitioning Creditors for Appointment of Trustee, Case No. 12-11564-CSS, Bankr. D. Del., May 17, 2012, D.I. 13 ("Mot. to App. Trustee"), Ex. 12.)  Defendants purportedly sought this extreme measure because Yucaipa allegedly manipulated Allied and prevented Allied's board of directors from fulfilling its fiduciary obligations.  But Allied had been in default under the First Lien Credit Agreement since August 2008, and during that entire time no creditor (despite having the express right to do so) had sought such extreme relief or any other remedy.  In reality, Defendants were attempting to portray Yucaipa as a bad actor through various falsehoods that are completely inconsistent with Yucaipa's many efforts to support Allied's business and operations.  Furthermore, these lies are totally inconsistent with the private and internal communications of Defendants, including communications describing Yucaipa "as operating in good faith to add value" to Allied and recognizing that Yucaipa "was doing the right things for [Allied]" and "won't screw people."

31.    To this day, Defendants are still pursuing "the equitable subordination angle" that they plotted years ago even before Yucaipa actually acquired any First Lien Claims.  There has been yet no final determination on the claims for equitable subordination, which are currently pending in Bankruptcy Court, although Yucaipa has already suffered harm from Defendants' misconduct.  However, if Defendants' claims are ultimately successful in spite of Defendants' fraudulent conduct, Yucaipa's claims will likely be wiped out, and Defendants will reap a substantial windfall on their initial investment since they would increase their share of the First Lien pie from 22% to 50%.

32.    In addition, Defendants also implemented a scheme to further disadvantage Yucaipa in connection with the sale of certain real estate and trucking assets that were excluded from the JCT purchase of substantially all of Allied's assets for $135 million, which, as described below, was designed to result in an additional multi-million dollar windfall for Defendants.  Defendants also skirted a Bankruptcy Court order freezing the payment of approximately $11.6 million for attorneys' fees to themselves, while refusing any comparable

13

payment to Yucaipa for attorneys' fees payable pursuant to the terms of the First Lien Credit Agreement.

33.    Defendants' scheme has already injured Yucaipa and cost it more than $175 million in damages, including loss of profit on the original JCT transaction scuttled by Defendants' wrongful involuntary bankruptcy filing, along with millions in attorneys' fees and costs.  If this scheme is successful, Defendants will have prevailed in fraudulently knocking out the 56% of First Lien Claims held by Yucaipa, resulting in an even greater windfall than they have achieved to date.  Defendants, to achieve their goals, have lied, made material omissions and conspired to deceive the Bankruptcy Court and Yucaipa, all in violation of RICO.

34.    Because of Defendants' obstruction, these facts were hidden from Yucaipa's view until recently.  They only came to light in adversary proceedings pending before the United States Bankruptcy Court following a failed year-long mediation process.  Yucaipa learned that Spectrum and Black Diamond explicitly conditioned their cooperation in filing the involuntary bankruptcy against Allied on Spectrum's receipt of the Involuntary Petition Payoff.  Yucaipa also learned that Black Diamond and Spectrum had communicated with each other to plot to equitably subordinate Yucaipa's claims on trumped-up charges of inequitable conduct.  Yucaipa also found other documents that showed both coordination and planning between Black Diamond and Spectrum during the RICO conspiracy period.  Indeed, Defendants were investigating "creditor remedies" in the months before Yucaipa even became a First Lien Lender in 2009.

35.    Even though the equitable subordination scheme is continuing, which establishes the continuity of Defendants' efforts since the beginning of their unlawful conspiracy, Yucaipa has suffered harm and injury, and continues to suffer harm and injury, as a result of the expenditures of fees and costs associated with, and arising from, the filing of the involuntary bankruptcy, and the lost opportunities and damage to reputation resulting from the filing of the involuntary bankruptcy and related wrongful conduct detailed in this Complaint.

36.     As set forth in greater detail below, Yucaipa is in a singularly unique position to seek relief for the harm that Defendants sought to inflict upon it, and for the harm they have already inflicted on Yucaipa.  Defendants' scheme was directed at Yucaipa as the majority holder of Allied's equity, as well as Allied's debt, and was crafted to take advantage of Yucaipa's employees' positions on Allied's board, as well as Yucaipa's majority holding of Allied's debt.  No other holder of a First Lien Claim is similarly situated:  Other First Lien Claim holders (1) hold minor stakes in the First Lien Debt; (2) have no equity stake in Allied; (3) are not insiders or have employees who serve on the Allied board of directors; (4) have no involvement in the management or control of Allied; (5) have not been denied their right to reimbursement of expenses incurred in their capacity as a Lender; (6) would suffer damages too inconsequential to pursue in connection with a RICO claim; (7) could not meet the elements of a RICO claim; (8) have not been sued for equitable subordination; and (9) have always acted in concert with Defendants or at least stand to benefit from Defendants' unlawful plan.  Moreover, and most critically, Defendants' scheme was directed at Yucaipa and is focused on eliminating Yucaipa's rights in favor of their own; therefore, this claim is one that only Yucaipa would or could assert.  It is entirely unrealistic to assume that any lender other than Yucaipa (or anyone else) would bring the claims set forth in this Complaint.

## II.     PARTIES AND KEY PLAYERS

37.     Plaintiff Yucaipa American Alliance Fund I, L.P. and Plaintiff Yucaipa American Alliance (Parallel) Fund I, L.P. are both limited partnerships organized under the laws of the State of Delaware, with their headquarters located in Los Angeles, California.  Yucaipa has a long and established record of working with management to reposition businesses and implement operational improvements that create value and increase efficiency.

38.     Defendant Black Diamond CLO 2005-1 Ltd. is a Cayman Islands company that may be served through its registered agent, MaplesFS Limited, at P.O. Box 1093, Queensgate House, 113 South Church Street, Cayman Islands.  It shares its principal place of business with

and is controlled by non-party Black Diamond Capital Management, L.L.C., whose managing principal is Defendant Deckoff.

39.     Defendant BDCM Opportunity Fund II, L.P. is a Delaware limited partnership that may be served through its registered agent, Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Its principal place of business is at One Sound Shore Drive, Suite 200, Greenwich, Connecticut 06830.  It shares its principal place of business with and is controlled by non-party Black Diamond Capital Management, L.L.C., whose managing principal is Defendant Deckoff; it is also controlled by non-party BDCM Opportunity Fund II GP, L.L.C.

40.     Defendant Spectrum Investment Partners, L.P. is a Delaware partnership that may be served through its registered agent, Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Its principal place of business is at 1250 Broadway, 19th Floor, New York, New York 10001.  It is controlled by non-party Spectrum Group GP, L.L.C., an entity related to non-party Spectrum Group Management, L.L.C.

41.     Defendant Richard A. Ehrlich is a managing director of Black Diamond, and on information and belief resides in New York County, New York.

42.     Defendant Stephen H. Deckoff is the founder of Black Diamond, and on information and belief resides in Westchester County, New York.

43.     Defendant Leslie A. Meier is the managing principal of Black Diamond, and on information and belief resides in Lake County, Illinois.

44.     Defendant Jeffrey A. Schaffer is the managing partner of Spectrum, and on information and belief resides in Union County, New Jersey.

45.     Non-party Allied Systems Holdings Inc. ("Allied") is an Atlanta, Georgia-headquartered corporation founded in 1934.  Until its sale to JCT, Allied provided distribution and transportation services to the automotive industry, including delivery of new vehicles from manufacturing plants to dealerships, principally in the United States.

46.     Non-party Jack Cooper Transport Company Inc. ("JCT") is a Kansas City, Missouri-headquartered corporation that provides automotive transportation and logistics services to the automotive industry in the United States and Canada.

47.     Non-party ComVest Investment Partners III, L.P. ("ComVest") is a private investment fund that provides equity capital to middle market companies in the United States.  It is controlled by non-party ComVest Partners.

48.     Non-party CIT Group/Business Credit, Inc. ("CIT") was the Administrative Agent and Collateral Agent for all of Allied's First Lien Lenders under the Amended and Restated First Lien Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, and is also one of Allied's First Lien Lenders.

49.     Non-party SBDRE LLC ("SBDRE") was formed on August 30, 2013, to receive Allied's remaining assets acquired by Black Diamond and Spectrum through a Credit Bid on behalf of all lenders after the sale of substantially all of Allied's assets to JCT.  Black Diamond and Spectrum control SBDRE through non-party agents Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance, L.L.C.

50.     Non-party Ronald Burkle is the founder and managing principal of Yucaipa.

51.     Non-party Derex Walker is a principal of Yucaipa.

52.     Non-party Michael Riggs is Chairman and CEO of JCT.

53.     Non-party Theo Ciupitu is Executive Vice President and General Counsel of JCT.

## III.     JURISDICTION AND VENUE

54.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

55.     This Court has supplemental subject matter jurisdiction over Yucaipa's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so closely related to the federal claims brought herein as to form part of the same case or controversy.

56.     This Court has personal jurisdiction over Defendants pursuant to Delaware Code Annotated title 10, section 3104(b), (c), 18 U.S.C. § 1965(a), (b), and Federal Rule of Civil

Procedure 4(k).  On information and belief, Defendants all regularly conduct business in this District as a result of their work in the distressed-debt trading industry and their location in or in close proximity to this District.  In addition, upon information and belief, Defendants Black Diamond CLO 2005-1 Ltd., Ehrlich, Deckoff, Meier, and Schaffer all maintain sufficient contacts with this District to support the exercise of jurisdiction over each.  For instance, Defendant Black Diamond CLO 2005-1 Ltd. availed and avails itself of this District because, among other reasons, it entered into the Cooperation Agreement with Defendants BDCM Opportunity Fund II, L.P. and Spectrum (both residents of this District) to trade claims and initiate the involuntary bankruptcy against Allied in this District, the activities out of which Yucaipa's claims arise.  (*See* Cooperation Agreement, Ex. 13.)  Defendants have also contracted with a law firm in this District, Landis Rath & Cobb LLP, to conduct activities on their behalf related to the subject matter of this dispute.

57.     Defendant Ehrlich has substantial and continuous contacts with this District because, among other reasons, he is a managing director of Black Diamond, which resides in or availed and avails itself of this District.  Ehrlich directed Black Diamond to enter into the Cooperation Agreement with Spectrum, which is located in this District, to unlawfully force Allied into involuntary bankruptcy in this District.  Furthermore, Ehrlich executed a false affidavit in support of the involuntary petition that Black Diamond filed in this District, and which deliberately misrepresents Black Diamond and Spectrum's claims trading before the involuntary bankruptcy.  (Black Diamond Affidavit, Ex. 8.)

58.     Defendant Deckoff has substantial and continuous contacts with this District because, among other reasons, he is a founder and managing principal of Black Diamond, which resides in or availed and avails itself of this District.  Deckoff directed Black Diamond to enter into the Cooperation Agreement with Spectrum, which is located in this District, to unlawfully force Allied into involuntary bankruptcy in this District.

59.     Defendant Meier has substantial and continuous contacts with this District because, among other reasons, he is a managing principal of Black Diamond, which resides in or

availed and avails itself of this District.  He was also a managing principal of Black Diamond when it entered into the Cooperation Agreement with Spectrum, which is located in this District, and was directly involved in closing the $4 million claims trade to Spectrum.  His managerial role is demonstrated by pointed, key emails that he sent encouraging Black Diamond employees to close the trade, such as "Neal—WTF."  (Meier Email, Ex. 7.)  Again, those are precisely the activities out of which Yucaipa's claims arise.

60.    Defendant Schaffer has substantial and continuous contacts with this District because he is the managing partner of Spectrum, which is located here.  Furthermore, Schaffer executed a false affidavit in support of the involuntary petition that Spectrum filed in this District, and which deliberately misrepresents Black Diamond and Spectrum's claims trading prior to the involuntary bankruptcy.  (Spectrum Affidavit, Ex. 9.)

61.    Venue in this District is proper under 18 U.S.C. § 1965(a) and (b) because Defendants BDCM Opportunity Fund II, L.P. and Spectrum reside in this District, and entered into a conspiracy with Defendants Black Diamond CLO 2005-1 Ltd., Ehrlich, Deckoff, Meier, and Schaffer, overt acts in furtherance of which were committed in this District.  Those overt acts in furtherance of the conspiracy are described more fully below, and include at least the following:  Black Diamond and Spectrum's filing of affidavits executed by Defendants Ehrlich and Schaffer, respectively, in this District, that deliberately misrepresent Black Diamond and Spectrum's claims trading prior to the involuntary bankruptcy (Black Diamond Affidavit, Ex. 8; Spectrum Affidavit, Ex. 9); and Black Diamond and Spectrum's formation of non-party SBDRE, a Delaware limited liability company, in order to dilute Yucaipa's pro rata interest in certain of Allied's assets acquired by all of the lenders through the Credit Bid.

62.    Further, venue is appropriate in this District under 18 U.S.C. § 1965(a) because Defendants Black Diamond CLO 2005-1 Ltd., Ehrlich, Deckoff, Meier, and Schaffer entered into a conspiracy with Defendants BDCM Opportunity Fund II, L.P. and Spectrum, and knew that overt acts in furtherance of the conspiracy occurred and would occur in this District.  Defendants relied on counsel in this District at Landis Rath & Cobb LLP.  Defendants Ehrlich,

Deckoff, and Meier manage and control Black Diamond, and were aware that Black Diamond had entered into an unlawful agreement with Spectrum, which is located in this District, to force Allied into involuntary bankruptcy in this District.  Likewise, Defendant Schaffer is the managing partner of Spectrum, and was aware that it had entered into an unlawful agreement with Black Diamond to force Allied into involuntary bankruptcy in this District.  For instance, on March 21, 2012, Defendant Schaffer emailed Defendant Ehrlich of Black Diamond, "[p]lease get this [claim transfer] closed this week.  We cannot file an involuntary without it done."  (Schaffer Email, Ex. 6.)  In addition, Defendant Ehrlich forwarded an email from Defendant Schaffer to Defendant Meier in which Schaffer stated that Spectrum's participation in the involuntary bankruptcy petition depended upon a claims transfer from Black Diamond to Spectrum.  (Meier Email, Ex. 7.)  Defendant Meier was aware that Black Diamond had entered into an unlawful agreement with Spectrum, a resident of this District.

