# **<u>EXHIBIT 1</u>**

**EXECUTION VERSION**

**AMENDED AND RESTATED FIRST LIEN**
**SECURED SUPER-PRIORITY DEBTOR IN POSSESSION**
**AND EXIT CREDIT AND GUARANTY AGREEMENT**

**dated as of March 30, 2007**

**and**

**amended and restated as of May 15, 2007**

**among**

**ALLIED HOLDINGS, INC.**

**and**

**ALLIED SYSTEMS, LTD. (L.P.),**
**as Borrowers**

**CERTAIN SUBSIDIARIES OF**

**ALLIED HOLDINGS, INC.**
**and**
**ALLIED SYSTEMS, LTD. (L.P.),**
**as Guarantors,**

**VARIOUS LENDERS,**

**GOLDMAN SACHS CREDIT PARTNERS L.P.,**
**as Lead Arranger and Syndication Agent,**

**and**

**THE CIT GROUP/BUSINESS CREDIT, INC.,**
**as Administrative Agent and Collateral Agent**

---

**$265,000,000 Senior Secured First Priority Credit Facilities**

---

## TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS AND INTERPRETATION ................................................................2
    1.1    Definitions.................................................................................................................2
    1.2    Accounting Terms....................................................................................................46
    1.3    Interpretation, etc. ..................................................................................................47

SECTION 2. LOANS AND LETTERS OF CREDIT .................................................................47
    2.1    Term Loans ..............................................................................................................47
    2.2    Revolving Loans......................................................................................................49
    2.3    Swing Line Loans. ...................................................................................................50
    2.4    Issuance of Letters of Credit and Purchase of Participations Therein ...................52
    2.5    Pro Rata Shares; Availability of Funds...................................................................60
    2.6    Use of Proceeds.......................................................................................................61
    2.7    Evidence of Debt; Register; Lenders' Books and Records; Notes...........................61
    2.8    Interest on Loans......................................................................................................62
    2.9    Conversion/Continuation ........................................................................................65
    2.10   Default Interest........................................................................................................65
    2.11   Fees .........................................................................................................................66
    2.12   Scheduled Payments ...............................................................................................67
    2.13   Voluntary Prepayments/Commitment Reductions; Call Protection ........................67
    2.14   Mandatory Prepayments ..........................................................................................69
    2.15   Application of Prepayments.....................................................................................71
    2.16   General Provisions Regarding Payments.................................................................72
    2.17   Ratable Sharing........................................................................................................73
    2.18   Making or Maintaining Eurodollar Rate Loans ......................................................74
    2.19   Increased Costs; Capital Adequacy ........................................................................76
    2.20   Taxes; Withholding, etc. .........................................................................................77
    2.21   Obligation to Mitigate.............................................................................................79
    2.22   Defaulting Lenders..................................................................................................80
    2.23   Removal or Replacement of a Lender .....................................................................81
    2.24   Super-Priority Nature of Obligations and Lenders' Liens ......................................82
    2.25   Payment of Obligations...........................................................................................83
    2.26   No Discharge; Survival of Claims ..........................................................................83
    2.27   Waiver of any Priming Rights .................................................................................83
    2.28   Co-Borrowers..........................................................................................................83
    2.29   Judgment Currency .................................................................................................85

SECTION 3. CONDITIONS PRECEDENT AND CONVERSION TO EXIT
              FACILITIES ...........................................................................................................86
    3.1    Closing Date.............................................................................................................86
    3.2    Conditions to Each Credit Extension.......................................................................90
    3.3    Exit Facilities Option ...............................................................................................91

| | | |
|---|---|---|
| 3.4 | Conditions to Exit Facilities Option | 91 |
| 3.5 | Conversion to Exit Facilities | 98 |
| | | |
| SECTION 4. | REPRESENTATIONS AND WARRANTIES | 99 |
| 4.1 | Organization; Requisite Power and Authority; Qualification | 99 |
| 4.2 | Equity Interests and Ownership | 99 |
| 4.3 | Due Authorization | 99 |
| 4.4 | No Conflict | 99 |
| 4.5 | Governmental Consents | 100 |
| 4.6 | Binding Obligation | 100 |
| 4.7 | Historical Financial Statements | 100 |
| 4.8 | Projections | 101 |
| 4.9 | No Material Adverse Change | 101 |
| 4.10 | No Restricted Junior Payments | 101 |
| 4.11 | Adverse Proceedings, etc. | 101 |
| 4.12 | Payment of Taxes | 101 |
| 4.13 | Properties | 102 |
| 4.14 | Environmental Matters | 102 |
| 4.15 | No Defaults | 103 |
| 4.16 | Material Contracts | 103 |
| 4.17 | Governmental Regulation | 103 |
| 4.18 | Margin Stock | 103 |
| 4.19 | Employee Matters | 103 |
| 4.20 | Employee Benefit Plans | 104 |
| 4.21 | Certain Fees | 105 |
| 4.22 | Solvency | 105 |
| 4.23 | Compliance with Statutes, etc. | 105 |
| 4.24 | Disclosure | 106 |
| 4.25 | Secured, Super-Priority Obligations | 106 |
| 4.26 | Patriot Act | 107 |
| | | |
| SECTION 5. | AFFIRMATIVE COVENANTS | 107 |
| 5.1 | Financial Statements and Other Reports | 107 |
| 5.2 | Existence | 112 |
| 5.3 | Payment of Taxes and Claims | 113 |
| 5.4 | Maintenance of Properties | 113 |
| 5.5 | Insurance | 113 |
| 5.6 | Books and Records; Inspections | 114 |
| 5.7 | Lenders Meetings | 114 |
| 5.8 | Compliance with Laws | 114 |
| 5.9 | Environmental | 114 |
| 5.10 | Subsidiaries | 116 |
| 5.11 | Additional Real Estate Assets | 117 |
| 5.12 | Interest Rate Protection | 117 |
| 5.13 | Further Assurances | 117 |
| 5.14 | Maintenance of Ratings | 118 |
| 5.15 | Final Supplemental DIP Order | 118 |

ii

5.16        Canadian Supplemental Final Order ........................................................................118
5.17        Restructuring Advisers ............................................................................................118
5.18        Intentionally Omitted ..............................................................................................118

SECTION 6.   NEGATIVE COVENANTS ......................................................................................118
6.1         Indebtedness ............................................................................................................119
6.2         Liens ........................................................................................................................123
6.3         No Further Negative Pledges ..................................................................................126
6.4         Restricted Junior Payments .....................................................................................126
6.5         Restrictions on Subsidiary Distributions ................................................................127
6.6         Investments ..............................................................................................................127
6.7         Financial Covenants .................................................................................................129
6.8         Fundamental Changes; Disposition of Assets; Acquisitions ..................................132
6.9         Disposal of Subsidiary Interests ..............................................................................134
6.10        Sales and Lease-Backs .............................................................................................135
6.11        Transactions with Shareholders and Affiliates .......................................................135
6.12        Conduct of Business ................................................................................................135
6.13        Amendments or Waivers of Organizational Documents and Certain
            Agreements ...............................................................................................................136
6.14        Haul Insurance .........................................................................................................136
6.15        Chapter 11 Claims; Adequate Protection ................................................................136
6.16        DIP Orders and Canadian Orders ............................................................................136
6.17        Limitation on Prepayments of Pre-Petition Obligations .........................................136
6.18        Fiscal Year ...............................................................................................................137
6.19        Repayment of Indebtedness .....................................................................................137
6.20        Reclamation Claims .................................................................................................137
6.21        Chapter 11 Claims ...................................................................................................137
6.22        Limitation on Voluntary Payments and Amendments or Waivers of the
            Second Lien Credit Agreement ...............................................................................137

SECTION 7.   GUARANTY ..............................................................................................................138
7.1         Guaranty of the Obligations .....................................................................................138
7.2         Contribution by Guarantors .....................................................................................138
7.3         Payment by Guarantors ............................................................................................139
7.4         Liability of Guarantors Absolute .............................................................................139
7.5         Waivers by Guarantors ............................................................................................141
7.6         Guarantors' Rights of Subrogation, Contribution, etc. ...........................................142
7.7         Subordination of Other Obligations ........................................................................142
7.8         Continuing Guaranty ...............................................................................................143
7.9         Authority of Guarantors or Borrowers ....................................................................143
7.10        Financial Condition of Borrowers ...........................................................................143
7.11        Bankruptcy, etc. .......................................................................................................143
7.12        Discharge of Guaranty Upon Sale of Guarantor .....................................................144

SECTION 8.   EVENTS OF DEFAULT; CARVE-OUT EVENT ....................................................144
8.1         Events of Default .....................................................................................................144
8.2         Carve-Out Events .....................................................................................................150

iii

SECTION 9.   AGENTS.................................................................................150
   9.1      Appointment of Agents.............................................................150
   9.2      Powers and Duties....................................................................151
   9.3      General Immunity ....................................................................151
   9.4      Agents Entitled to Act as Lender .............................................153
   9.5      Lenders' Representations, Warranties and Acknowledgment............153
   9.6      Right to Indemnity ...................................................................153
   9.7      Successor Administrative Agent, Collateral Agent and Swing Line Lender.......154
   9.8      Collateral Documents and Guaranty.........................................155

SECTION 10. MISCELLANEOUS .................................................................156
   10.1     Notices ....................................................................................156
   10.2     Expenses .................................................................................158
   10.3     Indemnity ................................................................................158
   10.4     Set-Off.....................................................................................159
   10.5     Amendments and Waivers .......................................................159
   10.6     Successors and Assigns; Participations ...................................163
   10.7     Independence of Covenants .....................................................167
   10.8     Survival of Representations, Warranties and Agreements ...............167
   10.9     No Waiver; Remedies Cumulative ..........................................167
   10.10    Marshalling; Payments Set Aside ...........................................167
   10.11    Severability.............................................................................168
   10.12    Obligations Several; Independent Nature of Lenders' Rights............168
   10.13    Headings .................................................................................168
   10.14    APPLICABLE LAW ...............................................................168
   10.15    CONSENT TO JURISDICTION..............................................168
   10.16    WAIVER OF JURY TRIAL.....................................................169
   10.17    Confidentiality.........................................................................169
   10.18    Usury Savings Clause ..............................................................170
   10.19    Counterparts ............................................................................171
   10.20    Effectiveness ...........................................................................171
   10.21    Patriot Act ...............................................................................171
   10.22    Electronic Execution of Assignments ......................................171
   10.23    Post-Closing Actions ...............................................................172
   10.24    Joint and Several Liability .......................................................172
   10.25    Limitations Act, 2002 ..............................................................172
   10.26    Effect of Restatement...............................................................172

**APPENDICES:**

| | |
|---|---|
| A-1 | Term Loan Commitments |
| A-2 | LC Commitments |
| A-3 | Revolving Commitments |
| B | Notice Addresses |

**SCHEDULES:**

| | |
|---|---|
| 4.1 | Jurisdictions of Organization and Qualification |
| 4.2 | Equity Interests and Ownership |
| 4.7 | Contingent Liabilities |
| 4.13 | Real Estate Assets |
| 4.16 | Material Contracts |
| 4.19 | Employee Matters |
| 4.20 | Employee Benefit Plans |
| 4.25 | Post-petition Liens |
| 6.1 | Certain Indebtedness |
| 6.2 | Certain Liens |
| 6.5 | Certain Restrictions on Subsidiary Distributions |
| 6.6 | Certain Investments |
| 6.8(a) | Planned Asset Sales |
| 6.8(b) | Restructuring Asset Sales |
| 6.11 | Certain Affiliate Transactions |
| 10.23 | Post-Closing Actions |

**EXHIBITS:**

| | |
|---|---|
| A-1 | Funding Notice |
| A-2 | Conversion/Continuation Notice |
| A-3 | Issuance Notice |
| B-1 | Term Loan Note |
| B-2 | Revolving Loan Note |
| B-3 | Swing Line Note |
| C | Compliance Certificate |
| D | [Intentionally Omitted] |
| E | Assignment Agreement |
| F | Certificate Re Non-bank Status |
| G-1 | Closing Date Certificate |
| G-2 | Solvency Certificate |
| H | Counterpart Agreement |
| I | Pledge and Security Agreement |
| J | Mortgage |
| K | Landlord Waiver and Consent Agreement |
| L | Intercompany Note |
| M | Interim Supplemental DIP Order |
| N | Canadian Pledge and Security Agreement |
| O | Affirmation Agreement |

v

**AMENDED AND RESTATED FIRST LIEN**
**SECURED SUPER-PRIORITY DEBTOR IN POSSESSION**
**AND EXIT CREDIT AND GUARANTY AGREEMENT**

This AMENDED AND RESTATED FIRST LIEN SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30, 2007, and amended and restated as of May 15, 2007, is entered into by and among ALLIED HOLDINGS, INC., a Georgia corporation and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as defined below) ("**Holdings**"), ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code ("**Systems**" and, together with Holdings, the "**Borrowers**"), CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary Guarantors, the Lenders party hereto from time to time, GOLDMAN SACHS CREDIT PARTNERS L.P. ("**GSCP**"), as Syndication Agent (in such capacity, "**Syndication Agent**"), and THE CIT GROUP/BUSINESS CREDIT, INC. ("**CIT**"), as Administrative Agent (together with its permitted successors in such capacity, "**Administrative Agent**") and as Collateral Agent (together with its permitted successor in such capacity, "**Collateral Agent**").

**RECITALS:**

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS,** on July 31, 2005 (the "**Petition Date**"), Borrowers and each of the other Debtors filed voluntary petitions for relief (collectively, the "**Cases**") under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court, which Cases have been recognized in Canada pursuant to the Canadian Stay Order;

**WHEREAS,** from and after the Petition Date, Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** Borrowers and the Agents and the Lenders party thereto previously entered into the Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of March 30, 2007 (the "**Existing Credit Agreement**"), as amended, under which the Lenders extended to Borrowers certain credit facilities (the "**Existing Credit Facilities**") consisting of $230,000,000 aggregate principal amount of Term Loans (the "**Existing Term Loans**"), $35,000,000 aggregate principal amount of Revolving Commitments and $50,000,000 aggregate principal amount of LC Commitments;

**WHEREAS,** Borrowers will refinance a portion of the Existing Term Loans with the proceeds of a new second lien term loan in an aggregate principal amount equal to $50,000,000 under a new Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of May 15, 2007;

**WHEREAS,** Borrowers have agreed to secure all of their Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of their assets, including a pledge of all of the Equity Interests of each of their respective Domestic Subsidiaries, 100% of all the Equity Interests of each of their Canadian Subsidiaries and 65% of all the Equity Interests of each of their other respective first-tier Foreign Subsidiaries;

**WHEREAS,** Guarantors have agreed to guarantee the obligations of Borrowers hereunder and to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of their respective assets, including a pledge of all of the Equity Interests of each of their respective Domestic Subsidiaries (including Systems), 100% of all the Equity Interests of each of their respective Canadian Subsidiaries and 65% of all the Equity Interests of each of their other respective directly owned Foreign Subsidiaries; and

**WHEREAS,** the Lenders have agreed to grant an option to Borrowers to cause the Credit Facilities to be converted to the Exit Facilities subject to certain terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS AND INTERPRETATION

**1.1    Definitions.** The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Act**" as defined in Section 3.1(r).

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward to the next whole multiple of 1/16 of 1%) (i) (a) the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate which appears on the page of the Telerate Screen which displays an average British Bankers Association Interest Settlement Rate (such page currently being page number 3740 or 3750, as applicable) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m.

2

(London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the offered quotation rate to first class banks in the London interbank market by Deutsche Bank for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan of Administrative Agent, in its capacity as a Lender, for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened against or affecting Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries.

"**Affected Lender**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 5% or more (or, for purposes of the definition of "Controlled Investment Affiliate", 50% or more) of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

3

"**Affirmation Agreement**" shall mean the Affirmation Agreement substantially in the form of Exhibit O hereto.

"**Agent**" means each of Administrative Agent, Syndication Agent and Collateral Agent.

"**Agent Affiliates**" as defined in Section 10.1(b)(iii).

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of March 30, 2007, and amended and restated as of May 15, 2007, as it may be amended, supplemented or otherwise modified from time to time.

"**AH Industries**" means AH Industries Inc., an Alberta corporation.

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans. A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Agents or to the lenders by means of electronic communications pursuant to Section 10.1(b).

4

"**Asset Sale**" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with, any Person (other than Borrower or any Guarantor Subsidiary), in one transaction or a series of transactions, of all or any part of Holdings' or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Equity Interests of any of Holdings' Subsidiaries, other than (i) inventory (or other assets) sold, leased or licensed out in the ordinary course of business (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued), (ii) sales or other dispositions of obsolete or worn out rigs and (iii) sales, leases or licenses out of other assets for aggregate consideration of less than $500,000 with respect to any transaction or series of related transactions and less than $1,000,000 in the aggregate during any Fiscal Year.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit E, with such amendments or modifications as may be approved by Administrative Agent.

"**Assignment Effective Date**" as defined in Section 10.6(b).

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer, controller, assistant controller, treasurer or assistant treasurer.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute; provided, however, that, with respect to the Cases, "Bankruptcy Code" means Title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Georgia or any other court having competent jurisdiction over the Cases.

"**Base Fiscal Year**" as defined in Section 6.7(c).

"**Base Rate**" means, for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

5

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Benchmark LIBOR Rate**" as defined in Section 2.4(m).

"**Beneficiary**" means each Agent, Issuing Bank, Lender and Lender Counterparty.

"**BIA**" means the Bankruptcy and Insolvency Act (Canada), as now or hereafter in effect or any successor statute.

"**Blue Thunder**" means Blue Thunder Auto Transport, Inc. or any of its Subsidiaries or Affiliates.

"**Blue Thunder Equipment**" means rigs (including tractors, trailers and related equipment) purchased from Blue Thunder or any auctioneer acting on behalf of Blue Thunder and any replacement parts or improvements made thereto.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Borrowers**" as defined in the preamble hereto.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "**Business Day**" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Confirmation Order**" means an order of the Canadian Court under Section 18.6 of the CCAA, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to Agents, giving full effect to the Confirmation Order, which order shall specifically but not exclusively confirm the Plan and approve and authorize the transactions contemplated thereby and the granting of liens under the Credit

6

Documents and containing a release in favor of Administrative Agent and Syndication Agent and the Lenders and their respective affiliates.

"**Canadian Credit Party**" means any Credit Party incorporated, organized or otherwise established under the laws of Canada or any political subdivision of Canada.

"**Canadian DIP Order**" means the Canadian Interim Order or the Canadian Final Order, as applicable.

"**Canadian Final Order**" means the order entitled "In the Matter of Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 and in the matter of Allied Holdings and those subsidiaries listed on Schedule A hereto" entered by the Canadian Court on April 16, 2007, as amended, supplemented or otherwise modified by the Canadian Supplemental Interim Order and Canadian Supplemental Final Order.

"**Canadian Insolvency Law**" shall mean any of the BIA and the CCAA, and any other applicable insolvency or other similar law.

"**Canadian Interim Order**" means the order entitled "In the Matter of Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 and in the matter of Allied Holdings and those subsidiaries listed on Schedule A hereto" entered by the Canadian Court on March 29, 2007, as amended, supplemented or otherwise modified by the Canadian Supplemental Interim Order and Canadian Supplemental Final Order.

"**Canadian Pledge and Security Agreement**" means the Pledge and Security Agreement, dated as of March 30, 2007, executed by each Canadian Credit Party, as it may be amended, supplemented or otherwise modified from time to time.

"**Canadian PPSA**" means the Personal Property Security Act (Ontario) and the Regulations thereunder, as from time to time in effect, provided, however, if the validity, perfection (or opposability), effect of perfection or of non-perfection or priority of Collateral Agent's security interest in any Collateral are governed by the personal property security laws or laws relating to movable property of any jurisdiction other than Ontario, Canadian PPSA shall mean those personal property security laws or laws relating to movable property in such other jurisdiction for the purpose of the provisions hereof relating to such validity, perfection (or opposability), effect of perfection or of non-perfection or priority and for the definitions related to such provisions.

"**Canadian Stay Order**" means, collectively, the order of the Canadian Court entered on August 5, 2005 under Section 18.6 of the CCAA, together with all extensions, modifications and amendments thereto, in each case in form and substance reasonably

7

satisfactory to the Agent, which, among other matters but not by way of limitation, recognizes the Cases and imposes a stay of proceedings against creditors and others in Canada.

"**Canadian Subsidiary**" means any Subsidiary that is incorporated, organized or otherwise established under the laws of Canada or any political subdivision of Canada.

"**Canadian Supplemental Final Order**" means an order of the Canadian Court under Section 18.6 of the CCAA, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to Agents, giving full effect to the Final Supplemental DIP Order, which order shall specifically but not exclusively provide that each of the Canadian Credit Parties is authorized to enter into the Credit Documents (as amended and restated) to which it is a party, and provide, execute and deliver all such guarantees, documents, security interests and liens as are contemplated in such Credit Documents and granting to the Collateral Agent a fixed charge, mortgage, hypothec, security interest and lien in all of the Collateral in which any of the Canadian Credit Parties now or hereafter has an interest ranking in priority to all other encumbrances.

"**Canadian Supplemental Interim Order**" means an order of the Canadian Court under Section 18.6 of the CCAA, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to Agents, giving full effect to the Interim Supplemental DIP Order, which order shall specifically but not exclusively provide that each of the Canadian Credit Parties is authorized to enter into the Credit Documents (as amended and restated) to which it is a party, and provide, execute and deliver all such guarantees, documents, security interests and liens as are contemplated in such Credit Documents and granting to the Collateral Agent a fixed charge, mortgage, hypothec, security interest and lien in all of the Collateral in which any of the Canadian Credit Parties now or hereafter has an interest ranking in priority to all other encumbrances.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Carve-Out**" means the following claims: (a) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6), (b) fees payable to the clerk of the Bankruptcy Court and any agent thereof and (c) fees and disbursements incurred by the Credit Parties' professionals (other than the Credit Parties' ordinary course professionals) and the professionals of the Committee retained prior to the Exit Facilities Conversion Date (collectively, the "**Professionals**") and allowed by order of the Bankruptcy Court in the aggregate amount not to exceed $1,500,000, in each case incurred prior to a Carve-Out Event but not yet paid to the extent such fees and expenses are approved by the Bankruptcy Court, subject to the right of Administrative Agent, the Lenders and any other party in interest to object to the award of such fees and expenses; provided, however, that the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Credit Parties, any Committee or any Professional in connection with the

8

investigation, initiation or prosecution of any claims, defenses or causes of action (as described in the Interim DIP Order) against the Agents or the Lenders and as otherwise provided in the Interim DIP Order or Final DIP Order, as applicable; provided, further, prior to a Carve-Out Event the Credit Parties shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 328, 330 and 331 of the Bankruptcy Code or otherwise pursuant to an order of the Bankruptcy Court, as the same may be due and payable, and the same shall not reduce the Carve-Out, subject to the right of Administrative Agent, the Lenders and any other party in interest to object to such payments; provided, further, that in the event of any inconsistency in the definition of "Carve-Out" between the provisions of this Agreement and the Interim DIP Order or Final DIP Order, the provisions of the Interim DIP Order or Final DIP Order shall govern.

"**Carve-Out Event**" as defined in Section 8.2.

"**Carve-Out Event Notice**" as defined in Section 8.2.

"**Cases**" as defined in the recitals hereto.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or the Government of Canada or (b) issued by any agency of the United States, in each case maturing within one year after the date of acquisition; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after the date of acquisition and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of acquisition thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one year after the date of acquisition and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; (v) fully collateralized repurchase agreements with a term of not more than 90 days for securities described in clause (i) above and entered into with a financial institution satisfying the criteria of clause (iv) above; and (vi) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) through (v) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

9

"**CCAA**" means Companies' Creditors Arrangement Act (Canada), as now and hereafter in effect, or any successor statute.

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit F.

"**Change of Control**" means, at any time on or after the Exit Facilities Conversion Date (i) prior to a Qualified Public Offering, (a) Sponsor and its Controlled Investment Affiliates shall not beneficially own and control at least 40% on a fully diluted basis of the economic and voting interests in the Equity Interests of Holdings, (b) Sponsor and its Controlled Investment Affiliates fail to elect a majority of the members of the board of directors (or similar governing body) of Holdings or (c) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall at any time have acquired beneficial ownership on a fully diluted basis of the voting and/or economic interests in the Equity Interests of Holdings greater than the beneficial ownership on a fully diluted basis of the voting and/or economic interests in the Equity Interests of Holdings owned by the Sponsor and its Controlled Investment Affiliates at such time; (ii) after a Qualified Public Offering, any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than Sponsor and its Controlled Investment Affiliates (a) shall have acquired beneficial ownership of 35% or more on a fully diluted basis of the voting and/or economic interest in the Equity Interests of Holdings or (b) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Holdings; (iii) Holdings shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interest in the Equity Interests of Systems; (iv) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Holdings cease to be occupied by Persons who either (a) were members of the board of directors of Holdings on the Exit Facilities Conversion Date or (b) were nominated for election by the board of directors of Holdings, a majority of whom were directors on the Exit Facilities Conversion Date or whose election or nomination for election was previously approved by a majority of such directors.

"**CIT**" as defined in the preamble.

"**Claim**" has the meaning specified in Section 101(5) of the Bankruptcy Code.

"**Class**" means with respect to Lenders, each of the following classes of Lenders: (i) Lenders having Term Loan Exposure, (ii) Lenders having Revolving Loan Exposure and (iii) Lenders having LC Deposits.

"**Closing Date**" means March 30, 2007.

10

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit G-1.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreement, Canadian Pledge and Security Agreement, the Quebec Security the Collateral Servicing Agreement, the Mortgages, the Intellectual Property Security Agreements, the Landlord Personal Property Collateral Access Agreements, if any, and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, or perfect a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate in form satisfactory to Collateral Agent that provides information with respect to the personal or mixed property of each Credit Party.

"**Collateral Servicing Agreement**" means a Collateral Servicing Agreement, in form and substance reasonably satisfactory to the Collateral Agent, by and among Corporation Service Company, each Credit Party (other than any Foreign Subsidiary), the Collateral Agent and the Second Lien Collateral Agent.

"**Committed Capital Expenditures**" as defined in Section 6.7(d).

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code, on August 5, 2005, as reconstituted from time to time.

"**Commitment**" means any Revolving Commitment, LC Commitment or Term Loan Commitment.

"**Commodity Agreement**" means any commodity exchange contract, commodity swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the commodity risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Confirmation Order**" as defined in Section 3.4(e)(iv).

