# **EXHIBIT 2**

**Execution Copy**

## AMENDMENT NO. 4 TO CREDIT AGREEMENT

This **AMENDMENT NO. 4 TO CREDIT AGREEMENT** dated as of August 21, 2009 (this **"Amendment"**), to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007 (as amended by that certain Limited Waiver and Amendment No. 1 to Credit Agreement and Pledge and Security Agreement, dated as of May 29, 2007, as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of June 12, 2007 and that certain Amendment No. 3 to Credit Agreement, dated as of April 17, 2008, the **"Credit Agreement"**), by and among **ALLIED SYSTEMS HOLDINGS, INC.** (formerly known as Allied Holdings, Inc.), a Delaware corporation (**"Holdings"**), **ALLIED SYSTEMS, LTD. (L.P.)**, a Georgia limited partnership (**"Systems"** and, together with Holdings, the **"Borrowers"**), and **CERTAIN SUBSIDIARIES OF THE BORROWERS**, the Lenders party thereto from time to time, **GOLDMAN SACHS CREDIT PARTNERS L.P.**, as Lead Arranger and as Syndication Agent and **THE CIT GROUP/BUSINESS CREDIT, INC.** as Administrative Agent (together with its permitted successors in such capacity, **"Administrative Agent"**) and as Collateral Agent.

## RECITALS:

**WHEREAS**, the Credit Agreement currently allows Sponsor and its Affiliates (other than the Borrowers and their Subsidiaries) to become Lenders by purchasing and assuming the rights and obligations of one or more Lenders under the Credit Agreement, but only if Sponsor and/or its Affiliates contribute such rights and obligations to the Borrowers in the form of capital contributions;

**WHEREAS**, Requisite Lenders have agreed (a) to amend the Credit Agreement to permit Sponsor and its Affiliates to be Lenders under the Credit Agreement without any requirement to contribute Loans or Commitments to the Borrowers and (b) to consent to make certain other modifications thereto, in each case, in the manner, and subject to the terms and conditions, provided for herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

**SECTION 1. DEFINITIONS**

1.1     All capitalized terms used herein (including in the introductory paragraph and Recitals set forth above) and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

**SECTION 2. AMENDMENTS TO CREDIT AGREEMENT**

2.1     <u>Amendments to Section 1: Definitions</u>.

(a)     Section 1.1 of the Credit Agreement is hereby amended by inserting the following definition therein:

LA\1967719.16

" "**Fourth Amendment**" means that certain Amendment No. 4 to the Credit Agreement, dated as of August 21, 2009, by and among the Borrowers, certain Subsidiaries of the Borrowers and the Lenders parties thereto."

(b)     Section 1.1 of the Credit Agreement is hereby further amended by deleting the definitions of "Eligible Assignee" and "Term Loan Exposure" in their entirety and inserting in lieu thereof the following:

" "**Eligible Assignee**" means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans; provided, neither Borrowers nor any of their Subsidiaries shall be an Eligible Assignee."

" "**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment."

2.2     **Amendments to Section 5: Affirmative Covenants.**

(a)     Section 5.1 of the Credit Agreement is hereby amended by deleting the following at the end of clause (a) thereof:

"and together with such financial statements, a written report certified by an Authorized Officer of Holdings identifying (i) the aggregate amount of Term Loans and Second Lien Term Loans acquired by any Restricted Sponsor Affiliate during such month (and with respect to the first month of any Fiscal Quarter, the amount of Term Loans and Second Lien Term Loans acquired in the last month of the preceding Fiscal Quarter), together with the date of, and purchase price for, each such acquisition and (ii) the aggregate principal amount of Term Loans and Second Lien Term Loans held by any Restricted Sponsor Affiliates as of the last day of such month;"

2.3     **Amendments to Section 8: Events of Default; Carve-Out Event.**

(a)     Section 8.1 of the Credit Agreement is hereby amended by deleting clause (aa) thereof in its entirety.

2.4     **Amendments to Section 10: Miscellaneous.**

(a)     Section 10.5 of the Credit Agreement is hereby amended by deleting clause (e) thereof in its entirety.

(b)     Section 10.6 of the Credit Agreement is hereby amended by deleting clause (b) thereof in its entirety and inserting the following in lieu thereof:

2

"(b)   Register.  The Borrowers, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments, LC Deposits and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment, LC Deposit or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of an Assignment Agreement effecting the assignment or transfer thereof, in each case, as provided in Section 10.6(d); provided, however, any Assignment Agreement that is not recorded in the Register within the time period required by the following sentence shall be deemed effective and recorded in the Register and the assignee thereof shall be deemed a Lender for all purposes under this Agreement in each case at the end of such time period.  Each assignment shall be recorded in the Register on the Business Day the Assignment Agreement is received by Administrative Agent, if received by 12:00 noon New York City time, and on the following Business Day if received after such time, prompt notice thereof shall be provided to the Borrowers and a copy of such Assignment Agreement shall be maintained, as applicable.  The date of such recordation of a transfer shall be referred to herein as the **"Assignment Effective Date."**  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments, LC Deposits or Loans."

(c)   Section 10.6(c) of the Credit Agreement is hereby amended by deleting the following at the end of the first sentence of clause (ii) thereof:

"; provided further, that (x) no Lender may sell, assign or transfer or otherwise convey any of its rights and obligations under this Agreement (including the Commitments, the LC Deposits or the Loans) to a Restricted Sponsor Affiliate and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) immediately prior to and after giving effect to such assignment or transfer the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate amount of the Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans have been contributed to the Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates) and (y) assignments by or to a Restricted Sponsor Affiliate shall be further subject to Section 10.6(j)."

(d)   Section 10.6(h) of the Credit Agreement is hereby amended by deleting clause (i) thereof in its entirety and inserting the following in lieu thereof:

"(i) Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings or any of its Subsidiaries) in all or any part of its Commitments, Loans or in any other Obligation."

(e)   Section 10.6 of the Credit Agreement is hereby amended by deleting clause (j) thereof in its entirety and inserting the following in lieu thereof (Section 2.17 of the

3

Credit Agreement is hereby correspondingly amended to delete the reference to Section 10.6(j)(iii) therein):

"(j) Restricted Sponsor Affiliates. The Restricted Sponsor Affiliates, from time to time, intend to become Lenders and, from time to time, to sell, assign or transfer all or a portion of their Commitments, LC Deposits, Loans or other Obligations and the rights and obligations as Lenders related thereto under this Agreement to Eligible Assignees. Each Agent and Lender hereby acknowledges that a Restricted Sponsor Affiliate (i) may be a Lender (provided such Restricted Sponsor Affiliate otherwise satisfies the criteria of the definition of the term of "Eligible Assignee") and (ii) may sell, assign or transfer all or a portion of its Commitments, LC Deposits, Loans, other Obligations and the rights and obligations as a Lender related thereto under this Agreement to Eligible Assignees."

(f) Section 10.6 of the Credit Agreement is hereby amended by deleting clause (k) thereof in its entirety (Section 2.17 of the Credit Agreement is hereby correspondingly amended to delete the reference to Section 10.6(k)(i) therein).

2.5 **Amendments to Exhibits.**

(a) Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby amended by deleting the heading of Section 1 in its entirety and inserting in lieu thereof the following:

"1. Representations and Warranties; Covenants."

(b) Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby further amended by deleting Section 1.1 of the Standard Terms and Conditions for Assignment and Assumption Agreement in its entirety and inserting in lieu thereof the following:

"1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "**Credit Documents**"), or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document."

(c) Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby further amended by deleting Section 1.2 of the Standard Terms and

4

Conditions for Assignment and Assumption Agreement in its entirety and inserting in lieu thereof the following:

"1.2     Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non-US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender."

## SECTION 3.  CONDITIONS PRECEDENT TO EFFECTIVENESS

The effectiveness of the amendments set forth in this Amendment are subject to the satisfaction, or waiver, of the following conditions on or before the date hereof (the "**Amendment Effective Date**"):

(a)     The Borrowers, the other Credit Parties and Requisite Lenders shall have indicated their consent by the execution and delivery of the signature pages hereof to ComVest via email, telex, telefacsimile, United States mail (certified, return receipt) or courier service at the address and email set forth below:

<div align="center">

ComVest Investment Partners III, L.P.
c/o The ComVest Group
CityPlace Tower
525 Okeechobee Blvd., Suite 1050
West Palm Beach, Fl 33401
Attention: Mark Hughes, Jose Gordo
Email: markh@comw.com, joseg@comvest.com
Fax: (561) 727-2100
Phone: (561) 727-2000

</div>

(b)     The Requisite Lenders shall have received a certificate from an officer of Holdings stating that as of the Amendment Effective Date and after giving effect to this Amendment (i) the representations and warranties (other than the representations and warranties contained in Sections 4.9, 4.15 and 4.22 of the Credit Agreement) contained in Section 4 herein

<div align="center">5</div>

and in the other Credit Documents are true, correct and complete in all material respects on and as of the Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties are true, correct and complete in all material respects on and as of such earlier date and (ii) other than those certain specified Events of Default listed on Schedule A hereto (the "**Specified Events of Default**"), no event has occurred and is continuing or will result from the consummation of the transactions contemplated by this Amendment that would constitute an Event of Default or a Default.

(c)    The Requisite Lenders shall have received an executed copy of the favorable written opinion of Troutman Sanders LLP, counsel for the credit parties, in form and substance reasonably satisfactory to the Requisite Lenders, addressing among other things the due authorization, execution and delivery of this Amendment, the enforceability of the Loan Documents, as amended by this Amendment, and the continuing validity of the security interests in the Collateral created pursuant to the Loan Documents and the perfection thereof.

(d)    The Requisite Lenders shall have received (i) certified copies of the resolutions of the Board of Directors of each Borrower and each other Credit Party approving this Amendment and the matters contemplated hereby, (ii) a certificate of a duly authorized officer of each Borrower and each other Credit Party certifying the names and true signatures of the officers of the Borrower and such other Credit Party authorized to sign this Amendment, (iii) certified copies of the organizational documents of each Borrower and each other Credit Party, (iv) a certificate of good standing or existence of each Borrower and each other Credit Party issued as of a recent date by the secretary of state or similar officer of the jurisdiction of organization of each such entity and (v) evidence satisfactory to them of the concurrent closing of the transactions contemplated by the Loan Purchase Agreement dated as of the date hereof relating to certain Loans and other Credit Extensions; and

(e)    The Requisite Lenders, shall have been reimbursed by the Borrowers for all costs and expenses, including attorneys' fees (including fees, charges and disbursements of Willkie Farr & Gallagher LLP, outside counsel for the Lenders signatory hereto) incurred by the undersigned in connection with the Credit Documents and this Amendment and all other transactions (contemplated, completed or otherwise) related to any thereof, whether or not consummated.

## SECTION 4.  REPRESENTATIONS AND WARRANTIES

4.1    Corporate Power and Authority.  Each Credit Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority to enter into this Amendment and to carry out the transactions contemplated by, and perform its obligations under, the Credit Agreement, as amended by this Amendment (the "**Amended Credit Agreement**").

4.2    Authorization of Amendments.  The execution and delivery of this Amendment have been duly authorized by all necessary corporate, limited liability company or partnership (as applicable) action on the part of each Credit Party.

6

4.3     No Conflict. The execution and delivery by each Credit Party of this Amendment and the performance by each Credit Party of the Amended Credit Agreement do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to any Credit Party, (ii) the certificate or articles of incorporation or bylaws (or other organizational documents) of any Credit Party or (iii) any order, judgment or decree of any court or other agency of government binding on any Credit Party; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of any Credit Party, (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of a Credit Party other than those in favor of the Collateral Agent, on behalf of itself and the Secured Parties, pursuant to the Credit Documents or those in favor of the Second Lien Collateral Agent on a second priority basis pursuant to the Second Lien Credit Documents, or (d) require any approval of stockholders or any approval or consent of any Person under any Contractual Obligation of any Credit Party other than (i) approvals and consents that have been made or obtained and (ii) approvals and consents the failure of which to obtain could not reasonably be expected to have a Material Adverse Effect.

4.4     Governmental Consents. No action, consent or approval of, registration, notice or filing with or any other action by any Governmental Authority is required in connection with the execution and delivery by each Credit Party of this Amendment or the performance by the Credit Parties of the Amended Credit Agreement except to the extent that the failure to undertake or obtain such action, consent, approval, registration or notice could not reasonably be expected to have a Material Adverse Effect.

4.5     Binding Obligation. This Amendment has been duly executed and delivered by each Credit Party and this Amendment and the Amended Credit Agreement constitute the legal, valid and binding obligation of each Credit Party enforceable against each Credit Party in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally and except as enforceability may be limited by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.6     Incorporation of Representations and Warranties From Credit Documents. The representations and warranties (other than the representations and warranties contained in Sections 4.9, 4.15 and 4.22 of the Credit Agreement) contained in the Credit Documents are and will be true, correct and complete in all material respects on and as of the Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true, correct and complete in all material respects on and as of such earlier date.

4.7     Absence of Default. After giving effect to the amendment set forth herein, other than the Specified Events of Default, no event has occurred and is continuing or will result from the consummation of the transactions contemplated by this Amendment that would constitute an Event of Default or a Default.

7

### SECTION 5.  ACKNOWLEDGEMENT AND CONSENT; RELEASE

Each Guarantor hereby consents to the terms of this Amendment and further hereby confirms and agrees that, notwithstanding the effectiveness of this Amendment, the obligations of such Guarantor under each of the Credit Documents to which such Guarantor is a party shall not be impaired and each of the Credit Documents to which such Guarantor is a party are, and shall continue to be, in full force and effect and are hereby confirmed and ratified in all respects.

Each Guarantor hereby acknowledges and agrees that (i) notwithstanding the conditions to effectiveness set forth in this Amendment, such Guarantor is not required by the terms of the Credit Agreement or any other Credit Document to consent to the amendment to the Credit Agreement effected pursuant to this Amendment and (ii) nothing in the Credit Agreement, this Amendment or any other Credit Document shall be deemed to require the consent of such Guarantor to any future amendments to the Credit Agreement.

The Credit Parties hereby acknowledge and agree that, for the avoidance of doubt and notwithstanding any other provision of this Amendment to the contrary, the obligations of the Credit Parties under Section 10.3 of the Credit Agreement as to any Indemnitee shall continue with respect to such Indemnitee notwithstanding any transfer by any Lender of its Loans or Commitments under the Credit Agreement.

The Requisite Lenders hereby acknowledge and agree that, upon ComVest Investment Partners III, L.P.'s ("**ComVest**") receipt of $1,850,000 pursuant to Section 1.5(a)(ii) of that certain Loan Purchase Agreement, dated as of August 21, 2009 (the "**Loan Purchase Agreement**"), among Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP and ComVest, (i) all conditions under Section 3(e) hereof shall be fully satisfied and (ii) the Borrowers shall have no further reimbursement obligations to the Requisite Lenders.

