# **EXHIBIT 9**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x

In re:                                          :

                                                :       Chapter 11

ALLIED SYSTEMS HOLDINGS, INC.,                   :

                        Alleged Debtor.          :       Case No. 11-[_____] ([___])

                                                :

                                                :

                                                :

-----------------------------------------------------------------x

In re:                                          :

                                                :       Chapter 11

ALLIED SYSTEMS, LTD. (L.P.),                     :

                        Alleged Debtor.          :       Case No. 11-[_____] ([___])

                                                :

-----------------------------------------------------------------x

## AFFIDAVIT OF JEFFREY A. SCHAFFER
## PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1003

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF NEW YORK     )


Jeffrey A. Schaffer being duly sworn, deposes and states:

1.      I make this affidavit on behalf of Spectrum Investment Partners LP ("Spectrum"),

a petitioning creditor in the above-captioned involuntary chapter 11 cases (the "Bankruptcy

Cases") filed by Spectrum and other petitioning creditors against (i) Allied Systems Holdings,

Inc., and (ii) Allied Systems, Ltd. (L.P.) (together, the "Debtors").  I am fully familiar with the

facts set forth herein either through my own personal knowledge or through a review of

documents related to Spectrum's claims against the Debtors.  If called to testify in connection

with the Bankruptcy Cases, the following would constitute my testimony.

2.      I am the Managing Member of Spectrum Group Management LLC, which is the investment manager of Spectrum, and am authorized to make this affidavit and to execute a petition commencing the Bankruptcy Cases on its behalf. Spectrum has its principal place of business at 1250 Broadway, 19th Floor, New York, New York 10001. Spectrum is a creditor of the Debtors based upon its status as a lender under that certain Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 by and among Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.), as borrowers, certain subsidiaries of borrowers, as subsidiary guarantors, various lenders, Goldman Sachs Credit Partners L.P., as lead arranger and syndication agent, and The CIT Group/Business Credit, Inc., as administrative and collateral agent (as amended, restated, modified, or supplemented from time to time, the "First Lien Credit Agreement").

### The First Lien Credit Agreement

3.      Pursuant to the First Lien Credit Agreement, various lenders committed to extend term loans, revolving loans, and synthetic letters of credit to the Debtors in the amount of $265 million. Due to the accrual of interest and fees, the current outstanding aggregate amount of the Obligations (as defined in the First Lien Credit Agreement) is approximately $296.4 million. A copy of the First Lien Credit Agreement will be annexed to a declaration in support of a statement contemporaneously filed by the petitioning creditors.

4.      Pursuant to the First Lien Credit Agreement, the lenders' commitments under term loans, revolving loans, and synthetic letters of credit were evidenced by promissory notes. The claims of Spectrum and other petitioning creditors derive from these notes.

5.      The Obligations are secured by first priority liens in substantially all of the Debtors' assets, including, but not limited to accounts, chattel paper, general intangibles, goods,

instruments, insurance, intellectual property, investment related property, letter of credit rights, money, receivables, and commercial tort claims. The Obligations are guaranteed by affiliates of the Debtors.

### The Assignments

6.      By virtue of the execution of several assignment and assumption agreements, Spectrum received an unconditional transfer and assignment of certain amounts of loans owed by the Debtors under the First Lien Credit Agreement (the "Assigned Claims") (the "Assigned Claims"). Redacted copies of the assignment documentation are attached as **Exhibit A**.

7.      The Assigned Claims were not assigned to Spectrum for the purposes of commencing the Bankruptcy Cases.

8.      As of the date hereof, the Debtors are indebted to Spectrum in the amount of at least $21.5 million, together with all accrued and unpaid interest (including default interest), fees and expenses calculated in accordance with the Credit Agreement.

Dated: May __, 2012
        New York, New York                          _____
                                                         JEFFREY A. SCHAFFER

Sworn to and subscribed before me
This ___ day of May, 2012

_____
        Notary Public

SOLMARIA VELEZ
Notary Public - State of New York
NO. 01VE6076495
Qualified in Bronx County
My Commission Expires _____

Case 12-11564-CSS Doc 8 Filed 09/17/12 Page 4 of 61

# EXHIBIT A

# LSTA ███████████ TRADE CONFIRMATION



**To:**   ***Spectrum Investment Partners, L.P.***
  *Attention:*
  *Phone No.:*
  *Fax No.:*
  *Email:*

**From:**

**Date:**

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for ███████ Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006, which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. The parties hereto agree to submit any dispute as to the reasonableness of a buy-in or sell-out price to binding arbitration in accordance with the LSTA "Rules Governing Arbitration Between Loan Traders With Regard to Failed Trades" in existence on the Trade Date, and to comply with any award or decision issued in connection with such an arbitration proceeding. Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:**   ███████████

**Seller:**   ████████████████████████   ☑ Principal   ☐ Agent

**Buyer:**   Spectrum Investment Partners, L.P.   ☑ Principal   ☐ Agent

**Credit Agreement:**   AMENDED AND RESTATED FIRST LIEN SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30, 2007, as amended and restated as of May 15, 2007 among ALLIED HOLDINGS, INC., ALLIED SYSTEMS, LTD. (L.P.), the Lenders party thereto from time to time, and THE CIT GROUP/BUSINESS CREDIT, INC., as Administrative Agent

**Borrower:**   Allied Holdings, Inc., Allied Systems, LTD (L.P.)

**Form of Purchase:**   Assignment



LSTA EFFECTIVE DECEMBER 2006  Copyright © LSTA 2006.  All rights reserved.

| Purchase Amount/ Type of Debt: | **Purchase Amount** | **Type of Debt** | **Facility** | **CUSIP Number** |
|---|---|---|---|---|
| | ▆▆▆▆ | Revolver | Synthetic LC Commitment | |
| | ▆▆▆▆ | Term | Term Loan | |

**Purchase Rate:**

▆▆▆▆  Synthetic LC Commitment

▆▆▆▆  Term Loan

**Up Front Fees: (if any):**   Synthetic LC Commitment    None

Term Loan    None

**Credit Documentation to be provided:**    No

**Trade Specific Other Terms of Trade:**    Recordation Fee is waived.

Please provide the signature of a duly authorized officer or other signatory where indicated below and return this letter to the attention of Aarti Patel at ClearPar at the following fax number (646)453-2870 or email address: aarti.patel@fnis.com
If you have any questions, please contact Aarti Patel at (845)639-4816.





Name:
Title:

**Spectrum Investment Partners, L.P.**
**By: Spectrum Group Management LLC, as General Partner**



By:

Name:
Title:



LSTA EFFECTIVE DECEMBER 2006. Copyright © LSTA 2006. All rights reserved.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Assignor") and Spectrum Investment Partners, L.P. (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2. Assignee: Spectrum Investment Partners, L.P.

3. Borrower(s): Allied Holdings, Inc., Allied Systems, LTD (L.P.)

4. Administrative Agent: The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5. Credit Agreement: The $265,000,000.00 Credit Agreement dated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto, Goldman Sachs Credit Partners L.P., as Administrative Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6. Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| Synthetic LC Commitment | USD 50,000,000.00 |  | |
| Term Loan | USD 177,300,000.00 | | |

Effective Date: 

7. Notice and Wire Instructions:

Notices:



Wire Instructions:



Notices:

Spectrum Investment Partners, L.P.



Phone:
Fax:
Contact:
Email:

Wire Instructions:

| | |
|---|---|
| Currency: | USD |
| Bank: | Citibank, N.A. New York |
| ABA#: | |
| Account #: | |
| Account Name: | Morgan Stanley & Co., NY |
| FFC: | Spectrum Investment Partners, L.P. |
| Attn: | |
| Reference: | Allied Holdings 1st Lien (5/07) |



2

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



By:

Name:

Title:

ASSIGNEE

**SPECTRUM INVESTMENT PARTNERS, L.P., as
Assignee**

By: Spectrum Group Management LLC, as General Partner



By:

Name:

Title:

3

Consented to and Accepted:

**THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent**

By: *Barbara J. Coffin*

Name: Barbara J. Coffin

Title: Assistant Vice President

Consented to:

**ALLIED HOLDINGS, INC.**

By: N A

Name:

Title:

**ALLIED SYSTEMS, LTD (L.P.)**

By: N A

Name:

Title:

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
## AND ASSUMPTION AGREEMENT

1. Representations and Warranties.

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2 Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2. Payments. All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1 With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2 With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3. General Provisions. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict



5

of laws principles thereof.





## PURCHASE AND SALE AGREEMENT ▓▓▓▓▓▓▓▓▓▓

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | ▓▓▓▓▓▓ |
| Agreement Date: | ▓▓▓▓▓▓▓▓ |
| Seller: | ▓▓▓▓▓▓▓▓▓▓ |
| Buyer: | Spectrum Investment Partners LP |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent |
| Borrower: | Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (i) ▓▓▓▓▓▓▓▓▓▓<br>(ii) ▓▓▓▓▓▓▓▓ |
| Tranche(s): | (i) ▓▓▓▓▓▓▓▓▓<br>(ii) ▓▓▓▓▓▓▓▓ |
| CUSIP Number(s), if available: | N/A |
| Pre-Settlement Date Accruals Treatment: | ☒ Settled Without Accrued Interest<br>☐ Trades Flat |
| Type of Assignment: | ☐ Original Assignment<br>☒ Secondary Assignment |
| Immediate Prior Seller (if any): | ▓▓▓▓▓▓▓▓ |
| Borrower in Bankruptcy: | Yes ☐     No ☒ |
| Delivery of Credit Documents: | Yes ☐     No ☒ |

LSTA EFFECTIVE DECEMBER 2006     Copyright © LSTA 2006. All rights reserved.

| TRANSACTION SUMMARY | | |
|---|---|---|
| **Netting Arrangements:** | Yes ☐ | No ☒ |
| **Flip Representations:** | Yes ☐[1] | No ☒ |
| **Step-Up Provisions:** | Yes ☐[1] | No ☒ |
| | Shift Date[2]: | **Not Applicable** |
| **Transfer Notice:** | Yes ☐[3] | No ☒ |

**A.    DEFINITIONS**

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means The CIT Group / Business Credit, Inc., as Administrative Agent.

"Assignment" means the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
    ☒ none.
    ☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
    ☒ none.
    ☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
    ☒ not applicable.

---

[1] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2] Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis. In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

NY440402.3/153-03372

☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
☐ none.
☒ means Synthetic LC Commitment in the principal amount of ▮▮▮▮▮▮▮ which is funded as an LC Deposit.

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____[5] transferred such Loans and Commitments (if any)].[6]

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.

---

[4] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

3

☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the $0.00 transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

## B.   SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

|  | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
|  | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
   If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

      "(k) [intentionally omitted]."[7]

---

[7]   Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

4

Section 4.1(r) (Predecessor Transfer Agreements).
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (Other Documents).
☒ None.
☐ The following: _____.

Section 4.1(v) (Proof of Claim). N/A
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
☐ the Agent on behalf of the Lenders.
☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

## C.  **SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

**C.1**  Section 5.1(n) (Buyer Status).  [Specify Buyer's status for purposes of determining Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

☐ Buyer is not a Lender.
☒ Buyer is a Lender.
☐ Buyer is an Affiliate (as defined in the Credit Agreement) of a Lender.
☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**  If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.  **SECTION 6 (INDEMNIFICATION)**

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

(i)  If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

(ii)  If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## E.  **SECTION 7 (COSTS AND EXPENSES)**

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
☐ one-half thereof.
☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
☐ one-half thereof.
☐ other relevant fraction or percentage, _____, thereof.

5

☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.     SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**     Section 8.2 (Distributions); Step-Up Distributions Covenant.

(i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

(ii)     If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**     Section 8.4 (Wire Instructions).

Buyer's Wire Instructions:

Bank Name:     JPMorgan Chase Bank, N.A.
Bank Address:  1166 Avenue of the Americas – 21st Floor
               New York, NY 10036
Bank Contact:  Erma McPherson
               Telephone (212) 899-1393
               Facsimile (212) 899-2914
ABA #:
Account Name:  Spectrum Investment Partners LP
Account No.:
Reference:     Term Loan and Synthetic LC/Allied Holdings



**G.     SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

Primary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC



Attn:
Telephone:
Facsimile:
E-Mail Address:

6

<u>Secondary Contact:</u>
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC



Attn:
Telephone:
Facsimile:
E-Mail Address:

**H.** **SECTION 26 (FURTHER PROVISIONS)**

None.

7

IN **WITNESS WHEREOF**, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



By:_____
   Name:
   Title:

**BUYER**

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner

By:_____
   Name:
   Title:

8

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



By: _____
   Name:
   Title:

**BUYER**

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner

By: _____
   Name:
   Title:

8

## ANNEX TO PURCHASE AND SALE AGREEMENT

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[1] and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.



2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

    N/A

3.  Description of Proof of Claim (if any).

    N/A

4.  Description of Adequate Protection Order (if any).

    N/A

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).

    None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is $0.00.

---

[1] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to ▆▆▆▆▆▆ loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

Annex-1

Case 1:12-cv-11564-CSS Document 8 Filed 08/17/12 Page 25 of 61

TRADE ID 

LSTA  TRADE CONFIRMATION

To:   **Buyer Name:**   *SPECTRUM INVESTMENT PARTNERS LP*
      **Contact Person:**
      **Phone No:**
      **Fax No:**

From: **Seller Name:**
      **Contact Person:**   
      **Phone No:**
      **Fax No:**
      **Email:**

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for ▮▮▮▮▮▮▮ Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association®, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below.  Capitalized terms used and not defined in this Confirmation shall have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:**

**Seller:** 

**Buyer:**              SPECTRUM INVESTMENT          ☑ Principal
                        PARTNERS LP [3]

**Credit Agreement:**   This SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND
                        EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30,
                        2007, is entered into by and among ALLIED HOLDINGS, INC., a
                        Georgia corporation and a debtor and debtor in possession under
                        Chapter 11 of the Bankruptcy Code (as defined below)("Holdings"),
                        ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a
                        debtor and debtor in possession under Chapter 11 of the Bankruptcy
                        Code ("Systems" and, together with Holdings, the "Borrowers"),
                        CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary
                        Guarantors, the Lenders party hereto from time to time, GOLDMAN
                        SACHS CREDIT PARTNERS L.P. ("GSCP"), as Syndication Agent (in
                        such capacity, "Syndication Agent"), and THE CIT GROUP/BUSINESS
                        CREDIT, INC. ("CIT"), as Administrative Agent (together with its

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[4] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[5] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[6] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[7] Specify Credit Agreement designation of the facility (e.g., tranche).  Specify multicurrency component, if any.

permitted successors in such capacity, "Administrative Agent") and as
Collateral Agent (together with its permitted successor in such
capacity, "Collateral Agent").

**Borrower:**          Allied Holdings, Inc and Allied Systems, Ltd. (L.P.) [4]

**Form Of Purchase:**      ☑ Assignment

**Purchase Amount/**
**Type Of Debt:**



| Purchase Amount[5] | Type of Debt[6] | Facility[7] | CUSIP Number |
|---|---|---|---|
| ▮▮▮▮ | Term Loan | TERM LOAN | |
| ▮▮▮▮ | Letter of Credit | SYNTHETIC LC | |

**Purchase Rate:**     ▮▮▮▮▮

**Accrued Interest:**   ☑ Settled Without Accrued Interest

**Credit Documentation**
**to be provided:**     ☑ No

**LSTA Standard**
**Other Terms of Trade:**

                       ☑ FOR THIS TRADE ONLY, seller shall pay no more than a total of
one-half of one assignment fee for transactions (specified in this or any
other Confirmation) allocated by an investment manager or advisor to
multiple funds or accounts.

**Trade Specific**
**Other Terms of Trade[9]:**
**Subject to:**         Negotiation, execution and delivery of reasonably acceptable contracts
and instruments of transfer, in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter
to the attention of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

If you have any questions, please contact ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

***SELLER***                           ***BUYER***

▮▮▮▮▮▮▮▮▮▮▮▮▮▮              ***SPECTRUM INVESTMENT PARTNERS LP***



---

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation
(including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA
▮▮▮▮▮ Trade Confirmation and/or the LSTA Standard Terms and Conditions for ▮▮▮▮▮ Trade Confirmations; if more space
is needed, attach additional pages.





## PURCHASE AND SALE AGREEMENT

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Buyer: | **Spectrum Investment Partners LP** |
| Credit Agreement: | **Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent** |
| Borrower: | **Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.)** |
| Purchase Amount(s): | (i)　　　　　　　outstanding principal amount<br>(ii)　　　　　principal amount |
| Tranche(s): | (i)<br>(ii) |
| CUSIP Number(s), if available: | **N/A** |
| Pre-Settlement Date Accruals Treatment: | ☒ **Settled Without Accrued Interest**<br>☐ **Trades Flat** |
| Type of Assignment: | ☐ **Original Assignment**<br>☒ **Secondary Assignment** |
| Immediate Prior Seller (if any): | |
| Borrower in Bankruptcy: | Yes ☐　　　　No ☒ |
| Delivery of Credit Documents: | Yes ☐　　　　No ☒ |

LSTA EFFECTIVE DECEMBER 2006　　　Copyright © LSTA 2006. All rights reserved.

| TRANSACTION SUMMARY | | |
|---|---|---|
| **Netting Arrangements:** | Yes ☐ | No ☒ |
| **Flip Representations:** | Yes ☐[1] | No ☒ |
| **Step-Up Provisions:** | Yes ☐[1] | No ☒ |
| | Shift Date[2]: | **Not Applicable** |
| **Transfer Notice:** | Yes ☐[3] | No ☒ |

**A.** **DEFINITIONS**

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means The CIT Group / Business Credit, Inc., as Administrative Agent.

"Assignment" means the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
    ☒ none.
    ☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
    ☒ none.
    ☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
    ☒ not applicable.

---

[1] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2] Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis. In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

NY446468.1/153-03410

☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
☐ none.
☒ means LC Commitment in the principal amount of ▮▮▮▮▮, all of which is funded as an LC Deposit.

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____[5] transferred such Loans and Commitments (if any)].[6]

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means, collectively, Term Loans in the outstanding principal amount of ▮▮▮▮▮ and LC Deposits in the principal amount ▮▮▮▮▮

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.

---

[4] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

3

☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the $0.00 transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

**B.    SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
    If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

        "(k) [intentionally omitted]."[7]

---

[7] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

Section 4.1(r) (Predecessor Transfer Agreements).
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
    ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (Other Documents).
    ☒ None.
    ☐ The following: _____.

Section 4.1(v) (Proof of Claim).  N/A
    ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
        ☐ the Agent on behalf of the Lenders.
        ☐ Seller or a Prior Seller.
    ☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

**C.**    **SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

**C.1**    Section 5.1(n) (Buyer Status).  [Specify Buyer's status for purposes of determining Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

    ☐ Buyer is not a Lender.
    ☒ Buyer is a Lender.
    ☐ Buyer is an Affiliate (as defined in the Credit Agreement) of a Lender.
    ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

**D.**    **SECTION 6 (INDEMNIFICATION)**

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

**E.**    **SECTION 7 (COSTS AND EXPENSES)**

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.

☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

### F.   SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)

F.1    Section 8.2 (Distributions); Step-Up Distributions Covenant.

   (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

   (ii)   If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

F.2    Section 8.4 (Wire Instructions).

Buyer's Wire Instructions:

Bank Name:     JPMorgan Chase Bank, N.A.
Bank Address:  1166 Avenue of the Americas – 21st Floor
               New York, NY 10036
Bank Contact:  Erma McPherson
               Telephone (212) 899-1393
               Facsimile (212) 899-2914
ABA #:         ████████
Account Name:  Spectrum Investment Partners LP
Account No.:   ████████
Reference:     Term Loan and LC/Allied Holdings

Seller's Wire Instructions:

Bank:          ████████
ABA No.:       ████████
Acct. No.:     ████████
Acct. Name:    ████████
Attention:     ████████
Reference:     ████████

### G.   SECTION 9 (NOTICES)

Buyer's Address for Notices and Delivery:

Primary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:          
Telephone:
Facsimile:
E-Mail Address:

6

<u>Secondary Contact:</u>
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC



Attn:
Telephone:
Facsimile:
E-Mail Address:

**H.**     **SECTION 26 (FURTHER PROVISIONS)**

None.

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER

By: _____
    Name: 
    Title:

**BUYER**

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner

By: _____
    Name:
    Title:

8

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER

By:_____
    Name:
    Title:

BUYER

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner



By:_____
    Name:
    Title:

8

## ANNEX TO PURCHASE AND SALE AGREEMENT

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[1] and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

    Purchase and Sale Agreement, and the related Assignment and Assumption Agreement, each dated as of ██████████ between ██████████

    

2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

    N/A

3.  Description of Proof of Claim (if any).

    N/A

4.  Description of Adequate Protection Order (if any).

    N/A

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).

    None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is $0.00.

---

[1] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

Annex-1



LSTA █████████ TRADE CONFIRMATION

**To:** Buyer Name: *SPECTRUM INVESTMENT PARTNERS LP*
Contact Person:
Phone No:
Fax No:

**From:** Seller Name:
Contact Person:
Phone No:
Fax No:
Email:

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for ████████ Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association®, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation shall have the respective meanings ascribed thereto in the Standard Terms and Conditions.

| | |
|---|---|
| **Trade Date:** | ███████████ |
| **Seller:** | ██████████████ ☑ Principal |
| **Buyer:** | SPECTRUM INVESTMENT PARTNERS LP [3] ☑ Principal |
| **Credit Agreement:** | This SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30, 2007, is entered into by and among ALLIED HOLDINGS, INC., a Georgia corporation and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as defined below)("Holdings"), ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code ("Systems" and, together with Holdings, the "Borrowers"), CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary Guarantors, the Lenders party hereto from time to time, GOLDMAN SACHS CREDIT PARTNERS L.P. ("GSCP"), as Syndication Agent (in such capacity, "Syndication Agent"), and THE CIT GROUP/BUSINESS CREDIT, INC. ("CIT"), as Administrative Agent (together with its |

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[4] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[5] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[6] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[7] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

permitted successors in such capacity, "Administrative Agent") and as Collateral Agent (together with its permitted successor in such capacity, "Collateral Agent").

| | |
|---|---|
| **Borrower:** | Allied Holdings, Inc and Allied Systems, Ltd. (L.P.) [1] |
| **Form Of Purchase:** | ☑ Assignment |

**Purchase Amount/ Type Of Debt:**

| Purchase Amount [3] | Type of Debt [6] | Facility [7] | CUSIP Number |
|---|---|---|---|
| ▬▬▬▬ | Term Loan | TERM LOAN | |
| ▬▬▬▬ | Letter of Credit | SYNTHETIC LC | |

| | |
|---|---|
| **Purchase Rate:** | ▬▬▬▬ |
| **Accrued Interest:** | ☑ Settled Without Accrued Interest |
| **Credit Documentation to be provided:** | ☑ No |
| **LSTA Standard Other Terms of Trade:** | |
| | ☑ Assignment fee is waived |
| **Trade Specific Other Terms of Trade [9]: Subject to:** | Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer, in accordance herewith. |

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention ▬▬▬▬

If you have any questions, please contact Thierry C Le Jouan at (212) 357 4280

*SELLER*



*BUYER*

*SPECTRUM INVESTMENT PARTNERS LP*



---

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA ▬▬▬ Trade Confirmation and/or the LSTA Standard Terms and Conditions for ▬▬▬ Trade Confirmations; if more space is needed, attach additional pages.

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between ███████████████ (the "Assignor") and Spectrum SPC II for the account of B Spectrum Investment Partners, L.P. Segregated Portfolio (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor:                      ███████████████████

2. Assignee:                      Spectrum SPC II for the account of B Spectrum Investment Partners, L.P. Segregated Portfolio

3. Borrower(s):                   Allied Holdings, Inc., Allied Systems, LTD (L.P.)

4. Administrative Agent:          The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5. Credit Agreement:              The $265,000,000.00 Credit Agreement dated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto, Goldman Sachs Credit Partners L.P., as Administrative Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6. Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| Synthetic LC Commitment | USD 50,000,000.00 |  | |
| Term Loan | USD 180,000,000.00 | | |

Effective Date: ██████

7. Notice and Wire Instructions:

Notices:



Wire Instructions:

Currency:
Bank:
ABA#:
Account #:
Account Name:
FFC:
Attn:
Reference:

Notices:

Spectrum SPC II for the account of B Spectrum
Investment Partners, L.P. Segregated Portfolio



Phone:
Fax:
Contact:
Email:

Wire Instructions:

Currency:        USD
Bank:            JPMorgan Chase Bank
ABA#:
Account #:       ████████
Account Name:  Morgan Stanley & Co B Spectrum
Investment Partners, L.P. Segregated Portfolio
FFC:
Attn:
Reference:       Allied Holdings 1st Lien (5/07)



2

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



By: _____

Name: _____

Title: _____

ASSIGNEE

**SPECTRUM SPC II FOR THE ACCOUNT OF B
SPECTRUM INVESTMENT PARTNERS, L.P.
SEGREGATED PORTFOLIO, as Assignee**



By: _____

Name: _____

Title: _____

3

Consented to and Accepted:

**THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent**

By: _____

Name: J. Danforth

Title: VP

Consented to:

**ALLIED HOLDINGS, INC.**

By: _____

Name:

Title:

**ALLIED SYSTEMS, LTD (L.P.)**

By: _____

Name:

Title:

ANNEX 1

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AND ASSUMPTION AGREEMENT

1. Representations and Warranties.

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other  instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2      Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.   Payments. All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1 With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2      With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.   General Provisions. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall



constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.





## PURCHASE AND SALE AGREEMENT

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Buyer: | Spectrum Investment Partners LP |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("**Holdings**"), Allied Systems, Ltd. (L.P.) ("**Systems**"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent |
| Borrower: | Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (i) outstanding principal amount <br> (ii) principal amount |
| Tranche(s): | (i) <br> (ii) |
| CUSIP Number(s), if available: | N/A |
| Pre-Settlement Date Accruals Treatment: | ☒ Settled Without Accrued Interest <br> ☐ Trades Flat |
| Type of Assignment: | ☐ Original Assignment <br> ☒ Secondary Assignment |
| Immediate Prior Seller (if any): | |

LSTA EFFECTIVE DECEMBER 2006        Copyright © LSTA 2006. All rights reserved.

NY440633.1/153-03372

NY440633.1/153-03372

| TRANSACTION SUMMARY | | |
|---|---|---|
| Borrower in Bankruptcy: | Yes ☐ | No ☒ |
| Delivery of Credit Documents: | Yes ☐ | No ☒ |
| Netting Arrangements: | Yes ☐ | No ☒ |
| Flip Representations: | Yes ☐[1] | No ☒ |
| Step-Up Provisions: | Yes ☐[1] | No ☒ |
| | Shift Date[2]: | Not Applicable |
| Transfer Notice: | Yes ☐[3] | No ☒ |

A.    **DEFINITIONS**

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means The CIT Group / Business Credit, Inc., as Administrative Agent.

"Assignment" means the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ none.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:

---

[1] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2] Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis. In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

2

☒ none.
☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
☒ not applicable.
☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
☐ none.
☒ means Synthetic LC Commitment in the principal amount of $918,434.29, all of which is funded as an LC Deposit.

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____ [5] transferred such Loans and Commitments (if any)].[6]

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means, collectively, Term Loans in the outstanding principal amount of ███████ and Synthetic LC Deposits in the principal amount of ███████.

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

---

[4] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

3

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involoved in the netting arrangement).
☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the $0.00 transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

4

## B.   SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
>      If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

>           "(k) [intentionally omitted]."[7]

---

[7]   Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

5

Section 4.1(r) (Predecessor Transfer Agreements).

☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.

☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.

☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (Other Documents).

☒ None.

☐ The following: _____.

Section 4.1(v) (Proof of Claim). N/A

☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by

☐ the Agent on behalf of the Lenders.

☐ Seller or a Prior Seller.

☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.

☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

## C.   SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

**C.1**   Section 5.1(n) (Buyer Status). [Specify Buyer's status for purposes of determining Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

☐ Buyer is not a Lender.

☒ Buyer is a Lender.

☐ Buyer is an Affiliate (as defined in the Credit Agreement) of a Lender.

☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**   If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.   SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

(i)   If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

(ii)   If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## E.   SECTION 7 (COSTS AND EXPENSES)

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to

☐ one-half thereof.

☐ other relevant fraction or percentage, _____, thereof.

6

☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.**    **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

F.1    Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**    Section 8.4 (Wire Instructions).

Buyer's Wire Instructions:

Bank Name:    JPMorgan Chase Bank, N.A.
Bank Address:  1166 Avenue of the Americas – 21st Floor
              New York, NY 10036
Bank Contact:  Erma McPherson
              Telephone (212) 899-1393
              Facsimile (212) 899-2914
ABA #:
Account Name: Spectrum Investment Partners LP
Account No.
Reference:    Term Loan and Synthetic LC/Allied Holdings

Seller's Wire Instructions:

Bank:
ABA No.:
Acct. No.:
Acct. Name:
Attention:
Reference:

**G.**    **SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

Primary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

7



Attn:
Telephone:
Facsimile:
E-Mail Address:

Secondary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:
Telephone
Facsimile:
E-Mail Address:

**H.     SECTION 26 (FURTHER PROVISIONS)**

None.

8

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



By: 

Title:

**BUYER**

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner

By:_____

    Name:

    Title:

9

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER

<span style="background:black"></span>

By:_____
     Name:
     Title:


**BUYER**

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner



By:_____
     Name:
     Title:

8

## ANNEX TO PURCHASE AND SALE AGREEMENT

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[1] and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

    Purchase and Sale Agreement, and the related Assignment and Assumption Agreement, each

    Assignment and Assumption Agreement

2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

    N/A

3.  Description of Proof of Claim (if any).

    N/A

4.  Description of Adequate Protection Order (if any).

    N/A

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).

    None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is $0.00.

---

[1] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

Annex-1






LSTA [BLACKED OUT] TRADE CONFIRMATION

To:    **Buyer Name:**    *SPECTRUM INVESTMENT PARTNERS LP*
       **Contact Person:**
       **Phone No:**
       **Fax No:**

From:  **Seller Name:**
       **Contact Person:**
       **Phone No:**
       **Fax No:**
       **Email:**

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for [BLACKED OUT] Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association®, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below.  Capitalized terms used and not defined in this Confirmation shall have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:**          

**Seller:**              [BLACKED OUT] P.          ☑ Principal

**Buyer:**               SPECTRUM INVESTMENT        ☑ Principal
                         PARTNERS LP [3]

**Credit Agreement:**    This SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND
                         EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30,
                         2007, is entered into by and among ALLIED HOLDINGS, INC., a
                         Georgia corporation and a debtor and debtor in possession under
                         Chapter 11 of the Bankruptcy Code (as defined below)("Holdings"),
                         ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a
                         debtor and debtor in possession under Chapter 11 of the Bankruptcy
                         Code ("Systems" and, together with Holdings, the "Borrowers"),
                         CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[4] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[5] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[6] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[7] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

Guarantors, the Lenders party hereto from time to time, GOLDMAN SACHS CREDIT PARTNERS L.P. ("GSCP"), as Syndication Agent (in such capacity, "Syndication Agent"); and THE CIT GROUP/BUSINESS CREDIT, INC. ("CIT"), as Administrative Agent (together with its permitted successors in such capacity, "Administrative Agent") and as Collateral Agent (together with its permitted successor in such capacity, "Collateral Agent").

