# Exhibit 6

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 12-11564 (CSS)

4   - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   ALLIED SYSTEMS HOLDINGS, INC., et al.,

8

9           Debtors.

10

11  - - - - - - - - - - - - - - - - - - -x

12  ALLIED SYSTEMS HOLDINGS, INC.

13

14          Plaintiff,

15

16  v.

17  AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL

18  GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT,

19  BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED

20  OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC,

21  PAR-FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT

22  PARTNERS LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS,

23  LLC, THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL

24  COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN

25  ALLIANCE FUND II, L.P. and YUCAIPA AMERICAN ALLIANCE

1    (PARALLEL) FUND II, L.P.

2

3          Defendants.

4

5    YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

6    AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA

7    AMERICAN ALLIANCE FUND II, L.P., and YUCAIPA AMERICAN

8    ALLIANCE (PARALLEL) FUND II, L.P.

9

10          Counterclaim and Cross-Claim Plaintiffs,

11

12          v.

13

14    ALLIED SYSTEMS HOLDINGS, INC.

15

16          Counterclaim Defendant,

17    and

18    AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL

19    GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT,

20    BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED

21    OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC, PAR-

22    FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT PARTNERS

23    LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC, THE CIT

24    GROUP/BUSINESS CREDIT, INC., THE OFFICIAL COMMITTEE OF

25    UNSECURED CREDITORS.

1        Cross-Claim Defendants.

2   --------------------------------------------------------X

3   BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND

4   CLO 2005-1 LTD, and SPECTRUM PARTNERS, L.P.

5

6        Plaintiff(s),

7

8        v.

9

10  YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

11  AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.,

12  YUCAIPA AMERICAN ALLIANCE FUND II, L.P.,

13  YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II,

14  L.P., RONALD BURKLE, DEREX WALKER, IRA TOCHNER,

15  JEFF PELLETIER, JOS OPDEWEEGH, OSEPH TOMCZAK,

16  And MARK GENDREGSKE

17

18       Defendants.

19  --------------------------------------------------------X

20  THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF

21  ALLIED SYSTEMS HOLDINGS, INC. and its affiliated debtors,

22

23       Plaintiff,

24  v.

25

1  YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

2  AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.,

3  YUCAIPA AMERICAN ALLIANCE FUND II, L.P.,

4  YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II,

5  L.P., MARK J. GENDREGSKE, JOS OPDEWEEGH, JAMES

6  FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER,

7  And JOSEPH TOMCZAK.

8

9      Defendants.

10 ---------------------------------------------------------X

11                    United States Bankruptcy Court

12                    824 Market Street

13                    Wilmington, Delaware 19801

14                    February 27, 2013

15                    09:30 AM

16

17 B E F O R E:

18 HONORABLE CHRISTOPHER S. SONTCHI

19 U.S. BANKRUPTCY JUDGE

20

21

22

23

24

25

1   HEARING re: Notice of Agenda of Matters Scheduled for Hearing on

2   February 27, 2013.

3

4   HEARING re: Cross-Claim Defendants BDCM Opportunity Fund II,

5   LP's Black Diamond CLO 2005-1 Ltd's and Spectrum  Investment

6   Partners LP's Motion to Dismiss the Amended Cross Claim in its

7   Entirety [Adv. Docket No. 73; filed January 25, 2013].

8

9   HEARING re: Motion of the Official Committee of Unsecured

10  Creditors for an Order Authorizing the Committee to Pursue

11  Certain Claims and Causes of Action of the Debtors' Estates

12  [Docket No. 858; filed February 1, 2013].

13

14  HEARING re: Motion and Memorandum of Law of Petitioning

15  Creditors for Entry of an Order (I) Pursuant to 11 U.S.C.

16  §105(a) Granting Standing to Petitioning Creditors to

17  Prosecute Certain Claims of the Debtors Estates for, Inter

18  Alia, Equitable Subordination, Breach of Fiduciary, Aiding and

19  Abetting Breach of Fiduciary Duty and Breach of Contract, or

20  Alternatively (II) Granting Petitioning Creditors Leave to

21  Intervene as Plaintiffs in Adversary Proceedings No. 13-50530

22  Pursuant to Federal Rule of Civil Procedure 24 [Docket No. 876;

23  filed February 8, 2013].

24

25  Transcribed by:  Mary Zajaczkowski

1    A P P E A R A N C E S :

2

3    SIDLEY AUSTIN

4         Attorneys for the Committee

5         787 7th Avenue

6         New York, New York 10019

7

8    BY:  MICHAEL BURKE, ESQUIRE

9         NICHOLAS LAGEMANN, ESQUIRE

10

11   RICHARDS LAYTON & FINGER

12        Attorney for the Debtors

13        One Rodney Square

14        Wilmington, Delaware 19801

15

16   BY:  ROBERT STEARN, ESQUIRE

17

18   BROWN RUDNICK LLP

19        Attorney for Special Committee of the Board

20        Seven Times Square

21        New York, New York 10036

22

23   BY:  ROBERT STARK, ESQUIRE

24

25

1   ARNOLD & PORTER LLP

2       Attorney for Mark Gendregske

3       555 Twelfth Street, NW

4       Washington, DC 20004

5

6   BY:  JUSTIN ANTONIPILLAI, ESQUIRE

7

8   LATHAM & WATKINS LLP

9       Attorney for Yucaipa

10      355 South Grand Avenue

11      Los Angeles, California 90071

12

13  BY:  ROBERT KLYMAN, ESQUIRE

14

15

16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2    [missing audio from 9:49-9:50]

3         MR. KELLY:  -- the Official Committee of Unsecured

4    Creditors and by Black Diamond and Spectrum.  And the other is

5    argument on motions to dismiss in an adversary proceeding.

6    There had been discussions concerning the standing motions, and

7    there is a partial deal involving most of the participants, and

8    I'll let them speak for themselves.  And I'll yield to whoever

9    wishes to address the Court on the suggestion as to handle the

10   standing motions.

11        THE COURT:  Okay.  Mr. Harris.

12        MR. HARRIS:  Good morning, Your Honor.  I believe

13   procedurally that a certificate of no objection was actually

14   entered, was submitted yesterday with respect to the

15   Committee's motion for standing.  There had been no opposition

16   filed by any party to that, so if I understand the docket

17   correctly, Mr. Hazeltine actually filed the certificate of no

18   objection with respect to that.

19        THE COURT:  When?  When?  Did you send it over?

20        MR. HAZELTINE:  Your Honor, William Hazeltine on

21   behalf of the Committee.  We filed a certificate of no

22   objection on the motion to seal.

23        MR. HARRIS:  Motion to seal, I'm sorry, then my

24   mistake.  So there's no --

25        THE COURT:  All right.

1          MR. HARRIS:  Sorry.

2          THE COURT:  Okay.

3          MR. HARRIS:  There's no opposition filed --

4          THE COURT:  Because I just lost an evening when I

5    could have signed something.  Okay.  All right.  We're okay

6    now.

7          MR. HARRIS:  There's no --

8          THE COURT:  Yes, I signed that order.

9          MR. HARRIS:  Okay.  There's no opposition filed to the

10   Committee's motion for standing.  There had been responses

11   filed by the Debtors, by the Committee and by Mr. Gendregske to

12   the petitioning creditors' request for standing, or on the

13   alternative a grant of an order for intervention of the

14   Committee's adversary proceeding as an additional plaintiff.

15         There had been discussions between parties, Your

16   Honor, which I believe has resulted in an agreement in

17   principal with the exception of one issue as between the

18   Debtors, the Committee and the petitioning creditors that would

19   resolve the responses and issues raised by the Debtors and the

20   Committee in opposition.  Mr. Gendregske has not signed on to

21   that agreement in principal, Your Honor.  I would be happy to

22   lay out for the Court the terms that had been agreed to by the

23   three parties and identify the one open issue, and I can then

24   turn the podium over to Mr. Gendregske's counsel to address any

25   continuing objections he may have, if that is okay with Your

1    Honor.

2         THE COURT:  All right.  So this, this proposed

3    resolution which I guess I'll hear about in a minute, is,

4    resolves both your client's motion for standing and the

5    Committee's motion for standing?

6         MR. HARRIS:  I believe so, Your Honor.

7         THE COURT:  Okay.

8         MR. HARRIS:  If I may.

9         THE COURT:  Yes, please do.  Hang on just -- go ahead.

10        MR. HARRIS:  As a preliminary, I believe all parties

11   are in agreement on the following terms -- that the Committee

12   would be granted standing to prosecute the causes of action set

13   forth in the complaint that the Committee filed in the

14   adversary proceeding.  The petitioning creditors, assuming Your

15   Honor approves this, would withdraw our request for standing as

16   set forth in our motion.

17        THE COURT:  Okay.

18        MR. HARRIS:  The petitioning creditors would be

19   authorized to intervene in the Committee's adversary proceeding

20   as an intervening plaintiff but not acting as an estate

21   representative or be deemed to be acting on behalf of the

22   estate.  The petitioning creditors and the Committee will work

23   to incorporate into an amended complaint if appropriate so that

24   a single complaint will exist and will incorporate all the

25   claims and defendants that are to be prosecuted.  Right now as

1  Your Honor knows there's two adversaries, two complaints, they

2  are substantially overlapping, there are some minor nuance

3  differences in terms of defendants and cases of action.  We're

4  going to talk to the Committee about whether their complaint

5  should be amended in some respect to incorporate some of those

6  things, but we may or may not do an amended complaint.

7           THE COURT: All right.  And when you say you, that's a

8  global you.

9           MR. HARRIS:  Yeah, right.

10          THE COURT:  Right.  And we'll just -- just for

11  parameters, I suppose will withdraw your complaint.

12          MR. HARRIS:  Yes, it's in the list.

13          THE COURT:  Okay, sorry.

14          MR. HARRIS:  That's okay.

15          THE COURT:  When you said that you would intervene not

16  as an estate representative, would, I assume you would not be

17  adding any individual causes of action.

18          MR. HARRIS:  There are two aspects to the causes of

19  action which arguably had individual components for the benefit

20  of petitioning creditors, but I think they're actually subsumed

21  within the causes of action the Committee has already stated.

22  One is the claim for enforcement of the obligations under the

23  third amendment to the credit agreement.  Obviously, the

24  Debtors are a party to that and we are a party to that.  Each

25  one of us could bring that but that cause of action is already

1  stated so we're not going to be adding any additional causes of

2  action there.

3         THE COURT:  All right.

4         MR. HARRIS:  With respect to the equitable

5  subordination causes of action, in connection with the trial on

6  that issue, to the extent Your Honor finds any kind of improper

7  conduct or inequitable conduct that would give rise to

8  subordination, there will also have to be a determination as to

9  which creditor parties were adversely affected.  It could be

10  some it could be all.  So I don't think it adds any additional

11  causes of action there either, although obviously there are

12  individual nuances for different creditor groups that come up

13  in the context of that.

14         THE COURT:  Okay.

15         MR. HARRIS:  My very next point, Your Honor, is that

16  the petitioning creditors will withdraw our adversary

17  proceeding obviously in favor of the Committee's action.

18         The next point is the intervening plaintiffs will be

19  entitled to fully participate in all aspects of discovery and

20  trial.  But to avoid duplication and burden, the petitioning

21  creditors will not require the parties on whom we've served

22  discovery to independently respond to them.  And effectively

23  they're going to be withdrawn.  We're going to rely on the

24  Committee's discovery requests right now with the right to

25  supplement.  And I believe, Your Honor, that to the extent

1    there's any differences in the discovery requests, that'll get

2    flushed out in the context of what are inevitably going to be

3    meet and confer conferences between the various parties so

4    that, you know, the parties on whom we've served discovery and

5    who they served discovery on won't have to duplicate the

6    responses in effect.

7            THE COURT:  And your, I mean is that going to matter,

8    your complaint is being dismissed anyway, so there would be no

9    discovery in connection with your action.

10           MR. HARRIS:   Right.  It'll kind of go away by

11   operation of law.

12           THE COURT:  All right.  What about has there been any

13   discussion about how depositions would occur, or is that an

14   issue for another day?

15           MR. HARRIS:  I think that's an issue for coordination

16   which is kind of my next point, Your Honor, which is that we're

17   going to use, we and the Committee have agreed to use

18   reasonable best efforts to coordinate all of our efforts on

19   discovery, depositions, strategy, prosecution, who is going to

20   take the lead on what issues, things like that to avoid, you

21   know, duplication and incremental costs as best as we possibly

22   can.

23           THE COURT:  Okay.

24           MR. HARRIS:  The UCC has asked and we have agreed that

25   they have the right to seek guidance from the Court to modify

1  the scope of the intervention in the event they believe that we

2  are not acting in the best interest of the estates generally

3  and prosecution of the causes of action.

4         THE COURT:  But your client will remain your client.

5         MR. HARRIS:  My client is going to remain my client,

6  yes.

7         THE COURT:  Right.  And their client will be, well

8  they'll be acting on behalf of the Debtors' estate as a whole.

9         MR. HARRIS:  Correct.  But I think the idea here is if

10  for any reason they think we're being obstructionists in any

11  way or --

12         THE COURT:  Right.

13         MR. HARRIS:  -- overstepping our bounds, if you will,

14  that they have the right to come to Your Honor and ask to put

15  us back in our cage.

16         THE COURT:  Okay.

17         MR. HARRIS:  The next point, Your Honor, is that the

18  petitioning creditors and the Committee have agreed that

19  neither party is going to have either a veto or a consent right

20  over any proposed settlement.  If any party reaches a

21  settlement with one or more defendants they can propose it and

22  seek approval from Your Honor subject, of course, to the whole

23  9019 process and everybody's rights and connection with that

24  process.

25         THE COURT:  All right.  So if they reach a settlement

1  in connection with the Debtors' estate, you'll have the right

2  to object to it.

3        MR. HARRIS:  Correct, and conversely --

4        THE COURT:  And if you reach a settlement on your

5  individual claims, they'll have a right to settle it or

6  objection to it.

7        MR. HARRIS:  Right.  Or if there's, if there are

8  individual claims or if there is a potential for a more global

9  settlement that parties agree to then we have the right to

10  propose it, obviously, they have the right to oppose it and

11  take whatever positions they think are appropriate.

12        THE COURT:  All right.

13        MR. HARRIS:  The nest point, Your Honor, is simply a

14  reservation of rights.  As we noted in our papers, the

15  petitioning creditors simply want to reserve the right to seek

16  an award of substantial contribution under 503(b) in the event

17  such an award would be, in our view, justified.  Obviously,

18  that's subject to the rights of any and all parties in the case

19  to take whatever positions they think are appropriate.  And

20  those are the terms on which all the parties have agreed other

21  than Mr. Gendregske's counsel as I indicated before.

22        The only open issue, Your Honor, is the following one,

23  which is that the Committee and the petitioning creditors

24  believe that the sole and exclusive authority to propose a

25  settlement with the defendants in the case or any of them

1   should be vested in the plaintiffs in the adversary proceeding,

2   and no longer reside with the Debtors.  The --

3          THE COURT:  I'm sorry, start that over again.

4          MR. HARRIS:  The open issue we have which the

5   Committee and we agree on, but which the Debtors are concerned

6   about, and I'll let them speak for themselves on this, is that

7   the plaintiffs both the Committee and the Petitioning Creditors

8   as the intervening plaintiffs either individually or together

9   would have the sole and exclusive authority to propose a

10  settlement and prosecute a settlement with the defendants in

11  the adversary as opposed to having the company continue to have

12  the authority to discuss potential settlements with the

13  defendants.  We believe that if the Committee and the

14  Petitioning Creditors are going to be prosecuting these actions

15  and the defendants, and there's a possibility of settlement,

16  the defendants should be talking to us not having the

17  opportunity to discuss potential settlements with various

18  parties who, you know, may or may not believe in the causes of

19  action who may or not be involved in the causes of action in

20  terms of their assessment, etc.

21          I understand, obviously, any settlement would be subject

22  to everybody's rights to take positions under 9019 when

23  ultimately proposed.  But really, Your Honor, as a matter of

24  efficiency and focus, it would make the most sense to have the

25  defendants talking to the plaintiffs in the action rather than

1  any other parties who have agreed that they would and chosen

2  not to take up the cause here and prosecute them.

3         THE COURT:  You touched on a matter that was certainly

4  on my mind coming in and I'm not sure exactly how or if it's

5  been resolved by what you've gone through, which is who's in

6  charge of running the show.  The Committee is going to be in

7  charge of running the adversary proceeding, correct?

8         MR. HARRIS:  The Committee is going to be in charge of

9  running the adversary proceeding working with us, but they have

10  --

11         THE COURT:  They have the decision making authority

12  and you'll tag along; or, if you feel, at some point like you

13  need to stand up more for yourself you'll come back and they'll

14  either agree or you'll come back and ask for me right?

15         MR. HARRIS:  At this point, Your Honor, we don't

16  actually think that there is a big difference of view certainly

17  as it relates to the prosecution of these causes of action or

18  our collective belief in their viability.  There may

19  differences in opinion on strategy.  There may be differences

20  of opinion on settlement and their parties have the ability to

21  go their own ways, obviously.  But as it relates to the causes

22  of action which are purely estate causes of action, clearly the

23  Committee is the one vested with prosecution of those.  We're

24  in the case.  We get to understand all the discovery.  We,

25  hopefully, will be coordinating with them pretty closely in

1    terms of how the prosecution of the claim gets put together.