63.     Additionally, venue in this District is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions that directly gave rise to Yucaipa's federal law claim occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     The Beginning: Yucaipa Sponsors Allied Out of Bankruptcy

64.     In July of 2005, Allied commenced a voluntary bankruptcy proceeding in the United States Bankruptcy Court for the Northern District of Georgia in the Prior Bankruptcy Case.  At the time of the Prior Bankruptcy Case, Allied was indebted to, among others, holders of $150 million of unsecured bonds (the "Prior Bonds").

65.     Yucaipa has a reputation for solving thorny business issues through consensus, particularly those involving disputes between management and labor.  During the Prior Bankruptcy Case, the International Brotherhood of Teamsters, which represented more than 4,000 of Allied's employees, and Allied were at loggerheads over potential wage and benefit concessions by the unionized workforce, and a strike (and potential liquidation of Allied) was on the horizon.  At the urging of the Teamsters, Yucaipa evaluated Allied as an investment

opportunity and determined that Yucaipa could play a constructive role that would enable a consensual exit from the Prior Bankruptcy Case and the preservation of approximately 5,000 jobs.  In order to do so, Yucaipa purchased approximately $99 million of the Prior Bonds, and then worked with Allied's management and the Teamsters to forge a consensual plan of reorganization.  As part of that reorganization plan, Yucaipa converted its entire stake in the Prior Bonds into a 67% stake in the reorganized Allied.  The reorganization plan won creditor support and bankruptcy court approval in May 2007.

66.     As the new majority shareholder and per the terms of the court-approved plan of reorganization, Yucaipa had the right to appoint a majority of members to Allied's board of directors and accordingly designated three of its employees to fill those roles.  In addition, as part of the plan of reorganization in the Prior Bankruptcy Case, Yucaipa and Allied entered into a management agreement in May 2007.  The plan of reorganization also resulted in the appointment of two non-Yucaipa designee board members.  These two members, Brian Cullen (who was selected by the creditors committee, per the plan of reorganization) and Mark Gendgreske (who was the newly appointed Chief Executive Officer), continued to serve as non-Yucaipa designees to the board of directors through December 2013.

67.     Allied funded the plan of reorganization and its exit from the Prior Bankruptcy Case by obtaining $315 million in loans under two separate credit facilities:  (1) the Amended and Restated First Lien Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, by and among Allied Holdings, Inc. and Allied Systems, Inc. as borrowers, various lenders, Goldman Sachs Credit Partners L.P. as lead arranger and syndication agent, and CIT as administrative agent and collateral agent (the "First Lien Credit Agreement"); and (2) the Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Amendment, dated May 15, 2007 (the "Second Lien Credit Agreement").

68.     The First Lien Credit Agreement provided a $265 million credit facility in the form of term loans, revolving loans and letters of credit.  (First Lien Credit Agreement §§ 2.1–2.4, Ex. 1.)  It restricted the assignment of that debt to "Eligible Assignees," which were defined

to include lenders under the First Lien Credit Agreement, affiliates of lenders, and commercial banks, insurance companies, and investment or mutual funds.  (First Lien Credit Agreement § 1.1, Ex. 1.)  The First Lien Credit Agreement expressly excluded Yucaipa or its affiliates from the definition of "Eligible Assignees," but expressly required that at least a majority of the Allied board of directors be appointed by Yucaipa.  (First Lien Credit Agreement § 1.1, Ex. 1.)

69.     The Second Lien Credit Agreement provided for loans in the original principal amount of $50 million.  Under various ancillary security documents, Allied and its subsidiaries pledged substantially all of their assets as security for their obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement.

### B.     Black Diamond and Spectrum Become Lenders to Allied

70.     Black Diamond is a distressed-debt trader whose reputation for aggressive tactics has led numerous corporate borrowers to insist on restricting any transfer or sale of their loans to Black Diamond.

71.     Black Diamond and Spectrum both became lenders under the First Lien Credit Agreement in connection with Allied's emergence from the Prior Bankruptcy Case in May 2007. As other lenders exited or became assignees under the First Lien Credit Agreement over time, Black Diamond and Spectrum bought and sold their debt at declining prices several times after first acquiring it.  Eventually, Black Diamond and Spectrum increased their combined ownership stake under the First Lien Credit Agreement from 4% to 22% as of May 2012.

72.     At the time of the involuntary bankruptcy filing in May 2012, Black Diamond held approximately $40 million (or approximately 13%) of the First Lien Claims (consisting of principal and accrued and unpaid interest), which it purchased at a deep discount for between five and fifteen cents on the dollar, and Spectrum held approximately $26 million (or approximately 8.5%) of the First Lien Claims.

73.     At the outset of the Great Recession, lenders holding First Lien Claims sought to exit their positions and looked to Yucaipa as a potential buyer given its already substantial investment in Allied.  In 2008, a majority of the First Lien Lenders approved a third amendment

to the First Lien Credit Agreement with the hope of facilitating Yucaipa's purchase of the First Lien Claims.  The Third Amendment authorized the First Lien Lenders to sell up to $50 million in term loans under the First Lien Credit Agreement to Yucaipa and its affiliates, subject to certain limitations on Yucaipa's ability to hold and vote certain amounts of debt.  (*See* Third Am., Ex. 14.)  Yucaipa did not, however, purchase any First Lien Debt under the Third Amendment.

### C.    Yucaipa Continues to Invest in and Support Allied

74.    Meanwhile, Allied's financial situation worsened as the U.S. economy headed into the Great Recession.  Starting in August 2008 and beyond, Allied was in material default under the First Lien Credit Agreement.

75.    Notwithstanding Allied's financial difficulties, Yucaipa continued to support Allied, and successfully restructured Allied's debt under the Second Lien Credit Agreement by acquiring $40 million of that debt out of a total of $50 million, simultaneously converting $20 million into equity.

76.    Contrary to the false allegations leveled by Defendants to support their fraudulent scheme to equitably subordinate Yucaipa's claims, Yucaipa and its designees to the Allied board of directors consistently acted to provide Allied with a chance to succeed and maximize value.

### D.    Black Diamond and Spectrum Hatch Their Scheme

77.    The combination of Allied's worsening financial condition and Yucaipa's continued efforts to support Allied presented Black Diamond and Spectrum with an opportunity to reap a windfall on their initial investment, at the expense of Yucaipa.

78.    In February 2009, ComVest acquired 56% of the First Lien Claims and became the Requisite Lender.  As Requisite Lender, ComVest assumed substantial powers under the First Lien Credit Agreement to amend or modify certain provisions of the First Lien Credit Agreement and to direct remedies.  Shortly after ComVest became Requisite Lender, and consistent with its goal of supporting Allied in an effort to right the ship, Yucaipa entered into direct negotiations with ComVest to acquire the First Lien Claims.

23

79.     This confluence of events led Black Diamond and Spectrum to formulate the heart of their unlawful conspiracy.  They knew that if they supported Yucaipa's acquisition of the ComVest debt, Yucaipa would obtain a 56% share of all of the First Lien Claims.  Were that to happen, Defendants could jointly push Allied into an involuntary bankruptcy, at which point Black Diamond and Spectrum could attempt to equitably subordinate Yucaipa's First Lien Claims by falsely accusing the Yucaipa designees on the Allied board of directors of breaching their fiduciary duties to Allied and operating Allied to Yucaipa's advantage.  Were the scheme successful, Defendants would be able to wrongfully wipe out Yucaipa's 56% ownership stake in the First Lien Claims.  They would increase their share of the pie from 22% to 50% and thus make a windfall on their original investment given their low cost basis in the First Lien Claims, as illustrated here:

**Without Defendants' Scheme**          **If Defendants' Scheme Succeeds**



80.     Moreover, at the time that Black Diamond and Spectrum hatched their scheme, Allied's First Lien Debt was trading at a steeply discounted price, which was consistent with Defendants' belief that Allied was worth only a small fraction of the $244 million in outstanding principal amount of the First Lien Debt.[9]  Indeed, by the time of the involuntary bankruptcy filing, Defendants valued Allied for only pennies on the dollar.  The only way for Black Diamond and Spectrum to get anything approaching a par recovery on their 22% of the First

---

[9] The First Lien Claims consist of $244 million in principal and $61 million in accrued and unpaid interest.

Lien Claims would be to eliminate Yucaipa's debt claims through equitable subordination, which would increase their share of the pie to 50%.

81.      As further evidence of Black Diamond's and Spectrum's unlawful plan, they turned down the opportunity to "cash out" at approximately 30 cents on the dollar when Yucaipa tendered that opportunity to them in February 2009.  At 30 cents on the dollar, Black Diamond would have made a substantial profit because Black Diamond has, for its entire debt pool, paid substantially less to acquire that debt.  However, as would be made clear, Black Diamond and Spectrum had an even richer payout in mind, one that required the implementation of their unlawful involuntary bankruptcy/equitable subordination scheme.

82.      Defendants' intricate scheme to enrich themselves at the expense of Yucaipa had the following steps:  (1) encourage Yucaipa to acquire as much Allied debt as possible from ComVest; (2) prevent Yucaipa from serving as "Requisite Lender" under the First Lien Credit Agreement; (3) file an involuntary bankruptcy petition to force Allied before the jurisdiction of the Bankruptcy Court, and submit false statements to the Bankruptcy Court to support the petition; and finally, (4) attempt to wipe out Yucaipa's First Lien Claims with a bogus complaint for equitable subordination and then abuse their Requisite Lender status in the bankruptcy case (which they hijacked from Yucaipa) with the goal of further harming Yucaipa.  Although Defendants' scheme was not without risk, they are in the business of taking risks, and here they effectively had little to lose given the nature of their initial investments.  Moreover, the potential reward made the risk worth it, as Defendants stood to gain a substantial multiple on their initial investment.  And with the benefit of hindsight, each of Defendants' steps has played out largely according to their plan.

**STEP 1:  Encourage Yucaipa's Acquisition of the First Lien Claims from ComVest**

83.      Defendants encouraged Yucaipa's acquisition of the First Lien Debt from ComVest because it would have been virtually impossible for them to equitably subordinate the debt while it was in the hands of ComVest.  Among other reasons, ComVest was not an insider

25

of Allied.  In practical effect, "insider" status is critical to the success of a claim for equitable subordination due to the heightened scrutiny frequently applied to insider conduct in connection with such claims.

84.     Defendants began "check[ing] out the 'equitable subordination' angle" against Yucaipa even before Yucaipa acquired any First Lien Claims from ComVest.  (Email from M. Riggs, Innovative Equity Partners, to J. Schaffer, Spectrum, Aug. 13, 2009, Ex. 15.)  As experienced distressed-debt traders, Black Diamond and Spectrum knew that equitable subordination required that the debt be held by an insider like Yucaipa, rather than a non-insider like ComVest.  In order to be successful, this plan required close coordination between Black Diamond and Spectrum and the deception of Allied, JCT, Yucaipa, and the Bankruptcy Court.

85.     Although Black Diamond and Spectrum would later claim to have been surprised by Yucaipa's acquisition of the First Lien Claims held by ComVest, the reality is that Yucaipa kept Defendants fully informed of its efforts throughout the negotiations with ComVest.  What is more, Defendants fully supported those efforts.  Indeed, during the spring and summer of 2009, Defendant Ehrlich was advised by Yucaipa of the status of negotiations regarding the acquisition of ComVest's debt.  During these discussions, Defendant Ehrlich was specifically advised of Yucaipa's intention to acquire ComVest's majority position in Allied's First Lien Debt and become the Requisite Lender.  Black Diamond understood and encouraged Yucaipa's approach.

86.     On August 18, 2009, Defendant Deckoff, founder and managing principal of the parent company of Black Diamond, travelled to Los Angeles from New York for the sole purpose of meeting with Ronald Burkle and Derex Walker of Yucaipa to pledge his support for the transfer of the First Lien Claims from ComVest to Yucaipa, as well as coordinating the go-forward strategy with respect to Allied.  (*See* Calendar Invitation, Aug. 18, 2009, Ex. 16.) Burkle proposed that Yucaipa continue with its plan to buy ComVest's Requisite Lender position and then work to sell Allied in a way that maximized the recovery on the First Lien Claims.  In response, Defendant Deckoff agreed to work together with Yucaipa and to support Yucaipa's plan to acquire the Requisite Lender position from ComVest.  This plan included a Fourth

Amendment to the First Lien Credit Agreement, which, as Yucaipa fully disclosed to Defendants, would be necessary in order for Yucaipa to acquire ComVest's First Lien Debt (i.e., by repealing the Third Amendment's restrictions on lenders' ability to transfer First Lien Claims to Yucaipa, and Yucaipa's ability to hold and vote First Lien Debt). This Fourth Amendment would also permit Yucaipa to serve as Requisite Lender—as ComVest had—once Yucaipa acquired the ComVest debt.

87.    Never during the many calls between Derex Walker of Yucaipa and Defendant Ehrlich or during the Yucaipa meeting with Defendant Deckoff did Black Diamond once voice any opposition to any aspect of Yucaipa's plan to become Requisite Lender.

88.    In August 2009, as part of Yucaipa's negotiations to acquire ComVest's First Lien Debt, ComVest, as Requisite Lender, and a Special Committee of the Allied board of directors—consisting of the Allied board members who were independent of Yucaipa—reviewed and voted to approve the Fourth Amendment. The Fourth Amendment removed all of the restrictions imposed on Yucaipa's acquisition of the First Lien Debt and made Yucaipa eligible to be Requisite Lender.

89.    On August 21, 2009, Yucaipa relied upon the Fourth Amendment and Defendants' support in purchasing all of ComVest's First Lien Debt, paying ComVest $43 million and acquiring 56% of the First Lien Claims.