"**Consolidated Adjusted EBITDA**" means, for any period, an amount determined for Holdings and its Subsidiaries on a consolidated basis equal to (i) Consolidated Net Income for such period, plus, to the extent deducted in determining such Consolidated Net Income, the sum, without duplication, of amounts for (a) Consolidated Interest Expense for such period; (b) consolidated income, single business, franchise, unitary or gross receipt tax expense for such period; (c) total depreciation expense for such period; (d) total amortization expense for such period; (e) the cumulative effect (whether positive or negative) of any change in accounting principles; (f) management fees and expenses paid during such period pursuant to the Management Agreement to the extent permitted hereunder; (g) Transaction Costs for such period; (h) with respect to any period (including any Fiscal Quarter) during Fiscal Year 2006 or 2007, costs and expenses resulting from administrative expenses paid with respect to the Cases for professional fees and expenses in an amount up to, but not exceeding in the aggregate for Fiscal Year 2006 and 2007, $30,000,000; (i) with respect to any period (including any Fiscal Quarter) during Fiscal Year 2006 or 2007, amounts paid as cure payments or similar costs in connection with assumptions of executory contracts assumed during the Cases or as part of the Plan in an amount up to, but not exceeding in the aggregate for Fiscal Year 2006 and 2007, $5,000,000; (j) fees and charges related to any events or transactions that are unusual in nature and infrequent in occurrence, in that it is unrelated to, or only incidentally related to, the current ordinary and typical activities of Borrowers and would not reasonably be expected to recur in a normal operating cycle in an amount up to, but not exceeding, $1,000,000 in the aggregate for any periods occurring during any Fiscal Year and, $3,000,000 in the aggregate from the Closing Date to the date of determination; (k) with respect to any period (including any Fiscal Quarter) during Fiscal Year 2007, non-recurring costs and expenses arising from or recognized in connection with the consummation and effectiveness of the Plan in an amount up to, but not exceeding in the aggregate for Fiscal Year 2007, $5,000,000; and (l) other non‑Cash charges for such period (excluding any such non‑Cash charge to the extent that it represents an accrual or reserve for potential Cash payment in any future period or amortization of a prepaid Cash payment that was made in a prior period); and (m) with respect to any period (including any Fiscal Quarter) during Fiscal Year 2007, amounts paid to Sponsor in connection with a claim by Sponsor for substantial contribution in accordance with the Plan in an amount up to, but not exceeding, $5,000,000, minus (ii) to the extent included in determining such Consolidated Net Income, non‑Cash gains for such period (excluding any such non‑Cash gain to the extent it represents the reversal of an accrual or reserve for potential Cash gain in any prior period).

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Holdings and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the consolidated statement of cash flows of Holdings

12

and its Subsidiaries, but excluding, however, any such expenditures made in connection with a Permitted Acquisition permitted hereunder.

"**Consolidated Cash Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Holdings and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Holdings and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any amount not payable in Cash and any amounts referred to in Section 2.11(f) payable on or before the Closing Date.

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of Holdings and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding Cash and Cash Equivalents.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of Holdings and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of long term debt.

"**Consolidated Excess Cash Flow**" means, for any Fiscal Year, an amount (if positive) equal to: (i) the sum, without duplication, of (a) Consolidated Adjusted EBITDA for such Fiscal Year; plus (b) the Consolidated Working Capital Adjustment for such Fiscal Year; minus (ii) the sum, without duplication, of (a) scheduled repayments of Indebtedness for borrowed money (including the implied principal component of scheduled payments made on Capital Leases, but excluding repayments of Revolving Loans or Swing Line Loans except to the extent the Revolving Commitments are permanently reduced in connection with such repayments) paid in Cash during such Fiscal Year; (b) Consolidated Capital Expenditures for such Fiscal Year (net of any proceeds of (x) any related financings with respect to such expenditures, (y) any sales of assets used to finance such expenditures and (z) any Spent Committed Capital Expenditures deducted in the calculation of Consolidated Excess Cash Flow for the preceding Fiscal Year); (c) Consolidated Cash Interest Expense for such Fiscal Year; (d) with respect to Fiscal Year 2007, any amounts referred to in Section 2.11(f) paid on or before the Closing Date; (e) consolidated income, single business, franchise, unitary or gross receipt tax expense payable in cash with respect to such Fiscal Year; (f) management fees and expenses paid during such Fiscal Year pursuant to the Management Agreement to the extent permitted hereunder; (g) with respect to Fiscal Year 2007, Transaction Costs paid in Cash during such Fiscal Year; (h) with respect to Fiscal Year 2007, costs and expenses resulting from administrative expenses with respect to the Cases which are for professional fees and expenses and are paid in Cash during such Fiscal Year; (i) amounts paid in cash during such Fiscal Year as cure payments or similar costs in connection with assumptions of executory contracts assumed during the Cases or as part of the Plan; (j) fees, charges and expenses related to any events or transactions that are paid in Cash during such Fiscal Year and are unusual in nature and infrequent in occurrence, in that it is unrelated to, or only incidentally related to, the current

13

ordinary and typical activities of Borrowers and would not reasonably be expected to recur in a normal operating cycle in an amount up to, but not exceeding, in the aggregate for any periods occurring during any Fiscal Year $1,000,000 and, $3,000,000 in the aggregate from the Closing Date to the date of determination; (k) with respect to Fiscal Year 2007, non-recurring costs and expenses paid in Cash during such Fiscal Year arising from or recognized in connection with the consummation and effectiveness of the Plan; and (l) the amount of Spent Committed Capital Expenditures paid in Cash within ninety days after the end of such Fiscal Year.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Holdings and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Holdings and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any amounts referred to in Section 2.11(f) payable on or before the Closing Date.

"**Consolidated Net Income**" means, for any period, (i) the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus (ii) (a) the income (or loss) of any Person (other than a Subsidiary of Holdings) in which any other Person (other than Holdings or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Holdings or any of its Subsidiaries by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries or that Person's assets are acquired by Holdings or any of its Subsidiaries, (c) the income of any Subsidiary of Holdings to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan, and (e) (to the extent not included in clauses (a) through (d) above) any net extraordinary gains or net extraordinary losses.

"**Consolidated Total Debt**" means, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness of Holdings and its Subsidiaries determined on a consolidated basis in accordance with GAAP.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities.

"**Consolidated Working Capital Adjustment**" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated

14

Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Controlled Foreign Corporation**" shall mean a "controlled foreign corporation" as defined in the Internal Revenue Code.

"**Controlled Investment Affiliate**" means any Affiliate of Sponsor which is organized primarily for making equity or debt investments in Holdings or other similar portfolio companies.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit H delivered by a Credit Party pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, the Intercreditor Agreement, any documents executed by the Administrative Agent in connection with or relating to the LC Deposit Account, any documents or certificates executed by Borrowers in favor of Issuing Bank relating to Letters of Credit, and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, Issuing Bank or any Lender in connection herewith.

"**Credit Extension**" means the making of a Loan, the issuing of a Letter of Credit or the making of an LC Deposit.

15

"**Credit Facilities**" means the credit facilities provided by the Lenders and Issuing Bank pursuant to this Agreement.

"**Credit Party**" means each Borrower and each Guarantor.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Debtors**" means Holdings, Systems, and certain Subsidiaries named as debtors in the Plan, each as debtor in the Cases under Chapter 11 of the Bankruptcy Code.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (including such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Defaulting Lender.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (ii) the date on which (a) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Section 2.13 or Section 2.14 or by a combination thereof) and (b) such Defaulting Lender shall have delivered to Borrowers and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitments, and (iii) the date on which Borrowers, Administrative Agent and Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"**Defaulted Loan**" as defined in Section 2.22.

"**Defaulting Lender**" as defined in Section 2.22.

16

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**DIP Order**" means the Interim DIP Order or the Final DIP Order, as applicable.

"**Disclosure Statement**" means the written disclosure statement that relates to the Plan, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure, as such disclosure statement may be amended, modified or supplemented from time to time in accordance with applicable law.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Eligible Assignee**" means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans; provided, no Affiliate of Holdings or Sponsor shall be an Eligible Assignee.

"**Employee Benefit Plan**" means, in respect of any Credit Party other than a Canadian Credit Party, any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates, and in respect of any Canadian Credit Party, any employee benefit plan of any nature or kind that is not a Pension Plan

17

or Multiemployer Plan and is maintained by or contributed to, or required to be maintained by or contributed to, by such Canadian Credit Party.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, state or provincial (or any subdivision of either of them), statutes, ordinances, standards, decrees, orders-in-council, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use (as it relates to Hazardous Materials) or the protection of human, plant or animal health or welfare (as it relates to Hazardous Materials) or of the environment or natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata), in any manner applicable to Holdings or any of its Subsidiaries or any Facility.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Holdings or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Holdings or such Subsidiary and with respect to

18

liabilities arising after such period for which Holdings or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means, only to the extent such event would not be discharged by the consummation of the Plan on the Plan Effective Date, (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Holdings, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

19

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Executive Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president (or the equivalent thereof), such Person's chief financial officer or treasurer and (except for purposes of Sections 5.2 and 6.8) such Person's vice president of human resources and risk management.

"**Existing Credit Agreement**" has the meaning specified in the recitals to this Agreement.

"**Existing Credit Facilities**" has the meaning specified in the recitals to this Agreement.

"**Existing Term Loans**" has the meaning specified in the recitals to this Agreement.

"**Existing DIP Credit Agreement**" means the post-petition credit agreement, dated as of August 1, 2005, as amended, among Borrowers, the other credit parties party thereto, the lenders party thereto and General Electric Capital Corporation, Morgan Stanley Senior Funding, Inc. and Marathon Structured Finance Fund, L.P., as agents.

"**Existing DIP Credit Agreement Reserve Amount**" means an amount equal to the "Reserve" under and as defined in the letter agreement, dated as of March 30, 2007, by and among each of the Debtors, General Electric Capital Corporation and Morgan Stanley Senior Funding, Inc.

"**Existing Indebtedness**" means all Indebtedness and other Obligations (as defined therein) outstanding under the Existing DIP Credit Agreement and other documents related thereto.

"**Exit Facilities**" means the Credit Facilities after the Exit Facilities Conversion Date.

20

"**Exit Facilities Conversion Date**" means the first date on which a Plan becomes effective, the Exit Facilities Option has been exercised and each of the conditions to exercising the Exit Facilities Option set forth in Section 3.4 has been satisfied or waived.

"**Exit Facilities Option**" as defined in Section 3.3.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by Administrative Agent.

"**Final DIP Order**" that certain Final Order under 11 U.S.C. §§ 105(a), 362, 363, and 364 and bankruptcy rules 2002, 4001, 6004, and 9014 (i) authorizing Debtors to (a) obtain new secured post-petition financing to refinance existing post-petition financing; (b) convert new post-petition financing into exit financing; and (c) pay related fees and expenses, and (ii) granting related relief entered by the Bankruptcy Court on April 13, 2007, as amended, supplemented or otherwise modified by the Interim Supplemental DIP Order and Final Supplemental DIP Order.

"**Final Supplemental DIP Order**" means an order (in form and substance substantially similar to the Interim DIP Order and otherwise satisfactory to Syndication Agent and Administrative Agent) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Credit Documents that (a) has not been modified or amended without the consent of Administrative Agent and Syndication Agent, or vacated, reversed, revoked, rescinded, stayed or appealed from, except as Administrative Agent and Syndication Agent may otherwise specifically consent, (b) with respect to which the time to

21

appeal, petition for certiorari, application or motion for reversal, rehearing, reargument, stay, or modification has expired, (c) no petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for a writ of certiorari with respect thereto has been filed or granted or the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order or judgment was appealed and (d) is no longer subject to any or further appeal or petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for any writ of certiorari with respect thereto or further judicial review in any form.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Holdings that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Financial Plan**" as defined in Section 5.1(i).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Funding Default**" as defined in Section 2.22.

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

22

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, state, provincial, municipal, national or other government, governmental department, commission, board, bureau, court, tribunal, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" as defined in the Pledge and Security Agreement.

"**GSCP**" as defined in the preamble.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each Domestic Subsidiary of either Borrower and (except as provided in Section 7.12) each Canadian Subsidiary of either Borrower, excluding in each case, any Inactive Subsidiary.

"**Guarantor Subsidiary**" means each Guarantor.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Haul Insurance**" means, collectively, (a) Haul Insurance Limited, a Cayman Islands corporation, and (b) any other captive insurance company hereafter formed by Holdings.

23

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedge Agreement**" means an Interest Rate Agreement, a Currency Agreement or a Commodity Agreement entered into with a Lender Counterparty and reasonably satisfactory to Administrative Agent.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of Holdings and its Subsidiaries, for the Fiscal Years ended December 31, 2003, December 31, 2004 and December 31, 2005, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, (ii) the unaudited financial statements of Holdings and its Subsidiaries as at the most recent Fiscal Quarter ending 45 days or more prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the twelve month period, ending on such date, and (ii) the unaudited financial statements of Holdings and its Subsidiaries as at the most recent calendar month ending 45 days or more prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for such month and, in the case of clauses (i), (ii) and (iii), certified by the chief financial officer of Holdings that they fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Holdings**" as defined in the preamble hereto.

"**Inactive Subsidiary**" means any Subsidiary of Holdings that has (i) no assets other than de minimus assets not exceeding $250,000, (ii) no revenues and (iii) no income.

"**Increased-Cost Lenders**" as defined in Section 2.23.

"**Indebtedness**", as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and bankers acceptances; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA), which purchase price is (a) due more than six months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person (other than a Lien on leased property (real or personal) granted by the landlord or lessor thereof) regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vi) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) Disqualified Equity Interests, (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation which would be Indebtedness of another; (ix) any obligation which would be Indebtedness of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation which would be Indebtedness of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; and (xi) all obligations which would be Indebtedness of such Person in respect of any exchange traded or over the counter derivative transaction, including any Hedge Agreement, whether entered into for hedging or speculative purposes; provided, in no event shall obligations under any Hedge Agreement be deemed "Indebtedness" for any purpose under Section 6.7.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby

25

(including the Lenders' agreement to make Credit Extensions or Issuing Bank's agreement to issue Letters of Credit or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements contained in the commitment letter delivered by any Lender to Borrowers with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries.

"**Indemnitee**" as defined in Section 10.3.

"**Initial Mortgaged Property**" as defined in Section 3.4(b)(i).

"**Installment**" as defined in Section 2.12.

"**Intellectual Property**" as defined in the Pledge and Security Agreement or the Canadian Pledge and Security Agreement, as applicable.

"**Intellectual Property Asset**" means, at the time of determination, any interest (fee, license or otherwise) then owned by any Credit Party in any Intellectual Property.

"**Intellectual Property Security Agreements**" has the meaning assigned to that term in the Pledge and Security Agreement or the Canadian Pledge and Security Agreement, as applicable.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit L evidencing Indebtedness owed among the Credit Parties and their Subsidiaries.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the Restatement Date, among the Collateral Agent, Borrower, and the Second Lien Collateral Agent.

"**Interim DIP Order**" means that certain Interim Order under 11 U.S.C. §§ 105(a), 362, 363, and 364 and bankruptcy rules 2002, 4001, 6004, and 9014 (i) authorizing Debtors to (a) obtain new secured post-petition financing to refinance existing post-petition financing; (b) convert new post-petition financing into exit financing; and (c) pay related fees and expenses, and (ii) granting related relief entered by the Bankruptcy Court on March 26, 2007, as amended, supplemented or otherwise modified by the Interim Supplemental DIP Order and Final Supplemental DIP Order.

**"Interim Supplemental DIP Order"** means an order (in substantially the form of Exhibit M and otherwise in form and substance satisfactory to Syndication Agent and Administrative Agent) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code entered after an interim hearing approving this Agreement and the other Credit Documents, as to which no stay has been entered and which has not been reversed, vacated or overturned, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Syndication Agent and Administrative Agent waive such requirement, and which has not been amended, supplemented or otherwise modified in any respect adverse to the Lenders without the prior written consent of Syndication Agent and Administrative Agent.

**"Interim Supplemental DIP Order"** means an order (in substantially the form of Exhibit M and otherwise in form and substance satisfactory to Syndication Agent and Administrative Agent) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code entered after an interim hearing approving this Agreement and the other Credit Documents, as to which no stay has been entered and which has not been reversed, vacated or overturned, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Syndication Agent and Administrative Agent waive such requirement, and which has not been amended, supplemented or otherwise modified in any respect adverse to the Lenders without the prior written consent of Syndication Agent and Administrative Agent.

**"Interest Coverage Ratio"** means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Adjusted EBITDA for the four Fiscal Quarter period then ended to (ii) Consolidated Interest Expense for such four Fiscal Quarter period; _provided_ that for any calculation of the Interest Coverage Ratio prior to April 1, 2008, Consolidated Interest Expense shall be (x) Consolidated Interest Expense for the period from April 1, 2007 through the end of the Fiscal Quarter for which the Interest Coverage Ratio is being calculated _divided_ by (y) the number of months included in the calculation made under clause (x) and _multiplied_ by (z) twelve (12); _provided further_ that for purposes of this definition, Consolidated Interest Expense shall exclude any upfront fees and ancillary costs incurred in connection with the transactions contemplated hereunder and any amortization thereof and any amortization or write down of fees relating to the financings being refinanced as part of the transactions contemplated hereunder.

**"Interest Payment Date"** means with respect to (i) any Loan that is a Base Rate Loan, each February 1, May 1, August 1 and November 1 of each year, commencing on the first such date to occur after the Closing Date and the final maturity date of such Loan; and (ii) any Loan that is a Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; _provided_, in the case of each Interest Period of longer than three months "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period.

**"Interest Period"** means, in connection with a Eurodollar Rate Loan, an interest period of one-, two-, three- or six-months, as selected by Borrowers in the applicable Funding

27

Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clauses (c) and (d), of this definition, end on the last Business Day of a calendar month; (c) no Interest Period with respect to any portion of the Term Loans shall extend beyond the Maturity Date; and (d) no Interest Period with respect to any portion of the Revolving Loans shall extend beyond the Revolving Commitment Termination Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than a Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person (other than Holdings or any Guarantor Subsidiary), of any Equity Interests of such Person; and (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Holdings or any of its Subsidiaries to any other Person (other than Holdings or any Guarantor Subsidiary), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Issuance Notice**" means an Issuance Notice substantially in the form of Exhibit A-3.

28

"**Issuing Bank**" means JPMorgan Chase Bank N.A. or a bank or other legally authorized Person selected by or acceptable to Administrative Agent in its sole discretion and guaranteed by Administrative Agent.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Landlord Consent and Estoppel**" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related lease, pursuant to which, among other things, the landlord consents to the granting of a Mortgage on such Leasehold Property by the Credit Party tenant, such Landlord Consent and Estoppel to be in form and substance acceptable to Collateral Agent in its reasonable discretion, but in any event sufficient for Collateral Agent to obtain a Title Policy with respect to such Mortgage.

"**Landlord Personal Property Collateral Access Agreement**" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit K with such amendments or modifications as may be approved by Collateral Agent.

"**LC Commitment**" means the commitment of a Lender to make LC Deposits hereunder and "**LC Commitments**" means such commitments of all Lenders.  The amount of each Lender's LC Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the LC Commitments as of the Closing Date is $50,000,000.

"**LC Commitment Period**" means the period from the Closing Date to but excluding the LC Commitment Termination Date.

"**LC Commitment Termination Date**" means the earliest to occur of (i) April 13, 2007, if the initial Term Loans are not made on or before that date, (ii) September 30, 2007, which date shall at the option of Holdings and upon satisfaction of the conditions set forth in Section 3.4, be deemed extended to the fifth anniversary of the Exit Facilities Conversion Date, (iii) the date the LC Commitments are permanently reduced to zero pursuant to Section 2.13(b), and (iv) the date of the termination of the LC Commitments pursuant to Section 8.1.

"**LC Deposit**" means, with respect to each LC Lender, the amount of such LC Lender's LC Commitment that such LC Lender shall deposit in such LC Lender's Sub-Account with Administrative Agent on or after the Closing Date, and that amount shall in turn be deposited by Administrative Agent in the LC Deposit Account, as such amount may be (a) reduced or reinstated from time to time as a result of withdrawals from the LC Deposit Account

29

debited by Administrative Agent from and payments to the LC Deposit Account credited by Administrative Agent to the Sub-Account of such LC Lender pursuant to Section 2.4, and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.6 and, "**LC Deposits**" mean such deposits of all LC Lenders.

"**LC Deposit Account**" as defined in Section 2.4(i).

"**LC Deposit Return**" shall mean the amount earned and received by the Administrative Agent from time to time on the investment of the amounts held in the LC Deposit Account in accordance with Section 2.4(m).

"**LC Depositary Bank**" shall mean the Issuing Bank or such other commercial bank or its affiliates organized under the laws of the United States, or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000.

"**LC Disbursement**" means a payment made by Issuing Bank pursuant to a Letter of Credit.

"**LC Exposure**" means, with respect to any Lender, as of any date of determination, such Lender's Pro Rata Share of the aggregate LC Deposits and LC Usage (other than the portion of such LC Usage represented by amounts available for drawing, but not yet drawn, under Letters of Credit).

"**LC Lender**" means a Lender having an interest in the LC Deposit Account or an LC Commitment.

"**LC Usage**" means, as of any date of determination, the sum of (i) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding, and (ii) the aggregate amount of all LC Disbursements not theretofore reimbursed by or on behalf of Borrowers.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

30

"**Lender Counterparty**" means each Lender or any Affiliate of a Lender counterparty to a Hedge Agreement (including any Person who is a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Hedge Agreement, ceases to be a Lender and any Person who enters into a Hedge Agreement in connection with the transactions contemplated by the Credit Documents prior to the Closing Date and is a Lender as of the Closing Date), including each such Affiliate that enters into a joinder agreement with Collateral Agent.

"**Letter of Credit**" means a commercial or standby letter of credit issued or to be issued by Issuing Bank pursuant to this Agreement.

"**Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Total Debt as of such day to (ii) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, hypothec, deemed trust, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a Term Loan and a Revolving Loan.

"**Management Agreement**" means any management agreement entered into on or after the Exit Facilities Conversion Date between the Sponsor or any of its Controlled Investment Affiliates and Holdings reasonably acceptable to Administrative Agent.

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means (i) a material adverse effect on and/or material adverse developments with respect to the business, operations, properties, assets or condition (financial or otherwise) of Holdings and its Subsidiaries taken as a whole; (ii) a material impairment of the ability of Credit Parties to fully and timely perform their Obligations; (iii) a material adverse effect on and/or material adverse developments with respect to the legality, validity, binding effect or enforceability against a Credit Party of a Credit Document to which it is a party; or (iv) a material impairment of the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

31

"**Material Contract**" means (i) any contract or other arrangement between Holdings or any of its Subsidiaries and their customers that represented 10% or more of the Consolidated Net Income of Holdings and its Subsidiaries for the most recently ended Fiscal Year and (ii) any collective bargaining agreement to which Holdings or any of its Subsidiaries is a party.

"**Material Real Estate Asset**" means (i) any fee-owned Real Estate Asset having a fair market value in excess of $1,500,000 (as reasonably determined by Borrowers) and (ii) all Leasehold Properties other than those with respect to which the aggregate payments under the term of the lease are less than $500,000 per annum.

"**Maturity Date**" means the earlier of (i) September 30, 2007, which date shall at the option of Holdings and upon satisfaction or waiver of the conditions set forth in Section 3.4, be deemed extended to the fifth anniversary of the Exit Facilities Conversion Date, (ii) the Plan Effective Date, if the conditions set forth in Section 3.4 have not been satisfied or waived on or prior to such date and (iii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means a Mortgage substantially in the form of Exhibit J, as it may be amended, supplemented or otherwise modified from time to time, with respect to real property located in the United States, and a mortgage or charge under applicable provincial law as may be required by Collateral Agent, in form and substance satisfactory to Collateral Agent, in order to grant a First Priority Lien in favor of Collateral Agent for the benefit of the Secured Parties in real property in which any Canadian Credit Party may have an interest and which is located in a province of Canada, including, without limitation, applicable Quebec Security, in each case, as it may be amended, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" means in respect of any Credit Party other than a Canadian Credit Party, any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA and in respect of any Canadian Credit Party, any "multiemployer pension plan" as defined in subsection 1(1) of the Pension Benefits Act (Ontario) or section 2 of the Pensions Benefits Standard Act, 1985 (Canada).

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Holdings and its Subsidiaries in the form prepared for presentation to senior management thereof for the

32

applicable Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Holdings or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Holdings or any of its Subsidiaries in connection with such Asset Sale.

"**Net Cash Proceeds**" means, (i) with respect to any Asset Sale, the Net Asset Sale Proceeds and (ii) with respect to any Recovery Event, the Net Insurance/Condemnation Proceeds.

"**Net Insurance/Condemnation Proceeds**" means, with respect to any Recovery Event, an amount equal to: (i) any Cash payments or proceeds received by Holdings or any of its Subsidiaries in connection with a Recovery Event, minus (ii) (a) any actual and reasonable costs incurred by Holdings or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Holdings or such Subsidiary in respect of such Recovery Event, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (ii) of the definition of Recovery Event, including income taxes payable as a result of any gain recognized in connection therewith.

"**Nonpublic Information**" means information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"**Non-US Lender**" as defined in Section 2.20(c).

"**Note**" means a Term Loan Note, a Revolving Loan Note or a Swing Line Note.

"**Notice**" means a Funding Notice, an Issuance Notice, or a Conversion/Continuation Notice.

"**Obligations**" means all obligations of every nature of each Credit Party, including obligations from time to time owed to the Agents (including former Agents), the

33

Lenders or any of them and Lender Counterparties, under any Credit Document or Hedge Agreement with any Credit Party, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under Letters of Credit, payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"**Obligee Guarantor**" as defined in Section 7.7.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation, amalgamation or organization, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended, and (v) with respect to an unlimited liability company, its memorandum and articles of association. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means, in respect of any Credit Party other than any Canadian Credit Party, any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA and in respect of any Canadian Credit Party, each pension, supplementary pension, retirement savings or other retirement income plan or arrangement of any kind, registered or non-registered, established, maintained or contributed to by such Canadian Credit Party for its employees or former employees, but does not include a Multiemployer Plan or the Canada Pension Plan or the Quebec Pension Plan that is maintained by the Government of Canada or the Province of Quebec, respectively.