As a material inducement to the willingness of ComVest to enter into this Amendment, and to consummate the transactions contemplated hereby, and subject to the terms of the last sentence of this paragraph, ComVest, on the one hand, and each of the Credit Parties, on the other hand, in each case, for itself and its respective successors, assigns and Affiliates (individually, a "**Releasor**" and collectively, the "**Releasors**"), (a) in the case of ComVest, the Credit Parties, and (b) in the case of the Credit Parties, ComVest, and, in each case, the Affiliates, stockholders, partners, controlling persons, Subsidiaries, agents, sub-agents, advisors, employees, directors, officers, successors and assigns of the Credit Parties or ComVest, as applicable, and their respective Affiliates (individually, a "**Releasee**" and collectively, "**Releasees**") hereby forever releases from any and all claims, demands, proceedings, causes of action, orders, obligations, Contractual Obligations, debts and liabilities whatsoever (collectively, "**Claims**"), whether known or unknown, suspected or unsuspected, both at law and in equity, which each Releasor now has, has ever had or may hereafter have against the respective Releasees, in each case, arising on or prior to the Amendment Effective Date, or on account of or arising out of any matter, cause or event occurring on or prior to the Amendment Effective Date (including, without limitation, arising out of or in connection with the Loan Purchase Agreement, the execution, delivery and performance of Loan Purchase Agreement by any Releasee and the consummation of the transactions contemplated thereby), whether or not relating to Claims pending on, or asserted after, the Amendment Effective Date, and which relate to the Borrowers or any Subsidiary thereof

8

and/or relate to or arise out of the Credit Documents, the Second Lien Credit Documents, the Loan Purchase Agreement or the respective transactions contemplated thereby, including any Claims on account of or arising out of any meeting between or among the parties hereto or any representatives thereof that occurred on or prior to the Amendment Effective Date; provided, however, that nothing contained in this Section 5 shall operate (i) to release ComVest in its capacity as a Lender under the Credit Documents from any contractual obligation it may have thereunder that is required to be performed after (but not before) the Amendment Effectiveness Date; provided, further, that notwithstanding the provisions of this clause (i) to the contrary, effective upon the registration or deemed registration of the assignment by ComVest of its Loans and Commitments to the Yucaipa Funds (as defined below) pursuant to the Loan Purchase Agreement in accordance with Section 10.6(b) of the Credit Agreement, as amended by this Amendment, ComVest will be released from all contractual obligations pursuant to Section 10.6(f) of the Credit Agreement (and, for the avoidance of doubt, all other Claims) under the Credit documents, or (ii) to release any Claims against any Credit Party or any Subsidiary thereof or any related Releasee thereof under the Credit Documents or the Second Lien Credit Documents. In furtherance of the foregoing, each Releasor hereby irrevocably covenants and agrees to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee, based upon any matter purported to be released hereby. Notwithstanding the provisions of clause (ii) of the proviso to the immediately preceding sentence to the contrary, the parties hereto acknowledge and agree that in accordance with the provisions of the Credit Documents, ComVest may assign all Claims referred to in clause (ii) above under the Credit Documents, and that upon any such assignment, such Claims under the Credit Documents shall be transferred to the applicable transferee. Notwithstanding anything in this paragraph to the contrary, neither Yucaipa American Alliance Fund I, LP nor Yucaipa American Alliance (Parallel) Fund I, LP (collectively, the "**Yucaipa Funds**"), nor any of the Affiliates, stockholders, partners, controlling persons, Subsidiaries, agents, sub-agents, advisors, employees, directors, officers, successors and assigns of such Yucaipa Funds (other than the Credit Parties and their Subsidiaries and their stockholders, partners, controlling persons, Subsidiaries, agents, sub-agents, advisors, employees, directors, officers, successors and assigns) shall constitute Releasees or Releasors hereunder.

## SECTION 6. MISCELLANEOUS

6.1     Binding Effect. This Amendment shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.

6.2     Severability. In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

6.3     Effect on Credit Agreement. Except as expressly set forth herein, Lender agrees to no amendment with respect to the Credit Agreement or any other Credit Document, and the Credit Agreement and the other Credit Documents remain in full force in accordance with their respective terms; provided, however, in case of any inconsistencies between this Amendment and the Credit Agreement, this Amendment shall prevail. The agreement by the Requisite Lenders agreeing to

9

the amendment contained herein does not and shall not create (nor shall any Credit Party rely upon the existence of or claim or assert that there exists) any obligation of Administrative Agent or any Lender to consider or to agree to any further amendment to any Credit Document. In the event that Administrative Agent or Lenders subsequently agree to consider any further amendment to any Credit Document, neither the amendment contained herein nor any other conduct of Administrative Agent or Lenders shall be of any force or effect on Administrative Agent's or Lenders' consideration or decision with respect to any such amendment, and the Administrative Agent and Lenders shall have no further obligation whatsoever to consider or to agree to any such amendment. Administrative Agent, on behalf of the Lenders, expressly reserves the right to require strict compliance with the terms of the Credit Agreement and the other Credit Documents in all respects. The amendment agreed to herein shall not constitute a course of dealing at variance with the Credit Agreement so as to require further notice by Administrative Agent or Lenders to require strict compliance with the terms of the Credit Agreement and the other Credit Documents in the future. The parties hereto acknowledge and agree that this Amendment shall be deemed to be a Credit Document. On and after the Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Credit Documents to the "Credit Agreement", "thereunder", "thereof", "therein" or words of like import referring to the Credit Agreement shall mean and be a reference to the Amended Credit Agreement.

6.4     Headings.   Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

6.5     APPLICABLE LAW.   **THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

6.6     Counterparts.   This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. As set forth herein, this Amendment shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by ComVest of written or telephonic notification of such execution and authorization of delivery thereof.

*[The remainder of this page is intentionally left blank.]*

10

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

BORROWERS:                              ALLIED SYSTEMS HOLDINGS, INC.

                                        By: _____
                                            Scott D. Macaulay
                                            Senior  Vice  President,  Chief  Financial
                                            Officer and Treasurer


                                        ALLIED SYSTEMS, LTD. (L.P.)

                                        By:   Allied Automotive Group, Inc.,
                                              its Managing General Partner


                                        By: _____
                                            Scott D. Macaulay
                                            Vice President/Treasurer

11

**ACKNOWLEDGED AND AGREED:**

**ALLIED AUTOMOTIVE GROUP, INC.**
**ALLIED FREIGHT BROKER LLC**
**ALLIED SYSTEMS (CANADA) COMPANY**
**AXIS CANADA COMPANY**
**AXIS GROUP, INC.**
**COMMERCIAL CARRIERS, INC.**
**CORDIN TRANSPORT LLC**
**C T SERVICES, INC.**
**F.J. BOUTELL DRIVEAWAY LLC**
**GACS INCORPORATED**
**QAT, INC.**
**RMX LLC**
**TERMINAL SERVICES LLC**
**TRANSPORT SUPPORT LLC**

By:  _____

Scott D. Macaulay
Vice President/Treasurer


**AXIS ARETA, LLC**
**LOGISTIC SYSTEMS, LLC**
**LOGISTIC TECHNOLOGY, LLC**

By:   AX          International          Limited,
its Sole Member and Manager


By:  _____

Scott D. Macaulay
Vice President/Treasurer

FOURTH AMENDMENT TO THE CREDIT AGREEMENT

To approve the Fourth Amendment:

ComVest Investment Partners III, L.P.

By: _____

Name:   Cecilio M. Rodriguez

Title:      CFO

13

## Schedule A

### Specified Events of Default

1.      The Borrowers delivered to the Administrative Agent certain financial statements and other materials described in and required by Sections 5.1(b) and (d) of the Credit Agreement (collectively "**Financial Reports**") for and in respect of (i) the Fiscal Month and the Fiscal Quarter ended as of June 30, 2008, (ii) the Fiscal Month and the Fiscal Quarter ended as of September 30, 2008 and (iii) the Fiscal Month and the Fiscal Quarter ended as of March 31, 2009 (collectively the "**Financial Statements**").    The Financial Statements, including without limitation the Compliance Certificates for and with respect to the other Financial Statements, disclose, or would disclose, that the Borrowers breached Sections 6.7(a) and 6.7(b) of the Credit Agreement by failing to comply, for the Fiscal Quarters of June 30, 2008, September 30, 2008 and March 31, 2009, with the financial covenants set forth in such sections, which failures to comply constitute Events of Default under Section 8.1(c) of the Credit Agreement.

2.      The Borrowers have failed to timely comply with their obligation to deliver certain monthly reports and other materials described in and required by Section 5.1(a) of the Credit Agreement for the Fiscal Month ended as of April 30, 2009, which failures to comply constitute Events of Default under Section 8.1(c) of the Credit Agreement.

3.      The Borrowers have failed to timely comply with their obligation to deliver a certified written report identifying the amount of Term Loans and Second Lien Term Loans purchased by the Restricted Sponsor Affiliates in the months of June and July the total aggregate amount of Term Loans and Second Lien Term Loans held by the Restricted Sponsor Affiliates as of the end of such months as required by Section 5.1(a) of the Credit Agreement, which failure to comply as of August 30, 2008 has resulted in an Event of Default under Section 8.1(c) of the Credit Agreement.

4.      The Borrowers have failed to timely comply with their obligation to deliver certain annual financial statements, a Compliance Certificate and other materials described in and required by Sections 5.1(c) and (d) of the Credit Agreement for the Fiscal Year ended December 31, 2008, which failure to comply as of April 15, 2009 has resulted in an Event of Default under Section 8.1(c) of the Credit Agreement.   Such annual financial statements would disclose that the Borrowers breached Sections 6.7(a) and 6.7(b) of the Credit Agreement by failing to comply, for the Fiscal Quarters ending December 31, 2008 and March 31, 2009, with the financial covenants set forth in such sections, which failures to comply constitute Events of Default under Section 8.1(c) of the Credit Agreement.

5.      The Borrowers have failed to timely comply with their obligation to deliver a consolidated plan and financial forecast for the Fiscal Year ended December 31, 2009, including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of Holdings and its Subsidiaries for such Fiscal Year and an explanation of the assumptions on which such forecasts are based, and (ii) forecasted consolidated statements of income and cash flows of Holdings and its Subsidiaries for each month in such Fiscal Year as required by Section 5.1(i) of

LA\1967719.16

the Credit Agreement, which failure to comply as of February 28, 2009 has resulted in an Event of Default under <u>Section 8.1(e)</u> of the Credit Agreement.

6.     The Borrowers have been maintaining excess cash balances in bank accounts that are not subject to any account control agreement which constitute an Event of Default under the <u>Section 8.1(e)</u> of Credit Agreement.

7.     The Borrowers have failed to timely comply with their obligation to pay promptly the attorneys' fees of Ropes & Gray LLP incurred by the Agents and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party under the Credit Agreement or under the other Credit Documents by reason of such Default or Event of Default or in connection with any refinancing or restructuring of the credit arrangements provided under the Credit Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings as required by <u>Section 10.2(h)</u> of the Credit Agreement, which failure to comply has resulted in an Event of Default under <u>Section 8.1(a)</u> of the Credit Agreement.

8.     The Borrowers have failed to timely comply with their obligation to reimburse the LC Disbursement as required by <u>Section 2.4(d)</u> of the Credit Agreement, which failure to comply has resulted in an Event of Default under <u>Section 8.1(a)</u> of the Credit Agreement.

9.     The Borrowers have failed to maintain Interest Rate Agreements at the level required by <u>Section 5.12</u> of the Credit Agreement, which failure has resulted in an Event of Default under <u>Section 8.1(e)</u> of the Credit Agreement.

10.    The Borrowers and the Guarantors have failed to make the payment of interest due to the Lenders on August 3, 2009, which failure has resulted in an Event of Default under <u>Section 8.1(a)(iii)</u> of the Credit Agreement.

11. The Borrowers have failed to comply, for the Fiscal Quarter ending June 30, 2009, with the financial covenants set forth in <u>Sections 6.7(a)</u> and <u>6.7(b)</u> of the Credit Agreement, which failures to comply constitute Events of Default under <u>Section 8.1(c)</u> of the Credit Agreement.

12.    The Borrowers have failed to timely give notice to the Administrative Agent of the foregoing Defaults or Events of Default as required by <u>Section 5.1(f)</u> of the Credit Agreement, which failure has resulted in an Event of Default under <u>Section 8.1(a)</u> of the Credit Agreement.

LA\1967719.16

# <u>**EXHIBIT 3**</u>

FILED: NEW YORK COUNTY CLERK 09/26/2012

NYSCEF DOC. NO. 68

INDEX NO. 650150/2012

RECEIVED NYSCEF: 09/26/2012

Case 1:15-cv-00373-SLR   Document 1-2   Filed 05/08/15   Page 18 of 158 PageID #: 253

Motion Sequence No. 3



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

September 18, 2009

Keith H. Wofford
212-841-8816
646-728-1664 fax
keith.wofford@ropesgray.com

Mr. Eric W. Kimball
Patton Boggs LLP
2001 Ross Avenue
Suite 3000
Dallas, Texas 75201

Dear Eric:

Thank you for sending us a copy of the letter you received from Latham & Watkins LLP, in which Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, the "Sponsors") purport to direct The CIT Group/Business Credit, Inc., in its capacity as Administrative Agent and Collateral Agent (the "Agent") under the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 among Allied Systems Holdings, Inc. (f/k/a Allied Holdings, Inc.) and Allied Systems, Ltd. (L.P.), certain subsidiaries thereof, various lenders party thereto, Goldman Sachs Credit Partners L.P. and The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent (the "Credit Agreement"), to terminate the control agreements with respect to certain deposit accounts and to enter into new, and unspecified, control agreements. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

As you know, our firm represents Black Diamond Capital Management LLC and Spectrum Group Management LLC, managers of funds that are Lenders under the Credit Agreement. It is our view and the view of our clients that the Agent should refuse to acknowledge the purported direction delivered by the Sponsors.

It would be imprudent for the Agent to act upon the purported direction from the Sponsors. In the first instance, even if it is assumed that the Sponsors constitute "Requisite Lenders" under the Credit Agreement, it is not clear that the Sponsors have the authority to issue the purported direction under the Credit Agreement. The purported direction cites no authority that permits a direction to the Agent to terminate Credit Documents and replace such documents with a form of the Sponsors' choosing. We do not believe that there is any such provision in the Credit Agreement, and would request that the Agent inform us of such provision if it disagrees. Second, the purported direction did not appear to attach the form of replacement control agreements. Without form documents attached, neither the Agent nor any Lender has any way of knowing whether the proposed terms of the new control agreements would contravene provisions of the Credit Documents, impose new

EXHIBIT 6 - 1

duties on the Agent or other Lenders, or potentially violate the special consent provisions of the Credit Agreement.

Further, we have doubts about the validity of the assignment of the Loans to the Sponsors and their entitlement to act as Requisite Lenders under the Credit Agreement. As you know, the Fourth Amendment to the Credit Agreement posted on Intralinks purports to remove prohibitions on ownership of the Loans by the Sponsors.

Compliance with the purported direction could give rise to Events of Default under the Credit Agreement, including an unauthorized release of Collateral. Given the long, and accumulating, slate of continuing defaults under the Credit Documents, such potential or requested action by a purported "Lender" is particularly disturbing. Any effort of the Sponsors to exercise control under the Credit Agreement other than for the purpose of curing the outstanding defaults highlights the Sponsors' severe conflict of interest and the possible breach of their fiduciary duties to creditors. It is inappropriate for the Agent to assist such conduct (whether or not such assistance rises to the level of aiding and abetting) prior to receiving complete assurance that the direction comes from an appropriate source and does not otherwise breach the Credit Documents.

Our clients reserve all their rights under the Credit Documents, the Security Documents, the Intercreditor Agreement, and otherwise. Nothing in this letter shall be deemed, or construed as (i) a modification, amendment, waiver or release of any term or provision of any Credit Document; (ii) a waiver or release of any breach or violation under any Credit Document or as an agreement or proposal to forbear in the exercise of remedies or pursuit of causes of action against the Agent, the Sponsors or otherwise; (iii) an election of remedies by our clients, or (iv) establishing a course of dealing among the parties.

Sincerely,

*Keith H. Wofford*

Keith H. Wofford

EXHIBIT 6 - 2

# **<u>EXHIBIT 4</u>**

| | |
|---|---|
| **From:** | Theo Ciupitu [tciupitu@jackcooper.com] |
| **Sent:** | Thursday, March 08, 2012 4:38 AM |
| **To:** | DerexWalker Blackberry; Ira Tochner |
| **Cc:** | Michael Riggs |
| **Subject:** | Yucaipa - Allied Final Term Sheet |
| **Attachments:** | #2507147v4_LA_ - Yucaipa-JC Term Sheet (Final draft 3_8_12).DOC; WS_BinaryComparison_#2507147v3_LA_ - Yucaipa-JC Term Sheet (JC draft 3_8_12)-# 2507147v4_LA_ - Yucaipa-JC Term Sheet (Final draft 3_8_~1.doc |

| | |
|---|---|
| **Importance:** | High |

Thank you, Derex.  This Term Sheet is final.  Regards,

Theo A. Ciupitu
Executive Vice President and General Counsel
Jack Cooper Holdings Corp.
Jack Cooper Transport Company, Inc.
tciupitu@jackcooper.com
404-350-7934 (office)
404-308-7803 (cell)

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed in this communication (or in any attachment).

CONFIDENTIALITY NOTICE: This electronic mail transmission has been sent by a lawyer. It may contain information that is confidential, privileged, proprietary, or otherwise legally exempt from disclosure. If you are not the intended recipient, you are hereby notified that you are not authorized to read, print, retain, copy, or disseminate this message, any part of it, or any attachments. If you have received this message in error, please delete this message and any attachments from your system without reading the content and notify the sender immediately of the inadvertent transmission. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Thank you for your cooperation.