**Borrower:** Allied Holdings, Inc and Allied Systems, Ltd. (L.P.) [4]

**Form Of Purchase:** ☑ Assignment

**Purchase Amount/ Type Of Debt:**

| Purchase Amount[5] | Type of Debt[6] | Facility[7] | CUSIP Number |
|---|---|---|---|
|  | Term Loan | TERM LOAN | |
| | Letter of Credit | SYNTHETIC LC | |

**Purchase Rate:**

**Accrued Interest:** ☑ Settled Without Accrued Interest

**Credit Documentation to be provided:** ☑ No

**LSTA Standard Other Terms of Trade:**

☑ FOR THIS TRADE ONLY, seller shall pay no more than a total of one-half of one assignment fee for transactions (specified in this or any other Confirmation) allocated by an investment manager or advisor to multiple funds or accounts.

**Trade Specific Other Terms of Trade[8]: Subject to:**

Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer, in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of ▒▒▒ the following fax number ▒▒▒ or e-mail address:

If you have any questions, please contact ▒▒▒

*SELLER*                                     *BUYER*

                                            *SPECTRUM INVESTMENT PARTNERS LP*



---

[*] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.



ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assi~~~~~~~~") ~~~~~~~~ the Effective Date set forth below and is entered into by and between ████████████████████ (the "Assignor") and Spectrum Investment Partners LP (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor:                     ████████████████████

2. Assignee:                     Spectrum Investment Partners LP

3. Borrower(s):                  Allied Holdings, Inc., Allied Systems, LTD (L.P.)

4. Administrative Agent:         The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5. Credit Agreement:             The $265,000,000.00 Credit Agreement dated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto, Goldman Sachs Credit Partners L.P., as Administrative Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6.   Assigned Interest:

| Facility | Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|---|
| Synthetic LC Commitment | | USD 50,000,000.00 | ███████████ | ███████████ |
| Term Loan | | USD 178,200,000.00 | ███████████ | ███████████ |

Effective Date: ███████████

2

7. Notice and Wire Instructions:

CREDIT CONTACT:

Spectrum Investment Partners LP

Primary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:
Telephone:
Facsimile:
E-Mail Address:

Secondary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:
Telephone:
Facsimile:
E-Mail Address:

NY440406.1/153-03372

Wire Instructions 

Bank:
ABA No.:
Acct. No.:
Acct. Name:
L.P.
Attention:
Reference:

Wire Instructions: Spectrum Investment Partners LP

Bank Name:      JPMorgan Chase Bank, N.A.
Bank Address:   1166 Avenue of the Americas – 21st
Floor
                New York, NY 10036
Bank Contact:   Erma McPherson
                Telephone (212) 899-1393
                Facsimile (212) 899-2914
ABA #:
Account Name:   Spectrum Investment Partners LP
Account No.:
Reference:      Term Loan and Synthetic LC/Allied
                Holdings

4

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



By:_____
    Name:
    Title:

ASSIGNEE

**SPECTRUM INVESTMENT PARTNERS LP, as Assignee**

By: Spectrum Group Management LLC, as General Partner

By:_____
    Name:
    Title:

NY440406.1/153-03372

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



By:_____
    Name:
    Title:

ASSIGNEE

**SPECTRUM INVESTMENT PARTNERS LP, as Assignee**

By: Spectrum Group Management LLC, as General Partner



By:_____
    Name:
    Title:

Consented to and Accepted:

**THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent**

By: _____

Name:     Barbara J Coffin

Title:      Assistant Vice President

Consented to:

**ALLIED HOLDINGS, INC.**

By: _____

Name:

Title:

**ALLIED SYSTEMS, LTD (L.P.)**

By: _____

Name:

Title:

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    Payments.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1    With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2    With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

7

3.       General Provisions.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.

8




**LSTA**  **TRADE CONFIRMATION**

**To:**    **Buyer Name:**    *SPECTRUM INVESTMENT PARTNERS LP*
       **Contact Person:**
       **Phone No:**
       **Fax No:**

**From:**   **Seller Name:**
       **Contact Person:**
       **Phone No:**
       **Fax No:**
       **Email:**



We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association®, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation shall have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:**

**Seller:** ☑ Principal

**Buyer:**                  SPECTRUM INVESTMENT      ☑ Principal
                      PARTNERS LP [3]

**Credit Agreement:**      This SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30, 2007, is entered into by and among ALLIED HOLDINGS, INC., a Georgia corporation and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as defined below)("Holdings"), ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code ("Systems" and, together with Holdings, the "Borrowers"), CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary Guarantors, the Lenders party hereto from time to time, GOLDMAN SACHS CREDIT PARTNERS L.P. ("GSCP"), as Syndication Agent (in such capacity, "Syndication Agent"), and THE CIT GROUP/BUSINESS CREDIT, INC. ("CIT"), as Administrative Agent (together with its

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[4] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[5] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[6] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[7] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

1 of 3

permitted successors in such capacity, "Administrative Agent") and as
Collateral Agent (together with its permitted successor in such
capacity, "Collateral Agent").

| | |
|---|---|
| **Borrower:** | Allied Holdings, Inc and Allied Systems, Ltd. (L.P.) [5] |
| **Form Of Purchase:** | ☑ Assignment |

**Purchase Amount/**
**Type Of Debt:**

| Purchase Amount [5] | Type of Debt [6] | Facility [7] | CUSIP Number |
|---|---|---|---|
| ▓▓▓▓▓ | Term Loan | TERM LOAN | |
| ▓▓▓▓▓ | Letter of Credit | SYNTHETIC LC | |

| | |
|---|---|
| **Purchase Rate:** | ▓▓▓▓▓ |
| **Accrued Interest:** | ☑ Settled Without Accrued Interest |
| **Credit Documentation**<br>**to be provided:** | ☑ No |
| **LSTA Standard**<br>**Other Terms of Trade:** | |

☑ FOR THIS TRADE ONLY, seller shall pay no more than a total of
one-half of one assignment fee for transactions (specified in this or any
other Confirmation) allocated by an investment manager or advisor to
multiple funds or accounts.

**Trade Specific**
**Other Terms of Trade** [9]**:**
**Subject to:**

Negotiation, execution and delivery of reasonably acceptable contracts
and instruments of transfer, in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter
to the attention of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

If you have any questions, please contact ▓▓▓▓▓▓▓▓▓▓▓▓▓

**SELLER**                                                    **BUYER**

▓▓▓▓▓▓▓                          *SPECTRUM INVESTMENT PARTNERS LP*



---

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation
(including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA
▓▓▓▓ Trade Confirmation and/or the LSTA Standard Terms and Conditions for ▓▓▓▓ Trade Confirmations; if more space
is needed, attach additional pages.





## PURCHASE AND SALE AGREEMENT 

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Buyer: | Spectrum Investment Partners LP |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent |
| Borrower: | Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (i) ▓▓▓▓▓▓▓tstanding principal amount <br> (ii) ▓▓▓▓▓ principal amount |
| Tranche(s): | (i) <br> (ii) ▓▓▓▓▓▓▓▓▓ |
| CUSIP Number(s), if available: | N/A |
| Pre-Settlement Date Accruals Treatment: | ☒ Settled Without Accrued Interest <br> ☐ Trades Flat |
| Type of Assignment: | ☐ Original Assignment <br> ☒ Secondary Assignment |
| Immediate Prior Seller (if any): | |

LSTA EFFECTIVE DECEMBER 2006        Copyright © LSTA 2006. All rights reserved.

# EXHIBIT 10

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., *et al.*,[1] | Case No. 12-11564 (CSS) |
| Debtor. | (Jointly Administered) |

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLIED SYSTEMS HOLDINGS, INC. and its affiliated debtors, | |
| Plaintiff, | Adv. Proc. No. 13-50530 (CSS) |
| BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., AND SPECTRUM INVESTMENT PARTNERS, L.P., | |
| Intervenor(s), | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., MARK J. GENDREGSKE, JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK, | |
| Defendants. | |

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).  The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' AMENDED
COMPLAINT FOR (I) EQUITABLE SUBORDINATION, (II)
RECHARACTERIZATION, (III) BREACH OF CONTRACT, (IV) SPECIFIC
PERFORMANCE, (V) BREACHES OF FIDUCIARY DUTIES, (VI) AIDING AND
ABETTING BREACHES OF FIDUCIARY DUTIES,
(VII) AVOIDANCE AND RECOVERY OF AVOIDABLE TRANSFERS,
AND (VIII) DISALLOWANCE OF CERTAIN CLAIMS**

The Official Committee of Unsecured Creditors (the "Committee" or the "Plaintiff"),

appointed in the above-captioned chapter 11 cases of Allied Systems Holdings, Inc. ("Allied"),

Allied Systems, Ltd. (L.P.) ("Systems") and their U.S. and Canadian subsidiaries (collectively,

the "Debtors" or the "Company"), by and through its undersigned counsel, hereby files, on

behalf of the estates of the Debtors, this Amended Complaint for (I) Equitable Subordination, (II)

Recharacterization, (III) Breach of Contract, (IV) Specific Performance, (V) Breaches of

Fiduciary Duties, (VI) Aiding and Abetting Breaches of Fiduciary Duties, (VII) Avoidance and

Recovery of Avoidable Transfers, and (VIII) Disallowance of Certain Claims (the "Amended

Complaint") against Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance

(Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., Yucaipa American Alliance

(Parallel) Fund II, L.P. (collectively, "Yucaipa"), Mark J. Gendregske ("Gendregske"), Jos

Opdeweegh ("Opdeweegh"), James Frank ("Frank"), Derex Walker ("Walker"), Jeff Pelletier

("Pelletier"), Ira Tochner ("Tochner"), and Joseph Tomczak ("Tomczak," together with

Gendregske, Opdeweegh, Frank, Walker, Pelletier and Tochner, the "Allied Directors" and the

Allied Directors together with Yucaipa, the "Defendants").  The Committee expressly reserves

the right to amend or supplement the parties to, and claims for relief in, the Amended Complaint,

and to assert and file additional cross-claims and/or third-party complaints herein and in any

related adversary proceeding, including, without limitation, *Allied Systems Holdings, Inc. v.

American Money Management Corp. et al.*, Adv. Pro. No. 12-50947 (CSS) (Bankr. D. Del.) (the

"Delaware Action"), which cannot be articulated as a result of the fact that the Committee has

not yet been able to confirm or deny many of the allegations in the related adversary

proceedings, and/or due to the failure of the complainants to particularize their claims in the

related adversary proceedings, and/or due to the fact that the Committee does not have copies of

documents relating to certain of the allegations in the related adversary proceedings.  In support

of the requested relief, the Committee alleges, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This is a case about the efforts of the owner of the majority of equity in the

Debtors to take control over all facets of the Debtors' capital structure in order to protect its

equity investment over the legitimate rights and expectations of the Debtors' secured and

unsecured creditors.  Through various methods, after taking control of the Debtors following

their first bankruptcy proceeding, Yucaipa attempted to strip away the protections afforded to all

creditors of Allied, all in an effort to protect its equity investment from the legitimate exercise by

actual creditors of their rights.

2.      Following the first Allied bankruptcy, Yucaipa took control of approximately

67% of the outstanding equity of Allied and was given the ability to name outright three of the

five directors on Allied's Board of Directors (the "Board").  What is more, Yucaipa effectively

had the power to name all five directors on Allied's Board, as it was empowered, through its

express control of an outright majority of the Board, to select Allied's Chief Executive Officer

and the fourth Board member, as well as the fifth Board member, who, despite being selected by

the creditors' committee in the first Allied bankruptcy, had to be "reasonably acceptable" to

Yucaipa.  Thus, given its controlling influence and express appointment and veto powers, even

the two nominal "independent" directors were under the control of Yucaipa as the appointment

of both so-called "independent" directors was subject to Yucaipa's veto and whim. Accordingly, after Allied's emergence from the first bankruptcy, Yucaipa effectively controlled not only a super-majority of the outstanding equity, and expressly controlled a super-majority of the Board, but it also effectively controlled 100% of the Board.

3.  Not long after Allied emerged from its first bankruptcy in May 2007, its business prospects began to falter. The global economic downturn began to come into view in late 2007 and early 2008, and was particularly felt in the automotive market, the primary market that Allied serviced as a long-haul car carrier.

4.  Accordingly, as early as 2008, Allied was nearing insolvency, if not already insolvent. Indeed, at that time Allied was increasingly failing to meet various debt covenants and failing to make required debt payments. What was needed to keep the business afloat and to navigate the challenging economic times was an equity investment that could be used to service the outstanding debt or a voluntary restructuring to keep Allied's business running until the challenging economic conditions improved. Indeed, Allied's existing creditors pleaded with its owner, Yucaipa, to provide such an infusion of equity for the benefit of all of its stakeholders, including its creditors, its employees and its equity owners.

5.  Yucaipa, however, refused to put equity into Allied, but instead crafted a scheme whereby it would protect its existing equity investment, take control over the outstanding secured debt of the Company and launch a plan to eliminate the existing debt in a manner that would benefit Yucaipa and Yucaipa alone. Additionally, Yucaipa thwarted any possibility of the Company entering into a voluntary restructuring or strategic combination that might have the effect of diluting or eliminating Yucaipa's existing equity. While Yucaipa may not have been required to infuse the Company with additional cash for a new equity investment, what it could

not do was to take steps to prevent the possibility of a voluntary restructuring or the exercise of rights by creditors in order to protect Yucaipa's existing equity investment. However, that is exactly what Yucaipa did, as it utilized its control over Allied to elevate Yucaipa to a status whereby it controlled not only the majority of the equity and effectively 100% of the Board, but also the outstanding secured debt of the company.

6.      First, Yucaipa began to push Allied's creditors to lift the restrictions upon Yucaipa's ability to own outstanding debt (the "<u>First Lien Debt</u>") under the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, as amended (the "<u>First Lien Credit Agreement</u>"). Initially, the lenders under the First Lien Credit Agreement (collectively, any and all such lenders who at any time held First Lien Debt are the "<u>First Lien Lenders</u>") agreed to permit Yucaipa to take a position in the First Lien Debt, but only if Yucaipa purchased that debt in a manner that prevented Yucaipa from taking control over the exercise of remedies by creditors and only in a manner that required Yucaipa to "put its money where its mouth is," by contributing half of any purchase of First Lien Debt as capital into the company. Yucaipa controlled this process from the outset. Indeed, Yucaipa ███████████████████████████████████████████████████████ ████████████████████████ while Allied sat idly by and let its controlling stockholder negotiate the terms of its outstanding First Lien Debt.

7.      Nevertheless, and notwithstanding its control over and input into the amendment of the First Lien Credit Agreement, Yucaipa refused to purchase any First Lien Debt unless it could have complete control over the credit facility, as it had already accomplished in the Second Lien Facility (as defined below). Indeed, under the Third Amendment to the First Lien Credit Agreement (the "<u>Third Amendment</u>"), Yucaipa could not protect its equity investment by

5

purchasing First Lien Debt because any such debt would have been non-voting, and, even if such debt was permitted to vote, the amendment ensured that Yucaipa could not acquire a sufficient amount of First Lien Debt to enable it to block the exercise of remedies for defaults under the First Lien Credit Agreement.

8.      Accordingly, instead of proceeding under the Third Amendment ███████████████,
Yucaipa began to affirmatively seek total control over Allied's outstanding secured debt.  Thus, in the second step of its plan, Yucaipa launched a tender offer for the First Lien Debt in an effort to acquire a majority of the First Lien Debt and control over Allied's existing debt facilities.

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ Indeed, the existing First Lien Lenders knew full well that permitting the majority equity owner to take control over the outstanding secured debt could have disastrous consequences for the Company and its other stakeholders, as it would permit the equity owner to control any bankruptcy of the Company, all in violation of the spirit, if not the letter, of the absolute priority rule.

9.      Not surprisingly, Yucaipa's tender offer failed.  However, Yucaipa was not dissuaded by the reaction of the market and instead undertook a more surreptitious route to attempt to reach its goal of total and complete control.  In 2009, Yucaipa engaged in discussions with the then existing Requisite Lender under the First Lien Credit Agreement, ComVest Investment Partners III, L.P. ("ComVest"), ██████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████.

10.    Accordingly, █████████████████████████████████████████

████████████████████████████████████████████. This

time, Yucaipa eventually convinced ComVest to attempt to use its status as the Requisite Lender

to purport to amend the First Lien Credit Agreement through the purported Fourth Amendment

to the First Lien Credit Agreement (the "Fourth Amendment") to enable Yucaipa to purchase a

majority of the First Lien Debt and ascend to the status of the Requisite Lender, a position

wherein Yucaipa could prevent the exercise of remedies against the Company.

11.    Yucaipa was only able to pull off this scheme by promising ComVest something

that no legitimate or actual lender would do; ████████████████████. Indeed, Yucaipa

treated its purchase of the ComVest debt like equity ███████████████████████████

████████████████████████████████████████████████. But this was

not all. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████.

12.    In the end, by ████████████████████████████████

Yucaipa was able to maneuver itself to the front of the line, protect its equity investment, and

essentially make an equity contribution to Allied without technically doing so.  Through its

manipulative scheme, Yucaipa gave itself the ability to prevent creditors from exercising rights

against the Company that could have benefitted the Debtors and their creditors but would have

adversely affected Yucaipa's equity interests.

13.     What is more, throughout this period, Yucaipa utilized Allied and its limited funds to pay Yucaipa and Yucaipa's advisors to engage in the transactions that comprised Yucaipa's scheme to protect Yucaipa's equity investment.  Allied was obligated to pay millions of dollars to Yucaipa, under the guise of a consulting agreement, whereby Yucaipa purportedly acted on behalf of Allied in negotiations with customers and employees of Allied.  Additionally, Yucaipa caused Allied to pay millions of dollars in legal and other fees to advisors of Yucaipa in connection with ████████████████████████████, as well as in connection with litigation that arose out of Yucaipa's scheme to eliminate any threat to its equity investment. However, that is not all, as Yucaipa went so far as ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████. All told, Yucaipa's actions caused Allied to pay millions of dollars for services of agents and advisors whose services solely benefitted Yucaipa.  All of these funds would otherwise have been available to Allied's legitimate creditors.

14.     Once it had claimed to have taken control of the First Lien Debt, Yucaipa exercised its purported power as the Requisite Lender in ways that caused harm to all creditors of the Debtors.  For instance, when the agent for the First Lien Lenders objected to the Fourth Amendment and Yucaipa's acquisition of ComVest's interests, Yucaipa caused Allied to bring suit against the agent ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████.

15.     Yucaipa's efforts were also aided and enabled by the members of Allied's Board, who failed to fulfill their fiduciary obligations to the stakeholders and creditors of Allied.  The Allied Directors were, or should have been, on notice of the possibility, if not certainty, that Yucaipa's interests, as Allied's primary equity holder, could conflict with the interests of Allied's legitimate creditors.  Indeed, even prior to Allied's emergence from the first bankruptcy the possibility that a conflict between the interests of Yucaipa and Allied was apparent, as many of the prior board of directors noted that Yucaipa's actions could be unlawful.

16.     Allied's Board, however, failed to take anything approaching reasonable steps to avoid the obvious conflicts of interests that arose from Yucaipa's control over the Debtors.  For instance, while Allied nominally established a "Special Committee" (the "Special Committee") of purportedly independent board members to evaluate transactions involving Yucaipa, even if those board members could be deemed to be "independent," the Special Committee process was entirely flawed and deficient.  Indeed, the Special Committee – which never retained any independent counsel or advisors until long into these bankruptcy cases – approved most, if not all, of the Yucaipa transactions, and did so without any independent evaluation.  Instead, the Special Committee approved most, if not all, of these transactions only after the full Board, including the Yucaipa Board members, had already deliberated and received advice from the same advisors who represented the entire Board and whose retention was subject to the whims of Yucaipa and its Board members.

17.     All told, Yucaipa's actions have cost the Debtors' estates and their stakeholders tens, if not hundreds, of millions of dollars that would otherwise be available for distribution to Allied's legitimate and actual creditors.  Moreover, in addition to the payment of millions of dollars in benefits to Yucaipa, the Debtors and their creditors have been deprived of tens of

9

millions of dollars in capital contributions that Yucaipa was required to have made as a result of its acquisition of ComVest's First Lien Debt, which Yucaipa instead has purported to have transformed into First Lien Debt.

18. Accordingly, Plaintiff, derivatively on behalf of the Debtors' estates, brings this action for: (i) equitable subordination of Yucaipa's purported debt holdings to all other claims asserted against the Debtors pursuant to section 510(c) of the Bankruptcy Code; (ii) recharacterization as equity of Yucaipa's purported debt holdings pursuant to section 105(a) of the Bankruptcy Code; (iii) breach of the Third Amendment by Yucaipa; (iv) specific performance of the Third Amendment against Yucaipa; (v) breach of fiduciary duties against Yucaipa; (vi) breach of fiduciary duties against the Allied Directors; (vii) aiding and abetting breach of fiduciary duty against Yucaipa and the Allied Directors; (viii) the avoidance and recovery of fraudulent transfers and obligations against Yucaipa pursuant to sections 548(a) and 550 of the Bankruptcy Code, (ix) the avoidance and recovery of fraudulent transfers, conveyances and obligations against Yucaipa pursuant to sections 544(b) and 550 of the Bankruptcy Code (x) the avoidance and recovery of preferential transfers against Yucaipa pursuant to sections 547 and 550 of the Bankruptcy Code; and (xi) disallowance of certain claims of Yucaipa pursuant to section 502(d) of the Bankruptcy Code.

19. BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P. ("Intervenors") intervened in this proceeding, on behalf of themselves and not on behalf of the Debtors' estates, pursuant to the directions given by the Court at the February 27, 2013 hearing. Additionally, the Intervenors assert a claim for equitable subordination of Yucaipa's purported debt holdings to all other claims asserted against the

10

Debtors arising under the First Lien Credit Agreement and Second Lien Credit Agreement pursuant to section 510(c) of the Bankruptcy Code for harm caused to the holders of such claims.

## JURISDICTION AND VENUE

20.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

21.     This Court has original jurisdiction under 28 U.S.C. § 1334(b), in that this is a civil proceeding relating to the underlying case arising under title 11 of the United States Code.

22.     This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

23.     This Court has personal jurisdiction over Defendants pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

24.     Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## STANDING

25.     The Committee has sought and received consent from the Debtors to have standing to bring this action against the Defendants on behalf of the Debtors' estates, [D.I. 907], and were granted such standing by the Court at the February 27, 2013 hearing.

## THE PARTIES

26.     The Committee, as Plaintiff in this adversary proceeding on behalf of the Debtors' estates, was appointed on June 20, 2012, pursuant to Section 1102 of the Bankruptcy Code.[2] Pursuant to Section 1103 of the Bankruptcy Code, the Committee has investigated and continues to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors.

---

[2] The Committee consists of Pension Benefit Guaranty Corporation; Central States, Southeast and Southwest Pension Fund; Teamsters National Automobile Transporters Industry Negotiating Committee; and General Motors LLC.

27. Intervenor BDCM Opportunity Fund II, LP is a Delaware limited partnership, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830.

28. Intervenor Black Diamond CLO 2005-1 Ltd. is a Cayman Islands limited liability company, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich CT 06830.

29. Intervenor Spectrum Investment Partners, L.P. is a Delaware limited partnership, with its principal place of business at 1250 Broadway, New York, NY 10001.

30. Upon information and belief, Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P. are Delaware limited partnerships headquartered at 9130 West Sunset Boulevard, Los Angeles, California 90069.

31. Upon information and belief, Mark J. Gendregske is a citizen of the state of Georgia and the chief executive officer and a director of Allied.

32. Upon information and belief, Jos Opdeweegh is a citizen of the state of Illinois, had previously served as an operating partner and advisor at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and was a director of Allied.

33. Upon information and belief, James Frank is a citizen of the state of New York, is employed by The Yucaipa Companies, LLC, an affiliate of Yucaipa, and a director of Allied.

34. Upon information and belief, Derex Walker is a citizen of the state of California, a partner at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and a director of Allied.

35. Upon information and belief, Jeff Pelletier is a citizen of the state of California, is an operating partner at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and is a director of Allied.

36. Upon information and belief, Ira Tochner is a citizen of the state of California, is a partner at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and is a director of Allied.

37. Upon information and belief, Joseph Tomczak is a citizen of the state of Illinois and was an operating partner at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and was a director of Allied.

## FACTUAL ALLEGATIONS

38. Allied is a leading provider of distribution and transportation services to the automotive industry in North America, primarily focused on the delivery of new automobiles from manufacturing facilities to dealerships.

(a) **Allied's 2007 Bankruptcy, Yucaipa's Acquisition of the Majority of the Equity in Allied, and Board Members' Early Concerns About Yucaipa**

39. Unfortunately, it is now clear that at least some of the seeds for the Debtors' current financial difficulties were sewn at the time of its last exit from bankruptcy in May 2007, which saw Yucaipa ascend to the role of Allied's majority and controlling shareholder with the power to appoint three of its five directors and the ability to control Allied's senior management.

40. Allied filed its first petition for relief under the Bankruptcy Code on July 31, 2005 in the United States Bankruptcy Court for the Northern District of Georgia (the "2005 Bankruptcy"). In or about May 2006, Yucaipa purchased a majority stake of the then existing Senior Unsecured Notes of Allied at a substantial discount to their par value.

41. After Yucaipa's acquisition of its interests in Allied, and during the 2005 Bankruptcy process, members of Allied's then board of directors were already focused on Yucaipa's tactics and voiced concerns about Yucaipa damaging Allied and its prospects. Among other things, members of the board raised significant concerns about the propriety of Yucaipa's actions taken purportedly on behalf of Allied and concerns about the amount of control that

Yucaipa was exerting over Allied's business. For instance, at a February 9, 2007 special meeting of the board, a board member raised his concern that there was "tort[i]ous interference" with the Company's business or contracts by Yucaipa.

42. During a February 20, 2007 special board meeting, another board member "indicated that he believed that Yucaipa is in the driver's seat and he and [another board member] agreed that once the Company[] signs the addendum, we would not be able to oppose what Yucaipa says or wants to do." At that time, the board discussed creating "value" for "everyone, not just Yucaipa, even in the circumstance if equity is out of the money" and the desire that the "process . . . allow the Company some control over this issue."

43. Additionally, as early as February 12, 2007, the board discussed whether Yucaipa had breached a confidentiality agreement that it had with Allied. The board even discussed whether Allied should bring a tortious interference claim against Yucaipa—so serious were these concerns, the board asked Allied's regular outside counsel to explore potential claims against Yucaipa.

44. By mid-March 2007, it was apparent to the board that, "in practical terms, Yucaipa may really be running and controlling the process."

45. Indeed, one member of the board described the situation in stark terms at a March 16, 2007 special board meeting, stating, "he believes that the Board has failed in its efforts in regard to the involvement of Yucaipa in the process." He was concerned "that the Board has exposure because the Company let Yucaipa do this to the Company," when it "should have required Yucaipa to sign some sort of agreement precluding it from" doing so, but "the Company never did" require such an agreement.

46.     When Allied emerged from bankruptcy in May 2007, Yucaipa was in total control of Allied.  As part of the exit plan, Yucaipa was permitted to name three of the five members of the Board, giving it a permanent majority and complete control of the board of directors.  Not surprisingly, none of the prior directors who had voiced concerns about Yucaipa's actions were retained as members of the Board of the reorganized Allied.

47.     Moreover, the Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. And Affiliated Debtors Proposed By The Debtors, Yucaipa, And The Teamsters National Automobile Transportation Industry Negotiating Committee (the "2007 Reorganization Plan"), approved by the United States Bankruptcy Court for the Northern District of Georgia on May 18, 2007 and effective as of May 29, 2007, demonstrates that the "independent" directors were hardly independent at all.  Indeed, one of the two so-called "independent" directors was the Chief Executive Officer of the Company, "who shall be selected by Yucaipa and shall be reasonably acceptable to TNATINC [i.e., the Teamsters] and the Creditors' Committee," in addition to the "three other members selected by Yucaipa."  (Allied Form 8-K, dated May 24, 2007, at Ex. 2.1 § 7.2.)

48.     The other "independent" director had served as the financial advisor to the creditors' committee in the 2005 Allied Bankruptcy.  While this member was not employed by Yucaipa or Allied, the 2007 Reorganization Plan makes clear that even though this individual was to be "chosen by the Creditors' Committee," he or she "shall be reasonably acceptable to Yucaipa."  (Id.)  Thus, following Allied's emergence from bankruptcy in May 2007, Yucaipa effectively controlled all five Board members:  it directly appointed 3 directors, its selection of the CEO and fourth Board member was subject only to being "reasonably acceptable" to certain

other creditors, and the fifth Board member, while chosen by the creditors' committee, was to be "reasonably acceptable to Yucaipa."

49.     In addition to its ability to control Allied's Board, through the 2007 Reorganization Plan, Yucaipa held 67% of the equity of Allied, which has increased to an approximate 70% equity stake.

50.     Through the 2005 Bankruptcy, Yucaipa acquired approximately two-thirds of a series of unsecured notes that Allied had issued in the principal amount of $150 million; it facilitated the $15.1 million financing of certain rigs represented by certain notes that were converted to equity; it supported the conversion of general unsecured debt into equity under the 2007 Reorganization Plan, of which Yucaipa held 67%; and it aided Allied in securing exit financing.  Accordingly, through its below-par purchase of Allied's then existing Unsecured Notes, Yucaipa was able to cancel the existing equity and take complete control over Allied thereafter.  Not only did Yucaipa own the majority of the newly issued equity in Allied, but it controlled at least two-thirds of the Board and, in reality, controlled one hundred percent of the Board.

(b)     **The Secured Debt Structure After Allied's Exit from its First Bankruptcy**

51.     Allied exited bankruptcy with $315 million of exit financing comprised of a $265 million senior secured first priority credit facility (the "First Lien Facility"), and a $50 million second lien facility (the "Second Lien Facility").