2         On those causes of action where we have independent

3    rights, we reserve the right, obviously, to stand up and say

4    hey we think this needs to be prosecuted or dealt with in a

5    slightly different way, particularly, as it relates to the

6    contractual claims and equitable subordination as it relates to

7    the harm we believe was suffered upon my clients directly.  But

8    as a bottom-line matter it's the Committee's adversary

9    proceeding.  We're intervening plaintiff, and they are vested

10   with the causes of action and to act on behalf of the estates.

11        THE COURT:  Okay.  So, I guess there are different

12   ways you could look at it which is there is the idea of

13   settling simply the adversary proceeding.  There is the idea,

14   perhaps, of settling the Debtors' case perhaps separately from

15   the adversary proceeding, although I struggle to see how that

16   would be possible.  Or there could be a global settlement that

17   would deal with the adversary proceeding and the Debtors' case.

18   And what I'm hearing you say is that notwithstanding that the

19   Debtors could be or would be affected by any settlement like

20   that, you do not want them to have the power to actually enter

21   into it.

22        MR. HARRIS:  Well let me be clear, Your Honor.  If the

23   Debtors were to propose a case resolution that didn't require a

24   resolution of the causes of action in the adversary proceeding

25   then what I'm saying here wouldn't matter.  If they were to

1    propose a sale that basically preserved the litigation for

2    later and escrowed a bunch of proceeds, that's fine, and that

3    would not be impacted by what we're saying here.  But I think

4    what we're saying today is that to the extent the case

5    resolution will if the Debtors propose would include or require

6    some resolution or releases that would affect the causes of

7    action, that would require -- that would not be something they

8    could do without having at least the Committee or us supportive

9    of it.

10          THE COURT:  Okay.  Okay I understand.

11          MR. HARRIS:  I'll turn the podium over to the Debtors

12   to speak to that issue.  And then I believe Mr. Gendregske's

13   counsel wants to be heard with respect to the intervention --

14          THE COURT:  Well let me -- I think my plaintiff might

15   want to be heard.

16          MR. KELLEY:  As a preliminary matter, I neglected --

17   this is Jeff Kelley for the Debtors.  I neglected to introduce

18   to the case on the record Mr. Robert Stark who is, I believe,

19   Your Honor knows who Your Honor has approved as counsel to our

20   Special Committee in this case.  And the Special Committee in

21   this particular instance consisting of one person because we

22   have two members: one of whom is defendant and one who is not.

23   So the one person member of our Special Committee has been,

24   through Mr. Stark's involvement, involved in all aspects of our

25   positions on this standing and intervention motion.  I did want

1    to make the Court aware that Mr. Stark was here today.

2          THE COURT:  I did see him on the list, but thank you.

3    Welcome.

4          MR. BURKE:  Good morning, Your Honor, Michael Burke

5    for the Committee and, again, thank you for allowing us to be

6    heard.  Mr. Harris did outline the proposed settlement and

7    quite literally it's done on loose leaf paper 20 minutes before

8    this hearing and which would be subject to a stipulation and

9    order that we would enter.  But I think Your Honor asked the

10   correct questions.

11         The Committee would retain control of their adversary

12   proceeding.  The Petitioning Creditors would be intervening in

13   our adversary proceeding.  Their adversary proceeding would be

14   dismissed.  And as we went through, we are trying to coordinate

15   so there's not duplication of services and unneeded costs to

16   the estate, so we will coordinate with matters with respect to

17   discovery.  And, moreover, and, importantly, in addition to

18   control that if the Committee comes up with a settlement we,

19   obviously, retain and have because we believe standing is

20   unequivocally ours, the right to propose that settlement

21   subject to a 9019 and the Petitioning Creditors could object.

22         Your Honor also hit upon what I think is a very

23   important point of, you know, if there's a settlement of this

24   case that what's the likelihood of a settlement of the

25   Bankruptcy case without addressing this adversary proceeding.

1    I think that's very moot, but, of course, if there is a sale we

2    can always reserve the rights, put the money in escrow or what

3    have you.  But we actually think there probably can be no

4    resolution to the Bankruptcy case without a resolution of the

5    adversary proceeding.

6         So on authority to settle, I guess, I guess isn't the

7    correct word.  We're not trying to prevent the Debtor from

8    proposing a, you know, a plan or a sale process.  But one in

9    which it affects our rights in connection with the adversary

10   proceeding.  We don't think that's likely, but we would not

11   want the Debtors to essentially get around the ability or have

12   them settle the adversary proceeding or grant releases or what

13   have you.

14        So we will try to flush out this protocol again which

15   was just come up with this morning in a form of stipulation and

16   order, but Mr. Harris did appropriately relay the main key

17   points subject to the, you know, the devil being in the details

18   in this stipulation and order.  If Your Honor has any

19   questions.

20        THE COURT:  So what you're asking -- maybe I should

21   ask Mr. Stark.  But what you're asking, the open issue you're

22   asking is whether or not the Debtor, even though it's not a

23   party to the adversary proceeding, would, nonetheless, be able

24   to participate in settlement negotiations presumably with

25   Yucaipa that would include the adversary proceeding without

1   your participation?

2        MR. BURKE:  Right trying to settle the adversary

3   proceeding whether through a plan or without -- well we think

4   we should have the sole exclusive authority to resolve the

5   adversary proceeding.  I'm not trying to infringe upon their

6   plan or 363 sale rights; however, if they affect my complaint

7   they shouldn't be permitted to do that.

8        THE COURT:  Right, okay I got you.

9        MR. BURKE:  Thank you.

10        THE COURT:  You're welcome.  Mr. Stearn, good morning.

11        MR. STEARN:  Good morning, Your Honor, may it please

12   the Court Bob Stearn from Richards Layton & Finger on behalf of

13   the Debtors.  Largely in agreement with what we heard today

14   with the exception of that last point and I'll explain why in a

15   moment.  From the Debtors' perspective what we were trying to

16   guard against was really the burden and expense to the estate

17   of having to participate in really two separate adversary

18   proceedings which were in many ways overlapping.  And one of

19   the reasons we're substantially in agreement with the

20   stipulation as has been presented is because it protects us

21   from that.  For instance, we're now looking at one complaint

22   instead of two.  We're now looking at one discovery request

23   instead of two; although recognizing that there may be some

24   supplementation.

25        I'm encouraged by the suggestion that the Petitioning

1    Creditors and the Committee will coordinate on discovery.  For

2    instance, if we're defending the depositions of, you know, one

3    of our officers our view is going to be look you get seven

4    hours.  If you get relief from the Court for more, you can

5    convince us as to why you're entitled to more fine.  But this

6    is one case, you know, one complaint and we're going to proceed

7    through discovery efficiently and you guys coordinate and you

8    figure out how you're going to divide the seven hours up

9    amongst yourselves.  But when seven hours is up, absent our

10   agreement or Court order, we're leaving.

11          So we were encouraged to hear about the coordination.

12   And, of course, the last thing that I was happy to hear about

13   was, for instance, essentially that everyone is reserving their

14   503(b) rights.  Obviously, you know, the Petitioning Creditors

15   are going to reserve whatever right they think they have to

16   seek substantial contribution.  We're going to reserve our

17   rights with respect to trying to, you know, protect against

18   that.  We don't want the estate to keep paying for really two

19   plaintiffs.

20          But the issue on which we've not yet reached agreement

21   and I think I don't know that we will, but there's been very

22   little discussion about it so far was this notion of sole

23   settlement authority.  It was first raised to us this morning;

24   20, 25 minutes whatever it was before the hearing was the first

25   that we heard about it.  It's not the subject of any of the

1  motions that are presented to Your Honor today.  Neither

2  standing motions sought this relief.  It was first floated to

3  us literally at 10 after 9:00 or something like that this

4  morning.

5          We're certainly not in a position right now to give up

6  what we view to be potentially important rights especially in

7  connection with a plan.  And we've essentially also been asking

8  the Special Committee to address issues relating to standing.

9  And, obviously, there's been no consultation with the Special

10 Committee on an important issue like this.  So as I stand here

11 today with respect to this question about whether the Debtors

12 would or could be forced to give up what we view as potentially

13 important rights, at least, hypothetically; don't know how this

14 case is going to play out.

15         But as we've said many times before, our goal is to

16 get out as quickly as we can, given the damage that's being

17 done to the business while we're in Bankruptcy.  We're

18 certainly not prepared as we stand here today to give up rights

19 that potentially could be valuable with respect to moving

20 forward with a plan process and getting us out of the case.  I

21 think that's something that's going to have to be a subject of

22 further discussion as between the parties.  And if the parties

23 are unable to agree, I suspect we'll be back before Your Honor

24 on that issue.  Thank you, Your Honor.

25         THE COURT:  Thank you, Mr. Stearn.

1        MR. STEARN:  I don't know if Mr. Stark wants to be

2   heard on that issue or not.

3        THE COURT:  Good morning.

4        MR. STARK:  Good morning, Your Honor, thank you for

5   allowing me to appear in the case.  Robert Stark from Brown

6   Rudnick on behalf of the Special Committee.  I'll be very

7   brief, because the points have already been made.  But I do

8   think for three reasons and, again, we're writing pretty

9   quickly on a piece of paper as we're learning about the

10  settlement terms.

11       I cannot state to the Court that the Special

12  Committee is supportive of this particular attribute of the

13  settlement and we do want a settlement.  We want all

14  settlements.  This case seems to be in certain respects

15  contracting as opposed to easing.  And I'm not sure that this

16  company, its business is, otherwise, enabled and strong enough

17  to stand forever in a Bankruptcy case like Tribune or Lyondell

18  or some of these other cases where litigation amok where we

19  kept the case going for years and years and years.  This is not

20  that strong of a company.

21       From our perspective the idea that settlement

22  authority would be vested exclusively with the plaintiffs here

23  and not and removed from the company certainly hasn't been

24  briefed and so, therefore, I haven't had any opportunity to

25  talk to the Special Committee about it.  I think that's really

1    important because this doesn't seem, at least, in my experience

2    to be customary.

3         And some of you were involved in Tribune and Lyondell

4    and cases like that, it doesn't seem to be a customary

5    proposition that a plaintiff, a committee, even an official

6    committee that is leading plaintiff would have the ability to

7    sort of touch upon, if not, eviscerate certain rights of

8    exclusivity, certain rights under 1107, for a debtor in

9    possession to lead his way out.  And on top of that, I'm not

10   entirely sure it's very wise.

11        In this case, again, we have a lot of inter-creditor

12   litigation, here and elsewhere.  We have a lot of issues that

13   are being raised as far as value allocation is concerned.

14   Obviously, there's been governance issues and causes of action

15   have been asserted.  And the Debtor is not objecting to the

16   prosecution of that.  But the beginning of a litigation is far

17   different than the ending of the litigation.  And the

18   foreseeability of how and when we're going to end that

19   litigation at this moment, you have to evaluate the strength of

20   the business and determine whether or not the business is

21   strong enough to withstand the possibility that this could

22   evolve and devolve into further litigation for extended periods

23   of time.  I'm not entirely sure this business is like that.

24        And so the opportunities that the Bankruptcy Code

25   presents a debtor to propose to the Court as all parties in

1     interest a solution.  They don't have to like it.  They can

2     argue against it.  They can vote it down.  But having, at

3     least, the opportunity to lead through and try to come up with

4     ideas that solve problems that's, I think, what debtors are

5     supposed to do and that's what's being proposed we cannot do

6     preordained before even gotten to the idea of sitting down and

7     talking about it.  Thank you, Your Honor.

8          THE COURT:  Thank you, Mr. Starck.  Mr. Gendregske.

9          MR. ANTONIPILLAI:  Good morning, Your Honor, Justin

10    Antonipillai from Arnold & Porter on behalf of Mr. Gendregske.

11    I understand this is a little bit, it has the sort of sense of

12    a train that's already left the station.  If the Court would

13    permit me, I'd like to talk for a minute, just focus on the

14    intervention point because the standing point we made was just

15    simply in a derivative claim, there shouldn't be two separate

16    parties, and I believe that's no longer at issue.

17         There's some very pragmatic concerns we have about the

18    arrangement that is on paper.  And I think largely Your Honor

19    has started unpacking them.  But I'm going to start, if the

20    Court would permit me, with a brief discussion of the law, and

21    I'll try and be brief.  I know Your Honor certainly knows many

22    of these cases.

23         For us, we are facing straightforward breach of

24    fiduciary duty and aiding and abetting of breach of fiduciary

25    duty claims.  There's standard straight, you know,

1    straightforward State law claims, non-core.  They could have

2    been brought in State Court and, you know, then we'd be having

3    an argument about whether they're related too.  Right, you can

4    imagine that kind of a discussion going on.

5         The question really is, you know, I know this is not

6    overly relevant, but if we were outside of Bankruptcy and we

7    were just in the District Court, this would be very clear that

8    the Petitioning Creditors should not be allowed to intervene in

9    this case.  So that's the sort of paradigm I'm starting from.

10   One could disagree and one could say maybe permissive

11   intervention, but it's certainly not mandatory intervention

12   outside the Bankruptcy circumstance.

13        Then we go to the Bankruptcy contacts and how does it

14   change its analysis.  And I'm going to start by citing three

15   cases.  I don't normally do this, but citing three cases that

16   are arguably adverse to my position.  I just want to explain

17   and cite them for the Court up front.  We start with Marin Oil.

18   Marin Oil was the Third Circuit case.  Obviously, it held that

19   a creditor's committee has the mandatory right to intervene in

20   almost any proceeding including adversary proceedings.  And

21   they're not limited in that case to amicus status.  They have

22   to have more.

23        It was, obviously, limited on space to creditors

24   committee.  There's a fair amount of discussion in that case

25   about the special roles of creditors' committees.  But I have

1    to tell Your Honor and Your Honor certainly read the case,

2    there's a fair amount of dicta in that case that arguably

3    relates beyond creditors' committees in interpreting the

4    relationship between 1109(b) and 24.  Okay so that's the first

5    one, but it's limited to creditors' committee.

6           In State Street Bank, Judge Walsh in this Court

7    applied essentially Marin to require intervention by a Debtor

8    in a case essentially applying Marin Oil.  And then third Phar-

9    Mor extended Marin, although it even cited internal criticism

10   and there's a dissent in that case, extended Marin Oil to

11   adversary proceedings that are non-core and arguably unrelated

12   to jurisdiction.  But, again, it's creditors committee case, so

13   that's the sort of lay of the land.

14          You have Marin Oil, State Street Bank and Phar-Mor.

15   They're all in the creditor's committee context or with the

16   debtors' committee context, but they're arguably adverse and

17   they all have sort of general language that interprets the

18   relationship between 1109(b) and 24(a) in a way that's broader.

19   It's dicta, but it's adverse to us.

20          Marin has been harshly criticized in many ways and

21   it's limited on its facts to the creditors' committees' cases.

22   Obviously, the Fifth Circuit and the Tenth Circuit, the Fifth

23   Circuit in Fuel Oil.  The Tenth Circuit has also joined in

24   saying that 1109(b) does not create a mandatory right to

25   intervene in any adversary proceeding related to a bankruptcy.

1    That is the better reading of the relationship between 1109(b)

2    and 24(a).  And in this context, it also plays off the plain

3    language of 7024 and the advisory committee notes.

4         So our simple point is under the plain language of

5    7024 and Rule 24 and the advisory committee notes, a creditor

6    as opposed to a creditor committee does not have the right to

7    mandatorily intervene in a case like this.  And we've looked

8    since Marin Oil, it's been, you know, 20, 24 years since that

9    case came out.  We couldn't find a single case holding that a

10   creditor, an individual creditor as opposed to a creditors

11   committee gets to intervene as a mandatory matter in an

12   adversary proceeding like this under the rationale of Marin

13   Oil.  I think that's for good reasons.

14        One, it would, you know, there are a lot of adverse

15   consequences that one can imagine from that; some of which are

16   playing out in the, you know, proposed order that we have

17   before you.  So, notwithstanding, the language of the cases

18   we've cited, Rule 24(a) does not require the Petitioning

19   Creditors to mandatorily intervene in this case.  And then it

20   becomes a matter of permissive intervention.

21        And I think of what you've heard today which is that

22   essentially the Petitioning Creditors are saying that the

23   creditors committee can proceed with the case.  That

24   essentially that's a concession that their interest are

25   adequately protected in terms of the estates interest here.

1    Again, you have a derivative claim, and we believe that the

2    estate -- essentially what they're saying is that the creditors

3    committee can bring this case as it does in many other cases

4    and that should be the end of the matter in terms of the

5    permissive intervention analysis, because, again, if you have a

6    party that's adequately representing the interest of the

7    estate, there is no permissive intervention.  Obviously, the

8    Judge, Your Honor can reach a different

9    conclusion in its discretion.

10        So that brings us to pragmatic concerns we have in

11   that context.  And we're looking at this from a permission

12   intervention perspective.  We have real concerns about what

13   this means.  I mean the last issue about the various ways in

14   which the settlements can go forward strikes us as very

15   complicated and you can imagine that being fought over at every

16   step in the proceedings.  In many ways, this agreement looks a

17   lot like standing without calling it standing.  They are called

18   the plaintiff in the case.  They're allowed to do every version

19   of discovery.  And even provisions about withdrawing discovery,

20   basically reserve the right to serve it again.  You know,

21   withdraw the complaint means that they have to coordinate, but

22   there's a lot of reservation of rights.