90.    Although Black Diamond and Spectrum were encouraging Yucaipa to acquire the First Lien Claims from ComVest and to become Requisite Lender, this encouragement was simply a sham to get the First Lien Claims out of the hands of a non-insider (ComVest) and into the hands of an insider (Yucaipa) so that Defendants would have a better shot at equitably subordinating 56% of the First Lien Claims and increasing their share of the pie from 22% to 50%. In truth, behind Yucaipa's back, Black Diamond and Spectrum were scheming to file an involuntary bankruptcy and lawsuits leveling false accusations against Yucaipa and its employees who served on Allied's board of directors, all in order to improperly equitably subordinate Yucaipa's claims and recover a substantial multiple on their original investment.

91.     Indeed, only a month after Yucaipa purchased the majority of the First Lien Debt from ComVest, Defendant Schaffer emailed Defendant Ehrlich stating "looks like [Yucaipa] pushed the equity button here . . . you ready to roll."  (Email from J. Schaffer, Spectrum, to R. Ehrlich, Black Diamond, Sept. 17, 2009, Ex. 17.)

**STEP 2:  Prevent Yucaipa from Serving as Requisite Lender**

92.     The next step was equally important.  In order for Black Diamond and Spectrum's scheme to work, Yucaipa had to hold the majority of First Lien Debt, but could not have the Requisite Lender status that went along with that debt.  That is because, as Requisite Lender, Yucaipa would have the power to direct waivers or forbearances of remedies to assist Allied's reorganization efforts or, alternatively, control the exercise of remedies (including credit bidding in a bankruptcy sale) for the benefit of all lenders under the First Lien Credit Agreement.

93.     Thus, Black Diamond and Spectrum undertook vigorous efforts to prevent that from ever happening.  Less than one month after Yucaipa purchased a majority of the First Lien Debt from ComVest, Black Diamond and Spectrum secretly (and successfully) urged CIT, the administrative agent for all lenders under the First Lien Credit Agreement, to refuse to recognize Yucaipa as Requisite Lender.  CIT, at the urging of Black Diamond and Spectrum, challenged Yucaipa's status as Requisite Lender, embarking on expensive litigation against Yucaipa in the Georgia Action.  Ultimately, CIT as administrative agent settled the Georgia Action and agreed to recognize Yucaipa as Requisite Lender along with the validity of the Fourth Amendment.

94.     Tellingly, at the same time Defendants secretly directed CIT to refuse to recognize Yucaipa as Requisite Lender, they deliberately decided not to ask CIT in its capacity as administrative agent to refrain from settling the trade between Yucaipa and ComVest because they wanted the First Lien Claims in the hands of Yucaipa in order to pursue their equitable subordination claim against Yucaipa.

95.     Concurrently with Black Diamond and Spectrum's initial steps toward the execution of their fraudulent scheme, JCT approached Allied and Yucaipa, along with certain

other lenders under the First Lien Credit Agreement, about the purchase of Allied's assets.  This would have resulted in the pre-bankruptcy transfer of Yucaipa's First Lien Debt to JCT, which JCT would have then converted into the assets of Allied through an expedited bankruptcy sale.  The pre-bankruptcy transfer of this debt would have destroyed Defendants' scheme before it got off the ground.  As of the commencement of the bankruptcy case, Yucaipa would not have been a debt holder under the First Lien Credit Agreement—thus, Defendants would not have had a facially viable equitable subordination claim.  Black Diamond and Spectrum, therefore, began to negotiate with JCT regarding the acquisition of Allied's assets.

96.     From at least March 2011 and through May 2012, Black Diamond and Spectrum negotiated directly with JCT regarding (i) JCT's efforts to acquire Allied's assets and (ii) Black Diamond's and Spectrum's willingness to sell their debt claims and simultaneously finance such an acquisition.  At the same time, they plotted to force Allied into involuntary bankruptcy.

97.     After weeks of negotiating directly with Black Diamond, JCT determined that any acquisition could be consummated only through a sale in an Allied bankruptcy case under Bankruptcy Code Section 363 (colloquially referred to as a "363 sale").[10]  A 363 sale, which is typically held as an auction, provided a path for JCT to acquire Allied's assets by credit bidding the First Lien Debt as currency.  A 363 sale is a common method for creditors to convert their debt claims in exchange for the assets of a debtor, free and clear of most other liens, claims and interests.  If JCT could acquire a majority of the First Lien Debt to qualify as Requisite Lender before an Allied bankruptcy, JCT would have the power under the First Lien Credit Agreement to direct a credit bid for Allied's assets using the First Lien Claims as currency.  On May 10, 2011, JCT sent a proposal incorporating a bankruptcy filing and 363 sale to both Black Diamond and Yucaipa.  (Email from M. Riggs, JCT, to D. Walker, Yucaipa, R. Ehrlich, Black Diamond, May 10, 2011, Ex. 18.)

---

[10]   Section 363 of the Bankruptcy Code governs a debtor's sale of assets outside the ordinary course of business.  Sales under Section 363 are commonly referred to as "363 Sales."

98.     On December 6, 2011, JCT reported to Yucaipa that it had reached agreement with Black Diamond on certain terms, including an agreement that Black Diamond would provide a bridge loan to JCT for the purpose of financing JCT's purchase of the First Lien Debt held by Yucaipa.  (Email from M. Riggs, JCT, to I. Tochner, Yucaipa, Dec. 6, 2011, Ex. 19.)  JCT further reported to Yucaipa that JCT had scheduled a meeting with Defendants on December 20, 2011, to "try and craft a package deal where [JCT] can purchase [Yucaipa's] debt, but simultaneously also acquire the debt of CIT, Black Diamond, and Spectrum."  (*Id*.)  This was consistent with JCT's intentions to acquire at least a majority of First Lien Debt before initiating a bankruptcy case.

99.     In short, from the period beginning December 2011 through to the time of the filing of involuntary bankruptcy in May 2012, there were numerous negotiations and the exchange of term sheets between and among JCT, Yucaipa, Black Diamond, and Spectrum.  But at no time did Black Diamond or Spectrum have an agreed-upon deal in which they would have received par plus accrued interest for their First Lien Debt.  Further, any such deal with JCT would not have been an all-cash deal, and it would have included numerous contingencies.

100.     Moreover, Defendants had no intention of participating in a sale to JCT that involved the pre-bankruptcy transfer of Yucaipa's First Lien Debt to JCT, particularly if the sale would have provided them with a smaller, highly contingent recovery compared with their expected recovery in the equitable subordination scheme.  Such a transfer would have put the First Lien Claims in the hands of a non-insider (like JCT) and thus would have precluded their chances for a successful equitable subordination claim—which offered them a greater recovery than any deal with JCT would have.  For their plan, only Yucaipa would and could be the appropriate victim.  Accordingly, consistent with their continued coordination and mutual support, Black Diamond and Spectrum communicated before the filing of the New York state court action to invalidate the Fourth Amendment in connection with their "Allied strategy," which included their concurrent efforts regarding the JCT deal.  (Email from S. Deckoff, Black Diamond, to R. Ehrlich, Black Diamond, Jan. 8, 2012, Ex. 20.)

**STEP 3:  File an Involuntary Bankruptcy Against Allied, Supported by False Statements to the Bankruptcy Court**

101.    During the time when Black Diamond and Spectrum pretended to be interested in selling their First Lien Claims to JCT, central to their "Allied Strategy" was a secret agreement between them to ensure that they maximized and shared their First Lien Claim holdings.  Under this secret agreement, Black Diamond and Spectrum agreed that each of them would offer the other a right of first refusal before transferring debt to a third party, as well as a right to participate pro rata in any debt acquired from third parties.  The purpose of this secret agreement was to ensure that Black Diamond and Spectrum could increase their debt holdings, and also that Spectrum in particular could acquire more "skin in the game" (at the lower acquisition prices for First Lien Claims that might be available to Black Diamond as a major distressed-debt trader) in order to reward Spectrum for its participation in the involuntary petition and scheme to subordinate Yucaipa's debt.

102.    In January of 2012, Defendants entered into a formal agreement (the "Cooperation Agreement") that contractually bound Black Diamond and Spectrum to extend first refusal and participation rights to the other.  The Cooperation Agreement stated that Defendants entered into it "in contemplation of . . . certain strategies to enforce the rights of the Parties as Lenders under the First Lien Credit Agreement."  (Cooperation Agreement 1, Ex. 13.)  That the Cooperation Agreement includes "certain strategies to enforce [their rights]," appears to reference the anticipated involuntary filing, particularly since the Defendants discussed an involuntary filing on numerous occasions, including on the eve of signing the Cooperation Agreement.  (*Id*.)  The Cooperation Agreement was drafted by Schulte Roth & Zabel LLP, which acted as attorneys to both Black Diamond and Spectrum in filing the involuntary bankruptcy.  In the context of the communications referencing an involuntary bankruptcy, and the payment of the Involuntary Petition Payoff, the Cooperation Agreement clearly functioned to spur the improper claims trading necessary to "get this done."

103.    The Cooperation Agreement was not disclosed to Yucaipa or to the Bankruptcy Court at the time of the filing of the involuntary bankruptcy, even though it was entered into four months prior to the filing of the involuntary bankruptcy specifically in contemplation of filing an involuntary bankruptcy and was drafted by the same counsel (Schulte Roth & Zabel) that prepared the involuntary petition for Defendants.  Nor was the Cooperation Agreement produced in discovery, even though requests for production of documents served on Black Diamond and Spectrum encompassed this document.  Yucaipa discovered the Cooperation Agreement only when Black Diamond and Spectrum—responding to allegations that they were involved in improper claims trading—produced it in an attempt to justify their conduct.  In other words, Defendants hid the Cooperation Agreement for more than two years from the Bankruptcy Court and Yucaipa and only disclosed its existence when their hands were caught in the proverbial cookie jar.

104.    The Cooperation Agreement further provided, "[e]ach Party shall timely pay its pro rata share of all costs and expenses incurred in (a) developing and implementing the Strategies, and (b) any action or proceeding arising therefrom or relating thereto, in accordance with that certain Engagement letter between and among the Parties and Schulte Roth & Zabel LLP."  (Cooperation Agreement ¶ 7, Ex. 13.)  This provision implies that the Cooperation Agreement was entered into in contemplation of an involuntary bankruptcy filing.

105.    The Cooperation Agreement further provided, "[e]ach Party agrees to disclose to all other Parties to the Agreement all communications (including the substance thereof) between the Party and . . . [Yucaipa]."  (Cooperation Agreement ¶ 4, Ex. 13.)

106.    At the same time, in accordance with the Cooperation Agreement, Defendants pursued their plan to force Allied into involuntary bankruptcy.  Black Diamond was more eager to pursue this plan than Spectrum because it held more debt than Spectrum—debt that Black Diamond had purchased at a relatively low average purchase price.

107.    Black Diamond thus began discussing the Involuntary Petition Payoff, by which Black Diamond would buy Spectrum's support for filing the involuntary bankruptcy (which,

under the Bankruptcy Code, requires the support of at least three petitioning creditors). Black Diamond agreed to transfer $4 million (in face amount) bribe in First Lien Claims to Spectrum on favorable pricing terms in exchange for Spectrum's support of the involuntary petition strategy, thereby giving both Spectrum and Black Diamond an additional upside in their plan to subordinate Yucaipa's debt holdings. Black Diamond and Spectrum have admitted in court filings that "in accordance with the Cooperation Agreement, Black Diamond sold Spectrum approximately 40% of the Acquired Debt (i.e., Spectrum's ratable share), which amounted to $4,239,486.90 of First Lien Debt, at the same price that Black Diamond paid for the Acquired Debt."

108. This bribe was in furtherance of Black Diamond and Spectrum's agreement to execute their plan and push Allied into involuntary bankruptcy. On March 21, 2012, Defendant Schaffer of Spectrum emailed Defendant Ehrlich, "[p]lease get this [claim transfer] closed this week. We cannot file an involuntary without it done." (*See* Schaffer Email, Ex. 6.)

109. All the while that Defendants Spectrum and Black Diamond negotiated about their bribe amount, they were still *at the same time* pretending to negotiate with JCT. This demonstrates that the negotiation with JCT was simply a sham, conducted to lull Allied, JCT and Yucaipa into falsely believing that no involuntary bankruptcy was on the horizon.

110. Thus, on May 17, 2012, Black Diamond and Spectrum filed their petitions for involuntary bankruptcy against Allied. But in order to successfully complete the petition for an involuntary bankruptcy, Black Diamond and Spectrum had to make false statements and material omissions to the Bankruptcy Court.

111. The involuntary petitions Black Diamond and Spectrum filed against Allied contain a field entitled "Transfer of Claim" which reads as follows: "Check this box if there has been a transfer of claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a)." (Involuntary Pet., Ex. 5.) On the filed petitions, this box is checked and the petitions were signed by Defendant Deckoff, a managing principal of Black Diamond, and Defendant Schaffer, the

managing partner of Spectrum.  (*Id.*)  Black Diamond and Spectrum's attorney also signed the petitions.  (*Id.*)  But Black Diamond and Spectrum did not attach to the petitions any documents evidencing the transfer or statements required under Bankruptcy Rule 1003(a).

112.    Instead, they filed the false Spectrum Affidavit, in which Defendant Schaffer declared under oath that the various claims transferred and assigned to Spectrum under the First Lien Credit Agreement "were not assigned to Spectrum for the purpose of commencing the Bankruptcy Cases."  (Spectrum Affidavit ¶ 7, Ex. 9.)  That statement was false.  Spectrum expressly required the Involuntary Petition Payoff as a prerequisite to joining in the filing of the involuntary bankruptcy.