"**Permitted Acquisition**" means any acquisition by Holdings or any of its wholly-owned Subsidiaries after the Exit Facilities Conversion Date, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all of the Equity Interests of, or a business line or unit or a division of, any Person; provided,

34

(i)     immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(ii)    all transactions in connection therewith shall be consummated, in all material respects, in accordance with all applicable laws and in conformity, in all material respects, with all applicable Governmental Authorizations;

(iii)   in the case of the acquisition of Equity Interests, all of the Equity Interests (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law) acquired or otherwise issued by such Person or any newly formed Subsidiary of Holdings in connection with such acquisition shall be directly or indirectly owned 100% by Holdings or a Guarantor Subsidiary thereof, and Holdings shall have taken, or caused to be taken, as of the date such Person becomes a Subsidiary of Holdings, each of the actions set forth in Sections 5.10 and/or 5.11, as applicable;

(iv)    the Interest Coverage Ratio on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended for which financial statements have been delivered pursuant to Section 5.1(b) or (c) (as determined in accordance with Section 6.7(e)) shall be no less than the correlative ratio indicated:

| | |
|---|---|
| June 30, 2007 | 1.60:1.00 |
| September 30, 2007 | 1.80:1.00 |
| December 31, 2007 | 2.00:1.00 |
| March 31, 2008 | 2.25:1.00 |
| June 30, 2008 | 2.50:1.00 |
| September 30, 2008 | 2.75:1.00 |
| December 31, 2008 | 2.75:1.00 |
| March 31, 2009 | 2.75:1.00 |
| June 30, 2009 | 3.00:1.00 |
| September 30, 2009 | 3.00:1.00 |
| December 31, 2009 | 3.00:1.00 |
| March 31, 2010 | 3.00:1.00 |
| June 30, 2010 | 3.00:1.00 |

35

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| September 30, 2010 | 3.00:1.00 |
| December 31, 2010 | 3.00:1.00 |
| Thereafter | 3.50:1.00 |

(v)    the Leverage Ratio on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended for which financial statements have been delivered pursuant to Section 5.1(b) or (c) (as determined in accordance with Section 6.7(e)) shall be no greater than the correlative ratio indicated:

| | |
|---|---|
| June 30, 2007 | 6.50:1.00 |
| September 30, 2007 | 5.50:1.00 |
| December 31, 2007 | 4.75:1.00 |
| March 31, 2008 | 4.25:1.00 |
| June 30, 2008 | 3.25:1.00 |
| September 30, 2008 | 3.25:1.00 |
| December 31, 2008 | 3.25:1.00 |
| March 31, 2009 | 3.00:1.00 |
| June 30, 2009 | 3.00:1.00 |
| September 30, 2009 | 3.00:1.00 |
| December 31, 2009 | 3.00:1.00 |
| March 31, 2010 | 3.00:1.00 |
| June 30, 2010 | 3.00:1.00 |
| September 30, 2010 | 3.00:1.00 |
| December 31, 2010 | 3.00:1.00 |
| Thereafter | 2.50:1.00 |

(vi)    Holdings and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 6.7 on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended for which financial statements have been delivered pursuant to Section 5.1(b) or (c) (as determined in accordance with Section 6.7(e));

(vii)    for any proposed acquisition in excess of $5,000,000, Holdings shall have delivered to Administrative Agent (A) at least 10 Business Days prior to

36

such proposed acquisition, (i) a Compliance Certificate evidencing compliance with Section 6.7 as required under clause (vi) above and (ii) all other relevant financial information with respect to such acquired assets, including the aggregate consideration for such acquisition and any other information required to demonstrate compliance with Section 6.7 and (B) promptly upon request by Administrative Agent, (i) a copy of the purchase agreement related to the proposed Permitted Acquisition (and any related documents reasonably requested by Administrative Agent) and (ii) quarterly and annual financial statements of the Person whose Equity Interests or assets are being acquired for the twelve month (12) month period immediately prior to such proposed Permitted Acquisition, including any audited financial statements that are available;

(viii)  any Person or assets or division as acquired in accordance herewith (y) shall be in same business or lines of business in which Holdings and/or its Subsidiaries are engaged as of the Closing Date and (z) shall have generated positive free cash flow (excluding capital expenditures) for the four quarter period most recently ended prior to the date of such acquisition;

(ix)   an Authorized Officer of Holdings shall certify that Holdings reasonably believes that, after giving effect to the Permitted Acquisition, Holdings and its Subsidiaries shall remain in compliance with Section 6.7(c);

(x)    during the 30 day period prior to the date of such proposed acquisition, the excess of (x) the aggregate Revolving Commitments over (y) the Total Utilization of the Revolving Commitments shall be no less than $20,000,000 for at least 5 consecutive Business Days at any time during such period; and

(xi)   the aggregate unused portion of the Revolving Commitments at such time (after giving effect to the consummation of the respective Permitted Acquisition and any financing thereof) shall equal or exceed $20,000,000.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, unlimited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

37

"**Petition Date**" has the meaning specified in the recitals to this Agreement.

"**Plan**" means the Chapter 11 plan of reorganization with respect to the Debtors confirmed by the Bankruptcy Court.

"**Plan Effective Date**" means the Effective Date as defined in the Plan.

"**Planned Asset Sales**" means the Asset Sales identified on Schedule 6.8(a).

"**Platform**" as defined in Section 5.1(q).

"**Pledge and Security Agreement**" means the Amended and Restated Pledge and Security Agreement, dated as of the Restatement Date, by Borrowers and each Guarantor substantially in the form of Exhibit I, as it may be amended, supplemented or otherwise modified from time to time.

"**Prepetition Indebtedness**" means all Indebtedness of any of Borrowers and their Subsidiaries outstanding on the Petition Date immediately prior to the filing of the Cases.

"**Prime Rate**" means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means, for each of Administrative Agent, Swing Line Lender and Issuing Bank, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrowers, Administrative Agent and each Lender.

"**Projections**" as defined in Section 4.8.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Term Loan of any Lender, the percentage obtained by dividing (a) the Term Loan Exposure of that Lender by (b) the aggregate Term Loan Exposure of all Lenders; (ii) with respect to all payments, computations and other matters relating to the participations in Letters of Credit, the LC Deposits or the LC Disbursements, the percentage obtained by dividing (a) the LC Exposure of such Lender by (b) the aggregate LC Exposure of all Lenders; (iii) with

38

respect to all payments, computations and other matters relating to the Revolving Commitment or Revolving Loans of any Lender or participations in Swing Line Loans purchased therein by any Lender the percentage obtained by dividing (a) the Revolving Exposure of such Lender by (b) the aggregate Revolving Exposure of all Lenders.  For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Term Loan Exposure, the LC Exposure and the Revolving Exposure of that Lender, by (B) an amount equal to the sum of the aggregate Term Loan Exposure, the aggregate LC Exposure and the aggregate Revolving Exposure of all Lenders.

"**Public Information**" means information which has been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"**Qualified Public Offering**" shall mean an underwritten public offering of common stock of Holdings to the extent that net proceeds received by Holdings are contributed to the equity capital of Holdings pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act that results in at least $50,000,000 of net cash proceeds to Holdings and results in the listing of the common stock of Holdings on a national securities exchange or the NASDAQ National Market quotation system.

"**Quebec Security**" means one or more demand debentures, pledges of debenture and deeds of hypothec, as may be required by Collateral Agent in order to grant a First Priority Lien in favor of Collateral Agent for the benefit of the Secured Parties in property or assets in which any Canadian Credit Party may have an interest and which is located in the Province of Quebec, in each case, in form and substance satisfactory to Collateral Agent and as may be amended, supplemented or otherwise modified from time to time.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Collateral Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third-party purchasers and encumbrancers of the affected real property.

39

"**Recovery Event**" means (i) any settlement of or payment in respect of any property or casualty insurance claim in respect of a covered loss thereunder or (ii) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking.

"**Refunded Swing Line Loans**" as defined in Section 2.3(b)(iv).

"**Register**" as defined in Section 2.7(b).

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time.

"**Regulation FD**" means Regulation FD as promulgated by the US Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

"**Reimbursement Date**" as defined in Section 2.4(d).

"**Reinvestment Deferred Amount**" means, with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by Holdings or its Subsidiaries in connection therewith that are not applied pursuant to Section 2.15(b) as a result of the delivery of a Reinvestment Notice.

"**Reinvestment Event**" means any Asset Sale or Recovery Event in respect of which Holdings has delivered a Reinvestment Notice.

"**Reinvestment Notice**" means a written notice executed by an Authorized Officer (i) stating that Holdings (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to repair or replace the assets which were the subject of such Asset Sale or Recovery Event or to acquire or improve Useful Assets and (ii) certifying that no Default or Event of Default shall have occurred and be continuing at such time.

"**Reinvestment Prepayment Amount**" means, with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to repair or replace the assets which were the subject of the relevant Asset Sale or Recovery Event or to acquire or improve Useful Assets.

"**Reinvestment Prepayment Date**"  means, with respect to any Reinvestment Event, the earlier of (i) the date occurring 270 days after such Reinvestment Event or if Holdings or its Subsidiaries enter into a legally binding commitment to reinvest the relevant Reinvestment Deferred Amount within 270 days after such Reinvestment Event, the date occurring 450 days after such Reinvestment Event and (ii) the date on which Holdings or its Subsidiaries shall have determined not to use all or any portion of the relevant Reinvestment Deferred Amount to repair or replace the assets which were the subject of the relevant Asset Sale or Recovery Event or to acquire or improve Useful Assets, but in the case of this clause (ii) only with respect to the portion of the applicable Reinvestment Deferred Amount as to which such determination has been made.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Lender**" as defined in Section 2.23.

"**Requisite Lenders**" means one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.

"**Restatement Date**" means May 15, 2007.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Holdings now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Holdings now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Holdings now or hereafter outstanding; (iv) management or similar fees payable to Sponsor or any of its Affiliates and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to the Indebtedness outstanding under the Second

Lien Credit Agreement or any Indebtedness which is subordinated in right of payment to the Obligations (other than the conversion of any of such Indebtedness to common Equity Interests of Holdings).

"**Revolving Commitment**" means the commitment of a Lender to make or otherwise fund any Revolving Loan and to acquire participations in Swing Line Loans hereunder and "**Revolving Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Revolving Commitment, if any, is set forth on Appendix A-3 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Commitments as of the Closing Date is $35,000,000.

"**Revolving Commitment Period**" means the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

"**Revolving Commitment Termination Date**" means the earliest to occur of (i) April 13, 2007, if the initial Term Loans are not made on or before that date; (ii) September 30, 2007, which date shall at the option of Holdings and upon satisfaction of the conditions set forth in Section 3.4, be deemed extended to the fifth anniversary of the Exit Facilities Conversion Date, (iii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.13(b), and (iv) the date of the termination of the Revolving Commitments pursuant to Section 8.1.

"**Revolving Exposure**" means, with respect to any Lender as of any date of determination, (i) prior to the termination of the Revolving Commitments, that Lender's Revolving Commitment; and (ii) after the termination of the Revolving Commitments, the sum of (a) the aggregate outstanding principal amount of the Revolving Loans of that Lender, (b) in the case of Swing Line Lender, the aggregate outstanding principal amount of all Swing Line Loans (net of any participations therein by other Lenders), and (c) the aggregate amount of all participations therein by that Lender in any outstanding Swing Line Loans.

"**Revolving Loan**" means a loan made by a Lender to Borrowers pursuant to Section 2.2(a).

"**Revolving Loan Note**" means a promissory note in the form of Exhibit B-2, as it may be amended, supplemented or otherwise modified from time to time.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation.

"**Second Lien Collateral Agent**" means the collateral agent under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means the Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of the Restatement Date, by and among GSCP as sole lead arranger, sole book runner and sole syndication agent and the other agents and lenders party thereto, as such may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement.

"**Second Lien Credit Documents**" shall mean the "Credit Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Term Loans**" means term loans in an aggregate principal amount of $50,000,000 made on the Restatement Date under the Second Lien Credit Agreement.

"**Secured Parties**" has the meaning assigned to that term in the Pledge and Security Agreement and the Canadian Pledge and Security Agreement, as applicable.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Solvency Certificate**" means a Solvency Certificate of the chief financial officer of Holdings substantially in the form of Exhibit G-2.

"**Solvent**" means, with respect to the Credit Parties, that as of the date of determination, both (i) (a) the sum of such Credit Parties' debt (including contingent liabilities) does not exceed the present fair saleable value of the Credit Parties' present assets; (b) the Credit Parties' capital is not unreasonably small in relation to their business; and (c) the Credit Parties have not incurred and do not intend to incur, or believe (nor should they reasonably believe) that they will incur, debts beyond their ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) the Credit Parties are "solvent" within the meaning given that term and similar terms under the Bankruptcy Code and applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability

43

at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Spent Committed Capital Expenditures**" as defined in Section 6.7(d).

"**Sponsor**" means, collectively, Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP.

"**Sub-Account**" as defined in Section 2.4(i).

"**Subject Transaction**" as defined in Section 6.7(e).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, unlimited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Swing Line Lender**" means CIT in its capacity as Swing Line Lender hereunder, together with its permitted successors and assigns in such capacity.

"**Swing Line Loan**" means a Loan made by Swing Line Lender to Borrowers pursuant to Section 2.3.

"**Swing Line Note**" means a promissory note in the form of Exhibit B-3, as it may be amended, supplemented or otherwise modified from time to time.

"**Swing Line Sublimit**" means the lesser of (i) $10,000,000 and (ii) the aggregate unused amount of Revolving Commitments then in effect.

"**Syndication Agent**" as defined in the preamble hereto.

44

"**Systems**" as defined in the preamble hereto.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed; provided, "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"**Term Loan**" means a loan made by a Lender to Borrowers pursuant to Section 2.1(a).

"**Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund any Term Loan and "**Term Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Term Loan Commitment, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Term Loan Commitments as of the Restatement Date is $180,000,000.

"**Term Loan Commitment Period**" means the period from the Closing Date to but excluding the Term Loan Commitment Termination Date.

"**Term Loan Commitment Termination Date**" means the earliest to occur of (i) April 13, 2007, if the initial Term Loans are not made on or before that date; (ii) September 30, 2007, which date shall at the option of Holdings and upon satisfaction of the conditions set forth in Section 3.4, be deemed extended to March 30, 2008, (iii) the date the Term Loan Commitments are permanently reduced to zero pursuant to Section 2.13(b), and (iv) the date of the termination of the Term Loan Commitments pursuant to Section 8.1.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment.

45

"**Term Loan Funding Period**" means the period from the Closing Date to and including the 6th month anniversary of the Closing Date and, upon satisfaction of the conditions set forth in Section 3.4, be deemed extended to the one year anniversary of the Closing Date.

"**Term Loan Note**" means a promissory note in the form of Exhibit B-1, as it may be amended, supplemented or otherwise modified from time to time.

"**Terminated Lender**" as defined in Section 2.23.

"**Title Policy**" as defined in Section 3.4(b)(v).

"**Total Utilization of Revolving Commitments**" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of repaying any Refunded Swing Line Loans, but not yet so applied) and (ii) the aggregate principal amount of all outstanding Swing Line Loans.

"**Transaction Costs**" means the fees, costs and expenses payable by Borrowers, or any of Subsidiaries of Borrowers on or before the Closing Date in connection with the transactions contemplated by the Credit Documents.

"**Type of Loan**" means (i) with respect to either Term Loans or Revolving Loans, a Base Rate Loan or a Eurodollar Rate Loan, and (ii) with respect to Swing Line Loans, a Base Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**U.S. Lender**" as defined in Section 2.20(c).

"**Useful Assets**" means, in the case of an Asset Sale, assets useful in the business of Holdings and its Subsidiaries and, in the case of a Recovery Event, long term or otherwise non-current productive assets of the general type used in the business of Holdings and its Subsidiaries.

**1.2    Accounting Terms**. (a) Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Holdings to Lenders pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the

reconciliation statements provided for in Section 5.1(e), if applicable). Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

(b)     If at any time the adoption of fresh-start accounting would affect the computation of any financial ratio or requirement set forth in this Agreement and either Borrowers or the Requisite Lenders shall so request, Administrative Agent and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such adoption of fresh-start accounting (subject to the approval of the Requisite Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP, as applicable, prior to such change therein and (ii) Borrowers shall provide the reconciliation statements required by Section 5.1(e).

1.3     **Interpretation, etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The terms lease and license shall include sub-lease and sub-license, as applicable.

## SECTION 2. LOANS AND LETTERS OF CREDIT

2.1     **Term Loans.**

(a)     Loan Commitments.  Subject to the terms and conditions hereof, during the Term Commitment Period, each Lender severally agrees to make Term Loans to Borrowers in an aggregate amount up to but not exceeding such Lender's Term Loan Commitment; provided that after giving effect to the making of any Term Loans in no event shall the amount of Term Loans made hereunder exceed the Term Loan Commitments then in effect.  Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed. For the avoidance of doubt, as of the Restatement Date the Term Loans have been fully funded and the aggregate unfunded Term Loan Commitments equal $0.  Subject to Sections 2.13(a) and 2.14, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Maturity Date.

(b)     Borrowing Mechanics for Term Loans.

47

(i)    Term Loans shall be made in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount.

(ii)    Whenever any Borrower desires that Lenders make a Term Loan, such Borrower shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 11:00 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Revolving Loan that is a Base Rate Loan. Except as otherwise provided herein, a Funding Notice for a Term Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and the applicable Borrower shall be bound to make a borrowing in accordance therewith.

(iii)    Notice of receipt of each Funding Notice in respect of Term Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each applicable Lender by telefacsimile with reasonable promptness, but (provided Administrative Agent shall have received such notice by 11:00 a.m. (New York City time)) not later than 2:00 p.m. (New York City time) on the same day as Administrative Agent's receipt of such Notice from such Borrower.

(iv)    Each Lender shall make its Term Loan available to Administrative Agent not later than 1:00 p.m. (New York City time) on the applicable Credit Date, by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent. Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Term Loans available to Borrowers on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Term Loans received by Administrative Agent from Lenders to be credited to the account of Borrowers at the Principal Office designated by Administrative Agent or to such other account as may be designated in writing to Administrative Agent by Borrowers.

(v)    Notwithstanding anything to the contrary herein, Borrowers may only request the Lenders to make Term Loans on up to three occasions (including the Closing Date) during the Term Loan Funding Period.

(vi)    Unless the Term Loan Commitments have been reduced in accordance with Section 2.13(b) or terminated in accordance with Section 8.1, on the last day of the Term Loan Funding Period, Borrowers shall be deemed to have made a funding request for a final Term Loan in an aggregate amount equal to the excess of (A) the Term Loan Commitments and (B) the aggregate principal amount of Term Loans previously made by the Lenders hereunder. The Credit Date for such final Term Loan shall be three Business Days after the last day of the Term Loan Funding Period.

48

Administrative Agent shall deliver notice to each Lender with a Term Loan Commitment of such request in accordance with paragraph (ii) above.

**2.2    Revolving Loans.**

(a)    <u>Revolving Commitments</u>.  During the Revolving Commitment Period, subject to the terms and conditions hereof, each Lender severally agrees to make Revolving Loans to Borrowers in an aggregate amount up to but not exceeding such Lender's Revolving Commitment; <u>provided</u>, that after giving effect to the making of any Revolving Loans in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect.  Amounts borrowed pursuant to this Section 2.2(a) may be repaid and reborrowed during the Revolving Commitment Period.  Each Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Loans and the Revolving Commitments shall be paid in full no later than such date.

(b)    <u>Borrowing Mechanics for Revolving Loans</u>.

(i)    Except pursuant to 2.4(d), Revolving Loans that are Base Rate Loans shall be made in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount, and Revolving Loans that are Eurodollar Rate Loans shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii)    Whenever any Borrower desires that Lenders make Revolving Loans, such Borrower shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 11:00 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Revolving Loan that is a Base Rate Loan.  Except as otherwise provided herein, a Funding Notice for a Revolving Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and the applicable Borrower shall be bound to make a borrowing in accordance therewith.

(iii)    Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each applicable Lender by telefacsimile with reasonable promptness, but (provided Administrative Agent shall have received such notice by 11:00 a.m. (New York City time)) not later than 2:00 p.m. (New York City time) on the same day as Administrative Agent's receipt of such Notice from such Borrower.

49

(iv)     Each Lender shall make the amount of its Revolving Loan available to Administrative Agent not later than 1:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Revolving Loans available to Borrowers on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by Administrative Agent from Lenders to be credited to the account of Borrowers at the Principal Office designated by Administrative Agent or such other account as may be designated in writing to Administrative Agent by Borrowers.

2.3     **Swing Line Loans.**

(a)     Swing Line Loans Commitments.  During the Revolving Commitment Period, subject to the terms and conditions hereof, Swing Line Lender hereby agrees to make Swing Line Loans to Borrowers in the aggregate amount up to but not exceeding the Swing Line Sublimit; provided, that after giving effect to the making of any Swing Line Loan, in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect.  Amounts borrowed pursuant to this Section 2.3 may be repaid and reborrowed during the Revolving Commitment Period.  Swing Line Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date and all Swing Line Loans and all other amounts owed hereunder with respect to the Swing Line Loans and the Revolving Commitments shall be paid in full no later than such date.

(b)     Borrowing Mechanics for Swing Line Loans.

(i)     Swing Line Loans shall be made in an aggregate minimum amount of $100,000 and integral multiples of $50,000 in excess of that amount.

(ii)     Whenever any Borrower desires that Swing Line Lender make a Swing Line Loan, such Borrower shall deliver to Administrative Agent a Funding Notice no later than 12:00 p.m. (New York City time) on the proposed Credit Date.

(iii)     Swing Line Lender shall make the amount of its Swing Line Loan available to Administrative Agent not later than 2:00 p.m.(New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at Administrative Agent's Principal Office. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Swing Line Loans available to the applicable Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Swing Line Loans received by Administrative Agent from Swing Line Lender to be credited to the account of Borrowers at Administrative Agent's

50

Principal Office, or to such other account as may be designated in writing to Administrative Agent by Borrowers.

(iv)     With respect to any Swing Line Loans which have not been voluntarily prepaid by Borrowers pursuant to Section 2.13, Swing Line Lender may at any time in its sole and absolute discretion, deliver to Administrative Agent (with a copy to Borrowers), no later than 11:00 a.m. (New York City time) at least one Business Day in advance of the proposed Credit Date, a notice (which shall be deemed to be a Funding Notice given by Borrowers, but Borrowers shall not be deemed to have made any representations and warranties in connection with such deemed Funding Notice) requesting that each Lender holding a Revolving Commitment make Revolving Loans that are Base Rate Loans to Borrowers on such Credit Date in an amount equal to the amount of such Swing Line Loans (the "**Refunded Swing Line Loans**") outstanding on the date such notice is given which Swing Line Lender requests Lenders to prepay. Anything contained in this Agreement to the contrary notwithstanding, (1) the proceeds of such Revolving Loans made by the Lenders other than Swing Line Lender shall be immediately delivered by Administrative Agent to Swing Line Lender (and not to Borrowers) and applied to repay a corresponding portion of the Refunded Swing Line Loans and (2) on the day such Revolving Loans are made, Swing Line Lender's Pro Rata Share of the Refunded Swing Line Loans shall be deemed to be paid with the proceeds of a Revolving Loan made by Swing Line Lender to Borrowers, and such portion of the Swing Line Loans deemed to be so paid shall no longer be outstanding as Swing Line Loans and shall no longer be due under the Swing Line Note of Swing Line Lender but shall instead constitute part of Swing Line Lender's outstanding Revolving Loans to Borrowers and shall be due under the Revolving Loan Note issued by Borrowers to Swing Line Lender. Borrowers hereby authorize Administrative Agent and Swing Line Lender to charge Borrowers' accounts with Administrative Agent and Swing Line Lender (up to the amount available in each such account) in order to immediately pay Swing Line Lender the amount of the Refunded Swing Line Loans to the extent the proceeds of such Revolving Loans made by Lenders, including the Revolving Loans deemed to be made by Swing Line Lender, are not sufficient to repay in full the Refunded Swing Line Loans. If any portion of any such amount paid (or deemed to be paid) to Swing Line Lender should be recovered by or on behalf of Borrowers from Swing Line Lender in bankruptcy, by assignment for the benefit of creditors or otherwise, the loss of the amount so recovered shall be ratably shared among all Lenders in the manner contemplated by Section 2.17.

(v)     If for any reason Revolving Loans are not made pursuant to Section 2.3(b)(iv) in an amount sufficient to repay any amounts owed to Swing Line Lender in respect of any outstanding Swing Line Loans on or before the third Business Day after demand for payment thereof by Swing Line Lender, each Lender holding a Revolving Commitment shall be deemed to, and hereby agrees to, have purchased a participation in such outstanding Swing Line Loans, and in an amount equal to its Pro Rata Share of the applicable unpaid amount together with accrued interest thereon. Upon one Business Day's notice from Swing Line Lender, each Lender holding a Revolving

51

Commitment shall deliver to Swing Line Lender an amount equal to its respective participation in the applicable unpaid amount in same day funds at the Principal Office of Swing Line Lender. In order to evidence such participation each Lender holding a Revolving Commitment agrees to enter into a participation agreement at the request of Swing Line Lender in form and substance reasonably satisfactory to Swing Line Lender. In the event any Lender holding a Revolving Commitment fails to make available to Swing Line Lender the amount of such Lender's participation as provided in this paragraph, Swing Line Lender shall be entitled to recover such amount on demand from such Lender together with interest thereon for three Business Days at the rate customarily used by Swing Line Lender for the correction of errors among banks and thereafter at the Base Rate, as applicable.

(vi)     Notwithstanding anything contained herein to the contrary, (1) each Lender's obligation to make Revolving Loans for the purpose of repaying any Refunded Swing Line Loans pursuant to the second preceding paragraph and each Lender's obligation to purchase a participation in any unpaid Swing Line Loans pursuant to the immediately preceding paragraph shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Swing Line Lender, any Credit Party or any other Person for any reason whatsoever; (B) the occurrence or continuation of a Default or Event of Default; (C) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of any Credit Party; (D) any breach of this Agreement or any other Credit Document by any party thereto; or (E) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing; provided that such obligations of each Lender are subject to the condition that Swing Line Lender believed in good faith that all conditions under Section 3.2 to the making of the applicable Refunded Swing Line Loans or other unpaid Swing Line Loans, were satisfied at the time such Refunded Swing Line Loans or unpaid Swing Line Loans were made, or the satisfaction of any such condition not satisfied had been waived by the Requisite Lenders prior to or at the time such Refunded Swing Line Loans or other unpaid Swing Line Loans were made; and (2) Swing Line Lender shall not be obligated to make any Swing Line Loans (A) if it has elected not to do so after the occurrence and during the continuation of a Default or Event of Default or (B) at a time when a Funding Default exists unless Swing Line Lender has entered into arrangements satisfactory to it and Borrowers to eliminate Swing Line Lender's risk with respect to the Defaulting Lender's participation in such Swing Ling Loan, including by cash collateralizing such Defaulting Lender's Pro Rata Share of the outstanding Swing Line Loans.

**2.4     Issuance of Letters of Credit and Purchase of Participations Therein.**

(a)     Letters of Credit. During the LC Commitment Period, subject to the terms and conditions hereof, Administrative Agent agrees to cause the Issuing Bank to issue Letters of Credit for the account of Borrowers in the aggregate amount up to but not exceeding the aggregate LC Commitments; provided, (i) each Letter of Credit shall be denominated in Dollars;

(ii) the stated amount of each Letter of Credit shall not be less than $100,000 or such lesser amount as is acceptable to Issuing Bank; (iii) after giving effect to such issuance, in no event shall the LC Usage exceed the amount in the LC Deposit Account; (iv) in no event shall any standby Letter of Credit have an expiration date later than the earlier of (1) after the Exit Facilities Conversion Date, the second Business Day prior to the LC Commitment Termination Date and (2) the date which is one year from the date of issuance of such standby Letter of Credit; and (v) in no event shall any commercial Letter of Credit (x) have an expiration date later than the earlier of (1) after the Exit Facilities Conversion Date, the second Business Day prior to the LC Commitment Termination Date and (2) the date which is 180 days from the date of issuance of such commercial Letter of Credit or (y) be issued if such commercial Letter of Credit is otherwise unacceptable to Issuing Bank in its reasonable discretion.

(b)     Notice of Issuance.     Whenever any Borrower desires the issuance, amendment, renewal or extension of a Letter of Credit, it shall deliver to Administrative Agent an Issuance Notice no later than 1:00 p.m. (New York City time) at least three Business Days (in the case of standby letters of credit) or five Business Days (in the case of commercial letters of credit), or in each case such shorter period as may be agreed to by Administrative Agent and Issuing Bank in any particular instance, in advance of the proposed date of issuance. Upon satisfaction or waiver of the conditions set forth in Section 3.2, Administrative Agent shall cause Issuing Bank to issue the requested Letter of Credit and such Letter of Credit shall be issued only in accordance with Issuing Bank's standard operating procedures. Upon receiving notice of the issuance of any Letter of Credit or amendment or modification to a Letter of Credit, Administrative Agent shall promptly notify each LC Lender of such issuance, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section 2.4(e).