---

**From:** "derex@att.blackberry.net" <derex@att.blackberry.net>
**Reply-To:** "derex@att.blackberry.net" <derex@att.blackberry.net>
**Date:** Thu, 8 Mar 2012 01:58:25 -0600
**To:** Theo <tciupitu@jackcooper.com>
**Subject:** Fw: Yucaipa - Allied Final Term Sheet

Please see below for final versions reflecting the two additional changes. Thanks, Derex
Sent via BlackBerry by AT&T

---

**From:** <Sean.Denvir@lw.com>
**Date:** Wed, 7 Mar 2012 23:51:08 -0800
**To:** <derex@att.blackberry.net>
**Cc:** <ira.tochner@yucaipaco.com>; <John.Blount@AlliedHoldings.com>; <stephanie.bond@yucaipaco.com>; <Robert.OShea@lw.com>; <ROBERT.KLYMAN@lw.com>; <Sean.Denvir@lw.com>
**Subject:** RE: Yucaipa - Allied Final Term Sheet

Confidential

YUCAIPA831192

Derex,

Attached please find the revised term sheet, clean and redlined against Jack Cooper's proposed changes, incorporating those changes described in your email to Theo below. Please let me know if you need anything further.

Best,
Sean

---

**From:** derex@att.blackberry.net [mailto:derex@att.blackberry.net]
**Sent:** Wednesday, March 07, 2012 11:44 PM
**To:** Theo Ciupitu
**Cc:** Ira Tochner; John Blount; Stephanie Bond; O'Shea, Robert (LA); Denvir, Sean (LA); Klyman, Robert (LA)
**Subject:** Re: Yucaipa - Allied Final Term Sheet

Great. Thanks!
Sent via BlackBerry by AT&T

---

**From:** Theo Ciupitu <tciupitu@jackcooper.com>
**Date:** Thu, 8 Mar 2012 01:41:07 -0600
**To:** 'derex@att.blackberry.net'<derex@att.blackberry.net>
**Cc:** 'ira.tochner@yucaipaco.com'<ira.tochner@yucaipaco.com>;
'John.Blount@AlliedHoldings.com'<John.Blount@AlliedHoldings.com>;
'stephanie.bond@yucaipaco.com'<stephanie.bond@yucaipaco.com>; 'Robert.OShea@lw.com'<Robert.OShea@lw.com>;
'Sean.Denvir@lw.com'<Sean.Denvir@lw.com>; 'robert.klyman@lw.com'<robert.klyman@lw.com>
**Subject:** Re: Yucaipa - Allied Final Term Sheet

Those changes are fine. We will be ready tomorrow at 9 am ET. Good night.

---

**From:** derex@att.blackberry.net <derex@att.blackberry.net>
**To:** Theo Ciupitu
**Cc:** Ira Tochner <ira.tochner@yucaipaco.com>; John Blount <John.Blount@AlliedHoldings.com>; Stephanie Bond
<stephanie.bond@yucaipaco.com>; Rob O'Shea <Robert.OShea@lw.com>; Sean.Denvir@lw.com
<Sean.Denvir@lw.com>; Robert A. Klyman <robert.klyman@lw.com>
**Sent:** Thu Mar 08 01:38:02 2012
**Subject:** Re: Yucaipa - Allied Final Term Sheet

Thanks, Theo. I think we're done if we make the following two changes to the mark-up you circulated:

1. On page 4 of the mark-up, change "promptly" to "prompt" in item 2

2. On page 8 of the mark-up under HSR Clearance, change "responding to all governmental requests" to "responding to all governmental requests relating solely to information'

Please confirm that this is acceptable, and we'll finalize the term sheet and be ready to meet at 9am ET. Thanks.

Sent via BlackBerry by AT&T

---

**From:** Theo Ciupitu <tciupitu@jackcooper.com>
**Date:** Thu, 8 Mar 2012 00:52:38 -0600
**To:** derex@att.blackberry.net<derex@att.blackberry.net>
**Cc:** Ira Tochner<ira.tochner@yucaipaco.com>; John Blount<John.Blount@AlliedHoldings.com>; Stephanie
Bond<stephanie.bond@yucaipaco.com>
**Subject:** Yucaipa - Allied Final Term Sheet

YUCAIPA831193

Derex,

Your changes look good.  I made a few minor tweaks and have attached a revised draft in TrackChanges form.  Please confirm the attached Term Sheet is in final form and that we may proceed with our due diligence meeting tomorrow morning at 9 am ET.

Regards,

Theo A. Ciupitu
Executive Vice President and General Counsel
Jack Cooper Holdings Corp.
Jack Cooper Transport Company, Inc.
tciupitu@jackcooper.com
404-350-7934 (office)
404-308-7803 (cell)

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed in this communication (or in any attachment).

CONFIDENTIALITY NOTICE: This electronic mail transmission has been sent by a lawyer. It may contain information that is confidential, privileged, proprietary, or otherwise legally exempt from disclosure. If you are not the intended recipient, you are hereby notified that you are not authorized to read, print, retain, copy, or disseminate this message, any part of it, or any attachments. If you have received this message in error, please delete this message and any attachments from your system without reading the content and notify the sender immediately of the inadvertent transmission. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Thank you for your cooperation.

---

**From:** "derex@att.blackberry.net" <derex@att.blackberry.net>
**Reply-To:** "derex@att.blackberry.net" <derex@att.blackberry.net>
**Date:** Thu, 8 Mar 2012 00:05:23 -0600
**To:** Theo <tciupitu@jackcooper.com>
**Cc:** Ira Tochner <ira.tochner@yucaipaco.com>, John Blount <John.Blount@AlliedHoldings.com>, Stephanie Bond <stephanie.bond@yucaipaco.com>
**Subject:** Fw: Yucaipa - Allied Term Sheet

Theo, attached is the mark-up we discussed. Please let me know if this is acceptable. I'm reachable on my cell if you would like to discuss. Thanks, Derex. 310-990-5378
Sent via BlackBerry by AT&T

---

**From:** <Sean.Denvir@lw.com>
**Date:** Wed, 7 Mar 2012 21:54:31 -0800
**To:** <derex@att.blackberry.net>
**Cc:** <Robert.OShea@lw.com>; <GLEN.COLLYER@lw.com>; <ROBERT.KLYMAN@lw.com>; <Sean.Denvir@lw.com>; <stephanie.bond@yucaipaco.com>
**Subject:** Yucaipa - Allied Term Sheet


Derex,

YUCAIPA831194

Attached please find a revised draft of the Allied Term Sheet, clean and redlined against Jack Cooper's last draft. Please let me know if you need anything further.

Best,

Sean

<<#2507147v2_LA_ - Yucaipa-JC Term Sheet (Yucaipa draft 3_7_12).DOC>>
<<WS_BinaryComparison_#2507147v1_LA_ - Yucaipa-JC Term Sheet (JC draft 3_7_12)-#2507147v2_LA_ - Yucaipa-JC Term Sheet (Yucaipa draft 3_7_12).doc>>

**Sean C. Denvir**

**LATHAM & WATKINS** LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Direct Dial: +1.213.891.8504
Fax: +1.213.891.8763
Email: sean.denvir@lw.com
http://www.lw.com

Confidential

YUCAIPA831195

<div style="border:1px solid">

**CONFIDENTIAL TERM SHEET –
FINAL VERSION 03/08/2012**

</div>

## <u>For Discussion Purposes Only</u>

**TERM SHEET FOR ACQUIRING FIRST AND SECOND LIEN SECURED DEBT
CLAIMS WITH RESPECT TO ALLIED SYSTEMS HOLDINGS, INC. AND
CONSUMMATING 363 SALE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

This term sheet (this "**Term Sheet**") outlines the parties nonbinding present intentions with respect to certain material terms of the following proposed transactions (the "**Proposed Transactions**"): (a) the purchase by Jack Cooper Transport Company, Inc. ("**Jack Cooper**") either directly or through one or more designated affiliates to be determined ("**JCT Affiliate**") of certain first and second lien secured debt claims (the "**Purchased Debt**") against Allied Systems Holdings, Inc. and its subsidiaries and other affiliates (collectively, "**Allied**") (the "**Debt Purchase Transaction**"); and (b) the purchase of substantially all of the assets and the assumption of designated liabilities of Allied through a sale under Section 363 of Title 11 of the United States Code (the "**Bankruptcy Code**") pursuant to a credit bid of the first and/or second lien secured debt claims against Allied (the "**363 Sale**").  The terms and conditions summarized herein are provided for discussion purposes only, and are not enforceable or binding on any parties hereto, and do not contain all of the contemplated terms and conditions of the Proposed Transactions.  In addition, the Term Sheet constitutes confidential settlement negotiations under Federal Rule of Evidence 408 (and comparable state law) and cannot be used in any proceeding for any purpose.  The consummation of the Proposed Transactions shall be subject to, among other things, the negotiation, execution, and delivery of definitive agreements that are mutually acceptable to Jack Cooper, Yucaipa (as hereinafter defined), and Allied as described herein (the "**Definitive Agreements**") and the satisfaction of customary and specific conditions precedent.

| **Debt Purchase Transaction Specific Terms** | |
|---|---|
| **Seller:** | The Yucaipa Companies, LLC, Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP, and all other funds managed by or related to the foregoing entities and their general partners (collectively, "**Yucaipa**"). |
| | |
| **Buyer(s):** | Jack Cooper and/or JCT Affiliate |
| | |
| **Purchased Debt:** | 1.  All claims held by Yucaipa at closing under that certain Amended and Restated First Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, by and among, <u>inter alia</u>, Allied Systems Holdings, Inc. (f/k/a Allied Holdings, Inc.) and Allied Systems, Ltd. (L.P.) (collectively, the "**Allied Borrowers**"), certain subsidiaries of Allied Borrowers as guarantors (the "**Allied Guarantors**"), the Lenders party thereto from time to time, and The CIT Group/Business Credit, Inc. ("**CIT**"), as administrative |

| | |
|---|---|
| | and collateral agent (as amended and modified, the "**First Lien Credit Agreement**"). |
| | 2.  All claims held by Yucaipa at closing under that certain Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, by and among, inter *alia*, the Allied Borrowers, the Allied Guarantors, and Goldman Sachs Credit Partners, L.P., as sole lead arranger, sole book runner, and sole lead administrative agent (as amended and modified, the "**Second Lien Credit Agreement**"; and, together with the First Lien Credit Agreement, the "**Credit Agreements**"). |
| **Amount of Purchased Debt:** | 1.  First Lien Credit Agreement term loans – approximately $114,700,000 of principal, plus all accrued and unpaid interest, fees, charges, and expenses. |
| | 2.  First Lien Credit Agreement synthetic letter of credit usage loans – approximately $20,100,000 of principal, plus all accrued and unpaid interest, fees, charges, and expenses. |
| | 3.  Second Lien Credit Agreement term loans – approximately $20,000,000 of principal, plus all accrued and unpaid interest, fees, charges, and expenses. |
| **Purchased Debt Purchase Price:** | 1.  First Lien Credit Agreement claims – $155 million as hereinafter described. |
| | 2.  Second Lien Credit Agreement claims - $1.00. |
| **Form of Purchase:** | Direct assignment by Yucaipa to Buyer. |
| **Documentation:** | Mutually acceptable to Buyer and Yucaipa, but to be based on "distressed trade" form documents published by The Loan Syndications and Trading Association, as amended or modified to accommodate the Debt Purchase Transaction. |
| **Closing Dates:** | "**First Closing Date**" shall mean three (3) business days following receipt of HSR Clearance (as hereinafter defined) and the satisfaction or waiver of all other Conditions Precedent to the First Closing (as set forth below). |
| | "**Second Closing Date**" shall mean fourteen (14) calendar days following the entry of an order of the Bankruptcy Court approving the 363 Sale in a form acceptable to the parties and to be attached to the Cooperation Agreements (as hereinafter |

2 -

YUCAIPA831197

| | |
|---|---|
| | defined). |
| | |
| **Assignment Fee under the Credit Agreements:** | Would be shared equally between Buyer and Yucaipa, unless waived by the Administrative Agent. |
| | |
| **Payment of Purchased Debt Purchase Price:** | The $155 million Purchased Debt Purchase Price would be paid as follows:<br><br>1.  On the First Closing Date, Buyer would pay Yucaipa **$75 million** of the Purchased Debt Purchase Price in form of notes identical in all material respects (except as otherwise provided herein) to those issued under Jack Cooper's 12 ¾% Senior Secured Notes Due 2015 (the "**Jack Cooper Notes**").<br><br>2.  On the Second Closing Date, Buyer would pay Yucaipa the remaining **$80 million** of the Purchase Debt Purchase Price in cash. |
| | |
| **Conditions Precedent to Signing Definitive Agreements for Debt Purchase Transaction:** | 1.  Allied and/or Yucaipa to provide to Jack Cooper the following due diligence items prior to signing the Definitive Agreements:<br><br>(a)  Full and complete copies of all documents in Allied's and Yucaipa's possession relating to the Credit Agreements (collectively, the "**Loan Documents**"), including, without limitation, those documents set forth on **Schedule 1** attached hereto.<br><br>(b)  Proof of the total amount of claims outstanding under the Credit Agreements.<br><br>(c)  Corporate structure charts and summary of shareholders and their ownership to the extent available.<br><br>(d)  Summary of certain material terms (to be agreed upon) of Ford customer contract, including, without limitation, revenue provisions, bankruptcy provisions, and evidence of the contract being a "no cut" contract.<br><br>(e)  Access to information regarding the rigs and real estate owned by Allied to allow Jack Cooper to confirm: (i) numbers and locations of such rigs and real estate; (ii) the age and condition of such rigs and general condition of such real estate; (iii) that Allied has clear title to such rigs and real estate; and (iv) that such rigs and real estate are not encumbered by claims (such as financing liens, |

3 -

YUCAIPA831198

|  | operating or capital lease claims, and mortgages), other than collateral interests granted pursuant to the Credit Agreements. For purposes of this Term Sheet, "access" shall be defined to include an opportunity to inspect all rigs owned or leased by Allied.<br><br>(f) Access to complete lease agreements regarding the rigs and real estate leased by Allied.<br><br>(g) Information identifying Allied's tax basis in its tangible assets.<br><br>(h) Access to such financial, operational, and other information concerning Allied (including, without limitation, estimated current run-rate revenues and terminal contribution margins by terminal based on current customer contracts) as agreed to between Robert Griffin, CEO of Jack Cooper, and Mark Gendregske, CEO of Allied.<br><br>Jack Cooper would complete its review and due diligence of the items listed in this item 1 by March 22, 2012. |
|  | 2. Jack Cooper would provide to Yucaipa only (and not Allied) the following due diligence items prior to signing the Definitive Agreements:<br><br>(a) Prompt access on March 8, 2012 to Jack Cooper's password protected investor website.<br><br>(b) As soon as reasonably available, access to any solicitation materials provided in connection with obtaining the Lenders Consent to holders of notes issued under Jack Cooper's 12 ¾% Senior Secured Notes Due 2015.<br><br>(c) Subject to mutually agreed to confidentiality restrictions, all other documents or information with respect to Jack Cooper and its affiliates and investments as reasonably requested by Yucaipa and agreed to by Jack Cooper for purposes of completing its due diligence.<br><br>Yucaipa would complete its review and due diligence of the items listed under clauses (a) and (c) in this item 2 by March 22, 2012. |
|  |  |