52.     The First Lien Facility was comprised of $180 million of term loans; a $35 million revolving credit facility from The CIT Group/Business Credit, Inc. ("CIT"); and a $50 million letter of credit facility.

53.     The First Lien Facility is governed by the First Lien Credit Agreement, entered into by and among Allied Holdings, Inc. ("Holdings") and Allied Systems Ltd (LP) ("Systems"),

16

as Borrowers, and certain subsidiaries of Holdings, as Guarantors, various lenders, Goldman

Sachs Credit Partners L.P. ("Goldman Sachs"), as Lead Arranger and Syndication Agent, and

CIT, as Administrative Agent and Collateral Agent.

54.   The Second Lien Facility was comprised of $50 million of loans.

55.   The Second Lien Facility is governed by that certain Second Lien Secured Super-

Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007 (the

"Second Lien Credit Agreement"), entered into by and among Holdings and  Systems as

Borrowers and certain subsidiaries of Holdings as Guarantors, various lenders, and Goldman

Sachs, as Lead Arranger, Syndication Agent, Administrative Agent and Collateral Agent.

56.   Allied has been in default under both the First Lien Credit Agreement and Second

Lien Credit Agreement since August 2008.  Specifically, and only by way of example among

many other Events of Default, Allied has failed to pay required principal and interest

payments—at times at Yucaipa's express insistence—even when Allied had the cash on hand to

make the payments.

**C.    The First Lien Credit Agreement and Second Lien Credit Agreement Were Expressly Drafted and Always Intended to Prevent Yucaipa, as the Majority Equity Holder, from Gaining Control Over the Outstanding Debt**

57.   Given the size of Yucaipa's equity holdings, its control of Allied's Board and,

indeed, its control over all of Allied, it was always intended that Yucaipa would be precluded

from taking control over the First Lien Debt and the outstanding debt under Second Lien Facility

(the "Second Lien Debt").  This intention was hardly surprising and, indeed, standard in such

secured debt offerings.  Secured creditors had the right to know that the majority equity holder

would not attempt to prevent creditors from enforcing rights that could harm the interests of

secured creditors.  Similarly, unsecured creditors and other stakeholders wanted to ensure that

Yucaipa, as the majority equity holder, would not be able to control the outstanding secured debt of the company in a manner that would favor equity holdings over legitimate debt holders.

58.     The First Lien Credit Agreement set forth a mechanism designed to ensure that a majority of the holders of the First Lien Debt would be able to control most of the actions taken by the lending group.  In particular, the First Lien Credit Agreement provides that "Requisite Lenders"—defined as holders of debt under the First Lien Facility representing more than 50% of the sum of the aggregate "Term Loan Exposure" of all lenders, the aggregate letter of credit exposure, and the aggregate revolving credit exposure (First Lien Credit Agreement § 1.1)— have the power to make certain key decisions affecting all First Lien Lenders.

59.     Among other things, the Requisite Lenders under the First Lien Facility have the authority to declare or not declare "Events of Default" under the First Lien Credit Agreement. (Id. §§ 8.1, 9.8.)

60.     The First Lien Credit Agreement expressly prevented Yucaipa from becoming eligible to become a Requisite Lender under the First Lien Credit Agreement because, as Allied's majority shareholder and "Sponsor," it was not a lender under the First Lien Facility and could not become such a lender.  (Id. §§ 1.1, 10.6.)

61.     The First Lien Credit Agreement was amended or, in the case of the "Fourth Amendment," purportedly amended, on four occasions.  The Third Amendment[3] and purported Fourth Amendment,[4] are relevant to this proceeding.

---

[3] The Third Amendment refers to that certain Amendment No. 3 To Credit Agreement and Consent, dated as of April 17, 2008, to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007.

[4] The Fourth Amendment refers to that certain Amendment No. 4 To Credit Agreement, dated as of August 21, 2009, to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dates as of May 15, 2007.

62.    The Second Lien Credit Agreement was amended on three occasions.  The

"Second Lien Third Amendment" is relevant to this proceeding.

63.    Notwithstanding the clear prohibition in the respective First Lien Credit

Agreement and Second Lien Credit Agreement that prohibited Yucaipa from acquiring the

secured debt of Allied, Yucaipa refused to acknowledge or abide by those terms.  ████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Yucaipa would

subsequently ██████████████████ that it could take control over the secured debt

facilities of Allied.

      (d)    **Yucaipa Causes the Second Lien Credit Agreement to be Amended and
       Acquires the Outstanding Second Lien Facility**

64.    On May 6, 2008, as part of Yucaipa's scheme to take control over the entirety of

Allied's financial structure, Yucaipa, acquired the face amount of $40 million in term loans

under the Second Lien Facility and exchanged $20 million of it for 21,396 shares of preferred

stock that is convertible into common stock.  The $40 million face value acquired by Yucaipa

represented approximately 80% of the outstanding amount of the term loans under the Second

Lien Facility.  Yucaipa acquired its holdings of the Second Lien Facility at a substantial discount

to its par value.

65.    In connection with Yucaipa's acquisition of the Second Lien Debt, the Second

Lien Credit Agreement was amended to allow Yucaipa to become an Eligible Assignee with no

restrictions on its right to vote or control the Second Lien Facility.  Accordingly, Yucaipa

became the Requisite Lender under the Second Lien Facility.  Yucaipa, not Allied, controlled the

negotiation of the amendment to the Second Lien Facility that enabled Yucaipa to take control

over the Second Lien Facility.

(e)     **Yucaipa Causes the Third Amendment to the First Lien Facility to be Executed by Allied to Permit Yucaipa to Purchase a Limited Amount of First Lien Debt**

66.     Not long after Allied emerged from the first bankruptcy, notwithstanding the terms of the First Lien Credit Agreement but consistent with Yucaipa's belief ████████ ████████████████████, Yucaipa began to push to acquire First Lien Debt. ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████

67.     ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████     By contrast, Allied took a back seat and went along for the ride while Yucaipa ████████████████████████████████.

68.     ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

69.     Under the Third Amendment, a "Restricted Sponsor Affiliate" was defined as the "Sponsor and its Affiliates," and, under the First Lien Credit Agreement, the Sponsor is Yucaipa. (First Lien Credit Agreement § 1.1.)  Accordingly, in light of the Restricted Sponsor Affiliate definition and under the terms of the Third Amendment, Yucaipa could acquire certain First Lien Debt.  However, Yucaipa was precluded from becoming a Requisite Lender under the Third

Amendment, and, to the extent Yucaipa decided to acquire any First Lien Debt, it would be

subject to the following restrictions, among others:

- Yucaipa could not acquire more than 25% of the aggregate principal amount of the Term Loan Exposure held by all Lenders (Third Amendment § 2.7(c));

- Yucaipa could not acquire more than $50 million of the principal amount of Term Loans (id. § 2.7(c));

- Yucaipa could not exercise any voting rights that it would otherwise have as a Lender, including the right to consent to any amendment to the Credit Agreement or the right to vote its debt in any Allied bankruptcy (id. §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)); and

- Within ten days of its acquisition of any Term Loans, Yucaipa was required to make a capital contribution to Allied of at least 50% of the aggregate principal amount of those Term Loans (id. § 2.7(e)).

70.     Notwithstanding its restrictions, the fact that the Third Amendment permitted

Yucaipa, as a Sponsor, to acquire any of Allied's First Lien Debt was a unique achievement for

Yucaipa. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

71.     ███████████████████████████████████████████████████████

███████████████ Yucaipa was not interested in acquiring any debt subject to the

restrictions ███████████████ in the Third Amendment.  Indeed, in these bankruptcy proceedings,

Yucaipa has averred that it "never intended to purchase any debt claims that would make it

bound by the Third Amendment's provisions."  (Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I.

65 at ¶25(a).)  Yucaipa has made plain to this Court that it "never would have acquired any first

lien debt while the Third Amendment's restrictions and conditions limiting Yucaipa's potential

ownership rights existed." (Id. at ¶ 50.)   Accordingly, unsatisfied by the terms of the Third

Amendment that it solicited and ███████, Yucaipa continued with its scheme to take total

control over the financial structure of Allied in order to protect its equity investment, to the

detriment of all of Allied's other creditors.

<blockquote>(f)   <b>Yucaipa's Control Over Allied's Purported Special Committee's Review of Potential Yucaipa Transactions</b></blockquote>

72.    During the spring of 2008, in connection with the Third Amendment that Yucaipa

apparently never actually wanted, Yucaipa continued to pursue ways to take total control over

the financial affairs of Allied.  Throughout this period, the Allied Board simply went along for

the ride.  Indeed, notwithstanding the appointment of a so-called "Special Committee" of

allegedly independent directors, who were supposed to evaluate any transaction involving

Yucaipa, including the Third Amendment, to ensure that it was beneficial to Allied and its

stakeholders, the Board, and ultimately the Special Committee, largely sat idly by ████████

████████████████████████████████████████████████████████████

████████████████████████

73.    On March 31, 2008 the Special Committee was formed.  The Committee

consisted of the two purportedly "independent" directors not formally appointed by Yucaipa,

Brian Cullen ("Cullen") and Defendant Gendregske, with Cullen appointed as its Chairman.

Other individuals, including Allied's in-house and outside counsel, regularly attended Special

Committee meetings.

74.    The purpose of the Special Committee was purportedly to negotiate on behalf of

Allied in connection with any transaction in which Yucaipa would be involved.  This necessarily

would have included the Third Amendment, which for the first time permitted Yucaipa to

acquire First Lien Debt.  However, neither Allied nor its Special Committee took any control

███████████████████████████████████████████████████████

████████████████████████.

75.     In addition, the Special Committee never took any steps to ensure that it was represented by or advised by independent professionals who could have taken steps to ensure that the interests of Allied, as opposed to those of Yucaipa, were being represented at the bargaining table over the Third Amendment or any subsequent transaction involving Yucaipa. At no time did the Special Committee retain independent counsel or independent financial advisors to assist its considerations of proposed transactions and whether to make certain recommendations to the Board.[5]  Indeed, throughout its entire existence until well into these chapter 11 cases, the Special Committee has relied solely on the legal and other advisors for the Debtors.

76.     At an April 1, 2008 Special Committee meeting, a transaction was discussed whereby Yucaipa would purchase Allied's Second Lien Debt, potentially at a discount, and then would turn around and forgive that debt as a contribution to Allied in exchange for equity.  Two weeks later, the Special Committee discussed Yucaipa's willingness to acquire and then convert up to $25 million of Second Lien Debt into equity, subject to a material adverse change clause.

77.     Three days later, on April 17, 2008, the Special Committee was advised that Defendant Walker, on behalf of Yucaipa, had stated that Yucaipa was only willing to convert $20 million of Second Lien Debt into equity, despite the fact that Allied's negotiators had advised that they would be more comfortable at the previously discussed $25 million conversion amount.  Nevertheless, at the conclusion of the Special Committee's April 17, 2008 meeting, the

---

[5] Only after months had passed in these current bankruptcy cases did the Special Committee ever retain independent counsel.

Special Committee unanimously agreed to return a term sheet to Yucaipa containing the $20 million commitment that Yucaipa preferred.

78.     Yucaipa would ultimately be unwilling, however, ███████████████████ ██████████████████████████████████████████████. Notwithstanding the enactment of the Third Amendment that ██████████████████████████ ███████████████████████████████████████████████████████████ ██████████

(g)     **Yucaipa Continues to Seek Approval to Acquire a Majority of the First Lien Debt to Protect its Equity Investment**

79.     Throughout 2008, Yucaipa was ███████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████

80.     ████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████

81.     ████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████

82. During the same time that Yucaipa was cementing its control, Allied was suffering financially and was informed of the heightened duties that it owed to its creditors as a result. On December 10, 2008, Cullen advised the Board that it should "consider the possibility that the Company was in the zone of insolvency and may have altered responsibilities as a consequence."

83. Nevertheless, while discussions concerning Yucaipa's potential acquisition of First Lien Debt continued, the Board and the Special Committee failed to take even rudimentary steps to ensure that any transaction would be fair to Allied and its stakeholders. For instance, on January 24, 2009, the Special Committee determined that it would not seek a fairness opinion concerning a contemplated transaction where Yucaipa would only acquire a minority amount of the First Lien Debt. Ultimately, Allied failed to ever obtain a fairness opinion concerning any acquisition of First Lien Debt by Yucaipa, including when Yucaipa ultimately purported to acquire the majority of outstanding First Lien Debt.

84. Notably, while the Special Committee and the Board failed to take steps to protect the interests of Allied and its stakeholders, the true motives of Yucaipa were obvious to, and known by, Allied's directors. For instance at a February 3, 2009 Special Committee meeting, Cullen stated in no uncertain terms that "he believed that Yucaipa was putting more money into the Company in an effort to retain and protect its ownership position." The Special Committee shared Cullen's views, as the minutes from that same meeting reflect that the "Special Committee noted that Yucaipa's additional infusion of cash in the Company suggested that it would remain willing to augment the Company's cash position to protect its investment." Still, the Allied Directors failed to take appropriate steps to ensure that the interests of the Company and its creditors, as opposed to the interests of Yucaipa, were protected.

85. Throughout this time, Yucaipa continued to 

86.

87.

88.                                                                    , on
February 4, 2009, Yucaipa launched a tender offer to the existing holders of the First Lien Debt
that, if successful, would have permitted Yucaipa "to be Lenders under [First Lien] Credit

Agreement without any capital contributions to [Allied] and without any limit on the amount of

Loans and LC Deposits that can be purchased." As part of the tender offer, Yucaipa offered to

purchase the outstanding debt at substantial discounts to par, namely term loans and letter of

credit deposits for approximately 15 cents on the dollar and revolving credit commitments for

approximately 13 cents on the dollar. Simultaneously, Yucaipa caused Allied to seek to secure

lender consent to an amendment to the First Lien Credit Agreement that, if successful, would

have permitted Yucaipa to become the Requisite Lender under the First Lien Facility.

89.     However, the existing lenders to the First Lien Facility would not tender or

consent to Yucaipa's desire to take control over the First Lien Facility. Accordingly, the

proposed tender offer and amendment strategy failed.

     (h)    **Yucaipa Initiates Its Backup Plan to Take Total Control Over Allied
Utilizing ComVest to Enable Yucaipa to Become the Requisite Lender Over
the First Lien Facility**

90.     Having failed in its efforts to convince the First Lien Facility lenders to permit

Yucaipa to take total control over the First Lien Facility, Yucaipa initiated its backup plan to take

complete control over Allied. Accordingly, Yucaipa turned its sights on another entity,

ComVest, to give Yucaipa the total control it so desired.

91.     At a March 6, 2009 Allied Board meeting, Defendant Walker informed the Board

about a contemplated transaction between Yucaipa and ComVest to acquire ComVest's Allied

debt holdings. At that meeting, Defendant Walker advised the Board that

> Yucaipa and Com-Vest reached an agreement under which Com-
> Vest would retain its debt holdings, but would allow Yucaipa full
> voting control over those holdings, as well as any future Allied
> debt acquired by Com-Vest. Com-Vest further agreed not to
> undertake any other activities in the carhaul sector. Com-Vest and
> Yucaipa reached an agreement as to how the two companies would
> share any recovery in the event of a liquidation by Allied. Under
> that agreement, any payments to Com-Vest/Yucaipa would be
> provided first to Com-Vest for the first $70 million, then to

Yucaipa up to an amount equal to the amount invested by Yucaipa in purchasing first lien debt, with any remaining funds shared between the companies pro-rata. Yucaipa planned to launch a tender offer for remaining first lien debt at twenty-three cents on the dollar. Finally, under the agreement, Allied was to provide Com-Vest a warrant for 25% of the outstanding shares in Allied. . . . Mr. Walker pointed out that in exchange for the 25% of the Company's equity, the Company would receive an amendment that would cure all defaults and set covenants at a level selected by the Company as achievable. It would also put requisite lender approval in the hands of Yucaipa, more closely aligning the interests of the Company and those of the requisite lenders.

92.     After Defendant Walker's presentation, the Board "went on to discuss the ramifications of the proposed transaction, including the impact of the proposed transaction on minority shareholders, and other lenders." As part of that discussion, Defendant Walker stated that ComVest's intention, absent an agreement on the proposed transaction, would be to "push the Company into bankruptcy and force a 363 sale in which it would likely credit bid its loans in order to obtain an order to purchase the Company."

93.     At this Board meeting, Cullen inquired as to whether a Special Committee meeting was needed and whether the Board should obtain a fairness opinion. The Board "directed the Special Committee to meet and return to the full Board with a recommendation on whether to authorize the Company to enter into the proposed transaction." The Board meeting was simply suspended momentarily to permit the Special Committee to meet. As usual, the Special Committee received no independent advice regarding the proposed transaction. Shortly thereafter the Board reconvened, and the Special Committee advised that it had unanimously decided to recommend that the Board approve of the proposed transaction and what would ultimately lead to the Fourth Amendment.

94.     Yucaipa's intent throughout this period was clear. Having failed in earlier attempts to convince the holders of the First Lien Debt to voluntarily consent to permit Yucaipa

28

to become the Requisite Lender, Yucaipa would utilize Allied in whatever fashion it desired in order to effectuate Yucaipa's efforts to protect its equity investment.

95.    Yucaipa's intentions throughout this period were known to the Allied Directors. All involved understood that Yucaipa, having already succeeded in its efforts to take control over the Second Lien Facility, was seeking approval to obtain First Lien Debt in an effort to support its equity investment in Allied.  Nevertheless, the Allied Directors took no measures to stop Yucaipa, or even to ensure that any takeover by Yucaipa of the First Lien Facility would not be inimical to the interests of Allied or its creditors.

    (i)    **Yucaipa Causes Allied and the Allied Directors to Fail to Negotiate with the First Lien Lenders Concerning a Consensual Restructuring of the First Lien Facility**

96.    Notwithstanding Defendant Walker's representation to the Allied Board in March 2009, Yucaipa and ComVest did not have any agreement at that time.  To the contrary, ComVest was interested in pursuing a restructuring of the outstanding debt of Allied in a manner that would have involved a potential consensual reorganization of Allied's debt structure.

97.    In the spring and summer of 2009, ComVest repeatedly approached Allied in an effort to engage in discussions concerning a potential conversion of the outstanding First Lien Debt into equity of a reorganized Allied.  The precise parameters of this potential consensual restructuring were not set in stone, but could have taken a number of different forms, including potentially a strategic combination with other parties in the long-haul auto industry or other potential structures.

98.    The benefits of a potential voluntary restructuring of the outstanding debt of the Company should have been clear to the Allied Directors at the time.  Indeed, by the spring of 2009, Allied had been in continuous default of its obligations under the First Lien Facility for almost a year.  A voluntary restructuring of the First Lien Debt in a manner that involved the

conversion of the outstanding debt into equity of a reorganized Allied would have significantly benefitted Allied and its creditors, as it could have potentially de-levered Allied's balance sheet. Accordingly, given the obvious benefits to the Company and its stakeholders, it was incumbent upon the Allied Directors to at least pursue discussions with ComVest, as the Requisite Lender, concerning a potential voluntary restructuring.

99.     The one party that would not have benefitted, however, from such a voluntary restructuring or strategic combination would have been Yucaipa, as the controlling existing equity holder of Allied.  In particular, to the extent that the Company entered into such a restructuring or combination, it is likely, if not certain, that Yucaipa would have seen the value of its existing equity holdings eliminated or, at a minimum, substantially diminished and would potentially see its super-majority control over Allied be eliminated or at least reduced.

100.     Unfortunately, the Allied Directors failed to even attempt to engage or direct the officers of Allied to engage in discussions or negotiations with ComVest concerning a potential voluntary restructuring of Allied's outstanding First Lien Debt.  Although the precise reasons for the failure of the Allied Board to fulfill its fiduciary obligations is not known to date, given Yucaipa's control over the Board and its decision making, it is hardly surprising that Allied failed to even attempt to engage in discussions concerning a potential transaction that could have greatly enhanced the value of the Company where it would not advance Yucaipa's self-serving interests.

101.     Accordingly, ComVest, having been rebuffed in its efforts to effectuate a voluntary out-of-court restructuring of Allied's debt structure, went back to the drawing board and began serious negotiations with Yucaipa.

(j)    **Yucaipa Causes Allied to Fail to Pay Under the First Lien Facility In Order to Benefit Yucaipa in its Negotiations with ComVest**

102.    Not content to simply pursue its backup plan to take control over Allied's entire financial structure, Yucaipa also took measures to put pressure on the existing First Lien Lenders through its control over Allied's equity and its Board. What is more, Yucaipa utilized Allied's existing funds as a cudgel to assist Yucaipa in connection with negotiations with ComVest, all to the detriment of the existing creditors of Allied.

103.    For example, at an August 3, 2009 Board meeting called for the purpose of discussing Allied's "liquidity, especially with respect to the approximately $4.8 million interest payment due to the first lien lenders the next day," the Board was advised that Defendant Walker "had suggested that the Company might be well-advised not to make the payment."

104.    At that meeting, Defendant Walker "updated the Board on the status of negotiations with ComVest, stating that ComVest and Yucaipa were back in discussions," that Yucaipa believed a deal could be reached, but "warned, however, that it was critical that the Company have adequate liquidity to provide a sufficient runway for negotiations, and that a free fall into bankruptcy could be highly disruptive to the Company and to the ongoing negotiations." Defendant Walker further "advised that based upon his conversations with ComVest, he did not believe that failure to make the payment would lead to precipitous action by the lenders or anyone else", because, according to Defendant Walker, "ComVest, as the Requisite Lenders, would not seek to exercise any rights and would not allow others to do so given the current state of negotiations between ComVest and Yucaipa."

105.    At this same meeting, Scott Macaulay, Allied's chief financial officer, advised the Board that Allied had $16.5 million of cash on hand, of which $12.3 million was immediately available. Of that $12.3 million, $2 million was needed for insurance premium payments,

leaving, as a practical matter, $10.3 million in immediately available cash on hand. Mr. Macaulay advised that making the interest payment of $4.8 million to the First Lien Facility lenders would leave Allied with $5.5 million of immediately available cash on hand. Accordingly, Allied had sufficient funds available to make its payment and to stay current on its payment obligations under the First Lien Facility.

106. Nevertheless, notwithstanding the fact that Allied had sufficient liquidity to pay debt service under the First Lien Facility, in order to facilitate Yucaipa's interests in negotiations with ComVest, Defendant Walker's motion that Allied forego the quarterly interest payment that it owed the First Lien Facility lenders on August 4, 2009 carried unanimously. Based upon the information disclosed to the Committee to date, it does not appear that the Special Committee ever met to consider or evaluate Defendant Walker's motion, notwithstanding that it was clearly in Yucaipa's interests (but not the Debtor's) for Allied not to make the payments owing under the First Lien Facility.

107. Of course, these were hardly the only defaults by Allied under the First Lien Credit Agreement. Indeed, since August 2008, Allied had been in continuous default under the First Lien Credit Agreement, as it failed to meet financial covenants set forth in the First Lien Credit Agreement. Additionally, Allied later disclosed that as of August 30, 2008, it had failed to fulfill its requirement under the First Lien Credit Agreement to disclose Yucaipa's acquisition of Second Lien Debt in June and July 2008. The failure to disclose Yucaipa's purchase of that debt also constituted an Event of Default under the First Lien Credit Agreement. Yucaipa directed or caused Allied to fail to disclose the acquisition of debt by Yucaipa in June and July 2008.

    (k)      **Yucaipa Completes Its Backup Plan to Take Total Control Over Allied's Financial Structure, as it ▌Causes Allied to Execute The Purported Fourth Amendment**

108.     While it was causing Allied to further default on its obligations to its creditors, Yucaipa continued negotiations with ComVest to complete its backup plan to cement its total control over Allied.  During this time, Yucaipa ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

109.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

110.     ███████████████████████████████████████████████████████████████████████████████████████████



111.     ████████████████ Yucaipa had struck a deal with ComVest whereby those parties agreed to amend the terms of the First Lien Agreement to provide precisely the opposite of what was always intended, namely that Yucaipa would now be permitted to control the entirety of Allied's debt structure. ███████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

112.     ███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ The transaction was ultimately approved by Allied's Board on August 19, 2009, at the recommendation of the purportedly independent Special Committee.  Despite the approval, neither Allied's Special Committee, nor the full Board, played any significant role in the negotiations of the terms of the

Fourth Amendment. Instead, the Allied Directors simply went along for the ride as Yucaipa completed its backup plan to cement control over Allied.

113. 

114. The purported Fourth Amendment purported to eliminate all of the Third Amendment's restrictions on Yucaipa's ability to obtain First Lien Debt. The Fourth Amendment purports to amend the First Lien Agreement's definitions of "Eligible Assignee" and "Term Loan Exposure" such that Yucaipa's ability to acquire certain First Lien Debt is no longer capped. (Fourth Amendment § 2.1(b).) It further purports to eliminate the voting restrictions for debt obtained by Yucaipa, purports to remove the $50 million cap, and purports to eliminate the capital contribution requirement. (Id. § 2.4(a).)

115. ████████████████████████████████████ Yucaipa now purports to hold "$114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments (i.e. deposits to support letter of credit), totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement," according to Yucaipa's Cross-Claims. (Adv. Pro. No. 12-50947

(Bankr. D. Del.), D.I. 65 at ¶17.) ████████████████████████████

█████████████████████

116.  ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████

117.  Following the execution of the Fourth Amendment, ████████████████

████████████████████████████████████████████  Yucaipa contended that it was the

Requisite Lender under the Credit Agreement.

**(l)  Having Executed its Backup Plan Through the Fourth Amendment, Yucaipa Plans to Eliminate the Threat to Its Equity Position**

118.  Having succeeded in its backup plan to take control over the entire secured debt

structure of Allied, Yucaipa next turned to planning a reorganization of Allied that would further

cement and protect its equity holdings in the Company.

119.  ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

120.     During this time, Yucaipa pursued discussions with other parties and entities that
had an interest in the First Lien Facility concerning the potential of a reorganization of Allied
whereby the existing debt of Allied would be converted to equity or wiped out.  Neither Yucaipa
nor the Allied Directors considered during this time whether such a reorganization strategy
would be consistent with the fiduciary obligations owed by Yucaipa and the Allied Directors to
Allied as a whole and its stakeholders, including its creditors.

121.     Additionally, following the execution of the Fourth Amendment, ████████

████████████████████  Yucaipa took additional steps to protect Yucaipa's equity position at the
expense of Allied's legitimate creditors.  As noted above, beginning in August 2009, Allied, at
Yucaipa's direction, began to refuse to make regularly scheduled payments of principal and
interest under the First Lien Facility.  Additionally, Yucaipa also caused Allied to fail to
reimburse collateral accounts that secured the First Lien Facility's letter of credit facility, to
attempt to terminate certain control agreements, and to retain excess cash all in violation of the
terms of the First Lien Credit Agreement.  These steps frustrated the rights of secured and
unsecured creditors to attempt to remedy defaults committed by Allied, all during a period in
which Allied was insolvent and in default of its obligations to creditors.

(m)     **Litigation Surrounding the Purported Fourth Amendment**

122.     Although Yucaipa has claimed to be the Requisite Lender under the Credit
Agreement in light of the purported Fourth Amendment, its claim to that position has been hotly

contested around the country and has been an issue in at least three separate proceedings (the third of which includes multiple adversary proceedings in the Delaware Action).[6]

> **(i)**     **The Georgia Litigation**

123.     Approximately one month after the execution of the Fourth Amendment and affiliated agreements, the majority of the other First Lien lenders objected to Yucaipa's acquisition and instructed CIT, which acted as the Administrative Agent and Collateral Agent under the First Lien Credit Agreement, to object to Yucaipa's claim to be the Requisite Lender and to challenge the validity of the Fourth Amendment.

124.     Following CIT's objection to the Fourth Amendment, Yucaipa and Allied, at Yucaipa's direction, brought suit against CIT in the Superior Court of Fulton County, Georgia (the "Georgia Action"),[7] seeking, among other things, a declaratory judgment that the Fourth Amendment was valid and that Yucaipa was the Requisite Lender. In response, CIT filed counterclaims seeking, among other things, a declaration that the Fourth Amendment was invalid and stating claims for breach of fiduciary duty against the Allied Board and aiding and abetting breach of fiduciary duty against Yucaipa.

125.     Shortly after filing a motion for partial summary judgment in its favor, CIT entered into a settlement agreement with Allied and Yucaipa. The Settlement Agreement made clear that the settlement was made solely by CIT in its individual capacity and did not release any claims that may have existed on behalf of "any other person."

---

[6] The Intervenors commenced on January 25, 2013 an adversary proceeding before this Court related to the same issues. *BDCM Opportunity Fund II, LP, et al. v. Yucaipa American Alliance Fund, I, LP et al.*, Adv. Pro. No. 13-50499 (CSS) (Bankr. D. Del.).

[7] In addition to the Georgia Litigation, the purported Fourth Amendment spawned a separate lawsuit against ComVest in Florida state court. In that case, Michael T. Riggs and affiliated entities sued ComVest, claiming that by entering into the transaction with Yucaipa that ComVest had breached various letters of intent and other agreements that contemplated a transaction involving Allied. That lawsuit has apparently been stayed pending these bankruptcy cases.

(ii)    **The New York Action**

126.    On January 17, 2012, just weeks after the settlement of Yucaipa and Allied's

lawsuit against CIT, the Intervenors commenced an action against Yucaipa in the Supreme Court

of the State of New York (the "New York Action") seeking a declaration from the court that "(i)

the purported Fourth Amendment is null and void, ineffective, and not binding," and (ii) that

"Yucaipa is not Requisite Lenders under the Credit Agreement."

127.    Yucaipa's motion to dismiss the New York Action was denied at a May 30, 2012

hearing without a written opinion, and the transcript of that hearing was "So Ordered" on August

2, 2012.

128.    The Intervenors moved for summary judgment on August 27, 2012.  At oral

argument on that motion on November 19, 2012, the court indicated it would grant the motion

for summary judgment and indicated it would subsequently issue a written order, as Yucaipa has

acknowledged (Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 at ¶88).

(n)    **Yucaipa Has Failed to Perform Under the Third Amendment**

129.    By virtue of the ruling in the New York Action, the Fourth Amendment has now

been found to be invalid such that reliance on the Fourth Amendment now is misplaced.

Accordingly, the Third Amendment is again the operative amendment to the First Lien Credit

Agreement and its terms, including the contribution provisions and limitations upon Yucaipa's

debt holdings, are binding and controlling.