23        It doesn't look like this is a material difference

24   from, you know, affording a separate party standing on a

25   derivative claim.  And, again, you know, in a derivative case,

1  you know, there's hundreds of cases talking about why. And

2  once you've granted one party standing to bring a derivative

3  claim, you don't want every shareholder, for example, also

4  intervening in the same case. You know, we cited some of that

5  language because it complicates the case. You're going to have

6  issues all the way through about what does it mean in

7  discovery, what does it mean in terms of settlement, who has

8  authority, and it's not really necessary in this case.

9        Our point is there seem to be two issues that are

10  really underlying this effort by the Petitioning Creditors to

11  intervene. I don't think they need to intervene in order to

12  solve those issues. One, they're already a plaintiff in a case

13  that's essentially been consolidated with my client's case.

14  And we've all agreed that discovery can take place in a

15  coordinative way. So a simple order that requires coordination

16  of discovery between this case and the case in which the

17  Petitioning Creditors are already bringing their direct claims

18  effectively solves the issue with respect to discovery. You

19  know, we're going to have to take the discovery once,

20  coordinate the discovery, you know, not repeat it, but that

21  solves most of the issues with respect to discovery.

22        The reason I'm resisting intervention as a plaintiff

23  is that, you know, could very well carry with it other rights

24  that I don't think are necessary and are certainly not

25  justified under either 24(a) or 24(b). So a coordinated

1   discovery order we don't object to and that would certainly

2   solve the issues with respect to most of the issues.  They're

3   already withdrawing their complaint.  And certainly there's

4   nothing wrong, you know, the Committee and the Petitioning

5   Creditors, they're always allowed to just coordinate in terms

6   of what plan should be brought.  There's no bar on that.  But

7   the notion that they be permitted to intervene as a plaintiff

8   that carries with it, you know, certain, you know, certain

9   other rights potentially and we don't know what that means.

10  But for discovery purposes, I think it's solved by the order of

11  just coordinating discovery.

12        Second, for settlement purposes, this provision is

13  troublesome to us.  We can imagine a lot of issues coming a

14  long down the way as to who's in charge of the case, who gets

15  to weigh in on what.  And Rule 9019 already gives the

16  Petitioning Creditors the right to weigh in once they sort of

17  seen the settlement discussions weigh in and disagree with it

18  or work out, you know, in terms of a settlement authority.

19        And so we think both a coordinated discovery order and

20  an order, you know, the normal 9019 process basically covers

21  most of the watershed, the waterfront.  And I don't know

22  honestly standing here what the consequences, all of the

23  consequences of permitting the Petitioning Creditors to

24  intervene under these circumstances.  We sort of explained why

25  it's not legally permitted or required, certainly.  But, you

1    know, once you have a party in the case as a plaintiff, you

2    know, I'm sure that will be thrown back at us regularly as to

3    what their rights are, what their permitted to participate in,

4    what their rights are for settlement.

5           And in a case that's trying to move towards trial in

6    August, I think that unduly complicates this case.  And,

7    obviously, Your Honor, we've made this clear and Your Honor

8    will be ruling on all of this stuff, but, you know, we haven't

9    worked through our issues with respect to a right to a jury

10   trial.  We could have a severance of this case of our claims

11   against my client.  You could have, you know, withdrawal of the

12   reference or, at least, the discussion about that.  You know,

13   you can imagine what the arguments would be there.  But it's

14   not appropriate at this point on this law to have us burdened

15   in some ways with the Petitioning Creditors as a named

16   intervener when I think most of the relief they seek can be

17   achieved through a coordinated discovery order and through the

18   normal 9019 process.  Thank you, Your Honor.

19          THE COURT:  Thank you.  Mr. Klyman.

20          MR. KLYMAN:  Thank you, Your Honor, for the record

21   Robert Klyman of Latham & Watkins on behalf of Yucaipa.

22   Yucaipa has not taken a position on who has standing.  We've

23   been agnostic on that.  The only point that I'd like to make is

24   that to the extent Your Honor does allow this resolution to

25   move forward, Yucaipa may amend its answer depending on how the

1   complaints shake out.  And we will work -- if you grant this,

2   notwithstanding, Mr. Gendregske's counsel's points that we will

3   work with the Committee to work out an appropriate timeline

4   that doesn't slow down the track that

5   we've already set out to get to a trial in August.

6         THE COURT:  Thank you.

7         MR. HARRIS:  Your Honor, would you like to hear a

8   response?

9         THE COURT:  Sure.

10        MR. HARRIS:  Your Honor, just a couple issues to

11  address the concerns raised by Mr. Gendregske's counsel.  I'm

12  not entirely clear, frankly, what coordinated discovery order

13  Mr. Gendregske's counsel thinks can be entered here.  On the

14  one hand, he complains in his response that there shouldn't be

15  two adversary proceedings that are prosecuted simultaneously.

16  There should be one, etc.  That's exactly the resolution we've

17  come to here.

18        If I understand his position correctly the two

19  adversary proceedings would stay outstanding.  They could be a

20  coordinated discovery order between the two.  To my mind that

21  creates enormous inefficiencies.  The first thing that is going

22  to happen is somebody is going to file motions to dismiss our

23  adversary proceedings or certain portions of it in any event

24  for lack of standing.  So we actually think what we've done

25  here is create a much more efficient means to move these cases

1    forward such that --

2         THE COURT:  Well I think his argument is that your

3    case should be dismissed.  The Committee's case should go

4    forward.  And basically you'd have the right to see whatever

5    happens; attend the deposition, get a copy of the document.

6    But not actually actively participate, and I think that's what

7    he's saying.

8         MR. HARRIS:  I mean maybe that's one interpretation,

9    Your Honor.  I'm not sure that's what I heard.  But that also

10   kind of skirts the few, you know, important issues here that

11   would remain outstanding such as the fact that we do have the

12   right to bring a contract enforcement action against Yucaipa

13   under the terms of the third amendment.  That is a claim that

14   my clients possess independent of the Debtors.

15        THE COURT:  But he wouldn't care about that.  His

16   client wouldn't care about that because he wouldn't be a

17   defendant.

18        MR. HARRIS:  True.  And we also have, we believe, an

19   independent basis for equitable subordination for harm suffered

20   on my clients in particular.  And that claim would subsume

21   virtually all of the discovery and information relating to

22   actions and conduct of the board of directors during the

23   relevant periods here, which while not necessarily in

24   connection with prosecution of a claim for a breach of

25   fiduciary duty or aiding and abetting breach of fiduciary duty.

1    Clearly, the conduct of the board here and the actions of the

2    board here are relevant to the overall claims for equitable

3    subordination.

4         It's not just Yucaipa acting with one hat on.  It's

5    the whole panoply of conduct that they undertook in the context

6    of both trying to become the requisite lender, as well as the

7    conduct in the context of the board.  So I actually think that

8    the way that we set this out is actually a much more efficient

9    process and not as confusing as Mr. Gendregske's counsel would

10   have it.

11        Circling back, Your Honor, I mean in our papers and in

12   Mr. Gendregske's papers there are standards that we both

13   actually agree on for the Court to review in terms of

14   intervention come down to basically two: do we have a

15   sufficient interest in the case in order to justify

16   intervention and is there adequate representation.

17        With respect to the first factor, Your Honor, we've

18   laid it out in our papers, but there seems to be several basis

19   to conclude that we do have a sufficient interest here to

20   justify intervention.  It's not just a mere economic interest

21   in terms of recovery in the case --

22        THE COURT:  You really don't need to get into the

23   intervention issue.

24        MR. HARRIS:  All right, Your Honor.  So with the

25   pragmatic standpoint, we think that the agreement that's been

1   reached between the company, the Committee here creates an

2   enormously efficient way to move forward with what our -- it's

3   not one adversary proceeding.  It's actually several adversary

4   proceedings and potentially cross claims, all of which are

5   being prosecuted simultaneously, all of which we're going to be

6   in the middle of simply by virtue of the way the parties have

7   agreed to proceed with these subject to Mr. Gendregske's issues

8   with potential severance of certain claims, etc.

9           So with that, Your Honor, we think the Court should

10  approve the agreement that's been reached here.  And to the

11  extent Your Honor does so, we will work to prepare an agreed

12  form of order to submit to Your Honor. Thank you.

13          THE COURT:  Mr. Burke.

14          MR. BURKE:  Thank you again, Your Honor, and I'll be

15  brief.  As Your Honor is probably sick of hearing me say, you

16  know, from the outset the Committee's view has always been that

17  they're sitting in the middle of these two titans: Black

18  Diamond and Yucaipa and there can't be a resolution to this

19  case unless these two parties settle or are forced to settle.

20          We proposed as Your Honor knows several months ago to

21  try to streamline the process by teeing up a 363 sale with the

22  Yucaipa bid.  That did not proceed, but it was a way to

23  streamline the case because, quite literally, the Debtor can't

24  stay in bankruptcy for the rest of its life.

25          THE COURT:  Well it just might stay in bankruptcy for

1    the rest of its life.

2         MR. BURKE:  So, you know, to that point again this is

3    another attempt at the Committee trying to streamline this.

4    Quite honestly, I have no desire to go to trial in August.  May

5    is when we're supposed to mediate.  It would be my hope that

6    there can be a resolution through mediation, and we will work

7    our hardest to try to get that.  But I don't want to be left in

8    another situation where under this stipulation if we have, it

9    is our adversary proceeding.  We control the adversary

10   proceeding.  They have rights to intervene.  I'm not conceding

11   for a moment that they have any direct causes of action.  But

12   let's hypothetically if they do, then we may have separate

13   issues that we have to deal with.  By having them intervene in

14   our adversary proceeding, it will tee up everything for

15   mediation or, at least, a trial if we ever get there.  And I do

16   think that this is more streamlined and a quicker approach then

17   battling over estate causes of actions and private causes of

18   action that Black Diamond may have.  Again, our sole intent

19   here is to streamline this, come up with a resolution,

20   hopefully consensually to get the Debtors out of Bankruptcy.

21   Thank you.

22        THE COURT:  You're welcome.  Any last comments?  Okay

23   well a couple of things.  In preparing for today's hearing on

24   the standing issues, it was one of my primary thoughts,

25   concerns issues I thought was just the pragmatic ability to

1    figure out how to run a case like this where the Committee

2    sought standing and in its papers the Petitioning Creditors

3    didn't object provided they would be allowed to intervene.  And

4    the issue becomes who controls the litigation if you have two

5    different plaintiffs with two different ideas going two

6    different directions and one lawsuit, you've got all sorts of

7    problems.

8            So in the context of the proposed agreement, I think,

9    flushes out, at least, most of those issues, although I could

10   see some, perhaps, arising in the future.  And what I really

11   probably will be doing is just kicking the can down the road.

12   Hopefully, we never have to deal with it, but if we do we'll do

13   with it in the context of agreements about discovery,

14   agreements about settlement, etc. etc.

15           So I'm certainly willing to grant the Committee's

16   standing to pursue the Committee's cause of action.  I don't

17   think Mr. Gendregske would object to that.  It is picking one

18   or the other.  However on the picking one or the other issue, I

19   will allow Black Diamond to, excuse me the Petitioning

20   Creditors to intervene/participate in the litigation provided

21   that the issue about coordinating discovery and having one set

22   of document requests and one deposition.  I'm not going to give

23   you -- I can tell you as I'm sitting here right now I'm not

24   giving the Committee a deposition and then turning around and

25   letting the Petitioning Creditors take it a week later.  If you

1    both want to participate and you both want to ask questions at

2    one deposition, I'll deal with that at a future date if

3    necessary.  But, you know, it's going to be one set of document

4    requests, one set of interrogatories, one set of request for

5    admissions, one set of depositions unless you can come back and

6    tell me there's a problem.

7         That solves a big issue I had about coming in and

8    saying okay I'm going to grant the Committee's motion.  I'm

9    going to allow the Petitioning Creditors to intervene.  We

10   don't have one captain.  We got two.  And, you know, gosh knows

11   what's going to happen.  And I think I understand how a

12   settlement might work in the event one is reached.  Certainly,

13   it sounds to me like all parties' rights are being reserved in

14   connection with the substance of any 9019 motion that's put in

15   front of the Court.

16        It's a little unclear -- well and it's also, I think -

17   - well it's confusing when you get to the point of okay let's

18   say Petitioning Creditors and Yucaipa reach some sort of

19   settlement.  The Committee is not a party to it, doesn't

20   necessarily agree with it.  Debtor is not a party to it,

21   doesn't necessarily agree with it.  And you come in and you try

22   to get a 9019 motion approved that settles their causes of

23   action or settles the Debtors' plan, etc. etc., I don't know

24   how that's going to work.  And I can't contemplate it.  All the

25   different ways it might work.  I mean I think the reality is

1    that unless all four parties, Committee, Yucaipa, Petitioning

2    Creditors, the Debtor are all on board with the settlement,

3    it's likely not to be a settlement, but I don't

4    know.

5         So notwithstanding that I'm unsure about how that

6    might play out, at least for purposes of moving the standing

7    motion forward and getting the litigation going and there's not

8    going to be a settlement until the litigation gets going and we

9    know what's happening, I'm okay with the structure that's been

10   set forward.  Now I just want to make sure I understand before

11   I make a decision if I have to on exclusive right to propose a

12   settlement of the adversary proceeding.

13        I guess my question is because I heard Mr. Stark say

14   he hadn't even had a chance to talk to his client about it.  I

15   heard Mr. Stearn say I haven't even had a chance to talk to my

16   client about this piece, do you want me to make a decision on

17   that issue or do you want to wait and?

18        MR. HARRIS:  Your Honor, I think the comments by both

19   Mr. Stearn and Mr. Stark are fair because the issue was not as

20   they said raised in the motion papers and it did come up in a

21   discussion this morning as we were trying to work through the

22   details of this.  I think it would be appropriate to give them

23   an opportunity to speak to their clients about positions and to

24   talk to us as to why we think the structure we proposed makes

25   sense.  And, hopefully, we can come to a resolution in the form

1  of an agreed order to submit to Your Honor.  And if we can't,

2  we may need to come back to you on just that particular issue,

3  but I don't think you need to

4  rule on it this morning.

5       MR. STARK:  Robert Stark again.  Your Honor, I'm

6  certainly fine with that and I'm certainly happy to pick up the

7  phone and call my client as soon as we leave the Courthouse.

8  The only problem that I have if and it is foreseeable

9  especially if the Special Committee decides that it is not

10  supportive of this particular attribute of the settlement, do

11  we then have an opportunity to brief the issue for Your Honor

12  and then come back and argue it again.  And I don't want to

13  necessarily hold up the other attributes of the settlement

14  because as Your Honor just said getting it started we can't

15  have an ending until we've gotten it started.

16       THE COURT:  I don't think I would need, I think have,

17  in effect, heard -- well I don't want to say that.  The idea of

18  briefing the issue really sort of takes me back a bit because

19  this thing needs to get moving and we have a schedule in place.

20  So I'm not sure I'd allow additional briefing, but I certainly

21  would allow I expect more discussion on the record before I

22  rule if you want me to.  I'm a little sort of at a loss how to

23  proceed.  I have an idea in my head, but those are bad places

24  for ideas sometimes.

25       And let me, well let me say that other than that open

1   issue, I am generally on board with what the parties have

2   agreed to do and would approve it subject to seeing the

3   details, etc. etc.  I don't know if that piece would blow up

4   all the other pieces.  I don't know if that piece is

5   sufficiently narrow that I can deal with it on its own and it

6   will not affect the overall settlement.  I'm not asking anybody

7   to make that decision as I sit here today.

8           MR. STEARN:  May I please the Court.

9           THE COURT:  I can't force the parties to settle no

10  matter how much I would like to do that.

11          MR. STEARN:  May I please --

12          THE COURT:  Except that there's 9019 or something like

13  that.

14          MR. STEARN:  May I please the Court, once again, Bob

15  Stearn from Richard Layton & Finger on behalf of the Debtors.

16  Just an observation or two, Your Honor, my view is this last

17  point is not driving the bus.  That the parties, otherwise,

18  have an agreement irrespective of it and then we just have a

19  dispute as to this separate point which can be cleaved off.

20  And, respectfully, I would say that if it something that Your

21  Honor is going to entertain if after I speak with my client,

22  Mr. Stark speaks with his client, if we have sort of a unified

23  voice that we're just not willing to give up this right without

24  kicking and screaming, we likely would, at least, request the

25  ability to submit something in writing to the Court since the

1  issue, again, has not even been presented.  It's not even been

2  requested in any form of motion or pleading.  It's just come up

3  today in conversation

4  so.  Thank you, Your Honor.

5       THE COURT:  All right.  So I'll reserve decision on

6  that aspect of the agreement in principle that's been reached,

7  at least, between the Committee, Mr. Harris's client and

8  Yucaipa's indifferent.  So other than the open issue, I will

9  approve the proposed procedure.  I'll overrule the objection

10  subject, of course, to actually seeing the stipulation and

11  seeing what it says.  And if it's consistent with what I've

12  been told in Court, I won't have a problem with it.  I will

13  hold aside an issue on who gets to take the lead in settlement

14  at this time without prejudice to the concept that that might

15  blow what I've already agreed to up; in which case, I'll deal

16  with that if necessary.  If it's a discreet issue, I'll deal

17  with that in its context.