113.    Black Diamond also filed the Black Diamond Affidavit in support of the involuntary bankruptcy petition, which was intended to mislead the Bankruptcy Court as to the nature and purpose of the claims transferred to Spectrum.  Under Bankruptcy Rule 1003, Black Diamond was required to provide a statement as to whether it transferred any claims for the purpose of commencing the involuntary bankruptcy.  Black Diamond ignored this requirement and declared only that no such claims were transferred to Black Diamond, never mind that Black Diamond had transferred such claims to Spectrum.  Defendant Ehrlich swore in his affidavit that the various claims transferred and assigned to Black Diamond "were not assigned to Black Diamond for the purpose of commencing the Bankruptcy Cases."  (Black Diamond Affidavit ¶ 7, Ex. 8.)  Defendant Ehrlich failed to disclose Black Diamond's role as transferor of the Involuntary Petition Payoff to Spectrum for the purpose of commencing the involuntary case.  Defendants knew or should have known that the false statements and omissions contained in their affidavits and in other papers filed in these cases violated applicable bankruptcy law and constituted fraud on Allied, Yucaipa, and the Bankruptcy Court.

114.    In an effort to portray Yucaipa as a bad actor to set the stage for their equitable subordination claim, Defendants also moved for the appointment of a bankruptcy trustee over Allied's estate.  (Mot. to App. Trustee, Ex. 12.)  They sought this extreme measure purportedly because Yucaipa manipulated Allied and prevented Allied's board of directors from fulfilling its

fiduciary obligations.  In reality Yucaipa did nothing of the sort.  That is why no other lender had previously sought such extreme relief (or any other relief, for that matter) even though Allied had been in continuous default under the First Lien Credit Agreement since August 2008 and had not paid any interest to the First Lien Lenders since August 2009.  Defendants were attempting to spin a false narrative about Yucaipa's alleged misconduct in order to further their equitable subordination scheme—by misleading the Bankruptcy Court about Yucaipa and by using court filings to buttress their false accusations justifying an equitable subordination.

**STEP 4:  Attempt to Equitably Subordinate Yucaipa's Claim**

115.    Lastly, once the involuntary bankruptcy had commenced, Defendants could move forward to complete their plan by filing a series of baseless adversary proceedings within the bankruptcy seeking to equitably subordinate Yucaipa's First Lien Claims to those of Defendants.  Equitable subordination is a remedy set forth in Bankruptcy Code Section 510, which provides for the reordering of recoveries among creditors based on allegations of inequitable conduct.

116.    Defendants' equitable subordination scheme began as early as August 2009.  Indeed, Defendants were secretly "check[ing] out the 'equitable subordination' angle" even before Yucaipa acquired any First Lien Debt on August 21, 2009.  (Email from M. Riggs, Innovative Equity Partners, to J. Schaffer, Spectrum, Aug. 13, 2009, Ex. 15.)

117.    On January 25, 2013, Black Diamond and Spectrum filed an equitable subordination claim against Yucaipa in the Bankruptcy Court.  Their complaint is replete with lies and misstatements about Yucaipa, and it contains false allegations of breaches of fiduciary duty and self-dealing, all in an attempt to effectively eliminate Yucaipa's First Lien Claims and enrich Black Diamond and Spectrum.  *See Allied Systems, et al.*, Case No. 12-11564, filed on March 14, 2013.  Many of these same false allegations also form the basis of the complaint for equitable subordination and other claimed relief in *ASHINC Corp., et al.*, Case No. 13-50499, filed January 25, 2013; *ASHINC Corp., et al.*, Case No. 13-50530, filed February 1, 2013; and *ASHINC Corp., et al.*, Case No. 14-50971, filed November 19, 2014.

118.    Of course, Black Diamond and Spectrum were aware that their allegations were objectively baseless and nothing more than fiction.  Even while implementing their scheme to enrich themselves at Yucaipa's expense, Defendants simultaneously were telling Yucaipa that they believed that Yucaipa was acting in good faith to maximize value for all stakeholders.  For example, in 2011, Defendant Deckoff of Black Diamond emailed Ron Burkle, the managing partner of Yucaipa, stating, "[o]n Allied, the strategy you outlined seemed right and you have our support.  If there is anything we can do to help let me know."  (Email from S. Deckoff, Black Diamond, to R. Burkle, Yucaipa, Feb. 2, 2011, Ex. 21.)

119.    On June 28, 2011—nearly a year before the involuntary bankruptcy filing— Ehrlich emailed Schaeffer to ask if he was "interested in doing a call with Adam Harris [of Schulte Roth & Zabel] to discuss available options," which, as of a year earlier, already included equitable subordination of Yucaipa's First Lien Claims.  (Email from R. Ehrlich, Black Diamond, to J. Schaffer, Spectrum, June 28, 2011, Ex. 22; *see also* Email from M. Riggs, Innovative Equity Partners, to J. Schaffer, Spectrum, Aug. 13, 2009, Ex. 15.)  Two days later, on June 30, a call with Schulte Roth & Zabel took place.  (Email from R. Ehrlich, Black Diamond, to J. Schaffer, Spectrum, June 30, 2011, Ex. 23.)

120.    Others at Black Diamond were aware of the scheme.  On July 10, 2011, Defendant Deckoff, Black Diamond's founder and managing partner, sent a Sunday night email to Ehrlich asking if he had "an Allied Strategy figured out yet."  (Email from S. Deckoff, Black Diamond, to R. Ehrlich, Black Diamond, July 10, 2011, Ex. 24.)

121.    In communications between September and October of 2011, Defendants Ehrlich, Deckoff and Meier all communicated about the status of the Allied involuntary bankruptcy.  For example, on October 13, Defendant Deckoff emailed Ehrlich, asking, "[w]hat is happening with involuntary on allied?"  (Email from S. Deckoff, Black Diamond, to R. Ehrlich, L. Meier, Black Diamond, Oct. 13, 2011, Ex. 25.)  Notably, this was seven months before the actual involuntary filing, and just as the negotiations with JCT were getting started.

122.     Over the course of successive months, Black Diamond and Spectrum concealed their agreements and scheming from the Bankruptcy Court.  As part of the bankruptcy case, Defendants filed the Black Diamond Affidavit and the Spectrum Affidavit, which misrepresented and concealed the nature of the illegal claims trading between them.  Further, the Cooperation Agreement, which memorialized the cooperation between Black Diamond and Spectrum, was never produced during the bankruptcy proceedings, although it was responsive to discovery requests propounded by Yucaipa.

123.     Defendants' motive for forcing the involuntary bankruptcy was simple greed. Black Diamond and Spectrum, as of May 2012, had 22% of the First Lien Debt.  At best, therefore, they had 22% of $305 million—the total amount of obligations outstanding under the First Lien Credit Agreement, inclusive of accrued but unpaid interest.  Thus, the "face value" of their First Lien Debt was approximately $67 million.  However, Black Diamond and Spectrum believed that the valuation of Allied was far less than $305 million, which meant that their recovery on the First Lien Debt would likely not be anywhere near face value of their debt.  Of course, because Black Diamond and Spectrum had acquired the First Lien Debt for a small fraction of its face value, recovery of the face value of their debt would have been a huge windfall, and a huge multiple of their original cost to acquire that First Lien Debt.  Recovering the face value of their debt, however, would require Black Diamond and Spectrum to equitably subordinate Yucaipa's debt, and eliminate Yucaipa's claims, allowing Black Diamond and Spectrum to increase their share of the pie from 22% to 50% and in turn, recover up to the face value of their debt—a recovery that could not have been achieved through a sale to JCT or anyone else.

124.     The involuntary bankruptcy petition filed by Black Diamond and Spectrum disrupted Yucaipa's negotiated sale of its First Lien Claims to JCT for $155 million.  Black Diamond and Spectrum were not interested in any deal with JCT because they would have been unable to recover par plus accrued interest, and in any event the JCT deal would have been subject to multiple closing conditions including funding contingencies, which made Black

Diamond and Spectrum's ultimate recovery under any deal uncertain.  Those contingencies included JCT obtaining antitrust approval and raising sufficient financing to repay existing debt and fund the cash portion of the purchase price.  Lastly, and most importantly, looked at from Black Diamond and Spectrum's perspective, the JCT deal was not an all-cash deal—it consisted of a large portion of unsecured debt in an acquirer about whom they had doubts about its viability, which would not have resulted in the windfall that Black Diamond and Spectrum sought to recover through their scheme.

125.    These contingencies made Black Diamond and Spectrum's ultimate recovery in any JCT deal (which would have been less than the face value of their debt) contingent, especially because they would have traded their Allied debt for JCT debt—not for cash.  At the time the JCT transaction was being contemplated, Allied's financial performance was poor and its debt was trading at pennies on the dollar—one reason Black Diamond and Spectrum had been able to obtain their debt at such rock bottom prices.  With the debt trading at those levels it was doubtful any First Lien Claims would be paid in full.  Given these uncertainties, Black Diamond and Spectrum decided it would be better to exclude others from recovery.  Black Diamond and Spectrum thus rationally (but unlawfully) determined that the best way to increase the value of their Allied debt holdings was to ensure that Yucaipa as an insider became a lender and thus vulnerable to an equitable subordination claim, and then seek equitable subordination of Yucaipa's debt.

126.    Moreover, because the JCT transaction required a "363 sale" of assets pursuant to a *voluntary* bankruptcy—the money from which would have been used to pay the lenders— Black Diamond and Spectrum would still increase their recovery by excluding the largest debtholder from recovery through equitable subordination.  Black Diamond and Spectrum together held approximately $67 million in First Lien Claims—with Yucaipa's claims equitably subordinated, they would become the largest debt-holding block, which would permit them to serve as Requisite Lender and use that power to control a sale of Allied's assets via a credit bid up to the full amount of the First Lien Debt in the "363 sale."

127. In addition, Spectrum was a holder of at least $5 million in Second Lien Debt. Spectrum, therefore, had an additional incentive to pursue any strategy that would enable it to recover all or a portion of its Second Lien Claims. A sale of Allied's assets to JCT (which included the transfer of Yucaipa's First Lien Claims to JCT as a precursor) would not have enabled Spectrum to recover anything on account of its Second Lien Claims. On the other hand, if Spectrum succeeded in equitably subordinating Yucaipa's First Lien Claims to its Second Lien Claims, it would also recover in full on the Second Lien claims.

128. Black Diamond and Spectrum thus colluded to block the sale of Yucaipa's First Lien Claims to JCT and used bankruptcy as an attempt to equitably subordinate Yucaipa's 56% ownership in the First Lien Debt. Because Defendants had sourced Allied's First Lien Debt for pennies on the dollar, this was an extremely rational strategy for them. If everything went according to plan, Defendants would parlay an investment of less than $8 million into multiples of that amount—a massive windfall even for highly aggressive hedge funds like Black Diamond and Spectrum. Until they got caught and their fraudulent scheme was revealed, Defendants believed they had no downside and enormous upside.

**E.      Black Diamond and Spectrum Collude to Block Payment of Yucaipa's Fees and Expenses, But Pay Their Own Fees and Expenses**

129. Black Diamond and Spectrum were not content with the execution of their fraudulent scheme—they also further sought to vindictively strip Yucaipa of any rights in connection with its holdings of the First Lien Claims. The First Lien Credit Agreement provides for reimbursement of legal expenses incurred by any lender in certain enumerated circumstances, including expenses incurred in the course of Allied's bankruptcy proceedings. (First Lien Credit Agreement § 10.2h, Ex. 1.) Through this provision, Yucaipa was entitled to reimbursement for fees and expenses related to, among other things, (a) litigation with CIT to enforce rights under the First Lien Credit Agreement, (b) litigation with Black Diamond and Spectrum, and (c) Yucaipa's fees incurred in connection with enforcing its rights in Allied's bankruptcy proceedings.

130.    Relying on the First Lien Credit Agreement, on December 19, 2013, Defendants submitted reimbursement claims to the Administrative Agent (which at the time was, and is now, their controlled affiliate) for legal expenses in the aggregate amount of $11.6 million. Defendants provided no explanation or details regarding the amount.  Concurrently, Yucaipa also submitted its expense reimbursement claim in the amount of $16.7 million to the Administrative Agent, along with a detailed description of work performed.

131.    Black Diamond and Spectrum colluded to block Yucaipa's claims for expense reimbursement, while arranging for the Administrative Agent (which, again, is their controlled affiliate) to pay their own fees and expenses in full.  Further, Yucaipa petitioned the Bankruptcy Court to freeze any payment of fees and expenses to Defendants.  Although the Bankruptcy Court ordered the freezing of any such payments, Defendants worked with their affiliated Administrative Agent to end-run that order and obtained payment of their fees and expenses.

**F.    Black Diamond Uses a Credit Bid to Dilute Interests of Other Lenders in Assets Excluded from the JCT Sale**

132.    Pursuant to the JCT sale, JCT acquired substantially all of the assets of Allied, but excluded from purchase certain real estate assets and trucks of Allied.  Defendants, purporting to act as the Requisite Lender, made a credit bid (the "Credit Bid") for those excluded assets. Yucaipa objected to Defendants purporting to act as the Requisite Lender and consistently maintained that Defendants did not qualify as the Requisite Lender, but Yucaipa did not object to the Credit Bid itself.  Black Diamond and Spectrum designated their controlled affiliates, Black Diamond Commercial Finance L.L.C. and Spectrum Commercial Finance, LLC, as agents to implement the Credit Bid (the "Black Diamond Agents").  On August 20, 2013, the Black Diamond Agents formed an entity called SBDRE LLC ("SBDRE") to hold the real estate and trucking assets they anticipated acquiring through the Credit Bid.

133.    On September 17, 2013, the Bankruptcy Court approved the Credit Bid, but in doing so the court explicitly refused to review or approve any provision of SBDRE's governance.  The Bankruptcy Court ruled that it had to determine that Black Diamond and

Spectrum together had the requisite authority to make the Credit Bid in order to allow the Credit Bid to go forward.  If the Bankruptcy Court had not made such a determination, none of the First Lien Lenders would have been able to submit the Credit Bid on behalf of the group.  However, the Bankruptcy Court went on to hold that nothing in its order affected Yucaipa's state-law rights with respect to SBDRE.  (*See*, Tr. 99, Case No. 12-11564, Bankr. D. Del., Sept. 17, 2013, Ex. 26.)  The Bankruptcy Court explicitly reserved all questions with respect to the voting rights, equity, and corporate governance of SBDRE for an appropriate non-bankruptcy court to resolve.