(c)     Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments.     In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit. As between Borrowers, Administrative Agent and Issuing Bank, Borrowers assume all risks of the acts and omissions of, or misuse of the Letters of Credit issued by Issuing Bank, by the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, neither Administrative Agent nor Issuing Bank shall be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in

cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of Issuing Bank's rights or powers hereunder.  Without limiting the foregoing and in furtherance thereof, any action taken or omitted by Administrative Agent or Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of Administrative Agent or Issuing Bank to Borrowers. Notwithstanding anything to the contrary contained in this Section 2.4(c), Borrowers shall retain any and all rights they may have against Administrative Agent and Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of such respective Person.

(d)    Reimbursement by Borrowers of Amounts Drawn or Paid Under Letters of Credit.  Upon receiving notice that the Issuing Bank has determined to honor a drawing under a Letter of Credit, Administrative Agent shall immediately notify the applicable Borrower, and such Borrower shall reimburse such LC Disbursement by paying to Administrative Agent on or before the Business Day immediately following the date of notice to such Borrower of such LC Disbursement (the "**Reimbursement Date**") an amount in Dollars and in same day funds equal to the amount of such LC Disbursement. Promptly following receipt by Administrative Agent of any payment from such Borrower pursuant to this paragraph in respect of any LC Disbursement, Administrative Agent shall distribute such payment to Issuing Bank or, to the extent payments have been made from the LC Deposit Account pursuant to paragraph (e) below, to the LC Deposit Account for allocation by Administrative Agent among the Sub-Accounts of the LC Lenders in accordance with their Pro Rata Shares.  Without limiting in any way the foregoing and notwithstanding anything to the contrary contained herein or in any separate application for any Letter of Credit, each Borrower hereby acknowledges and agrees that it shall be obligated to reimburse Administrative Bank (on behalf of the Issuing Bank) upon each LC Disbursement, and it shall be deemed to be the obligor for purposes of each such Letter of Credit issued hereunder.

(e)    Lenders' Purchase of Participations in Letters of Credit.  (i) Immediately upon the issuance of each Letter of Credit, each LC Lender shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from Administrative Agent a participation in all outstanding obligations incurred by Administrative Agent in connection with the issuance of Letters of Credit by Issuing Bank and any related LC Disbursement made by Issuing Bank thereunder in an amount equal to such Lender's Pro Rata Share (with respect to the LC Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder.  In the event that any Borrower shall fail for any reason to reimburse Issuing Bank in respect of an LC Disbursement as provided in Section 2.4(d), Administrative Agent shall promptly notify each LC Lender of the unreimbursed amount of such LC Disbursement, and Administrative Agent shall pay to Issuing Bank, from the LC Deposit Account, for the account of each LC Lender, an amount equal to such LC Lender's Pro Rata Share of such LC Disbursement, in Dollars and in same day funds, at the office of Issuing Bank specified in such

54

notice, not later than 1:00 p.m. (New York City time) on the first business day (under the laws of the jurisdiction in which such office of Issuing Bank is located) after the date notified by Issuing Bank.   In the event that the LC Deposit Account is charged by Administrative Agent to reimburse Issuing Bank pursuant to this Section 2.4(e), the applicable Borrower shall pay over to Administrative Agent in reimbursement of the applicable LC Disbursement an amount equal to the amount so charged, as provided in paragraph (d) above, and such payment shall be deposited by Administrative Agent in the LC Deposit Account.   Each LC Lender irrevocably authorizes Administrative Agent to apply, or to permit the LC Depositary Bank to apply, amounts of its LC Deposit held in the LC Deposit Account as provided in this Section 2.4(e).   Any payment made from the LC Deposit Account, pursuant to this paragraph to reimburse Issuing Bank for any LC Disbursement shall not constitute a Loan and shall not relieve any Borrower of its obligation to reimburse such LC Disbursement.

(f)      Obligations Absolute.   The obligation of Borrowers to reimburse Issuing Bank for LC Disbursements made by it, the obligation of Borrowers to reimburse each LC Lender for any payments made to Issuing Bank from the LC Deposit Account to reimburse Issuing Bank for any LC Disbursement and the obligations of LC Lenders under Section 2.4(e) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set-off, defense or other right which Borrowers or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), Issuing Bank, Lender or any other Person or, in the case of a Lender, against Borrowers, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between Borrowers or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by Issuing Bank to the beneficiary or as otherwise required by law under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; or (ix) the return of the LC Deposits; provided, in each case, that payment by Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of Issuing Bank under the circumstances in question.

(g)      Indemnification.   Without duplication of any obligation of Borrowers under Section 10.2 or 10.3, in addition to amounts payable as provided herein, each Borrower hereby agrees to protect, indemnify, pay and save harmless Administrative Agent and Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and reasonable allocated costs of internal counsel) which Administrative Agent or Issuing Bank may incur or be

55

subject to as a consequence, direct or indirect, of (i) the issuance of any Letter of Credit by Issuing Bank, other than, with respect to the Issuing Bank only, as a result of (1) the gross negligence or willful misconduct of Issuing Bank or (2) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

(h)     Issuing Bank Reports.  Unless otherwise agreed by Administrative Agent, Administrative Agent shall cause Issuing Bank to report in writing to Administrative Agent (i) on or prior to each Business Day on which Issuing Bank issues, amends, renews or extends any Letter of Credit, the date of such issuance, amendment, renewal or extension, and the aggregate face amount of the Letters of Credit issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension (and whether the amount thereof has changed), it being understood that Issuing Bank shall not affect the issuance, renewal, extension or amendment resulting in an increase in the amount of any Letter of Credit without first obtaining written confirmation from Administrative Agent that such increase is then permitted under this Agreement, (ii) on each Business Day on which Issuing Bank makes an LC Disbursement, the date and amount of such LC Disbursement, (iii) on any Business Day on which any Borrower fails to reimburse an LC Disbursement required to be reimbursed to Issuing Bank on such day, the date of such failure and the amount of such LC Disbursement and (iv) on any other Business Day, such other information as Administrative Agent shall reasonably request as to the Letters of Credit issued by Issuing Bank and outstanding on such Business Day.

(i)     Establishment of LC Deposit Account and Sub-Accounts.  On or prior to the Closing Date, Administrative Agent shall establish a deposit account (the "**LC Deposit Account**") of Administrative Agent at the LC Depositary Bank with the title "Allied Holdings 2007 Credit Agreement LC Deposit Account".  Administrative Agent shall maintain records enabling it to determine at any time the amount of the interest of each LC Lender in the LC Deposit Account (the interest of each LC Lender in the LC Deposit Account, as evidenced by such records, being referred to as such LC Lender's "**Sub-Account**").  Administrative Agent shall establish such additional Sub-Accounts for assignee LC Lenders as shall be required pursuant to Section 10.6(g).  No Person (including any LC Lender) shall have the right to make any withdrawal from the LC Deposit Account or to exercise any other right or power with respect thereto except as expressly provided in paragraph (l) below or in Section 10.6(g).  Without limiting the generality of the foregoing, each party hereto acknowledges and agrees that the amounts on deposit in the LC Deposit Account are and will at all times be property of Administrative Agent acting for the benefit of the LC Lenders, and that no amount on deposit at any time in the LC Deposit Account shall be the property of any of the Credit Parties, constitute "Collateral" under the Credit Documents or otherwise be available in any manner to satisfy any Obligations of any of the Credit Parties under the Credit Documents.  Each LC Lender agrees that its right, title and interest in and to the LC Deposit Account shall be limited to the right, acting through Administrative Agent, to require amounts in its Sub-Account to be applied as provided in paragraph (l) below and that it will have no right to require the return of its portion of the amounts in the LC Deposit Account other than as expressly provided in such paragraph (l) (each LC Lender hereby acknowledging (i) that its portion of the amounts in the LC Deposit

56

Account constitutes payment for its participations in Letters of Credit issued or to be issued hereunder, (ii) that its portion of amounts in the LC Deposit Account and any investments made therewith shall secure its obligations to Administrative Agent hereunder in respect of Letters of Credit (each LC Lender hereby granting to Administrative Agent a security interest in such LC Lender's portion of the amounts in the LC Deposit Account to secure such obligations) and (iii) that Administrative Agent shall cause the Issuing Bank to issue, amend, renew and extend Letters of Credit in reliance on the availability of such LC Lender's portion of the amounts in the LC Deposit Account to discharge such LC Lender's obligations in accordance with Section 2.4(e) in connection with any LC Disbursement thereunder).  The funding of the LC Deposits, the establishment and funding of the LC Deposit Account and the agreements with respect thereto set forth in this Agreement constitute arrangements among Administrative Agent, Issuing Bank and the LC Lenders with respect to the funding obligations of the LC Lenders under this Agreement, and the amounts in the LC Deposit Account do not constitute a loan or extension of credit to any Credit Party.  Except as otherwise set forth herein, no Credit Party shall have any responsibility or liability to the LC Lenders, the Agents or any other Person in respect of the establishment, maintenance, administration or misappropriation of the LC Deposit Account (or any Sub-Account) or with respect to the investment of amounts held therein, including pursuant to paragraph (n) below.  Administrative Agent hereby waives (and shall use its commercially reasonable efforts to cause the LC Depositary Bank to waive) any right of setoff against the LC Deposit Account that it may have under applicable law or otherwise with respect to amounts owed to it by LC Lenders (it being agreed that such waiver shall not reduce the rights of Administrative Agent to apply or require the application of the amounts in the LC Deposit Account in accordance with the provisions of this Agreement).

        (j)      <u>Funding of LC Deposits</u>.

        (i)      Subject to the terms and conditions hereof, each LC Lender severally agrees to make a deposit in such LC Lender's Sub-Account with Administrative Agent on the Closing Date in an aggregate amount up to but not exceeding such LC Lender's LC Commitment.

        (ii)      Each LC Lender shall make the amount of its LC Deposit available to Administrative Agent not later than 1:00 p.m. (New York City time) on the Closing Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall deposit the proceeds of such LC Deposits into the LC Deposit Account.

        (iii)      LC Deposits shall be available, on the terms and subject to the conditions set forth herein, for application pursuant to Section 2.4(e) to reimburse such LC Lender's Pro Rata Share of LC Disbursements that are not reimbursed by Borrowers.  The obligations of LC Lenders to make the deposits required by this Section 2.4(j) are several, and no LC Lender shall be responsible for any other LC Lender's failure to make its deposit as so required.

(k)    LC Deposits in LC Deposit Account.   The following amounts will be deposited in the LC Deposit Account at the following times:

(i)    Each LC Lender shall make such LC Lender's LC Deposits available to Administrative Agent in accordance with Section 2.4(j).  Thereafter, the LC Deposits shall be available, on the terms and subject to the conditions set forth herein, for application pursuant to Section 2.4(e) to reimburse Issuing Bank for such LC Lender's Pro Rata Share of LC Disbursements that are not reimbursed by Borrowers.

(ii)    On any date prior to the LC Commitment Termination Date on which Administrative Agent or Issuing Bank receives any reimbursement payment from Borrowers in respect of an LC Disbursement with respect to which amounts were withdrawn from the LC Deposit Account to reimburse Issuing Bank, subject to subparagraph (iii) below, Administrative Agent shall deposit, or Issuing Bank shall transfer to Administrative Agent, which shall deposit, in the LC Deposit Account, and Administrative Agent shall credit to the Sub-Accounts of the LC Lenders, the portion of such reimbursement payment to be deposited therein, in accordance with Section 2.4(e).

(iii)    If at any time when any amount is required to be deposited in the LC Deposit Account under subparagraph (ii) above the sum of such amount and the amount held in the LC Deposit Account at such time would exceed the total LC Deposits, then such excess shall not be deposited in the LC Deposit Account and shall instead be paid to Administrative Agent, which shall pay to each LC Lender its Pro Rata Share of such excess.

(iv)    Concurrently with the effectiveness of any assignment by any LC Lender of all or any portion of its LC Deposit, Administrative Agent shall transfer into the Sub-Account of the assignee the corresponding portion of the amount on deposit in the assignor's Sub-Account in accordance with Section 10.6(g).

(l)    Withdrawals From and Closing of LC Deposit Account.   Amounts on deposit in the LC Deposit Account shall be withdrawn and distributed (or transferred, in the case of subparagraph (iv) below) as follows:

(i)    On each date on which Issuing Bank is to be reimbursed by the LC Lenders pursuant to Section 2.4(e) for any LC Disbursement made by Issuing Bank, Administrative Agent shall withdraw from the LC Deposit Account the amount of such unreimbursed LC Disbursement (and Administrative Agent shall debit the Sub-Account of each LC Lender in the amount of such LC Lender's Pro Rata Share of such unreimbursed LC Disbursement) and apply such amount to reimburse Issuing Bank for such LC Disbursement (if such Issuing Bank shall be the LC Depositary Bank) or transfer such amount to Administrative Agent, which shall apply the amount so transferred to

58

reimburse Issuing Bank (if Issuing Bank shall not be the LC Depositary Bank), all in accordance with Section 2.4(e).

(ii)    Concurrently with each voluntary reduction of the total LC Commitments pursuant to and in accordance with Section 2.13 or 2.15, Administrative Agent shall withdraw from the LC Deposit Account and pay to each LC Lender such LC Lender's Pro Rata Share of any amount by which the LC Deposits, after giving effect to such reduction of the total LC Commitments, would exceed the greater of the total LC Commitments and the total LC Usage (and the LC Depositary Bank agrees to pay over such amounts in the LC Deposit Account to Administrative Agent).

(iii)    Concurrently with any reduction of the total LC Commitments to zero pursuant to and in accordance with Section 2.13, 2.15 or Section 8, Administrative Agent shall withdraw from the LC Deposit Account and pay to each LC Lender such LC Lender's Pro Rata Share of the excess at such time of the aggregate amount of the LC Deposits over the LC Usage (and the LC Depositary Bank agrees to pay over such amounts in the LC Deposit Account to Administrative Agent).

(iv)    Concurrently with the effectiveness of any assignment by any LC Lender of all or any portion of its LC Deposit, the corresponding portion of the assignor's Sub-Account shall be transferred on the records of Administrative Agent from the assignor's Sub-Account to the assignee's Sub-Account in accordance with Section 10.6(g) and, if required by Section 10.6(g), Administrative Agent shall close such assignor's Sub-Account.

(v)    Upon the reduction of each of the total LC Commitments and the LC Usage to zero, Administrative Agent shall withdraw from the LC Deposit Account and pay to each LC Lender the entire remaining amount of such LC Lender's LC Deposit, and shall close the LC Deposit Account (and the LC Depositary Bank agrees to pay over such amounts in the LC Deposit Account to Administrative Agent).

Each LC Lender irrevocably and unconditionally agrees that its LC Deposit may be applied or withdrawn from time to time as set forth in this paragraph (l).

(m)    Investment of Amounts in LC Deposit Account.  Administrative Agent shall use its commercially reasonable efforts to invest, or cause to be invested, the amounts held from time to time in the LC Deposit Account so as to earn for the account of Administrative Agent, acting on behalf of each LC Lender, a return thereon for each day at a rate per annum equal to (i) the one month LIBOR rate as determined by Administrative Agent on such day (or if such day was not a Business Day, the first Business Day immediately preceding such day) based on rates for deposits in dollars (as set forth by Bloomberg L.P.-page BTMM or any other comparable publicly available service as may be selected by Administrative Agent) (the

59

"**Benchmark LIBOR Rate**") minus (ii) 0.15% per annum (based on a 365/366 day year). The Benchmark LIBOR Rate will be reset on the first Business Day of each month. The LC Deposit Return accrued through and including the first day of January, April, July and October of each year shall be paid by the LC Depositary Bank to Administrative Agent, for payment to each LC Lender, on the third Business Day following such last day, commencing on the first such date to occur after the Closing Date, and on the date on which each of the total LC Deposits and the LC Usage shall have been reduced to zero. Neither Administrative Agent nor any other Person guarantees any rate of return on the investment of amounts held in the LC Deposit Account and, for the avoidance of doubt, Administrative Agent shall not be limited to making investments that by their terms are expressly based upon or related to an underlying LIBOR rate.

(n)     Sufficiency of LC Deposits to Provide for Undrawn/ Unreimbursed Letters of Credit. Notwithstanding any other provision of this Agreement, including Sections 2.1 and 2.4, Administrative Agent shall not cause any Letter of Credit to be issued or increased as to its stated amount if, after giving effect to such issuance or increase, the aggregate amount of the LC Deposits would be less than the LC Usage.

(o)     Satisfaction of LC Lender Funding Obligations. Borrowers, Issuing Bank and Administrative Agent each acknowledge and agree that, notwithstanding any other provision contained in this Agreement, the deposits by Administrative Agent, on behalf of each LC Lender, in the LC Deposit Account on the Closing Date of funds equal to such LC Lender's LC Commitment will fully discharge the obligation of such LC Lender to reimburse such LC Lender's Pro Rata Share of LC Disbursements that are not reimbursed by Borrowers pursuant to Section 2.4(d), and that no other or further payments shall be required to be made by any LC Lender in respect of any such reimbursement obligations.

**2.5     Pro Rata Shares; Availability of Funds.**

(a)     Pro Rata Shares. All Loans and LC Deposits shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan or LC Deposit hereunder or purchase a participation required hereby nor shall any Term Loan Commitment, LC Commitment or any Revolving Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b)     Availability of Funds. Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan or LC Deposit requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Borrowers a corresponding amount on such Credit Date. If such corresponding amount is not in fact made

    (iv)      Each of the Credit Parties, the Lenders, Issuing Bank and the Agents agree that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

    **10.2    Expenses.** Whether or not the transactions contemplated hereby shall be consummated, each Borrower agrees to pay promptly (a) all the actual and reasonable costs and expenses of Administrative Agent for the preparation, negotiation, execution and administration of the Credit Documents and the transactions contemplated thereby (including any costs and expenses incurred in connection with the establishment, maintenance and administration of the LC Deposit Account) and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for Borrowers and the other Credit Parties; (c) the reasonable fees, expenses and disbursements of counsel to Agents (in each case including reasonable allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrowers; (d) all the actual costs and reasonable expenses of creating, perfecting and recording Liens in favor of Collateral Agent, for the benefit of the Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or Requisite Lenders may reasonably request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers; (f) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual and reasonable costs and expenses incurred by each Agent in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including reasonable attorneys' fees (including reasonable allocated costs of internal counsel) and reasonable costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

    **10.3    Indemnity.**

    (a)      In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel (which shall be reasonably acceptable to Borrowers)), indemnify, pay and hold harmless, each Agent and Lender and the officers, partners,

hereof which are no longer operative); provided that any such amendment, modification or supplement shall not adversely affect any Lender or Issuing Bank in any material respect.

**10.6    Successors and Assigns; Participations.**

(a)    Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Register.  Borrowers, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments, LC Deposits and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment, LC Deposit or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of an Assignment Agreement effecting the assignment or transfer thereof, in each case, as provided in Section 10.6(d).  Each assignment shall be recorded in the Register on the Business Day the Assignment Agreement is received by Administrative Agent, if received by 12:00 noon New York City time, and on the following Business Day if received after such time, prompt notice thereof shall be provided to Borrowers and a copy of such Assignment Agreement shall be maintained, as applicable.  The date of such recordation of a transfer shall be referred to herein as the **"Assignment Effective Date."**  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments, LC Deposits or Loans.

(c)    Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment, LC Deposit or Loans owing to it or other Obligations (provided, however, that pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments):

(i)    to any Person meeting the criteria of clause (i) of the definition of the term "Eligible Assignee" upon the giving of notice to Borrowers and Administrative Agent; and

163

(ii)      to any Person meeting the criteria of clause (ii) of the definition of the term of "Eligible Assignee" upon giving of notice to Borrowers and Administrative Agent and, in the case of assignments of Revolving Loans or Revolving Commitments to any such Person (except in the case of assignments made by or to GSCP), consented to by each Borrower and Administrative Agent (such consent not to be (x) unreasonably withheld or delayed or, (y) in the case of Borrowers, required at any time an Event of Default shall have occurred and then be continuing); provided, further each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than (A) $1,000,000 (or such lesser amount as may be agreed to by Borrowers and Administrative Agent or as shall constitute the aggregate amount of the Revolving Commitments and Revolving Loans of the assigning Lender) with respect to the assignment of the Revolving Commitments and Revolving Loans and (B) $1,000,000 (or such lesser amount as may be agreed to by Borrowers and Administrative Agent or as shall constitute the aggregate amount of the Term Loans of the assigning Lender) with respect to the assignment of Term Loans.   Assignments by Related Funds shall be aggregated for purposes of determining compliance with such minimum assignment amounts.

(d)      Mechanics.  Assignments and assumptions of Loans, LC Deposits and Commitments shall only be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement.  Assignments shall be effective as of the Assignment Effective Date.  In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.20(c).

(e)      Representations and Warranties of Assignee.    Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments, LC Deposits, and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments, LC Deposits or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments, LC Deposits or Loans for its own account in the ordinary course and without a view to distribution of such Commitments, LC Deposits or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments, LC Deposits or Loans or any interests therein shall at all times remain within its exclusive control).

(f)      Effect of Assignment.  Subject to the terms and conditions of this Section 10.6, as of the Assignment Effective Date with respect to any Assignment Agreement (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans, LC Deposits and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the

164

assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on such Assignment Effective Date; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect any Commitment of such assignee and any Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon each Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Revolving Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(g)     LC Deposits.  In connection with each assignment of an LC Deposit, the LC Deposit of the assigning LC Lender shall not be released, but shall instead be purchased by the relevant assignee, and the amount of such LC Deposit shall continue to be held in the LC Deposit Account for application (to the extent not already applied) in accordance with Section 2.4 to satisfy such assignee's obligations in respect of the LC Usage.  Each LC Lender agrees that immediately prior to each such assignment (i) Administrative Agent shall establish a new Sub-Account in the name of the assignee, (ii) a corresponding portion of the amount held in the LC Deposit Account credited by Administrative Agent to the Sub-Account of the assigning LC Lender shall be purchased by the assignee and shall be transferred from the assigning LC Lender's Sub-Account to the assignee's Sub-Account and (iii) if after giving effect to such assignment the LC Deposit of the assigning LC Lender shall be zero, Administrative Agent shall close the Sub-Account of such assigning LC Lender.

(h)     Participations.

(i)     Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation.

(ii)     The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended beyond the LC Termination Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in

165

effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (B) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (C) release all or substantially all of the Collateral under the Collateral Documents (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.

(iii)        Each Borrower agrees that each participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 and subject to the provisions of Section 2.23 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section; provided, (x) a participant shall not be entitled to receive any greater payment under Section 2.19 or 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with such Borrower's prior written consent and (y) a participant that would be a Non-US Lender if it were a Lender shall not be entitled to the benefits of Section 2.20 unless each Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of each Borrower, to comply with Section 2.20 as though it were a Lender; provided further that, except as specifically set forth in clauses (x) and (y) of this sentence, nothing herein shall require any notice to any Borrower or any other Person in connection with the sale of any participation.  The Lender who has assigned to any participant that, by virtue of application of the provisions of this Section 10.6(h)(iii), is subject to replacement under Section 2.23 agrees that such Lender can also be replaced pursuant to the provisions of Section 2.23.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided such Participant agrees to be subject to Section 2.17 as though it were a Lender.

(i)        Certain Other Assignments and Participations.  In addition to any other assignment or participation permitted pursuant to this Section 10.6:

(i)        any Lender may assign and/or pledge all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; and

(ii)        notwithstanding anything to the contrary in this Section 10.6, any Lender may sell participations (or otherwise transfer its rights) in or to all or a portion of its rights and obligations under the Credit Documents (including all its rights and obligations with respect to the Term Loans, Revolving Loans and Letters of Credit) to one or more lenders or other Persons that provide financing to such Lender;

166

provided, that no Lender, as between Borrowers and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment, pledge, participation or other transfer and provided further, that in no event shall the applicable Federal Reserve Bank, pledge, trustee, lender or other financing source described in the preceding clauses (i) or (ii) be considered to be a "Lender" or be entitled to require the assigning, selling or transferring Lender to take or omit to take any action hereunder.

**10.7 Independence of Covenants.** All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.8 Survival of Representations, Warranties and Agreements.** All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.18(c), 2.19, 2.20, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in Sections 2.17, 9.3(b) and 9.6 shall survive the payment of the Loans, the return of the LC Deposits, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

**10.9 No Waiver; Remedies Cumulative.** No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the Hedge Agreements. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.10 Marshalling; Payments Set Aside.** Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or any Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

167

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

ALLIED HOLDINGS, INC.

By: _____

Thomas H. King
Executive Vice President and Chief Financial Officer

ALLIED SYSTEMS, LTD. (L.P.)

By: Allied Automotive Group, Inc.,
    its Managing General Partner

By: _____

Thomas H. King
Executive Vice President and Assistant Treasurer

ACE OPERATIONS, LLC
AXIS NETHERLANDS, LLC

By: AXIS Group, Inc.,
    its Sole Member and Manager

By: _____

Thomas H. King
Executive Vice President and Assistant Treasurer

1233309-New York Server 7A

*Signature Page to Amended and Restated First Lien Credit Agreement*

**AH INDUSTRIES INC.**
**ALLIED AUTOMOTIVE GROUP, INC.**
**ALLIED FREIGHT BROKER LLC**
**ALLIED SYSTEMS (CANADA) COMPANY**
**AXIS CANADA COMPANY**
**AXIS GROUP, INC.**
**COMMERCIAL CARRIERS, INC.**
**CORDIN TRANSPORT LLC**
**C T SERVICES, INC.**
**F.J. BOUTELL DRIVEAWAY LLC**
**GACS INCORPORATED**
**QAT, INC.**
**RMX LLC**
**TERMINAL SERVICES LLC**
**TRANSPORT SUPPORT LLC**

By:_____
          Thomas H. King
          Executive Vice President and
          Assistant Treasurer


**AXIS ARETA, LLC**
**LOGISTIC SYSTEMS, LLC**
**LOGISTIC TECHNOLOGY, LLC**

By:  AX International Limited,
       its Sole Member and Manager

          By:_____
                    Thomas H. King
                    Executive Vice President and
                    Assistant Treasurer

*Signature Page to Amended and Restated First Lien Credit Agreement*

1235309-New York Server 7A

GOLDMAN SACHS CREDIT PARTNERS L.P.,
as Syndication Agent and a Lender

By
Authorized Signatory

*Signature Page to Amended and Restated First Lien Credit Agreement*

1235309-New York Server 7A

**THE CIT GROUP/BUSINESS CREDIT, INC.,**
as Administrative Agent, Collateral Agent, Swing
Line Lender and a Lender

By: _____

Name: J. Danforth

Title: VP

1235309-New York Server 7A

*Signature Page to Amended and Restated First Lien Credit Agreement*



**APPENDIX A-1**
**TO CREDIT AND GUARANTY AGREEMENT**

**Term Loan Commitments**

| | | |
|---|---|---|
| Goldman Sachs Credit Partners L.P. | $180,000,000.00 | 100% |
| **Total** | $180,000,000.00[1] | 100% |

---

[1]   The term loans will be fully funded on the Restatement Date.