4 -

YUCAIPA831199

| | |
|---|---|
| | 3.  As of the date of signing the Definitive Agreements, Allied shall have the following: |
| | |
| | (a) average cash book balance of not less than $4,000,000 over a 10-day period prior to the signing date; and |
| | (b) average accounts receivable, net of contras, of not less than $9,000,000 over a 10-day period prior to the signing date. |
| | |
| | 4. Based upon final but unsigned Definitive Agreements, Jack Cooper would obtain the consent of its lenders and investors to consummate the Proposed Transactions (the "**Lenders Consent**"). |
| | |
| | 5.  Simultaneous with the signing of the Definitive Agreements, Yucaipa and Buyer would sign one or more definitive agreements governing their respective actions in connection with the Bankruptcy Process (as hereinafter defined). |
| | |
| | 6  Simultaneous with the signing of the Definitive Agreements, Buyer would sign definitive agreements with CIT, Black Diamond, and Spectrum (the "**Other Sellers Definitive Agreements**) for the purchase of all the claims under the Credit Agreements held by CIT, Black Diamond, and Spectrum and, simultaneous with the signing of such Other Sellers Definitive Agreements, such parties would prepare, execute, and deliver all agreements or other documentation necessary to effect the following (each of which would be effective as of the First Closing Date): |
| | (a) The settlement and dismissal with prejudice of all claims and counterclaims in that certain lawsuit styled as *BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD, and Spectrum Investment Partners, L.P. vs. Yucaipa American Alliance Fund I., LP and Yucaipa American Alliance (Parallel) Fund I, LP*, in the Supreme Court of the State of New York, New York County, Index No. _____ (filed on or about January 18, 2012). |
| | (b) CIT's, Black Diamond's, and Spectrum's respective retroactive affirmation of Amendment No. 4 to Credit Agreement, dated August 21, 2009. |
| | (c) Amendment of the Loan Documents to provide that |

5 -

YUCAIPA831200

| | |
|---|---|
| | Buyer may acquire claims under the Loan Documents as an "Eligible Assignee" and become the "Requisite Lender" with all rights associated therewith, including, but not limited to, the right to vote its acquired claims and to direct that actions be undertaken as may be allowed pursuant to the Loan Documents.<br><br>(d) CIT's agreement as the Administrative Agent under the First Lien Credit Agreement (on behalf of itself and its successors) that CIT would not contest that Yucaipa holds claims constituting "Requisite Lenders" and Buyer (or its designee) would be an Eligible Assignee and would hold claims constituting Requisite Lenders under the First Lien Credit Agreement upon purchasing all of the claims against Allied under the First Lien Credit Agreement held by Yucaipa. |
| | 7  The Other Sellers Definitive Agreements entered into with CIT would provide for CIT's cooperation (in its capacity as Administrative Agent and Collateral Agent under the First Lien Credit Agreement) in effectuating a credit bid as part of the 363 Sale as contemplated herein; provided, however, CIT would not be required to remain as Administrative Agent or Collateral Agent under the First Lien Credit Agreement.  In the event CIT would resign as Administrative Agent and/or Collateral Agent under the First Lien Credit Agreement, Buyer, Allied, and Yucaipa each would use its reasonable best efforts to replace CIT with a third party that would be willing to cooperate in effectuating a credit bid as part of the 363 Sale as contemplated herein. |
| | 8  In order to facilitate the consummation of the Proposed Transactions, Jack Cooper, Allied, and Yucaipa would motion the court in the Allied-Jack Cooper Lawsuit (as hereinafter defined) to extend the discovery deadline until May 31, 2012 and would agree to further motion such court to further extend the discovery deadline as necessary to prevent having depositions held while the parties are attempting to consummate the Proposed Transactions. |
| **Conditions Precedent to the First Closing:** | The following conditions precedent would have to be satisfied or waived on or prior to the First Closing Date: |
| | 1.  Within three (3) business days of Jack Cooper obtaining the Lenders Consent and the parties signing the Definitive Agreements, Jack Cooper and Yucaipa would (and/or Yucaipa |

6 -

YUCAIPA831201

|  | would cause Allied to) make a Hart-Scott-Rodino filing for the completion of the Debt Purchase Transaction and 363 Sale. |
|  | 2.  The expiration or termination of any applicable waiting periods under the Hart-Scott-Rodino Act applicable to the purchase of the Purchased Debt and the consummation of the 363 Sale described below (the "**HSR Clearance**"). |
|  | 3.  All commitments to make advances or issue new letters of credit under the First Lien Credit Agreement would be terminated. |
|  | 4.  Proof of Yucaipa, Allied, and CIT delivering evidence of releases of certain claims against each other in that certain lawsuit styled as *Allied Systems Holdings, Inc., Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP vs. The CIT Group/Business Credit, Inc., In the Superior Court of Fulton County, Georgia, Case No. 2009CF177574 (J. Goger).* |
|  | 5.  Settlement and dismissal with prejudice of all claims and counterclaims in that certain lawsuit styled as *Allied Systems Holdings, Inc. vs. T. Michael Riggs, IEP Carhaul LLC, Jack Cooper Transport Company, Inc., and Active Carhaul Acquisition, Inc. vs. The Yucaipa Companies, LLC and Mark J. Gendregske*; in the Superior Court of Cobb County, Georgia, Civil Action File No. CV-09-1-10536-48 (the "**Allied-Jack Cooper Lawsuit**"), to be effective as of the Second Closing Date. |
|  | 6. As of the First Closing Date: (a) the total outstanding principal amount under the First Lien Credit Agreement would not exceed $265,000,000 less the amount of any commitments that have been terminated before the First Closing Date; (b) the total outstanding principal amount under the Second Lien Credit Agreement would not exceed $30,000,000; and (c) Yucaipa would hold a majority of the voting shares of Allied and would have the power to elect the majority of the members of the Board of Directors of Allied. |
|  | 7.  Yucaipa (in its capacity as equity holder) and Allied would enter into one or more cooperation and support agreements with respect to the Allied bankruptcy filings and the 363 Sale as further described below (the "**Cooperation Agreements**"). |
|  | 8.  Proof reasonably satisfactory to Jack Cooper that Allied has |

7 -

YUCAIPA831202

| | prepared all documents and taken all steps necessary to file its bankruptcy cases in the Bankruptcy Court. |
| --- | --- |
| **Jack Cooper Notes**: | 1. Jack Cooper Holdings Corp. would have the right and option at any time to purchase for cash all Jack Cooper Notes held by Yucaipa at par plus accrued and unpaid interest, with no premium or penalty payment.<br><br>2. Yucaipa would agree to not purchase any Jack Cooper Notes (other than the notes part of the Purchased Debt Purchase Price) for two (2) years after the closing, except if the Jack Cooper Notes trade below a certain price to be agreed. |
| **Restrictive Covenants**: | Yucaipa would agree to a three (3)-year restrictive covenant covering the provision of car haul delivery, brokerage, and related services (to be agreed upon) in the United States, Canada, and Mexico providing for (a) non-competition, (b) non-solicitation of customers, vendors, and senior employees, and (c) mutual confidentiality and mutual non-disparagement restrictions – in each case subject to customary exceptions to be agreed upon. |
| **HSR Clearance**: | If and upon Jack Cooper obtaining the Lenders Consent and the parties executing the Definitive Agreements, Jack Cooper would use its reasonable best efforts to obtain HSR Clearance for the completion of the Debt Purchase Transaction and the 363 Sale; provided, however, Buyer would not be required to make any divestiture, enter into any consent decree, or otherwise accept any operational restriction with respect to Allied and its assets and operations that would be reasonably likely to have a material impact on the value of Allied and its assets and operations. Yucaipa and Allied would each use its reasonable best efforts in cooperating in preparing and making all filings and responding to all governmental requests relating solely to information as necessary to obtain HSR Clearance. Specific procedures and mutual covenants regarding obtaining HSR Clearance to be mutually agreed. If after Buyer has used its reasonable best efforts as described in this section and has satisfied the other procedures and covenants and Yucaipa and Allied have each used its reasonable best efforts in cooperating as described in this section, there is entered a final, non-appealable order prohibiting the completion of the Debt Purchase Transaction and/or the 363 Sale due to HSR issues, then Jack Cooper would be obligated to promptly pay to Yucaipa $10 million in cash (as exclusive and liquidated damages) and any Definitive Agreements executed hereafter to |

8 -

YUCAIPA831203

| | |
|---|---|
| | consummate the Proposed Transactions would be automatically terminated. |
| | |

<div align="center">

**363 Sale Specific Terms**

</div>

| | |
|---|---|
| **Structure of 363 Sale:** | Between the First Closing Date and the Second Closing Date, Buyer anticipates purchasing substantially all of the assets of Allied, free and clear of all liens, claims, and other encumbrances, pursuant to a sale under Section 363 of the Bankruptcy Code (the "**Bankruptcy Process**").  In addition, Buyer would expect to have Allied assume and assign certain customer contracts, supply agreements, leases, license agreements, and other executory contracts, which executory contracts would be designated by Buyer in its sole and absolute discretion.  Except as specifically agreed upon and designated by Buyer in the Cooperation Agreements that would be executed by Buyer, Yucaipa, and Allied, Buyer would not assume or otherwise be responsible for any indebtedness, trade payables, or other liabilities or obligations of Allied or its bankruptcy estate whatsoever, contingent or otherwise. |
| | |
| **363 Sale Purchase Price:** | Credit bid of all lender claims against Allied under the Credit Agreements, it being understood that the Definitive Agreements and the Other Sellers Definitive Agreements would obligate CIT (as Administrative Agent and Collateral Agent under the First Lien Credit Agreement) to effectuate a credit bid up to par plus accrued and unpaid interest. |
| | |
| **Signing and Closing 363 Sale:** | The Cooperation Agreements among Yucaipa, Allied, and Buyer would be signed simultaneous with the signing of the Definitive Agreements.<br><br>On or about the First Closing Date, Allied would file its bankruptcy cases in the Bankruptcy Court to allow for the 363 Sale as contemplated herein.<br><br>The Bankruptcy Process would be expected to take no longer than ninety (90) days, subject to any delays occasioned by the Bankruptcy Court's calendar. |
| | |
| **Bankruptcy and HSR Filings:** | Within three (3) business days of Jack Cooper obtaining the Lenders Consent and the parties executing the Definitive Agreements, Yucaipa (and Yucaipa would cause Allied to) and Buyer would make a Hart-Scott-Rodino filing to obtain the HSR Clearance. |

9 -

|  | On or about the First Closing Date, Allied would file a motion and form of order, both in form and substance acceptable to Buyer in its sole and absolute discretion, seeking approval of the 363 Sale, a customary break-up fee, and certain other bid protections, including, but not limited to, a minimum overbid and minimum bidding increments, acceptable to Buyer in its sole and absolute discretion (collectively, the "**Bid Protections**"), pursuant to Section 363 of the Bankruptcy Code. Pursuant to the Cooperation Agreements, Allied and Yucaipa would seek to promptly obtain approval by the Bankruptcy Court of the Bid Protections and the 363 Sale. |
| **Purchase of Debt Held by Non-Consenting Lenders:** | Prior to the closing of or in connection with the 363 Sale, Jack Cooper would purchase all outstanding debt claims against Allied under the First Lien Credit Agreement held by any non-consenting lender(s) for a purchase price up to par plus accrued and unpaid interest. |
| **Failure to Close 363 Sale:** | In the event Buyer is unable to acquire the assets of Allied (other than due to Buyer's (i) breach of or failure to comply with its covenants under the Definitive Agreements or (ii) failure to purchase all of the claims under the First Lien Credit Agreement) pursuant to a 363 Sale, a state foreclosure proceeding, or some other procedure as determined by Buyer within 180 days of the First Closing Date, then the Debt Purchase Transaction would be considered void *ab initio* and of no further force or effect and any Definitive Agreements executed hereafter to consummate the Proposed Transactions would be terminated. |
| **General Terms** | |
| **Transaction Costs:** | Each party shall be responsible for its own individual costs and expenses, specifically including costs and expenses of legal counsel and other advisors, to negotiate, document, and implement the Proposed Transactions. |
| **Nonbinding Provisions:** | Each party acknowledges and agrees that the provisions of this Term Sheet do not create or constitute any legally binding obligations among the parties.  The parties do not intend to be bound by the provisions of this Term Sheet, and no party shall have any liability to the other parties hereto with respect to the terms of this Term Sheet.   No party may reasonably rely on any promises inconsistent with this paragraph. |

10 -

YUCAIPA831205

*****

11 -

Confidential

YUCAIPA831206

## Schedule 1

### *List of Loan Documents*

1.  First Lien Credit Agreement Documents (all as amended and restated, including all amendments and restatements thereto)

    Credit Agreement
    Pledge and Security Agreement
    Intellectual Property Security Agreements
    Notes
    Mortgages
    Guaranties
    Intercreditor Agreements
    Canadian Pledge and Security Agreement
    Affirmation Agreement
    Any and all waiver letters or agreements
    Any and all forbearance agreements
    Evidence of the right of Requisite Lenders to accelerate the obligations under the First Lien Credit Agreement

2.  Second Lien Credit Agreement Documents (all as amended and restated, including all amendments and restatements thereto)

    Credit Agreement
    Pledge and Security Agreement
    Intellectual Property Security Agreements
    Notes
    Mortgages
    Guaranties
    Intercreditor Agreements
    Canadian Pledge and Security Agreement
    Affirmation Agreement
    Any and all waiver letters or agreements
    Any and all forbearance agreements

*****

12 -

YUCAIPA831207

# EXHIBIT 5

B 5 (Official Form 5) (12/07)

| UNITED STATES BANKRUPTCY COURT | INVOLUNTARY |
|---|---|
| District of Delaware | PETITION |

| IN RE (Name of Debtor – If Individual: Last, First, Middle) | ALL OTHER NAMES used by debtor in the last 8 years (Include married, maiden, and trade names.) |
|---|---|
| Allied Systems Holdings, Inc. | Allied Holdings, Inc. |

Last four digits of Social-Security or other Individual's Tax-I.D. No /Complete EIN (If more than one, state all.):
58-0360550

| STREET ADDRESS OF DEBTOR (No. and street, city, state, and zip code) | MAILING ADDRESS OF DEBTOR (If different from street address) |
|---|---|
| 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808 | 2302 Parklake Drive, Building 15 Suite 600, Atlanta, GA 30345 |
| COUNTY OF RESIDENCE OR PRINCIPAL PLACE OF BUSINESS New Castle | |
| ZIP CODE 19808 | ZIP CODE 30345 |

LOCATION OF PRINCIPAL ASSETS OF BUSINESS DEBTOR (If different from previously listed addresses)

CHAPTER OF BANKRUPTCY CODE UNDER WHICH PETITION IS FILED

☐ Chapter 7     ☑ Chapter 11

INFORMATION REGARDING DEBTOR (Check applicable boxes)

| Nature of Debts (Check one box.) | Type of Debtor (Form of Organization) | Nature of Business (Check one box.) |
|---|---|---|
| Petitioners believe: | ☐ Individual (Includes Joint Debtor) ☑ Corporation (Includes LLC and LLP) ☐ Partnership ☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.) | ☐ Health Care Business ☐ Single Asset Real Estate as defined in 11 U.S.C. § 101(51)(B) ☐ Railroad ☐ Stockbroker ☐ Commodity Broker ☐ Clearing Bank ☑ Other |
| ☐ Debts are primarily consumer debts ☑ Debts are primarily business debts | | |

| VENUE | FILING FEE (Check one box) |
|---|---|
| ☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in the District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District. | ☑ Full Filing Fee attached |
| ☐ A bankruptcy case concerning debtor's affiliate, general partner or partnership is pending in this District. | ☐ Petitioner is a child support creditor or its representative, and the form specified in § 304(g) of the Bankruptcy Reform Act of 1994 is attached. [If a child support creditor or its representative is a petitioner, and if the petitioner files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.] |

PENDING BANKRUPTCY CASE FILED BY OR AGAINST ANY PARTNER
OR AFFILIATE OF THIS DEBTOR (Report information for any additional cases on attached sheets.)

| Name of Debtor | Case Number | Date |
|---|---|---|
| Relationship | District | Judge |

| ALLEGATIONS (Check applicable boxes) | COURT USE ONLY |
|---|---|
| 1.   ☑ Petitioner (s) are eligible to file this petition pursuant to 11 U.S.C. § 303 (b). 2.   ☑ The debtor is a person against whom an order for relief may be entered under title 11 of the United States Code. 3.a. ☑ The debtor is generally not paying such debtor's debts as they become due, unless such debts are the subject of a bona fide dispute as to liability or amount; or b.  ☐ Within 120 days preceding the filing of this petition, a custodian, other than a trustee receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession. | |

B 5 (Official Form 5) (12/07) – Page 2

Name of Debtor  Allied Systems Holdings, Inc.