130.    However, notwithstanding the ruling in the New York Action, Yucaipa has

refused to perform in accordance with the terms of the First Lien Credit Agreement, as amended

by the Third Amendment.  Indeed, even if the forthcoming written ruling in the New York

Action withstands any appeal that Yucaipa claims it will bring, Yucaipa expressly contends in

this proceeding that it would refuse to perform the obligations contained in the First Lien Credit

Agreement, as amended by the Third Amendment. (Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 ¶¶ 109, 118-122, 130). Yucaipa's cross claims against the Interventors, setting forth its refusal to perform under the Third Amendment, were dismissed with prejudice by this Court on February 27, 2013.

(o)     **The Filing of These Bankruptcy Cases and Yucaipa's Attempt to Fulfill its Plan to Protect its Equity Investment**

131.    On May 18, 2012, the Intervenors filed these involuntary bankruptcy proceedings, alleging that Yucaipa had caused Allied to be mismanaged and had caused Allied to be in default under the First Lien Credit Agreement. Subsequently, Allied consented to the bankruptcy cases and filed a voluntary petition under chapter 11 of the Bankruptcy Code.

132.    Since that time, Yucaipa has sought to complete its long-standing plans for Allied. In particular, Yucaipa has repeatedly stated that it was preparing to bid to takeover Allied. Yucaipa would essentially retain its control over Allied's equity through any bid and eliminate existing debt of Allied, both secured and unsecured.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa**

133.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 132 as if fully set forth herein.

134.    The equities in this case demand that the amounts allegedly owed to Yucaipa on account of the First and Second Lien Facilities should be subordinated to all other claims except those of equity interest holders under 11 U.S.C. § 510(c).

135.     Yucaipa, as the owner of a super-majority of the outstanding equity in the Debtors and having been able to appoint at least three of the five directors on Allied's board of directors, was at all times, and still is, an insider of the Debtors.

136.     Yucaipa and its agents, including the members of Allied's Board appointed by Yucaipa, breached their fiduciary duties of good faith, honest governance, loyalty and care to Allied and its creditors by, among other wrongs, looting and engaging in self-dealing transactions for Yucaipa's own benefit and to the detriment of the Debtors and their creditors.

137.     Yucaipa's inequitable conduct injured Allied and its creditors by, among other things, causing the Company to fail to repay amounts outstanding under its various debt facilities and to expend millions of dollars in fees and other amounts that served no one's interest but those of Yucaipa.  In addition, Yucaipa acted inequitably toward Allied by improperly exercising its control over Allied and causing Allied to pay for and consent to a series of transactions effectuating Yucaipa's purported acquisition of a majority of the outstanding secured debt of Allied, all with the express intention of causing Allied to sell its assets to Yucaipa through the guise of a bid that would eliminate legitimate debt of Allied while protecting the equity interests of Yucaipa at the expense of the Debtors and their creditors.

138.     Plaintiff believes that equitable subordination of Yucaipa's purported debt holdings to all other claims except those of equity interest holders is consistent with the provisions of the Bankruptcy Code.  Yucaipa should not be permitted to profit from an illicit scheme that it willingly, and intentionally, imposed upon Allied and its creditors, in violation of its fiduciary duties of good faith and loyalty.

139.     For the reasons set forth above, Yucaipa's claims, in total, against the Debtors should be subordinated to all other claims asserted against the Debtors pursuant to section 510(c)

of the Bankruptcy Code because Yucaipa's inequitable conduct resulted in injury to the Debtors'

creditors as a whole and conferred an unfair advantage on Yucaipa, and such subordination

would be consistent with the provisions of the Bankruptcy Code.

### Second Claim for Relief

### Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa for Harm to All First Lien and Second Lien Lenders

140.    Intervenors repeat and reallege each and every allegation in paragraphs 1 through

139 as if set forth fully herein.

141.    At all times relevant hereto, Yucaipa was an insider of the Debtor.

142.    As more fully described above, Yucaipa has engaged in unfair and inequitable

conduct towards First Lien and Second Lien Lenders in that Yucaipa has manipulated the

Debtors as an insider and in its capacity as alleged Requisite Lender and has engaged in

overreaching with respect to the Debtors and their creditors by, among other things:

   (a)    Yucaipa caused the Debtors to favor Yucaipa at the expense of other non-insider creditors.

   (b)    Yucaipa improperly acted as Requisite Lender by failing to permit First Lien Lenders to exercise legitimate rights and remedies.

   (c)    Yucaipa caused the Debtors to abdicate their duty to maximize value, in favor of protecting Yucaipa's ownership position.

   (d)    Yucaipa pressured Debtors' management repeatedly to defer to Yucaipa for the sole benefit of Yucaipa.

143.    Yucaipa's inequitable conduct has resulted in injury to First Lien and Second Lien

Lenders by conferring unfair advantages upon Yucaipa in at least the following ways:

   (a)    Yucaipa caused the Debtors to adopt a business strategy to benefit Yucaipa at the expense of Plaintiffs.

   (b)    Yucaipa prevented the Debtors from developing restructuring proposals that maximize value for Intervenors.

(c)     Yucaipa forced the Debtors to place the interests of Yucaipa above the Debtors'
own interests and those of the Intervenors, including but not limited to
orchestrating amendments to the Credit Agreement solely for the benefit of
Yucaipa.

144.     As a result of Yucaipa's conduct, First Lien and Second Lien Lenders have been
materially harmed.

145.     Granting the relief sought herein against Yucaipa is consistent with the
Bankruptcy Code and is appropriate based on the indisputable facts of this case.

146.     Pursuant to 11 U.S.C. §510(c), all distributions to Yucaipa on account of its
status as First Lien Lender and Second Lien Lender should be subordinated to the claims of all
First Lien and Second Lien Lenders.

### Third Claim for Relief

**Recharacterization Pursuant to 11 U.S.C. § 105(a) of Yucaipa's Purported
Debt Holdings Under the First and Second Lien Facilities against Yucaipa**

147.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through
146 as if fully set forth herein.

148.     The substance and character of Yucaipa's purported debt holdings under the First
Lien Facility and Second Lien Facility is one of an equity contribution.

149.     Considering the totality of the circumstances surrounding Yucaipa's scheme to
take control of Allied's outstanding debt, including, but not limited to, its acquisition of Second
Lien Debt, the Third Amendment to the First Lien Credit Agreement, the Fourth Amendment to
the First Lien Credit Agreement, ███████████████████████████████████████████
█████████████ Yucaipa's claims against the Debtors should be recharacterized as equity
interests based on, but not limited to, the following factors:

a)     Since at least the spring of 2008, █████████████████████████
███████████████████████████████████████████████████████████;

b) Yucaipa's goal of obtaining First and Second Lien Debt was a transparent effort to control both sides of the lending equation—it has controlled the borrower through its majority equity holdings and accompanying power to appoint a majority of the Board, and it has sought to control the First Lien and Second Lien Debt by attempting to become the Requisite Lender under both facilities;

c) Yucaipa has never sought to obtain First or Second Lien Debt as debt, as it never intended to enforce the right of a debt holder to receive regularly scheduled payments of principal and interest on the debt;

d) Indeed, given the restrictions that would have attended any First Lien Debt that it would have acquired under the Third Amendment, in Yucaipa's Cross-Claims in these proceedings and in the New York Action, it has admitted that it did not acquire any First Lien Debt under the Third Amendment, "never would have," and "never intended to purchase any debt claims that would make it bound by the Third Amendment's provisions" (Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 at p. 15), an admission that it was only interested in acquiring First Lien Debt to the extent that it could achieve Requisite Lender status in furtherance of its equity interests;

e) Yucaipa's acquisition of First and Second Lien Debt was in the nature of an equity contribution because it was only acquired in furtherance of Yucaipa's equity interest in Allied ██████████████████████████████████ ██████████████████████████████████.

150.     For the reasons set forth above, Yucaipa's claims against the Debtors under the First Lien Facility and Second Lien Facility should be recharacterized as equity pursuant to section 105(a) of the Bankruptcy Code.

## Fourth Claim for Relief

### Specific Performance of Third Amendment
### to the First Lien Credit Agreement against Yucaipa (Contribution Provision)

151.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 150 as if fully set forth herein.

152.     As a purported holder of First Lien Debt, Yucaipa is bound by the terms of the First Lien Credit Agreement, as amended.

153.    The court in the New York Action has declared that the Fourth Amendment is

invalid.  Accordingly, because the Fourth Amendment has been found to be null and void, the

Third Amendment is enforceable and its terms govern the holdings of any holders of First Lien

Debt, including Yucaipa.

154.    Pursuant to the terms of the Third Amendment, Yucaipa is obligated to make a

capital contribution of fifty (50) percent of the face value of certain First Lien Debt holdings that

it acquired within ten days of the acquisition of such debt.  Specifically, under Section 10.6(j)(iii)

of the First Lien Credit Agreement,

> "(j) Restricted Sponsor Affiliates. …Each Lender that is a Restricted
> Sponsor Affiliate, upon succeeding to an interest in the Term Loans:
>
> …
>
> (iii) agrees further that no later than ten days after the date of such
> assignment or transfer of such Term Loans (or, if a Default or Event of Default occurs
> during such ten day period, then three Business Days after such Restricted Sponsor
> Affiliate has knowledge of the occurrence of such Default or Event of Default but in no
> event later than the last day of such ten day period), such Restricted Sponsor Affiliate
> shall make a capital contribution to Borrowers of no less than 50% of the aggregate
> principal amount of such Term Loans in accordance with Section 10.6(k);

155.    Yucaipa acquired a total of $145,112,547.06 in First Lien Debt, $114,712,088.66

in the form of Term Loans.

156.    Yucaipa has breached the First Lien Credit Agreement by failing to make the

capital contribution of not less than $57,356,044.33, required by the Third Amendment.

157.    Plaintiff has no adequate remedy at law for the harm that will continue to be

caused by Yucaipa's continued breach of the First Lien Credit Agreement, as amended by the

Third Amendment.

158.    Accordingly, Plaintiff is entitled to a decree of specific performance by Yucaipa

of its obligations under the First Lien Credit Agreement, as amended by the Third Amendment,

to, among other things, make the required capital contribution of not less than $57,356,044.33.

**Fifth Claim for Relief**

**Breach of Third Amendment
to the First Lien Credit Agreement against Yucaipa  (Contribution Provision)**

159.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 158 as if fully set forth herein.

160.     As a purported holder of First Lien Debt, Yucaipa is bound by the terms of the First Lien Credit Agreement, as amended.

161.     The court in the New York Action has declared that the Fourth Amendment is invalid.  Accordingly, because the Fourth Amendment has been found to be null and void, the Third Amendment is enforceable and its terms govern the holdings of any holders of First Lien Debt, including Yucaipa.

162.     Pursuant to the terms of the Third Amendment, Yucaipa is obligated to make a capital contribution of fifty (50) percent of the face value of certain First Lien Debt holdings that it acquired within ten days of the acquisition of such debt.  Specifically, under Section 10.6(j)(iii) of the First Lien Credit Agreement,

> "(j)  Restricted Sponsor Affiliates. …Each Lender that is a Restricted Sponsor Affiliate, upon succeeding to an interest in the Term Loans:
> …
> (iii)  agrees further that no later than ten days after the date of such assignment or transfer of such Term Loans (or, if a Default or Event of Default occurs during such ten day period, then three Business Days after such Restricted Sponsor Affiliate has knowledge of the occurrence of such Default or Event of Default but in no event later than the last day of such ten day period), such Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans in accordance with Section 10.6(k);

163.     Yucaipa acquired a total of $145,112,547.06 in First Lien Debt, $114,712,088.66 in the form of Term Loans.

164.    Yucaipa has breached the First Lien Credit Agreement by failing to make the capital contribution of not less than $57,356,044.33, required by the Third Amendment.

165.    Yucaipa's breach of the First Lien Credit Agreement, as amended by the Third Amendment has caused, and will continue to cause, substantial monetary damages to the Debtors and their creditors, in an amount to be determined at trial, but reasonably believed to be an amount not less than $57,356,044.33, plus interest.

## Sixth Claim for Relief

### Specific Performance of Third Amendment to the First Lien Credit Agreement against Yucaipa (Divestiture of Debt)

166.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 165 as if fully set forth herein.

167.    Even after giving effect to the terms of the First Lien Credit Agreement, as amended by the Third Amendment, requiring Yucaipa to pay the requisite capital contribution of not less than $57,356,044.33, Yucaipa is still in material breach of the terms of the First Lien Credit Agreement, as amended by the Third Amendment.

168.    Yucaipa has breached the First Lien Credit Agreement by exceeding the maximum permissible limits under the First Lien Credit Agreement on the acquisition of Term Loan Exposure under Section 10.6(c) after giving effect to the mandatory capital contribution in Section 10.6(j)(iii).  Specifically, Section 10.6(c)(ii) provides, in relevant part:

> "provided further, that (x) no Lender may sell, assign, transfer or otherwise convey any of its rights and obligations under this Agreement (including the Commitments, the LC Deposits or the Loans) to a Restricted Sponsor Affiliate and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) immediately prior to and after giving effect to such assignment or transfer the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate principal amount of the Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would

exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans have been contributed to Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates) and (y) assignments by or to a Restricted Sponsor Affiliate shall be further subject to Section 10.6(j)."

169.    Section 10.6(j)(iii) further provides that the "Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans . . . ."

170.    Under the terms of the Third Amendment, then, at most, Yucaipa would be permitted to hold no more than $25 million of the principal amount of Term Loans under the First Lien Credit Agreement.

171.    Yucaipa purports to hold $114,712,088.66 in Term Loans under First Lien Credit Agreement, which, even after reducing such amount by an award of monetary damages or conversion of such holdings into a capital contribution by $57,356,044.33, is still $32,356,044.33 greater than permitted under the First Lien Credit Agreement, as amended by the Third Amendment.

172.    Plaintiff has no adequate remedy at law for the harm that will continue to be caused by Yucaipa's continued breach of the First Lien Credit Agreement, as amended by the Third Amendment, even after Yucaipa is required to make the requisite capital contribution.

173.    Accordingly, Plaintiff is entitled to a decree of specific performance by Yucaipa of its obligations under the First Lien Credit Agreement, as amended by the Third Amendment, to, among other things, divest itself of not less than $32,356,044.33 of Term Loans under the First Lien Credit Agreement.

## Seventh Claim for Relief

### Breach of Fiduciary Duty against Yucaipa

174.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 173 as if fully set forth herein.

175.    As the controlling shareholder of Allied, Yucaipa owed Allied and, as of early 2008, its creditors, fiduciary duties of good faith, honest governance, loyalty and care.

176.    In addition to its ability to influence Allied by yielding no less than 67% of the voting power of equity, Yucaipa exercised further improper influence over Allied by entering into a consulting agreement with Allied as of May 29, 2007.  Through this "Monitoring and Management Services Agreement" ("MMSA"), Allied was induced to and did repose confidence in Yucaipa and its alleged superior knowledge and capabilities in negotiating with Allied's customers and its employees.  However, Yucaipa engaged in a self-serving campaign that extracted unnecessary and unreasonable fees from Allied and acted to ensure that Yucaipa and its interests would be served before the interests of Allied and its creditors.

177.    In violation of its fiduciary duties, Yucaipa engaged in inequitable conduct with regard to Allied and its creditors by entering into the transactions described above, whereby Yucaipa purported to seize control over the First and Second Lien Facilities with the intention of protecting its equity investment in the Debtors, while knowing that Allied was, at best, undercapitalized and insolvent.  Yucaipa further engaged in inequitable conduct through its control of the board of directors of Allied, by causing the directors to fail to even consider potential transactions that could have benefitted Allied if such transactions held even the potential of harming Yucaipa's equity interests.  Yucaipa abused its position of trust and control over the Debtors by structuring transactions that were nominally in the name of the Debtors but

were, in reality, actually structured in a manner to ensure and protect Yucaipa's existing equity investments in Allied.

178.    The Debtors and their creditors have suffered damages in an amount to be proved at trial as a result of Yucaipa's breaches of its fiduciary duties.

## Eighth Claim for Relief

### Breach of Fiduciary Duty against the Allied Directors

179.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 178 as if fully set forth herein.

180.    As members of the Board, the Allied Directors owed Allied and, as of at least early 2008, when Allied became insolvent, owed its creditors fiduciary duties of loyalty and care.

181.    The Allied Directors breached their fiduciary duty of loyalty to Allied by consciously and intentionally disregarding the responsibilities they bore to deal with Allied's debt structure in a manner that did not unduly benefit Yucaipa as Allied's primary equity holder. In abdicating their responsibilities they violated their fiduciary duties to act loyally to the corporation and in good faith.

182.    Specifically, the Allied Directors consciously and intentionally turned away from their responsibilities to Allied when they failed to ensure that Allied, and not Yucaipa, ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ In derogation of those duties, however, the Allied Directors consciously permitted Yucaipa to control the drafting of the Third Amendment and the Fourth Amendment to the First Lien Debt Facilities in a manner that attempted to ensure that Yucaipa could control the outstanding

secured debt of the company in a manner that would protect Yucaipa's interests, without regard to the interests of Allied and its creditors.

183.    Additionally, the Allied Directors consciously and intentionally failed to consider potential transactions that could have potentially greatly benefitted Allied if such transaction held even the potential of harming Yucaipa's equity interests in the Company.  In derogation of their duties to benefit the Company, not Yucaipa, the Allied Directors failed to even engage in negotiations with lenders concerning potential restructuring alternatives that could have benefitted the Company and its balance sheet, if such transactions were not likely beneficial to Yucaipa.

184.    The Allied Directors also consciously and intentionally disregarded their obligations to the corporation by repeatedly failing to make legitimate or conscientious efforts to ensure that any transactions involving the Company and Yucaipa, including the acquisition of outstanding secured debt, were in the Company's interests, not only Yucaipa's interests.  While the board of directors appointed a purported "Special Committee" of independent directors to evaluate any transaction involving Yucaipa, the committee was neither special nor independent and utterly failed in its purpose.  Indeed, the "Special Committee" never hired independent advisors, and repeatedly failed to engage in deliberations separate and apart from deliberations with the Yucaipa directors, but instead would merely meet and deliberate after presentations by and deliberations with the conflicted Yucaipa directors and the ordinary advisors to the Company, whose retention was subject to the whims of Yucaipa and its control over Allied.

185.    Additionally, the Allied Directors violated their duties of loyalty and care to the corporation by permitting and approving the payment of millions of dollars in purported fees paid to or on behalf of Yucaipa.  The Allied Directors failed to ensure that Allied received any

benefit from the millions of dollars that were scheduled to be paid to or on behalf of Yucaipa were necessary and appropriate

186.    The Allied Directors further violated their duties of care through their gross negligence of their obligation to seek information about Yucaipa's intentions once and if it acquired a majority stake in the outstanding secured debt of the Company.  This failure to act, and the approvals of the amendments to the secured debt facilities that enabled Yucaipa to seize complete control over every aspect of the Debtors' capital structure, were breaches of the Allied Directors fiduciary duties of loyalty and care.

187.    The Debtors have suffered damages in an amount to be proved at trial as a result of the Allied Directors' breach of fiduciary duties.

<u>**Ninth Claim for Relief**</u>

**Aiding and Abetting Breach of Fiduciary Duty against the Allied Directors and Yucaipa**

188.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 187 as if fully set forth herein.

189.    If and to the extent that any Defendant is found not to have owed a fiduciary duty to the Debtors at the time of the transactions complained of herein, each Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duty of one or more of the other Defendants who are found to have direct responsibility for the breaches of such duties.

190.    Each of the Defendants knowingly participated in or acquiesced to, benefitted from and aided and abetted the breach of fiduciary duty engaged in by the other Defendants.

191.    The Allied Directors knowingly participated in Yucaipa's breach of fiduciary duty by encouraging and approving the transactions described above which have injured the Debtors and its creditors.

192.    Yucaipa knew that the Allied Directors breached their fiduciary duties to Allied by entering into the transactions described above. Yucaipa knowingly participated in the Allied Directors' breach by controlling and dictating the terms of the transactions that were nominally entered into by the Debtors but were at all times performed for and perpetrated by Yucaipa.

193.    As a result of the insider transactions, which the Allied Directors and Yucaipa aided and abetted, the creditors of Allied have been damaged in an amount to be proved at trial in this action. At a minimum, the damages suffered by the Company, and thereby its creditors, include fees and interest paid to and on behalf of Yucaipa in connection with, among other things, the Third Amendment, the Fourth Amendment █████████████████ and the Georgia Litigation, through which Yucaipa received, or received the benefit of having Allied pay for, millions of dollars in fees paid by Allied.

**Tenth Claim for Relief**

**Avoidance and Recovery of Intentional and Constructive Fraudulent Transfers against Yucaipa Pursuant to 11 U.S.C. §§ 548(a) and 550**

194.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 193 as if fully set forth herein.

195.    Upon information and belief, for Yucaipa's benefit, the Debtor Allied Systems Holdings, Inc. or one of its Debtor affiliates transferred legal fees to Kasowitz, Benson, Torres & Friedman LLP ("Kasowitz") totaling not less than $2,458,549.76 (the "Kasowitz Transfers").

196.    The Kasowitz Transfers are as follows:

a)    December 23, 2009:  $19,155.09.

b)    March 8, 2010:  $100,379.58.

c)    April 13, 2010:  $38,128.38.

d)    April 16, 2010:  $13,359.04.

e)     May 13, 2010:  $98,894.79.

f)     July 26, 2010:  $101,538.66.

g)     September 15, 2010:  $191,526.39.

h)     September 20, 2010:  $304,033.11.

i)     October 6, 2010:  $209,165.47.

j)     November 2, 2010:  $360,447.42.

k)     December 16, 2010:  $111,808.98.

l)     December 21, 2010:  $4,897.50.

m)     March 7, 2011:  $237,893.64.

n)     June 30, 2011:  $100,000.00.

o)     September 7, 2011:  $117,321.71.

p)     October 12, 2011:  $200,000.00.

q)     November 23, 2011:  $100,000.00.

r)     December 9, 2011:  $75,000.00.

s)     December 15, 2011:  $75,000.00.

197.    Upon information and belief, for Yucaipa's benefit, the Debtor Allied Systems Holdings, Inc. or one of its Debtor affiliates transferred legal fees to Latham & Watkins LLP ("Latham") totaling not less than $1,911,949.17 (the "Latham Transfers," together with the Kasowitz Transfers, the "Law Firm Transfers").

198.    The Latham Transfers are as follows:

a)     November 19, 2007:  $13,701.44.

b)     December 11, 2007:  $26,064.71.

c)     December 13, 2007:  $196,295.99.

d)      January 2, 2008:  $8,408.82.

e)      May 2, 2008:  $18,642.50.

f)      October 15, 2008:  $36,461.28.

g)      December 31, 2008:  $1,280,000.00.

h)      December 23, 2009:  $15,276.86.

i)      December 31, 2009:  $26,961.67.

j)      February 4, 2010:  $4,495.50.

k)      September 23, 2010:  $33,220.53.

l)      October 6, 2010:  $46,285.93.

m)      December 9, 2010:  $1,235.00.

n)      December 31, 2010:  $39,106.45.

o)      March 11, 2011:  $26,536.16.

p)      December 27, 2011:  $139,256.33.

199.    Additionally, since May 29, 2007, the Debtors were required to transfer an annual management services fee of $1,500,000.00 per year to Yucaipa pursuant to the MMSA, whether or not Yucaipa provided such services (the "Yucaipa Transfers").

200.     collectively with the Law Firm Transfers and any Yucaipa Transfers, the "Fraudulent Transfers") whereby, in connection with the Fourth Amendment and the ███████████████████████████, Yucaipa obtained ComVest's First Lien Debt holdings.

201.    The Debtors were controlled and dominated by Yucaipa on the date of each of the Fraudulent Transfers.

202.    The Debtors were controlled and dominated by Yucaipa when ██████████ ██████████.

203.    Each of the Fraudulent Transfers constituted a transfer of an interest in property of the Debtors that were made to, or for the benefit of, Yucaipa.

204.    The Debtors incurred one or more obligations that gave rise to each of the Fraudulent Transfers, and those obligations shall be defined as the "Fraudulent Obligations."

205.    The Debtors made each of the Fraudulent Transfers and incurred the Fraudulent Obligations with actual intent to hinder, delay, or defraud any entity to which the Debtors were or became, on or after the date that each such Fraudulent Transfer and Fraudulent Obligation was made, indebted.

206.    The Debtors received less than a reasonably equivalent value in exchange for each of the Fraudulent Transfers and Fraudulent Obligations.  Moreover, each of the Fraudulent Transfers and Fraudulent Obligations was made or incurred by the Debtors without a fair consideration.

207.    At the time each of the Fraudulent Transfers was made and each of the Fraudulent Obligations was incurred, the Debtors (i) were insolvent, or became insolvent as a result of each such transfer or obligation; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which the property remaining with them was an unreasonably small amount of capital or was unreasonably small in relation to the business or transaction; and (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured or became due.

208.    None of the recipients of the Fraudulent Transfers or the Fraudulent Obligations took such transfers or obligations for value and in good faith.

209.     Yucaipa was either the initial transferee of the Fraudulent Transfers, the entity for whose benefit the Fraudulent Transfers were made or an immediate or mediate transferee of the initial transferee of the Fraudulent Transfers.

210.     The Fraudulent Transfers and Fraudulent Obligations made on or within two (2) years of the "Petition Date" (May 17, 2012 for Allied and Systems and June 10, 2012 for the other Debtors) constitute transfers or obligations avoidable by Plaintiff pursuant to section 548(a) of the Bankruptcy Code and such transfers are recoverable from Yucaipa pursuant to section 550 of the Bankruptcy Code.  For the foregoing reasons, Yucaipa is liable to the Debtors for the return of these Fraudulent Transfers, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and conveyances, plus interest from the transfer dates, and costs and fees to the extent available for the benefit of the Debtors' estates.  Each Yucaipa Defendant is jointly and severally liable for the entire amount of each Fraudulent Transfer.

### Eleventh Claim for Relief

**Avoidance and Recovery of Intentional and Constructive Fraudulent Transfers and Conveyances against Yucaipa Pursuant to 11 U.S.C. §§ 544(b) and 550**

211.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 210 as if fully set forth herein.

212.     At all relevant times, there has been at least one creditor – including but not limited to the members of the Committee – holding an unsecured claim against the Debtors that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

213.     Each of the Fraudulent Transfers and Fraudulent Obligations identified above was made to a creditor whose claim arose before the transfer or obligation was made, and was made to an insider for an antecedent debt.

214.     At the time each of the Fraudulent Transfers was made, the Debtors were insolvent and the insider receiving the Fraudulent Transfer had reasonable cause to believe that the Debtors were insolvent.

215.     The Fraudulent Transfers identified above constitute transfers and conveyances avoidable by Plaintiff pursuant to section 544(b) of the Bankruptcy Code and applicable state law[8] and such transfers are recoverable from Yucaipa pursuant to section 550 of the Bankruptcy Code.  The Fraudulent Obligations constitute obligations avoidable by Plaintiff pursuant to section 544(b) of the Bankruptcy Code and applicable state law as set forth above.  Yucaipa is liable to the Debtors for the return of these Fraudulent Transfers, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and conveyances, plus interest from the transfer dates, and costs and fees to the extent available for the benefit of the Debtors' estates.  Each Yucaipa Defendant is jointly and severally liable for the entire amount of each Fraudulent Transfer.

## Twelfth Claim for Relief

**Preferential Transfers against Yucaipa Pursuant to 11 U.S.C. §§ 547 and 550**

216.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 215 as if fully set forth herein.

217.     As described above, Yucaipa was at all relevant times, including at the times of the Fraudulent Transfers, and still is, an insider of the Debtors.

218.     The Fraudulent Transfers that were made within one (1) year of the Petition Date (collectively, the "Preferential Transfers") were made (i) to or for the benefit of a creditor, (ii) for or on account of an antecedent debt owed by the Debtors before such Preferential Transfers were

---

[8] Applicable state law may include, without limitation, Cal. Civ. Code § 3439.01 *et seq.*, Del. Code § 1301 *et seq.*, Fla. Stat. § 726.101 *et seq.*, and Ga. Code Ann. § 18-2-70 *et seq.*, and, if the Court should determine that this action is governed by the laws of other states, the applicable laws of such other states.

made, (iii) made while the Debtors were insolvent or presumed insolvent as a matter of law, and (iv) enabled such creditor would receive if (a) the case were a case under chapter 7 of the Bankruptcy Code, (b) the Preferential Transfers had not been made; and (c) such creditor received payment of such debt to the extent provided by the Bankruptcy Code.

219.    The Preferential Transfers are transfers avoidable by Plaintiff pursuant to section 547 of the Bankruptcy Code, and recoverable from Yucaipa pursuant to section 550 of the Bankruptcy Code.

220.    For the foregoing reasons, Yucaipa is liable to the Debtors for the return of the Preferential Transfers, or their value, in an amount to be determined at trial, but not less than the sum of those transfers.

## Thirteenth Claim for Relief

### Disallowance of Claim against Yucaipa

221.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 220 as if fully set forth herein.

222.    For Yucaipa's benefit, the Debtors transferred millions of dollars, all of which is either recoverable or avoidable pursuant to the Bankruptcy Code.

223.    By reason of the foregoing, pursuant to section 502(d) of the Bankruptcy Code, the Court shall disallow an amount, to be proven at trial, of Yucaipa's claims.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order

a)      subordinating Yucaipa's claim, in total, against the Debtors to all other claims, or subordinating Yucaipa's claim, in total, against the Debtors to such other claims as the Court may deem appropriate;

b)       recharacterizing Yucaipa's claim against the Debtors under the First Lien Facility and Second Lien Facility as equity;

c)       decreeing that Yucaipa specifically perform its obligations under the First Lien Facility, as amended by the Third Amendment;

d)       entering judgment in favor of Plaintiff and Debtors for money damages due to Yucaipa's breach of the First Lien Facility not less than $57,356,044.33, but in an amount to be proven at trial, plus pre-judgment interest;

e)       entering judgment in favor of Plaintiff and Debtors for damages due to Yucaipa's breach of fiduciary duties in an amount not less than $57,356,044.33, but in an amount to be proven at trial, plus pre-judgment interest;

f)       entering judgment in favor of Plaintiff and Debtors for damages due to the Allied Directors' breach of fiduciary duties in an amount not less than $57,356,044.33, but in an amount to be proven at trial, plus pre-judgment interest;

g)       entering judgment in favor of Plaintiff and Debtors for damages due to Defendants' aiding and abetting breach of fiduciary duty in an amount not less than $57,356,044.33, but in an amount to be proven at trial, plus pre-judgment interest;

h)       entering judgment for Plaintiff to recover the value of the preferential and fraudulent transfers that Yucaipa caused the Debtors to make, in an amount to be proven at trial, plus pre-judgment interest;

i)       disallowing an amount to be proven at trial of Yucaipa's claim pursuant to section 502(d) of the Bankruptcy Code;

j)       awarding Plaintiff all reasonable attorneys' fees, costs and disbursements in this action; and

k)    granting such other or further relief as is just, proper and equitable.