18       But I think it would be wise for everyone to actually

19  be able to have a more less frantic discussion and be able to

20  talk to their clients, etc., etc. on this issue.  So I think,

21  hopefully, everyone understands that.  Are there any questions

22  in connection with going forward in that way?

23       MR. HARRIS:  No, Your Honor, we'll work to put

24  together an agreed order between the parties consistent with

25  what Your Honor's rulings are.

1          MR. STEARN:  Bob Stearn for the Debtors, no questions,

2    Your Honor; thank you very much.

3          THE COURT:  You're welcome.  Okay that for present

4    purposes hopefully and forever deals with the two standing

5    motions.  That leaves us with the motion to dismiss the cross

6    claims, I believe, correct?  Okay we have to switch personnel,

7    bring in new Court Reporter.  And now seems like a good time

8    since it's a natural break so we'll take a short recess while

9    we get a new Court Reporter.

10        (Recess 10:44:28 to 10:48:47)

11         THE CLERK:  All rise.

12         THE COURT:  Please be seated.  From the Petitioning

13   Creditors.

14         MR. WARD:  Good morning, Your Honor.  Your Honor, my

15   name is Robert Ward from Schulte Roth & Zabel on behalf of

16   Petitioning Creditors and their motion to dismiss.

17         Your Honor, in their cross claims Yucaipa is seeking a

18   declaratory judgment that certain provisions of the third

19   amendment are null and void.  These happen to be the provisions

20   that prevent Yucaipa from acquiring a majority of the debt from

21   controlling the debt, that is, and from becoming the requisite

22   lender.  They also happen to be the same provisions that were

23   nullified by the fourth amendment which allowed them to become

24   the requisite lender and to acquire the debt.

25         With the nullification, if you will, of the fourth

1    amendment, this presents a problem for Yucaipa.  So what

2    they're asking this Court to do is, in effect, through a ruling

3    on this cross claim ultimately to reinstate those provisions

4    that allow them to control the debt and to become the requisite

5    lender, provisions that were in the fourth amendment which have

6    now been knocked out and nullified by the ruling by Justice

7    Ramos.  So it's a clear end run around the decision in New

8    York.  They could have brought this action in New York.  They

9    didn't, clearly, because of the negative result they've gotten

10   in New York, so they're asking Your Honor to provide them with

11   the relief here which is to knock out the various provisions in

12   the third amendment that prevent them from controlling the debt

13   and from becoming the requisite lender.

14          These provisions very briefly, Your Honor, are a

15   provision in the third amendment that prohibited Yucaipa from

16   voting any of the debt it acquired, that prohibited Yucaipa

17   from counting the debt toward for the purposes of becoming the

18   requisite lender for the percentage to get to the 50%.  They

19   couldn't count their debt.  In addition, one of the provisions

20   they seek to have nullified here by Your Honor is the

21   prohibition of Yucaipa acquiring more than 25% of the term

22   loans or $50 million dollars of the term loans.

23          So basically, Your Honor, as we say it's an end run

24   around the decision in New York.  We think it's improper.  And

25   among the reasons we do and these are all legal reasons as

1    opposed to factual.  That's why we're doing this on a motion to

2    dismiss is that New York law, Your Honor, which governs the

3    substance of the credit agreement provides that you look at the

4    four corners of an agreement.  And if the language is

5    unambiguous, you give those unambiguous provisions their

6    effect.

7         And there are two contractual provisions.  We think

8    they're unambiguous, very clear, and then there's the statute

9    of limitations.  The two unambiguous provisions are 2.7(e) of

10   the third amendment which amended the first lien credit

11   agreement and created 10.6(j) which is a covenant not to sue

12   specifically addressed to Yucaipa.  In addition, there's

13   10.6(b) which says that any subsequent holders take subsequent

14   to the consent and authorizations of the predecessors.  And,

15   clearly, the predecessors here consented to the third

16   amendment.  Yucaipa doesn't contest that.

17        The third is the statute of limitations which we

18   believe is the three year statute of limitations.  The third

19   amendment which Yucaipa is claiming violates the provisions of

20   the first lien credit agreement, but the third amendment was

21   created, signed, executed on April 21st of 2008.  The suit to

22   invalidate these provisions of the third amendment was not

23   brought until four and a half years later in December of last

24   year.  It's a three year statute of limitations as I'll get

25   into in a moment, Your Honor.

1        But before I do, I do want to get into some of the

2   facts that were raised by Yucaipa in its cross claim.  First

3   off, this is primarily a detrimental and reasonable reliance

4   case.  I say primarily.  It's actually entirely a detrimental

5   and reasonable reliance case by Yucaipa.  Their principle theme

6   is that Black Diamond, Spectrum, and the other lenders did not

7   say anything in connection with the purported fourth amendment

8   or with Yucaipa's acquisition of the debt and since they didn't

9   say anything, they relied on it.  As I'll get into in a moment,

10  Your Honor, there's a big problem with that claim.  10.9 of the

11  first lien agreement has a no waiver clause, and I'll get into

12  that in more detail, but it says as no waiver clauses say that

13  a delay or failure to act does not result in the loss of that

14  right.

15       Now in addition to the primary focus of the cross

16  claim which is you didn't tell me I couldn't do this which

17  clearly would fall by the no waiver claim, there is a

18  smattering of and Black Diamond encouraged us to do it.  I say

19  a smattering because it's a very small part of the complaint as

20  opposed to the constant and consistent allegations that Black

21  Diamond, Spectrum, the lenders, CIT you didn't tell me I

22  couldn't do this.  You didn't stop me.

23       With respect though to the alleged incursion by Black

24  Diamond, first off, it's got some significant issues.  What

25  Yucaipa is saying is that in a meeting in Los Angeles and in a

1   couple of phone calls in August of 2009, we encouraged them to

2   do something, to buy the debt, to enter into this purported

3   fourth amendment.  The problem is unless, you know, we had a

4   crystal ball in August of 2009 they had a crystal ball in

5   February of 2009.  In February of 2009, they already had done

6   so.  They already sought to acquire the debt.  They had sent

7   tender offer materials to all of the lenders in February of

8   2009 which contained what they called the proposed fourth

9   amendment which they admit in their cross claims is materially

10  the same as the actual fourth amendment that was entered into

11  and has now been nullified.

12        So in February of 2009, they had already committed to

13  do this, already sent out the tender offer materials so they've

14  got their causation backwards to say that in August of 2009 we

15  encouraged them to do something that they had already sought to

16  do in February of 2009.  So although on a motion to dismiss a

17  Court generally has to accept what's well pled.  Something is

18  not well pled, Your Honor, when it's patently absurd and we've

19  cited those cases.  You can't go back in time.  February of '09

20  they made the decision.  August of '09 they had discussions

21  with us.  One can't cause the other.  Something after the fact

22  can't cause something before the effect.

23        In addition to that, Your Honor, Yucaipa is saying

24  that because the lenders failed to object to the draft fourth

25  amendment which they submitted with the tender offer of

1  materials in February of 2009, you know, they moved ahead with

2  the project, you know, to acquire the debt.  And they also say

3  that since there was no objection to that draft fourth

4  amendment that was submitted with the tender offer materials in

5  February of 2009 that they thought they were okay.  They

6  detrimentally relied upon it.  That's hard to believe, Your

7  Honor, because the lenders rejected the tender offer.  So

8  Yucaipa in its papers is saying well no one said there was a

9  problem with our acquisition of the debt.  Well they did.  They

10  voted with their feet.  They didn't go ahead with the tender

11  offer.  The lenders refused to accept it.  So how that's not a

12  rejection is difficult to understand; again, an incredible

13  allegation.

14       The third thing and we raised this in our reply papers

15  is Yucaipa is asserting that in August of 2009 they were

16  encouraged by a meeting with Mr. de Koff [phonetic] of Black

17  Diamond and several, you know, quick phone calls.  However, a

18  year prior in a hotly contested matter called Performance

19  Transportation Services in the western district of New York,

20  Black Diamond and Yucaipa were warring with each other.  We

21  provided the documents that show there clearly was no love

22  lost.  They were fighting with each tooth and nail.

23       So it strains creditability and it patently absurd to

24  say that less than a year later Mr. Burkel from Yucaipa would

25  have relied upon his sworn enemy Mr. de Koff who they were

1   warring with each other in the Performance Transportation

2   Services case.  So it's just not credible as we say, Your

3   Honor.  There's no need to give any credit to what are patently

4   absurd allegations.  In addition, they're a small part of the

5   complaint.  The main complaint is no one told me I couldn't do

6   this and, therefore, I reasonably relied.  But in addition to

7   all that, Your Honor, it's irrelevant because we have legal

8   defenses which get around these facts even if Your Honor was to

9   give them any creditability or any credence and those are the

10   three that I mentioned that I'll get into in a second.

11        But before I do, Your Honor, the no waiver clause

12   which is 10.9 of the first lien agreement says it both ways.

13   It says no failure or delay by the lenders in the exercise of

14   power, right or privilege shall be construed to be a waiver or

15   acquiescence therein.  And then it says in the same paragraph

16   the other way around: any failure to exercise or delay in

17   exercising any right, power, or remedy shall not be construed

18   to be a waiver thereof or preclude the exercise of such rights.

19        So even if it were the case that the lenders sat on

20   their hands this no waiver clause you know ends it for Yucaipa,

21   precludes their claim.  And, Your Honor, I said that the

22   primary theme of the complaint is that the lenders sat on their

23   hands.  I'll give you some examples.  At paragraph 18: the

24   allegation in the cross claim is that Black Diamond did not

25   express any intention to challenge Yucaipa's buying the debt.

1    Paragraph 19: the lenders never raised a timely objection to

2    the purported fourth amendment.  Paragraph 25: the lenders were

3    made aware and made no efforts to oppose the purported fourth

4    amendment or Yucaipa's acquisition to the debt.  It goes on and

5    on.  Then at paragraph 71: Black Diamond never objected to

6    Yucaipa's proposed acquisition.  Paragraph 73: Spectrum never

7    objected to the acquisition.  And then at some other paragraphs

8    CIT and the lenders.

9         These claims of the fact that we sat on our hands and,

10   therefore, they reasonably relied on us not doing anything

11   first off, they're not true.  As I mentioned, Your Honor, on

12   the tender offer our clients voted with our feet and refused to

13   go ahead with it.  But, more importantly, they fall by virtue

14   of Section 10.9.

15        We're getting into the actual legal claims, Your

16   Honor.  Section 2.7(e) is a covenant not to sue.  And it says

17   that Yucaipa, it's specifically tailored to Yucaipa which in

18   the third amendment is called the restricted sponsor affiliate.

19   It says Yucaipa cannot assert, and Yucaipa irrevocably waives

20   any claims, causes of actions against any lenders arising out

21   of contract of tort, in any way related to the third amendment

22   or any of the credit documents, and it releases all claims

23   whether accrued or not, known or not, or suspected.  And it

24   even waives special and direct consequential and punitive

25   damages.  It's a broad covenant not to sue.

1        And by virtue of Section 10.5(b) which I'll get into

2    in a second and that's the provision that says a subsequent

3    holder takes pursuant to the consents and authorizations of the

4    predecessor.  It clearly binds Yucaipa.  In fact, Section

5    2.7(e) specifically says the restricted sponsor affiliate can't

6    bring these claims and that is Yucaipa.  With respect to claims

7    like this, Your Honor, they're enforceable in New York.  A

8    covenant not to sue is expressly permitted under New York law.

9    And as a result, it should be given effect.

10        Yucaipa alleges, Your Honor, that the covenant not to

11    sue is procured by misconduct.  Actually what they say is that

12    Section 2.7(e) is invalidated because of the misconduct of the

13    Petitioning Creditors.  However, in order to nullify a covenant

14    not to sue, there has to be an allegation that the covenant

15    itself was procured by misconduct or fraud.  There's no

16    allegation in the pleadings that that's the case.  The

17    allegation in the pleading is that their purchase of the debt

18    was pursuant to fraud and was produced by fraud.  There's no

19    allegation that the covenant itself was procured by misconduct.

20    And as a result under the law of New York the covenant not to

21    sue is given effect.

22        And, you know, this is not surprising, Your Honor,

23    because if it was simple enough simply to say that the covenant

24    was pursued or my actions were procured by fraud, then every

25    covenant not to sue would be rendered null and void.  You could

1   never have one, because the simple allegation in a fraud claim

2   or a misconduct claim or an estoppel claim that your actions

3   procured, that your actions were, my actions were procured by

4   your action would render a covenant not to sue unenforceable.

5   It can't be the case.  That's why it's restricted.  There has

6   to be an allegation that the covenant itself was procured by

7   misconduct or fraud.  No such allegation in the pleading, Your

8   Honor.  As a result it's in effect.

9         Yucaipa does argue that there's an exception to 2.7(e)

10  an exception to the covenant not to sue.  That the claims are

11  not waived "to the extent their caused by such lenders gross

12  negligence or willful misconduct."  However, what Yucaipa fails

13  to do is continue with that exclusion, with that exception.  It

14  says gross negligence or willful misconduct on or after the

15  date that Yucaipa became a lender.  Yucaipa didn't become a

16  lender until the fourth amendment.  The allegations here are

17  not challenging the fourth amendment.

18        They're challenging the third amendment.  The third

19  amendment was entered into well before Yucaipa acquired the

20  debt.  Yucaipa acquired the debt in August of 2009.  The third

21  amendment was entered into in April of 2008.  So this temporal

22  limitation on this exclusion means that it doesn't apply.

23        In addition to that, Your Honor, another part of the

24  exclusion is that it has to be a finding of gross negligence or

25  willful misconduct on or after the date Yucaipa became the

1    lender "as determined by a Court of competent jurisdiction by a

2    final and non-appealable judgment.  There's been no Court of

3    competent jurisdiction making a finding that there was gross

4    negligence or misconduct on the part of my clients.

5            And as a result, that's the second reason that this

6    exclusion --

7            THE COURT:  I'm sorry where is the exclusion

8    specifically?

9            MR. WARD:  It's in the covenant not to sue 2.7(e) of

10   the third amendment, Your Honor.

11           THE COURT:  Okay.

12           MR. WARD:  And with respect to the fact that there has

13   to be a finding by a Court of competent jurisdiction, Yucaipa

14   seeks to get around that by saying hey, you know we're pleading

15   misconduct and we're pleading willful misconduct and gross

16   negligence here, but that's too easy.  You can't just get

17   around a covenant not to sue like this by claiming that

18   especially when there's language in the exclusion that says

19   there has to be a finding by a Court of competent jurisdiction

20   to that effect.  Because if it was easy enough simply to plead

21   a fraud or an estoppel cause of action, a misconduct cause of

22   action as their pleading here and say well, therefore, the

23   covenant not to sue doesn't apply everybody could do it.  You

24   can imagine, Your Honor, someone comes in and pleads willful

25   misconduct or gross negligence and then is not able to prove it

1    and as a result, they render null and void a covenant like

2    this, which makes no sense because, of course, there's a

3    cardinal rule of contract instruction that you have to give

4    effect to every provision in an agreement.

5         So if Yucaipa can simply come and in and say oh it's

6    okay I'm pleading that and at some point I think I can prove

7    willful misconduct and that gets around your covenant not to

8    sue, it means the covenant not to sue has no effect because

9    what if they don't prove it, then how do you put the covenant

10   into effect, you know, in expo facto, so to speak. So that

11   exclusion doesn't apply.

12        Yucaipa also makes a number of other arguments to do

13   an end run around the covenant not to sue. First, they say

14   that -- sorry, Your Honor, just got ahead of myself. First,

15   they say, Your Honor that the fourth amendment itself nullified

16   this covenant not to sue. Well except the fourth amendment now

17   has also been nullified in the decision in New York. But,

18   again, Yucaipa can't have it both ways. They allege in the

19   cross claim, and the whole basis for the cross claim I saw, I

20   looked at it last night, there's five specific places where

21   Yucaipa says that their cross claim assumes the fact that

22   Justice Ramos in New York is invalidating the whole fourth

23   amendment. That's how they get a justiciable controversy here.

24   Now if the fourth amendment has been nullified in its entirety

25   and, therefore, they can present this issue in front of the

1    Court.

2          With respect to this covenant not to sue, they're not

3    saying well wait a minute, I know that I'm trying to get a

4    justiciable controversy before the Court for a declaratory

5    judgment by saying the whole fourth amendment is invalidated,

6    but that's except for the part that invalidates the covenant

7    not to sue.  Well they can't have it both ways.  If the fourth

8    amendment is not nullified in its entirety which is the basis

9    for their claim, then they're not here.  If, on the other hand,

10   I'm sorry, then the covenant not to sue can't be invalidated.

11   If, on the other hand, the, you know the Fourth -- sorry I'll

12   have to do it again.

13          If the fourth amendment is invalidated in its

14   entirety, then the covenant not to sue is in effect.  It's in

15   the third amendment.  If, on the other hand, there are pieces

16   of the fourth amendment that are still alive, well their whole

17   cross claim is based on an assumption that Justice Ramos has

18   invalidated the whole fourth amendment, so they

19   can't have it both ways.  They're either or they're not here.