134.    The Bankruptcy Court's approval of the Credit Bid in no way blessed the LLC agreement of SBDRE or Defendants' planned (but undisclosed) governance of SBDRE.

135.    On November 8, 2013, counsel for Defendants circulated a memorandum (the "Memorandum") to other First Lien Lenders.  In the Memorandum, Defendants first disclosed to the First Lien Lenders the fact that they intended to assert ongoing and unlawful control over SBDRE, the entity formed to hold the assets acquired by all of the lenders, pro rata, through the Credit Bid.  (Mem., Nov. 8, 2013, Ex. 27.)

136.    Specifically, Defendants disclosed that they would withhold from the other First Lien Lenders (including Yucaipa) their pro rata ownership interests in SBDRE.  Instead of distributing each First Lien Lender's pro rata share of the assets or each such lender's pro rata share of the membership interests in SBDRE, Defendants determined that Black Diamond and Spectrum would hold control of SBDRE for an indeterminate period of time while Black Diamond and Spectrum, directly and through the Black Diamond Agents, exercised control over those assets, wholly unfettered by fiduciary duties.  Black Diamond and Spectrum also set up an illegal equity rights offering (the "New Issuance") that excluded Yucaipa from participation and dramatically reduced Yucaipa's pro rata allocation of the SBDRE membership interest in favor of Black Diamond and Spectrum.

137.    In addition to the New Issuance, Black Diamond has informed the First Lien Lenders that it intends to cause SBDRE to reimburse Defendants for all of their litigation

expenses in securing its control of SBDRE.  Defendants are not entitled to this reimbursement, which further wrongfully dilutes Yucaipa's recoveries

138.    Also, SBDRE's LLC agreement purports to waive any fiduciary duties that would be owed by Defendants or the Black Diamond Agents to the fullest extent permitted by Delaware law.  Black Diamond's structure of SBDRE and the New Issuance effectively forces Yucaipa to abandon its interests in the Allied assets acquired through the Credit Bid or to invest substantial additional funds into an enterprise that Defendants would be entitled to manage in their sole discretion without any fiduciary duties.

139.    Thus, Defendants have used their current, disputed, temporary control of SBDRE to irreparably dilute Yucaipa and entrench themselves, while simultaneously limiting their liability for doing so, all in furtherance of their global conspiracy.

140.    In addition, as further evidence of the malice with which Black Diamond and Spectrum pursued their unlawful scheme, they engaged in other attempts to materially and negatively impact the financial outcome of the bankruptcy for Yucaipa.  As a prime example of this, at the time of the Credit Bid, Black Diamond and Spectrum, acting in their purported capacity as Requisite Lender, proposed segregating all the assets of Allied into two tranches in lieu of being sold to a third party like JCT:  a "Goodco" tranche and a "Badco" tranche.  The Goodco tranche held the fixed assets and other salable assets of Allied; the Badco tranche held the relatively worthless debt and liabilities.  Black Diamond and Spectrum sought to relegate Yucaipa to the Badco tranche, while taking the Goodco assets for themselves and the other non-Yucaipa lenders.  While ultimately unsuccessful, this conduct further demonstrated the intent behind Black Diamond and Spectrum's conduct during the relevant period of this Complaint.

### G.    This Case Should Be Heard by this Court

141.    Yucaipa, Black Diamond, Spectrum, and Allied (and its estate) are variously parties to a number of separate actions, none of which involve the causes of action or forms of relief sought in this Complaint.

142.    On January 18, 2012, Black Diamond and Spectrum filed a complaint in the Supreme Court of New York seeking a declaration that the Fourth Amendment to the First Lien Credit Agreement was void and not binding and that Yucaipa is not the Requisite Lender (the "New York Action").  On March 8, 2013, the New York Supreme Court entered an order in favor of Black Diamond and Spectrum, and on December 17, 2013, the New York Supreme Court Appellate Division reversed in part, holding that at least with respect to Black Diamond, there was a triable issue of fact as to whether it waived the right to challenge the validity of the Fourth Amendment and Yucaipa's status as Requisite Lender through its conduct.  The claims and relief sought by Yucaipa in the instant matter are not related to the New York Action.  The relief sought in the instant Complaint is monetary damages against Black Diamond and Spectrum and their principals for violations of 18 U.S.C. § 1962(c) and § 1962(d), whereas the New York Action seeks declaratory relief related to the interpretation of the First Lien Credit Agreement and its amendments.

143.    On December 11, 2013, Yucaipa filed a complaint against SBDRE and Defendants in the Court of Chancery of the State of Delaware, seeking declaratory judgments that (i) Black Diamond lacked authority to allocate the voting membership interests in SBDRE to the Black Diamond Agents, and (ii) Yucaipa, as the holder of a majority of Allied's First Lien Debt validly elected itself as the managing member of SBDRE (the "Chancery Court Action"). The claims and relief sought by Yucaipa in the instant matter are not related to the Chancery Court Action, which merely seeks to resolve these narrow issues of corporate governance.

144.    Further, the claims asserted by Yucaipa in this Complaint should not impact the Allied bankruptcy estate.  Under the Bankruptcy Court's order authorizing Allied to obtain post-petition financing from Black Diamond and Spectrum, the Allied debtors released any and all claims against Black Diamond and Spectrum, and therefore, based on that order, the Allied debtors could not assert any of their own claims against Black Diamond and Spectrum based on the allegations asserted in this Complaint or any findings or orders in this action.  Further, Defendants have no right of indemnity against Allied based on the allegations in this Complaint.

43

145.    In the Allied bankruptcy case, three relevant adversary proceedings were commenced.

146.    First, on October 18, 2012, Allied filed adversary case number 12-50947 (the "Allied Adversary Action"), naming multiple creditor parties as defendants, including Yucaipa, Black Diamond, and Spectrum.  Allied's complaint seeks a declaration as to the enforceability of the Third and Fourth Amendments to the First Lien Credit Agreement and the identity of the Requisite Lender under the First Lien Credit Agreement.  As alleged in Allied's complaint, "a judicial declaration from [the Bankruptcy] Court is necessary to guide the Debtors' actions in formulating and carrying out a course of action in these bankruptcy cases to maximize the value of the Debtors' estate."  The claims and relief sought by Yucaipa in this Complaint are different from those in the Allied Adversary Action.  The relief sought in the instant Complaint is monetary damages against Black Diamond and Spectrum and their principals for violations of 18 U.S.C. § 1962(c), whereas the Allied Adversary Action seeks declaratory relief related to the interpretation of the First Lien Credit Agreement and its amendments for purposes of administering the Allied bankruptcy estate.

147.    Second, on January 25, 2013, Black Diamond and Spectrum commenced an adversary proceeding against Yucaipa seeking equitable subordination of Yucaipa's claims, along with other claims, including breach of fiduciary duty and breach of contract.  Subsequently, the Official Committee of Unsecured Creditors filed adversary case number 13-50530 (the "CC Adversary Action") and Black Diamond and Spectrum dismissed their adversary proceeding and intervened in the CC Adversary Action.  The complaint in the CC Adversary Action seeks (i) equitable subordination of Yucaipa's claims, (ii) recharacterization of Yucaipa's debt as equity, (iii) damages for alleged breach of contract, (iv) specific performance of the Third Amendment against Yucaipa, (v) damages for alleged breaches of fiduciary duty, (vi) damages for aiding and abetting alleged breaches of fiduciary duty, (vii) avoidance under applicable bankruptcy law of certain allegedly fraudulent transfers by Allied, and (viii) disallowance of certain claims in the Allied bankruptcy case.  (*See* Am. Compl., Ex. 10.)  The claims and relief

44

sought by Yucaipa in the instant matter are materially different from those in the CC Adversary Action because that action seeks equitable relief against Yucaipa under the bankruptcy law doctrine of equitable subordination and the avoidance of transfers made by Allied under applicable bankruptcy law avoidance statutes.[11]  The CC Adversary Action also asserts state-law claims for breach of contract and breach of fiduciary duty against Yucaipa, in connection with the same nucleus of alleged facts underlying its claim for equitable subordination pursuant to Section 510(c) of the Bankruptcy Code.  By contrast, Yucaipa's Complaint here relates to federal non-bankruptcy law claims against Black Diamond and Spectrum and their principals based on their illegal conspiracy to file an involuntary petition against Allied, misrepresent their eligibility to file such an action, and then fabricate the basis for the equitable subordination claims (among other wrongful actions).

148.    Third, on November 19, 2014, Black Diamond and Spectrum, both in their individual capacities as well as in their capacities as "co-administrative agents," filed another complaint for (a) Equitable Subordination, (b) Breach of Contract, (c) Breach of the Implied Duty of Good Faith and Fair Dealing, and (d) Tortious Interference with Contract against the Yucaipa entities and other individual defendants (the "BD/S Action").  (BD/S Compl., Ex. 11.) The BD/S complaint largely mirrored the previously filed claim for equitable subordination in the CC Adversary Action.  In response, Yucaipa filed a compulsory counterclaim for equitable subordination against Black Diamond and Spectrum, premised in part on their misconduct as alleged in this Complaint.  Yucaipa has moved in this Court to withdraw the reference of the BD/S Action to the Bankruptcy Court, and that motion remains pending.  *See BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, L.P.*, Case No. 15-cv-256-SLR, D. Del., Mar. 24, 2015.

---

[11]   In the CC Adversary Action, the Bankruptcy Court entered an order on summary judgment declaring Black Diamond and Spectrum to be the Requisite Lender.  That order suffers from several legal flaws and is currently on appeal before this Court.  *See Yucaipa Am. Alliance Fund II, LP v. BDCM Opportunity Fund II*, Case Nos. 13-1580-SLR, 13-1583-SLR, D. Del., Sept. 19, 2013.

149.    The Bankruptcy Court presiding over the main Allied bankruptcy case, the Allied Adversary Action, the CC Adversary Action, and the BD/S Action lacks "related to" jurisdiction over the RICO and other claims asserted in this Complaint, for which Yucaipa has asserted its right to a jury trial.  The law is clear that there is no "related to" jurisdiction over an action between non-debtor parties if such action at most indirectly affects the debtor's plan or strategy for reorganization.  This action is between non-debtor parties and does not directly affect Allied's estate or bankruptcy case.  Moreover, this action does not constitute property of Allied's estate, directly or indirectly, and this action seeks damages payable solely by Defendants, does not seek to affect any debtor's rights or liabilities in the bankruptcy action, and does not seek any unwinding of transactions effected by or as a result of the bankruptcy action.

150.    On February 6, 2014, Yucaipa filed a prior version of this Complaint in the Southern District of New York, Case No. 15-cv-0916-DLC.  Defendants moved to dismiss or stay that action pending the outcome of the CC Adversary Action and the BD/S Action.  While Defendants' motion was pending, the Southern District of New York issued an order authorizing Yucaipa to amend its complaint.  Given the pendency of multiple related actions in this District, Yucaipa elected to voluntarily dismiss its action in the Southern District of New York without prejudice, and to pursue this action instead in the District of Delaware.

## V.    CLAIMS

**FIRST CAUSE OF ACTION**
**(Against All Defendants)**
**(Violations of Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(c))**

151.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

152.    At all relevant times, Plaintiffs are persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

153.    At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

154.    At all relevant times, each of the RICO Defendants was, and is, a person that exists separate and distinct from the RICO enterprise, described below.

A.    **The RICO Enterprise**

155.    BDCM Opportunity Fund II, L.P., Black Diamond CLO 2005-1 Ltd., Richard A. Ehrlich, Leslie A. Meier, Stephen H. Deckoff, Spectrum Investment Partners, L.P., and Jeffrey Schaffer constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to herein as the "Enterprise."

156.    BDCM Opportunity Fund II, L.P., Black Diamond CLO 2005-1 Ltd., Richard A. Ehrlich, Stephen H. Deckoff, Spectrum Investment Partners, L.P., and Jeffrey Schaffer are a group of persons associated together in fact for the common purpose of carrying on an ongoing criminal enterprise.  In particular, the Enterprise has a common goal of subordinating Yucaipa's debt to that held by the Enterprise through a sophisticated, coordinated, sustained, well-orchestrated and multi-year campaign of deceptive conduct, illegal claims trading, and misrepresentations made to the Bankruptcy Court in the Allied involuntary bankruptcy proceeding.  They intended to further that objective, and exercised substantial discretion in doing so.

157.    The Enterprise is ongoing because members of the Enterprise have long-standing business relationships rooted in common ownership, common control, ongoing business arrangements, and a mutual interest and participation in common (criminal) activities.  For instance, beginning in 2009, (i) members of the Enterprise encouraged the consolidation of Allied debt in front of Yucaipa, then directed the administrative agent CIT to engage in expensive litigation with Yucaipa; (ii) in 2011, members engaged in bad-faith negotiations with JCT (including proposals to sell their First Lien Debt and provide financing for JCT to acquire the First Lien Debt held by Yucaipa) and began to commit wire fraud by planning their fraudulent involuntary bankruptcy scheme, as detailed more fully below; (iii) in 2012, Black Diamond and Spectrum Investment Partners, L.P. entered into the Cooperation Agreement; (iv) that same year, members of the Enterprise scuttled JCT's planned purchase of the First Lien

Claims held by Yucaipa, then initiated Allied's second bankruptcy by filing an involuntary petition after engaging in unlawful claims trading, and then supported their petition with false and misleading statements in violation of law; (v) members of the Enterprise engaged in mail fraud, made false oaths and provided false declarations to the Bankruptcy Court, and continue to obstruct justice, as detailed more fully below; and (vi) to date, the Enterprise seeks to equitably subordinate Yucaipa's First Lien Debt in an adversary proceeding arising out of the same fraudulently initiated involuntary bankruptcy.

158.    To the extent that the Enterprise profited or intended to profit from its criminal activity, each member of the Enterprise profited or intended to profit from the same activity.