APPENDIX A-1-1

**APPENDIX A-2**
**TO CREDIT AND GUARANTY AGREEMENT**

**LC Commitments**

| | LC Commitment | LC Percentage |
|---|---|---|
| Goldman Sachs Credit Partners L.P. | $ 50,000,000.00 | 100% |
| Total | $ 50,000,000.00 | 100% |

APPENDIX A-2-1

**APPENDIX A-3**
**TO CREDIT AND GUARANTY AGREEMENT**

**Revolving Commitments**

| | | |
|---|---|---|
| The CIT Group/Business Credit, Inc. | $ 35,000,000.00 | 100% |
| Total | $ 35,000,000.00 | 100% |

APPENDIX A-3-1

**EXECUTION VERSION**

**AMENDED AND RESTATED FIRST LIEN
SECURED SUPER-PRIORITY DEBTOR IN POSSESSION
AND EXIT CREDIT AND GUARANTY AGREEMENT**

**dated as of March 30, 2007**

**and**

**amended and restated as of May 15, 2007**

**among**

**ALLIED HOLDINGS, INC.**

**and**

**ALLIED SYSTEMS, LTD. (L.P.),
as Borrowers**

**CERTAIN SUBSIDIARIES OF**

**ALLIED HOLDINGS, INC.
and
ALLIED SYSTEMS, LTD. (L.P.),
as Guarantors,**

**VARIOUS LENDERS,**

**GOLDMAN SACHS CREDIT PARTNERS L.P.,
as Lead Arranger and Syndication Agent,**

**and**

**THE CIT GROUP/BUSINESS CREDIT, INC.,
as Administrative Agent and Collateral Agent**

---

**$265,000,000 Senior Secured First Priority Credit Facilities**

---

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| SECTION 1. | DEFINITIONS AND INTERPRETATION | 2 |
| 1.1 | Definitions | 2 |
| 1.2 | Accounting Terms | 46 |
| 1.3 | Interpretation, etc. | 47 |
| SECTION 2. | LOANS AND LETTERS OF CREDIT | 47 |
| 2.1 | Term Loans | 47 |
| 2.2 | Revolving Loans | 49 |
| 2.3 | Swing Line Loans. | 50 |
| 2.4 | Issuance of Letters of Credit and Purchase of Participations Therein | 52 |
| 2.5 | Pro Rata Shares; Availability of Funds | 60 |
| 2.6 | Use of Proceeds | 61 |
| 2.7 | Evidence of Debt; Register; Lenders' Books and Records; Notes | 61 |
| 2.8 | Interest on Loans | 62 |
| 2.9 | Conversion/Continuation | 65 |
| 2.10 | Default Interest | 65 |
| 2.11 | Fees | 66 |
| 2.12 | Scheduled Payments | 67 |
| 2.13 | Voluntary Prepayments/Commitment Reductions; Call Protection | 67 |
| 2.14 | Mandatory Prepayments | 69 |
| 2.15 | Application of Prepayments | 71 |
| 2.16 | General Provisions Regarding Payments | 72 |
| 2.17 | Ratable Sharing | 73 |
| 2.18 | Making or Maintaining Eurodollar Rate Loans | 74 |
| 2.19 | Increased Costs; Capital Adequacy | 76 |
| 2.20 | Taxes; Withholding, etc. | 77 |
| 2.21 | Obligation to Mitigate | 79 |
| 2.22 | Defaulting Lenders | 80 |
| 2.23 | Removal or Replacement of a Lender | 81 |
| 2.24 | Super-Priority Nature of Obligations and Lenders' Liens | 82 |
| 2.25 | Payment of Obligations | 83 |
| 2.26 | No Discharge; Survival of Claims | 83 |
| 2.27 | Waiver of any Priming Rights | 83 |
| 2.28 | Co-Borrowers | 83 |
| 2.29 | Judgment Currency | 85 |
| SECTION 3. | CONDITIONS PRECEDENT AND CONVERSION TO EXIT FACILITIES | 86 |
| 3.1 | Closing Date | 86 |
| 3.2 | Conditions to Each Credit Extension | 90 |
| 3.3 | Exit Facilities Option | 91 |

| | | |
|---|---|---|
| 3.4 | Conditions to Exit Facilities Option | 91 |
| 3.5 | Conversion to Exit Facilities | 98 |
| SECTION 4. | REPRESENTATIONS AND WARRANTIES | 99 |
| 4.1 | Organization; Requisite Power and Authority; Qualification | 99 |
| 4.2 | Equity Interests and Ownership | 99 |
| 4.3 | Due Authorization | 99 |
| 4.4 | No Conflict | 99 |
| 4.5 | Governmental Consents | 100 |
| 4.6 | Binding Obligation | 100 |
| 4.7 | Historical Financial Statements | 100 |
| 4.8 | Projections | 101 |
| 4.9 | No Material Adverse Change | 101 |
| 4.10 | No Restricted Junior Payments | 101 |
| 4.11 | Adverse Proceedings, etc. | 101 |
| 4.12 | Payment of Taxes | 101 |
| 4.13 | Properties | 102 |
| 4.14 | Environmental Matters | 102 |
| 4.15 | No Defaults | 103 |
| 4.16 | Material Contracts | 103 |
| 4.17 | Governmental Regulation | 103 |
| 4.18 | Margin Stock | 103 |
| 4.19 | Employee Matters | 103 |
| 4.20 | Employee Benefit Plans | 104 |
| 4.21 | Certain Fees | 105 |
| 4.22 | Solvency | 105 |
| 4.23 | Compliance with Statutes, etc. | 105 |
| 4.24 | Disclosure | 106 |
| 4.25 | Secured, Super-Priority Obligations | 106 |
| 4.26 | Patriot Act | 107 |
| SECTION 5. | AFFIRMATIVE COVENANTS | 107 |
| 5.1 | Financial Statements and Other Reports | 107 |
| 5.2 | Existence | 112 |
| 5.3 | Payment of Taxes and Claims | 113 |
| 5.4 | Maintenance of Properties | 113 |
| 5.5 | Insurance | 113 |
| 5.6 | Books and Records; Inspections | 114 |
| 5.7 | Lenders Meetings | 114 |
| 5.8 | Compliance with Laws | 114 |
| 5.9 | Environmental | 114 |
| 5.10 | Subsidiaries | 116 |
| 5.11 | Additional Real Estate Assets | 117 |
| 5.12 | Interest Rate Protection | 117 |
| 5.13 | Further Assurances | 117 |
| 5.14 | Maintenance of Ratings | 118 |
| 5.15 | Final Supplemental DIP Order | 118 |

ii

5.16       Canadian Supplemental Final Order ...................................................................118
5.17       Restructuring Advisers ......................................................................................118
5.18       Intentionally Omitted ........................................................................................118

SECTION 6.   NEGATIVE COVENANTS ................................................................................118
6.1        Indebtedness .......................................................................................................119
6.2        Liens ...................................................................................................................123
6.3        No Further Negative Pledges ............................................................................126
6.4        Restricted Junior Payments ...............................................................................126
6.5        Restrictions on Subsidiary Distributions ..........................................................127
6.6        Investments ........................................................................................................127
6.7        Financial Covenants ..........................................................................................129
6.8        Fundamental Changes; Disposition of Assets; Acquisitions .............................132
6.9        Disposal of Subsidiary Interests ........................................................................134
6.10       Sales and Lease-Backs .......................................................................................135
6.11       Transactions with Shareholders and Affiliates ..................................................135
6.12       Conduct of Business ..........................................................................................135
6.13       Amendments or Waivers of Organizational Documents and Certain
           Agreements .........................................................................................................136
6.14       Haul Insurance ...................................................................................................136
6.15       Chapter 11 Claims; Adequate Protection ..........................................................136
6.16       DIP Orders and Canadian Orders ......................................................................136
6.17       Limitation on Prepayments of Pre-Petition Obligations ...................................136
6.18       Fiscal Year .........................................................................................................137
6.19       Repayment of Indebtedness ...............................................................................137
6.20       Reclamation Claims ...........................................................................................137
6.21       Chapter 11 Claims .............................................................................................137
6.22       Limitation on Voluntary Payments and Amendments or Waivers of the
           Second Lien Credit Agreement ..........................................................................137

SECTION 7.   GUARANTY ..................................................................................................138
7.1        Guaranty of the Obligations ..............................................................................138
7.2        Contribution by Guarantors ...............................................................................138
7.3        Payment by Guarantors ......................................................................................139
7.4        Liability of Guarantors Absolute .......................................................................139
7.5        Waivers by Guarantors .......................................................................................141
7.6        Guarantors' Rights of Subrogation, Contribution, etc. ......................................142
7.7        Subordination of Other Obligations ...................................................................142
7.8        Continuing Guaranty ..........................................................................................143
7.9        Authority of Guarantors or Borrowers ...............................................................143
7.10       Financial Condition of Borrowers ......................................................................143
7.11       Bankruptcy, etc. .................................................................................................143
7.12       Discharge of Guaranty Upon Sale of Guarantor ................................................144

SECTION 8.   EVENTS OF DEFAULT; CARVE-OUT EVENT ..................................................144
8.1        Events of Default ...............................................................................................144
8.2        Carve-Out Events ..............................................................................................150

SECTION 9.  AGENTS............................................................................................150
    9.1     Appointment of Agents.............................................................150
    9.2     Powers and Duties....................................................................151
    9.3     General Immunity ....................................................................151
    9.4     Agents Entitled to Act as Lender .............................................153
    9.5     Lenders' Representations, Warranties and Acknowledgment............153
    9.6     Right to Indemnity ..................................................................153
    9.7     Successor Administrative Agent, Collateral Agent and Swing Line Lender.......154
    9.8     Collateral Documents and Guaranty. .......................................155

SECTION 10. MISCELLANEOUS .........................................................................156
    10.1    Notices ....................................................................................156
    10.2    Expenses .................................................................................158
    10.3    Indemnity ................................................................................158
    10.4    Set-Off....................................................................................159
    10.5    Amendments and Waivers .......................................................159
    10.6    Successors and Assigns; Participations ....................................163
    10.7    Independence of Covenants .....................................................167
    10.8    Survival of Representations, Warranties and Agreements ................167
    10.9    No Waiver; Remedies Cumulative ...........................................167
    10.10   Marshalling; Payments Set Aside ............................................167
    10.11   Severability.............................................................................168
    10.12   Obligations Several; Independent Nature of Lenders' Rights............168
    10.13   Headings .................................................................................168
    10.14   APPLICABLE LAW ...............................................................168
    10.15   CONSENT TO JURISDICTION...............................................168
    10.16   WAIVER OF JURY TRIAL......................................................169
    10.17   Confidentiality ........................................................................169
    10.18   Usury Savings Clause ..............................................................170
    10.19   Counterparts ...........................................................................171
    10.20   Effectiveness...........................................................................171
    10.21   Patriot Act ..............................................................................171
    10.22   Electronic Execution of Assignments.......................................171
    10.23   Post-Closing Actions ...............................................................172
    10.24   Joint and Several Liability .......................................................172
    10.25   Limitations Act, 2002 ..............................................................172
    10.26   Effect of Restatement..............................................................172

**APPENDICES:**    A-1    Term Loan Commitments
A-2    LC Commitments
A-3    Revolving Commitments
B    Notice Addresses

**SCHEDULES:**    4.1    Jurisdictions of Organization and Qualification
4.2    Equity Interests and Ownership
4.7    Contingent Liabilities
4.13    Real Estate Assets
4.16    Material Contracts
4.19    Employee Matters
4.20    Employee Benefit Plans
4.25    Post-petition Liens
6.1    Certain Indebtedness
6.2    Certain Liens
6.5    Certain Restrictions on Subsidiary Distributions
6.6    Certain Investments
6.8(a)    Planned Asset Sales
6.8(b)    Restructuring Asset Sales
6.11    Certain Affiliate Transactions
10.23    Post-Closing Actions

**EXHIBITS:**    A-1    Funding Notice
A-2    Conversion/Continuation Notice
A-3    Issuance Notice
B-1    Term Loan Note
B-2    Revolving Loan Note
B-3    Swing Line Note
C    Compliance Certificate
D    [Intentionally Omitted]
E    Assignment Agreement
F    Certificate Re Non-bank Status
G-1    Closing Date Certificate
G-2    Solvency Certificate
H    Counterpart Agreement
I    Pledge and Security Agreement
J    Mortgage
K    Landlord Waiver and Consent Agreement
L    Intercompany Note
M    Interim Supplemental DIP Order
N    Canadian Pledge and Security Agreement
O    Affirmation Agreement

v

### AMENDED AND RESTATED FIRST LIEN
### SECURED SUPER-PRIORITY DEBTOR IN POSSESSION
### AND EXIT CREDIT AND GUARANTY AGREEMENT

This AMENDED AND RESTATED FIRST LIEN SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30, 2007, and amended and restated as of May 15, 2007, is entered into by and among ALLIED HOLDINGS, INC., a Georgia corporation and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as defined below) ("**Holdings**"), ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code ("**Systems**" and, together with Holdings, the "**Borrowers**"), CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary Guarantors, the Lenders party hereto from time to time, GOLDMAN SACHS CREDIT PARTNERS L.P. ("**GSCP**"), as Syndication Agent (in such capacity, "**Syndication Agent**"), and THE CIT GROUP/BUSINESS CREDIT, INC. ("**CIT**"), as Administrative Agent (together with its permitted successors in such capacity, "**Administrative Agent**") and as Collateral Agent (together with its permitted successor in such capacity, "**Collateral Agent**").

### RECITALS:

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS,** on July 31, 2005 (the "**Petition Date**"), Borrowers and each of the other Debtors filed voluntary petitions for relief (collectively, the "**Cases**") under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court, which Cases have been recognized in Canada pursuant to the Canadian Stay Order;

**WHEREAS,** from and after the Petition Date, Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** Borrowers and the Agents and the Lenders party thereto previously entered into the Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of March 30, 2007 (the "**Existing Credit Agreement**"), as amended, under which the Lenders extended to Borrowers certain credit facilities (the "**Existing Credit Facilities**") consisting of $230,000,000 aggregate principal amount of Term Loans (the "**Existing Term Loans**"), $35,000,000 aggregate principal amount of Revolving Commitments and $50,000,000 aggregate principal amount of LC Commitments;

**WHEREAS,** Borrowers will refinance a portion of the Existing Term Loans with the proceeds of a new second lien term loan in an aggregate principal amount equal to $50,000,000 under a new Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of May 15, 2007;

**WHEREAS,** Borrowers have agreed to secure all of their Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of their assets, including a pledge of all of the Equity Interests of each of their respective Domestic Subsidiaries, 100% of all the Equity Interests of each of their Canadian Subsidiaries and 65% of all the Equity Interests of each of their other respective first-tier Foreign Subsidiaries;

**WHEREAS,** Guarantors have agreed to guarantee the obligations of Borrowers hereunder and to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of their respective assets, including a pledge of all of the Equity Interests of each of their respective Domestic Subsidiaries (including Systems), 100% of all the Equity Interests of each of their respective Canadian Subsidiaries and 65% of all the Equity Interests of each of their other respective directly owned Foreign Subsidiaries; and

**WHEREAS,** the Lenders have agreed to grant an option to Borrowers to cause the Credit Facilities to be converted to the Exit Facilities subject to certain terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS AND INTERPRETATION

1.1    **Definitions.** The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Act**" as defined in Section 3.1(r).

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward to the next whole multiple of 1/16 of 1%) (i) (a) the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate which appears on the page of the Telerate Screen which displays an average British Bankers Association Interest Settlement Rate (such page currently being page number 3740 or 3750, as applicable) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m.

2

(London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the offered quotation rate to first class banks in the London interbank market by Deutsche Bank for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan of Administrative Agent, in its capacity as a Lender, for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened against or affecting Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries.

"**Affected Lender**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 5% or more (or, for purposes of the definition of "Controlled Investment Affiliate", 50% or more) of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

3

"**Affirmation Agreement**" shall mean the Affirmation Agreement substantially in the form of Exhibit O hereto.

"**Agent**" means each of Administrative Agent, Syndication Agent and Collateral Agent.

"**Agent Affiliates**" as defined in Section 10.1(b)(iii).

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of March 30, 2007, and amended and restated as of May 15, 2007, as it may be amended, supplemented or otherwise modified from time to time.

"**AH Industries**" means AH Industries Inc., an Alberta corporation.

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator.  Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans.  A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender.  The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Agents or to the lenders by means of electronic communications pursuant to Section 10.1(b).

4

"**Asset Sale**" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with, any Person (other than Borrower or any Guarantor Subsidiary), in one transaction or a series of transactions, of all or any part of Holdings' or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Equity Interests of any of Holdings' Subsidiaries, other than (i) inventory (or other assets) sold, leased or licensed out in the ordinary course of business (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued), (ii) sales or other dispositions of obsolete or worn out rigs and (iii) sales, leases or licenses out of other assets for aggregate consideration of less than $500,000 with respect to any transaction or series of related transactions and less than $1,000,000 in the aggregate during any Fiscal Year.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit E, with such amendments or modifications as may be approved by Administrative Agent.

"**Assignment Effective Date**" as defined in Section 10.6(b).

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer, controller, assistant controller, treasurer or assistant treasurer.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute; provided, however, that, with respect to the Cases, "Bankruptcy Code" means Title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Georgia or any other court having competent jurisdiction over the Cases.

"**Base Fiscal Year**" as defined in Section 6.7(c).

"**Base Rate**" means, for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

5

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Benchmark LIBOR Rate**" as defined in Section 2.4(m).

"**Beneficiary**" means each Agent, Issuing Bank, Lender and Lender Counterparty.

"**BIA**" means the Bankruptcy and Insolvency Act (Canada), as now or hereafter in effect or any successor statute.

"**Blue Thunder**" means Blue Thunder Auto Transport, Inc. or any of its Subsidiaries or Affiliates.

"**Blue Thunder Equipment**" means rigs (including tractors, trailers and related equipment) purchased from Blue Thunder or any auctioneer acting on behalf of Blue Thunder and any replacement parts or improvements made thereto.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Borrowers**" as defined in the preamble hereto.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "**Business Day**" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Confirmation Order**" means an order of the Canadian Court under Section 18.6 of the CCAA, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to Agents, giving full effect to the Confirmation Order, which order shall specifically but not exclusively confirm the Plan and approve and authorize the transactions contemplated thereby and the granting of liens under the Credit

6

Documents and containing a release in favor of Administrative Agent and Syndication Agent and the Lenders and their respective affiliates.

"**Canadian Credit Party**" means any Credit Party incorporated, organized or otherwise established under the laws of Canada or any political subdivision of Canada.

"**Canadian DIP Order**" means the Canadian Interim Order or the Canadian Final Order, as applicable.

"**Canadian Final Order**" means the order entitled "In the Matter of Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 and in the matter of Allied Holdings and those subsidiaries listed on Schedule A hereto" entered by the Canadian Court on April 16, 2007, as amended, supplemented or otherwise modified by the Canadian Supplemental Interim Order and Canadian Supplemental Final Order.

"**Canadian Insolvency Law**" shall mean any of the BIA and the CCAA, and any other applicable insolvency or other similar law.

"**Canadian Interim Order**" means the order entitled "In the Matter of Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 and in the matter of Allied Holdings and those subsidiaries listed on Schedule A hereto" entered by the Canadian Court on March 29, 2007, as amended, supplemented or otherwise modified by the Canadian Supplemental Interim Order and Canadian Supplemental Final Order.

"**Canadian Pledge and Security Agreement**" means the Pledge and Security Agreement, dated as of March 30, 2007, executed by each Canadian Credit Party, as it may be amended, supplemented or otherwise modified from time to time.

"**Canadian PPSA**" means the Personal Property Security Act (Ontario) and the Regulations thereunder, as from time to time in effect, provided, however, if the validity, perfection (or opposability), effect of perfection or of non-perfection or priority of Collateral Agent's security interest in any Collateral are governed by the personal property security laws or laws relating to movable property of any jurisdiction other than Ontario, Canadian PPSA shall mean those personal property security laws or laws relating to movable property in such other jurisdiction for the purpose of the provisions hereof relating to such validity, perfection (or opposability), effect of perfection or of non-perfection or priority and for the definitions related to such provisions.

"**Canadian Stay Order**" means, collectively, the order of the Canadian Court entered on August 5, 2005 under Section 18.6 of the CCAA, together with all extensions, modifications and amendments thereto, in each case in form and substance reasonably

7

satisfactory to the Agent, which, among other matters but not by way of limitation, recognizes the Cases and imposes a stay of proceedings against creditors and others in Canada.

"**Canadian Subsidiary**" means any Subsidiary that is incorporated, organized or otherwise established under the laws of Canada or any political subdivision of Canada.

"**Canadian Supplemental Final Order**" means an order of the Canadian Court under Section 18.6 of the CCAA, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to Agents, giving full effect to the Final Supplemental DIP Order, which order shall specifically but not exclusively provide that each of the Canadian Credit Parties is authorized to enter into the Credit Documents (as amended and restated) to which it is a party, and provide, execute and deliver all such guarantees, documents, security interests and liens as are contemplated in such Credit Documents and granting to the Collateral Agent a fixed charge, mortgage, hypothec, security interest and lien in all of the Collateral in which any of the Canadian Credit Parties now or hereafter has an interest ranking in priority to all other encumbrances.

"**Canadian Supplemental Interim Order**" means an order of the Canadian Court under Section 18.6 of the CCAA, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to Agents, giving full effect to the Interim Supplemental DIP Order, which order shall specifically but not exclusively provide that each of the Canadian Credit Parties is authorized to enter into the Credit Documents (as amended and restated) to which it is a party, and provide, execute and deliver all such guarantees, documents, security interests and liens as are contemplated in such Credit Documents and granting to the Collateral Agent a fixed charge, mortgage, hypothec, security interest and lien in all of the Collateral in which any of the Canadian Credit Parties now or hereafter has an interest ranking in priority to all other encumbrances.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Carve-Out**" means the following claims: (a) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6), (b) fees payable to the clerk of the Bankruptcy Court and any agent thereof and (c) fees and disbursements incurred by the Credit Parties' professionals (other than the Credit Parties' ordinary course professionals) and the professionals of the Committee retained prior to the Exit Facilities Conversion Date (collectively, the "**Professionals**") and allowed by order of the Bankruptcy Court in the aggregate amount not to exceed $1,500,000, in each case incurred prior to a Carve-Out Event but not yet paid to the extent such fees and expenses are approved by the Bankruptcy Court, subject to the right of Administrative Agent, the Lenders and any other party in interest to object to the award of such fees and expenses; provided, however, that the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Credit Parties, any Committee or any Professional in connection with the

8

investigation, initiation or prosecution of any claims, defenses or causes of action (as described in the Interim DIP Order) against the Agents or the Lenders and as otherwise provided in the Interim DIP Order or Final DIP Order, as applicable; provided, further, prior to a Carve-Out Event the Credit Parties shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 328, 330 and 331 of the Bankruptcy Code or otherwise pursuant to an order of the Bankruptcy Court, as the same may be due and payable, and the same shall not reduce the Carve-Out, subject to the right of Administrative Agent, the Lenders and any other party in interest to object to such payments; provided, further, that in the event of any inconsistency in the definition of "Carve-Out" between the provisions of this Agreement and the Interim DIP Order or Final DIP Order, the provisions of the Interim DIP Order or Final DIP Order shall govern.

"**Carve-Out Event**" as defined in Section 8.2.

"**Carve-Out Event Notice**" as defined in Section 8.2.

"**Cases**" as defined in the recitals hereto.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or the Government of Canada or (b) issued by any agency of the United States, in each case maturing within one year after the date of acquisition; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after the date of acquisition and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of acquisition thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one year after the date of acquisition and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; (v) fully collateralized repurchase agreements with a term of not more than 90 days for securities described in clause (i) above and entered into with a financial institution satisfying the criteria of clause (iv) above; and (vi) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) through (v) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

9

"**CCAA**" means Companies' Creditors Arrangement Act (Canada), as now and hereafter in effect, or any successor statute.

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit F.

"**Change of Control**" means, at any time on or after the Exit Facilities Conversion Date (i) prior to a Qualified Public Offering, (a) Sponsor and its Controlled Investment Affiliates shall not beneficially own and control at least 40% on a fully diluted basis of the economic and voting interests in the Equity Interests of Holdings, (b) Sponsor and its Controlled Investment Affiliates fail to elect a majority of the members of the board of directors (or similar governing body) of Holdings or (c) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall at any time have acquired beneficial ownership on a fully diluted basis of the voting and/or economic interests in the Equity Interests of Holdings greater than the beneficial ownership on a fully diluted basis of the voting and/or economic interests in the Equity Interests of Holdings owned by the Sponsor and its Controlled Investment Affiliates at such time; (ii) after a Qualified Public Offering, any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than Sponsor and its Controlled Investment Affiliates (a) shall have acquired beneficial ownership of 35% or more on a fully diluted basis of the voting and/or economic interest in the Equity Interests of Holdings or (b) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Holdings; (iii) Holdings shall cease to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interest in the Equity Interests of Systems; (iv) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Holdings cease to be occupied by Persons who either (a) were members of the board of directors of Holdings on the Exit Facilities Conversion Date or (b) were nominated for election by the board of directors of Holdings, a majority of whom were directors on the Exit Facilities Conversion Date or whose election or nomination for election was previously approved by a majority of such directors.

"**CIT**" as defined in the preamble.

"**Claim**" has the meaning specified in Section 101(5) of the Bankruptcy Code.

"**Class**" means with respect to Lenders, each of the following classes of Lenders: (i) Lenders having Term Loan Exposure, (ii) Lenders having Revolving Loan Exposure and (iii) Lenders having LC Deposits.

"**Closing Date**" means March 30, 2007.

10

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit G-1.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreement, Canadian Pledge and Security Agreement, the Quebec Security the Collateral Servicing Agreement, the Mortgages, the Intellectual Property Security Agreements, the Landlord Personal Property Collateral Access Agreements, if any, and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, or perfect a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate in form satisfactory to Collateral Agent that provides information with respect to the personal or mixed property of each Credit Party.

"**Collateral Servicing Agreement**" means a Collateral Servicing Agreement, in form and substance reasonably satisfactory to the Collateral Agent, by and among Corporation Service Company, each Credit Party (other than any Foreign Subsidiary), the Collateral Agent and the Second Lien Collateral Agent.

"**Committed Capital Expenditures**" as defined in Section 6.7(d).

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code, on August 5, 2005, as reconstituted from time to time.

"**Commitment**" means any Revolving Commitment, LC Commitment or Term Loan Commitment.

"**Commodity Agreement**" means any commodity exchange contract, commodity swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the commodity risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Confirmation Order**" as defined in Section 3.4(e)(iv).