Case No. _____

| TRANSFER OF CLAIM |
|---|
| ☑ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

**REQUEST FOR RELIEF**

Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

| | |
|---|---|
| x _____ | x _~~Kerri Mumford~~_  5/17/12 |
| Signature of Petitioner or Representative (State title)  *NBC* | Signature of Attorney                                    Date |
| **BDCM Opportunity Fund II, LP** | Landis Rath & Cobb LLP By Kerri K. Mumford (DE 4186) |
| Name of Petitioner               Date Signed | Name of Attorney Firm (If any) |
| Stephen H. Deckoff, Managing Principal | 919 Market St., Suite 1800 Wilmington, DE 19801 |
| Name & Mailing            BDCM Opportunity Fund II, LP | Address |
| Address of Individual     By: BDCM Opportunity Fund II, Adviser, L.L.C. | (302) 467-4400 |
| Signing in Representative    One Sound Shore Drive | Telephone No. |
| Capacity                          Suite 200 | |
|                                        Greenwich, CT 06830 | |
| x _____ | x _~~Kerri Mumford~~_  5/17/12 |
| Signature of Petitioner or Representative (State title)  *NBC* | Signature of Attorney                                    Date |
| **Black Diamond CLO 2005-1 Ltd.** | Landis Rath & Cobb LLP |
| Name of Petitioner               Date Signed | Name of Attorney Firm (If any) |
| Stephen H. Deckoff, Managing Principal | 919 Market St., Suite 1800 Wilmington, DE 19801 |
| Name & Mailing            Black Diamond CLO 2005-1 Ltd. | Address |
| Address of Individual     By: Black Diamond CLO 2005-1 Adviser, L.L.C. | (302) 467-4400 |
| Signing in Representative    One Sound Shore Drive | Telephone No. |
| Capacity                          Suite 200 | |
|                                        Greenwich, CT 06830 | |
| x _____ | x _____ |
| Signature of Petitioner or Representative (State title) | Signature of Attorney                                    Date |
| **Spectrum Investment Partners LP** | Landis Rath & Cobb LLP |
| Name of Petitioner               Date Signed | Name of Attorney Firm (If any) |
| Jeffrey A. Schaffer, Managing Member | 919 Market St., Suite 1800 Wilmington, DE 19801 |
| Name & Mailing            Spectrum Investment Partners LP | Address |
| Address of Individual     By: Spectrum Group Management LLC | (302) 467-4400 |
| Signing in Representative    1250 Broadway, 19th Floor | Telephone No. |
| Capacity                          New York, NY 10001 | |

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| BDCM Opportunity Fund II, LP | Bus. debt - loan default | At Least $26.8 million |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Black Diamond CLO 2005-1 Ltd. | Bus. debt - loan default | At Least $4.5 million |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Spectrum Investment Partners LP | Bus. debt - loan default | At Least $21.5 million |
| Note:      If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims  At Least $52.8 million |

_0_  continuation sheets attached

B 5 (Official Form 5) (12/07) – Page 2

Name of Debtor  Allied Systems Holdings, Inc.

Case No._____

| TRANSFER OF CLAIM |
|---|
| ☑ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner.  Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

| REQUEST FOR RELIEF |
|---|
| Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition.  If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached. |

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

x_____
Signature of Petitioner or Representative (State title)
BDCM  Opportunity Fund II, LP

Name of Petitioner                     Date Signed
              Stephen H. Deckoff, Managing Principal
Name & Mailing      BDCM Opportunity Fund II, LP
Address of Individual    By: BDCM Opportunity Fund II, Adviser, L.L.C.
Signing in Representative     One Sound Shore Drive
Capacity                Suite 200
                       Greenwich, CT 06830

x_____
Signature of Attorney,                     Date
Landis Rath & Cobb LLP By Kerri K. Mumford (DE 4186)
Name of Attorney Firm (If any)
919 Market St., Sutie 1800 Wilmington, DE 19801
Address
(302) 467-4400
Telephone No.

x_____
Signature of Petitioner or Representative (State title)
Black Diamond CLO 2005-1 Ltd.

Name of Petitioner                     Date Signed
              Stephen H. Deckoff, Managing Principal
Name & Mailing      Black Diamond CLO 2005-1 Ltd.
Address of Individual    By: Black Diamond CLO 2005-1 Adviser, L.L.C.
Signing in Representative     One Sound Shore Drive
Capacity                Suite 200
                       Greenwich, CT 06830

x_____
Signature of Attorney                     Date
Landis Rath & Cobb LLP
Name of Attorney Firm (If any)
919 Market St., Sutie 1800 Wilmington, DE 19801
Address
(302) 467-4400
Telephone No.

x_____
Signature of Petitioner or Representative (State title)
Spectrum Investment Partners LP

Name of Petitioner                     Date Signed
              Jeffrey A. Schaffer, Managing Member
Name & Mailing      Spectrum Investment Partners LP
Address of Individual    By: Spectrum Group Management LLC
Signing in Representative
Capacity             1250 Broadway, 19th Floor
                     New York, NY 10001

x_____
Signature of Attorney                     Date
Landis Rath & Cobb LLP
Name of Attorney Firm (If any)
919 Market St., Sutie 1800 Wilmington, DE 19801
Address
(302) 467-4400
Telephone No.

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| BDCM Opportunity Fund II, LP | Bus. debt - loan default | At Least $26.8 million |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Black Diamond CLO 2005-1 Ltd. | Bus. debt - loan default | At Least $4.5 million |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Spectrum Investment Partners LP | Bus. debt - loan default | At Least $21.5 million |
| Note:    If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims. At Least $52.8 million |

0    continuation sheets attached

# **EXHIBIT 6**

| | |
|---|---|
| **From:** | Jeffrey Schaffer <JSchaffer@spectrumgp.com> |
| **Sent:** | Wednesday, March 21, 2012 2:08 PM |
| **To:** | Rich Ehrlich |
| **Cc:** | Solmaria Velez |
| **Subject:** | FW: Allied Holdings - Black Diamond |
| | |
| **Importance:** | High |

Rich,

See below trail.  Looks like Brad Schaefer from BD and Tim Dable from Winston have been unresponsive for about 5 weeks.  In any case, they are saying that we have to pay 75% of any transfer fee, which is not OK, it should be split equally. But on all of our other trades there has been no fee, so not sure why there would even be one here.  And they are saying that you won't agree to mutual more expansive big boy language than what is in the normal lsta, which also doesn't make sense given how much knowledge we each have.  Please get this closed this week.  We cannot file an involuntary without it done. Ive ccd: Solmaria, our closer so that you can let he know when you have been able to get the logjam moving at BD

Thanks,

Jeff

------------------------------------------------------

**\*PLEASE NOTE OUR NEW FLOOR**

**Jeffrey A. Schaffer**
SPECTRUM GROUP MANAGEMENT
1250 Broadway, 19th Floor\*
New York, NY 10001
Phone: 212-687-9555
Fax: 212-983-2322
Email: jschaffer@spectrumgp.com

---

**From:** Solmaria Velez
**Sent:** Wednesday, March 21, 2012 1:11 PM
**To:** Jeffrey Schaffer
**Subject:** FW: Allied Holdings - Black Diamond
**Importance:** High

Below is the email trail containing the back and forth on the Allied trade documents with Black Diamond.

------------------------------------------------------

**\*PLEASE NOTE OUR NEW FLOOR AND
PERSONAL PHONE EXTENSION**

**Solmaria Velez**
Director of Operations & Controller
SPECTRUM GROUP MANAGEMENT

1

BDCM0003456

1250 Broadway, 19th Floor*
New York, NY 10001
Phone: 212-687-9555 x402*
Fax: 212-983-2322
Cell:  602-540-0653
Email: svelez@spectrumgp.com

---

**From:** Solmaria Velez
**Sent:** Monday, March 12, 2012 10:26 AM
**To:** 'Dable, Tim'
**Cc:** 'Brad Schaefer'
**Subject:** RE: Allied Holdings - Black Diamond
**Importance:** High

I haven't heard back from either of you on this.  What is the hold up?

---

**\*PLEASE NOTE OUR NEW FLOOR AND
PERSONAL PHONE EXTENSION**

**Solmaria Velez**
Director of Operations & Controller
SPECTRUM GROUP MANAGEMENT
1250 Broadway, 19th Floor*
New York, NY 10001
Phone: 212-687-9555 x402*
Fax: 212-983-2322
Cell:  602-540-0653
Email: svelez@spectrumgp.com

---

**From:** Solmaria Velez
**Sent:** Friday, March 09, 2012 11:40 AM
**To:** 'Dable, Tim'
**Cc:** 'Brad Schaefer'
**Subject:** RE: Allied Holdings - Black Diamond

Any update on this?

---

**\*PLEASE NOTE OUR NEW FLOOR AND
PERSONAL PHONE EXTENSION**

**Solmaria Velez**
Director of Operations & Controller
SPECTRUM GROUP MANAGEMENT
1250 Broadway, 19th Floor*
New York, NY 10001
Phone: 212-687-9555 x402*
Fax: 212-983-2322
Cell:  602-540-0653
Email: svelez@spectrumgp.com

Confidential

BDCM0003457

**From:** Solmaria Velez
**Sent:** Friday, March 02, 2012 6:05 PM
**To:** 'Dable, Tim'
**Cc:** 'Brad Schaefer'
**Subject:** RE: Allied Holdings - Black Diamond

Hi,

Just following up on status of the updated docs.  Please advise.

Thanks

Sol


-------------------------------------------------------------
**\*PLEASE NOTE OUR NEW FLOOR AND
PERSONAL PHONE EXTENSION**

**Solmaria Velez**
Director of Operations & Controller
Sᴘᴇᴄᴛʀᴜᴍ Gʀᴏᴜᴘ Mᴀɴᴀɢᴇᴍᴇɴᴛ
1250 Broadway, 19th Floor*
New York, NY 10001
Phone: 212-687-9555 x402*
Fax: 212-983-2322
Cell:  602-540-0653
Email: svelez@spectrumgp.com

**From:** Dable, Tim [mailto:TDable@winston.com]
**Sent:** Tuesday, February 21, 2012 11:31 AM
**To:** Solmaria Velez
**Cc:** 'Brad Schaefer'
**Subject:** RE: Allied Holdings - Black Diamond

Sol:

Thanks for your comments.

Transfer fee- We will revise the PSAs to reflect that there is no assignment fee.  Please note however that in the event that CIT as agent declines to waive the transfer fee, we have to change the language back.

Wire instructions/notice addresses- We will fix.

Big boy language- The big boy language is included in the standard terms incorporated by reference into the trade confirm and also in the standard terms incorporated by reference into the PSA.  Please see attached standard terms from the LSTA website (see paragraph 24 for trade confirm terms and paragraph 4.1(n) for PSA terms).

Thanks,

3

BDCM0003458

**Tim Dable**
D: +1 (312) 558-6369
www.winston.com

WINSTON
&STRAWN
LLP

---

**From:** Solmaria Velez [mailto:SVelez@spectrumgp.com]
**Sent:** Friday, February 17, 2012 2:45 PM
**To:** Dable, Tim
**Cc:** 'Brad Schaefer'
**Subject:** RE: Allied Holdings - Black Diamond

Below are Spectrum's initial comments:

Transfer Fee (p6 of PSA) – should be none; we haven't paid any transfer fees on any prior trades

Wire Instructions/Addresses for notices etc (p6/7 of PSA) – re-sending our admin details (please note we've moved to 19th floor)

Also, my long standing question on the trade confirms is with regard to big boy language.  New question is whether we'll be receiving updated trade confirms to reflect the revised trade amounts.

Thanks

Sol

..................................................................
**\*PLEASE NOTE OUR NEW FLOOR AND
PERSONAL PHONE EXTENSION**

**Solmaria Velez**
Director of Operations & Controller
SPECTRUM GROUP MANAGEMENT
1250 Broadway, 19th Floor\*
New York, NY 10001
Phone: 212-687-9555 x402\*
Fax: 212-983-2322
Cell:  602-540-0653
Email: svelez@spectrumgp.com

---

**From:** Dable, Tim [mailto:TDable@winston.com]
**Sent:** Wednesday, February 01, 2012 4:40 PM
**To:** Solmaria Velez
**Cc:** 'Brad Schaefer'
**Subject:** RE: Allied Holdings - Black Diamond

Attached for your review are draft transfer documents (PSA and AA) for each trade, together with closed upstream documents.  Please do not hesitate to contact me with any questions.

Best regards,

Confidential

BDCM0003459

**Tim Dable**
D: +1 (312) 558-6369
www.winston.com

WINSTON
&STRAWN
LLP

---

**From:** Solmaria Velez [mailto:SVelez@spectrumgp.com]
**Sent:** Wednesday, January 18, 2012 12:49 PM
**To:** 'Brad Schaefer'
**Cc:** 'Closers'; Dable, Tim
**Subject:** RE: Allied Holdings - Black Diamond
**Importance:** High

Where are we with this language and I believe the trade amounts were updated so those changes need to flow through to these documents as well.

---

**Solmaria Velez**
Controller
SPECTRUM GROUP MANAGEMENT
1250 Broadway, Suite 810
New York, NY 10001
Phone: 212-687-9555 x17
Fax: 212-983-2322
Cell: 602-540-0653
Email: svelez@spectrumgp.com

---

**From:** Solmaria Velez
**Sent:** Thursday, December 22, 2011 6:17 PM
**To:** 'Brad Schaefer'
**Cc:** 'Closers'; 'Dable, Tim'
**Subject:** RE: Allied Holdings - Black Diamond

I need to get an update on this language asap.

---

**From:** Solmaria Velez
**Sent:** Wednesday, November 30, 2011 9:34 AM
**To:** Brad Schaefer
**Cc:** Closers; Dable, Tim
**Subject:** RE: Allied Holdings - Black Diamond

Any update on this language?

---

**Solmaria Velez**
Controller
SPECTRUM GROUP MANAGEMENT

5

BDCM0003460

1250 Broadway, Suite 810
New York, NY 10001
Phone: 212-687-9555 x17
Fax: 212-983-2322
Cell: 602-540-0653
Email: svelez@spectrumgp.com

---

**From:** Solmaria Velez
**Sent:** Friday, November 18, 2011 1:32 PM
**To:** 'Brad Schaefer'
**Cc:** Closers; Dable, Tim
**Subject:** RE: Allied Holdings - Black Diamond

Is there any  update on this from your side?

---

**Solmaria Velez**
Controller
Sᴘᴇᴄᴛʀᴜᴍ Gʀᴏᴜᴘ Mᴀɴᴀɢᴇᴍᴇɴᴛ
1250 Broadway, Suite 810
New York, NY 10001
Phone: 212-687-9555 x17
Fax: 212-983-2322
Cell: 602-540-0653
Email: svelez@spectrumgp.com

---

**From:** Brad Schaefer [mailto:bschaefer@bdcm.com]
**Sent:** Tuesday, October 25, 2011 11:20 AM
**To:** Solmaria Velez
**Cc:** Closers; Dable, Tim
**Subject:** RE: Allied Holdings - Black Diamond

Sol,

I was not aware that Big Boy language had been agreed to at time of the trade.

---

Brad Schaefer
Black Diamond Capital Management
Trade Operations
P: 203-347-7842
bschaefer@bdcm.com


**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

---

6

BDCM0003461

**From:** Solmaria Velez [mailto:SVelez@spectrumgp.com]
**Sent:** Tuesday, October 25, 2011 9:46 AM
**To:** Brad Schaefer
**Cc:** Closers; Dable, Tim
**Subject:** RE: Allied Holdings - Black Diamond

Hi,

I just read through these quickly.  I was told there would be big boy language on this trade.  Is there a separate side letter for that?  Please confirm either way.

Thanks

Sol


.........................................................
**Solmaria Velez**
Controller
**SPECTRUM GROUP MANAGEMENT**
1250 Broadway, Suite 810
New York, NY 10001
Phone: 212-687-9555 x17
Fax: 212-983-2322
Cell: 602-540-0653
Email: svelez@spectrumgp.com

**From:** Brad Schaefer [mailto:bschaefer@bdcm.com]
**Sent:** Tuesday, October 25, 2011 9:10 AM
**To:** Solmaria Velez
**Cc:** Closers; Dable, Tim
**Subject:** Allied Holdings - Black Diamond
**Importance:** High

Sol,

Allied Trade confirms are attached for you review.
Please have them signed and returned to me at your earliest convenience.

Call or email me with any questions.