Dated: Wilmington, Delaware
       March 14, 2013

**SULLIVAN HAZELTINE ALLINSON LLC**

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
901 N. Market St., Suite 1300
Wilmington, DE 19801
Telephone: (302) 428-8191
Facsimile: (302) 428-8195

– and –

**SIDLEY AUSTIN LLP**
Michael G. Burke
Nicholas K. Lagemann
Cameron Moxley
Dennis Kao
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Counsel for the Official Committee of Unsecured Creditors*

# EXHIBIT 11

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*,[1] | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., AS CO-ADMINISTRATIVE AGENT, AND SPECTRUM COMMERCIAL FINANCE LLC, AS CO-ADMINISTRATIVE AGENT, | Adv. Proc. No. _____ (CSS) |
| Plaintiffs, | **COMPLAINT FOR (I) EQUITABLE SUBORDINATION, (II) BREACH OF CONTRACT, (III) BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING, AND (IV) TORTIOUS INTERFERENCE WITH CONTRACT** |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., RONALD BURKLE, JOS OPDEWEEGH, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK, | |
| Defendants. | |

---

[1] The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. (collectively, "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum" and, together with Black Diamond, the "Individual Lender Plaintiffs") and Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC, each in its capacity as Co-Administrative Agent under the First Lien Facility (collectively, the "Agent Plaintiffs," and together with the Individual Lender Plaintiffs, the "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint for (I) Equitable Subordination, (II) Breach of Contract, (III) Breach of the Implied Duty of Good Faith and Fair Dealing, and (IV) Tortious Interference with Contract (the "Complaint") against Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, "Yucaipa"), Ronald Burkle ("Burkle"), Jos Opdeweegh ("Opdeweegh"), Derex Walker ("Walker"), Jeff Pelletier ("Pelletier"), Ira Tochner ("Tochner"), and Joseph Tomczak ("Tomczak," together with Opdeweegh, Walker, Pelletier, and Tochner, the "Yucaipa Directors" and the Yucaipa Directors together with Yucaipa and Burkle, the "Defendants").  The Plaintiffs expressly reserve the right to amend or supplement the parties to, and claims for relief in, the Complaint, and to assert and file additional claims, cross-claims and/or third-party complaints herein and in any related adversary proceeding, including, without limitation, *Allied Systems Holdings, Inc. v. American Money Management Corp. et al.*, Adv. Proc. No. 12-50947 (CSS) (Bankr. D. Del.) (the "Allied Action") and *The Official Committee of Unsecured Creditors of ASHINC Corporation v. Yucaipa American Alliance Fund I, L.P. et al.*, Adv. Proc. No. 13-50530 (CSS) (Bankr. D. Del.) (the "Committee Action"), which cannot be articulated as a result of the fact that the Plaintiffs have not yet been able to confirm or deny certain of the allegations in the related adversary proceedings, and/or due to the failure of the

complainants to particularize their claims in the related adversary proceedings, and/or due to the fact that the Plaintiffs do not have copies of documents relating to certain of the allegations in the related adversary proceedings. In support of the requested relief, the Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.     This case arises from Yucaipa's intentional scheme to harm the lenders (the "First Lien Lenders") under the Debtors' $265 million first lien credit facility (the "First Lien Facility"), including the Individual Lender Plaintiffs. Yucaipa held a controlling stake in the Debtors' equity, controlled the Debtors' board of directors, wrongfully acquired majority of the debt under the First Lien Facility and improperly declared itself the "Requisite Lender" under the First Lien Facility and used the powers flowing from these positions for its own benefit to the detriment of the First Lien Lenders.

2.     Initially, Yucaipa's scheme was designed to protect its equity stake from being wiped out as a result of the legitimate exercise of the rights and remedies of the First Lien Lenders after the occurrence and during the continuance of numerous defaults under the First Lien Facility, including payment defaults. Later, when it became clear its equity stake could not be preserved because the Debtors were unquestionably insolvent, Yucaipa misused its alleged position as Requisite Lender to negotiate a transaction with a strategic buyer to extract more favorable terms for itself relative to the other First Lien Lenders. Ultimately, Yucaipa's greed in demanding a premium relative to the other First Lien Lenders (as opposed to agreeing to pro rata treatment for all First Lien Lenders) killed the proposed transaction, caused harm to all of the legitimate First Lien Lenders (who would have received payment in full on their First Lien Debt) and led to the involuntary filing of the Debtors' current bankruptcy cases.

3.     In 2007, pursuant to a reorganization plan (the "2007 Plan") confirmed in the Debtors' first bankruptcy case (the "2005 Bankruptcy Case"), Yucaipa converted its secured debt

into approximately 67% of the Debtors' equity and had the right to appoint outright three of the five directors on Debtors' Board of Directors (the "Board"). In reality, Yucaipa effectively had the power to appoint all five directors on the Debtors' Board, as it was able to select the Debtors' Chief Executive Officer (who would be the fourth director), as well as the fifth director, who, despite being selected by the creditors' committee in the first bankruptcy case, had to be "reasonably acceptable" to Yucaipa. Thus, given its controlling influence and express appointment and veto powers, even the two nominally "independent" directors were under Yucaipa's control. Accordingly, after the Debtors' emergence from their first bankruptcy case, Yucaipa controlled not only a super-majority of the outstanding equity, but it also effectively controlled 100% of the Debtors' Board.

4.     As part of the 2007 Plan, the Debtors emerged from the 2005 Bankruptcy Case with two credit facilities, comprised of a $265 million First Lien Facility and a $50 million second lien facility (the "Second Lien Facility").

5.     Not long after the Debtors emerged from the 2005 Bankruptcy Case in May 2007, under Yucaipa's control, their business prospects began to falter. By the second quarter of 2008, the Debtors were in default under the First Lien Facility and were nearing insolvency, if not already insolvent. Indeed, at that time, the Debtors were increasingly failing to meet various covenants and failing to pay principal and interest. The Debtors needed either an equity investment to fund their working capital needs and to service the outstanding debt, or a restructuring to reduce the Debtors' leverage and ease their cash requirements. Indeed, the First Lien Lenders pleaded with Yucaipa to provide such an infusion of equity for the benefit of all of the Debtors' stakeholders, including their creditors, their employees and their equity owners, or to negotiate a restructuring to de-lever the balance sheet.

6. Yucaipa, however, refused to infuse equity capital or to negotiate a restructuring (the effect of which would wipe out its equity investment). Instead, the Defendants crafted a scheme whereby Yucaipa would wrongfully seize control over the First Lien Facility so that, despite the occurrence and continuance of events of default (including payment defaults), Defendants would not have to be concerned about the First Lien Lenders' exercise of rights and remedies. Through this scheme, Defendants thwarted any possibility of the Debtors entering into a voluntary restructuring or strategic combination that would dilute or eliminate Yucaipa's existing equity − even though entering into such a transaction would have been in the best interests of the Debtors and their stakeholders, including the First Lien Lenders.

7. Defendants' scheme was implemented through a series of pre-meditated steps. First, Defendants pushed the existing First Lien Lenders to eliminate the prohibitions on Yucaipa's ability (as the controlling equity) to also own debt under the First Lien Facility (the "First Lien Debt") under the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, as amended (the "First Lien Credit Agreement"). Initially, the First Lien Credit Agreement contained an absolute prohibition on Yucaipa owning any First Lien Debt. Subsequently, in April 2008, at Yucaipa's request, the First Lien Lenders agreed to permit Yucaipa to acquire only a strictly limited amount of the First Lien Debt, *provided further*, that (a) 50% of any First Lien Debt acquired by Yucaipa was required to be contributed to capital and (b) the remainder of the First Lien Debt acquired by Yucaipa would be subject to onerous limitations and restrictions that prevented Yucaipa from ever becoming the Requisite Lender (*i.e.*, the First Lien Lender that, under the First Lien Credit Agreement, has the power to exercise, or refrain from exercising, the First Lien Lenders' rights and remedies under the First Lien Credit Agreement).

8.     Despite having engineered the amendment to the First Lien Credit Agreement that would permit its acquisition of First Lien Debt (the "Third Amendment"),[2] Yucaipa thereafter declined to purchase any First Lien Debt unless it could do so without any of the restrictions contained in the Third Amendment.

9.     To avoid the restrictions in the Third Amendment, Defendants launched a tender offer to acquire a majority of the First Lien Debt. A condition to accepting the tender offer was that the selling First Lien Lender had to execute an amendment to the First Lien Credit Agreement allowing Yucaipa to purchase First Lien Debt without any limitation or restriction.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████  The existing First Lien Lenders knew full well that permitting the controlling shareholder to take control of the First Lien Facility could have disastrous consequences for them, since it would permit Yucaipa to preserve its equity stake by blocking the exercise of any rights or remedies of the First Lien Lenders notwithstanding the occurrence and continuance of events of default. In fact, this was the very concern that drove the First Lien Lenders to prohibit Yucaipa from acquiring any First Lien Debt in the original First Lien Credit Agreement, and to impose the onerous restrictions on any First Lien Debt that Yucaipa was allowed to acquire as provided in the Third Amendment.

10.     Not surprisingly, Yucaipa's tender offer failed. However, Defendants were not dissuaded and instead undertook a more surreptitious route to reach their goal of total and complete control of the Debtors and the First Lien Debt. That is, after Yucaipa's tender offer

---

[2] The Third Amendment refers to that certain Amendment No. 3 To Credit Agreement and Consent, dated as of April 17, 2008, to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007.

failed in February 2009, Defendants approached ComVest Investment Partners III, L.P. ("ComVest"), who at that time held a majority of the First Lien Debt and thus constituted the Requisite Lender, to acquire ComVest's First Lien Debt. Initially, ComVest rebuffed Defendants' overtures, preferring instead to negotiate with the Debtors to pursue either an asset sale or a restructuring that would convert the First Lien Debt into the Debtors' equity (which would wipe out Yucaipa's equity stake). Defendants persisted and, by virtue of their control of the Debtors and the Board, and, in particular, through a combination of stonewalling any restructuring discussions with ComVest, refusing to allow the Debtors to pursue an asset sale, and directing the Debtors to cease paying interest on the First Lien Debt, convinced ComVest to sell its First Lien Debt. There was, however, a problem for Yucaipa. To accomplish the sale of ComVest's First Lien Debt to Yucaipa, Yucaipa needed an amendment to the First Lien Credit Agreement that would lift the onerous restrictions imposed by the Third Amendment on Yucaipa's ownership of First Lien Debt. So, as a condition to the purchase and sale of the First Lien Debt, Defendants required ComVest to execute and deliver a further amendment to the First Lien Credit Agreement that, if effective, would permit Yucaipa to purchase First Lien Debt without any limitations or restrictions, and in particular to acquire the status of the Requisite Lender (a position that would allow Yucaipa to control, or prevent, the exercise of rights and remedies by the First Lien Lenders against the Debtors) (the "Purported Fourth Amendment").[3]

11. On August 21, 2009, the Purported Fourth Amendment allegedly became effective and the Yucaipa/ComVest transaction closed. By purchasing ComVest's outstanding debt, Defendants were able to improperly maneuver Yucaipa into a position where it held a controlling equity interest, Board control, and (purportedly) control of the First Lien Debt. With

---

[3] The Purported Fourth Amendment refers to that certain Amendment No. 4 To Credit Agreement, dated as of August 21, 2009, to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007.

the powers emanating from these various positions, Defendants were able to do whatever was in their own self-interest, to the detriment of the other First Lien Lenders. Defendants exercised those powers without regard to, and to the significant detriment of, all of the First Lien Lenders.

12. Once Yucaipa had allegedly taken control of the First Lien Debt, Defendants exercised Yucaipa's purported power as the Requisite Lender and controlling shareholder in ways that caused harm to the First Lien Lenders. For instance, when The CIT Group/Business Credit, Inc. ("CIT"), in its capacity as the prior Agent under the First Lien Credit Agreement, objected to the Purported Fourth Amendment and Yucaipa's acquisition of ComVest's First Lien Debt, Defendants used their power to cause the Debtors to bring suit against CIT and to paralyze CIT and the First Lien Lenders from the legitimate exercise of their rights and remedies, notwithstanding the occurrence and continuation of events of default (including payment and other covenant defaults). The litigation against CIT continued for almost two years (from November 2009 through December 2011) during which the First Lien Lenders were unable to pursue the legitimate exercise of rights and remedies due to Yucaipa's wrongful assertion that the Purported Fourth Amendment was valid and that it was the Requisite Lender.

13. Further, as set forth below, Defendants used Yucaipa's position as the purported Requisite Lender to scuttle a transaction with a strategic buyer that would have provided full payment on the First Lien Debt to the First Lien Lenders. Beginning in late 2011, a principal competitor of the Debtors, Jack Cooper Transport Co. ("JCT"), expressed a strong interest in acquiring the Debtors' assets.

14. The appropriate course of conduct would have been for the Debtors to negotiate a transaction with JCT. At that time, the Debtors were unquestionably insolvent, owed fiduciary duties to all of the Debtors' stakeholders, and had a duty to negotiate the highest and best

purchase price for the assets without regard for how those proceeds might be allocated. Rather than allowing the Debtors to undertake these negotiations, Yucaipa – purporting to act as the Requisite Lender – controlled the negotiations.

15. Unfortunately, Yucaipa's primary concern was the maximization of its own recovery, with little or no regard for any other First Lien Lender. As such, it had no interest in allowing the Debtors to pursue a typical M&A type transaction with JCT. Instead, Yucaipa sought to pursue a sale of its First Lien Debt and alleged Requisite Lender status so that it could garner a premium for itself to the detriment of the other First Lien Lenders.

16. Indeed, throughout the negotiations with JCT, Defendants insisted that Yucaipa receive par plus accrued interest for its First Lien Debt, while the other First Lien Lenders were left to "negotiate their own terms." (Yucaipa's Motion for Leave to File a Counterclaim for Equitable Subordination Under 11 U.S.C. § 510(c) or, in the Alternative, to Amend the Answer to Assert Additional Affirmative Defenses (the "Motion for Leave"), Adv. Pro. No. 13-50530 (Bankr. D. Del.), D.I. 320, Ex. A ¶ 50.) When the Individual Lender Plaintiffs legitimately demanded that they receive ratable treatment with Yucaipa for their First Lien Debt, Defendants refused, insisting instead on a disproportionate percentage of the consideration. As a result of Defendants' wrongful actions, the negotiations with JCT eventually broke down.

17. As a result, rather than paying consideration in a transaction that would have satisfied all of the First Lien Debt in full (i.e., in excess of $300 million), JCT eventually purchased substantially all of the Debtors' assets for only $135 million

18. As described in more detail below, Defendants repeatedly engaged in inequitable conduct in an attempt to protect Yucaipa's equity investment and then to receive a more

favorable recovery on the First Lien Debt it wrongfully purchased, to the detriment of all First Lien Lenders, including the Individual Lender Plaintiffs. Specifically, Yucaipa:

    (a)    improperly acquired First Lien Debt in violation of the First Lien Credit Agreement;

    (b)    improperly used its purported debt holdings to declare itself the Requisite Lender, in clear violation of the First Lien Credit Agreement;

    (c)    improperly used its status as purported Requisite Lender to neutralize the First Lien Lenders, giving the Debtors a "free pass" to ignore the provisions of the First Lien Credit Agreement requiring them to pay principal and interest and abide by certain financial and operating covenants;

    (d)    improperly used its status as purported Requisite Lender to protect its equity investment by precluding a badly-needed restructuring of the Debtors; and

    (e)    improperly used its status as purported Requisite Lender to insist on a disproportionate share of the consideration JCT was willing to pay for the sale of the Debtors' assets, which resulted in derailing the sale.

19.    All told, Defendants' actions caused substantial damages to the First Lien Lenders in an amount to be proven at trial.

20.    Accordingly, the Plaintiffs, on behalf of all First Lien Lenders, bring this action for: (i) equitable subordination of Yucaipa's purported First Lien Debt to the First Lien Debt held by all other First Lien Lenders pursuant to section 510(c) of the Bankruptcy Code for harm caused to all other First Lien Lenders; (ii) breach by Yucaipa of the First Lien Credit Agreement, as amended by the Third Amendment; (iii) breach by Yucaipa of the duty of good faith and fair dealing implied in the First Lien Credit Agreement; and (iv) tortious interference with contract against the Yucaipa Directors and Burkle.

## JURISDICTION AND VENUE

21.    This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

22.     This Court has original jurisdiction under 28 U.S.C. § 1334(b), in that this is a civil proceeding relating to the underlying case arising under title 11 of the United States Code.

23.     This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(1)(b)(2)(A), (B), (K) and (O).

24.     This Court has personal jurisdiction over Defendants pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

25.     Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## THE PARTIES

26.     BDCM Opportunity Fund II, LP is a Delaware limited partnership, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830.

27.     Black Diamond CLO 2005-1 Ltd. is a Cayman Islands limited liability company, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich CT 06830.

28.     Spectrum Investment Partners, L.P. is a Delaware limited partnership, with its principal place of business at 1250 Broadway, New York, NY 10001.

29.     Black Diamond Commercial Finance, L.L.C. is a Delaware limited liability company, with its principal place of business at One Hundred Field Drive, Lake Forest, IL 60045-2596 and is Co-Administrative Agent under the First Lien Credit Agreement, bringing these claims on behalf of all First Lien Lenders.

30.     Spectrum Commercial Finance LLC is a Delaware limited partnership, with its principal place of business at 1250 Broadway, New York, NY 10001 and is Co-Administrative Agent under the First Lien Credit Agreement, bringing these claims on behalf of all First Lien Lenders.

31.     Upon information and belief, Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P. are Delaware limited partnerships headquartered at 9130 West Sunset Boulevard, Los Angeles, California 90069.

32.     Defendant Ronald Burkle, an individual, is, upon information and belief, the founder and Managing Partner of The Yucaipa Companies LLC, a private investment firm and, upon information and belief, at all relevant times, controlled the actions of Yucaipa and the Yucaipa Directors.

33.     Defendant Jos Opdeweegh is an individual who served as a director of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Opdeweegh, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a director at the direction of and for the benefit of Yucaipa and Burkle.

34.     Defendant Derex Walker is an individual who served as a director of and Chairman of the Board of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Walker, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a driector at the direction of and for the benefit of Yucaipa and Burkle.

35.     Defendant Jeff Pelletier is an individual who served as a director of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Pelletier, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a director at the direction of and for the benefit of Yucaipa and Burkle.

36.     Defendant Ira Tochner is an individual who served as a director of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Tochner, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a director at the direction of and for the benefit of Yucaipa and Burkle.

37.     Defendant Joseph Tomczak is an individual who served as an officer and director of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Tomczak, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a director at the direction of and for the benefit of Yucaipa and Burkle.

## FACTUAL ALLEGATIONS

38.     The Debtors were, at all relevant times, leading providers of distribution and transportation services to the automotive industry in North America, primarily focused on the delivery of new automobiles from manufacturing facilities to dealerships.

    (a)     **The Debtors' 2007 Bankruptcy, Yucaipa's Acquisition of the Majority of the Equity, and the Debtors' Secured Debt**

39.     The Debtors filed the 2005 Bankruptcy Case on July 31, 2005 in the United States Bankruptcy Court for the Northern District of Georgia.  In or about May 2006, Yucaipa purchased a majority stake of the Debtors' then existing senior unsecured notes at a substantial discount to their par value.

40.     When the Debtors emerged from bankruptcy in May 2007, Yucaipa was in total control of the Debtors.  As part of the 2007 Plan, Yucaipa converted its debt into approximately 67% of the issued and outstanding common stock of the reorganized Debtors (which it later increased to approximately 70%).  Yucaipa also had the right to appoint three of the five members of the Board, appoint the Chief Executive Officer (who was a fourth member of the

Board), and had approval rights over the fifth and final member of the Board, who was to be appointed by the creditors' committee in the 2005 Bankruptcy Case. As a result, Yucaipa had a permanent majority and, for all intents and purposes, the ability to exercise complete control of the Board.

41.     The Debtors exited the 2005 Bankruptcy Case with $315 million of exit financing comprised of a $265 First Lien Facility and a $50 million Second Lien Facility.

42.     The First Lien Facility was comprised of $180 million of term loans, a $35 million revolving credit facility from CIT and a $50 million letter of credit facility.

43.     The First Lien Facility is governed by the First Lien Credit Agreement, entered into by and among Allied Holdings, Inc. ("Holdings") and Allied Systems Ltd (LP) ("Systems"), as Borrowers, and certain subsidiaries of Holdings, as Guarantors, various lenders, Goldman Sachs Credit Partners L.P. ("Goldman Sachs"), as Lead Arranger and Syndication Agent, and CIT, as Administrative Agent and Collateral Agent.

44.     The Second Lien Facility was comprised of $50 million of term loans.

45.     The Second Lien Facility is governed by that certain Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007 (the "Second Lien Credit Agreement"), entered into by and among Holdings and Systems as Borrowers and certain subsidiaries of Holdings as Guarantors, various lenders, and Goldman Sachs, as Lead Arranger, Syndication Agent, Administrative Agent and Collateral Agent.

46.     In 2008, shortly after emergence from the 2005 Bankruptcy Case, the Debtors defaulted under both the First Lien Credit Agreement and Second Lien Credit Agreement. Specifically, and only by way of example among many other Events of Default, the Debtors

failed to pay required principal and interest payments – at times at Defendants'[4] express insistence – even when the Debtors had the cash on hand to make the required payments.

> (b)     **The First Lien Credit Agreement Was Expressly Drafted and Always Intended to Prevent Yucaipa, as the Majority Equity Holder, from Gaining Control Over the Outstanding Debt**

47.     Given the size of Yucaipa's equity stake, its control of the Board and, indeed, its control over all of the Debtors, the First Lien Credit Agreement provided that Yucaipa, as the "Sponsor," could not acquire any First Lien Debt. The purpose of the provision was clear – the First Lien Lenders did not want to have the Sponsor/controlling shareholder as a Lender under their First Lien Credit Facility with the ability to potentially interfere with the legitimate exercise of rights and remedies designed to protect the interests of the true First Lien Lenders

48.     The First Lien Credit Agreement set forth a mechanism designed to ensure that a majority of the legitimate holders of the First Lien Debt would be able to control most of the actions taken by the lending group. In particular, the First Lien Credit Agreement provides that "Requisite Lenders" – defined as holders of debt under the First Lien Facility representing more than 50% of the sum of the aggregate "Term Loan Exposure" of all lenders, the aggregate letter of credit exposure, and the aggregate revolving credit exposure (First Lien Credit Agreement § 1.1) – have the power to make certain key decisions affecting all First Lien Lenders.

49.     Among other things, the Requisite Lenders under the First Lien Facility have the authority to declare or not declare "Events of Default" under the First Lien Credit Agreement. (*Id.* §§ 8.1, 9.8.). The Requisite Lenders also have the ability to direct the Administrative Agent and Collateral Agent to act, or refrain from acting, upon the occurrence and continuance of an Event of Default.

---

[4] This allegation as to Burkle, as are the other such allegations as to Burkle herein, is asserted upon information and belief, unless otherwise set forth.

50.     The First Lien Credit Agreement expressly prevented Yucaipa – as the Debtors' majority shareholder and "Sponsor" – from becoming a "Lender" under the First Lien Credit Agreement.  As a result, Yucaipa could also never become a Requisite Lender.  (*Id.* §§ 1.1, 10.6.)

51.     The First Lien Credit Agreement was amended or, in the case of the Purported Fourth Amendment, purportedly amended, on four occasions.  The Third Amendment and Purported Fourth Amendment are relevant to this proceeding.

(c)     **Defendants Cause the Third Amendment to the First Lien Credit Agreement to be Executed by the Debtors to Permit Yucaipa to Purchase a Limited Amount of First Lien Debt**

52.     Not long after the Debtors emerged from the 2005 Bankruptcy Case, Yucaipa entered into discussions with CIT, in its capacity as Administrative Agent, concerning an amendment to the First Lien Credit Agreement that would permit Yucaipa to acquire First Lien Debt.  Although Yucaipa was not going to be a party to the amendment, it and its attorneys took the lead in negotiating and drafting the terms of the amendment.  By contrast, the Debtors took a back seat and allowed Yucaipa to dictate the terms of the negotiations.

53.     By April 2008, Yucaipa and CIT had reached agreement as to the terms of the Third Amendment, which amended the First Lien Credit Agreement such that Yucaipa, for the first time, could acquire debt under the First Lien Facility, but only under tight limitations and restrictions, as well as a requirement that half of any First Lien Debt acquired be contributed to capital.

54.     Under the Third Amendment, Yucaipa is the "Restricted Sponsor Affiliate," which is defined as the "Sponsor and its Affiliates" (under the First Lien Credit Agreement, the "Sponsor" is Yucaipa).  (First Lien Credit Agreement § 1.1.)  Accordingly, in light of being the Restricted Sponsor Affiliate under the terms of the Third Amendment, Yucaipa could, for the

first time, acquire certain First Lien Debt. However, under the Third Amendment, Yucaipa was precluded from becoming a Requisite Lender and, to the extent Yucaipa decided to acquire any First Lien Debt, it would be subject to the following restrictions, among others:

- Yucaipa could not acquire more than the lesser of (a) 25% of the aggregate principal amount of the Term Loan Exposure held by all First Lien Lenders and (b) $50 million in principal amount of Term Loans (Third Amendment § 2.7(c));

- Within ten days of its acquisition of any Term Loans, Yucaipa was required to make a capital contribution to the Debtors of at least 50% of the aggregate principal amount of those Term Loans (*id.* § 2.7(e)); and

- Yucaipa could not exercise any voting rights that it would otherwise have as a First Lien Lender, including the right to consent to any amendment to the First Lien Credit Agreement or the right to vote its debt in any bankruptcy (*id.* §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)).

55.    Notwithstanding these restrictions, the fact that the Third Amendment permitted Yucaipa, as the Sponsor, to acquire any of the First Lien Debt was a unique achievement for Yucaipa. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

56.    However, Yucaipa was not interested in acquiring any debt subject to the restrictions that it negotiated in the Third Amendment. Indeed, in these bankruptcy proceedings, Yucaipa has admitted that it "never intended to purchase any debt claims that would make it bound by the Third Amendment's provisions" and that it "never would have acquired any first lien debt while the Third Amendment's restrictions and conditions limiting Yucaipa's potential ownership rights existed." (Yucaipa's Amended Counterclaim and Cross-Claim for Declaratory Judgment and Injunctive and Other Relief and Amended Answer to Debtors' Verified Complaint

(the "Cross-Claims"), Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 ¶¶ 25(a), 50.) Accordingly, dissatisfied with the terms of the Third Amendment that they solicited and negotiated, Defendants continued with their scheme to take total control over the First Lien Credit Agreement to the detriment of the legitimate First Lien Lenders.

> (d) **Defendants Continue to Pursue Yucaipa's Acquisition of a Majority of the First Lien Debt**

57.     Throughout 2008, Defendants were in continuous talks with CIT, as the Agent for the First Lien Lenders, as well as with various holders of the First Lien Debt, regarding the Defaults and Events of Default that had occurred and were continuing under the First Lien Credit Agreement.  These discussions led Defendants to become concerned that the First Lien Lenders were not going to stand idly by, given the extensive Defaults and Events of Default that had occurred and were continuing – as well as the continued decline in the operational performance of the Debtors.  Defendants were also concerned that the First Lien Lenders could begin to exercise their rights and remedies against the Debtors at any time.  Defendants were desperate to prevent that from happening because such action could wipe out Yucaipa's equity stake.

58.     Defendants were informed of the request by the existing First Lien Lenders that Yucaipa support the Debtors through the infusion of additional equity capital. ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

59.  Faced with the possibility of ████████████████████████████
████████████████████████████████ Defendants increased their efforts to
keep, and ultimately solidify, Yucaipa's total control over the Debtors. ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

60.  ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

61.  ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

62.  Nevertheless, apparently undeterred by the extraordinary nature of its request, on
February 4, 2009, Yucaipa launched a tender offer to the existing holders of the First Lien Debt
that, if successful, would have permitted Yucaipa to acquire an unlimited amount of First Lien

Debt without any limitations or restrictions, and to become the Requisite Lender. Thus, pursuant to the tender offer, Yucaipa offered to purchase the outstanding First Lien Debt for approximately 13 to 15 cents on the dollar. As a condition to the acceptance of the tender, Yucaipa required any tendering First Lien Lender to execute a further amendment to the First Lien Credit Agreement that would have removed all of the limitations and restriction imposed on Yucaipa's ability to acquire and vote First Lien Debt under the Third Amendment, thus allowing Yucaipa to acquire an unlimited amount of First Lien Debt without any limitations or restrictions and to become the Requisite Lender.

63. The then existing First Lien Lenders did not accept Yucaipa's offer to tender their First Lien Debt, and the proposed tender offer and amendment strategy failed.

(e) **Defendants Initiate Their Backup Plan to Take Total Control Over the Debtors Utilizing ComVest to Enable Yucaipa to Become the Requisite Lender**

64. Having failed in their efforts to convince the First Lien Lenders to permit Yucaipa to take total control over the First Lien Facility, Defendants initiated their backup plan to take complete control over the Debtors. Accordingly, Defendants turned their sights on another entity, ComVest – who was at that time the Requisite Lender – to give Defendants the total control they desired. ComVest had been threatening to move forward with the exercise of the rights and remedies of the First Lien Lenders and to force either a sale of the Debtors or a restructuring (which would wipe out Yucaipa's equity). Defendants needed to find a way to stop ComVest and the First Lien Lenders from proceeding on either path.

65. To do this, Defendants engaged in a multi-step approach. First, Yucaipa engaged in discussions with ComVest to acquire ComVest's First Lien Debt. Second, Yucaipa – utilizing its control over the Board and management – stonewalled ComVest's efforts to pursue a sale or restructuring while at the same time asserting maximum pressure on ComVest and the other First

Lien Lenders by, *inter alia*, withholding payment of principal and interest due under the First Lien Credit Agreement.

66. For example, at an August 3, 2009 Board meeting called for the purpose of discussing the Debtors' "liquidity, especially with respect to the approximately $4.8 million interest payment due to the First Lien Lenders the next day," the Board was advised that Defendant Walker "had suggested that the Company might be well-advised not to make the payment."