20          If they're here based on the invalidity of the whole

21   fourth amendment, the covenant not to sue applies because it's

22   in the third amendment.  If, on the other hand, they're now

23   saying well, you know, the fourth amendment is still alive well

24   then they're whole cross claim falls because -- at paragraph

25   25, paragraph 93, paragraphs 96 and paragraph 108 they're whole

1  claim is based on the entire invalidity of the fourth

2  amendment.

3      The other thing they're saying which is a little bit

4  in conflict with their allegation that the whole fourth

5  amendment has been rendered null and void in their complaint as

6  I've just cited to Your Honor is that the fourth amendment

7  might be severable.  However, the relief that we sought in our

8  motion for summary judgment which was granted by the Judge from

9  the bench was that that purported fourth amendment to the

10  credit agreement is not and never was effective, and that's

11  what he said to me you've won, move on, and that he'll render a

12  decision in writing.

13      But contrary to what Yucaipa is saying, a ruling from

14  the bench is still an effective ruling.  The relief that we

15  sought in our summary judgment motion was clear.  It was

16  focused.  It was that the fourth amendment was null and void

17  and the Judge granted that ruling.  So with respect to

18  severability, we don't think that there is an issue, but we do

19  take instance with Yucaipa saying that we didn't raise the

20  issue in front of Justice Ramos.  In fact, the issue of

21  severability was raised in front of Justice Ramos.  They raised

22  it in their briefs and they didn't raise it in the oral

23  argument, but, you know, that was their choice in the oral

24  argument.  And then they submitted several letters subsequent

25  to the oral argument to Justice Ramos about severability, so

1    the issue has been raised.  It's not been hidden.

2         But, more importantly than that since Yucaipa does

3    argue the severability issue in their motion before Your Honor

4    and their objection to our motion, Your Honor, the law on

5    severability when it comes to New York is that if the sole

6    purpose and effect of an agreement is an integrated whole and

7    one part is interdependent on the other then it's not

8    severable.  It's an integrated document.  And, Your Honor, the

9    sole purpose and effect of the purported fourth amendment was

10   to remove each of the restrictions that prevented Yucaipa from

11   exerting influence on the lenders and becoming the requisite

12   lender.

13        So the purported fourth amendment, Your Honor, was

14   clearly intended to be a wholly integrated document that had

15   one goal which was handing the requisite lender status to

16   Yucaipa.  And there was no argument otherwise before Justice

17   Ramos.  This is not a typical situation of severability, Your

18   Honor, where you have a mistake and some language that would,

19   otherwise, doom some benign agreement.  Here, the entire

20   purpose of the fourth amendment, every substantive provision,

21   is part of a forbidden objective to give Yucaipa dictatorial

22   power over the first lien debt.  And the reason I can say that

23   so clearly, Your Honor, is if you look through the fourth

24   amendment what it simply does is pick and choose provisions of

25   the third amendment which it needs to overturn in order for

1    Yucaipa to vote its debt, to become the requisite lender, to

2    buy enough that it can become the requisite lender.  It's all

3    part and parcel of the same whole.  It's not severable.

4         And with respect to the next argument, Your Honor,

5    which is based on 10.6(b), that's the language that says a

6    subsequent holder is bound by the consent and authorizations of

7    the predecessor lenders.  The fact is the predecessor lenders

8    here consented to the third amendment.  Yucaipa doesn't contest

9    it otherwise.  There's nowhere in their pleadings where you

10   will see that Yucaipa contests that the predecessors from whom

11   they bought consented to the third amendment.

12        And the fact that a subsequent holder takes subject to

13   the predecessor lender's consents and authorizations is not

14   surprising.  It's the law.  Even if there weren't a provision

15   like this, the case law provides that an assignee assumes the

16   assignors obligations.  When they bought this debt, they knew

17   what was contained in the third amendment.  The third amendment

18   had these prohibitions on things it could do.  It couldn't vote

19   its debt.  It couldn't acquire enough debt to become the

20   requisite lender.  And it couldn't count the debt that it

21   bought for the calculation to become the requisite lender.  It

22   knew that.  How do we know that, because it was actively

23   involved in the negotiation and the drafting of the third

24   amendment.

25        The Committee in its complaint at paragraph 66 says

1  that.  So there's no hiding.  The fact is they knew what was in

2  the third amendment and when they bought the debt they knew

3  what was in the third amendment.  And they knew that Section

4  10.6(b) which is in actually the underlying first lien

5  agreement, not even the Third or the fourth amendment, says

6  that the subsequent holders take pursuant to the consents and

7  authorizations of the successors.  So there can't be any doubt

8  that they took subject to the provisions of the third

9  amendment.

10      Now one argument they make is a specific general

11  argument, you know, the rule of contract instruction that the

12  specific governs over the general.  And they say that there's

13  another provision of the first lien agreement 10.5 or 10.5(b)

14  which says when an amendment can and cannot be made.  That's

15  not specific to this case or what's before you, Your Honor.

16  What's specific to us before you is 10.6(b) the provision that

17  I'm talking about which says specifically that a successor take

18  subject to the consents and authorizations of the predecessor.

19  It can't be any more specific than that.

20      Next, Your Honor, with respect to the statute of

21  limitations.  The argument that Yucaipa makes it's throughout

22  its cross claim, but in particular paragraph 108 is that the

23  restrictions in the third amendment are inconsistent with the

24  terms of the first lien credit agreement which was being

25  amended by the third amendment.  And, therefore, if the

1   restrictions in third amendment are inconsistent with the terms

2   of the first lien credit agreement, they were inconsistent at

3   the time the third amendment was passed.  So, in effect, the

4   third amendment was void ab initio.

5           And, in fact, the claim here is a declaratory judgment

6   claim that we believe accrued as of the time of the third

7   amendment.  If the allegation by Yucaipa, Your Honor, is that

8   the third amendment was inconsistent with provisions of the

9   first lien agreement and, therefore, is null and void then it

10  clearly was null and void the moment it was passed.  That was

11  in April of 2008 and the action was not brought within three

12  years which we believe is the statute of limitations.  And

13  that's the Delaware statute of limitations, Your Honor, which

14  is a three year contract statute of limitations.  And as we

15  argued in our papers a Bankruptcy Court as a general matter

16  applies the choice of law rules of the State in which it sits;

17  Delaware clearly here.

18          In addition where there's a choice of law provision as

19  there is in this case, Your Honor, and it is New York, but when

20  there's a choice of law provision the case law that's Gluck vs.

21  Unisys in the Third Circuit and also American Energy which is a

22  case in Delaware, a choice of law provision does not apply with

23  the statute of limitations unless there is an explicit

24  reference in the agreement that it does.  And there is no

25  explicit reference here.  It's Section 11.14, Your Honor, of

1  the first lien credit agreement and that makes no specific

2  reference to the statute of limitation.  So as a result, Your

3  Honor, the choice of law is where Your Honor is sitting which

4  is in Delaware.

5       Now if that weren't enough, the Delaware Borrowing

6  Statute provides that if a cause of action arises outside of

7  the State an action cannot be brought in Delaware after the

8  expiration of whichever is shorter: the time limited by the law

9  of Delaware or time limited by the place where the cause of

10  action arose.  That's 10 Del. C. §121.  The shorter statute

11  here, Your Honor is three years.  The statute in New York is

12  six years, but we don't even see that the cause of action here

13  arises in New York.  It may have arisen in Atlanta.  It may

14  have arisen somewhere else, but we don't think it arose in New

15  York.  But in any case, under the Borrowing Statute this action

16  cannot continue because the statute of limitations applies and

17  it's three years.

18       With respect to the argument that, you know the New

19  York statute should apply, the only thing that happened in New

20  York, Your Honor, is that Justice Ramos ruled to invalidate the

21  purported fourth amendment, but that's no basis for finding

22  that the New York statute applies.  Otherwise, there's no

23  assertion, there's no allegation in the cross claim that

24  anything happened in New York, so New York certainly can't

25  apply.

1        With respect to the argument relating to the statute

2    of limitations, Yucaipa argues that the Borrowing Statute

3    should not apply because Borrowing Statutes typically apply

4    when one party is doing forum shopping.  The case law isn't

5    that strong.  It doesn't really call it forum shopping,

6    however, Yucaipa chose the forum here, Your Honor.  This is the

7    cross claim challenges the third amendment just like we had

8    challenged the fourth amendment in New York.  Yucaipa could

9    have brought this action in New York before Justice Ramos where

10   he was dealing with similar issues; the fourth amendment as

11   opposed to the third amendment.

12       They chose to come to this Court because they didn't

13   like the result that they were getting in New York.  In

14   addition, Your Honor, a cross claim is not like a counterclaim.

15   It's not compulsory.  It's permissive.  It can be brought

16   anytime.  Yucaipa clearly made a choice.  They decided to come

17   into this Court.  And since they decided to come into this

18   Court, they have to be bound by the statute of limitations of

19   this Court pursuant to the Borrowing Statute.  Just a few other

20   points on the statute of limitations, Your Honor; I'm about to

21   wrap up.

22       One of the arguments that they make is, Yucaipa makes

23   is the statute began to run when Justice Ramos ruled.  Well

24   that makes no sense.  The assertion here is that the third

25   amendment was void at the time it was passed, because the

1　assertion at paragraph 108 of the complaint is that the third

2　amendment violated the provisions in the first lien credit

3　agreement which the third amendment was amending.  If that's

4　true, it violated them the moment it was passed.  It doesn't

5　all of a sudden start violating the first lien credit agreement

6　when a Judge decides that the subsequent agreement the fourth

7　amendment should be invalidated.

8　　　　　THE COURT:  Don't I not have a controversy until the

9　fourth amendment is invalidated?

10　　　　　MR. WARD:  Your Honor, did you not or I couldn't hear

11　you.

12　　　　　THE COURT:  I'm sorry I was leaning back.  Wasn't it

13　the case there was no controversy until Justice Ramos made his

14　ruling?

15　　　　　MR. WARD:  Well, Your Honor, I think the issue of

16　whether there's a case of controversy which is a justiciability

17　issue isn't relevant for the purpose of the statute of

18　limitations and I was just about to get there, because there

19　are several cases.  One is Marvel and I think the other is

20　Madison Fund vs. Midland that says in connection with a breach

21　of contract cause of action, it runs from the date of the

22　breach.  So it doesn't run from the date of anything else.

23　It's fairly clear contract law that a breach of contract claims

24　runs from the date of the breach.  And it applies to an

25　assignee.  It applies to the third party beneficiary.

1          So if taking Yucaipa at its word as you have to do for

2     purposes of a motion to dismiss, that the third amendment

3     violated the first lien credit agreement.  That was the breach.

4     Now this is a declaratory judgment action, but the way statutes

5     of limitations work with declaratory judgment actions is you

6     take the corresponding damages claim and we've cited, you know,

7     case law for that.  And the corresponding claim here is breach

8     of contract.  And with every breach of contract claim, there's

9     no tolling.  It's not like a fraud claim.  It's not tolled.  A

10    breach of contract starts for the statute of limitations

11    purposes when the breach took place.

12          And the only breach here based on the theory that

13    Yucaipa is espousing is that the third amendment violated

14    provisions and was inconsistent with provisions in the first

15    lien credit agreement.  That had to happen on April 21st of

16    2008 when the third amendment passed.  It's a breach of

17    contract, the statute of limitations.  Those are the rules.

18    They could have brought these claims early on.  And they never

19    tried to bring them early on, because, Your Honor, it didn't

20    hurt them early on.  They had the fourth amendment in effect

21    and so everything was on cruise control.  However, just because

22    they didn't feel that they had a problem by virtue of the

23    fourth amendment knocking out the provisions in the third

24    amendment which they're now asking this Court to knock out

25    doesn't mean there wasn't a breach.  I'm sorry, Your Honor.

1        THE COURT:  No, no, I'm just having trouble getting my

2   head around it.  I mean they didn't have any issue with the

3   third amendment until the fourth amendment was put in place.

4        MR. WARD:  I understand, Your Honor, and I think with

5   all due respect, I think we're confusing two concepts.  I think

6   whether or not you have an issue that's not what causes a

7   statute of limitations to begin to run, at least in connection

8   with a breach of contract claim.  Now we all know that there

9   are tolling --

10       THE COURT:  I was going to say unless there's some

11  tolling.

12       MR. WARD:  Unless there's some tolling, but there's

13  tolling when it comes to a fraud claim.  I mean we all know

14  that.  I don't really know what it is in Delaware.  I know what

15  it is in New York.  It's two years after discovery or six years

16  after the event, so there are tolling provisions like that.

17  But there is not a tolling provision when it comes to a breach

18  of contract that I'm aware of in any Court or in any state, and

19  there certainly isn't one in Delaware.  And maybe it's a hard

20  and fast rule and maybe it's unfortunate that for Yucaipa it's

21  a hard and fast rule, but justiciability is one thing.  Whether

22  I have an issue is another thing.

23       The statute of limitations for a breach of contract

24  claims runs at the time of the breach.  And with all due

25  respect, Your Honor, if Yucaipa thought there was a problem

1  with the third amendment, that is, that some of the terms of

2  the third amendment were inconsistent with the first lien

3  credit agreement, they knew it.  They helped draft it.  The

4  complaint of the Committee points out from documents it has

5  that we didn't have that they were actively involved, and

6  that's paragraph 66 of the creditors committee's complaint.

7          So they really have no standing.  There should be no

8  equitable tolling here and I'll get to that in a second,

9  because they knew about the issue all along.  They didn't have

10  a problem with it.  But that doesn't allow them to get around

11  the statute of limitations.  If their assertion is to be

12  believed in the cross claim, they say clearly the third

13  amendment was inconsistent with provisions of the first lien

14  agreement.  There's nothing about the passing of the fourth

15  amendment that made the third amendment more consistent with

16  the first lien credit agreement.

17          Now we think the fourth amendment was inconsistent and

18  Justice Ramos ruled that way.  But the third amendment if it

19  was inconsistent, they knew it was inconsistent.  They had

20  helped draft it.  They can't bold-facedly come in and say the

21  third amendment was inconsistent with the terms of the first

22  lien credit agreement.  Nothing that Justice Ramos did, nothing

23  that's in the fourth amendment made the third amendment more or

24  less inconsistent with the first lien credit agreement.  It

25  either was or it wasn't.  It's very binary.

1    I'm trying to read a note from my partner, Your Honor.

2    And as I was getting into a moment ago, Your Honor, Yucaipa is

3    an assignee.  They're a subsequent holder.  And the case law

4    which we cite in our papers is that an assignee takes subject

5    to the rights of the assignor including specifically for

6    statute of limitation purposes.  So just like 10.6(b) said if

7    you're a subsequent holder, you take subject to the rights of

8    the predecessor holder.  The case law is very clear that the

9    statute of limitations applies.

10    Now Yucaipa does try to get around this issue, Your

11    Honor, and gets into another one of these logical conundrums

12    that I had a problem with a moment here, but here's how it

13    goes.  What Yucaipa is saying is well we had no right to

14    contest that, because Convest had the interest at the time.

15    Now the answer to that is well yeah, but you took from Convest

16    or you bought from Convest or Convest's predecessors and the

17    statute of limitations for a breach of contract arose at the

18    time Convest or its predecessors entered into the third

19    amendment if we had believed your claim that the third

20    amendment is inconsistent with the first lien.  So it starts

21    running from the date Convest or its predecessors had it.  You

22    as the assignee take subject to that statute of limitations.

23    That the way a statute of limitations law works and the way

24    assignments work.

25    What they say is well except we had no right to

1    contest that.  Well except you're taking subject to the rights

2    of your predecessor.  But then they say well and Convest had no

3    right to contest that because some of the provisions that we're

4    challenging here specifically relate to us that we can't vote

5    any stock that we buy.  You know, that we can't buy so much

6    stock and that we can't count it toward the requisite lender

7    provision.  Here's their problem.  Convest or its predecessors

8    have no standing to challenge the third amendment.  I would

9    say, Your Honor, that the assignee Yucaipa because the only way

10    they get standing is through buying this debt.  Yucaipa, the

11    assignee, has to take subject to the fact that Convest and its

12    predecessors have no standing.

13          So, again, their arguments tend to be very circular.

14    They take with one hand and try to give back with the other.

15    So what they're saying is Convest couldn't contest this and,

16    therefore, the statute of limitations didn't begin to run; well

17    until we got it.  Yeah, but you took it from Convest.  And if

18    Convest had no standing to contest the third amendment, then

19    you don't have standing either.  They need to have some sort of

20    standing to contest this because the only way they get their

21    rights is by buying this debt.  And they bought the debt

22    subject to the rights that the predecessors had.  It does get a

23    little bit convoluted, but since they take their rights as an

24    assignee they're stuck with the way the statute of limitations

25    runs.

1          And just a couple of other quick points, Your Honor,

2    in addition to everything else, third party beneficiary law, to

3    be a third party beneficiary you have to have a valid contract.

4    You have to have the contract being attended for the

5    beneficiary's benefit and the benefit is direct rather than

6    incidental.  And for this, I would just cite, Your Honor, to

7    the whereas clause in the third amendment.  I mean there's no

8    doubt what the third amendment is for.  It's for Yucaipa.  It

9    says Yucaipa you couldn't buy debt before.  Now you can buy

10   debt, but you can only buy debt subject to the following

11   restrictions.  You can't vote it; the things that I went

12   through before.