159.    The Enterprise has longevity sufficient to permit Defendants to pursue the Enterprise's goal of subordinating Yucaipa's First Lien Debt for Defendants' profit.  The scheme at the heart of the Enterprise has been in operation since at least March of 2011, and potentially as far back as 2009.  This scheme is ongoing and will continue until the members of the Enterprise achieve their goal of equitably subordinating Yucaipa's claims in the Allied bankruptcy case, thereby enlarging their own recovery on claims against the Allied estate. Among other things, the members of the Enterprise continue to assert causes of action for equitable subordination against Yucaipa in adversary case number 13-50530 filed in the Allied bankruptcy case.

160.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure, operating in, and directed from, the United States.  While the organization of the Enterprise may have changed over time, and its members may have held different roles at different times, the Enterprise has been structured to operate as a unit in order to accomplish the common goals and purposes of their criminal scheme, including as follows:

> a.  Defendant Deckoff maintains command and control of the Enterprise on a strategic level, and, along with Defendant Schaffer, is one of the principal authority figures with final say on business decisions.  As Managing Principal and

Founder of Black Diamond, Defendant Deckoff has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the aims of the criminal Enterprise.  From and through his business relationships, including his positions of responsibility at BDCM Opportunity Fund II, L.P. and Black Diamond CLO 2005-1 Ltd., he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to subordinate the First Lien Debt held by Yucaipa by, among other things, forcing Allied into involuntary bankruptcy.  Moreover, on information and belief, Defendant Deckoff enjoyed personal financial benefits as a result of this scheme through payments from Black Diamond.

b.  Defendant Schaffer maintains command and control of the Enterprise on a strategic level, and, along with Defendant Deckoff, is one of the principal authority figures with final say on business decisions.  Defendant Schaffer has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the aims of the criminal Enterprise, including making sworn statements to the Bankruptcy Court in his capacity as the managing partner at Spectrum concerning Spectrum's history of claims trading.  From and through his business relationships, including his position of responsibility as the managing partner at Spectrum, he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to subordinate Plaintiffs' debt by forcing Allied into an involuntary bankruptcy.  Moreover, on information and belief, Schaffer enjoyed personal financial benefits as a result of this scheme through payments from Spectrum.

c.  Defendant Ehrlich has been involved in, and held positions of responsibility with respect to, the planning and execution of the scheme to subordinate Plaintiffs'

49

debt, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise, including soliciting support for Allied's involuntary bankruptcy and making sworn statements to the Bankruptcy Court in his capacity as a managing director of Black Diamond concerning Black Diamond's history of claims trading.  From and through his business relationships, including his position of responsibility at BDCM Opportunity Fund II, L.P. and Black Diamond CLO 2005-1 Ltd., he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to subordinate Plaintiffs' debt.  Moreover, on information and belief, Defendant Ehrlich enjoyed personal financial benefits as a result of this scheme through payments from Black Diamond.

d. Defendant Meier has been involved in, and held positions of responsibility with respect to, the planning and execution of the scheme to subordinate Plaintiffs' debt, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise, including soliciting support for Allied's involuntary bankruptcy.  From and through his business relationships, including his position as a Principal at BDCM Opportunity Fund II, L.P. and Black Diamond CLO 2005-1 Ltd., he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to subordinate Plaintiffs' debt.  Moreover, on information and belief, Defendant Meier enjoyed personal financial benefits as a result of this scheme through payments from Black Diamond.

e. Directly and through its agent officers, directors, board members, and employees, Black Diamond has been an active participant and central figure in the operation and management of the Enterprise and its affairs, and in the orchestration,

planning, perpetration, and execution of the scheme to subordinate Plaintiffs'
debt.  Black Diamond has been responsible for entering into the agreements and
contracts with Spectrum that directly facilitated the criminal activities of the
Enterprise, such as the Cooperation Agreement.  Its high-level principals and
employees, including Defendants Deckoff, Ehrlich and Meier, knowingly and
directly engaged in the criminal activities of the Enterprise, within the scope of
their employment as Black Diamond's agents.  Thus, Black Diamond has, with
the other RICO Defendants, been responsible for conducting a covert campaign to
force Allied into bankruptcy, by, among other things, soliciting support for an
involuntary bankruptcy, transferring claims to secure support for an involuntary
bankruptcy and deceiving the Bankruptcy Court about the activities of the RICO
Defendants, their relatedness to and coordination between one another, and the
true nature of their fraudulent business practices.  Black Diamond stood to benefit
from this scheme because in the event of an equitable subordination, the First
Lien Debt held by the Enterprise would realize rights superior to those of the First
Lien Claims held by Plaintiffs.

f.   Directly and through its agent officers, directors, board members, and employees,
Spectrum has been an active participant and central figure in the operation and
management of the Enterprise and its affairs, and in the orchestration, planning,
perpetration, and execution of the scheme to subordinate Plaintiffs' debt.
Spectrum has been responsible for entering into the agreements and contracts with
Black Diamond that directly facilitated the criminal activities of the Enterprise,
such as the Cooperation Agreement.  Its high-level principals and employees,
including Defendant Schaffer, knowingly and directly engaged in the criminal
activities of the Enterprise, within the scope of their employment as Spectrum's
agents.  Thus, Spectrum has, with the other RICO Defendants, been responsible
for conducting a covert campaign to force Allied into bankruptcy, by, among

other things, soliciting support for an involuntary bankruptcy, transferring claims to secure support for an involuntary bankruptcy and deceiving the Bankruptcy Court about the activities of the RICO Defendants, their relatedness to and coordination between one another, and the true nature of their fraudulent business practices.  Spectrum stood to benefit from this scheme because in the event of an equitable subordination, the First Lien Debt held by the Enterprise would realize rights superior to those of the First Lien Debt held by Yucaipa.

161.    Each of the RICO Defendants knew of the existence of, and conducted or participated in the operation or management of, the Enterprise and its affairs.

162.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).  The Enterprise regularly participated in the multi-billion-dollar national and international asset management industry, purchased or negotiated for the purchase of debt claims from sellers located in various states, and held and transferred funds and assets using national and international financial institutions.

**B.    Pattern of Racketeering Activity**

163.    The RICO Defendants conducted or participated, directly or indirectly, in their conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).  This pattern included multiple predicate acts, including false claims, oaths, and declarations in relation to a bankruptcy proceeding in violation of 18 U.S.C. § 152(2), (3) and (6); obstruction of justice through corruptly endeavoring to influence, obstruct, or impede the due administration of justice in a pending judicial proceeding in violation of 18 U.S.C. § 1503; and wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343.  These predicate acts are all related to each other and to the Enterprise's purpose of subordinating Yucaipa's claims by forcing Allied into involuntary bankruptcy.

164.     Furthermore, Defendants' pattern of racketeering activity is continuous.  The numerous predicate acts detailed below extend over a substantial period of time, from September of 2011 to the present, and the involuntary bankruptcy proceeding that Defendants fraudulently initiated is currently pending.  Thus, Defendants' scheme will continue in the future until they achieve their objective of equitably subordinating Yucaipa's debt holdings in Allied, and Defendants will continue to make false statements to courts and to engage in other acts of obstruction and fraud in order to bring this scheme to fruition.

1.     **Pattern of Racketeering Activity:  Instances of Claims Trading in Relation to a Bankruptcy Proceeding in Violation of 18 U.S.C. § 152(6)**

165.     Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

166.     Among the predicate acts that constitute "racketeering activity" under 18 U.S.C. § 1961(1) is "any offense involving fraud connected with a case under title 11."  Title 18 U.S.C. § 152(6) prohibits "knowingly and fraudulently giv[ing], offer[ing], receiv[ing], or attempt[ing] to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11."

167.     As described herein, Black Diamond and Spectrum engaged in a scheme whose purpose was to equitably subordinate Yucaipa's ownership interest in Allied's First Lien Claims, which harmed both Allied and Yucaipa by placing Allied into involuntary bankruptcy.  In furtherance of this scheme, and in violation of 18 U.S.C. § 152(6), Black Diamond transferred approximately $4 million in First Lien Claims to Spectrum—which Spectrum accepted—as a bribe and inducement to Spectrum's serving as a qualified petitioner of the involuntary bankruptcy.  Black Diamond thus knowingly and fraudulently gave Spectrum remuneration for acting in a case under title 11, and Spectrum knowingly and fraudulently received remuneration in exchange for agreeing to act in a case under title 11, in violation of 18 U.S.C. § 152(6).

168.    Moreover, the parties' fraudulent intent is demonstrated through their secret negotiations.  On January 12, 2012, Defendants entered into a "Cooperation Agreement" that bound Black Diamond and Spectrum to coordinated action in regards to their Allied debt "for the purpose of maximizing the[ir] recoveries."  (Cooperation Agreement ¶ 1, Ex. 13.)  That agreement *required* them to disclose any communications the other party had with Yucaipa. (Cooperation Agreement ¶ 4, Ex. 13.)  It further prohibited each Defendant from selling, transferring, assigning, or disposing of its claims without the consent of the other.  (Cooperation Agreement ¶ 2, Ex. 13.)  It also further required Defendants to disclose to one another any communications that either party had with other holders of Allied debt.  (Cooperation Agreement ¶ 4, Ex. 13.)  Defendants' attempt to explain the agreement as a mere "informal agreement . . . which was later reduced to writing" only underscores the length and depth of the conspiracy.

169.    It was consistent with its pledge to "work together to identify and implement courses of action for the purpose of maximizing the[ir] recoveries" (Cooperation Agreement ¶ 1, Ex. 13), that Black Diamond transferred claims to Spectrum for the purpose of commencing an involuntary bankruptcy.  On March 21, 2012, less than two months before Black Diamond and Spectrum forced Allied into bankruptcy, Defendant Schaffer sent an email with "high importance" to Defendant Ehrlich (a managing director of Black Diamond), demanding that a transfer of approximately $4 million in First Lien Debt—namely, the Involuntary Petition Payoff—from Black Diamond to Spectrum be completed in the next two days.  (Schaffer Email, Ex. 6.)  Schaffer urged Ehrlich to "get the logjam moving at" Black Diamond and stated, in no uncertain terms, that the transfer was a prerequisite to Spectrum's participation in the involuntary filing:  "**We cannot file an involuntary without it done**."  (Schaffer Email, Ex. 6 (emphasis added).)

170.    Defendant Ehrlich then forwarded Defendant Schaffer's March 21, 2012, email to Defendant Meier with a cover email indicating "high importance."  (Meier Email, Ex. 7.) Spectrum already held sufficient claims to qualify as petitioner of the involuntary bankruptcy

under Bankruptcy Rule 1003.  Accordingly, the transfer of the additional $4 million was clearly an inducement in violation of 18 U.S.C. § 152(6).

171.    Defendant Meier, who was referred to as "the key decision maker" on issues related to Allied (*see* Email from C. Parker, Black Diamond, to M. Bilbao, Imperial Capital, Sept. 7, 2012, Ex. 28), then sent a terse email to a Black Diamond employee charged with closing the trade: "Neal—WTF."  (Meier Email, Ex. 7.)  The Involuntary Petition Payoff was then made and Black Diamond and Spectrum commenced the involuntary bankruptcy of Allied.

172.    Defendants' participation in the scheme was intentional and fraudulent:  Black Diamond and Spectrum understood and, in fact, intended, that the payment of the Involuntary Petition Payoff would initiate an involuntary bankruptcy proceeding.

## 2.    Pattern of Racketeering Activity:  False Oath in Relation to a Bankruptcy Proceeding in Violation of 18 U.S.C. § 152(2)

173.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

174.    As noted above, among the predicate acts that constitute "racketeering activity" under 18 U.S.C. § 1961(1) is "any offense involving fraud connected with a case under title 11." Title 18 U.S.C. § 152(2) prohibits "knowingly and fraudulently mak[ing] a false oath or account in or relation to any case under title 11."

175.    Bankruptcy Rule 1003 requires a petitioner to furnish all documents evidencing its receipt or transfer of claims, as well as a signed statement that claims were not transferred or acquired for the purpose of commencing an involuntary bankruptcy case.  As part of Defendants' involuntary petition to place Allied into involuntary bankruptcy filed on May 17, 2012, Defendant Ehrlich submitted a sworn affidavit pursuant to Rule 1003, swearing that Black Diamond had not received "an unconditional transfer and assignment of certain amounts of loans."  Defendant Ehrlich intentionally omitted the fact that Black Diamond had *transferred* any claims to Spectrum in order to induce Spectrum to agree to support the involuntary bankruptcy petition.  (Black Diamond Affidavit ¶¶ 6–7, Ex. 8.)  This was an intentional, material omission,

as Bankruptcy Rule 1003 requires a petitioner to furnish a signed statement that the claim was not transferred or acquired for the purpose of commencing an involuntary bankruptcy case.

### 3.   Pattern of Racketeering Activity:  False Oath in Relation to a Bankruptcy Proceeding in Violation of 18 U.S.C. § 152(2)

176.   Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

177.   As noted above, among the predicate acts that constitute "racketeering activity" under 18 U.S.C. § 1961(1) is "any offense involving fraud connected with a case under title 11." Title 18 U.S.C. § 152(2) prohibits "knowingly and fraudulently mak[ing] a false oath or account in or relation to any case under title 11."

178.   Bankruptcy Rule 1003 requires a petitioner to furnish all documents evidencing its receipt or transfer of claims, as well as a signed statement that claims were not transferred or acquired for the purpose of commencing an involuntary bankruptcy case.  As part of Defendants' petition to place Allied into involuntary bankruptcy filed on May 17, 2012, Defendant Schaffer deliberately misrepresented in a sworn statement that no claims were "assigned to Spectrum for the purposes of commencing the Bankruptcy Cases."  (Spectrum Affidavit ¶ 7, Ex. 9.)  This was a knowingly fraudulent statement made to the Bankruptcy Court under penalty of perjury in violation of 18 U.S.C. § 152(2).

179.   Bankruptcy Rule 1003 also requires a petitioner to furnish all documents evidencing its receipt or transfer of claims.  However, as with the Black Diamond Affidavit, the identifying information of the sellers/transferees, as well as the date of all such sales and transfers were redacted from the 162 pages of trading records attached to the Spectrum Affidavit, disguising the illegal claim transfer from Black Diamond to Spectrum—another intentional, material omission in violation of 18 U.S.C. § 152(2).