"**Consolidated Adjusted EBITDA**" means, for any period, an amount determined for Holdings and its Subsidiaries on a consolidated basis equal to (i) Consolidated Net Income for such period, plus, to the extent deducted in determining such Consolidated Net Income, the sum, without duplication, of amounts for (a) Consolidated Interest Expense for such period; (b) consolidated income, single business, franchise, unitary or gross receipt tax expense for such period; (c) total depreciation expense for such period; (d) total amortization expense for such period; (e) the cumulative effect (whether positive or negative) of any change in accounting principles; (f) management fees and expenses paid during such period pursuant to the Management Agreement to the extent permitted hereunder; (g) Transaction Costs for such period; (h) with respect to any period (including any Fiscal Quarter) during Fiscal Year 2006 or 2007, costs and expenses resulting from administrative expenses paid with respect to the Cases for professional fees and expenses in an amount up to, but not exceeding in the aggregate for Fiscal Year 2006 and 2007, $30,000,000; (i) with respect to any period (including any Fiscal Quarter) during Fiscal Year 2006 or 2007, amounts paid as cure payments or similar costs in connection with assumptions of executory contracts assumed during the Cases or as part of the Plan in an amount up to, but not exceeding in the aggregate for Fiscal Year 2006 and 2007, $5,000,000; (j) fees and charges related to any events or transactions that are unusual in nature and infrequent in occurrence, in that it is unrelated to, or only incidentally related to, the current ordinary and typical activities of Borrowers and would not reasonably be expected to recur in a normal operating cycle in an amount up to, but not exceeding, $1,000,000 in the aggregate for any periods occurring during any Fiscal Year and, $3,000,000 in the aggregate from the Closing Date to the date of determination; (k) with respect to any period (including any Fiscal Quarter) during Fiscal Year 2007, non-recurring costs and expenses arising from or recognized in connection with the consummation and effectiveness of the Plan in an amount up to, but not exceeding in the aggregate for Fiscal Year 2007, $5,000,000; and (l) other non-Cash charges for such period (excluding any such non-Cash charge to the extent that it represents an accrual or reserve for potential Cash payment in any future period or amortization of a prepaid Cash payment that was made in a prior period); and (m) with respect to any period (including any Fiscal Quarter) during Fiscal Year 2007, amounts paid to Sponsor in connection with a claim by Sponsor for substantial contribution in accordance with the Plan in an amount up to, but not exceeding, $5,000,000, minus (ii) to the extent included in determining such Consolidated Net Income, non-Cash gains for such period (excluding any such non-Cash gain to the extent it represents the reversal of an accrual or reserve for potential Cash gain in any prior period).

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Holdings and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the consolidated statement of cash flows of Holdings

12

and its Subsidiaries, but excluding, however, any such expenditures made in connection with a Permitted Acquisition permitted hereunder.

"**Consolidated Cash Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Holdings and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Holdings and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any amount not payable in Cash and any amounts referred to in Section 2.11(f) payable on or before the Closing Date.

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of Holdings and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding Cash and Cash Equivalents.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of Holdings and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of long term debt.

"**Consolidated Excess Cash Flow**" means, for any Fiscal Year, an amount (if positive) equal to: (i) the sum, without duplication, of (a) Consolidated Adjusted EBITDA for such Fiscal Year; plus (b) the Consolidated Working Capital Adjustment for such Fiscal Year; minus (ii) the sum, without duplication, of (a) scheduled repayments of Indebtedness for borrowed money (including the implied principal component of scheduled payments made on Capital Leases, but excluding repayments of Revolving Loans or Swing Line Loans except to the extent the Revolving Commitments are permanently reduced in connection with such repayments) paid in Cash during such Fiscal Year; (b) Consolidated Capital Expenditures for such Fiscal Year (net of any proceeds of (x) any related financings with respect to such expenditures, (y) any sales of assets used to finance such expenditures and (z) any Spent Committed Capital Expenditures deducted in the calculation of Consolidated Excess Cash Flow for the preceding Fiscal Year); (c) Consolidated Cash Interest Expense for such Fiscal Year; (d) with respect to Fiscal Year 2007, any amounts referred to in Section 2.11(f) paid on or before the Closing Date; (e) consolidated income, single business, franchise, unitary or gross receipt tax expense payable in cash with respect to such Fiscal Year; (f) management fees and expenses paid during such Fiscal Year pursuant to the Management Agreement to the extent permitted hereunder; (g) with respect to Fiscal Year 2007, Transaction Costs paid in Cash during such Fiscal Year; (h) with respect to Fiscal Year 2007, costs and expenses resulting from administrative expenses with respect to the Cases which are for professional fees and expenses and are paid in Cash during such Fiscal Year; (i) amounts paid in cash during such Fiscal Year as cure payments or similar costs in connection with assumptions of executory contracts assumed during the Cases or as part of the Plan; (j) fees, charges and expenses related to any events or transactions that are paid in Cash during such Fiscal Year and are unusual in nature and infrequent in occurrence, in that it is unrelated to, or only incidentally related to, the current

13

ordinary and typical activities of Borrowers and would not reasonably be expected to recur in a normal operating cycle in an amount up to, but not exceeding, in the aggregate for any periods occurring during any Fiscal Year $1,000,000 and, $3,000,000 in the aggregate from the Closing Date to the date of determination; (k) with respect to Fiscal Year 2007, non-recurring costs and expenses paid in Cash during such Fiscal Year arising from or recognized in connection with the consummation and effectiveness of the Plan; and (l) the amount of Spent Committed Capital Expenditures paid in Cash within ninety days after the end of such Fiscal Year.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Holdings and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Holdings and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any amounts referred to in Section 2.11(f) payable on or before the Closing Date.

"**Consolidated Net Income**" means, for any period, (i) the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus (ii) (a) the income (or loss) of any Person (other than a Subsidiary of Holdings) in which any other Person (other than Holdings or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Holdings or any of its Subsidiaries by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries or that Person's assets are acquired by Holdings or any of its Subsidiaries, (c) the income of any Subsidiary of Holdings to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan, and (e) (to the extent not included in clauses (a) through (d) above) any net extraordinary gains or net extraordinary losses.

"**Consolidated Total Debt**" means, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness of Holdings and its Subsidiaries determined on a consolidated basis in accordance with GAAP.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities.

"**Consolidated Working Capital Adjustment**" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated

14

Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Controlled Foreign Corporation**" shall mean a "controlled foreign corporation" as defined in the Internal Revenue Code.

"**Controlled Investment Affiliate**" means any Affiliate of Sponsor which is organized primarily for making equity or debt investments in Holdings or other similar portfolio companies.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit H delivered by a Credit Party pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, the Intercreditor Agreement, any documents executed by the Administrative Agent in connection with or relating to the LC Deposit Account, any documents or certificates executed by Borrowers in favor of Issuing Bank relating to Letters of Credit, and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, Issuing Bank or any Lender in connection herewith.

"**Credit Extension**" means the making of a Loan, the issuing of a Letter of Credit or the making of an LC Deposit.

"**Credit Facilities**" means the credit facilities provided by the Lenders and Issuing Bank pursuant to this Agreement.

"**Credit Party**" means each Borrower and each Guarantor.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Debtors**" means Holdings, Systems, and certain Subsidiaries named as debtors in the Plan, each as debtor in the Cases under Chapter 11 of the Bankruptcy Code.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (including such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Defaulting Lender.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (ii) the date on which (a) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Section 2.13 or Section 2.14 or by a combination thereof) and (b) such Defaulting Lender shall have delivered to Borrowers and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitments, and (iii) the date on which Borrowers, Administrative Agent and Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"**Defaulted Loan**" as defined in Section 2.22.

"**Defaulting Lender**" as defined in Section 2.22.

16

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**DIP Order**" means the Interim DIP Order or the Final DIP Order, as applicable.

"**Disclosure Statement**" means the written disclosure statement that relates to the Plan, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure, as such disclosure statement may be amended, modified or supplemented from time to time in accordance with applicable law.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Eligible Assignee**" means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans; provided, no Affiliate of Holdings or Sponsor shall be an Eligible Assignee.

"**Employee Benefit Plan**" means, in respect of any Credit Party other than a Canadian Credit Party, any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates, and in respect of any Canadian Credit Party, any employee benefit plan of any nature or kind that is not a Pension Plan

17

or Multiemployer Plan and is maintained by or contributed to, or required to be maintained by or contributed to, by such Canadian Credit Party.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, state or provincial (or any subdivision of either of them), statutes, ordinances, standards, decrees, orders-in-council, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use (as it relates to Hazardous Materials) or the protection of human, plant or animal health or welfare (as it relates to Hazardous Materials) or of the environment or natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata), in any manner applicable to Holdings or any of its Subsidiaries or any Facility.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Holdings or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Holdings or such Subsidiary and with respect to

18

liabilities arising after such period for which Holdings or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means, only to the extent such event would not be discharged by the consummation of the Plan on the Plan Effective Date, (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Holdings, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

19

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Executive Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president (or the equivalent thereof), such Person's chief financial officer or treasurer and (except for purposes of Sections 5.2 and 6.8) such Person's vice president of human resources and risk management.

"**Existing Credit Agreement**" has the meaning specified in the recitals to this Agreement.

"**Existing Credit Facilities**" has the meaning specified in the recitals to this Agreement.

"**Existing Term Loans**" has the meaning specified in the recitals to this Agreement.

"**Existing DIP Credit Agreement**" means the post-petition credit agreement, dated as of August 1, 2005, as amended, among Borrowers, the other credit parties party thereto, the lenders party thereto and General Electric Capital Corporation, Morgan Stanley Senior Funding, Inc. and Marathon Structured Finance Fund, L.P., as agents.

"**Existing DIP Credit Agreement Reserve Amount**" means an amount equal to the "Reserve" under and as defined in the letter agreement, dated as of March 30, 2007, by and among each of the Debtors, General Electric Capital Corporation and Morgan Stanley Senior Funding, Inc.

"**Existing Indebtedness**" means all Indebtedness and other Obligations (as defined therein) outstanding under the Existing DIP Credit Agreement and other documents related thereto.

"**Exit Facilities**" means the Credit Facilities after the Exit Facilities Conversion Date.

20

"**Exit Facilities Conversion Date**" means the first date on which a Plan becomes effective, the Exit Facilities Option has been exercised and each of the conditions to exercising the Exit Facilities Option set forth in Section 3.4 has been satisfied or waived.

"**Exit Facilities Option**" as defined in Section 3.3.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by Administrative Agent.

"**Final DIP Order**" that certain Final Order under 11 U.S.C. §§ 105(a), 362, 363, and 364 and bankruptcy rules 2002, 4001, 6004, and 9014 (i) authorizing Debtors to (a) obtain new secured post-petition financing to refinance existing post-petition financing; (b) convert new post-petition financing into exit financing; and (c) pay related fees and expenses, and (ii) granting related relief entered by the Bankruptcy Court on April 13, 2007, as amended, supplemented or otherwise modified by the Interim Supplemental DIP Order and Final Supplemental DIP Order.

"**Final Supplemental DIP Order**" means an order (in form and substance substantially similar to the Interim DIP Order and otherwise satisfactory to Syndication Agent and Administrative Agent) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Credit Documents that (a) has not been modified or amended without the consent of Administrative Agent and Syndication Agent, or vacated, reversed, revoked, rescinded, stayed or appealed from, except as Administrative Agent and Syndication Agent may otherwise specifically consent, (b) with respect to which the time to

21

appeal, petition for certiorari, application or motion for reversal, rehearing, reargument, stay, or modification has expired, (c) no petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for a writ of certiorari with respect thereto has been filed or granted or the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order or judgment was appealed and (d) is no longer subject to any or further appeal or petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for any writ of certiorari with respect thereto or further judicial review in any form.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Holdings that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Financial Plan**" as defined in Section 5.1(i).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Funding Default**" as defined in Section 2.22.

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

22

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, state, provincial, municipal, national or other government, governmental department, commission, board, bureau, court, tribunal, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" as defined in the Pledge and Security Agreement.

"**GSCP**" as defined in the preamble.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each Domestic Subsidiary of either Borrower and (except as provided in Section 7.12) each Canadian Subsidiary of either Borrower, excluding in each case, any Inactive Subsidiary.

"**Guarantor Subsidiary**" means each Guarantor.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Haul Insurance**" means, collectively, (a) Haul Insurance Limited, a Cayman Islands corporation, and (b) any other captive insurance company hereafter formed by Holdings.

23

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedge Agreement**" means an Interest Rate Agreement, a Currency Agreement or a Commodity Agreement entered into with a Lender Counterparty and reasonably satisfactory to Administrative Agent.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of Holdings and its Subsidiaries, for the Fiscal Years ended December 31, 2003, December 31, 2004 and December 31, 2005, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, (ii) the unaudited financial statements of Holdings and its Subsidiaries as at the most recent Fiscal Quarter ending 45 days or more prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the twelve month period, ending on such date, and (ii) the unaudited financial statements of Holdings and its Subsidiaries as at the most recent calendar month ending 45 days or more prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for such month and, in the case of clauses (i), (ii) and (iii), certified by the chief financial officer of Holdings that they fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Holdings**" as defined in the preamble hereto.

"**Inactive Subsidiary**" means any Subsidiary of Holdings that has (i) no assets other than de minimus assets not exceeding $250,000, (ii) no revenues and (iii) no income.

"**Increased-Cost Lenders**" as defined in Section 2.23.

24

"**Indebtedness**", as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and bankers acceptances; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA), which purchase price is (a) due more than six months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person (other than a Lien on leased property (real or personal) granted by the landlord or lessor thereof) regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vi) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) Disqualified Equity Interests, (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation which would be Indebtedness of another; (ix) any obligation which would be Indebtedness of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation which would be Indebtedness of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; and (xi) all obligations which would be Indebtedness of such Person in respect of any exchange traded or over the counter derivative transaction, including any Hedge Agreement, whether entered into for hedging or speculative purposes; provided, in no event shall obligations under any Hedge Agreement be deemed "Indebtedness" for any purpose under Section 6.7.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby

25

(including the Lenders' agreement to make Credit Extensions or Issuing Bank's agreement to issue Letters of Credit or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements contained in the commitment letter delivered by any Lender to Borrowers with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries.

"**Indemnitee**" as defined in Section 10.3.

"**Initial Mortgaged Property**" as defined in Section 3.4(b)(i).

"**Installment**" as defined in Section 2.12.

"**Intellectual Property**" as defined in the Pledge and Security Agreement or the Canadian Pledge and Security Agreement, as applicable.

"**Intellectual Property Asset**" means, at the time of determination, any interest (fee, license or otherwise) then owned by any Credit Party in any Intellectual Property.

"**Intellectual Property Security Agreements**" has the meaning assigned to that term in the Pledge and Security Agreement or the Canadian Pledge and Security Agreement, as applicable.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit L evidencing Indebtedness owed among the Credit Parties and their Subsidiaries.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the Restatement Date, among the Collateral Agent, Borrower, and the Second Lien Collateral Agent.

"**Interim DIP Order**" means that certain Interim Order under 11 U.S.C. §§ 105(a), 362, 363, and 364 and bankruptcy rules 2002, 4001, 6004, and 9014 (i) authorizing Debtors to (a) obtain new secured post-petition financing to refinance existing post-petition financing; (b) convert new post-petition financing into exit financing; and (c) pay related fees and expenses, and (ii) granting related relief entered by the Bankruptcy Court on March 26, 2007, as amended, supplemented or otherwise modified by the Interim Supplemental DIP Order and Final Supplemental DIP Order.

26

"**Interim Supplemental DIP Order**" means an order (in substantially the form of Exhibit M and otherwise in form and substance satisfactory to Syndication Agent and Administrative Agent) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code entered after an interim hearing approving this Agreement and the other Credit Documents, as to which no stay has been entered and which has not been reversed, vacated or overturned, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Syndication Agent and Administrative Agent waive such requirement, and which has not been amended, supplemented or otherwise modified in any respect adverse to the Lenders without the prior written consent of Syndication Agent and Administrative Agent.

"**Interim Supplemental DIP Order**" means an order (in substantially the form of Exhibit M and otherwise in form and substance satisfactory to Syndication Agent and Administrative Agent) of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code entered after an interim hearing approving this Agreement and the other Credit Documents, as to which no stay has been entered and which has not been reversed, vacated or overturned, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Syndication Agent and Administrative Agent waive such requirement, and which has not been amended, supplemented or otherwise modified in any respect adverse to the Lenders without the prior written consent of Syndication Agent and Administrative Agent.

"**Interest Coverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Adjusted EBITDA for the four Fiscal Quarter period then ended to (ii) Consolidated Interest Expense for such four Fiscal Quarter period; provided that for any calculation of the Interest Coverage Ratio prior to April 1, 2008, Consolidated Interest Expense shall be (x) Consolidated Interest Expense for the period from April 1, 2007 through the end of the Fiscal Quarter for which the Interest Coverage Ratio is being calculated divided by (y) the number of months included in the calculation made under clause (x) and multiplied by (z) twelve (12); provided further that for purposes of this definition, Consolidated Interest Expense shall exclude any upfront fees and ancillary costs incurred in connection with the transactions contemplated hereunder and any amortization thereof and any amortization or write down of fees relating to the financings being refinanced as part of the transactions contemplated hereunder.

"**Interest Payment Date**" means with respect to (i) any Loan that is a Base Rate Loan, each February 1, May 1, August 1 and November 1 of each year, commencing on the first such date to occur after the Closing Date and the final maturity date of such Loan; and (ii) any Loan that is a Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided, in the case of each Interest Period of longer than three months "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one-, two-, three- or six-months, as selected by Borrowers in the applicable Funding

Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clauses (c) and (d), of this definition, end on the last Business Day of a calendar month; (c) no Interest Period with respect to any portion of the Term Loans shall extend beyond the Maturity Date; and (d) no Interest Period with respect to any portion of the Revolving Loans shall extend beyond the Revolving Commitment Termination Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than a Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person (other than Holdings or any Guarantor Subsidiary), of any Equity Interests of such Person; and (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Holdings or any of its Subsidiaries to any other Person (other than Holdings or any Guarantor Subsidiary), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Issuance Notice**" means an Issuance Notice substantially in the form of Exhibit A-3.

28

"**Issuing Bank**" means JPMorgan Chase Bank N.A. or a bank or other legally authorized Person selected by or acceptable to Administrative Agent in its sole discretion and guaranteed by Administrative Agent.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Landlord Consent and Estoppel**" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related lease, pursuant to which, among other things, the landlord consents to the granting of a Mortgage on such Leasehold Property by the Credit Party tenant, such Landlord Consent and Estoppel to be in form and substance acceptable to Collateral Agent in its reasonable discretion, but in any event sufficient for Collateral Agent to obtain a Title Policy with respect to such Mortgage.

"**Landlord Personal Property Collateral Access Agreement**" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit K with such amendments or modifications as may be approved by Collateral Agent.

"**LC Commitment**" means the commitment of a Lender to make LC Deposits hereunder and "**LC Commitments**" means such commitments of all Lenders. The amount of each Lender's LC Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the LC Commitments as of the Closing Date is $50,000,000.

"**LC Commitment Period**" means the period from the Closing Date to but excluding the LC Commitment Termination Date.

"**LC Commitment Termination Date**" means the earliest to occur of (i) April 13, 2007, if the initial Term Loans are not made on or before that date, (ii) September 30, 2007, which date shall at the option of Holdings and upon satisfaction of the conditions set forth in Section 3.4, be deemed extended to the fifth anniversary of the Exit Facilities Conversion Date, (iii) the date the LC Commitments are permanently reduced to zero pursuant to Section 2.13(b), and (iv) the date of the termination of the LC Commitments pursuant to Section 8.1.

"**LC Deposit**" means, with respect to each LC Lender, the amount of such LC Lender's LC Commitment that such LC Lender shall deposit in such LC Lender's Sub-Account with Administrative Agent on or after the Closing Date, and that amount shall in turn be deposited by Administrative Agent in the LC Deposit Account, as such amount may be (a) reduced or reinstated from time to time as a result of withdrawals from the LC Deposit Account

29

debited by Administrative Agent from and payments to the LC Deposit Account credited by Administrative Agent to the Sub-Account of such LC Lender pursuant to Section 2.4, and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.6 and, "**LC Deposits**" mean such deposits of all LC Lenders.

"**LC Deposit Account**" as defined in Section 2.4(i).

"**LC Deposit Return**" shall mean the amount earned and received by the Administrative Agent from time to time on the investment of the amounts held in the LC Deposit Account in accordance with Section 2.4(m).

"**LC Depositary Bank**" shall mean the Issuing Bank or such other commercial bank or its affiliates organized under the laws of the United States, or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000.

"**LC Disbursement**" means a payment made by Issuing Bank pursuant to a Letter of Credit.

"**LC Exposure**" means, with respect to any Lender, as of any date of determination, such Lender's Pro Rata Share of the aggregate LC Deposits and LC Usage (other than the portion of such LC Usage represented by amounts available for drawing, but not yet drawn, under Letters of Credit).

"**LC Lender**" means a Lender having an interest in the LC Deposit Account or an LC Commitment.

"**LC Usage**" means, as of any date of determination, the sum of (i) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding, and (ii) the aggregate amount of all LC Disbursements not theretofore reimbursed by or on behalf of Borrowers.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

30

"**Lender Counterparty**" means each Lender or any Affiliate of a Lender counterparty to a Hedge Agreement (including any Person who is a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Hedge Agreement, ceases to be a Lender and any Person who enters into a Hedge Agreement in connection with the transactions contemplated by the Credit Documents prior to the Closing Date and is a Lender as of the Closing Date), including each such Affiliate that enters into a joinder agreement with Collateral Agent.

"**Letter of Credit**" means a commercial or standby letter of credit issued or to be issued by Issuing Bank pursuant to this Agreement.

"**Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Total Debt as of such day to (ii) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, hypothec, deemed trust, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a Term Loan and a Revolving Loan.

"**Management Agreement**" means any management agreement entered into on or after the Exit Facilities Conversion Date between the Sponsor or any of its Controlled Investment Affiliates and Holdings reasonably acceptable to Administrative Agent.

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means (i) a material adverse effect on and/or material adverse developments with respect to the business, operations, properties, assets or condition (financial or otherwise) of Holdings and its Subsidiaries taken as a whole; (ii) a material impairment of the ability of Credit Parties to fully and timely perform their Obligations; (iii) a material adverse effect on and/or material adverse developments with respect to the legality, validity, binding effect or enforceability against a Credit Party of a Credit Document to which it is a party; or (iv) a material impairment of the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

31

"**Material Contract**" means (i) any contract or other arrangement between Holdings or any of its Subsidiaries and their customers that represented 10% or more of the Consolidated Net Income of Holdings and its Subsidiaries for the most recently ended Fiscal Year and (ii) any collective bargaining agreement to which Holdings or any of its Subsidiaries is a party.

"**Material Real Estate Asset**" means (i) any fee-owned Real Estate Asset having a fair market value in excess of $1,500,000 (as reasonably determined by Borrowers) and (ii) all Leasehold Properties other than those with respect to which the aggregate payments under the term of the lease are less than $500,000 per annum.

"**Maturity Date**" means the earlier of (i) September 30, 2007, which date shall at the option of Holdings and upon satisfaction or waiver of the conditions set forth in Section 3.4, be deemed extended to the fifth anniversary of the Exit Facilities Conversion Date, (ii) the Plan Effective Date, if the conditions set forth in Section 3.4 have not been satisfied or waived on or prior to such date and (iii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means a Mortgage substantially in the form of Exhibit J, as it may be amended, supplemented or otherwise modified from time to time, with respect to real property located in the United States, and a mortgage or charge under applicable provincial law as may be required by Collateral Agent, in form and substance satisfactory to Collateral Agent, in order to grant a First Priority Lien in favor of Collateral Agent for the benefit of the Secured Parties in real property in which any Canadian Credit Party may have an interest and which is located in a province of Canada, including, without limitation, applicable Quebec Security, in each case, as it may be amended, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" means in respect of any Credit Party other than a Canadian Credit Party, any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA and in respect of any Canadian Credit Party, any "multiemployer pension plan" as defined in subsection 1(1) of the Pension Benefits Act (Ontario) or section 2 of the Pensions Benefits Standard Act, 1985 (Canada).

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Holdings and its Subsidiaries in the form prepared for presentation to senior management thereof for the

32

applicable Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Holdings or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Holdings or any of its Subsidiaries in connection with such Asset Sale.

"**Net Cash Proceeds**" means, (i) with respect to any Asset Sale, the Net Asset Sale Proceeds and (ii) with respect to any Recovery Event, the Net Insurance/Condemnation Proceeds.

"**Net Insurance/Condemnation Proceeds**" means, with respect to any Recovery Event, an amount equal to: (i) any Cash payments or proceeds received by Holdings or any of its Subsidiaries in connection with a Recovery Event, minus (ii) (a) any actual and reasonable costs incurred by Holdings or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Holdings or such Subsidiary in respect of such Recovery Event, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (ii) of the definition of Recovery Event, including income taxes payable as a result of any gain recognized in connection therewith.

"**Nonpublic Information**" means information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"**Non-US Lender**" as defined in Section 2.20(c).

"**Note**" means a Term Loan Note, a Revolving Loan Note or a Swing Line Note.

"**Notice**" means a Funding Notice, an Issuance Notice, or a Conversion/ Continuation Notice.

"**Obligations**" means all obligations of every nature of each Credit Party, including obligations from time to time owed to the Agents (including former Agents), the

33

Lenders or any of them and Lender Counterparties, under any Credit Document or Hedge Agreement with any Credit Party, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under Letters of Credit, payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"**Obligee Guarantor**" as defined in Section 7.7.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation, amalgamation or organization, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended, and (v) with respect to an unlimited liability company, its memorandum and articles of association. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means, in respect of any Credit Party other than any Canadian Credit Party, any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA and in respect of any Canadian Credit Party, each pension, supplementary pension, retirement savings or other retirement income plan or arrangement of any kind, registered or non-registered, established, maintained or contributed to by such Canadian Credit Party for its employees or former employees, but does not include a Multiemployer Plan or the Canada Pension Plan or the Quebec Pension Plan that is maintained by the Government of Canada or the Province of Quebec, respectively.