Thank you


Brad Schaefer
Black Diamond Capital Management
Trade Operations
P: 203-347-7842
bschaefer@bdcm.com


**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not

Confidential

BDCM0003462

the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

---

**From:** Solmaria Velez [mailto:SVelez@spectrumgp.com]
**Sent:** Monday, October 17, 2011 5:34 PM
**To:** Brad Schaefer
**Subject:** RE: Allied Holdings - Black Diamond

Hi,

Below are allocations (admin details attached):

SIPI Master Ltd = 62%
Khroma Special Situations Master SPC Ltd – Class A-1 = 38%

I was informed on Friday that we'd be using your counsel, please let me know if that is an issue.

Please let me know if you have any questions or need anything else from us in order to move forward.

Thanks

Sol

........................................................
**Solmaria Velez**
Controller
**Spectrum Group Management**
1250 Broadway, Suite 810
New York, NY 10001
Phone: 212-687-9555 x17
Fax: 212-983-2322
Cell: 602-540-0653
Email: svelez@spectrumgp.com

---

**From:** Brad Schaefer [mailto:bschaefer@bdcm.com]
**Sent:** Monday, October 17, 2011 3:28 PM
**To:** Solmaria Velez
**Cc:** Solmaria Velez
**Subject:** RE: Allied Holdings - Black Diamond
**Importance:** High

Solmaria,

Please send me your Allied allocation along with your Counsels information and I will draft a Trade Confirm.

Thank you

_____

Brad Schaefer
Black Diamond Capital Management

8

BDCM0003463

Trade Operations
P: 203-347-7842
bschaefer@bdcm.com

**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

**From:** Jeffrey Schaffer [mailto:JSchaffer@spectrumgp.com]
**Sent:** Monday, October 17, 2011 3:18 PM
**To:** Brad Schaefer
**Cc:** Solmaria Velez
**Subject:** RE: Allied Holdings - Black Diamond

Solmaria Velez, cc:d here

**Jeffrey A. Schaffer**
SPECTRUM GROUP MANAGEMENT
1250 Broadway, Suite 810
New York, NY 10001
Phone: 212-687-9555
Fax: 212-983-2322
Email: jschaffer@spectrumgp.com

**From:** Brad Schaefer [mailto:bschaefer@bdcm.com]
**Sent:** Monday, October 17, 2011 3:14 PM
**To:** Jeffrey Schaffer
**Subject:** Allied Holdings - Black Diamond
**Importance:** High

Good afternoon Jeffrey,

Who will be the Closers from Spectrum on this Allied trade?
Please send me their contact information and I will get a Trade Confirm drafted and sent over.

Thank you

_____

Brad Schaefer
Black Diamond Capital Management
Trade Operations
P: 203-347-7842
bschaefer@bdcm.com

9

Confidential

BDCM0003464

**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

---

The information contained in this email and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this email and any attachments is strictly prohibited. If you received this email in error, please notify the sender and permanently delete the email and any attachments immediately. You should not retain, copy or use this email or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Spectrum Group Management LLC and its related entities reserve the right to monitor all email communications through their networks.

---

The information contained in this email and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this email and any attachments is strictly prohibited. If you received this email in error, please notify the sender and permanently delete the email and any attachments immediately. You should not retain, copy or use this email or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Spectrum Group Management LLC and its related entities reserve the right to monitor all email communications through their networks.

---

The information contained in this email and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this email and any attachments is strictly prohibited. If you received this email in error, please notify the sender and permanently delete the email and any attachments immediately. You should not retain, copy or use this email or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Spectrum Group Management LLC and its related entities reserve the right to monitor all email communications through their networks.

---

The information contained in this email and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this email and any attachments is strictly prohibited. If you received this email in error, please notify the sender and permanently delete the email and any attachments immediately. You should not retain, copy or use this email or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Spectrum Group Management LLC and its related entities reserve the right to monitor all email communications through their networks.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. ****************************************************************************** Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

---

The information contained in this email and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this email and any attachments is strictly prohibited. If you received this email in error, please notify the sender and permanently delete the email and any attachments immediately. You should not retain, copy or use this email or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Spectrum Group Management LLC and its related entities reserve the right to monitor all email communications through their networks.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. ****************************************************************************** Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

Confidential

BDCM0003465

The information contained in this email and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this email and any attachments is strictly prohibited. If you received this email in error, please notify the sender and permanently delete the email and any attachments immediately. You should not retain, copy or use this email or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Spectrum Group Management LLC and its related entities reserve the right to monitor all email communications through their networks.

Confidential

BDCM0003466

# **EXHIBIT 7**

| From: | Neal Clemens |
|---|---|
| Sent: | Wednesday, March 21, 2012 2:44 PM |
| To: | Les Meier |
| Cc: | Rich Ehrlich |
| Subject: | RE: Allied Holdings - Black Diamond |

I will speak with them.
My phone has not rung beyond the request for their audit confirm.
I have however tried to call Solmaria and not received return calls.

Neal

**From:** Les Meier
**Sent:** Wednesday, March 21, 2012 2:21 PM
**To:** Neal Clemens
**Cc:** Rich Ehrlich
**Subject:** RE: Allied Holdings - Black Diamond

Neal – WTF?

**From:** Rich Ehrlich
**Sent:** Wednesday, March 21, 2012 1:19 PM
**To:** Les Meier
**Subject:** FW: Allied Holdings - Black Diamond
**Importance:** High

See below. Call to discuss.

**Richard Ehrlich**
**Black Diamond Capital Management, L.L.C.**
1 Sound Shore Drive, Suite 200
Greenwich, CT 06830
(203) 552-0888 (phone)
(203) 552-1014 (fax)
rehrlich@bdcm.com

**From:** Jeffrey Schaffer [mailto:JSchaffer@spectrumgp.com]
**Sent:** Wednesday, March 21, 2012 2:08 PM
**To:** Rich Ehrlich
**Cc:** Solmaria Velez
**Subject:** FW: Allied Holdings - Black Diamond
**Importance:** High

Rich,

1

Confidential - Professional's Only

BDCM0003411

See below trail.  Looks like Brad Schaefer from BD and Tim Dable from Winston have been unresponsive for about 5 weeks.  In any case, they are saying that we have to pay 75% of any transfer fee, which is not OK, it should be split equally. But on all of our other trades there has been no fee, so not sure why there would even be one here.  And they are saying that you won't agree to mutual more expansive big boy language than what is in the normal Ista, which also doesn't make sense given how much knowledge we each have.  Please get this closed this week.  We cannot file an involuntary without it done. Ive ccd: Solmaria, our closer so that you can let he know when you have been able to get the logjam moving at BD
Thanks,
Jeff


---------------------------------------------------------------
**\*PLEASE NOTE OUR NEW FLOOR**


**Jeffrey A. Schaffer**
SPECTRUM GROUP MANAGEMENT
1250 Broadway, 19th Floor\*
New York, NY 10001
Phone: 212-687-9555
Fax: 212-983-2322
Email: jschaffer@spectrumgp.com




**From:** Solmaria Velez
**Sent:** Wednesday, March 21, 2012 1:11 PM
**To:** Jeffrey Schaffer
**Subject:** FW: Allied Holdings - Black Diamond
**Importance:** High


Below is the email trail containing the back and forth on the Allied trade documents with Black Diamond.


---------------------------------------------------------------
**\*PLEASE NOTE OUR NEW FLOOR AND
PERSONAL PHONE EXTENSION**

**Solmaria Velez**
Director of Operations & Controller
SPECTRUM GROUP MANAGEMENT
1250 Broadway, 19th Floor\*
New York, NY 10001
Phone: 212-687-9555 x402\*
Fax: 212-983-2322
Cell:  602-540-0653
Email: svelez@spectrumgp.com

**From:** Solmaria Velez
**Sent:** Monday, March 12, 2012 10:26 AM
**To:** 'Dable, Tim'
**Cc:** 'Brad Schaefer'
**Subject:** RE: Allied Holdings - Black Diamond
**Importance:** High

Confidential - Professional's Only

BDCM0003412

# EXHIBIT 8

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x

In re:                                              :

ALLIED SYSTEMS HOLDINGS, INC.,      :        Chapter 11

                  Alleged Debtor.       :        Case No. 11-[_____] ([____])

                           :

---------------------------------------------------------------x

                           :

In re:                                              :

ALLIED SYSTEMS, LTD. (L.P.),         :        Chapter 11

                  Alleged Debtor.       :        Case No. 11-[_____] ([____])

                           :

---------------------------------------------------------------x

## AFFIDAVIT OF RICHARD EHRLICH ON BEHALF OF
## BDCM OPPORTUNITY FUND II, LP PURSUANT
## <ins>TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1003</ins>

STATE OF CONNECTICUT)
                   ) ss:
COUNTY OF FAIRFIELD  )

      Richard Ehrlich being duly sworn, deposes and states:

    1.     I make this affidavit on behalf of BDCM Opportunity Fund II, LP ("BDCM"), a petitioning creditor in the above-captioned involuntary chapter 11 cases (the "Bankruptcy Cases") filed by BDCM and other petitioning creditors against (i) Allied Systems Holdings, Inc., and (ii) Allied Systems, Ltd. (L.P.) (together, the "Debtors"). I am fully familiar with the facts set forth herein either through my own personal knowledge or through a review of documents related to BCDM's claims against the Debtors. If called to testify in connection with the Bankruptcy Cases, the following would constitute my testimony.

2.     I am a Managing Director of Black Diamond Capital Management, L.L.C., which through its affiliated entities is the investment manager for BDCM. BDCM has its principal place of business at 1 Sound Shore Drive, Suite 200, Greenwich, Connecticut 06830. BDCM is a creditor of the Debtors based upon its status as a lender under that certain Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 by and among Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.), as borrowers, certain subsidiaries of borrowers, as subsidiary guarantors, various lenders, Goldman Sachs Credit Partners L.P., as lead arranger and syndication agent, and The CIT Group/Business Credit, Inc., as administrative and collateral agent (as amended, restated, modified, or supplemented from time to time, the "First Lien Credit Agreement").

### The First Lien Credit Agreement

3.     Pursuant to the First Lien Credit Agreement, various lenders committed to extend term loans, revolving loans, and synthetic letters of credit to the Debtors in the amount of $315 million. Due to the accrual of interest and fees, the current outstanding aggregate amount of the Obligations (as defined in the First Lien Credit Agreement) is approximately $296.4 million. A copy of the First Lien Credit Agreement will be annexed to a declaration in support of a statement contemporaneously filed by the petitioning creditors.

4.     Pursuant to the First Lien Credit Agreement, the lenders' commitments under term loans, revolving loans, and synthetic letters of credit were evidenced by promissory notes. The claims of BDCM and other petitioning creditors derive from these notes.

5.     The Obligations are secured by first priority liens in substantially all of the Debtors' assets, including, but not limited to accounts, chattel paper, general intangibles, goods, instruments, insurance, intellectual property, investment related property, letter of credit rights,

money, receivables, and commercial tort claims. The Obligations are guaranteed by affiliates of the Debtors.

## The Assignments

6.    By virtue of the execution of several assignment and assumption agreements, BDCM received an unconditional transfer and assignment of certain amounts of loans owed by the Debtors under the First Lien Credit Agreement (the "Assigned Claims"). Redacted copies of the assignment documentation are attached as **Exhibit A**.

7.    The Assigned Claims were not assigned to BDCM for the purposes of commencing the Bankruptcy Cases.

8.    As of the date hereof, BDCM holds Obligations in the aggregate principal amount of at least $26.8 million, together with all accrued and unpaid interest (including default interest), fees and expenses calculated in accordance with the Credit Agreement.

Dated: May 11th, 2012
    Greenwich, Connecticut

                                     RICHARD EHRLICH

Sworn to and subscribed before me
This 11th day of May, 2012

_____
Notary Public

Subscribed and sworn to before me
this 11th day of May, 2012

_____
Notary Public
Date Commission Expires: 10/31/2014

# EXHIBIT A



## PURCHASE AND SALE AGREEMENT ▇▇▇▇▇▇▇▇

---

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR ▇▇▇▇▇▇ is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for ▇▇▇▇▇▇▇▇ published by the LSTA as of ▇▇▇▇▇▇▇ (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for ▇▇▇▇▇▇ governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Seller MEI: | |
| Buyer: | |
| Buyer MEI: | |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007, and amended and restated as of May 15, 2007, among Allied Systems Holdings, Inc. (as successor by merger to Allied Holdings, Inc.), Allied Systems, Ltd. (L.P.), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto from time to time, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto |
| Borrower: | Allied Systems Holdings, Inc., Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (1) ▇▇▇▇▇▇ principal amount of LC Deposits<br>(2) ▇▇▇▇▇▇ principal amount of Term Loans |
| Tranche(s): | (1) ▇▇▇▇<br>(2) ▇▇▇▇ |
| CUSIP Number(s), if available: | Not Applicable |
| Pre-Settlement Date Accruals Treatment: | ☐ Settled Without Accrued Interest<br>☒ Trades Flat |
| Type of Assignment: | ☒ Original Assignment |

 Copyright © LSTA 2011. All rights reserved.

| | Secondary Assignment | |
|---|---|---|
| Borrower in Bankruptcy: | Yes ☐ | No ☒ |
| Delivery of Credit Documents: | Yes ☐ | No ☒ |
| Netting Arrangements: | Yes ☒ | No ☐ |
| Flip Representations: | Yes ☐ | No ☒ |
| Step-Up Provisions: | Yes ☐ | No ☒ |
| | Shift Date: | Not Applicable |
| Transfer Notice | Yes ☐ | No ☒ |

## DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means THE CIT GROUP / Business Credit, Inc. as Administrative Agent under the Credit Agreement.

"Assignment" means an Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ none.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
☒ none.
☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
☒ not applicable.
☐ none has been set.
☐ means [specify applicable date, if any).

"Buyer Purchase Price" select one:
☐ not applicable.
☒ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

2

"Commitments" select one:
☒ none.
☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any) on or after the Shift Date [but prior to the transfer pursuant to which _____ transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means (i) LC Deposits in the outstanding principal amount of ███████████ and (ii) Term Loans in the outstanding principal amount of ██████████

"Netting Letter" select one:
☐ not applicable.
☒ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer and Original Buyer.

"Original Buyer" select one:
☐ not applicable.
☒ means ██████████████████████

"Penultimate Buyer" select one:
☐ not applicable.
☒ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means notice to the Borrowers and the Agent and the acceptance and recordation of the Assignment by the Agent.

"Seller Purchase Price" select one:
☐ not applicable.
☒ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" ██████████████

"Unfunded Commitments" means none.

3

## SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

|  | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
|  | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
    If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

        "(k) [intentionally omitted]."

4

Section 4.1(r) (Predecessor Transfer Agreements).
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
    ☒ Not applicable.

Section 4.1(u) (Other Documents).
    ☒ None.
    ☐ The following: _____.

Section 4.1(v) (Proof of Claim).
    ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
        ☐ the Agent on behalf of the Lenders.
        ☐ Seller or a Prior Seller.
    ☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☒ Not applicable.

## SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

Section 5.1(n) (Buyer Status).

    ☐ Buyer is not a Lender.
    ☒ Buyer is a Lender.
    ☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
    ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## SECTION 7 (COSTS AND EXPENSES)

  ☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.

☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☒ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

### SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)

Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

Section 8.4 (Wire Instructions).

Seller's Wire Instructions:

Bank Name: The Bank of New York

Buyer's Wire Instructions:

Bank:  JP Morgan Chase Bank

### SECTION 9 (NOTICES)

Seller's Address for Notices and Delivery:

*Credit Contact:* *(Financials, Credit Agreements, Amendments, Intralinks and Syntrax Access))*

6

*Trade Closing Contact:* ( *Confirms, Assignments, Funding Memo's)*



**Operations Contact**
*(Funding Notices, Borrowings, Paydowns, Interest, Fees, etc.)*



Buyer's Address for Notices and Delivery:

**All Notices Sent To**

BDCM OPPORTUNITY FUND II, L.P.
C/O Black Diamond Capital Management, L.L.C.
Attn: Loan Administrator



Email:
PH:                                    Fax:

**Legal Documentation:**

Send To:
BDCM OPPORTUNITY FUND II, L.P.
c/o Black Diamond Capital Management L.L.C.
Attn: Loan Administrator



PH:
Fax:

**Credit Communications**

**All Credit Information Sent To:**
Black Diamond Capital Management, L.L.C.



PH: █████████         Fax: █████████

H.      SECTION 27 (ADDITIONAL PROVISIONS)

The following additional provisions, including any modifications to existing provisions, shall apply:

        None

8

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**

By:_____
    Name:
    Title:

**BUYER**

**BDCM OPPORTUNITY FUND II, L.P.**
by BDCM Opportunity Fund II Adviser, L.L.C.
its Investment Manager

By:_____
    Name:
    Title:

9

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**BDCM OPPORTUNITY FUND II, L.P.**
by BDCM Opportunity Fund II Adviser, L.L.C.
its Investment Manager


By:_____
       Name:
       Title:

9

ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

    Not Applicable

2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

    None.