67. At that meeting, Defendant Walker "updated the Board on the status of negotiations with ComVest, stating that ComVest and Yucaipa were back in discussions," that Yucaipa believed a deal could be reached, but "warned, however, that it was critical that the Company have adequate liquidity to provide a sufficient runway for negotiations, and that a free fall into bankruptcy could be highly disruptive to the Company and to the ongoing negotiations." Defendant Walker further "advised that based upon his conversations with ComVest, he did not believe that failure to make the payment would lead to precipitous action by the lenders or anyone else" because, according to Defendant Walker, "ComVest, as the Requisite Lenders, would not seek to exercise any rights and would not allow others to do so given the current state of negotiations between ComVest and Yucaipa."

68. At this same meeting, Scott Macaulay, the Debtors' chief financial officer, advised the Board that the Debtors had $16.5 million of cash on hand, of which $12.3 million was immediately available. Of that $12.3 million, $2 million was needed for insurance premium payments, leaving $10.3 million in immediately available cash on hand. Mr. Macaulay advised that making the interest payment of $4.8 million to the First Lien Facility lenders would leave the Debtors with $5.5 million of immediately available cash on hand. Accordingly, the Debtors

had sufficient funds available to make their payment and to stay current on their payment obligations under the First Lien Credit Agreement.

69.     Nevertheless, notwithstanding the fact that the Debtors had sufficient liquidity to pay debt service under the First Lien Facility, in order to facilitate Defendants' interests in negotiations with ComVest, Defendant Walker made a motion to the Board that the Debtors forego the quarterly interest payment that they owed the First Lien Lenders on August 4, 2009, which motion was carried by the Board unanimously.

(f)     **Defendants Complete Their Backup Plan to Take Total Control Over the Debtors' Financial Structure, as They Negotiate and Cause the Debtors to Execute the Purported Fourth Amendment**

70.     While Defendants were using their control of the Debtors to put pressure on ComVest by, *inter alia*, causing the Debtors to intentionally default on their payment obligations to ComVest and the other First Lien Lenders, Defendants continued negotiations with ComVest to complete their backup plan to acquire control over the First Lien Credit Facility.  Yucaipa's negotiating team consisted of Defendants Burkle, Walker, Tochner, and also Stephanie Bond, who was employed by Yucaipa, with a third-party, ███████████████████, acting as a go-between with ComVest.

71.     ██████████████████████████████████████

████████████

████████████

██████████████████████████

████████████████████████

████████████████████████



72.

73.     Defendants, desperate to forestall the First Lien Lenders' exercise of remedies, caused Yucaipa to pay a significant premium to acquire ComVest's First Lien Debt. ▮

74.     Although Yucaipa had struck a deal with ComVest to acquire all of ComVest's First Lien Debt and become the Requisite Lender, that transaction was prohibited by the terms of the Third Amendment.  So, to accomplish the contemplated purchase and sale, Yucaipa needed for there to be a further amendment to the First Lien Credit Agreement allowing Yucaipa to acquire an unlimited amount of First Lien Debt and eliminating any and all limitations and restrictions contained in the Third Amendment.  Thus, as a condition of the closing of the transaction, ComVest and the Debtors (at Yucaipa's direction) executed the Purported Fourth Amendment.

75.     The Purported Fourth Amendment (if valid and enforceable) would have eliminated all of the Third Amendment's restrictions on Yucaipa's ability to acquire First Lien Debt.  The Purported Fourth Amendment would have amended the First Lien Agreement's definitions of "Eligible Assignee" and "Term Loan Exposure" such that Yucaipa's ability to acquire certain First Lien Debt was no longer prohibited.  (Purported Fourth Amendment § 2.1(b).)  It further would have eliminated the voting restrictions for First Lien Debt acquired by Yucaipa, removed the cap on the amount that could be acquired, and eliminated the capital contribution requirement.  (*Id.* § 2.4(a).)  In sum, it would have permitted Yucaipa to become a "Lender" without any restrictions whatsoever, and with the ability to become the Requisite Lender – the exact antithesis of what the First Lien Lenders specifically provided under the original First Lien Credit Agreement.

76.     The Loan Purchase Agreement and the Assignment and Assumption Agreement (the "Fourth Amendment Agreements") were executed on August 21, 2009, simultaneously with the Purported Fourth Amendment itself.  Through the Fourth Amendment Agreements, Yucaipa purported to acquire and hold "$114,712,088.66 of Term Loans and $30,400,458.40 of LC

Commitments (*i.e.* deposits to support letter of credit), totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement." (Cross-Claims, Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 ¶ 17.) ████████████████████
████████████████████

77.     Following the execution of the Purported Fourth Amendment and the Fourth Amendment Agreements, Yucaipa contended that it was the Requisite Lender under the First Lien Credit Agreement.

### (g)     Defendants Use Yucaipa's Alleged Requisite Lender Status to Paralyze the First Lien Lenders

78.     Operating under the Purported Fourth Amendment and the belief that they had succeeded in their plan to take control over the First Lien Credit Agreement, Defendants exercised the authority of the Requisite Lender.  Defendants' actions as the purported Requisite Lender violated the First Lien Credit Agreement and the Third Amendment, and thereby prevented the First Lien Lenders from exercising any of their rights or remedies under the First Lien Credit Agreement, notwithstanding the occurrence and continuance of Defaults and Events of Default (including payment defaults), and notwithstanding the continuing decline in the Debtors' operational performance.  Clearly, Defendants were determined to assert total control over the Debtors and the First Lien Credit Agreement such that no remedies could be exercised, no restructuring could take place, and no sale could occur, unless it was on terms acceptable to Defendants.

79.     Additionally, following the execution of the Purported Fourth Amendment, the Debtors, at Yucaipa's direction as controlling shareholder and with its "consent" as alleged Requisite Lender, refused to make regularly scheduled payments of principal and interest under the First Lien Facility.  The Debtors, at Yucaipa's direction as controlling shareholder and with

its "consent" as alleged Requisite Lender, also failed to reimburse collateral accounts that secured the First Lien Facility's letter of credit facility, attempted to terminate certain control agreements, and attempted to retain excess cash all in violation of the terms of the First Lien Credit Agreement. These steps caused continuing harm and damage to the First Lien Lenders.

80.     Thus, Yucaipa, acting as the purported Requisite Lender, gave the Debtors a "free pass" to ignore the terms of the First Lien Credit Agreement that required the Debtors to pay principal and interest and abide by various financial and operating covenants.

(h)     **Litigation Surrounding the Purported Fourth Amendment**

81.     Although Yucaipa claimed to be the Requisite Lender under the Credit Agreement in light of the Purported Fourth Amendment, its claim to that position was contested first by CIT, in its capacity as the Administrative Agent, and later by the Individual Plaintiff Lenders, and was an issue in at least three separate proceedings (the third of which includes multiple adversary proceedings before this Court).

(i)     **The Georgia Litigation**

82.     Approximately one month after the execution of the Purported Fourth Amendment, the Individual Plaintiff Lenders objected to Yucaipa's acquisition of First Lien Debt and alleged status as Requisite Lender, and instructed CIT, in its capacity as Administrative Agent, to challenge the validity and enforceability of the Purported Fourth Amendment.

83.     Following CIT's objection to the Purported Fourth Amendment, in November, 2009, Yucaipa and the Debtors (at Yucaipa's direction), brought suit against CIT in the Superior Court of Fulton County, Georgia (the "Georgia Action"), seeking, among other things, a declaratory judgment that the Purported Fourth Amendment was valid and that Yucaipa was the Requisite Lender. In response, CIT filed counterclaims seeking, among other things, a declaration that the Purported Fourth Amendment was invalid and stating claims for breach of

fiduciary duty against the Allied Board and aiding and abetting breach of fiduciary duty against Yucaipa.

84.     After two years of litigation in the Georgia Action – during which time the First Lien Lenders were completely paralyzed and unable to take action in respect of the numerous Events of Default that occurred and were continuing – CIT entered into a settlement agreement with the Debtors and Yucaipa, in which CIT capitulated that Yucaipa was the Requisite Lender. The settlement agreement, however, clearly provided that the settlement was made solely by CIT in its individual capacity and did not release any claims that may have existed on behalf of "any other person."

(ii)     <b>The New York Action</b>

85.     On January 17, 2012, just weeks after the settlement of Yucaipa's and the Debtors' lawsuit against CIT, the Individual Lender Plaintiffs commenced an action (the "New York Action") against Yucaipa in the Supreme Court of the State of New York (the "New York Court") seeking a declaration that "(i) the purported Fourth Amendment is null and void, ineffective, and not binding," and (ii) that "Yucaipa is not the Requisite Lenders under the Credit Agreement."

86.     Yucaipa's motion to dismiss the New York Action was denied at a May 30, 2012 hearing without a written opinion, and the transcript of that hearing was "So Ordered" on August 2, 2012.

87.     The Individual Lender Plaintiffs moved for summary judgment on August 27, 2012. At oral argument on that motion on November 19, 2012, the court indicated it would grant the Individual Lender Plaintiffs' motion for summary judgment and that it would subsequently issue a written order.

88.     In its written decision, dated March 8, 2013, the New York Court held that the restrictions contained in the Third Amendment "precluded Yucaipa from becoming the Requisite Lender or exerting control over the other Lenders." *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at *5 (N.Y. Sup. Ct. Mar. 8, 2013). The New York Court further held that Yucaipa's attempt to usurp Requisite Lender status through the Purported Fourth Amendment was "of course, flatly prohibited under the Credit Agreement" and therefore "the Purported Fourth Amendment is *invalid and of no force or effect.*" *Id.* at *5 (emphasis added). Based on the foregoing, the New York Court unequivocally held that "***Yucaipa is not the Requisite Lender.***" *Id.* at *6 (emphasis added).

89.     On December 17, 2013, the New York Appellate Division affirmed the New York Court's finding that the Purported Fourth Amendment was void *ab initio* and that Yucaipa is not the Requisite Lender. *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, 978 N.Y.S.2d 10, 11-12 (N.Y. App. Div. 2013).

90.     On January 17, 2014, conceding that the Appellate Division's decision did not disturb the New York Court's finding that the Purported Fourth Amendment was void *ab initio* and that Yucaipa is not the Requisite Lender, Yucaipa filed a motion for leave to appeal to the New York Court of Appeals. The New York Court of Appeals subsequently denied the motion. As a result, Yucaipa has exhausted its appeals in the New York Action.

(i)     **Yucaipa, as the Alleged Requisite Lender, Usurps Negotiations with JCT With Catastrophic Results**

91.     JCT was a principal competitor of the Debtors and had long sought to acquire the Debtors' assets in a strategic combination that would consolidate the industry.

92.     In fact, JCT's Chairman (Michael Riggs) often remarked that acquiring the Debtors' assets and merging them with JCT would be the fulfillment of "a life dream." At the

bankruptcy auction in September 2013, Riggs noted that he had been pursuing the Debtors for so long that "no one on the planet wants it [Allied] more than me."

93.     JCT ultimately acquired substantially all of the Debtors' assets in a Section 363 sale, which closed on December 27, 2013.  The price paid by JCT for substantially all of the Debtors' assets – $135 million – was far less than the value previously offered by JCT in proposals tendered in late 2011 and 2012, proposals that would have returned significantly greater value to the First Lien Lenders but for the Defendants' interference and inappropriate conduct.

94.     The significant deterioration in the value actually realized by the First Lien Lenders was the direct result of Yucaipa's wrongful usurpation of the negotiations with JCT. The negotiation of the JCT proposals, unfortunately, took place between JCT and Yucaipa (in its alleged capacity as Requisite Lender – which it was not), rather than with the "disinterested" members of the Board (or a special committee of the Board), whose responsibility would have been to negotiate the highest and best purchase price for the assets without immediate regard for how those proceeds might be allocated.

95.     Defendants, however, had a different agenda.  They had no interest in allowing the Debtors to pursue a typical M&A type transaction.  In fact, Defendants' strategy is confirmed by an e-mail from Riggs to the Individual Lender Plaintiffs in December 2011, in which Riggs explains that Yucaipa "is not interested in exploring a typical M&A type transaction" and instead wants JCT to "find a way to . . . buy their debt."

96.     Yucaipa, improperly using its alleged Requisite Lender position, wanted to pursue a sale of its First Lien Debt (instead of a typical M&A transaction) so that it could garner a premium for itself by demanding a disproportionate share of the consideration that JCT was

willing to pay, to the detriment of the other First Lien Lenders. The preferential and disparate treatment that Defendants were seeking to obtain for Yucaipa is reflected in documents produced during discovery. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

97.     When Individual Lender Plaintiffs legitimately requested that they receive ratable treatment with Yucaipa on account of the First Lien Debt they held, Yucaipa refused to yield, insisting instead on a disproportionate percentage of the consideration. As a result of Defendants' wrongful actions, the prospects for a transaction with JCT deteriorated dramatically.

98.     In February 2012, and again in March 2012, when it became evident that Defendants' intransigence was making it impossible to pursue a transaction with JCT that would benefit all of the First Lien Lenders equally, the Individual Lender Plaintiffs wrote letters to the Board demanding that the Board step in and take action consistent with its fiduciary obligations. Not surprisingly, the Yucaipa dominated board refused to act, leaving Defendants in the position of setting their own terms for allowing any JCT transaction to move forward. The terms Defendants set, however, continued to require disproportionately better treatment for Yucaipa and ultimately cratered any prospect for a transaction with JCT.

99. Defendants' improper conduct in connection with the 2011/2012 negotiations with JCT forms part of the basis for Plaintiffs' claim for equitable subordination of Yucaipa's claims. Equitable subordination is appropriate when, as here, there is evidence showing that creditors should recover less on their debts as a result of the defendant's misconduct. Had Defendants not engaged in the inequitable conduct described above, JCT "would have paid each Lender in full (i.e., par plus accrued interest) for the $305.1 million of outstanding first lien debt." (*See* Motion for Leave, Adv. Pro. No. 13-50530 (Bankr. D. Del.), D.I. 320, Ex. A ¶ 57.) Yucaipa's First Lien Debt claims should be equitably subordinated so as to compensate the harmed First Lien Lenders in an amount equal to the difference between (i) the actual recovery to First Lien Lenders (other than Yucaipa) from the proceeds of the JCT sale and (ii) the recovery that could have been realized had Yucaipa not wrongly appropriated discussions regarding a potential acquisition of the Debtors by JCT in late December 2011 (approximately 100% of a par recovery plus accrued interest). As a result, Yucaipa's distribution as First Lien Lenders should be equitably subordinated and, to the extent already paid, then turned over to the Co-Administrative Agents on behalf of the non-Yucaipa First Lien Lenders until the non-Yucaipa First Lien Lenders are made whole.

100. In addition, Defendants' wrongful conduct in connection with the JCT negotiations turned what would have been a quick and relatively inexpensive proceeding to accomplish a Section 363 sale to JCT into a protracted, and expensive, battle lasting nineteen months. As a result, the Debtors were forced to incur $30 million in post-petition financing, reducing the amount available from the Debtors' assets for distribution to the First Lien Lenders. The non-Yucaipa First Lien Lenders were also forced to incur millions of dollars in legal fees in

connection with the bankruptcy cases and the New York Action made necessary by Yucaipa's wrongful acts.

(j)    **Yucaipa Has Failed to Perform Under the Third Amendment**

101.    In the New York Action, the Purported Fourth Amendment was found to be invalid such that any reliance on the Purported Fourth Amendment now is misplaced. Accordingly, the Third Amendment is clearly the operative amendment to the First Lien Credit Agreement and its terms, including the contribution provisions and limitations upon Yucaipa's debt holdings, are binding and controlling.

102.    However, notwithstanding the ruling in the New York Action, Yucaipa refused to perform in accordance with the terms of the First Lien Credit Agreement, as amended by the Third Amendment.

(k)    **The Filing of These Bankruptcy Cases and Prior Proceedings in This Court**

103.    On May 18, 2012, the Individual Lender Plaintiffs filed these involuntary bankruptcy proceedings against the Debtors. Thereafter, the Debtors consented to the entry of an order for relief and filed voluntary petitions on behalf of their subsidiaries and affiliates.

104.    During the initial period of the chapter 11 cases, and even after the decision by the New York Court, Yucaipa continued to allege that it was the Requisite Lender under the First Lien Credit Agreement. To resolve the question, on July 9, 2013, the Individual Lender Plaintiffs filed a motion for summary judgment seeking a determination that they were the Requisite Lenders.

105.    On August 8, 2013, this Court granted the Individual Lender Plaintiffs' motion for summary judgment, holding that any First Lien Debt held by Yucaipa is subject to the terms of the Third Amendment, and that the Individual Lender Plaintiffs are the Requisite Lenders under the First Lien Credit Agreement.

106.    The Debtors subsequently conducted a court-approved auction to sell substantially all of their assets, including the collateral securing the First Lien Debt. Substantially all of the Debtors' assets were sold to JCT for a net recovery to First Lien Lenders of approximately $105 million (the "Sale Proceeds").[5]  The Sale Proceeds were more than $100 million less than the amount offered by JCT in late 2011 and early 2012.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Equitable Subordination Pursuant to 11 U.S.C. § 510(c) Against Yucaipa for Harm to All First Lien and Second Lien Lenders**

107.    The Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 106 as if set forth fully herein.

108.    At all times relevant hereto, Yucaipa was either a statutory "insider" of the Debtors as such term is defined in 11 U.S.C. § 101(31) or, alternatively, a *de facto* insider of the Debtors.

109.    As more fully described above, Yucaipa, as an insider with effective control over the Debtors and the Board and in its capacity as alleged Requisite Lender, has engaged in inequitable misconduct that specifically harmed the First Lien Lenders (other than Yucaipa) in ways that are different from any harm suffered by the Debtors' other creditors by, among other things:

(a)    improperly acquiring First Lien Debt in violation of the First Lien Credit Agreement;

(b)    improperly using its purported First Lien Debt holdings to declare itself the Requisite Lender, in clear violation of the First Lien Credit Agreement;

(c)    improperly using its status as purported Requisite Lender to neutralize the First Lien Lenders, giving the Debtors a "free pass" to ignore the provisions of the First

---

[5] The gross proceeds from the JCT sale totaled approximately $135 million.

Lien Credit Agreement requiring it to pay principal and interest and abide by certain financial and operating covenants;

(d)    improperly using its status as purported Requisite Lender to protect its equity investment by precluding a badly-needed restructuring of the Debtors;

(e)    improperly using its status as purported Requisite Lender to insist on a disproportionate share of the consideration JCT was willing to pay for the sale of the Debtors' assets, which derailed the sale;

(f)    improperly usurping Requisite Lender status, causing the First Lien Lenders to incur unnecessary legal costs regarding the impropriety of Yucaipa's status as Requisite Lender and the invalidity of the Purported Fourth Amendment; and

(g)    improperly usurping Requisite Lender status, preventing the Debtors from consummating a sale, which in turn caused the Debtors and the First Lien Lenders to incur unnecessary legal costs.

110.    As a result of Yucaipa's conduct, the First Lien Lenders (other than Yucaipa) have been materially harmed.

111.    Granting the relief sought herein against Yucaipa is consistent with the Bankruptcy Code and is appropriate based on the indisputable facts of this case.

112.    Pursuant to 11 U.S.C. §510(c), all distributions to Yucaipa on account of its status as First Lien Lender should be subordinated to the claims of all other First Lien Lenders and, to the extent already distributed to Yucaipa, then turned over to the Co-Administrative Agents on behalf of the non-Yucaipa First Lien Lenders until the non-Yucaipa First Lien Lenders are made whole.

## Second Claim for Relief

### Breach of Contract Against Yucaipa

113.    The Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 112 as if fully set forth herein.

114.    As a holder of First Lien Debt, Yucaipa is bound by the terms of the First Lien Credit Agreement, as amended by the Third Amendment.

115.    The court in the New York Action declared that the Purported Fourth Amendment is invalid. Accordingly, because the Purported Fourth Amendment has been found to be null and void, the Third Amendment is enforceable and its terms govern any holders of First Lien Debt, including Yucaipa.

116.    In addition, this Court has determined that the Third Amendment is binding on Yucaipa. (Transcript of Proceedings Held on July 30, 2013, Adv. Proc. No. 13-50530 (Bankr. D. Del.), D.I. 297 at 127:13-15.)

117.    Yucaipa has breached the First Lien Credit Agreement, as amended by the Third Amendment, by acquiring more Term Loan Exposure than permitted under Section 10.6(c) of the Third Amendment. Specifically, Section 10.6(c)(ii) provides, in relevant part:

> no Lender may sell, assign, transfer or otherwise convey any of its rights and obligations under this Agreement . . . and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) . . . the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate principal amount of the Term Loan Exposure . . . or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would exceed $50 million . . . .

118.    Thus, under the terms of the Third Amendment, at most, Yucaipa would be permitted to hold the lesser of $50 million or 25% of the aggregate principal amount of Term Loans.

119.    Yucaipa breached the First Lien Credit Agreement, as amended by the Third Amendment, by purchasing, and purporting to hold, $114,712,088.66 in Term Loans, which is substantially greater than the amount it is permitted to hold.

120.    In addition, the First Lien Credit Agreement, as amended by the Third Amendment, provides that Yucaipa may not purchase or hold any Revolving Loans or LC

Commitments. (Third Amendment § 2.1(c).) Yucaipa breached the First Lien Credit Agreement, as amended by the Third Amendment, by purchasing, and purporting to hold, $30,400,458.40 of LC Commitments.

121. As a result of its impermissible acquisition of First Lien Debt, Yucaipa declared itself to be the Requisite Lender, with all the rights and powers granted thereto under the First Lien Credit Agreement.

122. By improperly acting as the Requisite Lender, Yucaipa breached numerous other provisions of the First Lien Credit Agreement, as amended by the Third Amendment, including, but not limited to:

(a) Section 2.7(a) of the Third Amendment, which provides that Yucaipa "shall have no voting rights for all purposes under this Agreement (whether before, during, or after an Insolvency or Liquidation Proceeding) . . . with respect to their Term Loans."

(b) Section 2.7(b) of the Third Amendment, which provides that Yucaipa "shall not . . . make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders . . . ."

(c) Section 2.7(e)(iv) of the Third Amendment, which provides that Yucaipa "knowingly and irrevocably waives any and all rights to exercise any voting rights it would otherwise have as a Lender for all purposes under this Agreement . . . ."

123. Yucaipa's improper usurpation of Requisite Lender status breached the First Lien Credit Agreement, as amended by the Third Amendment, in at least the following ways:

(a) Yucaipa improperly acquired First Lien Debt in violation of the First Lien Credit Agreement;

(b) Yucaipa improperly used its purported debt holdings to declare itself the Requisite Lender, in clear violation of the First Lien Credit Agreement;

(c) Yucaipa improperly used its status as purported Requisite Lender to neutralize the First Lien Lenders, giving the Debtors a "free pass" to ignore the provisions of the First Lien Credit Agreement requiring them to pay principal and interest and abide by certain financial and operating covenants;

(d)     Yucaipa improperly used its status as purported Requisite Lender to protect its equity investment by precluding a badly-needed restructuring of the Debtors; and

(e)     Yucaipa's improper usurpation of Requisite Lender status caused the First Lien Lenders to incur unnecessary legal costs regarding the impropriety of Yucaipa's status as Requisite Lender and the invalidity of the Purported Fourth Amendment.

124.    In addition, starting in November or December 2011, Yucaipa, acting as the purported Requisite Lender, hijacked negotiations with JCT by insisting on terms that would benefit Yucaipa, rather than the Debtors, and by demanding that any deal disproportionately favor Yucaipa at the expense of the First Lien Lenders, including the Plaintiffs.  Yucaipa's improper usurpation of Requisite Lender status prevented the Debtors from consummating a sale with JCT, which in turn caused the Debtors and the First Lien Lenders to incur unnecessary legal costs.

125.    But for Yucaipa's wrongful usurpation of Requisite Lender status, JCT would have acquired the Debtors in late 2011 or early 2012 for an amount substantially in excess of $135 million.  Instead, the Debtors were forced to incur additional debt to fund a prolonged bankruptcy proceeding.

126.    As a result, the Plaintiffs have been harmed in an amount to be proven at trial.

### Third Claim for Relief

### Breach of the Duty of Good Faith and Fair Dealing Against Yucaipa

127.    The Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 126 as if fully set forth herein.

128.    The covenant of good faith and fair dealing is implied in all contracts under New York law.  The covenant operates to prevent a party from acting arbitrarily or unreasonably, and thereby frustrating the benefits of the bargain that the other party reasonably expected.  The

implied covenant also applies when a contract confers discretion on a party and requires that the party exercising that discretion do so reasonably and in good faith.

129.    To the extent that Yucaipa's wrongful usurpation of Requisite Lender status and its subsequent actions as purported Requisite Lender were not explicitly prohibited by the First Lien Credit Agreement, as amended by the Third Amendment, they are a violation of the covenant of good faith and fair dealing which is implied in the First Lien Credit Agreement, as amended by the Third Amendment.

130.    Yucaipa breached the implied covenant of good faith and fair dealing by acting arbitrarily and unreasonably, by frustrating the benefits of the bargain that the First Lien Lenders reasonably expected, and by exercising discretion granted to it by the First Lien Credit Agreement in an unreasonable and bad faith manner, as set forth above.

131.    As a result, the Plaintiffs have been harmed by Yucaipa's wrongful actions in an amount to be proven at trial.

### Fourth Claim for Relief

### Tortious Interference with Contract Against the Yucaipa Directors and Burkle

132.    The Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 131 as if fully set forth herein.

133.    The First Lien Credit Agreement, as amended by the Third Amendment, is a valid contract that governs the rights of First Lien Lenders with respect to the First Lien Debt.

134.    The Yucaipa Directors and Burkle were aware of the First Lien Credit Agreement and its terms.

135.    The Yucaipa Directors and Burkle, in their individual capacities, intentionally and maliciously induced multiple breaches by Yucaipa of the First Lien Credit Agreement through their control of Yucaipa, including:

a)  In August 2009, the Yucaipa Directors, and, upon information and belief, Burkle caused Yucaipa to purchase ComVest's First Lien Debt, in contravention of the First Lien Credit Agreement, as amended by the Third Amendment, which purchase purported to result in Yucaipa becoming the Requisite Lender. As a result, the First Lien Lenders were unable to exercise remedies available under the First Lien Credit Agreement.

b)  In late 2011 and early 2012, the Yucaipa Directors and, upon information and belief, Burkle, caused Yucaipa, wrongfully acting as the Requisite Lender, to hijack ongoing negotiations with JCT by insisting on terms that would benefit Yucaipa, rather than the Debtors, and by demanding that any deal disproportionately favored Yucaipa at the expense of the Debtors' other First Lien Lenders, including the Individual Lender Plaintiffs. As a result, the Debtors were forced to incur additional debt to fund a prolonged bankruptcy proceeding.

136.    The intentional acts committed by the Yucaipa Directors and Burkle were significant factors in causing Yucaipa's breaches of the First Lien Credit Agreement and were without justification.

137.    The Yucaipa Directors and Burkle acted improperly and without privilege in inducing Yucaipa's breaches of the First Lien Credit Agreement.

138.    In inducing Yucaipa's breaches of the First Lien Credit Agreement, the Yucaipa Directors and Burkle exceeded the scope of their agency as Yucaipa managers, employees, and/or agents and were motivated by a malicious and bad faith purpose to injure Plaintiffs.

139.    In inducing Yucaipa's breaches of the First Lien Credit Agreement, the Yucaipa Directors and Burkle were not pursuing in good faith the legitimate profit-seeking activities of Yucaipa or the Debtors. Rather, they were pursing to benefit themselves individually at the expense of the Debtors and their stakeholders, including the First Lien Lenders.

140.    Yucaipa's breaches of the First Lien Credit Agreement damaged the First Lien
Lenders in at least the following ways:

(a)    Yucaipa improperly acquired First Lien Debt in violation of the First Lien Credit Agreement;

(b)    Yucaipa improperly used its purported debt holdings to declare itself the Requisite Lender, in clear violation of the First Lien Credit Agreement;

(c)    Yucaipa improperly used its status as purported Requisite Lender to neutralize the First Lien Lenders, giving the Debtors a "free pass" to ignore the provisions of the First Lien Credit Agreement requiring them to pay principal and interest and abide by certain financial and operating covenants;

(d)    Yucaipa improperly used its status as purported Requisite Lender to protect its equity investment by precluding a badly-needed restructuring of the Debtors;

(e)    Yucaipa improperly used its status as purported Requisite Lender to insist on a disproportionate share of the consideration JCT was willing to pay for the sale of the Debtors' assets which resulted in derailing the sale.

(f)    Yucaipa's improper usurpation of Requisite Lender status caused the First Lien Lenders to incur unnecessary legal costs regarding the impropriety of Yucaipa's status as Requisite Lender and the invalidity of the Purported Fourth Amendment.

(g)    Yucaipa's improper usurpation of Requisite Lender status prevented the Debtors from consummating a sale, which in turn caused the debtors and the First Lien Lenders to incur unnecessary legal costs.

141.    As a result, the Plaintiffs have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment

a)    subordinating Yucaipa's claims as First Lien Lender, in total, against the Debtors to the claims of the other First Lien Lenders;

b)    in favor of the Plaintiffs and against Yucaipa due to Yucaipa's breaches of the First Lien Credit Agreement in an amount to be proven at trial, plus pre-judgment interest;

c)      or, in the alternative, in favor of the Plaintiffs and against Yucaipa due to Yucaipa's breaches of the implied duty of good faith and fair dealing in an amount to be proven at trial, plus pre-judgment interest;

d)      in favor of the Plaintiffs and against the Yucaipa Directors and Burkle due to their' tortious interference with contract in an amount to be proven at trial, plus pre-judgment interest; and

e)      granting such other or further relief as is just, proper and equitable.

Dated: November 19, 2014
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_(signature)_

Adam G. Landis (DE No. 3407)
Kerri K. Mumford (DE No. 4186)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
Robert J. Ward
David M. Hillman
919 Third Avenue
New York, NY  10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955

*Counsel to BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., Spectrum Investment Partners, L.P., Black Diamond Commercial Finance, L.L.C., As Co-Administrative Agent, and Spectrum Commercial Finance LLC, As Co-Administrative Agent*

# **EXHIBIT 12**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | :     Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., | : |
|         Alleged Debtor. | :     Case No. 12-[_____] ([___]) |
| | : |
| | : |

------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | :     Chapter 11 |
| ALLIED SYSTEMS, LTD. (L.P.), | : |
|         Alleged Debtor. | :     Case No. 12-[_____] ([___]) |
| | : |

------------------------------------------------------x

## EXPEDITED MOTION OF PETITIONING CREDITORS FOR THE APPOINTMENT OF A TRUSTEE PURSUANT TO 11 U.S.C. §§ 105(a), 1104(a)(1) AND 1104(a)(2)

The Petitioning Creditors, BDCM Opportunity Fund II, LP, ("BDCM"), Black Diamond CLO 2005-1 Ltd. ("Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum" collectively with BDCM and Black Diamond, "Petitioning Creditors") in their capacity as lenders (in such capacity, the "Lenders") under the Credit Agreements (as defined below), by and through their undersigned counsel, hereby submit this motion ("Motion") for an order under 11 U.S.C. §§ 105(a), 1104(a)(1) and 1104(a)(2) appointing a Chapter 11 trustee in these cases. Contemporaneously herewith, the Petitioning Creditors have filed a motion to limit and shorten notice, and seeking an expedited hearing on the Motion. In support of the Motion, the Petitioning Creditors respectfully state as follows.