13          The whereas clause of the third amendment says, the

14   borrowers have requested, the borrower is Allied which is

15   controlled by Yucaipa.  They had all the equity or most of the

16   equity and controlled the board and the management.  The

17   whereas clause says, the borrowers requested --

18          MR. KLYMAN:  Excuse me, Your Honor, if I may this is

19   maybe the 18th time that Mr. Ward is citing the facts outside

20   of the complaint.  He's not allowed to do that as part of a

21   motion to dismiss.  He's going on about the PTS litigation

22   which was -- he cites to the creditor committee's complaint,

23   not our complaint.  He cites to control over management which

24   his nowhere in our complaint.

25          MR. WARD:  Right, Your Honor, I'll take back control

1    over management because I don't --

2         MR. KLYMAN:  Your Honor, there are other issues, Your

3    Honor, that go partly to the heart of his argument where we've

4    tried to give him some leeway.  We were going to address it in

5    our argument, but he's way outside the scope of our complaint,

6    Your Honor.

7         MR. WARD:  I don't think so, Your Honor.  I mean maybe

8    on that point and I'll withdraw on that point on Allied being

9    controlled by Yucaipa, although I do think, Your Honor, this is

10   not the first time you've heard about that, Your Honor.

11        THE COURT:  Well, but look there's a standard to be

12   applied.

13        MR. WARD:  There is --

14        THE COURT:  And a lot of things I know that don't

15   necessarily get taken into account here.

16        MR. WARD:  And I agree, Your Honor --

17        THE COURT:  Including in whatever's in the Committee's

18   complaint.

19        MR. WARD:  I understand, Your Honor, but let me go to

20   the whereas clause of the third amendment which is before Your

21   Honor.  The whereas clause says the borrowers requested the

22   requisite lenders agree to amend the credit agreement to permit

23   the sponsor.  That's Yucaipa, Your Honor, to become a lender

24   under the credit agreement.  Since the whereas clause

25   specifically says that the purpose of the third amendment is to

1  allow Yucaipa to become a lender, clearly they're a third party

2  beneficiary. And if they're a third party beneficiary, Your

3  Honor, the law is clear that the statute of limitations on a

4  third party beneficiary runs from the date of the contract.

5  The date of the contract April of 2008 Yucaipa is a clear party

6  beneficiary from the whereas clause that is in the third

7  amendment. I'm not going to astringent evidence, so clearly by

8  virtue of the third party beneficiary argument Yucaipa has to

9  deal with the three year statute of limitations.

10  And with respect to Mr. Klyman's assertion about PTS

11  as we cited in a footnote in our reply brief, Your Honor,

12  matters which are of public record which and thereby which this

13  Court can take judicial notice can be made a part of a motion

14  to dismiss --

15  THE COURT: Well it's one thing to take notice of the

16  fact there's a lawsuit. It's another thing to take notice of

17  the fact how parties were behaving in the lawsuit where, you

18  know, whether they were each other's throats or how contentious

19  the litigation is, that's not something I can take judicial

20  notice of.

21  MR. WARD: I understand, Your Honor. We did attach

22  several of the pleadings from the PTS case which were filed.

23  They're a matter of public record from which we believe that

24  Your Honor can easily construe and understand that the parties

25  were at each other's throats. But I take your point, Your

1  Honor.

2       With respect to my final point, Your Honor, maybe

3  second to last point, equitable tolling.  For equitable tolling

4  the main thesis is that a party was actively mislead by the

5  other party concerning their cause of action.  You can't have

6  that here, Your Honor, because Yucaipa was actively involved in

7  connection with the third amendment.

8       MR. KLYMAN:  Again, Your Honor --

9       MR. WARD:  I promise when Mr. Klyman is up I'm not

10  going to interfere with --

11       THE COURT:  Yeah, Mr. Klyman, I understand.  I'll hear

12  from you when it's your turn.  Proceed.

13       MR. WARD:  Thank you, Your Honor.  I just lost my

14  place, Your Honor, I apologize.  In any case, Your Honor, we

15  believe that Yucaipa had notice of its causes of action long

16  ago.  Even if it's not April 21st of 2008 which is the date of

17  the third amendment, they didn't bring this action, this cause

18  claim until December 5th, I believe it was, of 2012, so

19  applying a three year statute of limitations from Delaware that

20  gets them to December of 2009.  That is well after they bought

21  the debt, well after they alleged in their pleadings that the

22  Petitioning Creditors had already turned on them.  I think it's

23  after the Georgia litigation had been started.  It's after the

24  Georgia litigation had been initiated by Yucaipa -- sorry, Your

25  Honor.

1          Your Honor, three years prior to the date they filed

2     their cross claim which should be December 5th of 2009 was

3     after they had already bought the debt in August of 2009.  And

4     according to the allegations in their own pleadings, they had

5     learned that the Petitioning Creditors had done things that

6     were adverse to them.  And they had to start, they being

7     Yucaipa, had to start an action against CIT to try to enforce

8     the fourth amendment.  So, clearly, they had notice that there

9     were issues with the fourth amendment and the third amendment

10    when they started the Georgia action.  And so even if it's not

11    April 21st of 2008, they still had plenty of notice during the

12    times they allege in their complaint August of 2009, for

13    example, which predates the, you know, the three years for the

14    running of the statute of limitations.

15         But the final point, Your Honor, and that is there is

16    an allegation in their opposition that statute of limitations

17    don't apply to an affirmative defense.  And even if Your Honor

18    dismisses their complaint, their declaratory judgment

19    complaint, estoppel and unjust enrichment complaint, they can

20    still bring the same assertions as an affirmative defense.  It

21    is true that typically a statute of limitations doesn't apply

22    to an affirmative defense to another claim.  However, our

23    equitable subordination claim relates to the fourth amendment

24    and the purchase of debt from Comcast.  That took place in

25    August of 2009.

1          Their cross claim relates to the third amendment.

2   It's different issues.  The third amendment was a year and a

3   half before and separate assertions and allegations in their

4   cross claims about the third amendment.  The only relief they

5   seek in their declaratory judgment action, Your Honor, is a

6   declaration that certain provisions of the third amendment are

7   not enforceable and that they're null and void.  In our

8   equitable subordination claim, Your Honor, we don't deal with

9   that issue.  We deal with the fourth amendment and the purchase

10  of the debt from Convest.  Thank you very much, Your Honor.

11          THE COURT:  You're welcome.

12          MR. LAGEMANN:  Good morning, Nick Lagemann from Sidley

13  Austin on behalf of the Committee.  I just would like to speak

14  very briefly in terms of our support for the motion to dismiss

15  the cross claim.  Consistent with what Your Honor was

16  discussing before about what the Court may or may not be able

17  to rely upon in reviewing the motion to dismiss and the cross

18  claim itself, I will confine myself simply to what is in the

19  cross claim itself.  As I'm sure the Court is aware under the

20  Supreme Court's decisions in Twombly and Iqbal the Court is

21  required to take a look at the allegations to determine whether

22  they state a plausible set of facts that could support a claim.

23          Here, we respectfully submit that the cross claim

24  utterly fails that standard for the following reasons.  And Mr.

25  Ward touched upon this, but I do just want to go through a

1    couple of the specific allegations within the cross claim.    In

2    particular, Yucaipa alleges that they somehow relied upon an

3    agreement reached with the Petitioning Creditors in August 2009

4    that the Petitioning Creditors would somehow support or not

5    object or do something in connection with what Yucaipa terms

6    its "plan" to take control of the first lien debt structure.

7    And that's specifically at paragraph 3 of the cross claim.

8            The problem with this allegation is that Yucaipa's own

9    cross claim admits that its intent, its plan, its design was

10   formed months before the Petitioning Creditors are even alleged

11   to have done any affirmative agreement, acquiescence or

12   anything of the sort with relation to what Yucaipa terms its

13   plan.  In particular as of December 2008, Yucaipa admits it

14   would not purchase any first lien debt unless "certain third

15   amendment terms related to Yucaipa's potential acquisition were

16   amended and Yucaipa could serve as the requisite lender on its

17   own."  That's paragraph 60 of the cross claim.

18           Then they admit at paragraph 4 as of February 2009

19   Yucaipa "intended to spend tens of millions of dollars to

20   acquire a majority of the first lien debt pursuant to an

21   amendment that reversed the restrictions on ownership in the

22   third amendment."  That's, again, at paragraph 4 of the cross

23   claim.

24           They admit at paragraph 61 they launched a tender

25   offer which included a version of the fourth amendment that if

1    valid would have enacted the intended reversals that Yucaipa

2    was seeking.  Now, we all know the tender offer fails, but

3    Yucaipa doesn't claim that the failure of the tender offer

4    changed its plan, altered its intent, or did anything of the

5    sort, nor does it say the Petitioning Creditors were somehow in

6    some agreement that caused that.

7         No, instead what Yucaipa says is right after the

8    failure of the tender offer "Yucaipa entered into direct

9    negotiations with Convest to acquire its requisite lender

10   position."  That's at paragraph 64 of the cross claim.  And

11   Yucaipa also admits in the same paragraph that it had its

12   negotiations with Convest, but the negotiations "played out

13   over several months and involved different proposals, but every

14   one of them contemplated Convest enacting certain amendments to

15   the third amendments terms.  Yucaipa's acquiring Convest

16   majority position and Allied Holdings first lien debt and

17   becoming the requisite lender."

18        Now what's important about those allegations is they

19   establish that whatever Yucaipa's intent that it's planned, to

20   use its word, was formed and was pursued months before the

21   Petitioning Creditors came into the picture.  Now one very

22   other brief point on plausibility or implausibility, Your

23   Honor, what you're being asked to believe in the cross claim is

24   that a multibillion dollar private equity firm armed with

25   armies of lawyers and advisors was somehow mislead because they

1    had a commercial discussion with another party.  We submit and

2    we certainly did not see anything in the opposition that there

3    was no support in the law and certainly none in the facts of

4    their play that could insulate Yucaipa from liability to the

5    Debtors' estates for the actions that it has done based upon

6    the allegations we see in the cross claim.  Unless Your Honor

7    has any questions, thank you.

8         MR. KLYMAN:  Thank you, Your Honor.  For the record

9    Robert Klyman of Latham & Watkins on behalf of Yucaipa.  Your

10   Honor, we've already touched on the legal standard on our

11   motion to dismiss.  The Court must accept Yucaipa's allegations

12   as true and draw all reasonable conclusions in its favor.  The

13   facts offered up by the Petitioning Creditors or the Committee

14   that are not contained in the amended complaints are irrelevant

15   for purposes of a motion to dismiss.

16        So as I mentioned while Mr. Ward was making his

17   presentation, the inferences that he's drawing from litigation

18   in PPS not applicable here.  The rejection by Black Diamond of

19   a tender offer not present here.  The allegations state that

20   the tender offer was unsuccessful because Convest came in and

21   bought up a majority of the debt.  The allegations that, you

22   know, we should cite to the Committee complaints and rely on

23   that also as you indicated have no place here.

24        Mr. Ward in his argument he narrowly construed the

25   Yucaipa complaint as simply a declaratory relief action seeking

1    to invalidate limited portions of the third amendment.  That's

2    not a fair reading of the complaint.  In count two, for

3    example, Yucaipa seeks to invalidate the applicability of the

4    entire third amendment because of the unjust and inappropriate

5    actions of Black Diamond and Spectrum.  Same thing in count

6    three and count four.  He's looking at one paragraph of count

7    one which is at paragraph 108, but ignoring the rest of the

8    prayer for relief.

9          Now Black Diamond and Spectrum's first argument says

10   that, you know, we should be, that the complaints should be

11   dismissed because of the plain terms of the third amendment.

12   But right now as we sit here today in this Court, there's no

13   legal basis on which to conclude that the third amendment

14   applies to Yucaipa.  I mean we're at (c).  Although Judge Ramos

15   orally ruled in November 2012 that he was going to grant Black

16   Diamond and Spectrum's motion for summary judgment invalidating

17   the fourth amendment, he hasn't written any order and no order

18   has been entered on the docket.

19         We can only speculate as to why this delay has

20   occurred, but based on filings in this Court that were

21   submitted by Black Diamond and Spectrum you know that Yucaipa

22   has argued to Judge Ramos that he can severe certain portions

23   of the fourth amendment while retaining the rest of the fourth

24   amendment.  It is possible that based on severability, Judge

25   Ramos will strike the various amendments that modified Section

1    2.7(e) and 10.6(b) that are identified by Petitioning Creditors

2    and other provisions in the third amendment upon which Black

3    Diamond relies.  As a matter of New York law until there's a

4    written Court order the fourth amendment remains in full force

5    and effect.  For that reason alone, the motion which depends

6    upon the operation of the third amendment should be denied.

7          Now Black Diamond says well if the fourth amendment

8    doesn't apply or the fourth amendment is still in force because

9    we're still waiting for Judge Ramos then we don't have a right

10    controversy for the cross complaint.  And, Your Honor, that's

11    just not true.  First of all, as you've said as the parties

12    just said in this case we need to move the issues along related

13    to who holds what debt, whether or not Yucaipa can be

14    subordinated, what the shape of a purchase agreement would look

15    like quickly, because this is not the type of case that is

16    getting better with age.

17          And there is a right of controversy.  As described in

18    the cross claim at paragraph 15 on December 3rd, 2012 Black

19    Diamond sent a notice to the Debtors demanding that Black

20    Diamond and Spectrum and one other lender be recognized as the

21    requisite lender.  Yucaipa has a firm position that Yucaipa

22    should be recognized as requisite lender and that's one of the

23    issues that is being tested in the cross complaint.  Because if

24    Yucaipa loses the ability to act as requisite lender and loses

25    its debt claim, Yucaipa's overall position and argument is that

1     that would result in an unjust enrichment and a windfall for

2     other lenders and an inappropriate prejudice to Yucaipa in

3     large measure because of the actions by Black Diamond and

4     Spectrum that are laid out in great detail in the complaint.

5          In addition, Black Diamond and the Committee have

6     filed their own complaints, their own litigation where they

7     seek to enforce the third amendment and the Debtor teed this

8     off by filing its own declaratory relief action to which a

9     number of our claims counterclaims against the Debtor were

10    compulsory.  And we ended up having to file cross claims

11    against other parties because they all arose from the same

12    operative facts and implicated core issues that would be tested

13    before this Court such as equitable subordination and credit

14    bidding and the like.

15         Second, the counterclaim seeks a declaration that

16    certain of the third amendment provisions don't apply.  And

17    Black Diamond and Spectrum's attempt to apply those provisions

18    at the motion to dismiss stage seeks to determine the ultimate

19    issue in this case without a trial.  We seek the declaration

20    that not only certain provisions don't apply, but that they're

21    stopped from applying the entire, all of the provisions of the

22    third amendment.

23         You know it's described in the complaints and the

24    cross complaint in 2008 the then existing lenders sought to

25    amend the first lien credit agreement to allow them to sell

1  that to Yucaipa.  This took the form of a third amendment.

2  That's at paragraphs 11 and 54 among others.  CIT, as agent,

3  coordinated the passages of the third amendment and which was

4  approved by the Special Committee of the Debtors' board and

5  approved by the majority of the lenders.  That's at cross

6  complaint at paragraph 12.

7         It's undisputed based on the cross complaint that

8  Yucaipa was not a signatory of the third amendment and never

9  bought any debt under the third amendment.  And, in fact, given

10 the restricted terms of the third amendment, Yucaipa made it

11 clear and would never have purchased debt under the third

12 amendment.  That's, among other places, cross complaint of

13 paragraph 13; therefore, no one expected that Yucaipa was going

14 to be bound by the third amendment in April 2008.

15        And, in fact, as pled in the cross complaint the

16 genesis of the third amendment was that certain lenders who

17 were seeing the decline of the automobile industry and by

18 extension the car haul industry wanted to sell their debt.

19 This document, this third amendment was not for the benefit of

20 Yucaipa unless Yucaipa decided to buy debt.  This document was

21 for the benefit of lenders to enable them to sell debt to

22 Yucaipa without any promise or representation that Yucaipa was

23 going to buy debt on the back end.  It's absurd based on the

24 allegations in the complaint to say that Yucaipa was somehow a

25 third party beneficiary of the third amendment when they

1  disclaimed that they were not going to buy any debt what so

2  ever in the third amendment.

3          Approximately eight months later in December 2008, the

4  auto industry continued to decline and lenders holding a

5  majority of the first lien debt approached Yucaipa about buying

6  the debt.  As set forth in paragraph 60 of the cross complaint,

7  Yucaipa made it clear to those lenders that it would only

8  acquire debt if the restrictions in the third amendment were

9  eliminated and Yucaipa could serve as requisite lender.

10          In February 2009 as described in the cross complaint,

11  Yucaipa launched a tender offer for debt under the fourth

12  amendment, not under the existing third amendment.  And when I

13  say under the fourth amendment it was a precursor to the fourth

14  amendment.  The material terms as set forth in the cross

15  complaint were essentially the same.  The tender offer included

16  an amendment to eliminate provisions of the third amendment

17  concerning, among other things, the amount of debt Yucaipa

18  could acquire and to eliminate restrictions on Yucaipa serving

19  as requisite lender.  That's identified in counterclaim at

20  paragraph 61.