> **4.     Pattern of Racketeering Activity:  Instances of False Declarations in Relation to a Bankruptcy Proceeding in Violation of 18 U.S.C.§ 152(3)**

180.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

181.    As noted above, among the predicate acts that constitute "racketeering activity" under 18 U.S.C. § 1961(1) is "any offense involving fraud connected with a case under title 11." Title 18 U.S.C. § 152(3) prohibits "knowingly and fraudulently mak[ing] a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11."

182.    The Black Diamond and Spectrum Affidavits in support of the petitions to place Allied into involuntary bankruptcy contained misrepresentations and material omissions that were knowing and fraudulent false statements under penalty of perjury, as set forth above with respect to the violation of 18 U.S.C. § 152(2).

> **5.     Pattern of Racketeering Activity:  Obstruction of Justice in Violation of 18 U.S.C. § 1503**

183.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

184.    Among the predicate acts that constitute "racketeering activity" under 18 U.S.C. § 1961(1) is "any act which is indictable under [18 U.S.C.] section 1503 (relating to obstruction of justice)."  Title 18 U.S.C. § 1503 prohibits individuals from, among other things, "corruptly . . . endeavor[ing] to influence, obstruct, or impede the due administration of justice . . . ."

185.    As described herein, Black Diamond and Spectrum engaged in a scheme whose purpose was to equitably subordinate Yucaipa's 56% ownership stake in the First Lien Debt, which harmed both Allied and Yucaipa by placing Allied into involuntary bankruptcy when it could have proceeded with an orderly sale to JCT in connection with a voluntary bankruptcy at a purchase price that was $170 million higher than what was ultimately obtained.  In an effort to conceal their scheme, Defendants knowingly filed false statements with the Bankruptcy Court

and made false statements under oath.  In doing so, Black Diamond and Spectrum endeavored to act corruptly with an intent to obstruct or interfere with a bankruptcy proceeding, thereby interfering with "the due administration of justice" in violation of 18 U.S.C. § 1503.

186.    While Plaintiffs contend that the extent of Defendants' misrepresentations and false declarations will be revealed by discovery in this action, Defendants' corrupt activities include at least the following instances:

- The filing of an affidavit by Richard Ehrlich, the managing director of Black Diamond Capital Management, L.L.C., on May 11, 2012, pursuant to Bankruptcy Rule 1003, that omitted Black Diamond's transfer of claims to Spectrum for the purpose of commencing the involuntary bankruptcy.  Ehrlich declared that Black Diamond was the recipient of "Assigned Claims" through "the execution of several assignment and assumption agreements" (that are not listed by name) and that these assignments "were not assigned to [Black Diamond] for the purposes of commencing the Bankruptcy cases."  (Black Diamond Affidavit ¶¶ 6–7, Ex. 8.)  Yet, Ehrlich did not mention the $4 million Involuntary Petition Payoff that Black Diamond made to Spectrum ("[w]e cannot file an involuntary without it done"), let alone declare that it was transferred for the purpose of commencing the case.

- Redacting the following information from documents that evidence the transfer of claims to or from Black Diamond and included in the involuntary petition package pursuant to Bankruptcy Rule 1003:

    1)  the identity of the assignor of its transferred claims;

    2)  the date of all such sales and transfers;

    3)  the amount of the transfers; and

    4)  the amount of the transfer fees incurred in connection to the assignment.

- The filing of an affidavit by Jeffrey Schaffer, the managing partner of Spectrum, in May 2012, pursuant to Bankruptcy Rule 1003, that contained deliberate

misrepresentations of Spectrum's record of claims trading.  Schaffer swore under oath that no claims were "assigned to Spectrum for the purposes of commencing the Bankruptcy Cases."  (Spectrum Affidavit ¶ 7, Ex. 9.)  This is a flagrant contradiction of Defendant Schaffer's own email, dated March 21, 2012 in which he stated in regards to the Involuntary Petition Payoff that "[w]e cannot file an involuntary without it done."  (Schaffer Email, Ex. 6.)

- Redacting the following information from documents that evidence the transfer of claims to or from Spectrum, annexed to the affidavit of Jeffrey Schaffer and included in the involuntary petition package pursuant to Bankruptcy Rule 1003:

    1) the identity of the sellers/transferees of its transferred claims;

    2) the date of all such sales and transfers;

    3) the amount of the transfers; and

    4) the amount of the transfer fees incurred in connection to the assignment.

187.    The motive for Defendants' omissions and misstatements is obvious:  to preserve their eligibility as qualified petitioners of the involuntary petition.  After years of laying the groundwork for Allied's involuntary bankruptcy—including soliciting support from Allied's creditors, entering into a Cooperation Agreement, and completing the Involuntary Petition Payoff—Defendants had reached the last stage of their scheme.  All that remained was filing the petition package and commencing the involuntary bankruptcy, and then seeking to equitably subordinate Yucaipa's debt.  However, Bankruptcy Rule 1003 prohibits an entity that has transferred or acquired a claim for the purpose of commencing an involuntary bankruptcy from serving as a qualified petitioner.  If Defendants revealed the Involuntary Petition Payoff to the Bankruptcy Court, they would have disqualified themselves from serving as qualified petitioners pursuant to this rule.  To prevent this result—and preserve their scheme—Defendants made false declarations to the Bankruptcy Court and redacted the information from their involuntary petition papers that would have put their scheme in jeopardy.  These actions evidence a corrupt intent to

59

attack the integrity of the Bankruptcy Court proceeding and obstruct the due administration of justice.

188.    Defendants' campaign to whitewash their record of coordination continued as litigation commenced between the parties.  In the discovery ordered by the United States Bankruptcy Court for the District of Delaware in relation to Plaintiffs' Motion For Leave To File A Counterclaim For Equitable Subordination Under 11 U.S.C. § 510(c) Or In The Alternative, To Amend The Answer To Assert Affirmative Defenses, in the CC Adversary Action, Black Diamond and Spectrum both failed to produce the Cooperation Agreement, despite the fact that it was directly responsive to several document requests propounded by Plaintiffs on Black Diamond and Spectrum.  The Cooperation Agreement finally reached Plaintiffs more than one year after the discovery was ordered by the Bankruptcy Court as an exhibit to the Declaration of Robert Ward, attorney at Schulte Roth & Zabel LLP, the joint counsel for Black Diamond and Spectrum.  Unlike other documents attached to the Ward Declaration, the Cooperation Agreement was not Bates-stamped as part of a Black Diamond production.  It is clear from the circumstances of its production that both Black Diamond and Spectrum agreed to withhold the Cooperation Agreement from Plaintiffs.  This tactic, which continued until August 15, 2014, amounts to additional obstruction of the bankruptcy proceeding and further protection for Defendants' scheme to subordinate Yucaipa's claims.

189.    Accordingly, Defendants have unlawfully obstructed and impeded the due administration of justice in violation of 18 U.S.C. § 1503.

### 6.    Pattern of Racketeering Activity:  Multiple Instances of Wire Fraud in Violation of 18 U.S.C. § 1343

190.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as though fully set forth herein.

191.    Among the predicate acts that constitute "racketeering activity" under 18 U.S.C. § 1961(1) is "any act which is indictable under [18 U.S.C.] section 1343 (relating to wire fraud)."

192.    As described herein, in furtherance of the Enterprise, Defendants have engaged in multiple counts of wire fraud in violation of 18 U.S.C. § 1343.  Specifically, Defendants' scheme to drive Allied into involuntary bankruptcy through the fraudulent trading of claims, the filing of false declarations, and the extensive redaction of their petition materials constitutes a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," within the meaning of Section 1343, and Defendants have knowingly transmitted or caused to be transmitted by means of wire communication in interstate commerce multiple communications for the purpose of executing this scheme, specifically through electronic communications between Defendants that facilitated the solicitation of Allied debtholders to join the involuntary petition and Defendants' illegal claims trading.

193.    While Plaintiffs contend that the extent of Defendants' electronic communications regarding the planning and execution of their scheme will be revealed by discovery in this action, they include at least the following communications:

- Email from Defendant Schaffer to Defendant Ehrlich on September 16, 2011, Subject: "Allied," stating that: "We should discuss with adam how to prime those who don't come along . . . obviously with respect to fees is easy but also perhaps a priority recovery."  (Email from J. Schaffer, Spectrum, to R. Ehrlich, Black Diamond, Sept. 16, 2011, Ex. 29.)

- Email from Defendant Ehrlich to Defendant Meier on September 16, 2011, where, after explaining that he requested each Allied lender to join "an activist group," Defendant Ehrlich states: "Spectrum—already on board."  (Email from R. Ehrlich, Spectrum, to L. Meier, Black Diamond, Sept. 16, 2011, Ex. 30.)

- Email from Defendant Deckoff to Defendant Ehrlich on October 13, 2011: "What is happening with involuntary on Allied?"  (Email from S. Deckoff, Black Diamond, to R. Ehrlich, L. Meier, Black Diamond, Oct. 13, 2011, Ex. 25.)

- Email from Defendant Schaffer to Defendant Ehrlich on March 21, 2012, where Schaffer implores Ehrlich "to get the logjam moving at BD."  As he tells Ehrlich:

"Please get this closed this week.  We cannot file an involuntary without it done."
(Schaffer Email, Ex. 6.)

- One or more of the wire transfers reflected in Exhibit A to the Spectrum
  Affidavit.  (Spectrum Affidavit, Ex. 9.)  As set forth above, Black Diamond
  agreed to transfer approximately $4 million in First Lien Claims to Spectrum on
  favorable pricing terms in exchange for Spectrum's support of the involuntary
  bankruptcy petition against Allied, and did so.  In the Spectrum Affidavit,
  Schaffer represents that Exhibit A constitutes "[r]edacted copies of the assignment
  documentation" for Allied debt that it purchased.  (*Id*.)  Although the assignment
  documents are heavily redacted to conceal the sellers, dates, and amounts, they
  reflect electronic bank transfers, one of which corresponds to the illegal claims
  transfer Black Diamond and Spectrum effectuated as an inducement for Spectrum
  to join the involuntary bankruptcy petitions.

194.    Defendants participated in the scheme knowingly, willfully, and with the specific
intent to profit from the equitable subordination of Yucaipa's claims by forcing Allied into
bankruptcy, in violation of 18 U.S.C. § 1343.

### 7.    Pattern of Racketeering Activity:  Multiple Instances of Mail Fraud in Violation of 18 U.S.C. § 1341

195.    Plaintiffs repeat and reallege each and every allegation in the foregoing
paragraphs as though fully set forth herein.

196.    Among the predicate acts that constitute "racketeering activity" under 18 U.S.C.
§ 1961(1) is "any act which is indictable under [18 U.S.C.] section 1341 (relating to mail fraud)."

197.    As described herein, on information and belief, in furtherance of the Enterprise,
Defendants have engaged in multiple counts of mail fraud in violation of 18 U.S.C. § 1341.
Specifically, Defendants' scheme to drive Allied into involuntary bankruptcy through the
fraudulent trading of claims, the filing of false declarations, and the extensive redaction of their
petition materials constitutes a "scheme or artifice to defraud, or for obtaining money or property

by means of false or fraudulent pretenses, representations, or promises," within the meaning of Section 1341.  On information and belief, Defendants have knowingly used the U.S. mail or other interstate carriers in furtherance of this scheme, including with respect to the illegal transfer of claims from Black Diamond to Spectrum intended to induce Spectrum to support the involuntary bankruptcy petition against Allied.

198.    Plaintiffs contend that the extent of Defendants' use of the mails and interstate carriers will be revealed by discovery in this action.  However, Section 10.6(b) of the First Lien Credit Agreement requires that claim transfers be effectuated as required by Section 10.6(d), which in turn requires "delivery to [the] Administrative Agent" of assignment agreements.  Section 10.1(a) of that agreement further requires that notices be delivered to the addresses of the required parties and to the Administrative Agent.  Thus, on information and belief, Defendants at least used the U.S. mail or other interstate carrier to deliver documents reflecting the illegal claims transfer from Black Diamond to Spectrum to induce Spectrum to support the involuntary bankruptcy petitions against Allied on or about May of 2012.

199.    Defendants participated in the scheme knowingly, willfully, and with the specific intent to profit from the equitable subordination of Yucaipa's claims by forcing Allied into bankruptcy, in violation of 18 U.S.C. § 1341.

C.    **Injury and Causation**

200.    Yucaipa has been and will continue to be injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.  The injuries to Yucaipa directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, millions of dollars in lost profits due to the unlawfully commenced involuntary bankruptcy and interference with Yucaipa's agreement with JCT and Allied for the sale of Yucaipa's First Lien Claims to JCT; lost opportunities; damage to Yucaipa's reputation and goodwill; and attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting Defendants' fraudulent activities.

201.    Pursuant to 18 U.S.C. § 1964(c), Yucaipa is entitled to recover treble damages, plus attorneys' fees and costs, from Defendants.  Further, Yucaipa is entitled to appropriate injunctive relief to prevent and restrain the ongoing racketeering activities.

### SECOND CAUSE OF ACTION
### (Against All Defendants)
### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))

202.    Yucaipa repeats and realleges the allegations set forth above as though set forth fully herein.

203.    Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

204.    By and through each Defendant's close coordination with one another, including while engaging in the Involuntary Petition Payoff, and before, during, and after fraudulently commencing the involuntary bankruptcy, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

205.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each Defendant shared a common purpose, namely, the orchestration, planning, perpetration, and execution of a scheme to defraud Yucaipa by unlawfully commencing involuntary bankruptcy proceedings and equitably subordinating Yucaipa's claims based on knowingly false accusations, as evidenced by, among other things, the written Cooperation Agreement.  In the absence of agreement, the Enterprise could not have

operated as it did. Further evidence of an agreement among Defendants is particularly within their control.

206. The participation and agreement of each Defendant was necessary to allow the commission of this pattern of racketeering activity.