"**Permitted Acquisition**" means any acquisition by Holdings or any of its wholly-owned Subsidiaries after the Exit Facilities Conversion Date, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all of the Equity Interests of, or a business line or unit or a division of, any Person; provided,

34

(i)     immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(ii)    all transactions in connection therewith shall be consummated, in all material respects, in accordance with all applicable laws and in conformity, in all material respects, with all applicable Governmental Authorizations;

(iii)   in the case of the acquisition of Equity Interests, all of the Equity Interests (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law) acquired or otherwise issued by such Person or any newly formed Subsidiary of Holdings in connection with such acquisition shall be directly or indirectly owned 100% by Holdings or a Guarantor Subsidiary thereof, and Holdings shall have taken, or caused to be taken, as of the date such Person becomes a Subsidiary of Holdings, each of the actions set forth in Sections 5.10 and/or 5.11, as applicable;

(iv)    the Interest Coverage Ratio on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended for which financial statements have been delivered pursuant to Section 5.1(b) or (c) (as determined in accordance with Section 6.7(e)) shall be no less than the correlative ratio indicated:

| | |
|---|---|
| June 30, 2007 | 1.60:1.00 |
| September 30, 2007 | 1.80:1.00 |
| December 31, 2007 | 2.00:1.00 |
| March 31, 2008 | 2.25:1.00 |
| June 30, 2008 | 2.50:1.00 |
| September 30, 2008 | 2.75:1.00 |
| December 31, 2008 | 2.75:1.00 |
| March 31, 2009 | 2.75:1.00 |
| June 30, 2009 | 3.00:1.00 |
| September 30, 2009 | 3.00:1.00 |
| December 31, 2009 | 3.00:1.00 |
| March 31, 2010 | 3.00:1.00 |
| June 30, 2010 | 3.00:1.00 |

35

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| September 30, 2010 | 3.00:1.00 |
| December 31, 2010 | 3.00:1.00 |
| Thereafter | 3.50:1.00 |

(v)  the Leverage Ratio on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended for which financial statements have been delivered pursuant to Section 5.1(b) or (c) (as determined in accordance with Section 6.7(e)) shall be no greater than the correlative ratio indicated:

| | |
|---|---|
| June 30, 2007 | 6.50:1.00 |
| September 30, 2007 | 5.50:1.00 |
| December 31, 2007 | 4.75:1.00 |
| March 31, 2008 | 4.25:1.00 |
| June 30, 2008 | 3.25:1.00 |
| September 30, 2008 | 3.25:1.00 |
| December 31, 2008 | 3.25:1.00 |
| March 31, 2009 | 3.00:1.00 |
| June 30, 2009 | 3.00:1.00 |
| September 30, 2009 | 3.00:1.00 |
| December 31, 2009 | 3.00:1.00 |
| March 31, 2010 | 3.00:1.00 |
| June 30, 2010 | 3.00:1.00 |
| September 30, 2010 | 3.00:1.00 |
| December 31, 2010 | 3.00:1.00 |
| Thereafter | 2.50:1.00 |

(vi)  Holdings and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 6.7 on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended for which financial statements have been delivered pursuant to Section 5.1(b) or (c) (as determined in accordance with Section 6.7(e));

(vii)  for any proposed acquisition in excess of $5,000,000, Holdings shall have delivered to Administrative Agent (A) at least 10 Business Days prior to

such proposed acquisition, (i) a Compliance Certificate evidencing compliance with Section 6.7 as required under clause (vi) above and (ii) all other relevant financial information with respect to such acquired assets, including the aggregate consideration for such acquisition and any other information required to demonstrate compliance with Section 6.7 and (B) promptly upon request by Administrative Agent, (i) a copy of the purchase agreement related to the proposed Permitted Acquisition (and any related documents reasonably requested by Administrative Agent) and (ii) quarterly and annual financial statements of the Person whose Equity Interests or assets are being acquired for the twelve month (12) month period immediately prior to such proposed Permitted Acquisition, including any audited financial statements that are available;

(viii)  any Person or assets or division as acquired in accordance herewith (y) shall be in same business or lines of business in which Holdings and/or its Subsidiaries are engaged as of the Closing Date and (z) shall have generated positive free cash flow (excluding capital expenditures) for the four quarter period most recently ended prior to the date of such acquisition;

(ix)  an Authorized Officer of Holdings shall certify that Holdings reasonably believes that, after giving effect to the Permitted Acquisition, Holdings and its Subsidiaries shall remain in compliance with Section 6.7(c);

(x)  during the 30 day period prior to the date of such proposed acquisition, the excess of (x) the aggregate Revolving Commitments over (y) the Total Utilization of the Revolving Commitments shall be no less than $20,000,000 for at least 5 consecutive Business Days at any time during such period; and

(xi)  the aggregate unused portion of the Revolving Commitments at such time (after giving effect to the consummation of the respective Permitted Acquisition and any financing thereof) shall equal or exceed $20,000,000.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, unlimited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

37

"**Petition Date**" has the meaning specified in the recitals to this Agreement.

"**Plan**" means the Chapter 11 plan of reorganization with respect to the Debtors confirmed by the Bankruptcy Court.

"**Plan Effective Date**" means the Effective Date as defined in the Plan.

"**Planned Asset Sales**" means the Asset Sales identified on Schedule 6.8(a).

"**Platform**" as defined in Section 5.1(q).

"**Pledge and Security Agreement**" means the Amended and Restated Pledge and Security Agreement, dated as of the Restatement Date, by Borrowers and each Guarantor substantially in the form of Exhibit I, as it may be amended, supplemented or otherwise modified from time to time.

"**Prepetition Indebtedness**" means all Indebtedness of any of Borrowers and their Subsidiaries outstanding on the Petition Date immediately prior to the filing of the Cases.

"**Prime Rate**" means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base ron corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means, for each of Administrative Agent, Swing Line Lender and Issuing Bank, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrowers, Administrative Agent and each Lender.

"**Projections**" as defined in Section 4.8.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Term Loan of any Lender, the percentage obtained by dividing (a) the Term Loan Exposure of that Lender by (b) the aggregate Term Loan Exposure of all Lenders; (ii) with respect to all payments, computations and other matters relating to the participations in Letters of Credit, the LC Deposits or the LC Disbursements, the percentage obtained by dividing (a) the LC Exposure of such Lender by (b) the aggregate LC Exposure of all Lenders; (iii) with

38

respect to all payments, computations and other matters relating to the Revolving Commitment or Revolving Loans of any Lender or participations in Swing Line Loans purchased therein by any Lender the percentage obtained by dividing (a) the Revolving Exposure of such Lender by (b) the aggregate Revolving Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Term Loan Exposure, the LC Exposure and the Revolving Exposure of that Lender, by (B) an amount equal to the sum of the aggregate Term Loan Exposure, the aggregate LC Exposure and the aggregate Revolving Exposure of all Lenders.

"**Public Information**" means information which has been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"**Qualified Public Offering**" shall mean an underwritten public offering of common stock of Holdings to the extent that net proceeds received by Holdings are contributed to the equity capital of Holdings pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act that results in at least $50,000,000 of net cash proceeds to Holdings and results in the listing of the common stock of Holdings on a national securities exchange or the NASDAQ National Market quotation system.

"**Quebec Security**" means one or more demand debentures, pledges of debenture and deeds of hypothec, as may be required by Collateral Agent in order to grant a First Priority Lien in favor of Collateral Agent for the benefit of the Secured Parties in property or assets in which any Canadian Credit Party may have an interest and which is located in the Province of Quebec, in each case, in form and substance satisfactory to Collateral Agent and as may be amended, supplemented or otherwise modified from time to time.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Collateral Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third-party purchasers and encumbrancers of the affected real property.

39

"**Recovery Event**" means (i) any settlement of or payment in respect of any property or casualty insurance claim in respect of a covered loss thereunder or (ii) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking.

"**Refunded Swing Line Loans**" as defined in Section 2.3(b)(iv).

"**Register**" as defined in Section 2.7(b).

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time.

"**Regulation FD**" means Regulation FD as promulgated by the US Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

"**Reimbursement Date**" as defined in Section 2.4(d).

"**Reinvestment Deferred Amount**" means, with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by Holdings or its Subsidiaries in connection therewith that are not applied pursuant to Section 2.15(b) as a result of the delivery of a Reinvestment Notice.

"**Reinvestment Event**" means any Asset Sale or Recovery Event in respect of which Holdings has delivered a Reinvestment Notice.

"**Reinvestment Notice**" means a written notice executed by an Authorized Officer (i) stating that Holdings (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to repair or replace the assets which were the subject of such Asset Sale or Recovery Event or to acquire or improve Useful Assets and (ii) certifying that no Default or Event of Default shall have occurred and be continuing at such time.

"**Reinvestment Prepayment Amount**" means, with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to repair or replace the assets which were the subject of the relevant Asset Sale or Recovery Event or to acquire or improve Useful Assets.

40

"**Reinvestment Prepayment Date**"  means, with respect to any Reinvestment Event, the earlier of (i) the date occurring 270 days after such Reinvestment Event or if Holdings or its Subsidiaries enter into a legally binding commitment to reinvest the relevant Reinvestment Deferred Amount within 270 days after such Reinvestment Event, the date occurring 450 days after such Reinvestment Event and (ii) the date on which Holdings or its Subsidiaries shall have determined not to use all or any portion of the relevant Reinvestment Deferred Amount to repair or replace the assets which were the subject of the relevant Asset Sale or Recovery Event or to acquire or improve Useful Assets, but in the case of this clause (ii) only with respect to the portion of the applicable Reinvestment Deferred Amount as to which such determination has been made.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Lender**" as defined in Section 2.23.

"**Requisite Lenders**" means one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.

"**Restatement Date**" means May 15, 2007.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Holdings now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Holdings now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Holdings now or hereafter outstanding; (iv) management or similar fees payable to Sponsor or any of its Affiliates and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to the Indebtedness outstanding under the Second

41

Lien Credit Agreement or any Indebtedness which is subordinated in right of payment to the Obligations (other than the conversion of any of such Indebtedness to common Equity Interests of Holdings).

**"Revolving Commitment"** means the commitment of a Lender to make or otherwise fund any Revolving Loan and to acquire participations in Swing Line Loans hereunder and **"Revolving Commitments"** means such commitments of all Lenders in the aggregate. The amount of each Lender's Revolving Commitment, if any, is set forth on Appendix A-3 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Commitments as of the Closing Date is $35,000,000.

**"Revolving Commitment Period"** means the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

**"Revolving Commitment Termination Date"** means the earliest to occur of (i) April 13, 2007, if the initial Term Loans are not made on or before that date; (ii) September 30, 2007, which date shall at the option of Holdings and upon satisfaction of the conditions set forth in Section 3.4, be deemed extended to the fifth anniversary of the Exit Facilities Conversion Date, (iii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.13(b), and (iv) the date of the termination of the Revolving Commitments pursuant to Section 8.1.

**"Revolving Exposure"** means, with respect to any Lender as of any date of determination, (i) prior to the termination of the Revolving Commitments, that Lender's Revolving Commitment; and (ii) after the termination of the Revolving Commitments, the sum of (a) the aggregate outstanding principal amount of the Revolving Loans of that Lender, (b) in the case of Swing Line Lender, the aggregate outstanding principal amount of all Swing Line Loans (net of any participations therein by other Lenders), and (c) the aggregate amount of all participations therein by that Lender in any outstanding Swing Line Loans.

**"Revolving Loan"** means a loan made by a Lender to Borrowers pursuant to Section 2.2(a).

**"Revolving Loan Note"** means a promissory note in the form of Exhibit B-2, as it may be amended, supplemented or otherwise modified from time to time.

**"S&P"** means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation.

42

"**Second Lien Collateral Agent**" means the collateral agent under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means the Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of the Restatement Date, by and among GSCP as sole lead arranger, sole book runner and sole syndication agent and the other agents and lenders party thereto, as such may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement.

"**Second Lien Credit Documents**" shall mean the "Credit Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Term Loans**" means term loans in an aggregate principal amount of $50,000,000 made on the Restatement Date under the Second Lien Credit Agreement.

"**Secured Parties**" has the meaning assigned to that term in the Pledge and Security Agreement and the Canadian Pledge and Security Agreement, as applicable.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Solvency Certificate**" means a Solvency Certificate of the chief financial officer of Holdings substantially in the form of Exhibit G-2.

"**Solvent**" means, with respect to the Credit Parties, that as of the date of determination, both (i) (a) the sum of such Credit Parties' debt (including contingent liabilities) does not exceed the present fair saleable value of the Credit Parties' present assets; (b) the Credit Parties' capital is not unreasonably small in relation to their business; and (c) the Credit Parties have not incurred and do not intend to incur, or believe (nor should they reasonably believe) that they will incur, debts beyond their ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) the Credit Parties are "solvent" within the meaning given that term and similar terms under the Bankruptcy Code and applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability

43

at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Spent Committed Capital Expenditures**" as defined in Section 6.7(d).

"**Sponsor**" means, collectively, Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP.

"**Sub-Account**" as defined in Section 2.4(i).

"**Subject Transaction**" as defined in Section 6.7(e).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, unlimited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Swing Line Lender**" means CIT in its capacity as Swing Line Lender hereunder, together with its permitted successors and assigns in such capacity.

"**Swing Line Loan**" means a Loan made by Swing Line Lender to Borrowers pursuant to Section 2.3.

"**Swing Line Note**" means a promissory note in the form of Exhibit B-3, as it may be amended, supplemented or otherwise modified from time to time.

"**Swing Line Sublimit**" means the lesser of (i) $10,000,000 and (ii) the aggregate unused amount of Revolving Commitments then in effect.

"**Syndication Agent**" as defined in the preamble hereto.

44

"**Systems**" as defined in the preamble hereto.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed; provided, "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"**Term Loan**" means a loan made by a Lender to Borrowers pursuant to Section 2.1(a).

"**Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund any Term Loan and "**Term Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Term Loan Commitment, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Term Loan Commitments as of the Restatement Date is $180,000,000.

"**Term Loan Commitment Period**" means the period from the Closing Date to but excluding the Term Loan Commitment Termination Date.

"**Term Loan Commitment Termination Date**" means the earliest to occur of (i) April 13, 2007, if the initial Term Loans are not made on or before that date; (ii) September 30, 2007, which date shall at the option of Holdings and upon satisfaction of the conditions set forth in Section 3.4, be deemed extended to March 30, 2008, (iii) the date the Term Loan Commitments are permanently reduced to zero pursuant to Section 2.13(b), and (iv) the date of the termination of the Term Loan Commitments pursuant to Section 8.1.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment.

45

"**Term Loan Funding Period**" means the period from the Closing Date to and including the 6th month anniversary of the Closing Date and, upon satisfaction of the conditions set forth in Section 3.4, be deemed extended to the one year anniversary of the Closing Date.

"**Term Loan Note**" means a promissory note in the form of Exhibit B-1, as it may be amended, supplemented or otherwise modified from time to time.

"**Terminated Lender**" as defined in Section 2.23.

"**Title Policy**" as defined in Section 3.4(b)(v).

"**Total Utilization of Revolving Commitments**" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of repaying any Refunded Swing Line Loans, but not yet so applied) and (ii) the aggregate principal amount of all outstanding Swing Line Loans.

"**Transaction Costs**" means the fees, costs and expenses payable by Borrowers, or any of Subsidiaries of Borrowers on or before the Closing Date in connection with the transactions contemplated by the Credit Documents.

"**Type of Loan**" means (i) with respect to either Term Loans or Revolving Loans, a Base Rate Loan or a Eurodollar Rate Loan, and (ii) with respect to Swing Line Loans, a Base Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**U.S. Lender**" as defined in Section 2.20(c).

"**Useful Assets**" means, in the case of an Asset Sale, assets useful in the business of Holdings and its Subsidiaries and, in the case of a Recovery Event, long term or otherwise non-current productive assets of the general type used in the business of Holdings and its Subsidiaries.

**1.2    Accounting Terms**.  (a)  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Holdings to Lenders pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the

reconciliation statements provided for in Section 5.1(e), if applicable). Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

(b)    If at any time the adoption of fresh-start accounting would affect the computation of any financial ratio or requirement set forth in this Agreement and either Borrowers or the Requisite Lenders shall so request, Administrative Agent and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such adoption of fresh-start accounting (subject to the approval of the Requisite Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP, as applicable, prior to such change therein and (ii) Borrowers shall provide the reconciliation statements required by Section 5.1(e).

1.3    **Interpretation, etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The terms lease and license shall include sub-lease and sub-license, as applicable.

## SECTION 2. LOANS AND LETTERS OF CREDIT

2.1    **Term Loans**.

(a)    Loan Commitments.  Subject to the terms and conditions hereof, during the Term Commitment Period, each Lender severally agrees to make Term Loans to Borrowers in an aggregate amount up to but not exceeding such Lender's Term Loan Commitment; provided that after giving effect to the making of any Term Loans in no event shall the amount of Term Loans made hereunder exceed the Term Loan Commitments then in effect. Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed. For the avoidance of doubt, as of the Restatement Date the Term Loans have been fully funded and the aggregate unfunded Term Loan Commitments equal $0. Subject to Sections 2.13(a) and 2.14, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Maturity Date.

(b)    Borrowing Mechanics for Term Loans.

47

(i)     Term Loans shall be made in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount.

(ii)    Whenever any Borrower desires that Lenders make a Term Loan, such Borrower shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 11:00 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Revolving Loan that is a Base Rate Loan.  Except as otherwise provided herein, a Funding Notice for a Term Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and the applicable Borrower shall be bound to make a borrowing in accordance therewith.

(iii)   Notice of receipt of each Funding Notice in respect of Term Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each applicable Lender by telefacsimile with reasonable promptness, but (provided Administrative Agent shall have received such notice by 11:00 a.m. (New York City time)) not later than 2:00 p.m. (New York City time) on the same day as Administrative Agent's receipt of such Notice from such Borrower.

(iv)    Each Lender shall make its Term Loan available to Administrative Agent not later than 1:00 p.m. (New York City time) on the applicable Credit Date, by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent.  Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Term Loans available to Borrowers on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Term Loans received by Administrative Agent from Lenders to be credited to the account of Borrowers at the Principal Office designated by Administrative Agent or to such other account as may be designated in writing to Administrative Agent by Borrowers.

(v)     Notwithstanding anything to the contrary herein, Borrowers may only request the Lenders to make Term Loans on up to three occasions (including the Closing Date) during the Term Loan Funding Period.

(vi)    Unless the Term Loan Commitments have been reduced in accordance with Section 2.13(b) or terminated in accordance with Section 8.1, on the last day of the Term Loan Funding Period, Borrowers shall be deemed to have made a funding request for a final Term Loan in an aggregate amount equal to the excess of (A) the Term Loan Commitments and (B) the aggregate principal amount of Term Loans previously made by the Lenders hereunder.  The Credit Date for such final Term Loan shall be three Business Days after the last day of the Term Loan Funding Period.

48

Administrative Agent shall deliver notice to each Lender with a Term Loan Commitment of such request in accordance with paragraph (ii) above.

**2.2    Revolving Loans.**

(a)    <u>Revolving Commitments</u>.  During the Revolving Commitment Period, subject to the terms and conditions hereof, each Lender severally agrees to make Revolving Loans to Borrowers in an aggregate amount up to but not exceeding such Lender's Revolving Commitment; <u>provided,</u> that after giving effect to the making of any Revolving Loans in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect.  Amounts borrowed pursuant to this Section 2.2(a) may be repaid and reborrowed during the Revolving Commitment Period.  Each Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Loans and the Revolving Commitments shall be paid in full no later than such date.

(b)    <u>Borrowing Mechanics for Revolving Loans.</u>

(i)    Except pursuant to 2.4(d), Revolving Loans that are Base Rate Loans shall be made in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount, and Revolving Loans that are Eurodollar Rate Loans shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii)    Whenever any Borrower desires that Lenders make Revolving Loans, such Borrower shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 11:00 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Revolving Loan that is a Base Rate Loan.  Except as otherwise provided herein, a Funding Notice for a Revolving Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and the applicable Borrower shall be bound to make a borrowing in accordance therewith.

(iii)    Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each applicable Lender by telefacsimile with reasonable promptness, but (provided Administrative Agent shall have received such notice by 11:00 a.m. (New York City time)) not later than 2:00 p.m. (New York City time) on the same day as Administrative Agent's receipt of such Notice from such Borrower.

49

(iv)        Each Lender shall make the amount of its Revolving Loan available to Administrative Agent not later than 1:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Revolving Loans available to Borrowers on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by Administrative Agent from Lenders to be credited to the account of Borrowers at the Principal Office designated by Administrative Agent or such other account as may be designated in writing to Administrative Agent by Borrowers.

**2.3     Swing Line Loans.**

(a)        Swing Line Loans Commitments.    During the Revolving Commitment Period, subject to the terms and conditions hereof, Swing Line Lender hereby agrees to make Swing Line Loans to Borrowers in the aggregate amount up to but not exceeding the Swing Line Sublimit; provided, that after giving effect to the making of any Swing Line Loan, in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect. Amounts borrowed pursuant to this Section 2.3 may be repaid and reborrowed during the Revolving Commitment Period. Swing Line Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date and all Swing Line Loans and all other amounts owed hereunder with respect to the Swing Line Loans and the Revolving Commitments shall be paid in full no later than such date.

(b)        Borrowing Mechanics for Swing Line Loans.

(i)        Swing Line Loans shall be made in an aggregate minimum amount of $100,000 and integral multiples of $50,000 in excess of that amount.

(ii)        Whenever any Borrower desires that Swing Line Lender make a Swing Line Loan, such Borrower shall deliver to Administrative Agent a Funding Notice no later than 12:00 p.m. (New York City time) on the proposed Credit Date.

(iii)        Swing Line Lender shall make the amount of its Swing Line Loan available to Administrative Agent not later than 2:00 p.m.(New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at Administrative Agent's Principal Office. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Swing Line Loans available to the applicable Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Swing Line Loans received by Administrative Agent from Swing Line Lender to be credited to the account of Borrowers at Administrative Agent's

50

Principal Office, or to such other account as may be designated in writing to Administrative Agent by Borrowers.

(iv)     With respect to any Swing Line Loans which have not been voluntarily prepaid by Borrowers pursuant to Section 2.13, Swing Line Lender may at any time in its sole and absolute discretion, deliver to Administrative Agent (with a copy to Borrowers), no later than 11:00 a.m. (New York City time) at least one Business Day in advance of the proposed Credit Date, a notice (which shall be deemed to be a Funding Notice given by Borrowers, but Borrowers shall not be deemed to have made any representations and warranties in connection with such deemed Funding Notice) requesting that each Lender holding a Revolving Commitment make Revolving Loans that are Base Rate Loans to Borrowers on such Credit Date in an amount equal to the amount of such Swing Line Loans (the "**Refunded Swing Line Loans**") outstanding on the date such notice is given which Swing Line Lender requests Lenders to prepay. Anything contained in this Agreement to the contrary notwithstanding, (1) the proceeds of such Revolving Loans made by the Lenders other than Swing Line Lender shall be immediately delivered by Administrative Agent to Swing Line Lender (and not to Borrowers) and applied to repay a corresponding portion of the Refunded Swing Line Loans and (2) on the day such Revolving Loans are made, Swing Line Lender's Pro Rata Share of the Refunded Swing Line Loans shall be deemed to be paid with the proceeds of a Revolving Loan made by Swing Line Lender to Borrowers, and such portion of the Swing Line Loans deemed to be so paid shall no longer be outstanding as Swing Line Loans and shall no longer be due under the Swing Line Note of Swing Line Lender but shall instead constitute part of Swing Line Lender's outstanding Revolving Loans to Borrowers and shall be due under the Revolving Loan Note issued by Borrowers to Swing Line Lender. Borrowers hereby authorize Administrative Agent and Swing Line Lender to charge Borrowers' accounts with Administrative Agent and Swing Line Lender (up to the amount available in each such account) in order to immediately pay Swing Line Lender the amount of the Refunded Swing Line Loans to the extent the proceeds of such Revolving Loans made by Lenders, including the Revolving Loans deemed to be made by Swing Line Lender, are not sufficient to repay in full the Refunded Swing Line Loans. If any portion of any such amount paid (or deemed to be paid) to Swing Line Lender should be recovered by or on behalf of Borrowers from Swing Line Lender in bankruptcy, by assignment for the benefit of creditors or otherwise, the loss of the amount so recovered shall be ratably shared among all Lenders in the manner contemplated by Section 2.17.

(v)     If for any reason Revolving Loans are not made pursuant to Section 2.3(b)(iv) in an amount sufficient to repay any amounts owed to Swing Line Lender in respect of any outstanding Swing Line Loans on or before the third Business Day after demand for payment thereof by Swing Line Lender, each Lender holding a Revolving Commitment shall be deemed to, and hereby agrees to, have purchased a participation in such outstanding Swing Line Loans, and in an amount equal to its Pro Rata Share of the applicable unpaid amount together with accrued interest thereon. Upon one Business Day's notice from Swing Line Lender, each Lender holding a Revolving

51

Commitment shall deliver to Swing Line Lender an amount equal to its respective participation in the applicable unpaid amount in same day funds at the Principal Office of Swing Line Lender. In order to evidence such participation each Lender holding a Revolving Commitment agrees to enter into a participation agreement at the request of Swing Line Lender in form and substance reasonably satisfactory to Swing Line Lender. In the event any Lender holding a Revolving Commitment fails to make available to Swing Line Lender the amount of such Lender's participation as provided in this paragraph, Swing Line Lender shall be entitled to recover such amount on demand from such Lender together with interest thereon for three Business Days at the rate customarily used by Swing Line Lender for the correction of errors among banks and thereafter at the Base Rate, as applicable.

(vi)     Notwithstanding anything contained herein to the contrary, (1) each Lender's obligation to make Revolving Loans for the purpose of repaying any Refunded Swing Line Loans pursuant to the second preceding paragraph and each Lender's obligation to purchase a participation in any unpaid Swing Line Loans pursuant to the immediately preceding paragraph shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Swing Line Lender, any Credit Party or any other Person for any reason whatsoever; (B) the occurrence or continuation of a Default or Event of Default; (C) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of any Credit Party; (D) any breach of this Agreement or any other Credit Document by any party thereto; or (E) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing; provided that such obligations of each Lender are subject to the condition that Swing Line Lender believed in good faith that all conditions under Section 3.2 to the making of the applicable Refunded Swing Line Loans or other unpaid Swing Line Loans, were satisfied at the time such Refunded Swing Line Loans or unpaid Swing Line Loans were made, or the satisfaction of any such condition not satisfied had been waived by the Requisite Lenders prior to or at the time such Refunded Swing Line Loans or other unpaid Swing Line Loans were made; and (2) Swing Line Lender shall not be obligated to make any Swing Line Loans (A) if it has elected not to do so after the occurrence and during the continuation of a Default or Event of Default or (B) at a time when a Funding Default exists unless Swing Line Lender has entered into arrangements satisfactory to it and Borrowers to eliminate Swing Line Lender's risk with respect to the Defaulting Lender's participation in such Swing Ling Loan, including by cash collateralizing such Defaulting Lender's Pro Rata Share of the outstanding Swing Line Loans.

**2.4     Issuance of Letters of Credit and Purchase of Participations Therein.**

(a)     Letters of Credit. During the LC Commitment Period, subject to the terms and conditions hereof, Administrative Agent agrees to cause the Issuing Bank to issue Letters of Credit for the account of Borrowers in the aggregate amount up to but not exceeding the aggregate LC Commitments; provided, (i) each Letter of Credit shall be denominated in Dollars;

(ii) the stated amount of each Letter of Credit shall not be less than $100,000 or such lesser amount as is acceptable to Issuing Bank; (iii) after giving effect to such issuance, in no event shall the LC Usage exceed the amount in the LC Deposit Account; (iv) in no event shall any standby Letter of Credit have an expiration date later than the earlier of (1) after the Exit Facilities Conversion Date, the second Business Day prior to the LC Commitment Termination Date and (2) the date which is one year from the date of issuance of such standby Letter of Credit; and (v) in no event shall any commercial Letter of Credit (x) have an expiration date later than the earlier of (1) after the Exit Facilities Conversion Date, the second Business Day prior to the LC Commitment Termination Date and (2) the date which is 180 days from the date of issuance of such commercial Letter of Credit or (y) be issued if such commercial Letter of Credit is otherwise unacceptable to Issuing Bank in its reasonable discretion.

(b)    Notice of Issuance.    Whenever any Borrower desires the issuance, amendment, renewal or extension of a Letter of Credit, it shall deliver to Administrative Agent an Issuance Notice no later than 1:00 p.m. (New York City time) at least three Business Days (in the case of standby letters of credit) or five Business Days (in the case of commercial letters of credit), or in each case such shorter period as may be agreed to by Administrative Agent and Issuing Bank in any particular instance, in advance of the proposed date of issuance.  Upon satisfaction or waiver of the conditions set forth in Section 3.2, Administrative Agent shall cause Issuing Bank to issue the requested Letter of Credit and such Letter of Credit shall be issued only in accordance with Issuing Bank's standard operating procedures.  Upon receiving notice of the issuance of any Letter of Credit or amendment or modification to a Letter of Credit, Administrative Agent shall promptly notify each LC Lender of such issuance, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section 2.4(e).

(c)    Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments.    In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit.  As between Borrowers, Administrative Agent and Issuing Bank, Borrowers assume all risks of the acts and omissions of, or misuse of the Letters of Credit issued by Issuing Bank, by the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, neither Administrative Agent nor Issuing Bank shall be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in

53

cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of Issuing Bank's rights or powers hereunder. Without limiting the foregoing and in furtherance thereof, any action taken or omitted by Administrative Agent or Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of Administrative Agent or Issuing Bank to Borrowers. Notwithstanding anything to the contrary contained in this Section 2.4(c), Borrowers shall retain any and all rights they may have against Administrative Agent and Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of such respective Person.