3.  Description of Proof of Claim (if any).

    Not applicable.

4.  Description of Adequate Protection Order (if any).

    Not applicable.

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).

    None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is ▮▮▮▮▮▮▮▮

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between ███████████ (the "Assignor") and BDCM Opportunity Fund II, L.P. (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor:                        ███████████████

2. Assignee:                        BDCM Opportunity Fund II, L.P.

3. Borrower(s):                     Allied Systems Holdings, Inc., Allied Systems, LTD (L.P.)

4. Administrative Agent:            The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5. Credit Agreement:                Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007, and amended and restated as of May 15, 2007, among Allied Systems Holdings, Inc. (as successor by merger to Allied Holdings, Inc.), Allied Systems, Ltd. (L.P.), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto from time to time, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6.    Assigned Interest:



| Facility | Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|---|
| LC Deposits | | USD ▮▮▮▮▮▮▮ | ▮▮▮▮▮ USD | ▮▮▮▮▮ % |
| Term Loans | | USD ▮▮▮▮▮▮▮ | ▮▮▮▮▮ USD | ▮▮▮▮▮ % |

Effective Date: ▮▮▮▮▮▮▮▮▮▮

2

7. Notice and Wire Instructions: See Attached

3

Wire Instructions                    Wire Instructions: See Attached

4

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR

By:_____
    Name:
    Title:

ASSIGNEE

**BDCM Opportunity Fund II, L.P., as Assignee**
**By BDCM Opportunity Fund II Adviser, L.L.C.**
Its Investment Manager

By:_____
    Name:
    Title:

5

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



ASSIGNEE

BDCM Opportunity Fund II, L.P., as Assignee
By BDCM Opportunity Fund II Adviser, L.L.C.
Its Investment Manager

By:_____
   Name:
   Title:

Consented to and Accepted:

THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent

By: _____

Name:   Michael Alibesto

Title:   Senior Vice President

Consented to:

ALLIED HOLDINGS, INC.

By: _____

Name:

Title:

ALLIED SYSTEMS, LTD (L.P.)

By: _____

Name:

Title:

6

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    Payments.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1    With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2    With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.   General Provisions. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.



## PURCHASE AND SALE AGREEMENT ████████

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT ████████ s dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement ████ ████████ published by the LSTA as of ████████ (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement ████████ governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Seller MEI: | |
| Buyer: | |
| Buyer MEI: | |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007, and amended and restated as of May 15, 2007, among Allied Systems Holdings, Inc. (as successor by merger to Allied Holdings, Inc.), Allied Systems, Ltd. (L.P.), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto from time to time, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto |
| Borrower: | Allied Systems Holdings, Inc., Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (1) ████ principal amount of LC Deposits<br>(2) ████ principal amount of Term Loans |
| Tranche(s): | (1) ██<br>(2) ████████ |
| CUSIP Number(s), if available: | Not Applicable |
| Pre-Settlement Date Accruals Treatment: | ☐ Settled Without Accrued Interest<br>☒ Trades Flat |
| Type of Assignment: | ☒ Original Assignment |

LSTA EFFECTIVE September 9, 2011     Copyright © LSTA 2011. All rights reserved.

| | Secondary Assignment | |
|---|---|---|
| Borrower in Bankruptcy: | Yes ☐ | No ☒ |
| Delivery of Credit Documents: | Yes ☐ | No ☒ |
| Netting Arrangements: | Yes ☒ | No ☐ |
| Flip Representations: | Yes ☐ | No ☒ |
| Step-Up Provisions: | Yes ☐ | No ☒ |
| | Shift Date: | Not Applicable |
| Transfer Notice | Yes ☐ | No ☒ |

## DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means THE CIT GROUP / Business Credit, Inc. as Administrative Agent under the Credit Agreement.

"Assignment" means an Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ none.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
☒ none.
☐ means [the United States Bankruptcy Court for the _____District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
☒ not applicable.
☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
☐ not applicable.
☒ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

2

"Commitments" select one:
☒ none.
☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e. that is not subject to future drawing)].

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any) on or after the Shift Date [but prior to the transfer pursuant to which _____ transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means (i) LC Deposits in the outstanding principal amount of ▓▓▓▓▓ and (ii) Term Loans in the outstanding principal amount of ▓▓▓▓▓

"Netting Letter" select one:
☐ not applicable.
☒ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer and Original Buyer.

"Original Buyer" select one:
☐ not applicable.
☒ means ▓▓▓▓▓▓▓▓▓▓▓

"Penultimate Buyer" select one:
☐ not applicable.
☒ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means notice to the Borrowers and the Agent and the acceptance and recordation of the Assignment by the Agent.

"Seller Purchase Price" select one:
☐ not applicable.
☒ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" ▓▓▓▓▓▓▓

"Unfunded Commitments" means none.

3

## SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

|  | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
|  | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
 If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

 "(k) [intentionally omitted]."

4

Section 4.1(r) (Predecessor Transfer Agreements).
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
☒ Not applicable.

Section 4.1(u) (Other Documents).
☒ None.
☐ The following: _____.

Section 4.1(v) (Proof of Claim).
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
☐ the Agent on behalf of the Lenders.
☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☒ Not applicable.

## SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

Section 5.1(n) (Buyer Status).

☐ Buyer is not a Lender.
☒ Buyer is a Lender.
☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

(i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

(ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## SECTION 7 (COSTS AND EXPENSES)

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
☐ one-half thereof.
☐ other relevant fraction or percentage, _____, thereof.

5

☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☒ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

## SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)

Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

Section 8.4 (Wire Instructions).

Seller's Wire Instructions:

Bank Name: The Bank of New York

Buyer's Wire Instructions:

Bank: JP Morgan Chase Bank

## SECTION 9 (NOTICES)

Seller's Address for Notices and Delivery:

*Credit Contact:* (Financials, Credit Agreements, Amendments, Intralinks and Syntrax Access))

6

*Trade Closing Contact:* ( *Confirms, Assignments, Funding Memo's)*



**Operations Contact**
*(Funding Notices, Borrowings, Paydowns, Interest, Fees, etc.)*



Buyer's Address for Notices and Delivery:

**All Notices Sent To**

BDCM OPPORTUNITY FUND II, L.P.
C/O Black Diamond Capital Management, L.L.C.
Attn: Loan Administrator



Email:
PH:                              Fax

**Legal Documentation:**

Send To:
BDCM OPPORTUNITY FUND II, L.P.
c/o Black Diamond Capital Management L.L.C.
Attn: Loan Administrator



PH:
Fax:

**Credit Communications**

**All Credit Information Sent To:**
Black Diamond Capital Management, L.L.C.

7

PH: ▮▮▮▮▮▮▮          Fax: ▮▮▮▮▮▮▮

### H.____ SECTION 27 (ADDITIONAL PROVISIONS)

The following additional provisions, including any modifications to existing provisions, shall apply:

None

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**

By:_____
    Name:
    Title:

**BUYER**

**BDCM OPPORTUNITY FUND II, L.P.**
by BDCM Opportunity Fund II Adviser, L.L.C.
its Investment Manager

By:_____
    Name:
    Title:

9

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



BUYER

**BDCM OPPORTUNITY FUND II, L.P.**
by BDCM Opportunity Fund II Adviser, L.L.C.
its Investment Manager

By:_____
    Name:
    Title:

9

## ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

    Not Applicable

2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

    None.

3.  Description of Proof of Claim (if any).

    Not applicable.

4.  Description of Adequate Protection Order (if any).

    Not applicable.

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).

    None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is ▮▮▮▮▮▮▮

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between ▮▮▮▮▮▮▮▮▮▮ (the "Assignor") and BDCM Opportunity Fund II, L.P. (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor: ▮▮▮▮▮▮▮▮▮▮

2. Assignee: BDCM Opportunity Fund II, L.P.

3. Borrower(s): Allied Systems Holdings, Inc., Allied Systems, LTD (L.P.)

4. Administrative Agent: The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5. Credit Agreement: Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007, and amended and restated as of May 15, 2007, among Allied Systems Holdings, Inc. (as successor by merger to Allied Holdings, Inc.), Allied Systems, Ltd. (L.P.), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto from time to time, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6.      Assigned Interest:



| Facility      Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| LC Deposits | USD ▮▮▮▮▮ | ▮▮▮▮ USD | ▮▮▮▮ % |
| Term Loans | USD ▮▮▮▮▮ | ▮▮▮▮ USD | ▮▮▮▮ % |

Effective Date ▮▮▮▮▮

2

7. Notice and Wire Instructions: See Attached

3

Wire Instructions:                    Wire Instructions: See Attached

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR

By:_____
    Name:
    Title:

ASSIGNEE

**BDCM Opportunity Fund II, L.P., as Assignee**
By BDCM Opportunity Fund II Adviser, L.L.C.
Its Investment Manager



By:____
    Nam
    Title

5

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



ASSIGNEE

BDCM Opportunity Fund II, L.P., as Assignee
By BDCM Opportunity Fund II Adviser, L.L.C.
Its Investment Manager

By:_____
    Name:
    Title:

Consented to and Accepted:

THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent

By: _____

Name: Michael Thibeault

Title: Senior Vice President

Consented to:

ALLIED HOLDINGS, INC.

By: _____

Name:

Title:

ALLIED SYSTEMS, LTD (L.P.)

By: _____

Name:

Title:

6

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.     Representations and Warranties.

1.1     Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2     Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.     Payments. All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1     With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2     With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.　General Provisions. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.



## PURCHASE AND SALE AGREEMENT FOR ███████████████

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR ███████████████ is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for ███████████ published by the LSTA as of ███████████ (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for ███████████ governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Seller MEI: | |
| Buyer: | |
| Buyer MEI: | |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007, and amended and restated as of May 15, 2007, among Allied Systems Holdings, Inc. (as successor by merger to Allied Holdings, Inc.), Allied Systems, Ltd. (L.P.), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto from time to time, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto |
| Borrower: | Allied Systems Holdings, Inc., Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (1) ███████ principal amount of LC Deposits |
| | (2) ███████ principal amount of Term Loans |
| Tranche(s): | (1) ███████████████ |
| | (2) |
| CUSIP Number(s), if available: | Not Applicable |
| Pre-Settlement Date Accruals Treatment: | ☐ Settled Without Accrued Interest<br>☒ Trades Flat |
| Type of Assignment: | ☒ Original Assignment |

LSTA EFFECTIVE September 9, 2011     Copyright © LSTA 2011. All rights reserved.

| | Secondary Assignment | |
|---|---|---|
| Borrower in Bankruptcy: | Yes ☐ | No ☒ |
| Delivery of Credit Documents: | Yes ☐ | No ☒ |
| Netting Arrangements: | Yes ☒ | No ☐ |
| Flip Representations: | Yes ☐ | No ☒ |
| Step-Up Provisions: | Yes ☐ | No ☒ |
| | Shift Date: | Not Applicable |
| Transfer Notice | Yes ☐ | No ☒ |

## DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means THE CIT GROUP / Business Credit, Inc. as Administrative Agent under the Credit Agreement.

"Assignment" means an Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
   ☒ none.
   ☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
   ☒ none.
   ☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
   ☒ not applicable.
   ☐ none has been set.
   ☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
   ☐ not applicable.
   ☒ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
   ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

2

"Commitments" select one:
☒ none.
☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any) on or after the Shift Date [but prior to the transfer pursuant to which _____ transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means (i) LC Deposits in the outstanding principal amount of ▮▮▮▮▮ and (ii) Term Loans in the outstanding principal amount of ▮▮▮▮▮

"Netting Letter" select one:
☐ not applicable.
☒ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer and Original Buyer.

"Original Buyer" select one:
☐ not applicable.
☒ means ▮▮▮▮▮▮▮▮▮

"Penultimate Buyer" select one:
☐ not applicable.
☒ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means notice to the Borrowers and the Agent and the acceptance and recordation of the Assignment by the Agent.

"Seller Purchase Price" select one:
☐ not applicable.
☒ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means none.

"Unfunded Commitments" ▮▮▮▮▮▮▮▮▮

3

**SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
   If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

   "(k) [intentionally omitted]."

4

Section 4.1(r) (<u>Predecessor Transfer Agreements</u>).
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
☒ Not applicable.

Section 4.1(u) (<u>Other Documents</u>).
☒ None.
☐ The following: _____.

Section 4.1(v) (<u>Proof of Claim</u>).
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
    ☐ the Agent on behalf of the Lenders.
    ☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☒ Not applicable.

## SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

Section 5.1(n) (<u>Buyer Status</u>).

☐ Buyer is not a Lender.
☒ Buyer is a Lender.
☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## SECTION 6 (INDEMNIFICATION)

Section 6.1 (<u>Seller's Indemnities</u>); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## SECTION 7 (COSTS AND EXPENSES)

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.

☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☒ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

### SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)

Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

Section 8.4 (Wire Instructions).

Seller's Wire Instructions:

Bank Name: The Bank of New York

Buyer's Wire Instructions:

Bank: JP Morgan Chase Bank

### SECTION 9 (NOTICES)

Seller's Address for Notices and Delivery:

*Credit Contact:* (Financials, Credit Agreements, Amendments, Intralinks and Syntrax Access))

*Trade Closing Contact:* ( Confirms, Assignments, *Funding Memo's)*



**Operations Contact**
*(Funding Notices, Borrowings, Paydowns, Interest, Fees, etc.)*



Buyer's Address for Notices and Delivery:

**All Notices Sent To**

BDCM OPPORTUNITY FUND II, L.P.
C/O Black Diamond Capital Management, L.L.C.
Attn: Loan Administrator



Email:
PH:                              Fax:

**Legal Documentation:**

Send To:
BDCM OPPORTUNITY FUND II, L.P.
c/o Black Diamond Capital Management L.L.C.
Attn: Loan Administrator



PH:
Fax:

**Credit Communications**

**All Credit Information Sent To:**
Black Diamond Capital Management, L.L.C.

7

PH: ██████████     Fax: ██████████

## H.    SECTION 27 (ADDITIONAL PROVISIONS)

The following additional provisions, including any modifications to existing provisions, shall apply:

None

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**

By:_____
    Name:
    Title:

**BUYER**

**BDCM OPPORTUNITY FUND II, L.P.**
by BDCM Opportunity Fund II Adviser, L.L.C.
its Investment Manager

By:_____
    Na
    Ti

9

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



BUYER

**BDCM OPPORTUNITY FUND II, L.P.**
by BDCM Opportunity Fund II Adviser, L.L.C.
its Investment Manager

By:_____
       Name:
       Title:

9

## ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

1.   If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

     Not Applicable

2.   List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

     None.

3.   Description of Proof of Claim (if any).

     Not applicable.

4.   Description of Adequate Protection Order (if any).

     Not applicable.

5.   List any exceptions to Section 4.1(w) (Notice of Impairment).

     None.

6.   The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is▮▮▮▮▮▮▮▮

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between           (the "Assignor") and BDCM Opportunity Fund II, L.P. (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or Instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor:

2. Assignee:            BDCM Opportunity Fund II, L.P.

3. Borrower(s):          Allied Systems Holdings, Inc., Allied Systems, LTD (L.P.)

4. Administrative Agent:     The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5. Credit Agreement:       Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007, and amended and restated as of May 15, 2007, among Allied Systems Holdings, Inc. (as successor by merger to Allied Holdings, Inc.), Allied Systems, Ltd. (L.P.), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto from time to time, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6.    Assigned Interest:

| Facility    Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| LC Deposits | USD ██████ | ██████ USD | ██████ % |
| Term Loans | USD ██████ | ██████ USD | ██████ % |

Effective Date: ██████████

2

7. Notice and Wire Instructions: See Attached

3

Wire Instructions:                          Wire Instructions: See Attached

4.