## PRELIMINARY STATEMENT

These cases were commenced by the Petitioning Creditors, who are Lenders under Credit Agreements (defined below)[1] pursuant to which the Alleged Debtors[2] obtained approximately $315 million in financing when they emerged from Chapter 11 in 2007 under the control of Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, "Yucaipa"). The compelling need for a Chapter 11 trustee in these cases arises from (among other reasons) the ongoing, pervasive manipulation and control of the Alleged Debtors by Yucaipa, and the significant conflicts of interest that leave the Alleged Debtors incapable of fulfilling their fiduciary obligations.

Under the Bankruptcy Code, appointment of a trustee is mandatory if "cause" exists. 11 U.S.C. §1104(a)(1). Courts may also appoint a trustee if it is in the interests of creditors, equity security holders and other interests of the estate. 11 U.S.C. §1104(a)(2).

As shown below, appointment of a Chapter 11 trustee under section 1104(a) is essential because, among other things:

- Yucaipa's position as majority shareholder and purported controlling First Lien Lender, and its control of the Allied board of directors (the "Allied Board") and senior management, create conflicts of interest that prevent the Alleged Debtors from discharging their fiduciary duties;

- The Alleged Debtors have grossly mismanaged their business ███████████████████████████████████████████

- In 2011 alone, the Alleged Debtors' mismanagement resulted in ███████████████████

- As a result of the Alleged Debtors' conflicts of interest and loyalty to Yucaipa, as well as their gross mismanagement of the business, the Petitioning Creditors have no

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Credit Agreements.

[2] The "Alleged Debtors" are Allied Systems Holdings, Inc. ("Allied") and Allied Systems, Ltd. (L.P.) ("Allied Systems").

**REDACTED**

confidence in the Alleged Debtors' ability to reorganize their business or discharge their fiduciary duties; and

- The Alleged Debtors, under control of Yucaipa, have been unwilling to engage the Petitioning Creditors in restructuring negotiations, which has resulted in litigation between the Petitioning Creditors and Yucaipa and created an acrimonious relationship between Petitioning Creditors (on the one hand), and Yucapia and the Alleged Debtors (on the other hand), warranting appointment of a Chapter 11 trustee.

The Alleged Debtors, as debtors-in-possession, the Allied Board and management owe fiduciary duties of care and loyalty to Alleged Debtors' creditors. The duty of loyalty includes a prohibition against self-dealing which prohibits the Alleged Debtors and members of the Allied Board and management from acting solely in their and Yucaipa's self-interest to the exclusion of other interests, such as the Petitioning Creditors', which they have a duty to protect. LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 292 (D. Del. 2000)(citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)).

The Alleged Debtors are undeniably under the control of Yucaipa, whose many roles relative to the Alleged Debtors will inevitably lead to the untenable situation of Yucaipa negotiating the terms of any restructuring with itself. Since 2007, as a result of the prior reorganization, Yucaipa (i) has been the majority shareholder of Allied, holding in excess of 70% of its common equity, (ii) designated four out of the five members of the Allied Board, including chairman Derex Walker, and (iii) controlled the actions of Allied's senior management through its appointment of current chief executive officer, Mark Gendregske. In addition, as discussed more fully below, in 2009 Yucaipa purported to acquire a majority of the Obligations under the First Lien Credit Agreement, and to thereby obtain the status of "Requisite Lender" with the ability to bind the Lenders, (including Petitioning Creditors) to various courses of action. Without an independent fiduciary, Yucaipa will control this restructuring from all sides, and it will use that control to benefit its own interest without regard to the interests of other creditors,

3                                                                      **REDACTED**

including the Petitioning Creditors. Thus, to maintain the integrity of the bankruptcy process and insure that the interests of all creditors are served, a Chapter 11 trustee must be appointed in these cases.

Further, the Alleged Debtors' prepetition conduct, at the direction of and solely for the benefit of Yucaipa, is indicative of the Alleged Debtors' loyalty to Yucaipa and their utter lack of regard for the interests of their creditors, including the Petitioning Creditors. As set forth in more detail below, the financial condition of the Alleged Debtors and their business operations deteriorated, resulting in the occurrence and continuance of certain Events of Default under the Credit Agreements. Further, other Events of Default were the result of affirmative decisions made by the Allied Board and management (at the direction of Yucaipa) to not comply with critical provisions of the Credit Agreements. These Events of Default include, but are not limited to, the following: (i) deliberate and willful failure to pay at least $67 million of principal and interest to all Lenders, including the Petitioning Creditors; ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████ [3]

The Alleged Debtors have admitted that these and other Events of Default have occurred and are continuing under each of the Credit Agreements. (Ehrlich Aff., ¶ 10). In any other circumstance, given the substantial and continuing payment defaults and other Events of Default that have occurred and continued for several years, the First Lien Lenders would long ago have

---

[3] *See* Affidavit of Richard Ehrlich in Support of Motion of Petitioning Creditors for the Appointment of a Chapter 11 Trustee dated May 11, 2012 ("Ehrlich Aff.").

**REDACTED**

instructed the Administrative Agent to accelerate the debt and commence the exercise of remedies. In the present case, however, the Alleged Debtors, under Yucaipa's control, engaged in a course of conduct with Yucaipa -- in direct violation of the terms of the First Lien Credit Agreement -- designed to thwart the legitimate exercise of the rights of the First Lien Lenders for the sole and exclusive benefit of Yucaipa.

Yucaipa's ability to control the potential restructuring of the Alleged Debtors' First Lien Obligations to the detriment of all Lenders, including the Petitioning Creditors, derives from, and is wholly dependent upon, the claimed validity of the fourth amendment to the Credit Agreement (the "Purported Fourth Amendment") and its claimed status as the controlling lender ("Requisite Lender") under the First Lien Credit Agreement, both of which the Petitioning Creditors have challenged in a state court action commenced prior to the filing of these involuntary petitions. Yucaipa caused the Alleged Debtors to enter into the Purported Fourth Amendment, and to join in its suit against The CIT Group/Business Credit, Inc. ("CIT")[4] when CIT properly refused to acknowledge the validity of the Purported Fourth Amendment. The Alleged Debtors' involvement with the Purported Fourth Amendment and in related litigation -- which benefited only Yucaipa -- clearly demonstrates that the Alleged Debtors, the Allied Board and senior management are under the control of Yucaipa. Yucaipa's control of the Alleged Debtors, and the Alleged Debtors' prepetition conduct, have raised substantial doubt whether the Allied Board and the Alleged Debtors' current management can fulfill their fiduciary duties to all creditors.

Appointment of a Chapter 11 Trustee is also appropriate given the Alleged Debtors' gross mismanagement of their business ███████████████████████████████████

██████████████████████████████████████████████████████████

---

[4] CIT was the Administrative Agent under the First Lien Credit Agreement. However, the action commenced by Yucaipa and the Alleged Debtors did not name CIT in that capacity.

**REDACTED**



A lack of confidence in the Alleged Debtors' ability to manage their business and discharge their fiduciary duties is grounds for appointment of a Chapter 11 Trustee. As discussed below, the Petitioning Creditors cannot trust the Alleged Debtors' management or the Allied Board, and have no confidence in management's ability to reverse the severely declining business of the Alleged Debtors, when they have shown no ability to do so during the past four years.

This Motion and these cases are not about a group of disgruntled minority lenders in a credit facility. Instead, these disputes are about the role and conduct of Yucaipa, a sophisticated equity investor, who has used its control over the Alleged Debtors to further entrench itself and elevate its own interests above the interests of other Lenders at the expense of the Alleged Debtors and its creditors. To allow Yucaipa to maintain control over the Alleged Debtors during these Chapter 11 proceedings would severely impact the integrity of the bankruptcy process and materially and adversely affect the prospects of a successful reorganization. Indeed, the Alleged Debtors, under Yucaipa's control, have rebuffed the Petitioning Creditors' attempts to engage in meaningful restructuring negotiations. Unless a disinterested fiduciary is appointed, Yucaipa will continue to strategically direct any restructuring process for its benefit and to the detriment of other creditors.

**REDACTED**

Appointment of a Chapter 11 trustee is necessary and appropriate.  Not only does "cause" exist for the appointment of a trustee, but the appointment of a trustee would be in the best interests of all parties.  Accordingly, to move these cases forward, preserve the value of these estates, and maintain the integrity of the bankruptcy process, the Petitioning Creditors request the appointment of a Chapter 11 trustee in each of the Alleged Debtors' cases.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## STATEMENT OF FACTS

Allied is a provider of distribution and transportation services to the automotive industry. (Ehrlich Aff., ¶ 3).  Allied and several related entities filed for Chapter 11 bankruptcy protection in July 2005.  (Ehrlich Aff., ¶ 4).

**Yucaipa's Control of Allied's Business**

In May 2007, Allied emerged from bankruptcy pursuant to a plan of reorganization that resulted in Yucaipa becoming the majority and controlling shareholder of Allied.  (Ehrlich Aff., ¶ 4).  As a result of its controlling ownership interest, Yucaipa also controls the Allied Board. Pursuant to Allied's plan of reorganization, Yucaipa designated four out of the five members of the Allied Board, including Derex Walker who is currently chairman of the Allied Board. (Harris Decl., Ex. A, at 48-49)[5].  Upon information and belief, Yucaipa's ability to appoint the members of the Allied Board has enabled Yucaipa to control Allied, including the right to appoint and direct the actions of senior management.  Yucaipa also selected Allied's current chief

---

[5] *See* Declaration of Adam C. Harris in Support of Motion of Petitioning Creditors for the Appointment of a Chapter 11 Trustee dated May 11, 2012 ("Harris Decl.").

**REDACTED**

executive officer, Mark Gendregske.  Id.

**The Credit Agreements**

In connection with their emergence from bankruptcy in May 2007, the Alleged Debtors obtained an aggregate of $315 million of financing comprised of (a) a $265 million senior secured first priority credit facility ("First Lien Loan"), and (b) a $50 million second lien credit facility ("Second Lien Loan").  The First Lien Loan is governed by the First Lien Credit Agreement.  (Ehrlich Aff., ¶ 5).  The Second Lien Loan is governed by the Second Lien Credit Agreement.  (Schaffer Aff.[6], Ex. A, collectively, with the First Lien Credit Agreement, "Credit Agreements").

The Petitioning Creditors are Lenders under both the First Lien Credit Agreement and the Second Lien Credit Agreement, and own or control, with power to vote (a) approximately $47.9 million (20%) in aggregate principal amount of First Lien Obligations, and (b) approximately $5 million (17%) in aggregate principal amount of Second Lien Obligations. (Ehrlich Aff., ¶ 7); (Schaffer Aff., ¶ 7).  Because of its controlling equity ownership position, for purposes of each of the Credit Agreements, Yucaipa is defined as the "Sponsor." (Ehrlich Aff., ¶ 12); (Schaffer Aff., ¶ 7).  The First Lien Credit Agreement, prior to any amendments, contained an absolute prohibition against Yucaipa, as the majority and controlling shareholder of Allied, from becoming a First Lien Lender.  (Ehrlich Aff., ¶ 8).  The purpose of this prohibition was to assure that, Yucaipa, as the majority shareholder, could not also, as a First Lien Lender, interfere with the rights of, and decisions being made by, the First Lien Lenders vis-à-vis Allied, including (without limitation) declaring or waiving defaults, and deciding when (or if) to exercise remedies.  This prohibition was designed to prevent Yucaipa, as the controlling owner of the

---

[6] See Affidavit of Jeffrey A. Schaffer in Support of Motion of Petitioning Creditors for the Appointment of a Chapter 11 Trustee dated May 11, 2012 ("Schaffer Aff.").

**REDACTED**

Borrower and guarantors, from buying enough debt to be able to prevent the Lenders from collecting on that debt or otherwise exercising their rights.

## The Alleged Debtors' Events of Default

Just over a year after emerging from Chapter 11, Events of Default began to occur under each of the Credit Agreements. (Ehrlich Aff., ¶ 9). These Events of Defaults include, but are not limited to, the following:

- Failure to pay at least $67 million of principal and interest to all Lenders, including the Petitioning Creditors.



In fact, since August 2008, the Alleged Debtors' Events of Default have continued under the Credit Agreements. The Alleged Debtors have acknowledged the defaults and recognized that the defaults entitled the First Lien Lenders to accelerate the debt. (Ehrlich Aff., ¶ 10).

## Yucaipa Obtains the Right to Become a
## Lender under the Credit Agreements With Significant Restrictions

In addition to its status as majority shareholder of Allied and its control over the Allied Board and day-to-day operations, Yucaipa sought to become a Lender under the First Lien Credit Agreement. Section 10.6 of each of the Credit Agreements permitted Lenders to sell, assign or transfer all or a portion of their rights and obligations under the applicable Credit Agreement, but only to a party that satisfied the definition of "Eligible Assignee." Under each of the Credit Agreements as originally drafted, the definition of Eligible Assignee expressly excluded the "Sponsor" and "Affiliates" of Allied. (Ehrlich Aff., ¶ 12).

9

**REDACTED**

As majority shareholder, Yucaipa is both the "Sponsor" and an "Affiliate" of Allied. Thus, unless the parties to the Credit Agreements consented to an amendment to the definition of "Eligible Assignee," no Lender could sell, assign or transfer any of its rights or obligations to Yucaipa and, consequently, Yucaipa could not become a Lender under either Credit Agreement. (Ehrlich Aff., ¶ 13); (Schaffer Aff., ¶ 7). Yucaipa and Allied requested and obtained Lender consent to that certain Amendment No. 3 to Credit Agreement and Consent, dated as of April 17, 2008 (the "Third Amendment"), which amended the First Lien Credit Agreement to allow Yucaipa to become a First Lien Lender and a Second Lien Lender, but only under strictly limited circumstances and conditions.[7] (Ehrlich Aff., ¶ 14).

The Third Amendment placed significant restrictions and conditions on any sale or assignment of Term Loans to Yucaipa; in addition sales or assignments of the LC Deposits and Revolving Loan were not permitted at all. Specifically, Yucaipa's potential status as a First Lien Lender was subject to the following restrictions and conditions, among others (i) after giving effect to any such sale or assignment, Yucaipa could not hold or beneficially own more than 25% of the aggregate outstanding principal amount of the Term Loans, or acquire more than $50 million in the aggregate of the principal amount of the Term Loans; (ii) Yucaipa was required to make capital contributions to Allied of at least 50% of the aggregate principal amount of Term Loans it acquired; and (iii) Yucaipa would not have any voting rights with respect to any Term Loans it might acquire (which other First Lien Lenders holding Term Loans would have), including rights to consent to any amendment, modification, termination or waiver of any provision of the First Lien Credit Agreement. (Ehrlich Aff., ¶ 15). These restrictions and conditions served to ensure that Yucaipa, already a majority and controlling shareholder of

---

[7] Pursuant to Amendment No. 3 dated as of April 17, 2008 to the Second Lien Credit Agreement, Yucaipa was also permitted to purchase Second Lien Obligations. (Schaffer Aff., Ex. D, at 3-5).

**REDACTED**

Allied, did not obtain unfettered control over Allied and injure or destroy the Lenders' rights and interests by, among other things, becoming the Requisite Lender under the First Lien Credit Agreement. (Ehrlich Aff., ¶ 16).

Under the First Lien Credit Agreement, the Requisite Lender has the authority to make certain key decisions affecting the rights of all Lenders under the First Lien Credit Agreement, including the Petitioning Creditors, which includes the right to direct the exercise of (or forbearance from exercise of) remedies such as demanding payment by Allied of any and all amounts due, or commencing foreclosure on the collateral pledged to secure the Obligations. (Ehrlich Aff., ¶ 17)

Pursuant to the Third Amendment, the prohibitions imposed on Yucaipa's ability to acquire and vote Term Loans and other Obligations effectively precluded Yucaipa from ever becoming the Requisite Lender. (Ehrlich Aff., ¶ 18). Consequently, because Yucaipa had no ability to become the Requisite Lender under the First Lien Credit Agreement, it could not, as majority and controlling owner of Allied, harm the interests of the Petitioning Creditors and other Lenders, or otherwise interfere with the Lenders' rights. In the Third Amendment, Yucaipa acknowledged that as "Restricted Sponsor Affiliate" its breach of the Third Amendment "will cause the other Lenders and Agents to sustain damages for which they would not have an adequate remedy at law for money damages" and further agreed that "specific performance of such covenants and agreements" contained in the Third Amendment would be the appropriate remedy. Id.

**The Forbearance Agreements**

Given the occurrence and continuance of Events of Default, on or about September 24, 2008, Allied entered into forbearance agreement[s] pursuant to which the Lenders

**REDACTED**

agreed to refrain from taking action to enforce their rights under the Credit Agreements so that the parties could engage in discussions regarding a restructuring of Allied's debt. Those discussions ultimately proved unsuccessful. (Ehrlich Aff., ¶ 19); (Schaffer Aff., ¶ 7).

**The Failed Tender Offer**

In February 2009, Yucaipa launched a tender offer to purchase the Obligations from the First Lien Lenders at a substantial discount to par. The tender offer was conditioned upon acceptance and consent by First Lien Lenders constituting Requisite Lenders to an amendment to the First Lien Credit Agreement that would have eliminated all of the restrictions and conditions imposed upon Yucaipa's ownership of Obligations as set forth in the Third Amendment. (Ehrlich Aff., ¶ 20). Yucaipa's tender offer failed, as Yucaipa did not receive a sufficient number of acceptances to amend the First Lien Credit Agreement in the manner needed. (Ehrlich Aff., ¶ 21).

**Yucaipa, with the Assistance of the Alleged Debtors, Violates the
First Lien Credit Agreement; The Purported Fourth Amendment**

After the First Lien Lenders refused to accept Yucaipa's tender offer, it appears that Yucaipa entered into direct discussions with ComVest Investment Partners III ("ComVest") to purchase ComVest's Term Loans and LC Facility Obligations, which at the time comprised a majority of the Term Loans, Revolving Loans and aggregate LC Exposure then outstanding. Given the size of its holdings, ComVest was the Requisite Lender. (Ehrlich Aff., ¶ 23). In connection therewith, Yucaipa caused Allied to enter into a purported amendment to the First Lien Credit Agreement with ComVest, dated as of August 21, 2009 (the "Purported Fourth Amendment"). (Ehrlich Aff., ¶ 24).

The Purported Fourth Amendment, executed by ComVest and the Alleged Debtors, without the consent of the other Lenders or the Administrative Agent, deleted every restriction

**REDACTED**

and condition in the Third Amendment prohibiting Yucaipa from acquiring and voting Obligations and preventing it from interfering with Lenders' rights. (Ehrlich Aff., ¶ 25). The Purported Fourth Amendment further allowed Yucaipa to enter into an Assignment and Assumption Agreement with ComVest, dated August 21, 2009 (the "ComVest Assignment"), pursuant to which ComVest assigned its interest in $114.7 million of Term Loans (constituting more than 65% of the aggregate Term Loan Exposure), and $30.4 million of LC Exposure (constituting more than 60% of the aggregate LC Exposure) to Yucaipa, in direct violation of the express limitations imposed by the Third Amendment. (Ehrlich Aff., ¶ 26).

By virtue of the Purported Fourth Amendment, Yucaipa not only claims to have no restrictions on its ability to acquire Obligations under the First Lien Credit Agreement and to vote those Obligations, Yucaipa also asserts that it constitutes the "Requisite Lender." (Ehrlich Aff., ¶ 26). Under the First Lien Credit Agreement, the Requisite Lender has broad authority to make certain decisions affecting the rights of all First Lien Lenders, including the Petitioning Creditors. Those rights include the ability to direct the Administrative Agent to (a) act (or not act) upon the occurrence and during the continuance of an Event of Default, (b) accelerate (or not accelerate) the Obligations when Allied fails to pay interest or principal when due, and (c) exercise (or not exercise) remedies to obtain payment of the Obligations. (Ehrlich Aff., ¶ 17).

Acting under its alleged status as the Requisite Lender, Yucaipa has prevented the Administrative Agent from taking any actions on behalf of the First Lien Lenders to accelerate the Obligations or exercise remedies despite the fact that Allied has admitted to the occurrence and continuance of Defaults and Events of Default for more than three years, including the failure to pay more than $67 million in interest and principal owed to all Lenders on the First Lien Loan and Second Lien Loan. (Ehrlich Aff., ¶ 28).

**REDACTED**

**Prepetition Litigation**

      The Administrative Agent initially refused to acknowledge the validity of the Purported Fourth Amendment or Yucaipa's alleged status as Requisite Lender. (Harris Decl., Ex. D, at 2). In response, Yucaipa and Allied commenced an action against CIT, in its individual capacity and not as the Administrative Agent, in the Superior Court of Fulton County, Georgia, *inter alia*, (a) alleging breach of the First Lien Credit Agreement, (b) seeking a declaration that the Purported Fourth Amendment was effective and binding on the parties to the First Lien Credit Agreement, and (c) seeking a declaration that Yucaipa was the Requisite Lender under the First Lien Credit Agreement (the "Georgia Action"). (Harris Decl., Ex. D). Thereafter, on December 21, 2009, CIT filed a verified answer and counterclaims against Yucaipa and Allied seeking a declaration that the Purported Fourth Amendment was ineffective and not binding, that Yucaipa was not the Requisite Lender, and other relief ("CIT Counterclaim"). (Harris Decl., Ex. E).

      Notwithstanding the positions set forth in the CIT Counterclaim, on December 5, 2011, without notice to or consultation with the Petitioning Creditors, the parties to the Georgia Action entered into a settlement agreement (the "Settlement Agreement") pursuant to which CIT, in its individual capacity as a Lender, agreed not to "object to, challenge or contest, either directly or indirectly, the validity of the Fourth Amendment," and acknowledged "that Yucaipa is the Requisite Lender for all purposes including the exercise of remedies." (Harris Decl., Ex. F, at 11-12)[8].

      As a result of the foregoing, Yucaipa not only has control over the Alleged Debtors (the

---

[8] The Petitioning Creditors dispute the validity, enforceability and effectiveness of the Purported Fourth Amendment, as well as any transaction or event taken in reliance thereon. In order to protect their interests the Petitioning Creditors commenced an action against Yucaipa on January 17, 2012 in the Supreme Court of the State of New York, County of New York, seeking a declaration that the Purported Fourth Amendment is invalid, ineffective and not binding, and that Yucaipa is not the Requisite Lender under the First Lien Credit Agreement. *BDCM Opportunity Fund II, LP et al. v. Yucaipa American Alliance Fund I L.P. et al*, Index No. 650150/2012 (the "New York Action").(Harris Decl., Ex. G).

       **REDACTED**

Borrower) through its majority and controlling ownership interest in the Alleged Debtors and control of the Allied Board, but it also purports to have control over all decisions affecting all Lenders (as the purported Requisite Lender), including the ability to prevent the First Lien Lenders from exercising their rights and remedies against the Alleged Debtors (including, without limitation, upon the Maturity Date of the Obligations). (Ehrlich Aff., ¶ 27).

█████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████  In March 2011, the Alleged Debtors admitted that their business model was not viable with its labor costs and customer rate structure.  (Harris Decl., Ex. B & C).  A failed attempt to reduce their labor costs induced a strike notice from their Teamster represented employees.  Id.  ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

**REDACTED**



the Alleged Debtors have been unable to pay, and thus have failed to pay, since August 2009 (a) interest and principal payments to all First Lien Lenders in the aggregate amount of at least $57.4 million and (b) interest payments to all Second Lien Lenders in the aggregate amount of at least $9.6 million. (Ehrlich Aff., ¶ 34).

**The Petitioning Creditors' Efforts to Engage
The Alleged Debtors in Restructuring Negotiations**

In the face of the ongoing Defaults and Events of Default, including the failure to make interest and principal payments for more than two and one-half years, the Petitioning Creditors attempted to engage the Alleged Debtors in restructuring negotiations. These attempts have been met with a perfunctory response which failed to address the substantive issues raised by the Petitioning Creditors or the Petitioning Creditors' request to engage in restructuring discussions. (Ehrlich Aff., ¶ 37).

REDACTED

## APPLICABLE AUTHORITY

### Appointment of a Trustee is Warranted Under
### Sections 1104(a) and 105(a) of the Bankruptcy Code

Section 1104(a) of the Bankruptcy Code provides that at any time after the commencement of a Chapter 11 case but prior to confirmation of a plan, a bankruptcy court shall order the appointment of a trustee:

> (1) for cause, *including*, fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders and other interests of the estate, without regard to the number of holders of the securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a) (emphasis supplied). The party requesting appointment of a trustee has the burden of showing by "clear and convincing evidence" that the appointment of a trustee is warranted. In re Marvel Entm't Group, Inc., 140 F.3d 463, 471 (3d Cir. 1998); In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989).

Section 1104(a) provides for appointment of a Chapter 11 trustee even during the gap period of an involuntary case. See Prof'l Accountants Referral Servs., Inc., 142 B.R. 424, 429 (Bankr. D.Colo. 1992) (approving the appointment of a Chapter 11 trustee during the gap period where court found there was a reasonable likelihood that debtor would be found to be a proper involuntary debtor under the Bankruptcy Code); Collier on Bankruptcy 303-90 (Alan N. Resnick & Henry J. Sommer ed., LexisNexis) (16th ed. 2011) (". . . a trustee can be appointed in the [involuntary] chapter 11 case prior to the entry of the order for relief pursuant to section 1104(a). ... By its terms, section 1104 is triggered by the commencement of the case, not the entry of the order for relief. There is case law supporting appointment of a chapter 11 trustee in these

**REDACTED**

circumstances (listing cases).").

Appointment of a trustee during the gap period is an appropriate exercise of the court's equitable powers under section 105(a) of the Bankruptcy Code. See Prof'l Accountants, 142 B.R. at 430 ("This Court further believes that, if necessary, the exercise of its equitable powers under 11 U.S.C. § 105 allows for the appointment of a trustee during the gap period").

As discussed below, appointment of a trustee is appropriate here under both Sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code.

A.    **Appointment of a Trustee is Required under Section 1104(a)(1) of the Bankruptcy Code.**

Section 1104(a)(1) of the Bankruptcy Code requires the appointment of a trustee upon a court's findings of fraud, dishonesty, incompetence, or gross mismanagement by a debtor's current management. 11 U.S.C. § 1104(a)(1). Under section 1104(a)(1), appointment of a trustee is mandatory if cause is shown. 11 U.S.C. § 1104(a); Sharon Steel Corp., 871 F.2d at 1226. The court may consider both prepetition and postpetition misconduct of the current management when making the determination of whether "cause" exists for the appointment of a trustee. 11 U.S.C. § 1104(a)(1).

The language of section 1104(a)(1) does not, by its very terms, set out an exclusive list of what constitutes "cause" mandating the appointment of a trustee. Marvel, 140 F.3d at 472. Thus, the appointment of a trustee for "cause" also may be based upon a finding that the debtor's management suffers from conflicts of interest or is unable to discharge its fiduciary duties. See Id. at 473; In re Bellevue Place Assocs., 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994); In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990).

A Chapter 11 debtor owes fiduciary duties to its estate, including obligations "to protect and to conserve property in its possession for the benefit of creditors" and "to 'refrain from acting

18                                    **REDACTED**

in a manner which could damage the estate, or hinder a successful reorganization..." Ionosphere, 113 B.R. at 169 (quoting Sharon Steel, 86 B.R. at 457); see also Marvel, 140 F.3d at 471, 474. "Indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355, 105 S. Ct. 1986, 1994 (1986) (citations omitted). Therefore, "the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interest of creditors are served." In re Intercat, Inc., 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000).

## B. Appointment of a Trustee is in the Best Interests of Parties Under Section 1104(a)(2) of the Bankruptcy Code.

Even in the absence of "cause", the court may still appoint a trustee pursuant to section 1104(a)(2) if "such appointment is in the interests of creditors, any equity security holders and other interests of the estate." 11 U.S.C. § 1104(a)(2).

Section 1104(a)(2) creates a flexible standard that provides the court with discretion to appoint a trustee when to do so would best serve the parties' and the estate's interests. Sharon Steel, 871 F.2d at 1226 ("Subsection (a)(2) allows appointment of a trustee even when no 'cause' exists."). In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers. . . . [E]quitable remedies are a special blend of what is necessary, what is fair and what is workable." In re Hotel Assocs., Inc., 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980).

In determining whether to appoint a trustee under section 1104(a)(2), "courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." Hotel Assocs., 3 B.R. at 345. Among the factors considered by courts are: (i) trustworthiness of the debtor; (ii) the debtor in possession's past and present

19

**REDACTED**

performance and prospects for the debtor's rehabilitation; (iii) the confidence - or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. Ionosphere, 113 B.R. at 168 (citations omitted).

There are many factual scenarios that have been held to support the appointment of a trustee under section 1104(a), including the following which are relevant here:

- Conflicts of interest preventing the debtor from discharging its fiduciary duties to creditors;[9]

- Gross mismanagement of the debtor;[10]

- A lack of confidence in the debtor's abilities to manage its business and discharge its fiduciary duties;[11] and

- Acrimony between the debtor and its creditors.[12]

---

[9] See, e.g., Marvel, 140 F.3d at 471; Cajun Elec. Power Coop. v. Cent. La. Elec. Co. (In re Cajun Elec. Power Coop.), 69 F.3d 746, 751 (5th Cir. 1995), majority op. withdrawn and dissenting op. adopted, 74 F.3d 599, 600 (5th Cir. 1996); Bellevue, 171 B.R. at 624; In re Concord Coal Corp., 11 B.R. 552, 554-55 (Bankr. S.D.W. Va. 1981).