21          Unlike Mr. Ward's allegations that outside the four

22  corners of our complaints there was no rejection by Black

23  Diamond or Spectrum of the fourth amendment.  But instead as

24  alleged in the complaint, Convest came in and for whatever

25  reason better price or whatever, they acquired the majority of

1    the first lien debt, thereby obviating the tender offer.

2    Thereafter, Yucaipa entered into negotiations with Convest and

3    ultimately acquired Convest's majority position pursuant to the

4    fourth amendment as described, in among other places,

5    paragraphs 15 and 16 of the cross complaint.  That was in

6    August of 2009.

7         But it's abundantly clear from the allegations in the

8    complaint that Yucaipa never acquired and never intended to

9    acquire any claims under the third amendment.  And also as I'll

10   describe in a few minutes and as laid out in great detail in

11   the cross complaint, Black Diamond and Spectrum were actively

12   encouraging this debt purchased under the fourth amendment with

13   respect to Convest when in discussions with Yucaipa.  In

14   addition to Yucaipa's clear intent never to be bound by the

15   third amendment, the cross complaint lays out facts which are

16   as I mentioned presumed to be true that Yucaipa relied on Black

17   Diamond and Spectrum's support in acquiring the requisite

18   lender position.  And it also pleads that it would be

19   inequitable and work an unjust enrichment if Black Diamond and

20   Spectrum could now apply the third amendment to Yucaipa.

21        For example, as set forth in paragraph 72 and 73,

22   Black Diamond and Spectrum were consulted in the loop about

23   Yucaipa's purchase of the debt under the fourth amendment and

24   encouraged that purchase.  It wasn't just no noise coming from

25   them and, therefore, Yucaipa made the assumption that there

1    would be no objection.  There was active encouragement, and

2    after the execution of the fourth amendment, that support

3    continued.

4         And CIT, for example, recorded all of Yucaipa's loans

5    on the registry which, as a result, means that pursuant to the

6    terms of the credit agreement Black Diamond and Spectrum were

7    obligated to treat Yucaipa's holdings of approximately $145

8    million dollars of debt and requisite lender status.  The head

9    of Black Diamond and the head of Yucaipa as described in the

10   cross complaint mentioned about strategies after Yucaipa became

11   requisite lender.

12        For example, after the execution of the fourth

13   amendment as set forth in paragraph 72, they discussed a joint

14   strategy to use their debt to implement a sale of Allied which

15   relied on Yucaipa's status as requisite lender.  They further

16   met in February 2010 nearly six months after Yucaipa acquired

17   the requisite lender position under the fourth amendment to

18   discuss Yucaipa's plans as requisite lender to increase

19   Allied's value and Black Diamond expressed support for those

20   plans.  That's at paragraph 8.

21        They met in New York on January 31, 2011 nearly 18

22   months after Yucaipa acquired the requisite lender position to,

23   again, discuss Yucaipa's plans as requisite lender.  That's at

24   paragraph 8.  Then in March through May 2011, Black Diamond

25   made numerous proposals to effectuate a transaction with

1    respect to Allied, each of which relied upon Yucaipa's status

2    as requisite lender.  That's also at cross claim, among other

3    places at paragraph 8.

4            And then in December 2011, more than 25 months after

5    Yucaipa acquired a requisite lender position under the fourth

6    amendment.  Yucaipa directed CIPS agents to terminate certain

7    letters of credit which resulted in the distribution of

8    approximately $17 million dollars in deposit to existing

9    lenders including Black Diamond on a pro rata basis.  This only

10   could have occurred had the lenders and CIT recognized

11   Yucaipa's requisite lender under the fourth amendment.  That's

12   laid out across claim at paragraph 21.

13           It is in the foregoing, Black Diamond's arguments that

14   this covenant to sue should not apply, can't survive.  First of

15   all the whole premise of the cross complaint is that it would

16   be unjust to bind Yucaipa to the third amendment, which it

17   never signed up to, would have never bought debt to and only

18   move forward under the fourth amendment because of the improper

19   encouragement.  It was turned out to be duplicitous by Black

20   Diamond and Spectrum.

21           First as laid out in our papers a party cannot rely on

22   a covenant not to sue, where the covenant was procured by

23   misconduct.  Based on the facts set forth in the cross

24   complaint, the petitioning creditors acted duplicitously in

25   inducing Yucaipa to acquire the first lien debt, supporting

1    Yucaipa as requisite lender, accepting the fruits of the

2    actions of Yucaipa as requisite lender through the release of

3    funds, working with Yucaipa to develop proposals that relied on

4    Yucaipa's requisite lender status and then two years after the

5    fact seeking to apply the terms of the third amendment to

6    Yucaipa.  This bait and switch was intentional

7    misrepresentation.  All as plead in the cross claim and

8    demonstrates that the application of the covenant is the result

9    of their misconduct.

10        Second, covenants not to sue cannot be relied upon to

11   insulate a party from its own willful or intentional misconduct

12   such as the wrongful conduct alleged by Black Diamond and

13   Spectrum throughout the cross complaint.  In essence such

14   covenants are shields, not swords.  And here Black Diamond and

15   Spectrum seek to use the covenant as a sword to grant

16   themselves an unjust financial windfall after falsely assuring

17   Yucaipa that they supported Yucaipa as requisite lender under

18   the fourth amendment.

19        Most interestingly to us was that Black Diamond

20   intentionally, Black Diamond and Spectrum, intentionally

21   omitted from its papers when it was citing to Section 2.7(e) in

22   the covenant not to sue.  The language in 2.7(e) that knocked

23   out the applicability of the covenant not to sue, if any

24   operative act was caused by any lenders gross negligence or

25   willful misconduct after the date that Yucaipa became the

1  lender as determined by a Court.  Well that is essentially what

2  our whole complaint is about that they acted duplicitously

3  before and after execution of the fourth amendment, and as a

4  result we should be able to argue that it would be unjust and

5  inequitable for Black Diamond and Spectrum to be able to apply

6  the third amendment against Yucaipa.

7       We're not yet at point where a Court of competent

8  jurisdiction has made that determination, but we have all

9  agreed pursuant to the schedule that's played out that in

10 August this Court is going to make that determination.  Black

11 Diamond and Spectrum also attempt to bar the cross claim by

12 Section 10.6(b), which according to Black Diamond and Spectrum

13 provide that the consent to the third amendment by Yucaipa's

14 predecessor's in interest bind Yucaipa.

15      Like the other provisions of the third amendment

16 Yucaipa never agreed nor intended to be bound by the third

17 amendment.  Further, as laid out in the papers Yucaipa alleges

18 that that provision was not validly affected because it

19 required the consent to each affected lender.

20      Now Black Diamond and Spectrum next delve into the

21 statute of limitations issue.  Under the legal standard there

22 is no accrual of the statute of limitations unless there is a

23 justiciable controversy which involved some present prejudice

24 to the Plaintiff, which didn't occur until Judge Ramos made his

25 oral ruling.

1        Now, Mr. Ward says no such thing as equitable tolling,

2   but that's just not right.  If a party to a contract alleges a

3   breach and the other party agrees to cure in six months and

4   doesn't, you can't go back to that period of time and say oh,

5   statute of limitations tolled because you had an agreement that

6   they would cure.  The same thing applies here.

7        According to Black Diamond while the fourth amendment

8   was in full force, while Black Diamond was working with Yucaipa

9   to implement transactions that required Yucaipa's requisite

10  lender status, and as late as December 2011 where Black Diamond

11  was accepting the fruits of Yucaipa's requisite lender status

12  under the fourth amendment.  Black Diamond argues that Yucaipa

13  should have brought suit seeking to declaratory relief that the

14  third amendment didn't apply.  Well the fourth amendment was in

15  full force and effect.  We would have been facing other

16  arguments about rightness, and lack of a judiciable controversy

17  if we somehow manufactured an argument at that time that we

18  shouldn't be bound by the third amendment.

19       We were not as I mentioned the third party beneficiary

20  to the third amendment.  In fact Yucaipa expressly disclaimed

21  any interest in being a participant under the third amendment

22  and never bought that under that amendment.  When Yucaipa

23  acquired claims under the fourth amendment CIT as the agent of

24  Black Diamond and Spectrum among others entered Yucaipa on the

25  registry, thereby, recognizing Yucaipa as a valid debt holder.

1      And there has been no allegation that Yucaipa is not properly

2      on the registry today.

3              Following the CIT litigation which involved the fourth

4      amendment that was dismissed with prejudice by CIT, so as late

5      as 2010 there was no controversy that was still brewing that

6      would somehow suggest that Yucaipa should worry itself at all

7      with the third amendment.

8              Further, as we lay down our objection, even if you get

9      into a discussion about which statute of limitation applies,

10     and we think it's irrelevant because the cause of action didn't

11     accrue until Judge Ramos ruled on the bench the six year New

12     York Statute of Limitation applies.  Yucaipa was not forum

13     shopping and ended up in this venue only because the petition

14     and Creditors filed an involuntary petition.  They fought a

15     transfer of this case to another venue.  Then the Debtors filed

16     a declaratory relief action, and Yucaipa had compulsory counter

17     claims to that action.  And as a result also filed cross claims

18     against Black Diamond, and Spectrum and others.

19             Even if this dis-causative action could of somehow

20     been split with some in New York and some here, the overlap of

21     facts and law that would have occurred mandated one forum that

22     combined all Creditors and the Committee.  We spent a lot of

23     time arguing in front of Your Honor months ago about how it was

24     necessary that this Court take jurisdiction of all of the

25     issues because the Debtor needed a binding resolution of all

1    the issues so it could try and exit this case.

2        As I mentioned the issues associated with Yucaipa's

3    claims that Black Diamond and Spectrum acted inequitably are

4    directly implicated by and serve as affirmative defenses to

5    Black Diamond and Spectrum's complaints, and the Committees

6    complaints and their efforts to subordinate Yucaipa's claims as

7    well as other Court proceedings involving credit bidding if we

8    ever get to a sale.  So this was the logical venue, but the

9    underlying policies with respect to the borrowing statute that

10   would shorten the statute of limitations that are not

11   implicated because Yucaipa did not choose this forum.  In any

12   event, as I mentioned under either the New York or Delaware

13   Statutes the claims are barred.

14       Now Black Diamond and Spectrum also contend for the

15   first time in the reply that Section 10.9, the so called no

16   waiver provision, blocks Yucaipa's cross complaint.  This

17   argument was only raised in the reply and should not be

18   considered by the Court.  They had plenty of time to brief

19   their issues and they raised a new argument in the reply.  But

20   if Your Honor is going to consider it, you know, this argument

21   is not applicable.

22       Yucaipa is contending first of all as with all the

23   other provisions of the third amendment that the third

24   amendment doesn't apply and if it did it would result in unjust

25   enrichment windfall to Black Diamond, and Spectrum and the

1    other lenders.  Because Yucaipa never intended to be bound by

2    the third amendment and never would have bought that under the

3    third amendment.

4         The cases cited by Black Diamond and Spectrum as

5    dealing with arguments that the exercise of expressed remedies

6    are not waived by the passage of time or estoppel are just not

7    applicable.  We are not arguing for example, that the

8    acceptance of late payments result in the waiver of compliance

9    with payment terms or that, you know, defendants were prevented

10   from arguing that a one year delay in bringing an action

11   constituted a waiver.

12        Here we are arguing that the entire third amendment

13   should not apply to us on unjust enrichment and inequitable

14   grounds.  And that was purely driven by the decision that was

15   made by Judge Ramos which still, as I mentioned, is not yet

16   reduced to a written order, but we need to get this case

17   moving.  And so as a result we are willing to proceed to get to

18   an August trial date even while Judge Ramos has not issued

19   his written order.

20        THE COURT:  Thank you.  Reply?

21        MR. WARD:  Your Honor, very briefly.  Thank you.

22        THE COURT:  Yes.

23        MR. WARD:  Your Honor, just a couple of points.

24   First, with respect to the equitable tolling argument,

25   throughout the cross-claims Yucaipa alleges that it would never

1    have brought that under the third amendment.  Now, clearly it

2    had made that determination before the passage of the fourth

3    amendment, it sought the fourth amendment to get rid of the

4    restrictions in the third amendment, which were the reasons it

5    wouldn't buy debt.  But considering it wouldn't buy debt under

6    the third amendment and had made that decision well before the

7    fourth amendment adds purchase of the debt, it was aware of the

8    issues with the third amendment at that time, which would be

9    any time between April 21st of 2008 when the third amendment

10   was entered into and August of 2009 when they purchased the

11   debt.  That's still more than the three years prior to the

12   statute of limitations.  Equitable tolling certainly can't toll

13   the claim past the date when they've made the decision that

14   they wouldn't buy under the third amendment or past the date

15   when they actually bought under the fourth amendment.  So I

16   think that that argument is out the window.

17          In addition, what Yucaipa would have us believe is

18   that in connection with the third amendment, the lenders went

19   out on their own without Yucaipa's help and passed an amendment

20   to remit Yucaipa to buy debt but in post terms that were

21   unacceptable to Yucaipa.  I mean what would have been the

22   point?  Again, I think that's relevant to when did Yucaipa get

23   notice of its claim.  Clearly, it had notice of its claim well

24   before the fourth amendment.

25          And with respect to the point that Mr. Klyman just

1    raised about the no waiver clause, first off, one of Yucaipa's

2    arguments is that we don't know what parts of the fourth

3    amendment are in effect, but some parts of the fourth amendment

4    may knock out some of the defenses we have.  The primary

5    example is the covenant not to sue which I've dealt with, I

6    raised in the argument.  But there's nothing in the fourth

7    amendment that addresses the no waiver clause, that's 10.9 of

8    the first lien agreement, that's been in effect since the

9    beginning.  So there's nothing in the fourth amendment

10   regardless of what justice Ramos does that's going to knock out

11   the no waiver clause.  Now Mr. Klyman says yeah, but unfair,

12   you didn't raise the no waiver clause until the reply.  The no

13   waiver clause is very much a part of the argument in front of

14   Justice Ramos.  The New York litigation is cited many times in

15   the cross claim, it's clearly before Your Honor, and we've

16   attached the briefs which, the briefs on the motion for summary

17   judgment where we cite to the no waiver clause.  Because not

18   surprisingly, in the New York action, Yucaipa brought up how

19   unfair it would be if the fourth amendment was reversed because

20   they relied upon what Black Diamond did, allegedly did, didn't

21   do, and they relied upon the fact that the lenders didn't

22   oppose the fourth Amendment.  We cited the no waiver clause in

23   front of Justice Ramos in our papers which are an exhibit to

24   our reply.  So clearly this is not a new argument that Yucaipa

25   couldn't anticipate, they are a party, they're with the other

1    party in the New York action.

2         In addition, the assertions relating to the third

3    amendment are before the Court, were before the Court in the

4    Georgia action.  And I looked at my notes which Mr. Klyman was

5    speaking, the Georgia action was commenced by Yucaipa on

6    November 13th of 2009 seeking to enforce the fourth amendment.

7    And in the course of those arguments dealing with the history

8    of the third amendment leading up to the fourth amendment,

9    November 13th, 2009 is still more than three years prior to

10   Yucaipa's bringing this action.  So whether it's equitable

11   estoppels or whatever argument you want to make, they were

12   aware of these claims when they brought the Georgia action in

13   November of 2009.  They were certainly aware of these claims at

14   least in-between the period of the third amendment and the

15   fourth amendment, but it doesn't have to be April 21st, 2008,

16   the date of the third amendment.  It can be any time between

17   the third amendment and the fourth amendment and their purchase

18   of the debt which was August of 2009.  That's still more than

19   three years before.

20        What's happening here is very opportunistically,

21   Yucaipa likes the fourth amendment, they didn't want to do

22   anything vis-à-vis the third amendment, and as I think Mr.

23   Lagemann may have said in his papers, they were caught with

24   their hands in the cookie jar and they're now going back and

25   saying, oh but we have these issues relating to the third

1   amendment.  The fact is statutes of limitations for breaches of

2   contract aren't tolled by any actions except this equitable

3   tolling argument.  And, Your Honor, it doesn't, shouldn't apply

4   here because Yucaipa was aware of these claims well before the

5   three years, and as I say, well before it purchased the debt in

6   August of 2009.

7          So just a couple of other things.  Mr. Klyman points

8   out that I was focusing substantially on the declaratory

9   judgment claim because most of their complaint, or cross claim

10  focuses on that.  But whether it's the declaratory judgment

11  claim which specifically calls for the reversal or voiding of

12  four paragraphs there, or the unjust enrichment claim or the

13  estoppel claim, it all deals simply with the third amendment.

14  The third amendment again was passed a long time ago.

15         Mr. Klyman also says that as a matter of New York

16  law, Justice Ramos's ruling from the bench that the fourth

17  amendment is null and void has no affect.  There's not a single

18  case cited by Yucaipa for that proposition, and in fact it's

19  not true, at least in New York.  I'm not going to get into

20  something that's extraneous to the pleadings, but there's no

21  case cited by Yucaipa that that is true.  Your Honor, I'm

22  pretty much done here.

23         Oh, one of the other issues, and this is the covenant

24  not to sue, is the claimant I think is blending things

25  together.  The law is clear, the cases that he cites, and in

1   fact he even mentioned that a covenant not to sue will not be

2   given affect if that covenant was procured by fraud.  And then

3   half a second later, Mr. Klyman said, as his papers say, as the

4   cross claim says, that their investment was procured by fraud.