207. Yucaipa has been and will continue to be injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial. The injuries to Yucaipa directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in lost profits due to the unlawfully commenced involuntary bankruptcy and interference with Yucaipa's agreement with JCT for the sale of Yucaipa's First Lien Debt; lost opportunities; damage to Yucaipa's reputation and goodwill; and attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting Defendants' fraudulent activities.

208. Pursuant to 18 U.S.C. § 1964(c), Yucaipa is entitled to recover treble damages, plus attorneys' fees and costs, from Defendants. Further, Yucaipa is entitled to appropriate injunctive relief to prevent and restrain the ongoing racketeering activities.

### THIRD CAUSE OF ACTION
#### (Against All Defendants)
#### (Fraud)

209. Yucaipa repeats and realleges the allegations set forth above as though set forth fully herein.

210. Federal Rule of Bankruptcy Procedure 1003 imposes duties upon petitioners filing an involuntary bankruptcy case that include, among other obligations, the disclosure by a transferor or transferee of a claim of "all documents evidencing the transfer, whether transferred unconditionally, for security, or otherwise" and a "signed statement that the claim was not transferred for the purpose of commencing the case and setting forth the consideration for and terms of the transfer."

211.    Defendants have engaged in fraud through the making of material misrepresentations and omissions that have harmed and continue to harm Yucaipa.  These misrepresentations and material omissions include at least the following:

- Defendant Ehrlich's sworn statement on May 17, 2012, in an affidavit submitted to the Bankruptcy Court that Black Diamond had not received "an unconditional transfer and assignment of certain amounts of loans."

- Defendant Ehrlich's omission from that affidavit of the fact that Black Diamond *transferred* claims to Spectrum to induce Spectrum to agree to support the involuntary bankruptcy petitions.

- Defendant Schaffer's misrepresentation on May 17, 2012, in an affidavit submitted to the Bankruptcy Court that no claims were "assigned to Spectrum for the purposes of commencing the Bankruptcy Cases."

- Defendant Schaffer's omission from the claim transfer records attached to his May 17, 2012, affidavit of seller and transferee information.  On information and belief, this information was redacted from those records for the purpose of concealing the fact that Black Diamond had transferred claims to Spectrum for the purpose of inducing it to support the involuntary bankruptcy petitions.

212.    Each of the foregoing misrepresentations and omissions was made with the purpose of harming Yucaipa to the benefit of Defendants.  Yucaipa relied on these misrepresentations and omissions in determining its litigation position in the bankruptcy action and other related proceedings.  Moreover, on information and belief, the Bankruptcy Court relied on these misrepresentations and omissions in granting the involuntary bankruptcy petition. Yucaipa has suffered damages as a result of these misrepresentations and omissions at least equal to the lost profits from the scuttled sale of Allied to JCT, but also out-of-pocket losses in the form of attorneys' fees expended in the involuntary bankruptcy action and costs to maintain Allied.

## FOURTH CAUSE OF ACTION
### (Against All Defendants)
### (Tortious Interference With Business Relations)

213.     Yucaipa repeats and realleges the allegations set forth above as though set forth fully herein.

214.     Defendants engaged in intentional and improper interference with Yucaipa's business relations with respect to the sale of Allied to JCT.  But for Defendants' interference, JCT would have purchased substantially all of the assets and assumed the liabilities of Allied, including debt owned by Yucaipa.  As part of that transaction, JCT intended to purchase "[a]ll claims held by Yucaipa," and would have entered into the necessary contracts to do so if not for the interference of Defendants.  (March 2012 Term Sheet, Ex. 4.)  The parties had agreed upon substantially all of the terms of that transaction, as set forth in the March 2012 Term Sheet, and expected to complete the necessary contracts and paperwork to effectuate the transaction.  (*Id*.)  The consummation of the sale was thus reasonably likely and probable.

215.     Defendants were not only well aware of the planned sale of Allied to JCT, they pretended for over a year to support the sale of Allied to JCT and negotiated with JCT regarding the sale of their own debt to JCT.  That negotiation was a sham, pursued only for the purpose of buying time to enable Defendants to force Allied into an involuntary bankruptcy and thus maximize their own profits at the expense of Yucaipa and Allied.  Indeed, at the same time that Defendants were negotiating with JCT, they were plotting between themselves to force Allied into involuntary bankruptcy, which was wholly inconsistent with the terms of the contemplated transaction, which required a "363 sale" pursuant to a *voluntary* bankruptcy.  In fact, Defendants had no intention of participating in a sale to JCT that would have involved Yucaipa's sale of its Allied debt to JCT because such a transfer would put the First Lien Claims in the hands of a non-insider (like JCT) and thus preclude their chances for a successful equitable subordination claim, allowing them to maximize their own profits.  For their plan, only Yucaipa would and could be the appropriate victim.  Defendants were thus misleading both Yucaipa and JCT during the course of those negotiations and were negotiating in bad faith.

216.    On May 17, 2012, Defendants filed the involuntary bankruptcy case against Allied, intentionally and wrongfully scuttling the sale of Allied to JCT and damaging Yucaipa. In order to pursue the involuntary bankruptcy, as set forth above, Defendants engaged in illegal claims trading and made misrepresentations and material omissions to the Bankruptcy Court.

217.    As a result of the involuntary bankruptcy, substantially all of Allied's assets were subsequently sold to JCT for $170 million less in consideration than offered by JCT before the involuntary bankruptcy petition was filed.  But for the filing of the involuntary bankruptcy petition, Yucaipa would have received a substantial purchase price for its Allied debt as part of the JCT sale.  Defendants' intentional and wrongful interference with that sale damaged Yucaipa in an amount to be determined at trial but at least in the amount of the purchase price that JCT would have paid for Yucaipa's Allied debt.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Yucaipa prays for relief and judgment against Defendants as follows:

A.    General and compensatory damages according to proof at trial;

B.    Treble damages pursuant to 18 U.S.C. § 1964(c);

C.    Punitive damages;

D.    Appropriate equitable relief, including but not limited to an accounting and an order preventing and restraining the ongoing racketeering activities;

E.    Declarations that Defendants violated 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d);

F.    A declaration that Defendants committed fraud against Yucaipa;

G.    A declaration that Defendants committed the tort of interference with prospective economic advantage in regard to Yucaipa;

H.    A declaration that Defendants were unjustly enriched;

I.    An award of reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c);

J.    Pre-judgment interest; and

K.      Such other and further relief, at law or in equity, as the Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Yucaipa demands a jury trial on all issues so triable.

Dated: May 8, 2015
     Wilmington, Delaware

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

*/s/ Michael R. Nestor*
John T. Dorsey, Esquire (No. 2988)
Michael R. Nestor, Esquire (No. 3526)
Sharon M. Zieg, Esquire (No. 4196)
Michael S. Neiburg, Esquire (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Robert A. Klyman (*Pro Hac Vice* pending)
Maurice M. Suh (*Pro Hac Vice* pending)
Kahn Scolnick (*Pro Hac Vice* pending)
333 South Grand Avenue
Los Angeles, CA  91001
Telephone: (213) 229-7000
rklyman@gibsondunn.com

*Attorneys for Plaintiffs*

## APPENDIX OF TECHNICAL AND DEFINED TERMS

| Term | Definition | First Reference (¶) |
|------|------------|---------------------|
| 363 Sale | The sale of a bankruptcy estate's assets under Section 363 of the Bankruptcy Code (11 U.S.C. § 363).  Under Section 363(f), a bankruptcy trustee or debtor-in-possession may sell the bankruptcy estate's assets "free and clear of any interest in such property."  Secured creditors are generally permitted to credit bid up to the full amount of their claims on a dollar-for-dollar basis with cash bids. | 97 |
| Administrative Agent | The agent appointed under the First Lien Credit Agreement to serve as the principal agent administering the agreement, including processing interest payments and other administrative duties. | 13 |
| Allied Adversary Action | Adversary proceeding filed in Allied's main bankruptcy case on October 18, 2012 in which the Allied estate seeks declaratory judgment regarding the enforceability of the Third and Fourth Amendments. | 146 |
| Bankruptcy Court | The United States Bankruptcy Court for the District of Delaware. | 4 |
| Black Diamond Affidavit | Affidavit of Defendant Ehrlich in support of Black Diamond's involuntary petition filed against Allied, wherein Ehrlich states that no claims were transferred to Black Diamond for the purpose of commencing the Allied bankruptcy case. | 26 |
| Black Diamond Agents | Black Diamond Commercial Finance L.L.C. and Spectrum Commercial Finance, LLC, as agents designated by Black Diamond to form SBDRE and credit bid for certain Allied real property assets. | 132 |
| CC Adversary Action | Adversary proceeding filed by the Official Committee of Unsecured Creditors in Allied's bankruptcy case, with Black Diamond and Spectrum as intervenors, which seeks, *inter alia*, subordination of Yucaipa's claims. | 147 |
| Cooperation Agreement | Secret agreement entered into between Black Diamond and Spectrum, later produced in the CC Adversary Action, according to which the parties agreed to trade claims and share information as part of their strategy to file an involuntary case against | 27 |

| Term | Definition | First Reference (¶) |
|---|---|---|
| | Allied. | |
| Credit Bid | The right of a secured creditor to offset and count up to the full amount of its secured claim towards the purchase price of assets sold by the estate in a 363 Sale, as provided in Bankruptcy Code Section 363(k) (11 U.S.C. § 363(k)). | 49 |
| Eligible Assignee | An assignee eligible to have debt assigned and transferred to it under the First Lien Credit Agreement. | 68 |
| Equitable Subordination | The lowering of the priority of a claim asserted against a bankruptcy estate, usually because the holder of the claim is found guilty of misconduct affecting other claimants.  Equitable subordination is a judicially developed doctrine now codified in Section 510(f) of the Bankruptcy Code (11 U.S.C. § 510(c)). | 3 |
| First Lien | A lien that takes priority over all other encumbrances over the same collateral. | 2 |
| First Lien Claims | Claims of creditors holding debt under the First Lien Credit Agreement. | 2 |
| First Lien Credit Agreement | Agreement providing for first lien "exit financing" from Allied's Prior Bankruptcy Case, consisting of a $265 million facility in the form of term loans, revolving loans and lenders' deposits to support letters of credit. | 1 |
| First Lien Debt | Debt under the First Lien Credit Agreement. | 8 |
| First Lien Lenders | Lenders under the First Lien Credit Agreement. | 11 |
| Fourth Amendment | Fourth amendment to the First Lien Credit Agreement, which removed restrictions on the transfer of First Lien Debt and allowed Yucaipa to become Requisite Lender. | 11 |
| Georgia Action | Expensive, years-long litigation in Georgia state court among Allied, Yucaipa, and the administrative agent under the First Lien Credit Agreement, CIT, which result from Defendants Black Diamond and Spectrum's secretly direction to CIT to refuse to recognize Yucaipa as Requisite Lender after adoption of the Fourth Amendment to the First Lien Credit Agreement. | 14 |

| Term | Definition | First Reference (¶) |
|---|---|---|
| Involuntary Bankruptcy | A bankruptcy case initiated by at least three creditors holding unsecured claims aggregating at least $15,325 against the debtor, under Bankruptcy Code Section 303 (11 U.S.C. § 303).  Compare with "Voluntary Case." | 1 |
| Involuntary Petition Payoff | Black Diamond's bribe to Spectrum to induce Spectrum to join the conspiracy to file an Involuntary Bankruptcy petition against, consisting of approximately $4 million (in face amount) of Black Diamond's First Lien Claims at Black Diamond's low discounted purchase price. | 23 |
| Memorandum | A memorandum dated November 8, 2013, circulated by counsel for Black Diamond to other First Lien Lenders, disclosing to the lenders the fact that Black Diamond intended to assert control over SBDRE. | 135 |
| New Issuance | Black Diamond and Spectrum's illegal equity rights offering in the Involuntary Bankruptcy proceeding against Allied in the Bankruptcy Court, Case No. 12-11564, filed on March 14, 2013, that excluded Yucaipa from participation and dramatically reduced Yucaipa's pro rata allocation of the SBDRE membership interest in favor of Black Diamond and Spectrum. | 136 |
| New York Action | Case filed by Black Diamond and Spectrum on January 18, 2012 in the Supreme Court of New York seeking, *inter alia*, a declaration that Yucaipa is not the Requisite Lender under the First Lien Credit Agreement. | 16 |
| Prior Bankruptcy Case | Voluntary bankruptcy case filed by predecessors of Allied in 2005. | 5 |
| Prior Bonds | $150 million of unsecured bonds representing Allied's indebtedness at the time Allied filed the Prior Bankruptcy Case. | 64 |
| Requisite Lender | Defined in the First Lien Credit Agreement to mean one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.  The Requisite Lender has certain power to | 1 |

| Term | Definition | First Reference (¶) |
|---|---|---|
| | modify and/or amend loan covenants and direct the Administrative Agent (CIT) to exercise remedies under the First Lien Credit Agreement. | |
| SBDRE | Entity formed by agents of Black Diamond to credit bid for certain real property assets of Allied. | 49 |
| Second Lien | A lien that is subordinate only to First Liens and otherwise takes priority over all other encumbrances on the collateral. | 6 |
| Second Lien Credit Agreement | Agreement providing for Second Lien "exit financing" from Allied's Prior Bankruptcy Case, consisting of $50 million in loans. | 6 |
| Second Lien Debt | Debt under the Second Lien Credit Agreement. | 6 |
| Special Committee | A subcommittee of the Allied board of directors, consisting of members independent from Yucaipa. | 88 |
| Spectrum Affidavit | Affidavit of Defendant Schaffer in support of Spectrum's involuntary petition against Allied, wherein Schaffer states that no claims were transferred to Spectrum for the purpose of commencing the bankruptcy case. | 26 |
| Third Amendment | Third amendment to the First Lien Credit Agreement, which removed restrictions on the transfer of Allied's First Lien Debt to Yucaipa. | 73 |
| Voluntary Bankruptcy | A bankruptcy case filed by the debtor itself, as opposed to creditors of the debtor, under Bankruptcy Code Section 301 (11 U.S.C. § 301).  Compare with "Involuntary Bankruptcy." | 1 |