(d)     Reimbursement by Borrowers of Amounts Drawn or Paid Under Letters of Credit. Upon receiving notice that the Issuing Bank has determined to honor a drawing under a Letter of Credit, Administrative Agent shall immediately notify the applicable Borrower, and such Borrower shall reimburse such LC Disbursement by paying to Administrative Agent on or before the Business Day immediately following the date of notice to such Borrower of such LC Disbursement (the "**Reimbursement Date**") an amount in Dollars and in same day funds equal to the amount of such LC Disbursement. Promptly following receipt by Administrative Agent of any payment from such Borrower pursuant to this paragraph in respect of any LC Disbursement, Administrative Agent shall distribute such payment to Issuing Bank or, to the extent payments have been made from the LC Deposit Account pursuant to paragraph (e) below, to the LC Deposit Account for allocation by Administrative Agent among the Sub-Accounts of the LC Lenders in accordance with their Pro Rata Shares. Without limiting in any way the foregoing and notwithstanding anything to the contrary contained herein or in any separate application for any Letter of Credit, each Borrower hereby acknowledges and agrees that it shall be obligated to reimburse Administrative Bank (on behalf of the Issuing Bank) upon each LC Disbursement, and it shall be deemed to be the obligor for purposes of each such Letter of Credit issued hereunder.

(e)     Lenders' Purchase of Participations in Letters of Credit. (i) Immediately upon the issuance of each Letter of Credit, each LC Lender shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from Administrative Agent a participation in all outstanding obligations incurred by Administrative Agent in connection with the issuance of Letters of Credit by Issuing Bank and any related LC Disbursement made by Issuing Bank thereunder in an amount equal to such Lender's Pro Rata Share (with respect to the LC Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder. In the event that any Borrower shall fail for any reason to reimburse Issuing Bank in respect of an LC Disbursement as provided in Section 2.4(d), Administrative Agent shall promptly notify each LC Lender of the unreimbursed amount of such LC Disbursement, and Administrative Agent shall pay to Issuing Bank, from the LC Deposit Account, for the account of each LC Lender, an amount equal to such Lender's Pro Rata Share of such LC Disbursement, in Dollars and in same day funds, at the office of Issuing Bank specified in such

54

notice, not later than 1:00 p.m. (New York City time) on the first business day (under the laws of the jurisdiction in which such office of Issuing Bank is located) after the date notified by Issuing Bank.  In the event that the LC Deposit Account is charged by Administrative Agent to reimburse Issuing Bank pursuant to this Section 2.4(e), the applicable Borrower shall pay over to Administrative Agent in reimbursement of the applicable LC Disbursement an amount equal to the amount so charged, as provided in paragraph (d) above, and such payment shall be deposited by Administrative Agent in the LC Deposit Account.  Each LC Lender irrevocably authorizes Administrative Agent to apply, or to permit the LC Depositary Bank to apply, amounts of its LC Deposit held in the LC Deposit Account as provided in this Section 2.4(e).  Any payment made from the LC Deposit Account, pursuant to this paragraph to reimburse Issuing Bank for any LC Disbursement shall not constitute a Loan and shall not relieve any Borrower of its obligation to reimburse such LC Disbursement.

(f)      Obligations Absolute.  The obligation of Borrowers to reimburse Issuing Bank for LC Disbursements made by it, the obligation of Borrowers to reimburse each LC Lender for any payments made to Issuing Bank from the LC Deposit Account to reimburse Issuing Bank for any LC Disbursement and the obligations of LC Lenders under Section 2.4(e) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set-off, defense or other right which Borrowers or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), Issuing Bank, Lender or any other Person or, in the case of a Lender, against Borrowers, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between Borrowers or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by Issuing Bank to the beneficiary or as otherwise required by law under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; or (ix) the return of the LC Deposits; provided, in each case, that payment by Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of Issuing Bank under the circumstances in question.

(g)      Indemnification.  Without duplication of any obligation of Borrowers under Section 10.2 or 10.3, in addition to amounts payable as provided herein, each Borrower hereby agrees to protect, indemnify, pay and save harmless Administrative Agent and Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and reasonable allocated costs of internal counsel) which Administrative Agent or Issuing Bank may incur or be

55

subject to as a consequence, direct or indirect, of (i) the issuance of any Letter of Credit by Issuing Bank, other than, with respect to the Issuing Bank only, as a result of (1) the gross negligence or willful misconduct of Issuing Bank or (2) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

(h)     Issuing Bank Reports. Unless otherwise agreed by Administrative Agent, Administrative Agent shall cause Issuing Bank to report in writing to Administrative Agent (i) on or prior to each Business Day on which Issuing Bank issues, amends, renews or extends any Letter of Credit, the date of such issuance, amendment, renewal or extension, and the aggregate face amount of the Letters of Credit issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, renewal or extension (and whether the amount thereof has changed), it being understood that Issuing Bank shall not affect the issuance, renewal, extension or amendment resulting in an increase in the amount of any Letter of Credit without first obtaining written confirmation from Administrative Agent that such increase is then permitted under this Agreement, (ii) on each Business Day on which Issuing Bank makes an LC Disbursement, the date and amount of such LC Disbursement, (iii) on any Business Day on which any Borrower fails to reimburse an LC Disbursement required to be reimbursed to Issuing Bank on such day, the date of such failure and the amount of such LC Disbursement and (iv) on any other Business Day, such other information as Administrative Agent shall reasonably request as to the Letters of Credit issued by Issuing Bank and outstanding on such Business Day.

(i)     Establishment of LC Deposit Account and Sub-Accounts. On or prior to the Closing Date, Administrative Agent shall establish a deposit account (the "**LC Deposit Account**") of Administrative Agent at the LC Depositary Bank with the title "Allied Holdings 2007 Credit Agreement LC Deposit Account". Administrative Agent shall maintain records enabling it to determine at any time the amount of the interest of each LC Lender in the LC Deposit Account (the interest of each LC Lender in the LC Deposit Account, as evidenced by such records, being referred to as such LC Lender's "**Sub-Account**"). Administrative Agent shall establish such additional Sub-Accounts for assignee LC Lenders as shall be required pursuant to Section 10.6(g). No Person (including any LC Lender) shall have the right to make any withdrawal from the LC Deposit Account or to exercise any other right or power with respect thereto except as expressly provided in paragraph (l) below or in Section 10.6(g). Without limiting the generality of the foregoing, each party hereto acknowledges and agrees that the amounts on deposit in the LC Deposit Account are and will at all times be property of Administrative Agent acting for the benefit of the LC Lenders, and that no amount on deposit at any time in the LC Deposit Account shall be the property of any of the Credit Parties, constitute "Collateral" under the Credit Documents or otherwise be available in any manner to satisfy any Obligations of any of the Credit Parties under the Credit Documents. Each LC Lender agrees that its right, title and interest in and to the LC Deposit Account shall be limited to the right, acting through Administrative Agent, to require amounts in its Sub-Account to be applied as provided in paragraph (l) below and that it will have no right to require the return of its portion of the amounts in the LC Deposit Account other than as expressly provided in such paragraph (l) (each LC Lender hereby acknowledging (i) that its portion of the amounts in the LC Deposit

56

Account constitutes payment for its participations in Letters of Credit issued or to be issued hereunder, (ii) that its portion of amounts in the LC Deposit Account and any investments made therewith shall secure its obligations to Administrative Agent hereunder in respect of Letters of Credit (each LC Lender hereby granting to Administrative Agent a security interest in such LC Lender's portion of the amounts in the LC Deposit Account to secure such obligations) and (iii) that Administrative Agent shall cause the Issuing Bank to issue, amend, renew and extend Letters of Credit in reliance on the availability of such LC Lender's portion of the amounts in the LC Deposit Account to discharge such LC Lender's obligations in accordance with Section 2.4(e) in connection with any LC Disbursement thereunder). The funding of the LC Deposits, the establishment and funding of the LC Deposit Account and the agreements with respect thereto set forth in this Agreement constitute arrangements among Administrative Agent, Issuing Bank and the LC Lenders with respect to the funding obligations of the LC Lenders under this Agreement, and the amounts in the LC Deposit Account do not constitute a loan or extension of credit to any Credit Party. Except as otherwise set forth herein, no Credit Party shall have any responsibility or liability to the LC Lenders, the Agents or any other Person in respect of the establishment, maintenance, administration or misappropriation of the LC Deposit Account (or any Sub-Account) or with respect to the investment of amounts held therein, including pursuant to paragraph (n) below. Administrative Agent hereby waives (and shall use its commercially reasonable efforts to cause the LC Depositary Bank to waive) any right of setoff against the LC Deposit Account that it may have under applicable law or otherwise with respect to amounts owed to it by LC Lenders (it being agreed that such waiver shall not reduce the rights of Administrative Agent to apply or require the application of the amounts in the LC Deposit Account in accordance with the provisions of this Agreement).

(j)     Funding of LC Deposits.

(i)     Subject to the terms and conditions hereof, each LC Lender severally agrees to make a deposit in such LC Lender's Sub-Account with Administrative Agent on the Closing Date in an aggregate amount up to but not exceeding such LC Lender's LC Commitment.

(ii)     Each LC Lender shall make the amount of its LC Deposit available to Administrative Agent not later than 1:00 p.m. (New York City time) on the Closing Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall deposit the proceeds of such LC Deposits into the LC Deposit Account.

(iii)     LC Deposits shall be available, on the terms and subject to the conditions set forth herein, for application pursuant to Section 2.4(e) to reimburse such LC Lender's Pro Rata Share of LC Disbursements that are not reimbursed by Borrowers. The obligations of LC Lenders to make the deposits required by this Section 2.4(j) are several, and no LC Lender shall be responsible for any other LC Lender's failure to make its deposit as so required.

(k)   <u>LC Deposits in LC Deposit Account</u>.  The following amounts will be deposited in the LC Deposit Account at the following times:

(i)   Each LC Lender shall make such LC Lender's LC Deposits available to Administrative Agent in accordance with Section 2.4(j).  Thereafter, the LC Deposits shall be available, on the terms and subject to the conditions set forth herein, for application pursuant to Section 2.4(e) to reimburse Issuing Bank for such LC Lender's Pro Rata Share of LC Disbursements that are not reimbursed by Borrowers.

(ii)   On any date prior to the LC Commitment Termination Date on which Administrative Agent or Issuing Bank receives any reimbursement payment from Borrowers in respect of an LC Disbursement with respect to which amounts were withdrawn from the LC Deposit Account to reimburse Issuing Bank, subject to subparagraph (iii) below, Administrative Agent shall deposit, or Issuing Bank shall transfer to Administrative Agent, which shall deposit, in the LC Deposit Account, and Administrative Agent shall credit the Sub-Accounts of the LC Lenders, the portion of such reimbursement payment to be deposited therein, in accordance with Section 2.4(e).

(iii)   If at any time when any amount is required to be deposited in the LC Deposit Account under subparagraph (ii) above the sum of such amount and the amount held in the LC Deposit Account at such time would exceed the total LC Deposits, then such excess shall not be deposited in the LC Deposit Account and shall instead be paid to Administrative Agent, which shall pay to each LC Lender its Pro Rata Share of such excess.

(iv)   Concurrently with the effectiveness of any assignment by any LC Lender of all or any portion of its LC Deposit, Administrative Agent shall transfer into the Sub-Account of the assignee the corresponding portion of the amount on deposit in the assignor's Sub-Account in accordance with Section 10.6(g).

(l)   <u>Withdrawals From and Closing of LC Deposit Account</u>.  Amounts on deposit in the LC Deposit Account shall be withdrawn and distributed (or transferred, in the case of subparagraph (iv) below) as follows:

(i)   On each date on which Issuing Bank is to be reimbursed by the LC Lenders pursuant to Section 2.4(e) for any LC Disbursement made by Issuing Bank, Administrative Agent shall withdraw from the LC Deposit Account the amount of such unreimbursed LC Disbursement (and Administrative Agent shall debit the Sub-Account of each LC Lender in the amount of such LC Lender's Pro Rata Share of such unreimbursed LC Disbursement) and apply such amount to reimburse Issuing Bank for such LC Disbursement (if such Issuing Bank shall be the LC Depositary Bank) or transfer such amount to Administrative Agent, which shall apply the amount so transferred to

58

reimburse Issuing Bank (if Issuing Bank shall not be the LC Depositary Bank), all in accordance with Section 2.4(e).

        (ii)       Concurrently with each voluntary reduction of the total LC Commitments pursuant to and in accordance with Section 2.13 or 2.15, Administrative Agent shall withdraw from the LC Deposit Account and pay to each LC Lender such LC Lender's Pro Rata Share of any amount by which the LC Deposits, after giving effect to such reduction of the total LC Commitments, would exceed the greater of the total LC Commitments and the total LC Usage (and the LC Depositary Bank agrees to pay over such amounts in the LC Deposit Account to Administrative Agent).

        (iii)      Concurrently with any reduction of the total LC Commitments to zero pursuant to and in accordance with Section 2.13, 2.15 or Section 8, Administrative Agent shall withdraw from the LC Deposit Account and pay to each LC Lender such LC Lender's Pro Rata Share of the excess at such time of the aggregate amount of the LC Deposits over the LC Usage (and the LC Depositary Bank agrees to pay over such amounts in the LC Deposit Account to Administrative Agent).

        (iv)      Concurrently with the effectiveness of any assignment by any LC Lender of all or any portion of its LC Deposit, the corresponding portion of the assignor's Sub-Account shall be transferred on the records of Administrative Agent from the assignor's Sub-Account to the assignee's Sub-Account in accordance with Section 10.6(g) and, if required by Section 10.6(g), Administrative Agent shall close such assignor's Sub-Account.

        (v)       Upon the reduction of each of the total LC Commitments and the LC Usage to zero, Administrative Agent shall withdraw from the LC Deposit Account and pay to each LC Lender the entire remaining amount of such LC Lender's LC Deposit, and shall close the LC Deposit Account (and the LC Depositary Bank agrees to pay over such amounts in the LC Deposit Account to Administrative Agent).

Each LC Lender irrevocably and unconditionally agrees that its LC Deposit may be applied or withdrawn from time to time as set forth in this paragraph (l).

        (m)     <u>Investment of Amounts in LC Deposit Account</u>.  Administrative Agent shall use its commercially reasonable efforts to invest, or cause to be invested, the amounts held from time to time in the LC Deposit Account so as to earn for the account of Administrative Agent, acting on behalf of each LC Lender, a return thereon for each day at a rate per annum equal to (i) the one month LIBOR rate as determined by Administrative Agent on such day (or if such day was not a Business Day, the first Business Day immediately preceding such day) based on rates for deposits in dollars (as set forth by Bloomberg L.P.-page BTMM or any other comparable publicly available service as may be selected by Administrative Agent) (the

"**Benchmark LIBOR Rate**") minus (ii) 0.15% per annum (based on a 365/366 day year).  The Benchmark LIBOR Rate will be reset on the first Business Day of each month.  The LC Deposit Return accrued through and including the first day of January, April, July and October of each year shall be paid by the LC Depositary Bank to Administrative Agent, for payment to each LC Lender, on the third Business Day following such last day, commencing on the first such date to occur after the Closing Date, and on the date on which each of the total LC Deposits and the LC Usage shall have been reduced to zero.  Neither Administrative Agent nor any other Person guarantees any rate of return on the investment of amounts held in the LC Deposit Account and, for the avoidance of doubt, Administrative Agent shall not be limited to making investments that by their terms are expressly based upon or related to an underlying LIBOR rate.

(n)     Sufficiency of LC Deposits to Provide for Undrawn/ Unreimbursed Letters of Credit.  Notwithstanding any other provision of this Agreement, including Sections 2.1 and 2.4, Administrative Agent shall not cause any Letter of Credit to be issued or increased as to its stated amount if, after giving effect to such issuance or increase, the aggregate amount of the LC Deposits would be less than the LC Usage.

(o)     Satisfaction of LC Lender Funding Obligations.  Borrowers, Issuing Bank and Administrative Agent each acknowledge and agree that, notwithstanding any other provision contained in this Agreement, the deposits by Administrative Agent, on behalf of each LC Lender, in the LC Deposit Account on the Closing Date of funds equal to such LC Lender's LC Commitment will fully discharge the obligation of such LC Lender to reimburse such LC Lender's Pro Rata Share of LC Disbursements that are not reimbursed by Borrowers pursuant to Section 2.4(d), and that no other or further payments shall be required to be made by any LC Lender in respect of any such reimbursement obligations.

**2.5     Pro Rata Shares; Availability of Funds.**

(a)     Pro Rata Shares.  All Loans and LC Deposits shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan or LC Deposit hereunder or purchase a participation required hereby nor shall any Term Loan Commitment, LC Commitment or any Revolving Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b)     Availability of Funds.  Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan or LC Deposit requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Borrowers a corresponding amount on such Credit Date.  If such corresponding amount is not in fact made

60

          (iv)      Each of the Credit Parties, the Lenders, Issuing Bank and the Agents agree that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

        **10.2    Expenses.** Whether or not the transactions contemplated hereby shall be consummated, each Borrower agrees to pay promptly (a) all the actual and reasonable costs and expenses of Administrative Agent for the preparation, negotiation, execution and administration of the Credit Documents and the transactions contemplated thereby (including any costs and expenses incurred in connection with the establishment, maintenance and administration of the LC Deposit Account) and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for Borrowers and the other Credit Parties; (c) the reasonable fees, expenses and disbursements of counsel to Agents (in each case including reasonable allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrowers; (d) all the actual costs and reasonable expenses of creating, perfecting and recording Liens in favor of Collateral Agent, for the benefit of the Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or Requisite Lenders may reasonably request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers; (f) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual and reasonable costs and expenses incurred by each Agent in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including reasonable attorneys' fees (including reasonable allocated costs of internal counsel) and reasonable costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

        **10.3    Indemnity.**

          (a)      In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel (which shall be reasonably acceptable to Borrowers)), indemnify, pay and hold harmless, each Agent and Lender and the officers, partners,

hereof which are no longer operative); provided that any such amendment, modification or supplement shall not adversely affect any Lender or Issuing Bank in any material respect.

**10.6    Successors and Assigns; Participations.**

(a)    Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Register.  Borrowers, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments, LC Deposits and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment, LC Deposit or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of an Assignment Agreement effecting the assignment or transfer thereof, in each case, as provided in Section 10.6(d).  Each assignment shall be recorded in the Register on the Business Day the Assignment Agreement is received by Administrative Agent, if received by 12:00 noon New York City time, and on the following Business Day if received after such time, prompt notice thereof shall be provided to Borrowers and a copy of such Assignment Agreement shall be maintained, as applicable.  The date of such recordation of a transfer shall be referred to herein as the **"Assignment Effective Date."**  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments, LC Deposits or Loans.

(c)    Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment, LC Deposit or Loans owing to it or other Obligations (provided, however, that pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments):

(i)    to any Person meeting the criteria of clause (i) of the definition of the term "Eligible Assignee" upon the giving of notice to Borrowers and Administrative Agent; and

163

(ii)      to any Person meeting the criteria of clause (ii) of the definition of the term of "Eligible Assignee" upon giving of notice to Borrowers and Administrative Agent and, in the case of assignments of Revolving Loans or Revolving Commitments to any such Person (except in the case of assignments made by or to GSCP), consented to by each Borrower and Administrative Agent (such consent not to be (x) unreasonably withheld or delayed or, (y) in the case of Borrowers, required at any time an Event of Default shall have occurred and then be continuing); provided, further each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than (A) $1,000,000 (or such lesser amount as may be agreed to by Borrowers and Administrative Agent or as shall constitute the aggregate amount of the Revolving Commitments and Revolving Loans of the assigning Lender) with respect to the assignment of the Revolving Commitments and Revolving Loans and (B) $1,000,000 (or such lesser amount as may be agreed to by Borrowers and Administrative Agent or as shall constitute the aggregate amount of the Term Loans of the assigning Lender) with respect to the assignment of Term Loans.   Assignments by Related Funds shall be aggregated for purposes of determining compliance with such minimum assignment amounts.

(d)      Mechanics.  Assignments and assumptions of Loans, LC Deposits and Commitments shall only be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement.  Assignments shall be effective as of the Assignment Effective Date.  In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.20(c).

(e)      Representations and Warranties of Assignee.    Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments, LC Deposits, and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments, LC Deposits or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments, LC Deposits or Loans for its own account in the ordinary course and without a view to distribution of such Commitments, LC Deposits or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments, LC Deposits or Loans or any interests therein shall at all times remain within its exclusive control).

(f)      Effect of Assignment.  Subject to the terms and conditions of this Section 10.6, as of the Assignment Effective Date with respect to any Assignment Agreement (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans, LC Deposits and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the

164

assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on such Assignment Effective Date; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect any Commitment of such assignee and any Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon each Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Revolving Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(g)    LC Deposits.  In connection with each assignment of an LC Deposit, the LC Deposit of the assigning LC Lender shall not be released, but shall instead be purchased by the relevant assignee, and the amount of such LC Deposit shall continue to be held in the LC Deposit Account for application (to the extent not already applied) in accordance with Section 2.4 to satisfy such assignee's obligations in respect of the LC Usage. Each LC Lender agrees that immediately prior to each such assignment (i) Administrative Agent shall establish a new Sub-Account in the name of the assignee, (ii) a corresponding portion of the amount held in the LC Deposit Account credited by Administrative Agent to the Sub-Account of the assigning LC Lender shall be purchased by the assignee and shall be transferred from the assigning LC Lender's Sub-Account to the assignee's Sub-Account and (iii) if after giving effect to such assignment the LC Deposit of the assigning LC Lender shall be zero, Administrative Agent shall close the Sub-Account of such assigning LC Lender.

(h)    Participations.

(i)    Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation.

(ii)    The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended beyond the LC Termination Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in

165

effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (B) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (C) release all or substantially all of the Collateral under the Collateral Documents (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.

(iii)     Each Borrower agrees that each participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 and subject to the provisions of Section 2.23 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section; provided, (x) a participant shall not be entitled to receive any greater payment under Section 2.19 or 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with such Borrower's prior written consent and (y) a participant that would be a Non-US Lender if it were a Lender shall not be entitled to the benefits of Section 2.20 unless each Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of each Borrower, to comply with Section 2.20 as though it were a Lender; provided further that, except as specifically set forth in clauses (x) and (y) of this sentence, nothing herein shall require any notice to any Borrower or any other Person in connection with the sale of any participation. The Lender who has assigned to any participant that, by virtue of application of the provisions of this Section 10.6(h)(iii), is subject to replacement under Section 2.23 agrees that such Lender can also be replaced pursuant to the provisions of Section 2.23. To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided such Participant agrees to be subject to Section 2.17 as though it were a Lender.

(i)     Certain Other Assignments and Participations.  In addition to any other assignment or participation permitted pursuant to this Section 10.6:

(i)     any Lender may assign and/or pledge all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; and

(ii)     notwithstanding anything to the contrary in this Section 10.6, any Lender may sell participations (or otherwise transfer its rights) in or to all or a portion of its rights and obligations under the Credit Documents (including all its rights and obligations with respect to the Term Loans, Revolving Loans and Letters of Credit) to one or more lenders or other Persons that provide financing to such Lender;

166

provided, that no Lender, as between Borrowers and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment, pledge, participation or other transfer and provided further, that in no event shall the applicable Federal Reserve Bank, pledge, trustee, lender or other financing source described in the preceding clauses (i) or (ii) be considered to be a "Lender" or be entitled to require the assigning, selling or transferring Lender to take or omit to take any action hereunder.

10.7   **Independence of Covenants.**   All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.8   **Survival of Representations, Warranties and Agreements.** All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.18(c), 2.19, 2.20, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in Sections 2.17, 9.3(b) and 9.6 shall survive the payment of the Loans, the return of the LC Deposits, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

10.9   **No Waiver; Remedies Cumulative.** No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the Hedge Agreements. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.10   **Marshalling; Payments Set Aside.** Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or any Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

ALLIED HOLDINGS, INC.

By:_____
    Thomas H. King
    Executive Vice President and Chief Financial
    Officer

ALLIED SYSTEMS, LTD. (L.P.)

By: Allied Automotive Group, Inc.,
    its Managing General Partner

    By:_____
        Thomas H. King
        Executive Vice President and Assistant
        Treasurer

ACE OPERATIONS, LLC
AXIS NETHERLANDS, LLC

By: AXIS Group, Inc.,
    its Sole Member and Manager

    By:_____
        Thomas H. King
        Executive Vice President and
        Assistant Treasurer

1233309-New York Server 7A

*Signature Page to Amended and Restated First Lien Credit Agreement*

**AH INDUSTRIES INC.**
**ALLIED AUTOMOTIVE GROUP, INC.**
**ALLIED FREIGHT BROKER LLC**
**ALLIED SYSTEMS (CANADA) COMPANY**
**AXIS CANADA COMPANY**
**AXIS GROUP, INC.**
**COMMERCIAL CARRIERS, INC.**
**CORDIN TRANSPORT LLC**
**C T SERVICES, INC.**
**F.J. BOUTELL DRIVEAWAY LLC**
**GACS INCORPORATED**
**QAT, INC.**
**RMX LLC**
**TERMINAL SERVICES LLC**
**TRANSPORT SUPPORT LLC**

By:_____
    Thomas H. King
    Executive Vice President and
    Assistant Treasurer

**AXIS ARETA, LLC**
**LOGISTIC SYSTEMS, LLC**
**LOGISTIC TECHNOLOGY, LLC**

By:  AX International Limited,
    its Sole Member and Manager

By:_____
    Thomas H. King
    Executive Vice President and
    Assistant Treasurer

*Signature Page to Amended and Restated First Lien Credit Agreement*

**GOLDMAN SACHS CREDIT PARTNERS L.P.,**
as Syndication Agent and a Lender

By

Authorized Signatory

*Signature Page to Amended and Restated First Lien Credit Agreement*

**THE CIT GROUP/BUSINESS CREDIT, INC.,**
as Administrative Agent, Collateral Agent, Swing
Line Lender and a Lender

By: _____

Name: J. Danforth

Title: VP

*Signature Page to Amended and Restated First Lien Credit Agreement*



APPENDIX A-1
TO CREDIT AND GUARANTY AGREEMENT

**Term Loan Commitments**

| | | |
|---|---|---|
| Goldman Sachs Credit Partners L.P. | $180,000,000.00 | 100% |
| **Total** | $180,000,000.00[1] | 100% |

---

[1]   The term loans will be fully funded on the Restatement Date.

APPENDIX A-1-1

APPENDIX A-2
TO CREDIT AND GUARANTY AGREEMENT

**LC Commitments**

|  | LC Commitment | LC Percentage |
|---|---|---|
| Goldman Sachs Credit Partners L.P. | $ 50,000,000.00 | 100% |
| Total | $ 50,000,000.00 | 100% |

APPENDIX A-2-1

**APPENDIX A-3**
**TO CREDIT AND GUARANTY AGREEMENT**

**Revolving Commitments**

| | | |
|---|---|---|
| The CIT Group/Business Credit, Inc. | $ 35,000,000.00 | 100% |
| Total | $ 35,000,000.00 | 100% |

APPENDIX A-3-1