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR

By:_____
    Name:
    Title:

ASSIGNEE

**BDCM Opportunity Fund II, L.P., as Assignee**
By BDCM Opportunity Fund II Adviser, L.L.C.
Its Investment Manager

By:_____
    Name:
    Title:

5

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR

ASSIGNEE

BDCM Opportunity Fund II, L.P., as Assignee
By BDCM Opportunity Fund II Adviser, L.L.C.
Its Investment Manager

By:_____
    Name:
    Title:

5

Consented to and Accepted:

THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent

By: _Michael Alberta (signature)_

Name: _Michael Alberta_

Title: _Senior Vice President_

Consented to:

ALLIED HOLDINGS, INC.

By: _____

Name:

Title:

ALLIED SYSTEMS, LTD (L.P.)

By: _____

Name:

Title:

### STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
### AND ASSUMPTION AGREEMENT

1.     Representations and Warranties.

1.1     Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2     Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.     Payments. All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1     With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2     With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3. General Provisions. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.



**PURCHASE AND SALE AGREEMENT FOR** ████████████████████

---

## TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

**EXECUTION COPY**

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | ████████████████ |
| Agreement Date: | |
| Seller: | |
| Buyer: | |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent |
| Borrower: | Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (i) ████████ principal amount  (ii) ████████ principal amount |
| Tranche(s): | (i) ████████  (ii) ████████ |
| CUSIP Number(s), if available: | N/A |
| Pre-Settlement Date Accruals Treatment: | ☒ Settled Without Accrued Interest  ☐ Trades Flat |
| Type of Assignment: | ☐ Original Assignment  ☒ Secondary Assignment |
| Immediate Prior Sellers: | ████████████████ |

LSTA EFFECTIVE DECEMBER 2006

Copyright © LSTA 2006. All rights reserved.

463-055/AGR/1939464.1

| TRANSACTION SUMMARY | | |
|---|---|---|
| Borrower in Bankruptcy: | Yes ☐ | No ☒ |
| Delivery of Credit Documents: | Yes ☐ | No ☒ |
| Netting Arrangements: | Yes ☐ | No ☒ |
| Flip Representations: | Yes ☐[1] | No ☒ |
| Step-Up Provisions: | Yes ☐[1] | No ☒ |
| | Shift Date[2]: | Not Applicable |
| Transfer Notice: | Yes ☐[3] | No ☒ |

### A.    DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement", "this Agreement", "herein", "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means The CIT Group / Business Credit, Inc., as Administrative Agent under the Credit Agreement.

"Assignment" means the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ none.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
☒ none.
☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

---

[1] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2] Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis. In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

2

"Bar Date" select one:
- ☒ not applicable.
- ☐ none has been set.
- ☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
- ☒ not applicable.
- ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
- ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
- ☐ none.
- ☒ means LC Commitment in the principal amount of ████████████ all of which is funded as an LC Deposit.

"Covered Prior Seller" select one:
- ☒ not applicable.
- ☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____[5] transferred such Loans and Commitments (if any)].[6]

"Filing Date" select one:
- ☒ none.
- ☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means collectively, Term Loans in the outstanding principal amount of ████████████ and LC Deposits in the principal amount of ████████████.

"Netting Letter" select one:
- ☒ not applicable.
- ☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
- ☒ not applicable.
- ☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
- ☒ not applicable.
- ☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
- ☐ means [_____].

"Required Consents" means notice to the Borrower and acceptance and recordation of the Assignment by the Agent.

"Seller Purchase Price" select one:

---

[4]  If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5]  Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6]  The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

453-055/AGR/1939464.1

☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ████ transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means none.

**B.** **SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(ii) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
    If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

        "(k) [intentionally omitted]."[7]

---

[7] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

453-055/AGR/1939464.1

4

Section 4.1(r) (Predecessor Transfer Agreements).
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
    ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (Other Documents).
    ☒ None.
    ☐ The following: _____.

Section 4.1(v) (Proof of Claim).  N/A
    ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
        ☐ the Agent on behalf of the Lenders.
        ☐ Seller or a Prior Seller.
    ☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

## C.  SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

**C.1**  Section 5.1(n) (Buyer Status).  [Specify Buyer's status for purposes of determining Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

    ☐ Buyer is not a Lender.
    ☒ Buyer is a Lender.
    ☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
    ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**  If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.  SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## E.  SECTION 7 (COSTS AND EXPENSES)

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.

☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.    SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**    Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**    Section 8.4 (Wire Instructions).

Buyer's Wire Instructions:

JPMorgan Chase Bank



Seller's Wire Instructions:

Bank of New York



**G.    SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

BDCM OPPORTUNITY FUND II, L.P.
C/O Black Diamond Capital Management, L.L.C.
Attn: Loan Administrator



Email: ▓▓▓▓▓
PH: ▓▓▓▓▓
Fax: ▓▓▓▓▓

**Credit Communications**
Black Diamond Capital Management, L.L.C.





PH:
Fax:

<u>Seller's Address for Notices and Delivery</u>:

<u>Primary Credit Contact</u>

Name:
Company:
Title:
Address:

Telephone:
Facsimile:
E-Mail Address:

<u>Secondary Credit Contact</u>



**H.**  **<u>SECTION 26 (FURTHER PROVISIONS)</u>**

None.

453-055/AGR/1939464.1

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**BDCM OPPORTUNITY FUND II, LP**

by: BDCM Opportunity Fund II Adviser, LLC
its Investment Manager

By:_____
Name:
Title:

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER

By:_____
    Name:
    Title:

BUYER

BDCM OPPORTUNITY FUND II, LP

by:  BDCM Opportunity Fund II Adviser, LLC
     its Investment Manager

By _

8

**ANNEX TO PURCHASE AND SALE AGREEMENT**

1.    If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[1] and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

**With respect to** ▇▇▇▇▇ **principal amount of Term Loans and** ▇▇▇▇▇ **principal amount of LC Deposits:**

That certain Purchase and Sale Agreement and Assignment and Assumption Agreement, each dated ▇▇▇▇▇ between ▇▇▇▇▇ as seller, and ▇▇▇▇▇ as buyer.

    That certain Assignment and Assumption Agreement dated ▇▇▇▇▇ between ▇▇▇▇▇ as assignor, and ▇▇▇▇▇ as assignee. [par/near par loans]

**With respect to** ▇▇▇▇▇ **principal amount of Term Loans and** ▇▇▇▇▇ **principal amount of LC Deposits:**

That certain Purchase and Sale Agreement and Assignment and Assumption Agreement, each dated ▇▇▇▇▇ between ▇▇▇▇▇ as seller, and ▇▇▇▇▇ as buyer.

    That certain Assignment and Assumption Agreement dated ▇▇▇▇▇ between ▇▇▇▇▇ as assignor, and ▇▇▇▇▇ as assignee. [par/near par loans]

**With respect to** ▇▇▇▇▇ **principal amount of Term Loans and** ▇▇▇▇▇ **principal amount of LC Deposits:**

That certain Purchase and Sale Agreement and Assignment and Assumption Agreement, each dated ▇▇▇▇▇ between ▇▇▇▇▇ as seller, and ▇▇▇▇▇ as buyer.

    That certain Assignment and Assumption Agreement dated ▇▇▇▇▇ between ▇▇▇▇▇ as assignor, and ▇▇▇▇▇ as assignee. [par/near par loans]

**With respect to** ▇▇▇▇▇ **principal amount of Term Loans and** ▇▇▇▇▇ **principal amount of LC Deposits:**

That certain Purchase and Sale Agreement and Assignment and Assumption Agreement, each dated ▇▇▇▇▇ between ▇▇▇▇▇ as seller, and ▇▇▇▇▇ as buyer.

---

[1]  List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

That certain Assignment and Assumption Agreement dated ███████ between ███████ as assignor, and ███████ as assignee. [par/near par loans]

**With respect to** ███████ **principal amount of Term Loans and** ███████ **principal amount of LC Deposits:**

That certain Purchase and Sale Agreement and Assignment and Assumption Agreement, each dated ███████ between ███████ as seller, and ███████ as buyer.

That certain Assignment and Assumption Agreement dated ███████ between ███████ as assignor, and ███████ as assignee. [par/near par loans]

**With respect to** ███████ **principal amount of Term Loans and** ███████ **principal amount of LC Deposits:**

That certain Purchase and Sale Agreement and Assignment and Assumption Agreement, each dated ███████ between ███████ as seller, and ███████ as buyer.

That certain Assignment and Assumption Agreement dated ███████ between ███████ as assignor, and ███████ as assignee. [par/near par loans]

2. List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

   None.

3. Description of Proof of Claim (if any).

   N/A

4. Description of Adequate Protection Order (if any).

   N/A

5. List any exceptions to Section 4.1(w) (Notice of Impairment).

   None.

6. The amount of any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is ███████.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between ▮▮▮▮▮▮▮▮▮▮▮▮ (the "Assignor") and BDCM Opportunity Fund II, LP (the "Assignee"). ▮▮▮▮▮ Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor:

2. Assignee:                           BDCM Opportunity Fund II, LP

3. Borrower(s):                        Allied Holdings, Inc., Allied Systems, LTD (L.P.)

4. Administrative Agent:               The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5. Credit Agreement:                   Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007, as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders parties thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent

6.    Assigned Interest:



| Facility    Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| Synthetic LC Commitment | USD ▮▮▮▮▮ | USD ▮▮▮▮▮ | ▮▮▮▮▮ % |
| Term Loan | USD ▮▮▮▮▮ | USD ▮▮▮▮▮ | ▮▮▮▮▮ % |

Effective Date: ▮▮▮▮▮

7. Notice and Wire Instructions:

ASSIGNOR:

Closing Contact:

ASSIGNEE:

Black Diamond Capital Management, L.L.C.

Wire Instructions:

Bank of New York

Wire Instructions:

JPMorgan Chase Bank

Reference: Allied Holdings/BDCM

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



ASSIGNEE

BDCM OPPORTUNITY FUND II, LP, as
Assignee

by:  BDCM Opportunity Fund II Adviser,
LLC its Investment Manager

By: _____
    Name:
    Title:

The terms and conditions in this Assignment are hereby agreed to:

ASSIGNOR

By:
    Name:
    Title:

ASSIGNEE

BDCM OPPORTUNITY FUND II, LP, as
Assignee

by: BDCM Opportunity Fund II Adviser,
LLC its Investment Manager

Consented to and Accepted:

THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent

By: _____

Name: Christian Alianto

Title: Vice President

Consented to:

ALLIED HOLDINGS, INC.

By: _____NK_____

Name:

Title

ALLIED SYSTEMS, LTD (L.P.)

By: _____NK_____

Name:

Title

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
## AND ASSUMPTION AGREEMENT

1.  Representations and Warranties.

1.1     Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2     Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.      Payments. All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1     With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2     With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.     General Provisions. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.

7

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between █████████████████ (the "Assignor") and ████████████████ (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1   Assignor:                          ████████████████████████

2   Assignee:                          BDCM Opportunity Fund II, L.P.

3   Borrower(s):                       Allied Holdings, Inc., Allied Systems, LTD (L.P.)

4   Administrative Agent:              The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5   Credit Agreement:                  The $265,000,000.00 Credit Agreement dated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto, Goldman Sachs Credit Partners L.P., as Administrative Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6.      Assigned Interest:



| Facility   Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| Synthetic LC Commitment | USD ▮▮▮▮▮ | USD ▮▮▮▮▮ | ▮▮▮▮▮% |
| Term Loan | USD ▮▮▮▮▮ | USD ▮▮▮▮▮ | ▮▮▮▮▮% |

Effective Date: ▮▮▮▮▮▮

2

7 Notice and Wire Instructions:



BDCM Opportunity Fund II, L.P.

CREDIT CONTACT:
Black Diamond Capital Management, L.L.C.

PH:                          Fax:

LOAN ACTIVITY CONTACT:
BDCM OPPORTUNITY FUND II, L.P.
C/O Black Diamond Capital Management, L.L.C.
Attn: Loan Administrator

Email:
PH:                          Fax:

3

Wire Instructions: ████████████████

Wire Instructions: BDCM Opportunity Fund II, L.P.

████████████████████████

Bank: JPMorgan Chase Bank New York, NY
ABA No.████████
Acct. No.████
Acct Name: BDCM OPPORTUNITY FUND II, L.P.

Reference:    Allied Holdings to Black Diamond

4

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



ASSIGNEE

**BDCM OPPORTUNITY FUND II, L.P., as Assignee
By:  BDCM Opportunity Fund II Advisor, L.L.C.,
its Investment Manager**

By:_____
    Name:
    Title:

NY-474811 1/9999-00999

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR

By:_____ _____
    Name:
    Title:

ASSIGNEE

**BDCM OPPORTUNITY FUND II, L.P., as Assignee**
**By: BDCM Opportunity Fund II Adviser, L.L.C.,**
**its Investment Manager**



Consented to and Accepted:

**THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent**

By: _____

Name: Michael Hibberts

Title: Vice President

Consented to:

**ALLIED HOLDINGS, INC.**

By: _____

Name:

Title:

**ALLIED SYSTEMS, LTD (L.P.)**

By: _____

Name:

Title:

6

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
## AND ASSUMPTION AGREEMENT

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder. (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    Payments.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1    With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2    With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

7

3.    General Provisions. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.

8



## PURCHASE AND SALE AGREEMENT FOR

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Buyer: | |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("**Holdings**"), Allied Systems, Ltd. (L.P.) ("**Systems**"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent |
| Borrower: | Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (i) ▮▮▮▮ outstanding principal amount <br> (ii) ▮▮▮▮ principal amount |
| Tranche(s): | (i) ▮▮▮▮ <br> (ii) ▮▮▮▮ |
| CUSIP Number(s), if available: | N/A |
| Pre-Settlement Date Accruals Treatment: | ☒ Settled Without Accrued Interest <br> ☐ Trades Flat |
| Type of Assignment: | ☐ Original Assignment <br> ☒ Secondary Assignment |

LSTA EFFECTIVE DECEMBER 2006     Copyright © LSTA 2006. All rights reserved.

| TRANSACTION SUMMARY | | |
|---|---|---|
| **Immediate Prior Seller (if any):** | | |
| **Borrower in Bankruptcy:** | Yes ☐ | No ☒ |
| **Delivery of Credit Documents:** | Yes ☐ | No ☒ |
| **Netting Arrangements:** | Yes ☐ | No ☒ |
| **Flip Representations:** | Yes ☐[1] | No ☒ |
| **Step-Up Provisions:** | Yes ☐[1] | No ☒ |
| | Shift Date[2]: | **Not Applicable** |
| **Transfer Notice:** | Yes ☐[3] | No ☒ |

A.   **DEFINITIONS**

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means The CIT Group / Business Credit, Inc., as Administrative Agent.

"Assignment" means the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ none.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

---

[1] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2] Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis. In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

2

"Bankruptcy Court" select one:
☒ none.
☐ means [the United States Bankruptcy Court for the _____ ____District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
☒ not applicable.
☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
☐ none.
☒ means Synthetic LC Commitment in the principal amount of ▮▮▮▮▮▮▮ all of which is funded as an LC Deposit.

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____[5] transferred such Loans and Commitments (if any)].[6]

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means, collectively, Term Loans in the outstanding principal amount of ▮▮▮▮▮▮ and Synthetic LC Deposits in the principal amount of ▮▮▮▮▮▮.

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:

---

[4] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

3

☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means the notice to the Borrower and the Agent.

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ▮▮▮▮transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of ▮▮▮▮▮▮.

## B.    SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (<u>Purchase Price</u>); <u>Netting Arrangements</u>.
If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

"(k) [intentionally omitted]."[7]

Section 4.1(r) (<u>Predecessor Transfer Agreements</u>).
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (<u>Other Documents</u>).
☒ None.
☐ The following: _____.

Section 4.1(v) (<u>Proof of Claim</u>). N/A
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
    ☐ the Agent on behalf of the Lenders.
    ☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☒ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

## C.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

**C.1**    Section 5.1(n) (<u>Buyer Status</u>). [Specify Buyer's status for purposes of determining Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

☒ Buyer is not a Lender.
☐ Buyer is a Lender.
☐ Buyer is an Affiliate (as defined in the Credit Agreement) of a Lender.
☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.    SECTION 6 (INDEMNIFICATION)

Section 6.1 (<u>Seller's Indemnities</u>); <u>Step-Up Indemnities</u>.

(i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

(ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

---

[7] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.