[10] See, e.g., Kwitchurbeliakin, LLC, v. Laporte Savings Bank, No. 3:10–CV–170, 2011 WL 93714, at *6 (N.D. Ind. Jan. 10, 2011)(affirming bankruptcy court's appointment of a trustee due to, among other things, debtor's mismanagement resulting in customer and related revenue loss, and debtor's failure to provide lender with statements and financial reports and repair leaky roof and pay real estate taxes); Intercat, 247 B.R. at 922 (appointing trustee for mismanagement for, among other things, willful infringement of the patent rights of W.R. Grace resulting in judgment against debtors, self dealing transactions, waste of corporate assets); Ionosphere, 113 B.R. at 170 (finding gross mismanagement based on "debtors' inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses").

[11] See, e.g., Sharon Steel, 871 F.2d at 1227-28; In re Cardinal Indus., 109 B.R. 755, 765-66 (Bankr. E.D. Ohio 1990)(sufficient cause exists to appoint a trustee due to the creditors' "serious and general loss of confidence in the Debtors' management," despite no finding of any of the enumerated 1104(a)(1) factors); In re The Bible Speaks, 74 B.R. 511, 512-13 (Bankr. D. Mass. 1987)("the need for a neutral party to mediate disputes between the debtor and its creditors is grounds for a trustee's appointment").

[12] See, e.g., Marvel, 140 F.3d at 471; Cajun Elec., 69 F.3d at 751; Bellevue, 171 B.R. at 625.

**REDACTED**

## ARGUMENT

**A.    Yucaipa's Control of the Allied Board and Senior Management Creates Conflicts of Interest that Prevent the Alleged Debtors from Discharging Their Fiduciary Duties to Creditors.**

Yucaipa's control over the Allied Board and senior management, compounded by its role as majority shareholder (i.e. Sponsor) and its self-proclaimed status as controlling Lender (i.e. Requisite Lender), creates conflicts of interest that make it utterly impossible for the Alleged Debtors to exercise their fiduciary duties.  Indeed, the inability to fulfill fiduciary duties of a debtor-in-possession is cause to appoint a Chapter 11 trustee. Bellevue, 171 B.R. at 624.

The nature of the fiduciary duties owed by a debtor-in-possession to its creditors is analogous to the fiduciary duties owed by directors to shareholders under state law and includes the duties of care and loyalty.  LaSalle Nat'l Bank, 82 F. Supp. at 292.  The duty of loyalty includes the prohibition against self-dealing.  Id.  This means that if the debtor-in-possession is controlled by another party, then the debtor-in-possession, as a fiduciary to all the debtor's creditors, cannot act solely in the interests of that party, to the exclusion of other interests which the debtor-in-possession has the fiduciary obligation to protect.  See Bellevue, 171 B.R. at 624 (finding that because a secured creditor controlled the debtor-in-possession, the debtor-in-possession could only act in that secured creditors' interest without considering the debtor-in-possession's fiduciary duties).

The Alleged Debtors are undeniably under the control of Yucaipa, whose many "hats" make their involvement in these cases pervasive at every level.  In any restructuring, the Alleged Debtors would be required to negotiate with their creditors and their equity holders -- but in these cases the Allied Board and management are controlled by Yucaipa, the controlling shareholder is Yucaipa and the Requisite Lender having the authority to bind all other Lenders is also

21                                                    **REDACTED**

(allegedly) Yucaipa. Thus, the Alleged Debtors, under Yucaipa's control, are not free to exercise their fiduciary duties as debtors-in-possession to any other party in interest. Moreover, virtually any transaction that the Allied Board proposes will constitute an "interested party" transaction because Yucaipa occupies every seat at the negotiating table -- as debtor (through its control of the Allied Board and senior management), Requisite Lender (allegedly), and controlling equity holder.

Further, the Alleged Debtors' prepetition conduct is clear evidence of their inability to act independently of Yucaipa. Yucaipa has a history of improperly using its position of control over the Alleged Debtors to further entrench itself and protect its own interests, and the Alleged Debtors have a history of simply going along. The Alleged Debtors' conduct demonstrates their utter lack of regard for the interests of the Petitioning Creditors and other creditors. Since 2008, Events of Default under the Credit Agreements have occurred and continue as a result of the Alleged Debtors' deteriorating financial condition and business operations. Certain other Events of Default were the result of affirmative decisions made by the Allied Board and management (at the direction of Yucaipa) to not comply with critical provisions of the Credit Agreements. These continuing Events of Defaults include the failure to pay in excess of $67 million of principal and interest to all Lenders and failing to deliver financial statements and other information.

Yucaipa caused the Alleged Debtors to enter into the Purported Fourth Amendment, and to join Yucaipa in its suit against CIT in the Georgia Action, when in its capacity as Administrative Agent CIT properly refused to acknowledge the amendment. The Alleged Debtors' involvement in that action -- which benefited only Yucaipa -- clearly demonstrates that the Alleged Debtors, the Allied Board and senior management are mere puppets of Yucaipa and

**REDACTED**

incapable of making independent decisions or taking actions that may be contrary to Yucaipa's interests (even if it is in the best interest of the Alleged Debtors and their creditors as a whole).

In re Bellevue Place Assocs. is instructive. The debtor in Bellevue was controlled by a single secured creditor pursuant to the terms of a "Master Agreement." 171 B.R. at 624. The Master Agreement vested complete control of the debtor's reorganization process in Meridien, the controlling secured creditor. Id. Meridien representatives, who became the new directors and officers of entities that controlled the debtor, were granted "sole discretion and authority to manage the affairs and operations of [the debtor] BPA." Id. at 620. Accordingly, the court found that, because "the debtor in this case is under the complete control and direction of one secured creditor", the debtor was not free to exercise its fiduciary duties to its other creditors. Id. The court held that the inability of the debtor to exercise its fiduciary duty constituted "cause" under section 1104(a)(1) mandating appointment of a trustee. Id. The court also held that appointment of a trustee was in the best interest of all parties, and thus appropriate under section 1104(a)(2), as of result of the debtor's lack of control. Id. at 624-25. Here, Yucaipa's control of the Allied Board and management, its position as Sponsor, and its alleged position as Requisite Lender and its prepetition conduct undeniably lead to the conclusion that the Alleged Debtors are incapable of exercising their fiduciary duties to all creditors, thereby warranting appointment of a Chapter 11 trustee.

Further, irreconcilable conflicting loyalties and conflicts of interest alone are sufficient to support the appointment of a Chapter 11 trustee. For example, in In re Cajun Elec. Power Coop., Inc., certain creditors moved for appointment of a trustee where the debtor's board members were also board members or managers of the debtor's customers. 69 F.3d at 747, majority op. withdrawn and dissenting op. adopted, 74 F.3d at 600. Specifically, the District Court in Cajun

**REDACTED**

found that a pervasive conflict of interest existed warranting appointment of a Chapter 11 trustee where Cajun's board members owed duties of loyalty to both Cajun's creditors and Cajun's member-customers. Id. at 750 n.13. The dual loyalties of Cajun's board members resulted in numerous conflicts including the failure (i) to collect monies owed by members-customers, and (ii) to allow members access to information and to participate in possible sales of Cajun's assets. Id.; Id. at 751. The Fifth Circuit agreed with the District Court. Id. at 751. The court held that when the board members began "working at cross-purposes . . . the appointment of a trustee may be the only effective way to pursue reorganization." Id. citing In re Colorado-Ute Electric Ass'n, Inc., 120 B.R. 164, 176 (D. Colo. 1990)(holding appointment of a trustee proper where court could not envision a way for current management to resolve conflicts among the debtor, its creditors and its members).

Here, as in In re Cajun Elec. Power Coop., Inc., the Alleged Debtors have conflicting loyalties to both Yucaipa and to their other creditors. Under the influence and at the direction of Yucaipa, the Alleged Debtors have (i) withheld financial information from Lenders, including the Petitioning Creditors, (ii) failed to pay at least $67 million owed to the Lenders under the Credit Agreements, and (iii) refused to engage the Petitioning Creditors in restructuring negotiations. As in Cajun Elec. the Alleged Debtors' Board and senior management suffer from irreconcilable conflicting loyalties and conflicts of interest necessitating appointment of an independent disinterested trustee.

A trustee is also appropriate where, as is the case here, the multiple influences of Yucaipa on the Alleged Debtors and the Alleged Debtors' prepetition misconduct, have raised "substantial doubt whether the Debtor's current management...[could] be considered loyal to its goal of rehabilitation." Concord Coal, 11 B.R. at 554 (Chapter 11 trustee warranted where

**REDACTED**

debtor's president had a conflict of interest where he held ownership interests in multiple "competing business interests" which spawned charges of dishonest dealings). It is simply untenable for the Alleged Debtors to be in a situation where they are controlled by management and a board which is in turn beholden to the interests of Yucaipa to the exclusion of other creditors.

Without an independent fiduciary, Yucaipa will remain in total control of the reorganization process, including but not limited to the identification and evaluation of the strategic alternatives to maximize value and creditor resources, and will be situated to drive the reorganization process in a manner that benefits its own interests without regard to the interests of the other creditors. Therefore, appointment of a Chapter 11 trustee in these cases is both necessary and appropriate.

**B.    Gross Mismanagement Warrants Appointment of a Trustee.**

Appointment of a Chapter 11 trustee is appropriate due to the gross mismanagement of the Alleged Debtors. See 11 U.S.C. § 1104(a)(1). In Sharon Steel, the Third Circuit affirmed the appointment of a trustee where mismanagement resulted in the company suffering substantial losses and a failure to cut major expenses. Sharon Steel, 871 F.2d at 1228 (affirming district court's appointment of trustee even after the creditors' committee was granted standing to pursue avoidance actions against insiders because that "may have solved that isolated management problem, but it has not cleared up the question about current management's fitness to continue running Sharon Steel and its commitment to see it through to a successful reorganization"). See also Ionosphere, 113 B.R. at 170 (finding gross mismanagement based on the "debtors' inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses"). ██████████

25

**REDACTED**

██████████████████████████████████████████████████

████████████████ Management's utter failure to stem these losses for such an extensive period of time, in and of itself requires the appointment of a Chapter 11 trustee. See Ionosphere, 113 B.R. at 168.

Moreover, the few actions the Alleged Debtors did take made the situation dramatically worse rather than better. ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

**C.      The Petitioning Creditors Have No Confidence in Existing Management.**

Similarly, a lack of creditor confidence in a debtor's ability to manage its business and discharge its fiduciary duties is grounds for appointment of a Chapter 11 trustee. See, e.g., Sharon Steel, 871 F.2d at 1227-28. As extensively discussed above, the Petitioning Creditors cannot trust the Alleged Debtors' management to either restructure their business, or to exercise their fiduciary duties, for the benefit of all creditors. The Allied Board and management's past actions indicate that they will protect Yucaipa's interest at the expense of other stakeholders. As a result, if the current management, controlled by Yucaipa, remains at the helm of the Alleged Debtors, these cases will surely be unnecessarily litigious, expensive and unproductive. Creditors cannot be expected to have confidence in management's ability to reverse the Alleged Debtors' business decline when they have shown no ability to do so for the last four years. Id. at 1226-28 (held trustee appropriate where management failed to keep records, operated at a loss

**REDACTED**

and failed to cut major expenses). Therefore, appointment of a qualified, competent and independent trustee is necessary here for a successful reorganization.

**D.     Acrimony and Distrust Between the Alleged Debtors and the Petitioning Creditors <u>Warrant Appointment of a Chapter 11 Trustee.</u>**

In the face of the ongoing Defaults and Events of Default -- including the failure to make in excess of $67 million of interest and principal payments for more than two and one-half years, and the commencement of the New York Action -- the Petitioning Creditors attempted to engage the Alleged Debtors in restructuring negotiations. These attempts have been met with a perfunctory response which failed to address the substantive issues raised by the Petitioning Creditors or the Petitioning Creditors' request to engage in restructuring discussions.

The Court of Appeals for the Third Circuit has held that acrimony between the debtor and certain creditors constitutes cause for appointment of a trustee. In <u>In re Marvel Entm't Group, Inc.,</u> acrimony developed between the debtors, controlled by Carl Icahn, and certain of debtors' secured lenders. 140 F.3d at 467-69. Among other things, Icahn and the lenders were entangled in multiple litigations and had failed to demonstrate any ability to resolve matters consensually. <u>Id.</u> at 473. The lenders moved for appointment of a trustee claiming that the parties had <u>reached an impasse</u>. <u>Id.</u> at 468 (emphasis supplied). The Third Circuit agreed with the lenders holding that the level of acrimony constituted "cause" under section 1104(a)(1) and that a trustee was in the best interest of all parties and the estate under section 1104(a)(2). <u>Id.</u> at 473-74 ("Having found that this unhealthy conflict of interest was manifest in the 'deep-seeded conflict and animosity' between the Icahn-controlled debtor and the Lenders and in the lack of confidence all creditors had in the Icahn interests' ability to act as fiduciaries, the district court did not depart from the proper exercise of discretion when it determined sufficient cause existed under § 1104(a)(1) to appoint a neutral trustee to facilitate reorganization." . . . "The level of acrimony

27

**REDACTED**

found to exist in this case certainly makes the appointment of a trustee in the best interests of the parties and the estate [under § 1104(a)(2)].").

As set forth above, the Alleged Debtors' management is controlled by and the Allied Board's loyalties run to Yucaipa. Yucaipa controls the Alleged Debtors and will undoubtedly control the identification and implementation of any strategic alternative the Alleged Debtors may determine to pursue in these cases. So long as Yucaipa remains in control of the Alleged Debtors, the Petitioning Creditors have no confidence that a reorganization alternative will be identified and implemented that considers the interests of any party-in-interest other than Yucaipa. The Petitioning Creditors are powerless to change management and are (at the moment) powerless to instruct the Administrative Agent to accelerate the Obligations and commence the exercise of remedies. A neutral trustee is clearly necessary here to facilitate a successful reorganization. As was the case in Marvel, Yucaipa and the Alleged Debtors under their control (on the one hand) and the Petitioning Creditors and other Lenders (on the other hand) are at odds with one another and there is no hope of consensual resolution. These Chapter 11 cases will have no hope of success -- but will rather be mired in extensive, time consuming and expensive litigation -- unless there is a neutral trustee at the helm. This acrimony between the Alleged Debtors and the Petitioning Creditors, in and of itself, is sufficient reason to appoint a Chapter 11 trustee.

**REDACTED**

**CONCLUSION**

WHEREFORE, the Petitioning Creditors respectfully request entry of an order granting

the relief requested herein and such other and further relief as is just.

Dated: May 17, 2012
    Wilmington, Delaware

LANDIS RATH & COBB LLP

By: *[signature]*
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, Delaware 19899
Telephone: (302) 467-4400
Facsimile: (302) 467-4500

—and—

Adam C. Harris
Robert J. Ward
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Attorneys for BDCM Opportunity Fund II, LP,*
*Black Diamond CLO 2005-1 Ltd, and*
*Spectrum Investment Partners, L.P.*

# **EXHIBIT 13**

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

January 12, 2012

Ladies and Gentlemen:

   This letter agreement ("Agreement") is entered into and made by and among Black Diamond CLO 2005-1 LTD., BDCM Opportunity Fund II, L.P. (collectively, "Black Diamond") and Spectrum Investment Partners, L.P. (together with its affiliates, "Spectrum", and collectively with Black Diamond, the "Parties"), each of whom is a Lender under the First Lien Credit Agreement and/or the Second Lien Credit Agreement.[1] In the aggregate, the Parties own or control (or have the right to acquire), with power to vote, approximately $56.7 million in principal amount of the Obligations (prior to reduction of the LC Commitments) outstanding under the First Lien Credit Agreement ("Lender Claims").

   In contemplation of, among other things, the pursuit of certain strategies to enforce the rights of the Parties as Lenders under the First Lien Credit Agreement ("Strategies"), the Parties have agreed to enter into this Agreement.

   1.  Cooperation.  For so long as this Agreement is in effect, the Parties shall, in good faith, work together to identify and implement courses of action for the purpose of maximizing the recoveries of the Parties in respect of the Lender Claims.  The Parties

---

[1] "First Lien Credit Agreement" means the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 and amended and restated as of May 15, 2007, and as further amended, modified or supplemented through April 17, 2008 (including, without limitation, as set forth in Amendment No. 3 to Credit Agreement and Consent dated as of April 17, 2008), by and among Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.), as Borrowers, certain Subsidiaries of Borrowers, as Subsidiary Guarantors, various Lenders, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, and The CIT Group/Business Credit, Inc. ("CIT"), as Administrative Agent and Collateral Agent.

"Second Lien Credit Agreement" means the Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of May 15, 2007 (as amended, modified or supplemented from time to time), by and among Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.), as Borrowers, certain Subsidiaries of Borrowers, as Subsidiary Guarantors, various Lenders, and Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, Administrative Agent and Collateral Agent .

The First Lien Credit Agreement and the Second Lien Credit Agreement are collectively referred to herein as the "Credit Agreements."

Capitalized terms used but not specifically defined herein shall have the meanings ascribed to them in the First Lien Credit Agreement.

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

acknowledge and agree that such courses of action may include the exercise of rights attendant to the Lender Claims and/or claims held by any Party under the Second Lien Credit Agreement.

    2.   Transfer of Lender Claims. (a) For so long as this Agreement is in effect, except as specifically set forth below in this Paragraph 2, each Party shall not (i) grant any proxies to any person in connection with its Lender Claims except as limited by this Agreement and otherwise consistent with the terms hereof, or, (ii) sell, transfer, assign, further pledge, further encumber or otherwise dispose of its Lender Claims, except with the prior written consent of all Parties to this Agreement to a party that agrees in writing (A) to assume such Party's Lender Claim, and (B) to be subject to the terms and conditions of this Agreement. Any such transfer, sale, assignment, further pledge, further encumbrance or other disposition by a Party of all or a portion of its Lender Claims that is not in compliance with the terms of this Agreement shall be void ab initio. Subject to Paragraph 3 hereof, this Agreement shall in no way be construed to preclude any Party from acquiring additional Lender Claims, provided that any such Lender Claim so acquired shall thereafter be subject to this Agreement.

    (b) Notwithstanding the foregoing, a Party (a "Selling Party") may sell, transfer or otherwise dispose of its Lender Claims as follows:

    (i) to any affiliate, or to one or more funds, managed accounts or entities that are under common management or control with the Selling Party (in which case such Lender Claims shall remain subject to the terms of this Agreement); or

    (ii) to any third party so long as:

    (A) prior to such sale, transfer or disposition, such Selling Party shall have offered to sell its Lender Claims to the other Parties hereto pursuant to a written notice setting forth the terms and conditions on which the Selling Party is prepared to sell its Lender Claims (including price) (an "Offer"). The non-selling Parties shall have five (5) business days (the "Offer Period") to accept the Offer in writing and to execute a binding commitment to purchase such Lender Claims. If the Offer is not timely accepted in writing and a binding commitment timely executed, subject to compliance with clause B of this Paragraph 2(b)(ii), the Selling Party shall be entitled to sell, transfer or otherwise dispose of its Lender Claims to any third party free and clear of any obligations set forth in this Agreement on terms and conditions no less favorable to the Selling Party than those set forth in the Offer. If the Selling Party does not enter into a binding commitment for the sale, transfer or disposition of its Lender Claims within thirty (30) days after the expiration of the Offer Period, prior to any sale, transfer or disposition thereafter the Selling Party must extend a new Offer to the other Parties hereto in accordance with this Paragraph 2(b)(ii); and

    (B) if the Offer of any Selling Party is not timely accepted by one or more non-selling Parties and the Selling Party determines to sell, transfer or otherwise dispose of its Lender Claims to a third party, in connection with such sale, transfer or other disposition the proposed third party purchaser must agree in writing to include in such sale, transfer or other disposition of the Selling Party's Lender Claims all of the Lender

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

Claims of all other Parties hereto on identical terms and conditions. In furtherance thereof, such third party purchaser shall make an offer in writing to each non-selling Party, and such non-selling Parties shall have five (5) business days to accept the offer in writing and to execute a binding commitment to sell its Lender Claims.

3. <u>Purchase of Lender Claims</u>. If any Party (or any affiliate of any Party) acquires (directly or indirectly), or is offered the opportunity to acquire (directly or indirectly), any additional Lender Claims (an "Additional Claim Purchase"), such Party shall (or, as applicable, shall cause its affiliate to) offer in writing to each of the other Parties hereto the opportunity to acquire such other Party's ratable share of the Lender Claims subject to the Additional Claim Purchase, on the same terms and conditions. The offer to the other Parties hereto may be made prior to or after consummation of the Additional Claim Purchase, but in no event later than five (5) business days following consummation of the Additional Claim Purchase.

4. <u>Communication with Yucaipa or Borrowers</u>. Each Party agrees to disclose to all other Parties to the Agreement all communications (including the substance thereof) between the Party and either (a) Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP or any affiliate thereof (collectively, the "Yucaipa Entities"), (b) the Borrowers or any affiliate thereof, or (c) any person named as agent under any of the Loan Documents, in each case relating to the Borrowers, the Guarantors, the First Lien Credit Agreement or the Lender Claims. Such disclosure shall be made promptly and within a reasonable period of time after such communication in accordance with the Notice provisions below.

5. <u>Confidentiality</u>. Each Party agrees that, without obtaining the prior approval of each other Party (such approval not to be unreasonably withheld or delayed), or except as may be required by applicable law or regulation or by relevant legal, administrative, or regulatory authorities or otherwise in connection with any judicial, regulatory or administrative proceeding or investigation, no Party will (i) issue a press release or other public statement relating to this Agreement, the Strategies, or any matters related thereto, or (ii) otherwise disclose to any third party (other than each Party's principals, employees, members, partners, funding sources, attorneys, auditors, professional advisors, limited partners or Affiliates who need to know) any non-public information regarding the Strategies, or disclose any of the terms of this Agreement, without, in each case, the prior written consent of each other Party.

6. <u>Representations and Warranties</u>. Each Party represents, warrants and covenants to the other Parties that:

(a) such Party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement and that such Party has duly authorized such execution, delivery and performance;

(b) this Agreement, when executed and delivered by such Party, will constitute a valid and binding agreement of such Party, enforceable against such Party in accordance with its terms,

DOC ID-17646546.8

(c) neither the execution or delivery by such Party of this Agreement nor pursuit of the Strategies will violate or be in conflict with (i) any provisions of law or regulation applicable to such Party, (ii) any order of any court or government agency having jurisdiction over such Party, or (iii) any agreement or instrument to which such Party or any of its Affiliates is a party or to which such Party or any of its Affiliates may be bound;

(d) such Party owns or controls, with power to vote, the principal amount of First Lien Obligations and Second Lien Obligations set forth on the signature pages hereto; and

(e) it shall not take, directly or indirectly, any action that could reasonably be expected to adversely impact the recoveries (either in dollar amount of form) on account of the Lender Claims, or induce or support any other person to do so.

7. <u>Expenses</u>. Each Party shall timely pay its pro rata share of all costs and expenses incurred in (a) developing and implementing the Strategies, and (b) any action or proceeding arising therefrom or relating thereto, in accordance with that certain Engagement letter between and among the Parties and Schulte Roth & Zabel LLP ("SRZ"), dated as of November 9, 2009, regardless of whether this Agreement shall have terminated in accordance with Paragraph 16 hereof. Notwithstanding the above, any waiver, forgiveness or discount of legal fees granted to one of the Parties by SRZ shall be equally applicable to the other Party, *mutatis mutandis,* and shall be attested to by such Party and SRZ.

8. <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial; Remedies</u>. This Agreement is governed by the laws of the State of New York, without reference to principles of choice or conflict of laws other than Section 5-1401 of the New York General Obligations Law. Each of the Parties agrees that any legal action or proceeding with respect to this Agreement may be brought in the federal and state courts located in the State of New York, and, by execution and delivery of this Agreement, each Party hereby irrevocably submits itself in respect of its property, generally and unconditionally, to the exclusive jurisdiction of the aforesaid courts in any legal action or proceeding arising out of or relating to this Agreement. Each of the Parties hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to in the preceding sentence. Each of the Parties hereby irrevocably waives the right to a trial by jury in connection with any matter arising out of or relating to this Agreement. The Parties acknowledge that money damages may not be a sufficient remedy for any breach of this Agreement by any Party. Accordingly, in the event of any such breach or threatened breach, each non-breaching Party, in addition to any other remedies at law or in equity that it may have, shall be entitled, without the requirement of posting a bond or other security, to seek equitable relief, including injunctive relief or specific performance or both.

9. <u>Notices</u>.

(a) All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

by courier service, messenger, telecopy or electronic mail at, or if duly deposited in the U.S. mail, by certified or registered U.S. mail, postage prepaid, return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

    (i)     in the case of Black Diamond, to:

        1 Sound Shore Drive, Suite 200
        Greenwich, Connecticut 06830

        Attention:  Richard Ehrlich
        Telephone:  (203) 552-0888
        Facsimile:  (203) 552-1014
        Email:  rehrlich@bdcm.com

        with a copy (which shall not constitute notice) to:

        Schulte Roth & Zabel LLP
        919 Third Avenue
        New York, New York  10022

        Attention:  Adam Harris, Esq.
        Telephone:  (212) 756-2253
        Facsimile:  (212) 593-5955
        Email:  adam.harris@srz.com

    (ii)    in the case of Spectrum, to:

        1250 Broadway
        New York, New York  10001

        Attention:  Jeffrey A. Schaffer
        Telephone:  (212) 687-9555
        Facsimile:  (212) 983-2322
        Email:  jschaffer@spectrumgp.com

        Attention:  Stephen C. Jacobs
        Telephone:  (212) 687-9555
        Facsimile:  (212) 983-2322
        Email:  sjacobs@spectrumgp.com

        with a copy (which shall not constitute notice) to:

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022

Attention: Adam Harris, Esq.
Telephone: (212) 756-2253
Facsimile: (212) 593-5955
Email: adam.harris@srz.com

(b)      All demands, requests, consents, notices and communications shall be deemed to have been given either (i) at the time of actual delivery thereof, or (ii) if given by certified or registered mail, five (5) business days after certification or registration thereof, or (iii) if given by facsimile, upon receipt of confirmation of transmission to the recipient. For purposes of this Agreement, the term "business day" means any calendar day other than Saturday, Sunday or any other day on which banking institutions in New York, New York are not required to be open.

10.      Amendments; Waivers. (a) No waiver and no amendment of any provision of this Agreement shall be effective unless such waiver or amendment is in writing and signed by the Party against whom it is sought to be enforced, and then such waiver or amendment shall be effective only in the specific instance and for the specific purpose for which given, (b) no failure on the part of any Party hereto to exercise and no delay in exercising, any right hereunder or under any related document shall operate as a waiver thereof by such Party, and (c) any single or partial exercise of any right hereunder or under any other related document shall not preclude any other or further exercise thereof or the exercise of any other right.

11.      Further Assurances. The Parties undertake to use their commercially reasonable efforts to execute, deliver, and perform in good faith any agreements as may be necessary or desirable to accomplish the actions contemplated by this Agreement.

12.      Entire Agreement. This Agreement sets forth the entire agreement and understanding among the Parties relating to the subject matter hereof and supersedes all other prior agreements, discussions and documents with respect thereto. No Party shall be bound by any terms, conditions, definitions, warranties, understandings or representations with respect to the subject matter hereof other than as expressly provided for in this Agreement and except as may hereafter by agreed to in a writing signed by such Party.

13.      Merger. Each Party confirms that it has not executed this Agreement in reliance on any promise or representation or warranty (not contained herein) by the other Parties concerning the subject matter hereof.

14.      Captions and Headings. The captions and headings in this Agreement are for convenience only and (a) are not intended to be full or accurate descriptions of the contents thereof, (b) are not to be deemed to be part of this Agreement, and (c) in no way define, limit, extend or describe the scope or intent of any provisions hereof.

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

15.  Counterparts.  This Agreement may be executed in counterparts, each counterpart when so executed and delivered constituting an original, but all such counterparts together shall constitute one and the same instrument.

16.  Consideration.  Each Party hereto acknowledges the receipt and sufficiency of good and valuable consideration in exchange for its agreement to undertake its duties and obligations under this Agreement.

17.  Termination.  This Agreement shall terminate as to all Parties and be of no further force and effect (except as otherwise set forth herein) on the earliest to occur of the following: (a) the mutual agreement of all of the Parties, (b) the date on which any Party sells, transfers or otherwise disposes of its Lender Claims in accordance with Paragraph 2(b)(ii) of this Agreement, (c) the sale of all or substantially all of the assets of the Borrowers and/or Guarantors, (d) if the Borrowers and/or Guarantors become debtors under Chapter 11 of the Bankruptcy Code, the earliest to occur of (i) the substantial consummation of a plan of reorganization confirmed in accordance with the requirements of Chapter 11 of the Bankruptcy Code, (ii) the entry of a final non-appealable order confirming a plan of reorganization, and (iii) the entry of an order converting the cases to cases under chapter 7 of the Bankruptcy Code.

18.  Survival.  The provisions of Paragraphs 5, 7 and 8 of this Agreement shall survive the termination hereof.

Please acknowledge your agreement to the foregoing by executing this Agreement in the space set forth below, whereupon this Agreement will become a binding contract among the parties hereto.


[SIGNATURES ON FOLLOWING PAGE]

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

**BLACK DIAMOND CLO 2005-1 LTD.**
BLACK DIAMOND CLO 2005-1 ADVISER,
L.L.C., as its Collateral Manager

By: _____
Name: Stephen H. Deckoff
Title:   Managing Principal

First Lien Obligations:
$ **4,544,511.51**
Second Lien Obligations: $_____

**BDCM OPPORTUNITY FUND II, L.P.**
BDCM OPPORTUNITY FUND II ADVISER,
L.L.C., as its Investment Manager

By: _____
Name: Stephen H. Deckoff
Title:   Managing Principal

First Lien Obligations:
$     26,862,637.20
Second Lien Obligations: $_____

**SPECTRUM INVESTMENT PARTNERS, L.P.**

By: _____
Name:
Title:

First Lien Obligations:  $_____
Second Lien Obligations: $_____

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

**BLACK DIAMOND CLO 2005-1 LTD.**
BLACK DIAMOND CLO 2005-1 ADVISER,
L.L.C., as its Collateral Manager

By: _____
Name:
Title:

First Lien Obligations: $_____
Second Lien Obligations: $_____

**BDCM OPPORTUNITY FUND II, L.P.**
BDCM OPPORTUNITY FUND II ADVISER,
L.L.C., as its Investment Manager

By: _____
Name:
Title:

First Lien Obligations: $_____
Second Lien Obligations: $_____

**SPECTRUM INVESTMENT PARTNERS, L.P.**
By: SPECTRUM GROUP MANAGEMENT LLC, As Investment Manager
By: _____
Name: JEFFREY A. SCHAFFER
Title: MANAGING MEMBER

First Lien Obligations: $ 20,531,461.66
Second Lien Obligations: $ 5,000,000

DOC ID-17646546.8