5   Their investment is not the covenant not to sue.  Covenant not

6   to sue is separate.  The case law is clear, in order to knock

7   out a covenant not to sue, you have to have a specific

8   allegation that that covenant itself was procured by fraud and

9   misconduct, there is no allegation anywhere in the pleadings to

10  that affect.  So the covenant not to sue applies.

11          THE COURT:  Okay.

12          MR. WARD:  And finally, Your Honor, with respect to

13  the covenant not to sue, Mr. Klyman says, well you know it does

14  say, well it says two things, it's got a temporal limitation

15  which is it's only the actions after they become a lender, and

16  the actions after they become a lender are really not in play

17  in the cross claim as everything before, so the temporal

18  limitation on the exclusion to the covenant not to sue doesn't

19  apply.  But the other aspect of the exclusion is there has to

20  be a finding of willful misconduct or gross negligence by a

21  court.  And he says, oh yeah, it's okay, we're alleging that

22  and we're going to prove that here.  As I said, Your Honor,

23  it's circular.  If that's the way that you can get around a

24  covenant not to sue, then everybody would come in on a covenant

25  like this and say, I can prove willful misconduct.  They'll

1  take the case to discovery, the case will settle, and the

2  covenant will have no effect.  Basically this provision says

3  there has to have been a finding of gross negligence or willful

4  misconduct, and there hasn't been here.  And the reason is that

5  this covenant is more in the nature of a contribution or

6  indemnity claim, and, you know, Your Honor can construe it, but

7  basically this hadn't been an argument raised by Yucaipa

8  before.  But basically what this is is a claim, is a covenant

9  not to sue where Yucaipa gives up the rights, Yucaipa has no

10  right to sue.  But clearly if by virtue of some third party's

11  claim where some court has found that a lender has acted

12  grossly, negligently or with willful misconduct, somehow

13  Yucaipa has to pay for our gross negligence or willful

14  misconduct, then they have the right to sue, but it requires a

15  prior determination by a court.  It's not just an end around a

16  covenant not to sue where you can always simply plead it and

17  say, oh yeah, I'm going to prove that later on, and if I don't,

18  well too bad, the case will be over, and the covenant wouldn't

19  have any affect.

20          With respect to the covenant, and I know I had a

21  point, but now it slipped my mind.  Well I think that's it, it

22  couldn't have been much of a point.  Maybe I'll think of it

23  while Nick is up.

24          THE COURT:  All right.  Thank you.

25          MR. LAGEMANN:  Your Honor, Nick Lagemann from Sidley

1    Austin for the Committee.  Two very quick points.  You did not

2    hear Mr. Klyman, sat and went through the allegations in the

3    cross claim, but you did not hear any refutation of the fact

4    that his own allegations established that Yucaipa formed its

5    intent to pursue its plan well before any action was undertaken

6    by the petitioning creditors.  So in terms of the allegations

7    later on that after August '09 they somehow relied upon whether

8    it be an agreement, affirmative encouragement, acquiesce,

9    whatever, it doesn't fit and it's implausible under the facts

10   as alleged in the complaint.

11          The second point is simply this.  Yucaipa's argument

12   here and is that essential party A, being the petitioning

13   creditors, either agreed or acquiesced to party B, Yucaipa's

14   preexisting plan to purchase the debt of party C, being the

15   debtors, and that that somehow insulates party B from liability

16   to party C if party B's actions were wrongful.  They haven't

17   identified a single case or any authority that supports an

18   allegation or a claim of such a nature, and we frankly think

19   nonexists.  It's implausible, there are allegations are

20   contradicted by their own allegations in the cross claim and we

21   respectfully submit the motion should be granted.  Thank you,

22   Your Honor.

23          THE COURT:  Thank you.

24          MR. KLYMAN:  Very briefly, Your Honor.

25          THE COURT:  Counsel have anything further?

1          MR. WARD:  Actually it was a plausibility point, the

2     fact that, you know, contrary to what Mr. Klyman said, the

3     Court doesn't need to accept everything that's pled in the

4     complaint, the Bell Atlantic Twombley case says it has to be

5     plausible, and we've said in other cases that say it can't be

6     patently absurd.

7          THE COURT:  Okay.  Thank you.  Mr. Klyman, briefly.

8          MR. KLYMAN:  Very briefly, Your Honor.  Going back to

9     the point that Mr. Lagemann just made. Yucaipa developed a plan

10    to buy pursuant to the fourth amendment, and then they made

11    that plan before they pulled the trigger with Convest expressly

12    dependent upon the encouragement and support of Black Diamond

13    and Spectrum.  That's in the pleadings.  That's how it happened

14    and as laid out in the pleadings.  And Mr. Lagemann cannot get

15    up now and say that's not well pled because it's all over the

16    pleadings.

17         Secondly, Mr. Ward would have this Court apply a

18    statute of limitations to when we started litigating with CIT.

19    Well that litigation was settled, while that litigation was

20    going on before there was a resolution, it would have been

21    nonsensical for us to then go into another court or that court

22    and seek to invalidate the third amendment.

23         And last, with respect to the covenant not to sue, Mr.

24    Ward reads into that language which does not exist.  It doesn't

25    say that a covenant not to sue is limited to our action against

1    a lender who has been found in a separate action to have

2    committed willful misconduct or fraud.  It could have been

3    written that way, but that's not how it was written.  A

4    covenant, and this must have been important to them because in

5    their pleadings they put ellipses where the carve out for

6    intentional misconduct and fraud existed in section 2.78.  That

7    provision by its plain terms allows us to get a determination

8    by court of competent jurisdiction that they acted improperly

9    and then argue that the covenant not to sue applies.  And our

10   position is is that we would have never been in this mess and

11   we would not have the third amendment even arguably applied to

12   us had they not acted inequitably as laid out in our cross

13   complaint.  Thank you.

14          THE COURT:  All right.  Thank you.  I'm going to take

15   a break and I'm going to gather my thoughts and then we will,

16   I'll come back out and make a ruling.  That will probably be

17   about, I don't know, 20 minutes or so.  Let's do this.  We'll

18   reconvene at 12:45.

19   (Recess 12:16 to 12:56)

20          THE CLERK:  All rise.

21          THE COURT:  Please be seated.  I'm going to do my best

22   to articulate my reasoning in connection with my ruling.  Given

23   the fast track that this case needs to stay on and really

24   frankly the fact that on the particular close matter, I don't

25   think it requires me to take the matter under advisement and

1    issue a more complete opinion, we'll just go with my ruling,

2    which in short is to grant the motion to dismiss.

3           And in support of that I really for all material

4    aspects adopt the petitioning creditors' arguments virtually in

5    toto.  Let me highlight some of them.

6           Starting off with the standard of review on the motion

7    to dismiss.  Obviously all well pled allegations need to be

8    taken as true, but under the Twombly Iqbal standards as

9    interpreted by the Third Circuit, something more than mere

10   really window dressing or bald allegations need to be made,

11   they have to rise to the level of plausibility.  I think in

12   this case -- let me back up a second.  The motion to dismiss is

13   on two bases, one the covenant not to sue brought us the action

14   and the other is the statute of limitations.  Talking about the

15   first item, that really rests on the factual allegations in the

16   complaint that would be necessary to raise an issue, a

17   plausible issue about whether the covenant not to sue should be

18   applied.  And the allegations in this complaint, and by

19   complaint I mean cross-claim do not meet that standard.  There

20   is some innuendo, there's some vague allegations.  The bottom

21   line is I just don't think the story as pled holds together

22   sufficiently to meet the standard.  Implicit in talking about

23   that is the concept that the actual covenant not to sue

24   applies, and I understand that was also an argument made by

25

1    Yucaipa that it did not.  But hopefully as I go through that

2    here I'll address these things.

3         The argument on the covenant not to sue are several.

4    One is simply under its plain meaning, you can't sue.  I don't

5    think there's any question as to the plain meaning of the

6    covenant and I think it's very clear.  I don't find its sort of

7    carve out to be particularly troubling either.  The -- I agree

8    that the carve out as written deals with the narrow situation

9    of a finding at some time post signing of the covenant by a

10   court that there's been willful misconduct or gross negligence.

11   And I don't think that can, I don't think that is done in the

12   auspices of a lawsuit directly related between the parties, it

13   has to come from somewhere else.  It's a little vague, but I

14   think it's fair to say it has to be a narrow exception.  And I

15   endorse the view that when looking at the covenant not to sue

16   being applicable we have to look at whether that covenant was

17   entered into as a result of some sort of fraud or misconduct by

18   the party that is being forbidden to sue.

19        And I don't find anything in the record that would

20   support plausible claim that the, that in the entry of the

21   third amendment there was any fraud or wrongdoing whatsoever in

22   connection with the actual covenant not to sue.  As a matter of

23   fact, I don't think there's any allegation really that rises to

24   the plausibility that there was any kind of mischief going on

25   that was detrimental or directed at Yucaipa at the time of the

1   third amendment being entered into the purchase, excuse me, and

2   then the fourth amendment being negotiated, and then the debt

3   being brought and then the fourth amendment being passed.

4   Excuse me.  So basically, I don't know it has led to level of

5   fraud necessarily in connection with the covenant not to sue,

6   but it would need to certainly be something with some heft

7   behind it to support some detrimental reliance argument.  And

8   it just isn't there.  It just isn't there.

9            As to the applicability, the first credit agreement

10  does contain the provision that when you buy or assign the debt

11  you are stuck with what your assignor had previously agreed to

12  or waived, etc., and I find that when Yucaipa bought this debt

13  they were subject to the agreements that had previously been

14  entered.  And as such, they are applicable when we're looking

15  at the third amendment.  The fact that it was all part of a

16  grand strategy that somehow Yucaipa was sucked in to allow

17  Convest to make the agreement and then make the sale, I just, I

18  just don't find that plausible.  I think it is true that it was

19  part of the strategy by Yucaipa to eventually purchase the debt

20  under terms roughly equivalent to what ultimately at the time

21  they were contemplating, it ultimately ended up being with the

22  fourth amendment.  And again, the, that's a very normal and

23  understandable provision that when you buy something, when you

24  buy debt, you buy the debt, it is what it is and you are where

25  you are, and you can't undo, you don't have the time machine

1    ability to undo a previous agreement.  Excuse me, I'm sorry.

2        I also find that the waiver argument or the waiver

3    provision bars the case for the reasons that were discussed in

4    the briefs; for instance, statute of limitations.  Again, this

5    is an independent, these are really two rulings.  It's granting

6    the motion to dismiss on the covenant not to sue, granting the

7    motion to dismiss in connection with the statute of

8    limitations.  I look at the statute of limitations.  I think it

9    is not true that the cause of action would arise as of the

10   signing in April of 2008.  Again, while the documents are what

11   they are at that time, I do think you need to look at it in the

12   context of what the underlying facts might be and when a cause

13   of action might arise.  Having said that, Yucaipa was clearly

14   on notice throughout times after April of 2008 as to what was

15   going on, they had their strategy, they were mulled in

16   negotiations that ultimately led to the fourth amendment, and

17   they bought debt into the situation -- this is after April of

18   2008, they bought the debt in August 2009 I believe.

19       I think it is a fair reading and correct that as of

20   August 2009 that the cause of action would be sufficiently ripe

21   to give rise to the beginning of running of the statute of

22   limitations certainly by November of 2009 when litigation had

23   ensued on these very issues, albeit with CIT, there was notice

24   that would give rise to running of the statute of limitations

25   three years, that takes us to November 2012 which is before

1  this lawsuit was brought.  The Delaware statute of limitations

2  is applicable here based on the fact that this case was brought

3  in Delaware, breach of contract claim brought in a federal

4  court setting in Delaware, so the Delaware statute applies.  In

5  the alternative, the borrowing statute applies which would use

6  the shorter three year statute of limitations.  Other than a

7  bald choice of law provision there's nothing in this contract

8  or deal that is so involved in New York to provide that the New

9  York statute of limitations would have to apply.  First of all

10  the contract doesn't say that.  It was mentioned that the case

11  survived the transfer of venue motion but not to New York, to

12  Georgia, I believe.  So maybe not a motion, but certainly, I

13  can't think back that far, but certainly there was movement

14  about changing venue.  So the [indiscernible] year statute

15  applies and that statute run at the latest in November of 2012,

16  so the cause of action, the cross claim is barred by the

17  running of the statute of limitations.

18      Other than to say that I generally endorse the

19  petitioning creditors' legal arguments set forth in their

20  brief, I think this is a sufficient reasoning to support the

21  Court's decision to deny the motion to dismiss.  The Court will

22  enter an order.  Mr. Klyman?

23      MR. WARD:  Your Honor, you said deny.

24      THE COURT:  I'm sorry, to grant the motion to dismiss.

25  And I apologize.

1           MR. KLYMAN:  Your Honor, we obviously respectfully

2     disagree.

3           THE COURT:  Of course.

4           MR. KLYMAN:  We're not going to reargue all the points

5     that we made before.  We do want the opportunity to have leave

6     to amend to see if we can cure whatever you identified as the

7     defects in the pleadings.  We think that there are sufficient

8     facts to justify the inapplicability of these provisions in the

9     third amendment to Yucaipa.  There may be other facts that we

10    can bring out about why there should be additional tolling of

11    the statute of limitations and why we should not be barred, and

12    we want an opportunity to expeditiously amend our complaint to

13    see if we can meet that test.  We won't slow down the process,

14    we're still embarking on discovery, there's still going to be

15    affirmative defenses that are going to be pled, it's not going

16    to prejudice the August trial date, but we think we would be

17    significantly prejudiced if we didn't have an opportunity to

18    amend particularly given, you know, the various standards that

19    apply to a motion to dismiss and that leave to amend is grandly

20    liberally.

21          MR. WARD:  Your Honor, may I?  Your Honor, given the

22    various bases that Your Honor has made your decision on, the

23    waiver clause, the covenant not to sue, the fact that the

24    subsequent holders are bound by their predecessors' consents

25    and the statute of limitations, a number of these of which I

1   don't think are curable at all, it seems to me that you should

2   deny the motion for leave to amend.  And I do think it's going

3   to get in the way of our ability to move this case along.  We

4   start, we've already started document discovery to the extent

5   that we've served document demands on each other, etc.

6         THE COURT:  Okay.  I'm going to deny the motion to

7   amend.  I'm going to dismiss the case with prejudice.  I --

8   sorry.

9         MR. WARD:  We have an order [indiscernible]

10        THE COURT:  Okay.  Just quickly.  I'm not going to

11  allow an amendment of the complaint.  I concur with counsel

12  that these are in effect legal bases, they turn obviously to

13  some extent on the facts, but I simply don't view them as in

14  effect curable based on my understanding of what's in the cross

15  claims today as well as my broader understanding of the case in

16  and of itself.  So, no, I will not allow leave to amend and the

17  case will be, the cross-claim will be dismissed with prejudice.

18        MR. WARD:  Your Honor, we have an order prepared.  I

19  don't know if it's appropriate [indiscernible].

20        THE COURT:  I'll enter an order.

21        MR. WARD:  Thank you, Your Honor.

22        THE COURT:  Anything else for today?  All right.

23  Thank you.  We're adjourned.

24        (Whereupon these proceedings were concluded at 1:11 PM)

25

1                    I N D E X

2

3                    RULINGS

4                                        Page    Line

5  HEARING re:  Notice of Agenda of Matters

6  Scheduled for Hearing on February 6, 2013      6       12

7

8  HEARING re:  Cross-Claim Defendants BDCM

9  Opportunity Fund II, LP's Black Diamond

10  CLO 2005-1 Ltd's and Spectrum Investment

11  Partners LP's Motion to Dismiss the Amended

12  Cross Claim in its Entirety [Adv. Docket

13  No. 73; filed January 25, 2013]              108       7

14

15  HEARING re:  Motion of the Official

16  Committee of Unsecured Creditors for an

17  Order Authorizing the Committee to Pursue

18  Certain Claims and Causes of Action

19  of the Debtors' Estates

20  [Docket No. 858; filed February 1, 2013].    108       7

21

22   HEARING re:  Motion and Memorandum of Law

23  of Petitioning Creditors for Entry of an Order

24  (I) Pursuant to 11 U.S.C. §105(a) Granting

25  Standing to Petitioning Creditors to

1    Prosecute Certain Claims of the Debtors

2    Estates for, Inter Alia, Equitable Subordination,

3    Breach of Fiduciary, Aiding and Abetting

4    Breach of Fiduciary Duty and Breach of

5    Contract, or Alternatively (II) Granting

6    Petitioning Creditors Leave to Intervene

7    as Plaintiffs in Adversary Proceedings

8    No. 13-50530 Pursuant to Federal Rule

9    of Civil Procedure 24

10   [Docket No. 876; filed February 8, 2013]    108       7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE

2      I certify that the foregoing is a correct transcript from the

3      electronic sound recording of the proceedings in the above-

4      entitled matter.

5

6      AAERT Certified Electronic Transcriber CET**D-531

7      Mary Zajaczkowski

8

9      AAERT Certified Electronic Transcriber CET**00650

10     Theresa Pullan

11

12

13

14

15

16

17

18

19

20

21     Veritext

22     200 Old Country Road

23     Suite 580

24     Mineola, NY  11501

25     Date:  February 10, 2013