# Exhibit 8

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 12-11564-css

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   ALLIED SYSTEMS HOLDINGS, INC., ET AL.,

7           Debtors.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   ADV. PROC. NO. 12-50947-css

10

11  ALLIED SYSTEMS HOLDINGS, INC.,

12          Plaintiff,

13  v.

14  AMMC VIII, LIMITED, AVENUE CAPITAL GROUP,

15  BDCM OPPORTUNITY FUND II, LP, BENNETT

16  MANAGEMENT, BLACK DIAMOND CLO 2005-1 LTD.,

17  DEL MAR DISTRESSED OPPORTUNITIES MASTER FUND,

18  MJX ASSET MANAGEMENT, LLC, PAR-FOUR INVESTMENT

19  MANAGEMENT, SPECTRUM INVESTMENT PARTNERSHIP, LP,

20  TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC,

21  THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL

22  COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN

23  ALLIANCE (PARALLEL) FUND II, L.P.,

24          Defendants.

25  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
 1   - - - - - - - - - - - - - - - - - - - - - - - - - -x

 2   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF

 3   ALLIED SYSTEMS HOLDINGS, INC. AND ITS AFFILIATED

 4   DEBTORS, ON BEHALF OF ALLIED SYSTEMS HOLDINGS, INC.,

 5   AND ITS AFFILIATED DEBTORS,

 6            Plaintiffs,

 7

 8   BLACK DIAMOND OPPORTUNITY FUND II, L.P., BLACK

 9   DIAMOND CLO 2005-1 LTD., AND SPECTRUM INVESTMENT

10   PARTNERS, L.P.,

11            Intervenors,

12

13   -against-

14

15   YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

16   AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA

17   AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN

18   ALLIANC (PARALLEL) FUND II, L.P., MARK J. GENDREGSKE,

19   JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF

20   PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,

21            Defendants.

22   - - - - - - - - - - - - - - - - - - - - - - - - - -x

23

24

25
```

1          United States Bankruptcy Court

2          824 North Market Street

3          Wilmington, Delaware

4

5          July 30, 2013

6          10:13 AM

7    B E F O R E :

8    HON CHRISTOPHER S. SONTCHI

9    U.S. BANKRUPTCY JUDGE

10

11   ECR OPERATOR:  LESLIE MURIN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  First Omnibus Motion for an Order Pursuant to Section 365 of

2  the Bankruptcy Code and Bankruptcy Rule 6006 Authorizing the

3  Debtors to Assume Certain Real Property Leases [Docket No.

4  671; filed November 30, 2012]

5

6  Debtors' Fourth Motion Pursuant to Bankruptcy Rules 9006(b)

7  and 9027 for Order Extending the Time to File Notices of

8  Removal of Civil Actions [Docket No. 1249; filed June 4,

9  2013]

10

11  Debtors' Fourth Motion for Extension of Exclusive Periods

12  During Which Debtors May Propose and File Plans of

13  Reorganization and Solicit Acceptances Thereof [Docket No.

14  1250; filed June 4, 2013]

15

16  Debtors' Motion to Authorize Axis Group, Inc. to Enter

17  License Agreement with City of New York [Docket No. 1284;

18  filed June 17, 2013]

19

20  Motion of the Debtors Pursuant to 11 U.S.C. § 107(b)(1) of

21  the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule

22  9018-1(b) to File Exhibit to Key Employee Incentive Plan

23  Under Seal [Docket No. 1370; filed July 1, 2013]

24

25

1    Petitioning Creditors' Motion to File a Redacted Version of

2    the Objection of the Petitioning Creditors to the Debtors'

3    Motion for Order Authorizing (I) Implementation of Key

4    Employee Incentive Plan for Certain Insiders and (II)

5    Payment of any Obligations Arising Thereunder as

6    Administrative Expenses [Docket No. 1456; filed July 22,

7    2013]

8

9    Motion for Authorization to Seal the Unredacted Objection of

10   the Official Committee of Unsecured Creditors to Motion for

11   an Order Pursuant to Sections 105(a), 363(b)(1) and

12   503(c)(3) of the Bankruptcy Code Authorizing (I)

13   Implementation of Key Employee Incentive Plan for Certain

14   Insiders and (II) Payment of any Obligations Arising

15   Thereunder as Administrative Expenses [Docket No. 1460;

16   filed July 22, 2013]

17

18   Motion of Norman Fredrick Wessels, Joyce Elaine Wessels,

19   Gladys Ann Walker, Michael Jay Meyer, and Dale Woudstra and

20   Tonia Woudstra for Relief from the Automatic Stay to Pursue

21   Personal Injury Claims [Docket No. 761; filed January 8,

22   2013]

23

24   Motion by James Joseph Pursuant to 11 U.S.C. §362 for Relief

25   from the Automatic Stay [Docket No. 1147; filed May 8, 2013]

1    Motion and Joinder of Travis and Erin Cogdill to Motion of

2    Norman Frederick Wessels, Joyce Elaine Wessels, Gladys Ann

3    Walker, Michael Jay Meyer and Dale Woudstra and Tonia

4    Woudstra for Relief from the Automatic Stay to Pursue

5    Personal Injury Claims (Docket No. 761) [Docket No. 1282;

6    filed June 17, 2013]

7

8    Motion for an Order Pursuant to Sections 105(a), 363(b)(1)

9    and 503(c)(3) of the Bankruptcy Code Authorizing (I)

10   Implementation of Key Employee Incentive Plan for Certain

11   Insiders and (II) Payment of any Obligations Arising

12   Thereunder as Administrative Expenses [Docket No. 1369;

13   filed July 1, 2013]

14

15   Motion of Yucaipa American Alliance Fund I, L.P.'s and

16   Yucaipa American Alliance (Parallel) Fund I, L.P. for

17   Reconsideration and/or Amendment of Final Order Granting

18   Debtors' Motion for Authorization to Obtain Post-petition

19   Secured Replacement DIP Financing and Related Relief [Docket

20   No. 1373; filed July 2, 2013]

21

22   Interim Fee Applications:

23

24   P

25

1  Petitioning Creditors' Motion for Summary Judgment Regarding

2  the Determination of Requisite Lenders Under the First Lien

3  Credit Agreement [Adv. (12-50947) Docket No. 246; Adv. (13-

4  50530) Docket No. 253; filed July 9, 2013]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sherri L. Breach & Sheila Orms

1    A P P E A R A N C E S :

2    RICHARDS, LAYTON & FINGER, P.A.

3         Attorney for the Debtors

4         One Rodney Square

5         920 North King Street

6         Wilmington, Delaware 19801

7

8    BY:  ROBERT STEARN, ESQ.

9         CHRISTOPHER M. SAMIS, ESQ.

10        MARK D. COLLINS, ESQ.

11

12   TROUTMAN SANDERS, LLP

13        Attorneys for the Debtors

14        Bank of America Plaza

15        600 Peachtree Street, Suite 5200

16        Atlanta, Georgia 30308

17

18   BY:  JEFFREY W. KELLEY, ESQ.

19

20

21

22

23

24

25

1   YOUNG CONAWAY, STARGATT & TAYLOR, LLP

2        Attorneys for Yucaipa, et al.

3        Rodney Square

4        1000 North King Street

5        Wilmington, Delaware 19801

6

7   BY:  MICHAEL R. NESTOR, ESQ.

8

9   LATHAM & WATKINS, LLP

10        Attorneys for Yucaipa, et al.

11        355 South Grand Avenue

12        Los Angeles, California 90071

13

14   BY:  ROBERT A. KLYMAN, ESQ.

15        RUSSELL F. SAUER, JR., ESQ.

16

17   SCHULTE, ROTH & ZABEL, LLP

18        Attorneys for Black Diamond, CLO 2005-1, LITD. &

19        BDCM Fund II, LP, et al

20        919 Third Avenue

21        New York, New York 10022

22

23   BY:  ADAM C. HARRIS, ESQ.

24        ROBERT J. WARD, ESQ.

25        VICTORIA A. LEPORE, ESQ.

```
1   LANDIS, RATH & COBB, LLP

2        Attorneys for Black Diamond, CLO 2005-1, LITD. &

3        BDCM Fund II, LP, et al

4        919 North Market Street, Suite 1800

5        Wilmington, Delaware 19801

6

7   BY:  KERRI K. MUMFORD, ESQ.

8

9   SIDLEY AUSTIN

10       Attorneys for the Committee of Unsecured Creditors

11       8787 Seventh Avenue

12       New York, New York 10019

13

14  BY:  NICHOLAS K. LAGEMANN, ESQ.

15       BRIAH J. LOHAN, ESQ.

16

17  SULLIVAN, HAZELTINE & ALLINSON, LLC

18       Attorneys for the Committee of Unsecured Creditors

19       901 North Market Street

20       Suite 1300

21       Wilmington, Delaware 19801

22

23  BY:  WILLIAM A. HAZELTINE, ESQ.

24

25
```

1   MORRIS, NICHOLS, ARSHT & TUNNELL

2        Attorneys for Mark Gendregske

3        1201 North Market Street, 18th Floor

4        P.O. Box 1347

5        Wilmington, Delaware 1999

6

7   BY:  WILLIAM M. ALLEMAN, JR., ESQ.

8

9   KING & SPALDING, LLP

10        Attorneys for Jack Cooper

11        1180 Peachtree Street

12        Atlanta, Georgia 30309

13

14   BY:  JESSE H. AUSTIN, III, ESQ.

15

16   COUSINS, CHIPMAN & BROWN, LLP

17        Attorneys for Jack Cooper

18        The Nemours Building

19        1007 North Orange Street, Suite 1110

20        Wilmington, Delaware 19801

21

22   BY:  WILLIAM E. CHIPMAN, JR., ESQ.

23

24

25

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for U.S. Trustee

3         33 Whitehall Street

4         21st Floor

5         New York, New York 10004

6

7    BY:  DAVID BUCHBINDER, ESQ.

8

9    APPEARING TELEPHONICALLY:

10   STEPHEN ANTINELLI

11   PEG BRICKLEY

12   MATTHEW BROOKS

13   JEFF P. BULLER

14   THEO CIUPITU

15   JOSEPH DRYER

16   RICHARD EHRLICH

17   MARK GENDREGSKE

18   MICHAEL E. JOHNSON

19   STEPHEN S. LAPLANTE

20   MEGHAN E. MAREK

21   LES MEIER

22   JUSTIN MENDELSOHN

23   STEPHEN S. ROACH

24   CARL STAPEN

25   ROBERT STARK

1   APPEARING TELEPHONICALLY (CONT.):

2   MATT Z. TAYLOR

3   DEREX WALKER

4   RICAHRD M. SELTZER

5   JUSTIN ANTONIPILLAI

6   WAYNE FLICK

7   JULIE GERCHIK

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.

4          Good morning.

5          MR. SAMIS:  Good morning, Your Honor.  Chris Samis

6    from Richards, Layton & Finger here today on behalf of the

7    debtors.

8          Your Honor, as for today's agenda, the only items

9    that require any action by the Court are Items 5, 6, 13, and

10   14.

11         Items 5 and 6 are both seal motions that relate to

12   the Key Employee Incentive Plan which is not being heard

13   today; Item Number 13 are the third interim fee applications

14   that were adjourned from a prior hearing; and Item Number 14

15   is the main event, which is the motion for summary judgment

16   that was filed by the petitioning creditors on the requisite

17   lender issue.

18         Your Honor, we can proceed in any fashion that you

19   would like.  I -- I leave it up to Your Honor.

20         THE COURT:  I -- did you mention the fee

21   applications?

22         MR. SAMIS:  Yes.  They're -- they're at Agenda

23   Item 13, Your Honor.  They were adjourned from the hearing

24   in June.

25         THE COURT:  Yes.  Yes.

1          First -- give me two minutes to get my papers

2    organized.

3          MR. SAMIS:  Certainly.

4       (Pause)

5          THE COURT:  All right.  I should have done this

6    earlier.

7          Okay.  Well, with Agenda Number 5, that -- that

8    binder had been misplaced and it was found this morning.  So

9    that order has been signed.

10          And 6 indicates -- it's just -- that it's going to

11    go forward.  So what's --

12          MR. SAMIS:  Your Honor, I'm not sure if the

13    petitioning creditors have a form of order here today.

14          THE COURT:  Ms. Mumford.

15          MS. MUMFORD:  Good morning, Your Honor.  I do have

16    a form of order.

17          THE COURT:  All right.

18          MS. MUMFORD:  May I approach?

19          THE COURT:  Yes.

20          And for the record this is the motion to file

21    certain -- a redacted version, I'm sorry, of the petitioning

22    creditors' motion regarding the Key Employee Incentive Plan.

23    Is there any objection?

24          All right.  I've signed the orders presented.

25          Now let's kick over to the fee apps.

1          MR. SAMIS:  Your Honor, on the fee applications,

2     the fee auditor issued final reports with respect to all the

3     applications.  All of the professionals have signed off on

4     the form of order that was previously submitted under

5     certification of counsel, and I believe there are

6     representatives from the various forms either in court or on

7     the phone today.

8          So I don't know if Your Honor has any independent

9     questions, but I do have a form of order prepared.

10          THE COURT:  All right.  Please approach.

11          MR. SAMIS:  Thank you, Your Honor.

12          THE COURT:  Does anyone wish to be heard with the

13     interim fee applications as modified?

14          All right.  I hear none.  As always, I -- I very

15     much appreciate the assistance of our fee auditors and this

16     one in particular, and I'm happy to sign the orders

17     presented.  And anyone who is here just for that is more

18     than welcome to jump off the phone or leave the court.

19          So I've signed the order.

20          MR. SAMIS:  Thank you, Your Honor.

21          That would bring us to Item 14, Your Honor, which

22     is the main event, the petitioning creditors' motion for

23     summary judgment.

24          At this time I would cede the podium to counsel

25     for the petitioning creditors.

1        THE COURT:  Okay.

2        Mr. Harris.  No.  All right.

3        MR. WARD:  Good morning, Your Honor.

4        THE COURT:  Good morning.

5        MR. WARD:  Robert Ward on behalf of the

6   petitioning creditors.

7        Your Honor, in the -- in petitioning creditors'

8   motion, we seek a ruling that Yucaipa is not the requisite

9   lender and that the petitioning creditors are.  And we

10  believe we have numerous bases -- a number of basis -- bases

11  for the relief we seek.

12        First off, Justice Ramos in the State Court in New

13  York resolved two issues.  First, and this is at page 14 of

14  Exhibit 1, that's his opinion:  "That the purported Fourth

15  Amendment is not and never was effective under the plain

16  terms of the credit agreement," and then "Yucaipa is not the

17  requisite lender."

18        Contrary to Yucaipa's argument, Justice Ramos

19  never said that Yucaipa is not the requisite lender as a

20  result of the fact that the Fourth Amendment is null and

21  void.  In fact, in reaching his decision that Yucaipa is not

22  the requisite lender, Justice Ramos reviewed and construed

23  the Third Amendment and the purported Fourth Amendment,

24  both.

25        In particular, as to the Third Amendment, Justice

1   Ramos determined, for example, and this is a quote at page 4

2   to 5 of his opinion:

3          "The Third Amendment prohibited Yucaipa from

4   exercising any and all voting rights" -- that's the Third

5   Amendment -- "prohibited Yucaipa from exercising any and all

6   voting rights it would otherwise have as a lender involving

7   the right to consent to any amendment of the credit

8   agreement or the right to vote in any Allied bankruptcy."

9          He also found that the Third Amendment represented

10  a compromise between Yucaipa, which wanted to acquire a

11  portion of Allied's debt obligations and the lenders who

12  recognized the dangers in allowing Yucaipa to assert

13  unfettered control over the credit lien agreement -- the

14  lien credit agreement.  And he found in that respect, Your

15  Honor, and I quote again, with respect to the Third

16  Amendment:

17         "The quid pro quo for permitting Yucaipa to

18  acquire the term loan was that any such term loans acquired

19  by Yucaipa would be subject to substantial restrictions

20  that, among other things, would preclude Yucaipa from voting

21  on any matter that would affect in any way the rights and

22  remedies of the lenders."

23         That's, again, on the Third Amendment, Your Honor.

24  That's page 9 of Exhibit 1, Justice Ramos's opinion.

25         In fact, Justice Ramos also found, and I quote

1    from page 4 of his opinion:  "The restrictions" -- and he

2    was dealing here with the Third Amendment.  It's the section

3    of his opinion on the Third Amendment:  "The restrictions

4    precluded Yucaipa from becoming the requisite lender or

5    exerting a control over the other lenders."

6              It's clear from the opinion, Your Honor, that

7    Justice Ramos is construing the Third Amendment here.

8              He also found at pages 4 -- 4 and 5 of his opinion

9    that the Third Amendment prohibited Yucaipa from exercising

10   any voting rights they would otherwise have as a lender.

11   With respect to that, pages 4 and 5, the quote by the judge

12   is:

13             "By the terms of the Third Amendment upon

14   acquiring any interest in the term loans, Yucaipa 'knowingly

15   and irrevocably waived any and all right to exercise any

16   voting rights it would otherwise have as lender for all

17   purposes under the credit agreement.'"

18             He was quoting from the Third Amendment.

19             Under the Third Amendment, Your Honor, he also

20   found "That the aggregate outstanding principal amount of

21   the term loan of Yucaipa shall be disregarded for purposes

22   of the definition of term loan exposure and, thus, for the

23   calculation of who can be the requisite lender."  That's

24   page 5 of his opinion.

25             It is clear from Justice Ramos's opinion, Your

1    Honor, that he construed the terms of the Third Amendment

2    and determined the issues which led him to -- to conclude

3    that Yucaipa is not the requisite lender.

4              And, Your Honor, the reason that I'm --

5              THE COURT:  Well, what --

6              MR. WARD:  -- quoting --

7              THE COURT:  -- what about -- what about this

8    argument that, fine, but because of the nature of who was on

9    which side at which time that Justice Ramos's ruling are not

10   binding as collateral estoppel on Yucaipa?

11             MR. WARD:  Well, Your Honor, the only person that

12   -- the only entity I know that's -- that's fighting my

13   clients being the requisite lender is Yucaipa.  The fact is

14   Allied -- and I can find a cite for it, Your Honor.  Allied,

15   I believe, in its opposite -- or its -- its statement on

16   June 19th in connection with the application or the

17   objection, I suppose, of Yucaipa said -- and this is at

18   Exhibit 5 to my -- to my affidavit, Your Honor, which is the

19   reply affidavit.  At paragraph 9, Allied acknowledged that

20   in the New York Court, the New York Court conclusively

21   determined that "Yucaipa is not the requisite lender and

22   that Justice Ramos's ruling is binding and conclusive."

23             Further, at page 2 and in paragraph 16 of that

24   same document, which is the debtors' document -- it's

25   Exhibit 5 to my affidavit -- Allied -- Allied acknowledged

1    in the opening paragraph and at paragraph 16 that Black

2    Diamond, Spectrum and the AMMC Group are the requisite

3    lenders.  The only entity, Your Honor, here that's fighting

4    is -- is the only entity with respect to which we have

5    collateral estoppel, and that is Yucaipa which was a party

6    to the New York case.

7              THE COURT:  Okay.

8              MR. WARD:  And -- and I would like to get into the

9    elements of collateral estoppel, if I can, Your Honor --

10             THE COURT:  Sure.

11             MR. WARD:  -- to -- to seek further to prove that.

12             Your Honor, with respect to collateral estoppel,

13   we believe that the issue of Yucaipa not being the requisite

14   lender was raised in the New York proceeding.  That's the

15   first element of collateral estoppel;

16             Secondly, that the issue was actually litigated

17   and decided in that proceeding;

18             Third, that Yucaipa had a full and fair

19   opportunity to litigate those issues; and

20             Fourth, that the resolution of those issues was

21   necessary to support the final judgment, the valid and final

22   judgment on the merits because the issue of whether or not

23   Yucaipa was a requisite lender was actually raised.

24             And, Your Honor, with respect to that, let me

25   point to Your Honor that in the wherefore clauses in the New

1   York complaint, which is Exhibit 4 to the -- to the

2   Mendelson affidavit, which is our moving affidavit, it

3   doesn't tie the request for a declaration that Yucaipa is

4   not the requisite lender to the Fourth Amendment.  They're

5   separate.  They're separate elements.

6           In addition to that, Your Honor, at paragraph 14

7   of the New York complaint we separately seek "a declaration

8   that the purported Fourth Amendment is invalid and that the

9   Yucaipa defendants are not the requisite lender under the

10  credit agreement."  They weren't tied together.

11          And in fact, Your Honor, at page 5 -- I'm sorry --

12  page 3, paragraph 5 of the New York complaint the

13  petitioning creditors allege:

14          "The Third Amendment also expressly provided that

15  if Yucaipa were to acquire any term loan exposure, Yucaipa

16  would not be entitled to vote and the obligations held by it

17  would essentially be disregarded in connection with any

18  matter required to be submitted to the lenders for consent

19  under the credit agreement."

20          I'm -- I'm just going to point out a few

21  paragraphs, Your Honor, where in our complaint in the New

22  York action we specifically addressed the Third Amendment

23  and -- and Yucaipa engaged us in their answer in connection

24  with those allegations.

25          For example, in paragraph 31 at page 10 of our New

1    York complaint we say, with respect to the Third Amendment:

2    "Specifically, Yucaipa's potential status as a lender was

3    subject to the following restrictions and conditions, among

4    others:  Three, Yucaipa would not have any voting rights

5    with respect to any term loan."  That was specific to the

6    Third Amendment.

7            At paragraph 31 of Yucaipa's answer, Yucaipa

8    engages on that issue and says -- they state that the

9    question of whether or not and to what extent Yucaipa's

10   potential status as a lender is subject to restrictions and

11   conditions is a question of law for which no response is

12   required.

13           By the way, Your Honor, when we sought a

14   determination in our wherefore clause, and I believe I said

15   in paragraph 16 of the complaint, we sought a determination

16   that they were not the requisite lender under the credit

17   agreement.  And in the complaint we defined the credit

18   agreement to include the Third Amendment.  And -- and that

19   is clear throughout the complaint and it's clear in

20   Yucaipa's answer.

21           At paragraph 33, page 11, Your Honor, of our

22   complaint, again speaking about the Third Amendment, we said

23   that the restrictions and conditions were necessary -- the

24   restrictions and conditions in the Third Amendment were

25   necessary to ensure that Yucaipa "did not obtain unfettered

1     control over Allied by, among other things, becoming the

2     requisite lender."

3          We continue at paragraph 34 to cite the Third

4     Amendment and say, "Pursuant to the Third Amendment, the

5     prohibitions imposed on Yucaipa's ability to acquire and

6     write term -- and -- and buy term loans and other

7     obligations effectively preclude Yucaipa from ever becoming

8     a requisite lender."

9          In its answer -- and, again, Yucaipa is engaging

10    us in these allegations.  We're making the allegations about

11    the Third Amendment.  They're engaging us in those

12    allegations.  Yucaipa denies the allegations that I just

13    referred to that we had made, denies the allegations

14    contained in paragraph 34, and respectfully refers the Court

15    to the credit agreement and all of the amendments thereto

16    for a full and accurate statement of its contents.  We had

17    already defined in the complaint what the credit amendment

18    was -- credit agreement was and that is -- it includes the

19    Third Amendment and the Fourth Amendment, and Yucaipa here

20    says, "and all the amendments thereto."

21          I'm not going to burden the record much further,

22    Your Honor, but at page -- paragraph 60, page 18 of our

23    complaint we say, "We seek a declaration under CPLR" --

24    that's Civil Practice Law and Rules -- "3001 that the

25    purported Fourth Amendment is null and void and, separately,

1    that Yucaipa is not requisite lender under the credit

2    agreement."

3            Yucaipa, in its answer, admits that the complaint

4    seeks this declaration, but denies that the plaintiffs are

5    entitled to it.

6            There's no place in the -- in the answer where

7    Yucaipa says, we're only fighting here about the Fourth

8    Amendment.  We were fighting about the Third Amendment and

9    the Fourth Amendment.

10           THE COURT:  Well, my memory of the argument in

11   front of Justice Ramos was that it was focused entirely on

12   the Fourth Amendment.

13           MR. WARD:  Your Honor, there's a couple of things

14   you have to remember.  First off, there was an argument on

15   November 19th and -- and those issues -- and it was a -- it

16   was a longish argument, but those issues, as happens in oral

17   argument, went one or two different directions depending on,

18   you know, how the parties were arguing.

19           But if you actually look at our motion -- if you

20   actually look at two things.  First off, Justice Ramos's

21   decision, which I was reading to you earlier, where there

22   are numerous quotes where he's construing the Third

23   Amendment.  But, also, if you look at the motion for summary

24   judgment that we actually filed -- and let me just quote a

25   couple of things from there.

1          With respect to our motion for summary judgment,

2     in our moving brief at page 25 we seek a ruling from the New

3     York Court that "it declare that Yucaipa is not the

4     requisite lender under the credit agreement."  And we don't

5     say there a requisite lender under the Fourth Amendment.

6          In connection -- in our reply brief on summary

7     judgment -- this is paragraph -- this is Exhibit 68 to Mr.

8     Sauer's affidavit, the petitioning creditors specifically

9     argue that Yucaipa could not have become a requisite lender

10    under the Third Amendment; that under the Third Amendment at

11    Section 2.1(e) Yucaipa "could buy a limited amount of term

12    loans and could never vote them."  That's page 7.  This is

13    all in our motion for summary judgment which was before the

14    Court and, actually, as a result an actually litigated

15    issue.

16          And in addition in our reply brief on summary

17    judgment, "That the prohibitions in the Third Amendment

18    prevent a defendant from becoming requisite lenders."

19    That's at page 8.

20          It's clear, Your Honor, that in our summary

21    judgment motion we were addressing the Third Amendment, the

22    Fourth Amendment, and the issue of requisite lender all at

23    once.  The fact that -- by the way, on the November 19th

24    oral argument that we focused mainly on -- or we focused, I

25    think -- well, actually, we focused on two things, Your

1    Honor.

2              First, language in the Fourth Amendment.  But very

3    quickly, language in one of the defenses that had been

4    raised by Yucaipa based on the Georgia action.  So,

5    basically, those were the two issues that were in that oral

6    argument.

7              However, in the actual written decision from

8    Justice Ramos, I think dated March 19th, he deals

9    extensively with the Third Amendment and then deals with the

10   Fourth Amendment.  And it's on -- on both of those bases,

11   and I think it is very clear from reading his opinion that

12   he decides those issues.

13             But the reason I've been going through, Your

14   Honor, what we actually argued in our complaint and then in

15   response to Your Honor's question of what was actually

16   argued or asserted in our complaint -- alleged in our

17   complaint, and then what we actually argued in summary

18   judgment is that the issue of Yucaipa not being the

19   requisite lender was raised in the New York proceeding.

20   It's in our complaint.  If you look through it, if you look

21   at the cites that I've mentioned it's actually there.

22   Yucaipa engages us in that issue.  The issue was actually

23   litigated and decided in the proceeding.

24             Now Yucaipa says they didn't have a full

25   opportunity -- a full and fair opportunity to litigate.

1    However, Justice Ramos said at page 13 of his opinion,

2    Exhibit 1 again, "The credit agreement itself is unambiguous

3    and, accordingly, summary judgment is appropriate."  That's

4    page 11 of his argument -- of his decision actually.

5            For their part, the defendants contend that there

6    are many factual issues.  There are none.  This is a case of

7    contract interpretation.  That's page 13.  And Your Honor

8    knows very well that when you have a case of contract

9    interpretation and when the contract is clear on its face,

10   you don't need extrinsic evidence.  The argument that

11   Yucaipa is making that they didn't have a chance to do

12   discovery and, as a result, they didn't have a full and fair

13   opportunity to litigate is -- is just wrong.

14           In fact, we quote a case at page 7 of our brief

15   called Kronish versus Dehari (ph) saying that a summary

16   judgment constitutes "a full and fair opportunity to

17   litigate."

18           Yucaipa had the full and fair opportunity to

19   litigate, Your Honor.  The issue was raised in our answer.

20   The issue was raised in our summary judgment motion.  And

21   the resolution of the issue, Your Honor, was necessary for a

22   valid and final judgment because we did ask for that relief

23   in our complaint.  In our wherefore clause we do ask

24   separately that the Fourth Amendment is -- is invalid and,

25   secondly, that they were not the requisite lender.

1          In getting there, if you read Justice -- if -- and

2     I'm sure Your Honor has -- if you read Justice Ramos's

3     decision which is Exhibit 1 to our moving affidavit, he

4     clearly goes through the Third Amendment and construes it.

5     And I've --

6               THE COURT:  Okay.

7               MR. WARD:  -- I've cited to some of the

8     constructions.  And, in fact, it's some of the same

9     construction that I'll be going through a minute in talking

10    about the Third Amendment, Your Honor.

11              THE COURT:  Okay.

12              MR. WARD:  But -- so why don't I just move on,

13    Your Honor.  And with respect to the next issue, even if the

14    New York Court had not already ruled that Yucaipa was the

15    requisite lender, that Court clearly ruled that the

16    purported Fourth Amendment is no longer in effect -- is null

17    and void and was never in effect, actually, and that's

18    clearly binding on collateral -- by virtue of collateral

19    estoppel on Yucaipa.  I don't see any fight on that issue.

20              And that holding results, Your Honor, in the

21    application of the Third Amendment since the Fourth

22    Amendment has been dealt -- has been determined to be null

23    and void.  That holding results in the application of the

24    Third Amendment to the issues presented in this motion.

25              And this includes the express provisions in the

1  Third Amendment that any obligations -- and I'll get into

2  these in a second.  Any of the debt obligations acquired by

3  Yucaipa are disregarded and not counted for purposes of

4  determining who is the requisite lender.

5          Now Yucaipa argues that the Third Amendment is

6  ineffective.  But that's directly at odds with, I believe,

7  this Court's prior recognition of the Third Amendment as

8  effective, valid and enforceable.

9          And that is, Your Honor, on October 18, 2012, Your

10  Honor will recall Allied commenced its own adversary

11  proceeding before this Court.  And in Exhibit 4 to my reply

12  affidavit, we attached that complaint and in that complaint

13  Allied seeks a declaration identifying who the requisite

14  lender is and a ruling on the enforceability of both the

15  Third and the Fourth Amendments.

16          Then after Justice Ramos ruled from the bench on

17  November 19th, but before his longer written decision which

18  is the one that deals much more with the Third Amendment, as

19  the Court is aware Yucaipa filed cross-claims against, among

20  other -- among other defendants, my clients, the petitioning

21  creditors.  That's Exhibit 15 to our moving affidavit.

22          Now petitioning creditors moved to dismiss that

23  cross-claim.  That's Exhibit 22 to our moving affidavit,

24  which motion this -- this Court granted on several grounds

25  and including, Your Honor, the ground that the covenant not

1    to -- not to -- that there was a covenant not to sue

2    contained in the Third Amendment at Section 2.7(e), page 7

3    of the Third Amendment, which was binding on Yucaipa once it

4    -- once it purchased the Allied debt.

5           In fact, this Court specifically -- and in fact --

6    I'm sorry -- that Section 2.7(e) at page 7 of the Third

7    Amendment, the covenant not to sue, is binding only on

8    Yucaipa.  It is specifically tailored to Yucaipa.  It just

9    says Yucaipa.  They're called the restricted lender

10   affiliate, something like that, but it's a defined term in

11   there.

12          But with respect to Your Honor's ruling, what Your

13   Honor said on February 27th in your ruling, which is Exhibit

14   3 to our moving affidavit, Your Honor said, "In support of

15   that" -- our motion to dismiss the cross-claims, which Your

16   Honor granted -- "In support of that, I really, for all

17   material aspects, adopt the petitioning creditors' arguments

18   virtually in toto."  And then the Court highlighted the

19   arguments on which it relied.

20          In particular, the Court's decision turned on this

21   covenant not to sue, which is only contained in the Third

22   Amendment and specifically refers only to Yucaipa.  And the

23   Court found that contrary to Yucaipa's arguments, the

24   covenant not to sue in the Third Amendment, which

25   specifically, you know, addressed them, was binding on

1    Yucaipa.  And the Court found that the allegations pled by

2    Yucaipa in arguing in their -- in their cross-claims against

3    the application of the covenant not to sue was not plausible

4    under the Twombly Iqbal standards.  That's page 104 of

5    Exhibit 3, Your Honor.  That's the transcript.

6          The Court found that the plain meaning of this

7    covenant not to sue in the Third Amendment, that the plain

8    meaning is that Yucaipa couldn't sue.  In fact, the quote

9    from Your Honor is, at page 105, "I don't think there's any

10   question as to the plain meaning of the covenant and I think

11   it's very clear."

12         Now since the Court found that Yucaipa was bound

13   by the covenant not to sue, which is contained in the Third

14   Amendment, obviously the Court was finding that Yucaipa was

15   bound by a provision of the Third Amendment and that the

16   Third Amendment was binding and effective on Yucaipa, which

17   we think is the law of the case, but let me just go a little

18   bit further on this, Your Honor.

19         This Court then made several other findings that

20   reinforced the applicability of the Third Amendment as

21   against Yucaipa.  At page 106, lines 9 through 15:

22         "As to the applicability, the first lien credit

23   agreement does contain the provision that when you buy or

24   assign the debt, you are stuck with what you asked nor had

25   previously agreed to and waived, et cetera.  And I find that

1    when Yucaipa bought this debt, they were subject to the

2    agreements that had been previously entered and, as such,

3    they are applicable when they're -- when they're looking at

4    the Third Amendment."  I think it's when we're looking at

5    the Third Amendment, Your Honor, but you certainly

6    referenced the Third Amendment at the end.

7            And then again, Your Honor, at page 106 at -- at

8    -- I'm sorry, Page 106, line 22 to page 107 line 1, "That's

9    the very normal and understandable provision; that when you

10   buy something, when you buy a debt, when you buy the debt,

11   it is what it is and you are where you are, and you can't

12   undo -- you can't have that time machine ability to undo the

13   previous agreement."

14           What Your Honor was talking about there, I

15   believe, was that the Fourth Amendment had been rendered

16   null and void, and you go back to the Third Amendment and

17   you can't act as if the Third Amendment didn't exist.

18           However, once again, the language that I'm quoting

19   to Your Honor from your opinion, I think, of February 27th

20   was -- points out that the Third Amendment was binding on

21   Yucaipa.  And we believe, Your Honor, that this is law of

22   the case.

23           In response, Yucaipa argues that the application

24   of law -- of the law of the case doctrine is discretionary.

25   However, I point out, Your Honor, that one of your bases for

1    your determination was the application of the Twombly Iqbal

2    standards that the claims -- that -- that the claims have to

3    rise to the level of plausibility, which is Exhibit 3, page

4    104, lines 7 through 11.  There's nothing that's happened

5    since this Court's determination of February 27th, five

6    months ago, to make those cross-claims about actions from

7    four -- and four and five years ago more plausible.

8            Further, this Court denied Yucaipa's application

9    to re-plead, and said at Exhibit 3, page 110, lines 6

10   through 7, "I'm going to dismiss the case with prejudice."

11          So, yes, Your Honor, the application of the law of

12   the case doctrine is discretionary, but nothing has changed

13   since then.  We believe it was a firm finding by Your Honor

14   and Your Honor, in fact, dismissed the case with prejudice.

15          Now, Your Honor, moving on to the Third Amendment

16   itself, even if this Court determines not to apply its prior

17   determination that the Third Amendment, we believe, is

18   effective, there can be no doubt that the Third Amendment is

19   effective.

20          Yucaipa's argument as to why the Third Amendment

21   is ineffective is that the Fourth Amendment requires

22   unanimous consent and so must the Third Amendment.  And

23   Yucaipa has several other arguments, but let me get into our

24   -- the main thrust of the argument here, Your Honor.

25          The fact is this -- this argument by Yucaipa rests

1    on the fundamental misconception as to Section 10.5 of the

2    first lien credit agreement, and it ignores critical

3    differences between the Third Amendment and the Fourth

4    Amendment.

5         Generally, amendments to the first lien credit

6    agreement are controlled by Section 10.5(a), and that's

7    Exhibit H, which is the first lien credit agreement, and

8    that requires only requisite lender consent, which was

9    obtained in connection with the Third Amendment.

10        With respect, however, to certain other types of

11   amendments, they are controlled by Section 10.5(b) as

12   opposed to (a), and with respect to Section 10.5(b)(ix), and

13   I quote, this is Exhibit A, the first lien credit agreement:

14   "Without the written consent of each lender, other than a

15   defaulting lender, that would be effected thereby, no

16   amendment, modification, termination or consents shall be

17   effective if the effect thereof would be," and then "(ix)

18   amend the definition of requisite lender."

19        Now Justice Ramos found that the purported Fourth

20   Amendment had the effect of amending the definition of

21   requisite lenders because it allowed Yucaipa, for the first

22   time, to become a requisite lender and thus effected --

23   effected and affected -- thus affected every lender without

24   requiring -- thereby requiring unanimous consent, which

25   wasn't obtained.

1    And I was trying to imagine a more fundamental

2    change than that before the Fourth Amendment Yucaipa could

3    not be the requisite lender and then after the Fourth

4    Amendment they could.

5    But the change to the Third Amendment on the other

6    hand, Your Honor, did not affect any of the lenders because

7    prior to the Third Amendment, Yucaipa could not become the

8    requisite lender and after the Third Amendment Yucaipa could

9    not become the requisite lender because, as I'll get into in

10   a minute, there were significant restrictions placed on the

11   debt that Yucaipa bought.  I've been calling it neutered

12   debt in -- in several of those proceedings.

13   However, as opposed to the Third Amendment, the

14   purported Fourth Amendment is a very different story because

15   after its alleged passage, Yucaipa could become the

16   requisite lender.

17   Your Honor, prior to the Third Amendment Yucaipa

18   was precluded from buying any Allied debt under the first

19   lien credit agreement and that's because the definition of

20   eligible lender excluded Yucaipa specifically.  They were

21   the sponsor and the sponsor was excluded.

22   THE COURT:  Were they -- were they prohibited from

23   buying or were the lenders prohibited from selling?

24   MR. WARD:  Well, Your Honor, I -- I think it's the

25   lenders were prohibited from selling, but I don't see at the

1 end of the day that that really matters as much because,

2 first off, once they bought the debt they were still subject

3 to the prior authorities and conditions, and so they became

4 subject to the terms.  And maybe that's a little bit

5 circular.

6 　　　　　But. in addition, how do you buy the debt that

7 you're precluded from buying without causing a tortuous

8 interference with the agreement.  So it seems that what

9 Yucaipa is saying is by virtue of their wrongful behavior,

10 they should be rewarded here.  We don't think that that's

11 justifiable or allowable under -- under any of the claims.

12 　　　　　If what Your Honor is talking about is the Praven

13 (ph) line of decisions that was raised, you know, by

14 Yucaipa, I'm happy to get into that --

15 　　　　　THE COURT:  Yeah.  Please do.

16 　　　　　MR. WARD:  -- right now.

17 　　　　　Well, with respect to Praven, Your Honor, and I

18 think some of this is really a red herring.  But Praven is

19 the governing case.  It's a Second Circuit case and it holds

20 that under New York law only expressed limitations on

21 assignability are enforceable.  And you have to remember the

22 context in which the Praven case was coming out of.

23 　　　　　In Praven, the underlying agreement "expressly

24 permits assignments to financial institutions," and this is

25 a quote.  "It does not limit assignments only to those

1  entities."  In other words, it's inclusionary.  It's not

2  exclusionary language.  And as I was citing to Your Honor,

3  what -- what Praven -- what the Second Circuit in Praven was

4  looking for is exclusionary language.  You know, it said

5  "Under New York law only expressed limitations on

6  assignability are enforceable."

7           And with respect to Praven, again, the underlying

8  language that's being construed is -- this is -- this is the

9  language from the underlying agreement:  "We may -- we may

10  assign all or any part of our interest in the letter

11  agreement to any financial institution."  In other words,

12  it's all inclusionary.  It says who you can assign to.  It

13  doesn't say who you can't assign to.

14           This agreement is very clear.  It's page -- I

15  believe it's page 17.  It's the definition -- of Exhibit 8.

16  It's the definition of eligible lender, eligible assignee,

17  and it specifically excludes Yucaipa.  In Praven, there's no

18  exclusionary language.  There's only inclusionary language,

19  Your Honor.  That's very, very different.  And -- and we'll

20  get into that in a second, Your Honor.  But, specifically,

21  Yucaipa was excluded from -- from being an eligible assignee

22  under the agreement.  And that's very much missing in

23  Praven.

24           In addition, Your Honor, Yucaipa cites a number of

25  -- of other cases.  And I'm sorry.  And the exclusionary

1　　language actually continued in the Third Amendment, Your

2　　Honor, because Yucaipa was specifically excluded from being

3　　able to buy any letter of credit debt and revolving debt.

4　　That's Section 2.1(c) of the Third Amendment.  And under

5　　Section 2.7(e) of the Third Amendment, they could only buy

6　　20 percent of the aggregate principal amount of term loan

7　　exposure or $50 million, subject to significant limitations.

8　　I'll get into that in a second.

9　　　　　　But we believe, Your Honor, that the Praven

10　　standard was satisfied because of the expressed limitations

11　　on assignability, you know, contained in -- in the credit

12　　agreement.

13　　　　　　Now Yucaipa also cites Sullivan, Alhusen (ph) and

14　　a number of other New York cases which it relies on which

15　　don't involve credit agreements.  They are factually

16　　distinguishable.  They are assignments of simple bilateral

17　　contracts which -- where typically there's a provision in

18　　each of those contracts requiring the consent of the other

19　　side.  That's not this agreement.  This is a very different

20　　agreement, our credit agreement.  There's no consent

21　　requirement and it's a much more complex agreement.

22　　　　　　But in connection with Sullivan and Alhusen and

23　　the thing to recall -- or the thing to take into account is

24　　that these cases state a proposition relative to the general

25　　assignability of clauses under New York law.  And in none of

1  these cases is there exclusionary language.  There is no

2  list in Alhusen or Sullivan or any of these cases as to a

3  specific assignee that is excluded.  Again, it's -- it's a

4  simple proposition of New York law that generally, you know,

5  generally you can have assignments.  Generally, as the quote

6  -- as the Court quoted in Alhusen and Sullivan, you know,

7  generally you can have assignments.

8          However, in none of those cases was there any

9  exclusionary language specifying an entity or a person to

10  whom you could not assign.  And I think that's very

11  important, Your Honor.

12          In addition, in Alhusen and Sullivan, Praven and

13  also -- and I'll get to it in a second -- in 785 Partners,

14  you didn't have a case where the assignee, Yucaipa here,

15  negotiated the limitations on their ability to -- on the

16  ability to assign, as Yucaipa did here.  And I can get into

17  that in a second.  We cite it in our brief.  It was Yucaipa

18  itself that negotiated the Third Amendment.

19          And so in none of these cases do you actually have

20  a situation where it's the assignee who is negotiating the

21  limitation and then is seeking relief from the limitation by

22  going to this general principle of New York law.

23          However, Alhusen, Sullivan, they are all general

24  assignability cases, but so is Singer versus Baccus (ph),

25  which is a more recent case.  It's an appellate division

1    case.  As Your Honor knows, that's the intermediate

2    appellate court in New York.  It's a 202 case.

3          And Baccus holds, Your Honor, and we think this is

4    dispositive, "There is no need for the non-assignment clause

5    to also contain talismanic language or magic words

6    describing the effect of any attempt by the assignor to make

7    an assignment."  That's a much more practical way of looking

8    at it.

9          Also, in Alhusen, one of the cases that's relied

10   upon by Yucaipa, the Court said, "When clear language is

11   used and the plainest words have been chosen, parties may

12   limit the freedom of alienation of rights and prohibit an

13   assignment."

14         Your Honor, there's nothing clearer than what's

15   contained in paragraph -- in -- at page 17, Section 1.1 of

16   the first lien credit agreement where it says Yucaipa may

17   not be the eligible -- may not be an eligible assignee.  And

18   then in the Third Amendment where it says Yucaipa may not

19   buy LC debt, may not buy revolving debt, and it can buy a

20   certain amount of term loan debt with significant

21   limitations.

22         Now with respect to 785, once again, as with

23   Praven, there was a provision about the entities to whom an

24   assignment could be made; again, inclusionary language.  You

25   can assign to a financial institution.  There was no

1    language saying you could not assign to X.  There was no

2    exclusionary language.  Again, that's a strong factual

3    distinction between that case, the Praven case, and our

4    case.

5            And with respect to 787 (sic), as I said, it

6    relies very heavily upon Praven, which is to be expected.

7    Praven is the Second Circuit case, and we believe we

8    satisfied the Praven standard with the exclusionary

9    language, the expressed limitation language.  And, remember,

10   what Praven was looking for was expressed limitation

11   language and there's expressed limitation language in the

12   first lien credit agreement and in the -- in the Third

13   Amendment with respect to Yucaipa.

14           But, also, in 785 Partners, the facts are very

15   different from the case here.  The facts in 785 were between

16   -- the dispute was between a borrower and a single assignee

17   of a single creditor.  It was a lender/borrower dispute.

18   Here, the dispute is an inter-creditor dispute where one

19   lender knowingly violated an agreement it itself negotiated

20   in order to obtain an advantage over the other lenders.  We

21   think as a result, Your Honor, 785 is factually

22   distinguishable.

23           And Yucaipa cites no cases involving inter-

24   creditor disputes.  They cite a fair number of New York

25   cases involving simple contract assignability provisions.

1    They are not credit agreements.  They are bilateral

2    contracts.  This is a much more complex situation, as Your

3    Honor knows from all the time we've spent with you.  But

4    there's no case, Your Honor, that they cite where there's an

5    inter-creditor dispute involved.

6              THE COURT:  Okay.

7              MR. WARD:  And once again, 785, Your Honor, is not

8    a case where the assignee negotiated the limitation on the

9    ability to assign as Yucaipa did here.

10             THE COURT:  Right.

11             MR. WARD:  So we think, Your Honor, that there are

12   many reasons that it's distinguishable.

13             But if I -- if I can get back to the Third

14   Amendment, Your Honor.

15             THE COURT:  Yes.  Thank you.

16             MR. WARD:  With respect to the Third Amendment,

17   Your Honor, it -- first off, it -- it provided strict

18   conditions and limitations on the very limited amount of

19   debt that Yucaipa was allowed to buy, the result of which

20   was that Yucaipa could not become a requisite lender.

21             For example, Section 2.1(e) of the Third Amendment

22   -- and that's page 3 of the Third Amendment and that's

23   Exhibit 2 to the Mendelson affidavit, our moving affidavit

24   says, "The aggregate outstanding principal amount of term

25   loans of Yucaipa shall be disregarded for purposes of this

1    definition of term loan exposure."

2          As Justice Ramos explained, Your Honor, at page 12

3    of his opinion, Exhibit 1 -- and by the way, Section 2.1(e)

4    is very important because it specifically says that any term

5    loan debt that Yucaipa buys shall be disregarded for

6    purposes of this definition.  And it's this definition that

7    is applied in connection with requisite lender because, as

8    Justice Ramos explained:

9          "The term loan exposure is utilized both to define

10   which lenders may become the requisite lenders or be part of

11   the group comprising requisite lenders, and to calculate

12   whose obligations may be counted by calculating the amount

13   that a lender or group of lenders must hold in order to be

14   the requisite lender."

15         So the definition, Your Honor, of requisite

16   lender, as Your Honor I think is familiar with very well by

17   now at page 41 of the first lien credit agreement is, "more

18   than 50 percent of the sum of the aggregate of term loan

19   exposure, letter of credit exposure, and revolving debt

20   exposure."

21         And the fact is since, under Section 2.1(e) of the

22   Third Amendment the term loan exposure may not be counted

23   for any purpose whatsoever, they can never become the

24   requisite lender because under Section 2.1(c) of the Third

25   Amendment they are prohibited from buying an LC debt, any

1    letter of credit debt, and they are prohibited from buying

2    revolving debt.

3           And with respect to Section 2.1(e) at page 3 of

4    the Third Amendment that I just read, none of the term loan

5    debt that they buy can be counted for any purpose, including

6    for purposes of determining the requisite lender.  So they

7    can never get there under the Third Amendment.

8           Your Honor, the point I'm trying to make is that

9    the Third Amendment and the Fourth Amendment were very

10   different.  The Fourth Amendment definitely affected all the

11   lenders because it removed all the restrictions in the Third

12   Amendment and thereby allowed Yucaipa for the first time to

13   become the requisite lender.

14         With respect to the Third Amendment, as Justice

15   Ramos found, there was a quid pro quo.  You can buy some

16   debt, but subject to significant restrictions, including

17   some of the ones that I just spoke about, Your Honor.

18         With respect to the Third Amendment -- and I'll

19   continue just a little bit, Your Honor, on that -- the

20   definition of term loan exposure as originally contained in

21   the first lien agreement is at Section 1.1, page 45, and it

22   defines term loan exposure as: "With respect to any lender

23   as of any date of determination, it's the outstanding

24   principle amount of the term loan of such lender."  This is

25   a fairly flat definition of what term loan exposure is.

1          When the Third Amendment was put into effect,

2    there was a proviso added that I eluded to already, Your

3    Honor, and that's at 2.1(e) of the Third Amendment, page 3.

4    And the language continues the language I've cited to you

5    from the first lien agreement which is fairly plain vanilla;

6    that with respect to any lender as of any date of

7    determination, the outstanding principle amount of the term

8    loan of such lender -- that's the underlying language from

9    the Third Amendment.  Then there's a proviso added by the

10   Third Amendment:

11          "Provided further that with respect to any

12   provision of this agreement relating to the voting rights of

13   lenders, including the rights of lenders to consent or take

14   any action with respect to any amendment, modification,

15   termination or waiver of any provision of this agreement or

16   the other credit documents, or consent to any departure by

17   any credit party therefrom, the aggregate outstanding

18   principle amount of the term loans of all restricted sponsor

19   affiliates" -- restrict sponsor affiliates, that's -- that's

20   Yucaipa; that's a defined term.  Their debt "Shall be

21   disregarded for the purposes of the definition of term loan

22   exposure."

23          And that's important, Your Honor, because as I

24   pointed out, the definition of requisite lender includes

25   term loan exposure, LC exposure and revolving debt.  Under

1    Section 2.1(c) of the Third Amendment, Yucaipa could not buy

2    any LC debt.  The definition of eligible assignee, which is

3    amended at that section, says they cannot buy.  They cannot

4    have any LC debt.

5            With respect to the term loan debt that they were

6    allowed to buy, it's -- it doesn't count as -- as the

7    definition of term loan exposure at Section 2.1(e) that I've

8    just read shows.

9            So with respect to those two limitations -- or as

10   a result of those two limitations, Yucaipa could never

11   become the requisite lender because any LC debt -- well,

12   it's not allowed to buy any LC debt under 2.1(c) of the

13   Third Amendment.  And with respect to 2.1(e), any term loan

14   debt it buys, which is of a limited amount, it can't count

15   for the definition of requisite lender.

16           So definitionally it can never become the

17   requisite lender because it can't get to the majority of the

18   aggregate -- of the sum of the aggregate of the term loan

19   debt, the LC debt, and the revolving debt because it can't

20   buy LC debt under 2.1(c) of the Third Amendment, and any

21   debt -- any long-term debt it buys under 2.1(e) just doesn't

22   count for any purpose whatsoever.

23           But in addition to that, Your Honor, there's

24   another reason they can't become the requisite lender, and

25   that's because even if this -- these provisions saying that

1   the term loan debt doesn't count and that they can't buy LC

2   debt, there are other restrictions.

3            For example, Section 2.7(e) of the Third Amendment

4   provides a new section or creates a new section in the first

5   lien credit agreement, 10.6(j)(iv).  It's at page 7 of the

6   Third Amendment and it says: "Each lender that is a

7   restricted sponsor affiliate" -- and that's -- that's

8   Yucaipa.  That's the definition of Yucaipa in the Third

9   Amendment.

10           "Each lender that is a restricted sponsor

11  affiliate, upon succeeding to an interest in the term loans"

12  -- and then -- "(iv) knowingly and irrevocably waives any

13  and all rights to exercise any voting rights it would have

14  otherwise -- it would otherwise have as a lender for all

15  purposes under this agreement and the other credit

16  documents."

17           It just can't get any broader than that.  They

18  completely have given up any voting rights in return for the

19  quid pro quo, as Judge Ramos cites, for obtaining -- or the

20  ability to buy some term loan debt.

21           Now this provision couldn't be any more clearer.

22  Yucaipa just forfeited any right it had to vote.  But this

23  Third Amendment also provides -- and it's very relevant for

24  the proceedings before Your Honor -- at Section 2.7(a) at

25  page 5 of the Third Amendment, which is Exhibit 2:

1  "Restricted sponsor affiliates" -- again, that's Yucaipa.

2  "Restricted sponsor affiliates shall have no voting rights

3  for all purposes under this agreement (whether before,

4  during or after and in any insolvency or liquidation

5  procedure) and the other credit documents with respect to

6  their term loans specific to an insolvency."

7         The same line, Your Honor, continues -- or the

8  same theme continues at Section 2.7(b).  I just read 2.7(a).

9  Section 2.7(b) of the Third Amendment at page 5 says:

10        "Yucaipa, the restricted sponsor affiliate, that

11 becomes a lender hereunder shall not, in their capacity as

12 lenders, hereunder and hereby irrevocably and voluntarily

13 waive in their capacity as lenders hereunder any right to

14 make any election, give any consents, commence any action,

15 or file any motion, claim, obligation, notice or application

16 or take any such action in any insolvency or liquidation

17 proceeding without the prior written consent of all lenders,

18 other than restricted sponsor affiliates."

19        Further, in paragraph 7(a), again, at page 5:

20        "Yucaipa, the restricted sponsor affiliates, that

21 become lenders hereunder shall have no right under the

22 agreements  -- under -- under this agreement or any other

23 credit documents and hereby waive any such right to consent

24 to take any action with respect to any amendment,

25 modification, termination or waiver of any provision of this

1    agreement or any other credit document or consent to any

2    departure by any credit party therefrom."

3           They gave up all voting rights.  They specifically

4    gave up all actions with respect to this Court with respect

5    to an insolvency.

6           Now Yucaipa says that the complete lack of voting

7    rights doesn't matter; that they could still count their

8    term loan exposure and partner up with someone else.  Well,

9    they can't count the term loan exposure under 2.1(e).  The

10   Third Amendment specifically says that.  But there are

11   several problems with their argument that -- that they can

12   simply count their exposure even if they can't vote.

13          First, Yucaipa couldn't perform any of the

14   functions that were necessary for a requisite lender if it

15   couldn't vote. If it can't fulfill these functions

16   effectively it can't become the requisite lender.  In fact,

17   the New York Court -- the New York Court found this argument

18   that the determination of requisite lender had nothing to do

19   with term -- with voting rights to be "not logical."  And

20   that's Exhibit 16 to our moving affidavit, the transcript at

21   page 23.  And that the requisite lender's powers to make

22   "amendments, modifications and waivers can be exercised only

23   by voting."

24          So the argument that even though I can't vote I

25   can still become the requisite lender that Yucaipa makes

1  would make this language where they gave up all voting

2  rights, in particular with respect to insolvency

3  proceedings, superfluous.  And as this Court is well aware

4  you can't construe an agreement to render superfluous any of

5  language in the agreement.

6           However, most relevant, Your Honor, are these

7  Sections 2.7(a) and 2.7(b) that I -- that I read to you that

8  specifically provide that Yucaipa has no voting rights

9  "before, during or after any insolvency proceeding."  You

10  know, the obvious intent of all these voting proceedings or

11  all of these voting prohibitions was to prevent Yucaipa from

12  exerting any influence with the very limited amount of term

13  loan debt it was permitted to acquire under the Third

14  Amendment.

15           Plus, Your Honor, whether because of the exclusion

16  of term loan exposure by the definition in 2.1(e) for -- for

17  any purpose, or whether by the voting prohibition that's

18  contained at 2.7(e), Yucaipa simply can't become the

19  requisite lender.  It -- its debt doesn't count for purposes

20  of calculating the requisite lender.  It wasn't allowed

21  under 2.1(c) to buy any LC debt.  So it can never get to the

22  50 percent of the aggregate of term loan debt, LC debt and

23  revolving debt.  And even if it did, it has given up all

24  rights to vote and all rights to participate in proceedings

25  like this.  Therefore, it can't be the requisite lender.

1          THE COURT:  And what about --

2          MR. WARD:  But, Your Honor, --

3          THE COURT:  -- what about the argument on the flip

4   side that you can't be the requisite lender even if they are

5   not counted because of the infirmity in the transfer of --

6          MR. WARD:  Well, Your Honor, I can --

7          THE COURT:  -- I can't remember the name of the

8   company, but it's about one-and-a-half-million-dollars.

9          MR. WARD:  AMMC, Your Honor.  You know, and let me

10  get to there right now.

11         The fact is, Your Honor, Yucaipa concedes that we

12  have $51,938,610 in first lien debt, but -- but they do

13  argue that we are lacking the $4,548,000 in first lien debt

14  from AMMC.  So two things, Your Honor, and we've said this

15  in our reply papers and we've attached the documents.

16         Once Justice Ramos declared that Yucaipa was not

17  the requisite lender, the petitioning creditors and AMMC and

18  certain other first lien lenders constituting the requisite

19  lenders appointed Black Diamond Commercial Finance and

20  Spectrum Commercial Finance as the co-administrator -- co-

21  administrator agents, and Black Diamond Finance -- Black

22  Diamond Commercial Finance as the collateral agent.  And

23  they registered the trades.

24         But even if Your Honor finds that that's a little

25  too circular, the fact is the petitioning creditors,

1    together with AMMC, would still be the requisite lender

2    because if you add our $51 million in debt to their $4.5

3    million in debt, we do get over the 50 percent hurdle, once

4    Yucaipa's, you know, debt is discounted.

5         And, Your Honor, as we point out -- and this is

6    Exhibit 9 to my reply affidavit.  In the AMMC trade

7    confirmation, AMMC agreed to give petitioning creditors full

8    control of the first lien debt it was selling, including the

9    power to vote and/or to exercise rights or remedies under

10   the first lien credit agreement.  So as a result -- as a

11   result, Black Diamond and Spectrum controlled the AMMC debt.

12   And if you -- if you take the 51 million we have plus the

13   four-and-a-half-million they have, we do get over the 50

14   percent, Your Honor.

15        In fact, if -- if you do the math, it comes out

16   something like this:  With Yucaipa's debt, term loan

17   exposure and -- and LC exposure and all the revolving

18   exposure together, there's a total of $244 million in debt.

19   Of this, Yucaipa purports to hold 134 million of term loan

20   exposure and LC exposure.

21        As we point out, their LC exposure, they're not

22   allowed to have it under 2.1(c) of the Third Amendment.

23   That should fall out.  Their term loan exposure doesn't

24   count for purposes of the calculation of requisite lender.

25   When you take that out, it leaves $109 million worth of

1    debt.  We have together 51.9 million and the AMMC debt which

2    is 4.5 million, and that amounts to more than 50 percent.

3              So we believe, Your Honor, that by virtue of

4    Exhibit 9, which is attached to my reply affidavit, that we

5    do meet the standards.  We do have enough debt.

6              Your Honor, just one other -- a few other very

7    brief points, I believe.

8              Even if the Third Amendment is determined to be

9    ineffective and falls out of the picture entirely, still

10   under the first lien credit agreement Yucaipa can't become

11   the requisite lender.  And that's because the definition of

12   eligible assignee in the first lien credit agreement

13   specifically excludes the sponsor.  The sponsor was Yucaipa.

14   They can't be the assignee of any of the debt.  So Yucaipa

15   couldn't buy that debt.

16             And, Your Honor, let me just walk through this

17   very briefly.

18             The definition of requisite lender -- and I think

19   this is pretty obvious.  The definition of requisite lender

20   is one or more lenders having or holding term loan exposure,

21   LC exposure, and a revolving exposure and representing more

22   than 50 percent of the sum of the aggregate of the term loan

23   exposure, the LC exposure, and the revolving exposure of all

24   the lenders.  But it starts out, the requisite lender is one

25   or more lenders.  The fact is Yucaipa can't become a lender

1  and here's why:

2        Lender is defined at page 30 of Exhibit 8, which

3  is the first lien credit agreement, to be either "An

4  original signatory to the first lien credit agreement" --

5  and it wasn't.  It was specifically excluded as -- as a

6  sponsor.  But it's either "An original signatory to the

7  first lien credit agreement or a person that becomes a party

8  hereto" -- that's to the first lien credit agreement --

9  "pursuant to the assignment agreement."

10       Now the assignment agreement is defined at page 5

11  of Exhibit 8 as "the agreement in the form of Exhibit E to

12  the first lien credit agreement," which at Section 1.2 of

13  this -- of the attachment, Exhibit E, it requires that the

14  assignee, which would be Yucaipa, represents that "it meets

15  all requirements of an eligible assignee under the credit

16  agreement."

17       Well, Yucaipa can never meet any -- can never meet

18  all the requirements of an eligible assignee under the

19  credit agreement because specifically under the first lien

20  credit agreement it's excluded from being an eligible

21  assignee.

22       So considering that in order to be a lender -- in

23  order to be the requisite lender you have to be a lender.

24  In order to be a lender, you have to take your interest

25  pursuant to the assignment agreement.  The assignment

1    agreement requires a specific representation that you'll

2    meet all the requirements of the eligible assignee.  They

3    can't because, specifically, under the definition of

4    eligible assignee in Exhibit 8 of the first lien credit

5    agreement, page 17, they're excluded from being an eligible

6    assignee.

7              And the same is -- would be true even -- even

8    under the Third Amendment, Your Honor, because under Section

9    2.1(c) they are not an eligible assignee for any LC or

10   revolving debt.  The same would be true with respect to term

11   loan exposure because none of that exposure counts.  They

12   have no voting rights.

13             I think, Your Honor, the only other point I think

14   I need to touch on or would like to touch on is the

15   procedural basis for this motion, and I can do that fairly

16   quickly.

17             Your Honor, at the hearing before this Court on

18   June 19th, the Court said, "I will make the determination as

19   to who is the requisite lender" -- I'm sorry -- "I will make

20   a determination as to who the requisite lender is either

21   prior to or at -- or in the context of the sale hearing.  I

22   don't see how else we can go forward.  It may or may not be

23   that I can do that as a matter of law.  I'll have to hear

24   the briefing on that."

25             The second basis, Your Honor, for our motion is

1    that in the fully negotiated amended scheduling order, which

2    is Exhibit 2 to my reply affidavit, the parties -- which was

3    so ordered by this Court, the parties, including Yucaipa,

4    acknowledged that this Court may address the issues of "the

5    enforceability and/or the impact of the Third Amendment on

6    any first lien debt purportedly held by Yucaipa and who, if

7    anyone, is the requisite lender."

8              Also, Your Honor, in the Allied adversary

9    proceeding, and I attach it as Exhibit 4 to my reply

10   affidavit, Allied seeks a determination -- a declaration as

11   to which lenders constitute the requisite lender.  They've

12   now made that determination, as I've pointed out, in their

13   June -- in their June 19th papers.

14             However, Your Honor, the Allied proceeding is

15   still under -- is alive and well, and in that proceeding it

16   -- it is a relevant issue, of course, as to who is the

17   requisite lender because that's specifically what Allied is

18   asking for, a declaration as to who is the requisite lender.

19             In addition, and finally, Your Honor, the

20   requisite lender issue is integral and important to the

21   committee adversary proceeding because we argue -- we and

22   the committee argue, but we specifically also argue that

23   Yucaipa manipulated the debtors as an insider and in its

24   capacity as an alleged requisite lender and improperly acted

25   as a requisite lender.  That's Exhibit 6 to my affidavit at

1  paragraph 142.

2         So a finding as to who is the requisite -- as to

3  whether or not Yucaipa is the requisite lender is material

4  to all these claims.

5         So, Your Honor, there was a basis for this motion.

6  The rules are not as strict as -- as Yucaipa would say.

7         And with respect to, I think, just one other point

8  and that is, Your Honor, the statute of limitations.  We are

9  not looking historically as to what happened three years

10  ago.  The issue is who is the requisite lender is something

11  that needs to be currently determined.  Your Honor made that

12  determination, I believe, yourself in the -- in the first

13  language that I cited from your June 19th hearing.

14         It's -- it's not a static situation.  It changes

15  over time.  What we are seeking right now is who is the

16  requisite lender currently and the requisite lender

17  currently is the lender that owns more than 50 percent of

18  the first lien debt which is entitled to be considered in

19  determining the identity of the requisite lender at any

20  given time.

21         And as we point out, pursuant to the Third

22  Amendment, and even without the Third Amendment, pursuant to

23  the first lien credit agreement, Yucaipa can't hold this

24  debt or certainly can't vote this debt and it doesn't count

25  for purposes of -- of who is the requisite lender.

1          And so, Your Honor, very simply, I would finish by

2     saying that it's clear that either under Justice Ramos's

3     decision by the doctrine of collateral estoppel or this

4     Court's rulings on the -- I think the clear and unambiguous

5     language -- I'm sorry -- by this Court's rulings in

6     connection with the effectiveness of the Third Amendment

7     against Yucaipa, or under the clear and unambiguous language

8     of either the Third Amendment, or if that's not effective,

9     the first lien credit agreement that Yucaipa is not the

10    requisite lender and that the petitioning creditors, Your

11    Honor, are the requisite lender.

12          Thank you very much.

13          THE COURT:  You're welcome.

14          Anyone else before I turn to Yucaipa?

15          All right.  Let's take a short recess and then

16    I'll hear from Yucaipa.

17          MR. WARD:  Thank you very much, Your Honor.

18       (Recess taken at 11:06 a.m.; resumed at 11:24 a.m.)

19          THE CLERK:  All rise.

20          THE COURT:  Please be seated.

21          I'll hear from Yucaipa.

22          MR. SAUER:  Good morning, Your Honor.  Russell

23    Sauer of Latham & Watkins for the Yucaipa funds in this

24    matter.

25          And I've been in your courtroom before, Your

1  Honor.  This is the first time I've actually had the

2  opportunity to address you, so I do appreciate that option.

3          THE COURT:  All right.  Welcome.

4          MR. SAUER:  For the first 45, 50 minutes of Mr.

5  Ward's presentation I thought Yucaipa had filed the motion

6  for summary judgment.  But, of course, it has not.  The

7  petitioning creditors' motion for summary judgment in this

8  case that they be deemed requisite lender should be denied.

9  The petitioning creditors have the burden of demonstrating

10  that there are no disputed issues of fact and that they are

11  entitled to judgment as a matter of law.

12          And to prevail, to carry that burden, the

13  petitioning creditors must show two things:  One, that

14  they're entitled to include in the numerator of the

15  requisite lender calculation the $4.56 million of American

16  Money debt, and that all of the Yucaipa first lien debt, all

17  of it must be excluded from the denominator.

18          Here, the petitioning creditors have not and

19  cannot carry that burden.

20          As I proceed through some of my discussion this

21  morning, Your Honor, some of the discussion will be fairly

22  technical and it will be based on the terms of the first

23  lien credit agreement.  But petitioning creditors have made

24  the point of saying the first lien credit agreement is

25  clear.  It should be interpreted according to its terms.

1    It's unambiguous.

2            So as I go through my technical arguments, it is

3    important to understand the petitioning creditors can't have

4    it both ways.  They can't argue that the credit agreement is

5    clear and should be interpreted according to its terms when

6    it suits them, but then -- and we heard Mr. use -- Mr. Ward

7    use the words "the intent of the parties" several times

8    during his arguments.  What they can't do is then turn

9    around and say, but the Court can interpret the first lien

10   credit agreement according to the intent of the parties when

11   it's less conducive for the petitioning creditors or more

12   practical for them to reach a different result.  It doesn't

13   work that way.

14           Finally, there are some very significant

15   procedural issues, some of which Mr. Ward touched upon, some

16   of which he didn't, which we believe provide significant

17   problems for the hearing and granting of this motion.  I'll

18   defer those to the end.

19           The first and most important issue I think that we

20   should address is whether the petitioning creditors are a

21   requisite lender even assuming that no Yucaipa held debt is

22   counted in the denominator.  The American Money debt cannot

23   be counted.  It cannot be counted in the numerator, at least

24   not at this date, not for summary judgment purposes.

25           Requisite lender status is based on debt holdings.

1    We heard lots of discussion about voting rights and all

2    kinds of other attributes of the debt, and I will come back

3    to that.  But the first lien credit agreement describes

4    requisite lender as one or more lenders having or holding

5    term loan exposure, letter of credit exposure and/or

6    revolving exposure and representing more than 50 percent of

7    the sum of those three components.

8         So the question is do the petitioning creditors --

9    because that's who is the movant in this case, the

10   petitioning creditors, Black Diamond and Spectrum -- do they

11   have or hold more than 50 percent of the outstanding first

12   lien debt.  If we exclude all of the Yucaipa held debt, all

13   of it, the denominator in the requisite lender formula is

14   $109,211,840, so 1.92 million.  Thus, the petitioning

15   creditors need to hold 54.6 million of first lien debt to be

16   requisite lenders, but they do not.  What they do hold is

17   $51.9 million of Yucaipa first lien debt, which is less than

18   the 50 percent required.

19        Let's talk about the AMMC, the American Money,

20   $4.56 million and why it cannot be counted.  It cannot be

21   counted because under the terms of the first lien credit

22   agreement the petitioning creditors do not hold that debt.

23   Under the first lien credit agreement, Section 10.6(d) at

24   page 164, before an assignment of first lien debt is

25   effective, the following steps are required:

1      First, there needs to be an execution and delivery

2  of an assignment agreement to the administrative agent;

3      Then the administrative agent must record the

4  assignment in the register.

5      Indeed, recordation in the register or lack

6  thereof is "conclusive" on each lender.  And that's Section

7  2.7 of the first lien credit agreement.

8      So who can record the assignment into the

9  register?  Well, only the administrative agent can enter the

10  transfer in the register.  That's also in the first lien

11  credit agreement at Section 2.7(b).  And assignments only

12  become effective on the effective date and the assignment

13  effective date is the date on which the transfer is recorded

14  in the register.

15      So since this is a summary judgment motion, let's

16  talk about the facts that are actually undisputed, not

17  desired, but those that are undisputed.

18      It is undisputed that CIT was the original

19  administrative agent under the first lien credit agreement.

20  It is also undisputed that CIT resigned as administrative

21  agent effective May 19th, 2012.  That is before the

22  purported assignment of the American Money debt to the

23  petitioning creditors.  Only either the administrative agent

24  or requisite lenders may appoint a replacement

25  administrative agent.  Petitioning creditors don't dispute

1     that.

2             The petitioning creditors also don't dispute --

3     it's in Mr. Walker's declaration and there's been no --

4     nothing to dispute it -- that no replacement agent was

5     appointed by CIT when it resigned and no replacement agent

6     was appointed in May of 2012 by the requisite lenders.  And,

7     in fact, the petitioning creditors, in Exhibit 9, in a

8     letter from their counsel specifically warn CIT not to

9     appoint a replacement agent, particularly one suggested by

10    Yucaipa because of this dispute over the requisite lender

11    status.

12            So absent a successor administrative agent, only

13    the requisite lender can then serve as the administrative

14    agent, as a de facto agent.

15            But the issue of requisite lender hasn't been

16    determined.  That's what this motion is about.  That's what

17    the August 22nd hearing is about.  And without a requisite

18    lender and no administrative agent to record the assignment,

19    then the petitioning creditors cannot hold and do not hold

20    this additional debt.

21            So what do the petitioning creditors do?  They

22    recognize this is a fatal problem.  So with their motion,

23    first, the petitioning creditors produced redacted documents

24    purporting to support the amount of Allied first lien debt

25    that they hold.  But not even Mr. Ward stood before this

1    Court and -- and disagreed with the fact that Yucaipa

2    requested all of those documents in the court of discovery.

3              And what did the petitioning creditors do?  They

4    refused to produce them.  That's in my affidavit, Exhibit 78

5    and 79 are the petitioning creditors' responses to the

6    document product requests.  The -- not Request 37, not

7    Request 142.  Request number 1 was all documents

8    demonstrating and/or supporting their claim to the amount of

9    Allied first lien debt that you hold, and each of the

10   petitioning creditors responded and refused to produce any

11   of that material claiming it was not relevant and no likely

12   to lead to the discovery of admissible evidence.  So we

13   didn't get it.

14             When is the first time we see this?  We see this

15   with their motion.  But, of course, as the Court knows,

16   parties are not allowed to rely on evidence in support of a

17   motion for summary judgment which they specifically refuse

18   to produce during the course of discovery.  That is black

19   letter law.

20             Then to compound the problem, the petitioning

21   creditors produce even more evidence with their reply

22   because what we got with their motion was a bunch of

23   redacted stuff.  It doesn't say who they get the debt from,

24   when they got the debt from, where they got it from.

25             So with their reply, they produced the LSTA trade

1  confirmations to support the purchase of the AMMC debt, a

2  purported appointment agreement and some joinders.  But,

3  again, they refused to produce that in discovery.

4          Two, none of this evidence, none of it that was

5  produced with the reply is properly authenticated and, thus,

6  it cannot be considered as a matter of law in support of

7  their motion for summary judgment because it has no

8  evidentiary value.  It is well established in this circuit

9  and every circuit around the country that only admissible

10  evidence may be relied on to support a summary judgment

11  motion.

12          And for the record, Your Honor, I would point the

13  Court to Rule 901 of the Federal Rules of Evidence, the

14  Philbin versus TransUnion Corp case, 101 F.3d 957 (3rd

15  Circuit).  I would point to a United States Supreme Court

16  case in Atticus versus S&H Crest Company, at 398 U.S. 144.

17  And I could go on.  But the Court is familiar with that

18  principle.  None of these new documents that were refused in

19  discovery were produced.  None of these new documents

20  produced in connection with the reply have been properly

21  authenticated and, therefore, they are not properly before

22  the Court and cannot be considered.

23          And more -- just as important is this new evidence

24  should also be rejected because, again, it's black letter

25  law in the Third Circuit and everywhere else in the country

1    that you can't submit new evidence at the reply stage.

2            And for that proposition, I would point the Court

3    to several Third Circuit cases.  One is Guffy (ph) versus AW

4    Chesterton Co., 2012 U.S. District Lexus 150860.  It's the

5    Eastern District of Pennsylvania case in 2012.  I would

6    point the Court to the decision of Judge Stark here in

7    Delaware in Lab -- Laboratory Skin Care, Inc. v Limited

8    Brands, 757 S. Supp. 2d 431, a 2010 case where Judge Stark

9    specifically struck the new evidence that was submitted by

10   the moving party in support of a summary judgment and,

11   therefore, denied summary judgment.

12           But even if the Court is prepared to consider this

13   new evidence, which it shouldn't, it doesn't help the

14   petitioning creditors because it still doesn't justify

15   including that American Money debt in the calculation of the

16   petitioning creditors' holdings.

17           See, petitioning creditors -- and we're going to

18   get to this in a bit -- they recognize the importance of the

19   definitional term "holdings" as opposed to controlling or

20   having support from.  They recognize the importance of that.

21   So what do they do?  They knew they needed to get this

22   American Money debt "recorded in the register."  So to

23   correct the flaw, the petitioning creditors and purportedly

24   American Money entered into an appointment agreement to

25   purportedly appoint affiliates of the two petitioning

1    creditors to serve as a successor administrative agent, and

2    then they purported to record the American Money debt in the

3    register.

4            But they put the cart before the horse because the

5    appointment of themselves as administrative agents could

6    only be effective if, in fact, they are requisite lenders.

7    But at the time they did it they were not.  It cannot be

8    disputed that they were not requisite lenders.   Per Mr.

9    Ward's own affidavit with this new evidence, in Exhibit 10,

10   the appointment agreement was purportedly entered into on

11   December 3, 2012.  But they were not requisite lenders at

12   that time unless both of the following are true:

13           First, the Fourth Amendment was invalidated at

14   that time; and none of the Yucaipa debt holdings were

15   included in the denominator.  Again, I'm going to get to the

16   denominator in a bit because I don't think we even need to

17   get there.

18           But, you see, on December --

19           THE COURT:  Why does the Fourth Amendment have to

20   be invalid at that time?

21           MR. SAUER:  Because if the Fourth Amendment is not

22   invalidated, if the Fourth Amendment remained in effect,

23   then Yucaipa was the requisite lender.  And so the

24   petitioning creditors and American Money couldn't have been

25   requisite lenders.

1          THE COURT:  The Fourth Amendment was never -- the

2    Fourth Amendment was never applicable, was never valid.

3          MR. SAUER:  Your Honor, the Fourth -- the Fourth

4    Amendment was valid until it was deemed invalid.

5          THE COURT:  But how can that be because the whole

6    point that Justice Ramos makes in finding it invalid is that

7    it was a violation of the Third -- Third Amendment as well

8    as the other -- the other issues that arise from the initial

9    -- there's a difference between when the judge says

10   something and when it actually happens.

11         And, for example, with your point about they are

12   not the requisite lender until, I guess, I say they are,

13   that's not the same -- that's not really necessarily true.

14   If I say there's a requisite lender, that really means they

15   always were.  And if I say the Fourth Amendment is invalid,

16   it really means it never was valid.

17         So I -- I don't -- I don't understand your point

18   that -- about why it basically existed or was valid until it

19   was invalid.

20         MR. SAUER:  Well, Your Honor, I guess I would

21   respectfully disagree.  If you have a contractual provision

22   that is enforced, it's enforced until the Court says it can

23   no longer be enforced.  I understand the Court's point.  I

24   think I just respectfully disagree.

25         THE COURT:  Okay.

1          MR. SAUER:  And just to sort of continue this --

2     this line, but it -- not -- not that it necessarily matters

3     because at the end of the day we can't include the American

4     Money debt --

5          THE COURT:  Right.

6          MR. SAUER:  -- in this calculation because new

7     evidence, not permitted, evidence refused to produce in

8     discovery, not permitted.

9          In any event, to finish the line out, Justice

10    Ramos's decision was not entered and final until March of

11    2013, March 29th of 2013, four months after this purported

12    appointment agreement and his oral inclinations indicated on

13    November of 2012, a matter of New York law, which is the law

14    that matters when you are determining the preclusive effect,

15    only a final decision has any collateral estoppel or

16    preclusive effect.  And we've cited those cases to the Court

17    before.

18          The -- for example, Eggbert (ph) Square Realty

19    versus 112 114 Corp at 93 A.D. 3d at 687, a New York

20    Appellate Division case in 2012 reversing the grant of a

21    motion to dismiss counterclaims because the issue preclusion

22    had been based on a decision on which no formal enter had

23    yet been entered.  And several other cases, Church versus

24    New York State Freeway Authority, 16 Atlantic A.D. 3d at

25    808, another 2005 New York Appellate Division case, and a

1    series of others.

2             And, again, since Justice Ramos didn't issue his

3    decision until March 29th, nearly four months after, that

4    appointment agreement was invalid.

5             But, again, I still come back to the fundamental

6    proposition.  We are here arguing the motion for summary

7    judgment wholly founded on documents that the petitioning

8    creditors refused to produce in the course of discovery, and

9    then compounded the problem by producing yet more

10   unauthenticated inadmissible evidence in support of their

11   reply.

12            Now petitioning creditors come here also and say,

13   well, why don't you consider petitioning creditors and

14   American Money to be the movants here.  You can't do that.

15   American Money is not a movant.  This is the petitioning

16   creditors' motion.  American Money isn't even before the

17   Court.  While they were named in the Allied adversary, they

18   haven't even filed an appearance yet.  They're not a proper

19   party to this motion and I don't believe petitioning

20   creditors are permitted, substantively or procedurally, to

21   now add them in an effort to get over some problem that the

22   petitioning creditors created for themselves.

23            So at the end of the day --

24            THE COURT:  Well, they don't necessarily have to

25   be a movant to be considered a requisite lender.  The movant

1   can argue that -- purportedly it could argue that creditor

2   -- Movant A could argue that creditors A, B and C together

3   constitute the requisite lenders.  It doesn't need to be

4   necessarily that Creditor A, B and C move that -- to -- to

5   appoint -- or that A, B and C were requisite lenders.

6           However, I take your point that we don't know

7   about B or C unless --

8           MR. SAUER:  But more -- fair enough.

9           THE COURT:  -- unless you look at the -- what you

10  call the new evidence.

11          MR. SAUER:  Well, and more importantly, the motion

12  isn't that petitioning creditors, along with American Money,

13  are requisite lender.  It's very specifically styled that

14  they are.

15          THE COURT:  Uh-huh.

16          MR. SAUER:  But, again, however one looks at it,

17  it's all based on denied evidence --

18          THE COURT:  Uh-huh.

19          MR. SAUER:  -- and newly produced evidence which

20  is simply improper.

21          Next -- in any event, let's get to the

22  denominator.  You don't exclude all of the Yucaipa held debt

23  from the denominator.  So even if one were to include the

24  4.56 million in American Money debt in the denominator, even

25  if you include it, the petitioning creditors and with the

1    American Money debt are not requisite lender.  Again,

2    petitioning creditors argue that the first lien credit

3    agreement is unambiguous and that unambiguous contractual

4    provisions should be determined as a matter of law by the

5    Court.

6            Again, the first lien credit is crystal clear.

7    Requisite lenders are based on a determination of holdings,

8    not voting rights, not other attributes of the debt.  I will

9    come to that.  I -- it sounds a little counter-intuitive,

10   but not under the terms of these -- of these credit

11   agreements.  It would have been very easy, very easy for

12   these lenders, whether at the outset, in conjunction with

13   the Third Amendment or any other time to make it very clear

14   that requisite lender determinations are based on something

15   other than holdings, or to have specifically said anything

16   they could have said to make it clear, not a practical

17   result, but to make it clear that a restricted sponsor

18   affiliate could not be requisite lender.  They did no such

19   thing.

20           So what does Yucaipa currently hold?  Well, let's

21   -- let's put aside the settlement which, obviously, hasn't

22   been approved yet.  So today Yucaipa currently holds $114

23   million in term loans and $20 million in letter of credit

24   exposure.  For my argument, I'm only going to focus on

25   letter of credit exposure because the balance of the term

1    loans also follows suit.  But let's -- let's focus on the

2    $20 million of letter of credit exposure.

3            Adding $20 million that denominator increases it

4    to $129 million and, thus, not even the 56.4 million that

5    petitioning creditors claim to hold is more than 50 percent.

6    Yes, the petitioning creditors argue that the Third

7    Amendment precluded Yucaipa from acquiring the letter of

8    credit exposure; that it acquired it under the invalid

9    Fourth Amendment.  But, first, I would point out there's a

10   disputed issue of fact even on the application of the Third

11   Amendment in this regard.  And petitioning creditors do not

12   dispute any of these undisputed facts.  Why?  Because they

13   are based on their client's own documents.

14           Exhibits 11, 25, 36 and 37 to my declaration,

15   these are e-mails and handwritten notes of the petition

16   creditors.  And not even the petitioning creditors believe

17   that the time that the third amendment was an impediment to

18   Yucaipa, who was not a party to the agreement.

19           I know we've heard over and over again, the mantra

20   is that Yucaipa negotiated the third amendment, they're

21   bound by the terms of what they negotiated.  But that simply

22   isn't the truth, and it's never been the truth.  Mr.

23   Walker's declaration at paragraph 9 submitted in conjunction

24   with this opposition, which petitioning creditors haven't

25   disputed, makes clear that yes, Yucaipa did participate

1  early on in those discussions over a third amendment.  But

2  there came a time when the demands of the lenders became so

3  onerous that they just walked away, and moved on to a third

4  amendment to the second lien agreement.

5          And I only raise that because we've heard

6  repeatedly about Yucaipa is bound by the terms they

7  negotiated.  At the end of the day, these were lender

8  imposed terms that Yucaipa never agreed to.

9          Putting that aside --

10          THE COURT:  Are you talking about the first lien

11  debt?

12          MR. SAUER:  Yes, Your Honor.

13          THE COURT:  That came out of the bankruptcy?  That

14  came out of the bankruptcy?

15          MR. SAUER:  No, no.  Yucaipa -- we're talking

16  about the first lien debt that Yucaipa currently holds.  The

17  -- we're talking about the third amendment to the first lien

18  credit agreement.

19          THE COURT:  Right.

20          MR. SAUER:  And what we heard Mr. Ward say, we've

21  heard repeatedly said in this court that it was Yucaipa who

22  negotiated the terms of that third amendment.  All I'm

23  telling you is, that for the purpose of summary judgment,

24  there's a very significant factual dispute as to that.

25          So if someone is inclined to say, well, I might

1  not otherwise hold a non-party to that amendment to its

2  specific terms, I will hold Yucaipa to those terms, because

3  Yucaipa was a moving force, and negotiated the terms, and

4  I'm telling you they didn't.  And at a minimum, there's a

5  disputed issue of fact as set forth in Mr. Walker's

6  declaration at paragraph 9.  That's exactly what happened.

7         They started the negotiations, the lenders began

8  to impose more and more onerous restrictive terms, in terms

9  of the amount of debt they could buy, the -- whether it had

10  to be contributed, or could be contributed as opposed to

11  mandatory -- the restrictions on the voting rights.  At some

12  point early on in those negotiations, Yucaipa said, you

13  know, finish -- you guys can do what you want --

14         THE COURT:  And then starting negotiating with

15  ComBest.

16         MR. SAUER:  No, no, no.  That -- Your Honor, that

17  doesn't come for a year later.  That's a year and a half

18  later.

19         THE COURT:  When does the third amendment get --

20         MR. SAUER:  Let me walk through the timeline.

21  Allied exits from bankruptcy in May, early June of 2007.

22  The third amendment comes into play in mid-April of 2008.

23  In February of 2009, ComBest acquires the 54.7 percent of

24  the Allied debt.  On August 21 of 2009, a full year and a

25  half after the third amendment, Yucaipa acquires the

1    position from ComBest.  And that's when the fourth amendment

2    is passed in August of '09.

3              THE COURT:  So the third amendment was passed?

4              MR. SAUER:  April of '08.  A year and a half

5    before Yucaipa acquired the debt.

6              THE COURT:  Okay.  Yucaipa stopped talking in

7    connection with that amendment or --

8              MR. SAUER:  The negotiations, as Mr. Walker

9    indicates in his declaration, lenders approached Yucaipa

10   about the possibility of their acquiring some of their debt.

11   Negotiations over the third amendment commenced really in

12   late March of 2008, and Yucaipa walked away from those

13   negotiations effectively in the end of the first week of

14   April or so.

15             THE COURT:  Uh-huh.

16             MR. SAUER:  And then the terms of the third

17   amendment to the first lien credit agreement were then

18   pursued by the lenders and Allied, and on terms that were

19   restrictive for Yucaipa's appetite, so they no longer

20   participated in the discussions.

21             But what Yucaipa did do, was continue to negotiate

22   for a third lien -- third amendment to the second lien

23   credit agreement, which then allowed them to buy second lien

24   debt without restriction.

25             THE COURT:  All right.

1          MR. SAUER:  Which they did, and then contributed

2     most of what their -- or half of what they acquired back to

3     the capital of the company.

4          THE COURT:  Okay.

5          MR. SAUER:  So back to the denominator.  Why do we

6     include at a minimum a letter of credit exposure.  Let me --

7     I'm sorry, let me go back to the third amendment and the

8     petitioning creditors.

9          Their own views at the time, and as we know in

10    interpreting contracts, it's often times the views expressed

11    by the parties at the time, which are the best evidence of

12    their understanding and intent, not what they say later on.

13         Well, we know in December of 2008 that Spectrum

14    Principles wrote to each other in December of '08.  We have

15    gone three or four ideas on how to block or stop the trade

16    to Yucaipa, when the third amendment was in effect, had a

17    block or stop the trade from being 51 percent.  None seemed

18    viable when we talked them through.

19         We also know that Spectrum, one of the petitioning

20    creditors was among a group of creditors who in December of

21    2008 had negotiated to sell their debt to Yucaipa.  It's

22    Spectrum.  One of the petitioning creditors was part of the

23    group.  We've submitted the evidence, it's undisputed.

24         Then in February of 2009, after Black Diamond had

25    determined that they had been excluded from those lenders,

1    then negotiating with ComBest to sell their debt, who did

2    Black Diamond turn to?  They turned to Yucaipa, and asked to

3    partner with Yucaipa to buy the debt in a joint bid.

4              So my only point here --

5              THE COURT:  And what is it that you would deem

6    ambiguous in the documents that would make all of that

7    relevant?

8              MR. SAUER:  Well, I think it goes to the intent of

9    the parties --

10             THE COURT:  All right.

11             MR. SAUER:  -- which is ultimately the touchdown.

12   Because we're --

13             THE COURT:  But the intent of the parties is, in

14   the first instance, if possible, gleam from the four corners

15   of the document.

16             MR. SAUER:  That is always the first step, Your

17   Honor.

18             THE COURT:  Right.

19             MR. SAUER:  But here, when the clear understanding

20   of the parties, particularly the parties moving expressed at

21   the time a very different view, I'm not so sure that

22   language which purports to be clear on its face is this

23   clear.  But let's get past that, because I don't want to get

24   bogged down in more of the minutia, because at the end of

25   the day, let's stick with the very expressed terms of the

1    third amendment.

2         Let's talk about just the 20 million in letter of

3    credit exposure.  And now we get into the applicability of

4    New York law on this issue.  Well, we heard lots of

5    discussion from Mr. Ward about well, this case is

6    distinguished because it didn't involve a credit agreement.

7    Oh, and this case is distinguishable because it didn't have

8    Allied in the name, or some such thing, if these were

9    personal services contracts.

10        At the end of the day, at the end of the day, New

11   York law is crystal clear, and petitioning creditors have

12   cited not a single case to the contrary.  I will come to the

13   one case they did cite, because they misrepresented to the

14   Court exactly what that Court said.

15        Under New York law, first, the courts look to

16   determine whether or not an assignment is prohibited.  If

17   you don't get past the first prong, you never have to worry

18   about the next, because if the assignment of the contractual

19   right or obligation is not prohibited, there's nothing to

20   debate about.

21        But if, if the language of the contract is clear

22   that a particular form of assignment, type of assignment, or

23   an assignment to a particular person is prohibited, when the

24   Court looks to determine, okay, it's a prohibited

25   assignment, but does that make the assignment invalid or

1     void, and for that, the courts look for very specific

2     language in the contract, whether it says, any prohibited

3     assignment is void, or it is invalid.

4          I'm not making this up.  We've cited eight, nine,

5     ten New York cases, federal cases, state cases, bankruptcy

6     court cases, all of which cite that very same proposition.

7     The petitioning creditors purport to claim that Praven (ph)

8     is the central case.  No Praven is just one of the cases

9     that relies on the fundamental decisions of New York state

10    courts for this proposition.

11         They purport to distinguish Praven on the grounds

12    that -- or sorry, they purport to distinguish Praven on the

13    grounds that the particular contract wasn't fully

14    exclusionary.  It said, you can only assign to financial

15    institutions, and there the assignee in that case was a non-

16    financial institution.

17         So what the Court said in Praven, when one reads

18    it thoroughly, is that gee, the complaining parties to the

19    contract couldn't get over the first hurdle.  The first

20    hurdle being that the assignment was prohibited in the first

21    instance.  But the Praven court did very clearly endorse and

22    cite the New York case law I've identified, that there are

23    two prongs.

24         First, is the assignment prohibited, and if it's

25    clearly prohibited to, is it invalid or void under the

1    specific terms.

2           THE COURT:  Right.  Now, you wouldn't argue with

3    me that the assignment was prohibited?

4           MR. SAUER:  I am not sitting here arguing with you

5    today, Your Honor, that Yucaipa was an eligible assignee.

6    There's no question that under the original first lien

7    credit agreement, or even as it relates to term loan

8    exposure and -- not term loan, but the LC exposure, that

9    they were a not eligible assignee.  So they clearly can

10   overcome the first hurdle.  But they cannot overcome the

11   second hurdle, and they must overcome both.

12           They haven't cited a single case, not a single

13   case, which contravenes New York law, which is applicable to

14   the interpretation of this credit agreement by its own

15   terms.  They just haven't.  The only case they do cite, and

16   you know, we do have the 785 Partners' case which is a

17   federal bankruptcy case from the Southern District of New

18   York, which is quite frankly very close here.  Because first

19   we heard from petitioning creditors, but none of the cases

20   they cite really contain complicated credit agreements.

21   Well, 785 Partners does.

22           And there, what the bankruptcy court determined

23   was I don't have to decide whether the particular assignee

24   in that case was an ineligible assignee because I don't have

25   to worry about the first hurdle, because they couldn't clear

1    the second piece, because there's nothing in that credit

2    agreement which says the prohibited assignment is void.

3    Those are the words, or words to that effect.  It wasn't

4    there, it's not in this credit agreement, it's not in the

5    third amendment, New York law applies.

6           The only case they do cite is the Baucus (ph)

7    case, Single Asset Financial Co. versus Baucus at 294 AD2d

8    818.  But that case doesn't change New York law, it doesn't

9    reverse New York law, it actually cites the law I've been

10   citing to the Court.

11          The full quote that petitioning creditors didn't

12   put in their brief, or again read today is, where they

13   clearly stated intent to render Baucus powerless to assign,

14   their words, no need for the non-assignment clause to also

15   contain talismanic language or magic words describing the

16   effect of any attempt to make such an assignment.

17          They left out where they clearly stated intent to

18   render Baucus powerless to assign.  They left that out.

19   Why?  Because in that particular agreement, the purported

20   assignor didn't have any power to assign, it was very clear

21   from the contract.  Here, all the first lien credit

22   agreement says is, restricted sponsor affiliate isn't an

23   assignee.  The lenders shouldn't sell to a restricted

24   sponsor affiliate.  But that's no different than the other

25   8, 10 or 12 cases we've cited where the contract

1    specifically provided you can't assign without consent, you

2    can't assign to this party, you can't assign to anybody.

3           That language is no different than those other

4    cases, and in every one of those cases, the New York courts

5    have said, absent the voiding language, the assignment is

6    valid and effective, and the assignee takes the rights that

7    go with the contractual obligations assumed.

8           What it leaves them with is a breach of contract

9    claim against the assignor who violated the terms of the

10   agreement, but we're not here to decide that.

11          So at the end of the day, at a minimum --

12          THE COURT:  So explain to me perhaps again okay,

13   the -- Yucaipa is not a party to the amendment.  Yucaipa was

14   not an eligible assignee, but nonetheless was the recipient

15   of the assignment, but having done that, why is it -- if you

16   could just restate it for me, why is it that in that

17   instance, the provisions of the third amendment that would

18   limit Yucaipa from being considered in the numerator or the

19   denominator in figuring out who the requisite lender is.

20   Does that make any sense?  You can't answer a question

21   that doesn't make any sense.

22          MR. SAUER:  Well, Your Honor, let me try to

23   interpret your question.  If I interpret it wrong, I

24   apologize.

25          THE COURT:  My point is, okay fine, everything you

1    said is right, right, they weren't a party, they were not an

2    eligible assignee, they took it anyway, but that's sort of

3    the end of the day, and we don't apply all of the other

4    provisions that arguably they apply, that would make

5    Yucaipa, you know, not in the ballgame.

6            MR. SAUER:  I understand that, and fully prepared

7    to address that question, which I believed I understood the

8    first time.

9            THE COURT:  Okay.

10           MR. SAUER:  Here's the fundamental confusion

11   that's been created by petitioning creditors.  And we heard

12   it again repeatedly today when petitioning creditors tried

13   to define what the third amendment does.

14           Again, if we go back to the first lien credit

15   agreement to the term requisite lender, which has not been

16   modified, it is lenders having or holding.  Having or

17   holding, it has nothing to do with any other attributes of

18   the debt.

19           So what the petitioning creditors then say, but

20   even if they could hold it, it can't be counted towards

21   requisite lender status, because that's what the third

22   amendment says, and they cite the third amendment 2.1(e)

23   which redefines the term, term loan exposure.  And then they

24   go on to paraphrase it and say, that it says, term loan

25   exposure that has been acquired by a restricted sponsor

1  affiliate, Yucaipa, can't be counted for requisite lender

2  status.  That's what they say.

3         That is, however, not, not what that definition

4  reads.  The definition says, "With respect to any provisions

5  of this agreement relating to the voting rights of lenders,"

6  has nothing to do with holdings, nothing to do with

7  requisite lender calculation, paren, "including the right of

8  lenders to consent or take any other action with respect to

9  any amendment, modification, termination, or waiver of any

10  of this provisions, or the provisions of this agreement, or

11  the other credit documents, or consent to any departure."

12         So what it says is, that any term loans acquired

13  by Yucaipa couldn't be counted for voting purposes, to the

14  extent they purported to try to amend the credit documents,

15  that's what it says.  It doesn't say anything, anything at

16  all about how Yucaipa held restricted sponsor affiliate debt

17  to be more precise, how that debt, or whether that debt was

18  to be counted in the definition of requisite lender status,

19  and in fact, again, it's very easy if that really was what

20  they were getting at, and these were all sophisticated

21  parties.  All they had to do is say, any restricted sponsor

22  affiliate, term loan exposure acquired cannot be counted or

23  included for any purpose under the first lien credit

24  agreement or words to that effect.  They didn't.  They were

25  very specific, very specific.  That the exclusion of Yucaipa

1   held debt, term loans, particularly because that's all we're

2   talking about under that provision, are excluded from the

3   voting provisions, not from the holding provisions.

4          And if it's not excluded from the holdings, even

5   the term loans have to be included in the denominator, but I

6   wasn't even going there because the third amendment only

7   speaks to term loan exposure.  It doesn't speak to letter of

8   credit exposure, and that's where we rely in the first

9   instance on the applicable provisions of New York law, which

10   says, even if they weren't supposed to get it, if they got

11   it, they get all the attributes that normally goes with it.

12          And so they get to hold it, they would even get to

13   vote, the letter of credit exposure.  But again, we're not

14   there, we're just talking about the requisite lender

15   definition, and if that 20 million is included in the

16   denominator, even giving petitioning creditors credit for

17   the American money piece, 56 point whatever million divided

18   by 129 doesn't equal 50 percent.

19          Now, that could lead what some might argue is a

20   potentially problematic result, and that is, well, gee, then

21   maybe there's no requisite lender.  But there's no

22   requirement that there be a requisite lender under the

23   credit agreement.  There's no requirement that requisite

24   lenders, holding 50 percent or more of the debt agree on

25   entry.

1          In fact, one of the biggest problems Allied had

2     after emerging from bankruptcy was this functional lender

3     group.  They couldn't get requisite lenders to agree that

4     today was Tuesday.  They just couldn't.

5          So there is no requirement that you have a

6     requisite lender.  I mean, it's no different than if there

7     are only three lenders, two of whom held 49 percent, 1 of

8     them who held 2 percent, and neither one of them could ever

9     get to the 2 percent on their side.  That's just a function

10    or a fact of the credit agreement.

11         So how does that get resolved?  Well, it gets

12    resolved as follows.  If Yucaipa actually gets to hold the

13    debt, all of the debt, even if it can't vote the debt, that

14    doesn't necessarily mean Yucaipa is the requisite lender

15    because of its holdings, and Yucaipa doesn't need to vote or

16    to do anything, because under the terms of this credit

17    agreement, which petitioning creditors say is clear and

18    unambiguous, again, it's going to sound counter intuitive, I

19    struggled with it.  But when you go to the credit agreement,

20    provision-by-provision, this is the conclusion you get to

21    based on the unambiguous terms.

22         The lenders have to vote irrevocably authorize the

23    administrative agent to exercise certain powers delegated to

24    it, including the power to exercise remedies, such as a

25    credit bid.  If no successor agent is appointed, then the

1    requisite lender acts as the de facto administrative agent.

2              But the requisite lender doesn't need to vote to

3    do anything.  Requisite lenders if there were others, they

4    can direct the agent not to do certain things, but the

5    administrative agent, or in this case, a requisite lender

6    standing in the shoes of the administrative agent doesn't

7    need to vote, doesn't need to consent, he has already been

8    delegated the action under the terms of the credit

9    agreement.  That's -- when you read Section 9.29.7 and

10   9.8(b) together, that's exactly where you come out.

11             So Yucaipa actually could be requisite lender, and

12   could for example, credit bid or exercise remedies if it

13   chose to do so.  Not as a lender, but as the administrative

14   agent.  I didn't write the credit agreement, but that's how

15   it reads, and that's what it says.  And that's just --

16   that's the consequence of this unambiguous credit agreement

17   that we're here to argue about.

18             But again, I'm not here asking this Court to

19   determine that Yucaipa is a requisite lender.  We're

20   actually here today to talk about the petitioning creditors,

21   and they are not, for the reasons we've discussed.

22             But let's turn briefly to Justice Ramos' decision

23   because Mr. Ward spent a lot of time on it.  We do not

24   believe, and we said so in our opposition that Justice

25   Ramos' decision should be given collateral estoppel effect

1    because Yucaipa was denied discovery, the opportunity to

2    conduct any discovery in that case.  That's undisputed.

3    Nobody says we had the opportunity to conduct discovery.

4    There's been no dispute about that.

5              And we've cited a number of cases at page 32 of

6    our opposition, where the courts have specifically held that

7    collateral estoppel should not be applied under these very

8    circumstances, where the party who is the target of this

9    preclusive order was denied the opportunity to undertake

10   discovery.  And the petitioning creditors have undertaken no

11   effort whatsoever to distinguish any of the cases.  But they

12   do cite in a footnote, the Cronish (ph) case that Mr. Ward

13   referred to.

14             And I would ask the Court when you have a moment

15   or your clerks, if they haven't, read the Cronish case.  See

16   if it says what the petitioning creditors claim it says in

17   their reply.

18             What the Cronish case says, it's unpublished, but

19   what it does say, it doesn't say that a party who -- against

20   who summary judgment is granted has been deemed to have been

21   given a full opportunity to litigate, even though they were

22   denied discovery.  All it says is, if you lose on summary

23   judgment, that still constitutes an opportunity to litigate,

24   it doesn't address --

25             THE COURT:  Whether or not I give it preclusive

1    effect in connection with this summary judgment motion,

2    assuming there are no material disputed facts, et cetera,

3    that would stand in its way, I could make the very same

4    holdings that Black Diamond is arguing, have already

5    remained and can't be undone.

6           MR. SAUER:  You could, but let me tell you why you

7    wouldn't, because on certain disputed issues of fact, and

8    these are just among the kinds of things that would have

9    been discovered in the New York case, had Yucaipa been given

10    an opportunity to conduct discovery, which they were not.

11           So let me now convince you that there are disputed

12    issues of fact on this very issue.  One, we know, as a

13    matter of undisputed fact, it's in my declaration and a

14    whole series of exhibits, a majority of the first lien

15    lenders including Spectrum were prepared to sell their debt

16    to Yucaipa in December of 2008, and to sign a fourth

17    amendment removing all the restrictions of the third

18    amendment.  They were prepared to do that.

19           The only reason why they didn't do it was because

20    one of the provisions of that new fourth amendment also

21    would've reduced or relaxed their financial covenants, which

22    were hamstringing Allied, and those lenders at the last

23    minute after agreeing on price and other terms, said, gee,

24    we'd like Yucaipa to indemnify us because of the covenant

25    restrictions.  Not because of the elimination of the

1   restrictions of the third debt.  You don't have to believe

2   me and take that as a given at this point, but we've put

3   evidence in front of the Court, the kind of evidence that

4   would've been discovered in New York, but which Yucaipa

5   wasn't allowed to gather or produce.

6           There is a letter from CIT sent to all of the

7   lenders in February of 2009, after -- what had happened was

8   just chronologically in December of 2008, a bunch of lenders

9   come to Yucaipa and asked them to buy their debt.  Because

10  what had happened was, there had been negotiations to amend

11  the credit agreement after Allied went into a covenant

12  default in August of 2008.

13          When no amendment could be reached, lenders come

14  to Yucaipa and say, please get us out of this because the

15  auto industry continues to spiral down, we read every day

16  that Chrysler and GM are on the verge of filing for

17  bankruptcy, and we don't see this credit as a particularly

18  good one, take us out.  This is the ineligible assignee

19  they're talking to.

20          So they go through all this process, at the last

21  minute literally on December 26th, 2008, some of the

22  participating lenders in this group say we need an

23  indemnity.  Well, Yucaipa balks at the indemnity.  Then not

24  having heard from this group, Yucaipa launches a tender

25  offer.  At the same time that now ComBest is out there

1    trying to buy this debt unbeknownst to Yucaipa.

2              So they launch a tender offer, which includes a

3    fourth amendment.  CIT, and that's attached to my

4    declaration, sends a letter to Allied/Yucaipa and the other

5    lenders saying, we don't believe this fourth amendment that

6    you're proposing could be valid as it relates to changes to

7    the administrative agent powers and duties without our

8    consent, but as to the rest, they recognized it only needed

9    requisite lender consent.  I didn't write that.  CIT did,

10   the administrative agent, and the sole holder of the

11   revolving debt.

12             In August of 2009, after Yucaipa acquires the

13   ComBest position, CIT in their own internal memo, they

14   discuss this very same concept and recognize that while some

15   of the provisions of the fourth amendment might be invalid

16   as they affected the role of administrative agent, the

17   balance of the fourth amendment was probably effective and

18   nothing we can do about it because all they needed was

19   requisite lender consent.  These are the lenders who are

20   writing these things.

21             We know, for example, that after -- there's a

22   tremendous volume of information in the Black Diamond

23   documents in particular, where after Yucaipa acquires the

24   ComBest position, where Black Diamond and Yucaipa are

25   working together, and presumptively assumes Yucaipa's

1    requisite lender position.  After the Georgia action was

2    settled in December of 2011, Yucaipa then acting as

3    requisite lender, asks to have released a large amount -- 30

4    or so million dollars or $25 million or so of letter of

5    credit exposure, which they only could have done if they

6    were requisite lender.  That money was disbursed to all the

7    creditors holding letter of credit exposure, including the

8    petitioning creditors.  They were very happy to take that

9    money verifying Yucaipa's requisite lender status, and then,

10   and I know at one point the Court said they didn't think

11   this was particularly relevant, but it would've been

12   relevant to Justice Ramos.  When just a few doors down in

13   his own courtroom, Black Diamond was arguing the exact

14   opposite of what they were arguing in front of Justice

15   Ramos.  They were the borrower in the Commerce Bank case; as

16   the borrower, where they were prohibited under their own

17   credit agreement from buying the debt.  They bought it.

18   They had the seller amend the credit agreement to do a lot

19   of things right before they bought it.

20          I'm not going to bore with you, it's all in my

21   declaration, all in the exhibits.  Again, that kind of

22   discovery I'm not sure how it would affect this Court, but

23   most judges would not be happy to know that one party is

24   standing before it pounding the gavel and arguing about how

25   horrible that Yucaipa was behaving in this massive conflict

1    of interest, when down the hall, in the very same court, at

2    the very same time, they argued just the opposite, just the

3    opposite.

4            Anyway, that's the kind of discovery, some of the

5    kind of discovery that would've been determined in the New

6    York case.

7            There's been some discussion about whether or not

8    this Court has determined that the third amendment was valid

9    in the first instance.  We don't believe it has, because

10   while we spend a lot of time talking about what this Court

11   ruled in connection with the motion to dismiss, I would

12   point out to the Court that for the purpose of that motion,

13   Yucaipa assumed the third amendment was valid.  We were

14   arguing about the covenant not to sue, we were arguing about

15   statues of limitations.  There was no discussion about that

16   the third amendment was invalid during those hearings.  Why,

17   because that would've created all these other issues of

18   fact, that was a motion to dismiss, one.

19           Number two, an interlocutory order isn't entitled

20   to law of the case.  We've cited a plethora of cases in our

21   opposition for that point.

22           And in any event, as the Court is I'm sure aware

23   and we've cited the cases at page 34 in our opposition, even

24   if, even if this Court had ruled on the validity to the

25   third amendment, which it was never asked to do, but even if

1    it had, that was in a motion to dismiss under a much less

2    exacting standard.  And the McKenzie court and others that

3    we've cited makes it clear, that a holding on a motion to

4    dismiss does not -- I'm quoting, does not establish law of

5    the case for the purposes of summary judgment.  It's a very

6    different, more difficult standard.

7            Is the third amendment valid in the first

8    instance, we think that there's a very strong argument that

9    it's not.  Justice Ramos made his ruling based on the

10   changed definition of term loan exposure.  That very

11   definition was changed in the third amendment.  With a

12   minimum, there was a disputed issue of fact, as to the

13   validity of the third amendment, and what these very

14   petitioning creditors believed at the time.

15           They come before you now and say, yes, but you

16   only need unanimous under consent when you have affected

17   lenders under Section 10.6(b) or 5(b), I apologize for not

18   having the specific reference.  But at the time, both

19   petitioning creditors claim they were affected, and in fact,

20   Black Diamond wrote in their own notes, they believed the

21   third amendment was not effective because it didn't have 100

22   percent vote.  I didn't write that.  They did.

23           Spectrum didn't support and didn't sign on the

24   third amendment because they believed in the bankruptcy

25   process that regardless of what the third amendment said,

1  that Yucaipa would get to hold and to vote its debt,

2  Exhibits 14 and 15 to my declaration. These are Spectrum

3  generated materials.

4      Black Diamond didn't support it because Mr. Urlich

5  (ph) who's on the phone said, "It was too dangerous." And

6  then Black Diamond wrote, as I mentioned in December of

7  2009, that it believed the third amendment was not effective

8  because it needed 100 percent vote. These are the words and

9  actions of the petitioning creditors.

10      So these facts alone, none of which were

11  discovered in the New York case, none of which have yet been

12  presented to this Court, these disputed facts alone would

13  suggest there's a triable issue, on the validity of the

14  third amendment.

15      At the end of the day, petitioning creditors do

16  not get to count the American money debt in the numerator,

17  and at least, if some, if not all of the Yucaipa debt should

18  be counted in the numerator.

19      Now, briefly, let me turn to a couple of

20  procedural issues. We don't believe this motion is

21  appropriate in the first instance. All that was discussed

22  in the amended scheduling order, and it's a practical matter

23  before this Court on June 19th, was trying this issue, if

24  there was an issue to be tried on August 22.

25      The motion for summary judgment is a possibility

1  was raised by Mr. Harris when he asked the Court, if the

2  Court might have some time at the end of the month to hear a

3  motion for summary judgment if one could be fashioned.  And

4  the Court said maybe the last week of July, I'm not

5  available on the 31st.  I've got a pretty good memory

6  without the transcript.  But no one, even in the amended

7  scheduling order ever unbundled this issue from a claim

8  before the Court.

9         Now, petitioning creditors say yes, but the

10 validity of the third amendment or the applicability or the

11 determination of records at lender status is directly

12 applicable to the Allied adversary.  But Yucaipa no longer

13 has any affirmative claims in the Allied adversary.  The

14 petitioners don't have any cross claims in the Allied

15 adversary.

16        So what they're effectively doing is seeking to

17 bind Allied to the decision of Justice Ramos, except they

18 can't do it.  Because one of the principle foundations of

19 collateral estoppel is that the party must have been before

20 the Court.  They were not.  They weren't in privity with

21 Yucaipa at the time, and privity by definition is a question

22 of fact.

23        Now, we also know that as a matter of bankruptcy

24 law, and I apologize for referencing bankruptcy law, because

25 that's not my primary forum, but my understanding of

1    bankruptcy law is that the debtor has scheduled Yucaipa's

2    debt as uncontingent, as due and owing, and that that

3    constitutes an admission of the debtors.  Maybe the debtors

4    at some future point said, oh, we believe petitioning

5    creditors are potentially requisite lender, but we have an

6    admission currently on the records of this Court that

7    Yucaipa's debt has been fully scheduled is non-contingent.

8            Next, petitioning creditors argue that the

9    requisite lender determination is integral to their quote,

10   equitable subordination claim, or an equitable subordination

11   claim that can be filed.  But again, we don't know what's

12   going to happen with the settlement with the committee.  If

13   the committee's settlement is approved, the committee

14   complaint goes away.

15           They rely on the Cencru (ph) decision of Judge

16   Shannon, to suggest that under Rule 56, you don't need to

17   tie an issue on summary judgment to a claim.  They say Judge

18   Shannon said that in the Cencru case.  Again, I would

19   encourage the Court to read that case, that's not what Judge

20   Shannon said.

21           In Cencru, Judge Shannon properly noted that with

22   the amendments to Rule 56, a motion for summary judgment

23   didn't have to dispose of the entire case.  But that a

24   motion for summary judgment could address a single claim or

25   issue directly related to the claim, but nowhere does he

1  suggest or could he under the terms of the rule, that a

2  motion for summary judgment can be filed on an issue of

3  interest to a party, that's not tethered to a specific

4  claim.

5          Finally, we've talked a lot about discovery here.

6  There is no question, there's no question that we requested

7  depositions for the purposes of this motion.  I know Mr.

8  Ward takes a different view of what was said on the

9  conference call on June 21, and I'm not going to ask the

10 Court -- I'm not going to call the other witness to that

11 phone conversation to the stand, and I'm not going to ask

12 the Court to take on the unpleasant task of trying to decide

13 whose declaration is true, I'm not going to ask you to do

14 that.

15         But Exhibit 78 and 79 of my declaration couldn't

16 be more clear that we wanted depositions; we weren't allowed

17 to have them.  It can't be any more clear that we requested

18 the very documents which form the foundation of the

19 petitioning creditor's claim to account for the American

20 money, $4.56 million, and they refused to produce it in

21 discovery, and then produced most of the important stuff on

22 their reply, which they cannot do.

23         Final word.  I know Mr. Ward says that this is not

24 an effort to get around the three year statute of

25 limitations, but it clearly is.  The only way the

1    petitioning creditors can be requisite lender is if the

2    third amendment is specifically enforced against Yucaipa.

3    That is the only way.  And that effort is barred by the

4    three year statute of limitations.  We know that because

5    that's the law of Delaware.  We know that's the law under

6    Central Mortgage Company versus Morgan Stanley.

7            THE COURT:  How is it that it's specific

8    performance?

9            MR. SAUER:  Because right now Yucaipa holds a

10   bunch of debt.  What they want to do is strip the debt of

11   voting rights.  They want to require that Yucaipa

12   contributed a bunch of it, and determine that Yucaipa is not

13   eligible -- is not allowed to hold the letter of credit.

14   They're seeking to --

15           THE COURT:  No, to say that Yucaipa bought the

16   debt when it was not an eligible assignee, and that nobody

17   raised the issue as to what the limitations might be on that

18   purchased debt within three years doesn't make sense.

19   Because the issue is whether they were subject to those --

20   whether those limitations were or were not applicable to

21   begin with.

22           So I don't understand how -- to me, that's a

23   dispute that never expires because if they -- the ability or

24   inability to have neutered or non-neutered debt, it's --

25   arguably it's a matter of what the documents say.  And I

1  don't see how -- I really don't see how the statute would

2  apply.  Because it comes to an interpretation of what they

3  are or are not allowed to do, and until they try at least to

4  do something, maybe this is your point, they tried to do

5  something, and it was more than three years ago, and since

6  nobody objected, the statutes expired?

7        MR. SAUER:  Well, I think it's more than that,

8  Your Honor, and look, far be it for me to try to convince

9  you since I'm certain on this point you're made up your

10  mind, but let me just layer this a little bit.

11        When you have a contract and that a party acts

12  under that contract, you have an obligation.  If they breach

13  -- if there's a breach of the third amendment, the breach

14  is, as they argued to this Court, remember they argued this

15  to the Court, and the Court adopted their position, that as

16  it relates to the third amendment, any challenge to the

17  third amendment or any attempt to enforce or not enforce it,

18  accrued back in September of '09.

19        Yucaipa has been acting as requisite lender for

20  three and a half years -- for almost three years, and

21  petitioning creditors went along with it.  They took the

22  money, they did a lot of things.  Yucaipa didn't contribute

23  the debt.  Yucaipa continued to do lots of things that --

24  forget about requisite lender, that a lender holding 54

25  percent of the debt might do.

1          And I think that the petitioning creditors had an

2     obligation, if this was really an issue for them, to have

3     challenged the validity of Yucaipa's actions, or to have

4     specifically enforced the third amendment at the time.  And

5     we know --

6          THE COURT:  All right.  So when Yucaipa acts

7     purportedly in violation of the contract, and the other side

8     is aware they're acting in violation of the contract, that's

9     really when the statute would start to tick.

10         MR. SAUER:  Central Mortgage Company versus Morgan

11    Stanley says, the Delaware statute of limitations for

12    contract claims begins to run on the date of the first

13    breach, the first breach.  Yucaipa was obligated purportedly

14    to contribute 50 percent of $50 million worth of term loan

15    exposure within ten days.  They didn't.

16         And we know -- I mean, this is not like the

17    petitioning creditors weren't thinking about this.

18         THE COURT:  I'm sure there's something in the

19    contract, a no waiver clause, that one breach doesn't

20    necessarily waive other provisions that can be enforced.

21         MR. SAUER:  But I don't believe the no waiver

22    provision applies to the statute of limitations.  I've

23    looked, and have not found a single case for any court

24    anywhere in this country, I thought that might come up, that

25    a no waiver provision somehow trumps a statute of

1    limitations provision.

2            And let me just close with one final exhibit, and

3    that is Exhibit 50, which is to my declaration at paragraph

4    32.  In late September of '09, Mr. Shaffer wrote to Mr.

5    Urlich of Black Diamond an e-mail, so it was Spectrum to

6    Black Diamond, "I like the idea to try and enforce the 50

7    percent covenant and strip their vote."

8            They knew they had the ability to pursue specific

9    enforcement at the time, they contemplated it, they didn't.

10   Any effort to -- I believe to specifically enforce this

11   agreement, which I think really is what this dispute is

12   about is time barred.  But again, we never really have to

13   get there.

14           THE COURT:  Okay.

15           MR. SAUER:  Thank you, Your Honor.

16           THE COURT:  Thank you.

17           MR. WARD:  Your Honor, I have a few things to say

18   in reply, would you like me to go now or should we take a

19   short break?

20           THE COURT:  Yeah, let's take a quick break and

21   hopefully this time it'll be quick.

22       (Recessed at 12:27 p.m.; reconvened at 12:39 p.m.)

23           THE CLERK:  All rise.

24           THE COURT:  You may be seated.

25           Mr. Ward.

1          MR. WARD:  Your Honor, may I?

2          THE COURT:  Yes.

3          MR. WARD:  Your Honor, a couple of points.  First

4    off, we strongly disagree with what Yucaipa, what Mr. Sauer

5    has said about our plan is not having enough debt to

6    constitute the numerator.  And let me see if I understand

7    some of the admissions I believe that Mr. Sauer on behalf of

8    Yucaipa made.

9          I think the principal admission is that we have

10   $51 million in debt, and that AMMC has 4 and a half million

11   dollars in debt, basically it's about 55 million.  The other

12   concession is that if you disregard Yucaipa's debt, and I

13   believe, Your Honor, I'm not going to repeat all of my

14   arguments, I may touch on one of them or two of them, but we

15   believe that under the third amendment, under Justice Ramos'

16   decision, whatever, that there are many, many reasons to

17   disregard Yucaipa's debt.

18         That definition in 2.1(e) of the term loan, that

19   debt doesn't count.  The fact that eligible assignee under

20   2.1(c) of the third amendment says they can't buy LC debt.

21   But if you disregard the debt, then you're down to $109

22   million.  If you add AMMC to our debt, we've got more than

23   half.

24         Now, Your Honor, if what Your Honor rules today is

25   simply that Yucaipa's debt is to be disregarded, we have

1    clearly advanced the ball.  Now, what we had done, Your

2    Honor, is we believed that when Justice Ramos made his

3    decision, and you heard me spend a lot of time arguing that

4    we believed it collateral estoppel not only on the fourth

5    amendment, but also on the issue of requisite lender based

6    on his construction of the third amendment, we believe that

7    he said that the Yucaipa debt, in effect, was disregarded

8    because of his rulings and findings on the third amendment.

9              So when we acted, and Your Honor, it's with

10   respect to Exhibits I think 10 and 11 to my affidavit, after

11   Justice Ramos' decision from the bench on November 19th, and

12   contrary to what Mr. Sauer said, Justice -- I was there.

13   Justice Ramos said, we had won, plaintiff, plaintiff you've

14   won.  We knew we had won.  All that Justice Ramos said, I

15   will follow this up with a decision.

16             As far as we were concerned that was the ruling,

17   and it was a ruling on requisite lender issue, and it was a

18   ruling on the fourth amendment issues.

19             So on December 3rd -- remember that argument is

20   November 19th.  On December 3rd, the entities that believes

21   they were the requisite lender on the basis of Justice

22   Ramos' decision got together and appointed the Black Diamond

23   entity and the Spectrum entity as the co-admin agents, and

24   registered the AMMC trade.

25             If it turns out that Your Honor doesn't believe

1    that Justice Ramos went far enough, and that it is

2    collateral estoppel on the requisite lender issue, then what

3    we would need from Your Honor is simply is a ruling that

4    Yucaipa's debt is to be disregarded.  This afternoon,

5    tomorrow, we will then get together, it doesn't matter how

6    we get together, I mean, if Black Diamond, and Spectrum, and

7    AMMC will then get together and buy the admission that Mr.

8    Sauer and Yucaipa makes, these three entities together,

9    Black Diamond, Spectrum and AMMC have a majority of debt if

10   Yucaipa's debt is disregarded.  And we believe we've given

11   Your Honor many, many bases for the disregarding of the

12   debt.

13           And like I said, what we did on December 3rd, and

14   by the way, Exhibit 12 to my affidavit was the notice we

15   gave to Yucaipa on December 3rd that on that very day,

16   December 3rd, we had -- the parties thought they were the

17   requisite lender by virtue of Justice Ramos' decision of

18   November 19th, had appointed the co-admin agents and they

19   registered the trade.  We can just do that tomorrow.  There

20   doesn't have to be a ruling on that issue today.

21           So -- but there are a number of other things that

22   I just want to address briefly.  First off, much of what Mr.

23   Sauer said on behalf of Yucaipa I think illustrates the

24   reason for the rule, which is very well established that you

25   don't look to extrinsic evidence to create an ambiguity in

1   the document.  You look at the four corners of the document.

2           If the four corners don't show an ambiguity, you

3   don't look at the extrinsic evidence.  Much of what Mr.

4   Sauer said was simply extrinsic evidence, and by the way,

5   the e-mails that he's citing to were by and large after

6   April of 2008, but it's after the third amendment.

7           So basically what Yucaipa is arguing is, well,

8   there was a stayed amendment, and then there was a lot of e-

9   mails back and forth, Black Diamond and Spectrum and other

10  parties who are commenting on what the third amendment does.

11  If there's anything that should be excluded as unnecessary

12  extrinsic evidence in the face of a clear contract, it's

13  that sort of evidence.

14          And where Mr. Sauer said if Judge Ramos only knew

15  what had happened.  Well, Judge Ramos knew what happened,

16  here's his ruling.  He said at page 13 of his decision which

17  is Exhibit 1 to our moving affidavit, "The credit agreement

18  itself is unambiguous, and accordingly summary judgment is

19  appropriate.  For their part, the defendants," that's

20  Yucaipa, "contend there are many factual issues.  There are

21  none.  This is a case for contract interpretation."

22          That is a full and fair opportunity to argue for

23  purposes of collateral estoppel.

24          Now, what Mr. Sauer says is, well, because the

25  discovery wasn't done, it's not a fair and full opportunity.

1     Take that argument to its logical extension.  What that

2     means is that every time a Court rules for summary judgment

3     on the basis of a contract, and excludes the extrinsic

4     evidence, whether before discovery or after discovery, that

5     can't be a full and final ruling.  Because where a Court is

6     determining that a document, a contract, on its face

7     contains no ambiguity, the Court is excluding the extrinsic

8     evidence.

9            And the rule is, you don't -- and Courts do this,

10    Courts know this, you don't look at the contract, and don't

11    look at the extrinsic evidence and say, from this extrinsic

12    evidence I hereby see there's an ambiguity.  You look at the

13    contract, if you're satisfied that the contract

14    unambiguously represents or expresses the intent of the

15    parties, you never look at the extrinsic evidence.

16           Taking Mr. Sauer's argument to its logical

17    exclusion, never can a decision like that on summary

18    judgment be full and final and fair.  There can't be a final

19    judgment.  Well, that's not true.  There are many such

20    decisions that are final judgment.

21           So when Justice Ramos ruled, and we had ruled for

22    summary judgment on the face of what we thought were very

23    clear contracts, the fourth amendment, the third amendment,

24    he ruled that these documents were clear on the face, and he

25    didn't need the extrinsic evidence.

1          That, pursuant to collateral estoppel indicates a

2     final judgment, that makes it full and fair in terms of

3     their ability to have litigated that issue.

4          But a couple of other things have litigated that

5     issue, but a couple of other things, Your Honor, one of the

6     things that Mr. Sauer says is well, you know what, we don't

7     need to vote the debt, we just need to have the debt.  And

8     that the fact that the definition of requisite lender speaks

9     about having a holding.

10          Now, what I think what Mr. Sauer would like to do,

11     what Yucaipa would do, I'm not making this personal, I

12     happen to have a lot of respect for Mr. Sauer, and I hope he

13     has the same for me, the definition of requisite lender is

14     part of an integrated series of documents.  It's the first

15     lien credit agreement, it's the third amendment, and it's

16     not the fourth amendment.

17          In the third amendment, it is very clear when I've

18     cited it to Your Honor, that they can't vote.  And you can't

19     take the definition of requisite lender, where you have to

20     be a lender, and use the having holding language, and

21     exclude the voting language just because it's in another

22     provision.  Now, it may be in the third amendment, but it's

23     still part of an integrated series of documents.

24          So as a result, the having and the holding have to

25     be read together with the voting, you have to be able to

1  vote and -- because otherwise, as I said to Your Honor, it

2  violates the principal of contract instruction that you're

3  giving no effect to a provision in an agreement.

4          So if you're saying, hey, Yucaipa, you can have

5  and hold, and you can be the requisite lender, but you can't

6  vote.  I mean, first off, it doesn't make any sense.  Judge

7  Ramos in his -- Justice Ramos in his decision said that's

8  just not logical, that the requisite lender acts through

9  amendments and waivers, they act, that's what a requisite

10  lender does, they act.

11          But the problem I've got with Yucaipa's argument

12  in this regard is it takes having and holding completely out

13  of the context, and doesn't interrelate with the fact that

14  they can't vote.

15          Now, another thing that's interesting and Mr.

16  Sauer doesn't touch upon this, is the fact that we argue

17  that a critical element of the definition of requisite

18  lenders, you have to be a lender.  Well, I did this before,

19  and I'm going to do it real fast, lender -- requisite lender

20  you have to be a lender.  Lender is defined in paragraph 30

21  of Exhibit 8, which is the first lien credit agreement, and

22  it says, you've got to either be an original signatory, they

23  were not, or you have to be a party to the assignment

24  agreement.  The assignment agreement is contained in the

25  form in Exhibit E.

1          Exhibit E says, you have to be able to represent
2     in that assignment agreement that it, quote, that's the
3     assignee, it meets all requirements of an eligible assignee
4     under the credit agreement.  They can't do that.  Since they
5     can't do that, they can't be a lender.  If they can't be a
6     lender, they can't be a requisite lender.

7          Now, Yucaipa focuses on the having and holding,
8     and they ignore the voting.  I've addressed that.  But they
9     also ignore the fact that they have to be a lender.

10          Now, they may think that they can come in and
11     violate the agreement and buy all this LC debt and buy all
12     this term loan debt, and as a result, take advantage of the
13     other creditors.  But they can't do it.  And they can't do
14     it because they can't become a lender, and because the
15     provision that says you can't vote is a problem for them,
16     because you can't be a requisite lender without voting.

17          In particular, as I cited to Your Honor earlier in
18     the day, I think it's 2.7(a) and 2.7(b) specifically says,
19     you, Yucaipa when you buy this debt, term loan debt, any
20     debt, you cannot vote -- and by the way, the conclusion on
21     voting rights applies not only to the term loan debt, but to
22     the LC debt, both of them, and revolving debt if they had
23     bought it.  It's across the board.

24          Now, with respect to 2.7(a) and 2.7(b), as I
25     recited to Your Honor, it says, you in effect can't do

1   anything in a liquidation proceeding.  So I don't even

2   understand what they're doing here.  They want to be the

3   requisite lender, they say they can be the requisite lender

4   having no vote.  They got mooted that, they basically are

5   going to be a transparent requisite lender, and they're

6   specifically not allowed to do anything in this proceeding.

7          That is, as Justice Ramos said, is not logical.

8   That also, I believe, would violate the rule of construction

9   that you're in effect or that you're giving no effect to a

10  particular provision, which is the no vote provision.

11         But let me on to a couple of the other provisions,

12  Your Honor.  Oh, with respect to us being too late I guess

13  under Rule 901 of the Federal Rules of Evidence, I don't

14  think Mr. Sauer is right.  I don't know that that argument

15  was in his papers.  If it was, I missed it.

16         The LSTA trade document we believe is a self-

17  authenticating document, and as a result under the Federal

18  Rules of Evidence, it's not to be excluded pursuant to the

19  argument that Mr. Sauer mentioned.  But I think that's

20  probably overly technical issue because as I said, Your

21  Honor, if Your Honor rules that Yucaipa's debt is

22  disregarded and we're down to $109 million worth of debt,

23  there is a requisite lender out there, I mean, it's Black

24  Diamond, it's Spectrum, and we're going to get together with

25  AMMC.  I mean, we own their debt anyway, and it's just going

1    to be a matter, a purely administrative functional matter of

2    the three of us then, Black Diamond, Spectrum, and AMMC

3    appointing the admin agent, who will then register, and

4    we'll be exactly where we thought we were on December 3rd.

5           So that, Your Honor, I think gains them absolutely

6    nothing.

7           Oh, and with respect to the argument that Justice

8    Ramos' decision on November 19th was not effective, now as I

9    said, Your Honor, he ruled from the bench that the agreement

10   was null and void.

11          Let me just quickly go through my notes, Your

12   Honor, because I think I've covered much of this.  Oh, two

13   arguments.  The arguments under -- well, let me do the

14   argument under Praven last, but with respect to Mr. Sauer

15   saying that in fact Yucaipa had nothing to do at least with

16   the execution of the third amendment, we cite -- we attach

17   as Exhibit 14 to our moving affidavit an e-mail from Dericks

18   Walker (ph), who is the Chairman of Allied, appointed by

19   Yucaipa, and he's writing to Ron Burkle (ph), who is for

20   want of a better term, Your Honor, I'll say he's the head

21   guy, he's the head guy at Yucaipa.

22          And what Mr. Walker says on April 17th, 2008,

23   which Your Honor happens to be the exact same date as the

24   third amendment, he says, "We were successful in acquiring

25   $40 million in second lien debt for $26.4 million.  We now

1   control 40 of the 50 million of outstanding second lien

2   debt."

3           Who bought that debt that day?  It was Yucaipa.

4           In the very next line of the e-mail he says, "we",

5   the same word he uses to describe the we who bought the

6   debt, "We also successfully obtained an amendment from our

7   first lien lenders, allowing us to buy first lien debt, and

8   convert both the first and second lien debt in equity."

9   That's the third amendment.

10          They drafted it, they negotiated it.  I don't

11  think it's relevant, Your Honor, to be honest, because as

12  Your Honor pointed out, there is a provision that when you

13  take, when you buy the debt, you take subject to the prior

14  authorizations and consents of the parties.

15          So when they took this debt, they took prior --

16  they took subject to the authorization that the third

17  amendment was in effect.

18          With respect to Praven, let me point out a couple

19  of things.  Praven as I said is very clear about this

20  inclusionary/exclusionary point.  Praven makes clear and I

21  apologize, Your Honor, that it was troubled by the fact that

22  there were no express limitations on assignability.  There

23  are expressed limitations on assignability here.  And

24  although Mr. Sauer cites to all the New York cases -- well,

25  basically if you read these cases, Your Honor, like a

1    mantra, he may have said that, they repeat again and again

2    the same language.  They're just recycling some general

3    provision of old New York law about assignability of claims.

4              However, as we point out, in each of those cases,

5    there's no exclusionary language in Praven.  There's no

6    exclusionary language.  In 785, there's no exclusionary

7    language.  There is no language in any of these cases that

8    says, you may be an ineligible assignee or lender, you may

9    be an eligible assignee or lender, but you may not.  That's

10   what distinguishes this case, except for a couple of other

11   points that distinguish this case.

12             First off, as I mentioned, this case here is an

13   intercreditor fight, it's not -- it's a much more simple

14   case of 785 and I know Mr. Sauer said it was very

15   complicated, but surely not that complicated.  If you had a

16   borrower, and you had a lender, and the lender assigned the

17   note to another entity, and it was that entity that was

18   seeking to make the claim.  A much more simple circumstance,

19   it's borrower versus lender, here we have Yucaipa which

20   sought to be lender, and take advantage of the other

21   lenders, through an agreement that itself had negotiated,

22   787 Praven, you don't have a circumstance where the assignee

23   had negotiated an agreement to get their foot in the door,

24   and then once they got their foot in the door, blew it wide

25   open.  It's a very, very different case.  Our case is a

1    very, very different case.

2          The generic state court cases of which Mr. Sauer

3    cites many don't advance the ball, except to simply say, New

4    York law, old New York law is this.  But they don't deal

5    with any exclusionary language.  There's not a single case

6    that Yucaipa has cited, that deals with an intercreditor

7    agreement, where you have two creditors who are fighting

8    with each other under the terms of the agreement.  We think

9    that our case is distinguishable.

10          Another major reason of course is as we say in

11   Praven, the 2nd Circuit was crying out for some exclusionary

12   language, it wasn't there.  787 relies most heavily on

13   Praven, not a surprise, it's a 2nd Circuit case.  And in

14   that case, too, in 785, again, there was no exclusionary

15   language.  Here there is very clear exclusionary language,

16   some of which as I said, Your Honor, in fact, all of which

17   as I said, Your Honor, in the third amendment, was

18   negotiated by Yucaipa itself.

19          I'm almost done, Your Honor, if you can just bear

20   with me one moment.

21      (Pause)

22          MR. WARD:  I mean, what -- the one thing I find I

23   guess probably -- one of the things I find very troubling

24   about Yucaipa's position is what they're saying is under

25   Praven and this line of authority even though under Praven

1   and this line of authority, we can buy the debt, but we

2   don't have to be bound by the provisions in the agreement.

3   And that seems to me to be, Your Honor, a very difficult

4   position for anyone to take.

5           And I think finally, Your Honor, on the procedural

6   issues, Mr. Sauer said that -- I think he admitted, and in

7   fact, it's true that the cases on summary judgment have much

8   more liberal since the amendments in terms of what partial

9   summary judgment means.  And for partial summary judgment

10  you don't have to dispose of a whole claim, in a complaint

11  with three claims, you don't have to dispose of a whole

12  claim for there to be a motion for partial summary judgment

13  allowed.

14          But the fact is, that even if that weren't the

15  case, in the Allied adversary proceeding, one of the

16  specific forms of relief that Allied specifically asks for

17  is who is the requisite lender, and a determination of their

18  rights under the third and fourth amendment.  That's what

19  we're seeking here.  We clearly should be entitled to

20  summary judgment on those issues.  And that I think, Your

21  Honor, is all I have.  Thank you for your patience.

22          MR. SAUER:  Your Honor, may I have just literally

23  one minute?

24          THE COURT:  Yes.

25          MR. SAUER:  Actually I meant what I said one

1 minute.  I think it's important that the Court obviously,

2 I'm sure has and will review the third amendment.  The

3 limitations on voting applicable to how the voting works is

4 very specifically delineated in terms of what it applies to.

5 I raised it on my opening argument, I just refer the Court

6 to that.

7    Two, with respect to New York law, we heard lots

8 of reasons why it's distinguishable and why it's old, it's

9 not distinguishable, and it's not old.  We referenced, for

10 example -- first of all, you've got 785 Partners, which is a

11 2012 case.  We referenced Almado Oil Company (ph) which is a

12 2008 case.  We referenced the Bank Russell's case which is a

13 2000 case, all of these cases come after the Praven

14 decision.

15    We've represented or referred to the Purchased

16 Partners case which is also a 2012 case.  So this is not old

17 outdated New York law, this is old New York which continues

18 in force and in effect, which petitioning creditors don't

19 like because it leads to a result they don't like, but it is

20 the law that needs to be applied.  Thank you.

21    THE COURT:  Okay.  All right.  Thank you.  What

22 I'm going to -- what we're going to do is we're going to

23 take a break.  I am going to make my decision, and then

24 we'll come back and I will announce it.  We'll come back at

25 3 o'clock and I'll announce it.

1          I am going to close the courtroom because I'm

2    going to work here, because I've got everything here, and I

3    know where everything is.  You may leave your items, I have

4    no other matters, and we'll reconvene at 3.

5          All right.  Thank you.

6        (Recessed at 1:00 p.m.; reconvened at 3:03 p.m.)

7          THE CLERK:  All rise.

8          THE COURT:  Please be seated.

9          All right.  Hopefully this will be as relatively

10   cogent as possible, obviously complicated.  I won't bury the

11   lead.  The Court is going to grant the motion for summary

12   judgment and rule that Black Diamond/Spectrum are the

13   requisite lenders under the first lien credit agreement.

14          So let me tell you how I got there.  I'm going to

15   start with some of the procedural, related two procedural

16   posture issues.  Sorry, first summary judgment can be

17   entered on claims and/or issues properly, and I've granted

18   summary judgment in the past on elements of claims, not even

19   claims in their entirety, and I think finally the identity

20   of the requisite lender here is implicated as an issue

21   (indiscernible) throughout the cases, certainly in

22   connection with many of the things going on in the

23   underlying bankruptcy, but also the adversary proceedings,

24   and otherwise is specifically or it relies in connection

25   with several specific claims.

1          Also the motion is not time barred.  The identity

2    of the requisite lender in a situation like this is

3    constantly evolving and liquid issue as people come in or

4    out of the debt.  And while (indiscernible) is the requisite

5    lender in 2007 might be time barred, the question of who is

6    requisite lender now is certainly not time barred.

7          And I guess one could argue that the facts and law

8    governing the determination in 2013 which arose maybe in

9    2008 or 2009 would in effect make those elements time

10   barred, but I don't think that that would be a proper

11   application of a statute of limitations in a case like this.

12         The controversy would've arise on a host of things

13   that have happened since 2007, but the specifics of making

14   the ruling are certainly not time barred.  The other point

15   is that I thought there was an argument, a good argument

16   that this issue or these issues about requisite lender have

17   been a live controversy for five years, really all the way

18   back at least as early as the CIT case being filed, and

19   really perhaps all the way back to the exit of the initial

20   bankruptcy.  So there's never been an instance where this

21   has sort of gone away and people have forgotten about it.

22   It's been something that's been live and in controversy and

23   evolving as we go forward.

24         But again, the issue today who is the requisite

25   lender on July 30, 2013 is clearly not barred in any way by

1      any statute of limitations.

2              So the issue, what is the issue.  The issue as I

3      see it is pretty clear, it's who is the requisite lender.

4      And counsel for Yucaipa I think explained it very well in

5      (indiscernible) issue, that it's really a question of

6      determining the (indiscernible) denominator of the

7      appropriate debt and do the math, and seeing if a group or

8      an individual lender has over 50 percent of the debt.

9              Now, that determination starts with an examination

10     of the four corners of the documents to determine the

11     parties' intent, which is how you -- the parties' intent,

12     first you start with the four corners of the document, if

13     it's ambiguous, you move on, and only if it is ambiguous do

14     you look to extrinsic evidence to determine the intent.

15             And in this case, I found and hold that the

16     contract -- the contracts are not ambiguous in any way, and

17     the Court can determine its -- make its determination based

18     on the four corners of the document.

19             The legal started as summary judgment, the

20     petitioning creditors have the burden to establish they're

21     entitled to judgment as a matter of law, and if there in

22     absence of a genuine issue of material fact, in which point

23     the burden shifts to Yucaipa to identify a genuine issue of

24     material fact.

25             Again, just to read a little law, because I think

1   it's important for figuring out how we proceed, under the

2   summary judgment standard, a Court -- this is -- open quote,

3   a Court faces a conceptually difficult task, end quote, in

4   interpreting a contract, because the Court must, quote,

5   determine whether as a matter of law if the contract is

6   ambiguous or unambiguous on its face.  Typically a Court may

7   (indiscernible) grant summary judgment when the terms are

8   unambiguous; however, where a Court determines as a matter

9   of law that the contract is ambiguous, it may yet examine

10  evidence extrinsic to the contract as including summary

11  judgment materials and what that evidence is as a matter of

12  law dispositive of the interpretive issue grant summary

13  judgment on that basis.

14          And it goes on to say, a contract is unambiguous

15  if it is objectively susceptible to at least two reasonable

16  but conflicting (indiscernible), ambiguity is not determined

17  simply because the parties to the contract have differing

18  interpretations.

19          So it would be possible to enter summary judgment

20  even if we had -- even if the Court had to go outside the

21  four corners of the document.  But in this case, I don't

22  think that you -- that we have to go outside the four

23  corners of the document, and summary judgment is certainly

24  appropriate in that instance.

25          Now, getting into more of the specifics, Yucaipa

1   (indiscernible) collateral estopped from arguing that the

2   fourth amendment is valid.  This arises in the case in front

3   of Judge Ramos.  Again, for (indiscernible) being identical

4   issue was raised, the issue actually litigated and decided,

5   Yucaipa had (indiscernible) opportunity to litigate, and

6   importantly that doesn't mean necessarily discovery, it's

7   really a case-by-case issue on whether there's a fault or

8   opportunity.

9            And further (indiscernible) the issues necessary

10  to support the valid judgment, and I don't think there are

11  going to be any (indiscernible) that the fourth amendment,

12  its validity were clearly the subject of extensive briefing

13  and argument and (indiscernible) Justice Ramos, and I find

14  that Yucaipa is collaterally estopped that the fourth

15  amendment is valid.

16           However, I don't believe they're collaterally

17  estopped from arguing the issues as to who the requisite

18  lender may or may not be under the third amendment.  And

19  (indiscernible) because I think (indiscernible) touches on

20  the third amendment a little bit, there was nothing that I

21  could find in the argument that really touched on it at all.

22  And I don't believe the Court sufficiently focused on it, I

23  don't think it was sufficiently before the Court to really

24  find that that issue was actually litigated and decided.

25           So I find that Yucaipa is not collaterally

1    estopped from arguing the issues related to the third

2    amendment.

3            So that gets us to the next question which is

4    whether the third amendment on the merits precludes Yucaipa

5    from being the requisite lender; i.e., the debt not counted

6    in the denominator which of course leads to a situation

7    where the petitioning creditors might be the -- excuse me,

8    might be the requisite lenders.

9            First, there's this argument that there's law of

10   the case that the Court has already decided, the issue and

11   as a result, we don't need to get to it any further.  And

12   the issue there being is Yucaipa stuck with the provisions

13   of the third amendment no matter what.

14           And I certainly made that statement or statements

15   to that effect twice in the ruling on the motion to dismiss

16   the cross claims, but for purposes of the law of the case, I

17   don't think it was sufficiently really considered or all be

18   different variations were necessarily considered that would

19   make it fairly preclusive.  So I've got to go into the

20   actual amendment itself.

21           The potential issue there is whether the third

22   amendment required all lenders consent, as opposed to a

23   requisite lender consent.  And I'm going to quote or

24   paraphrase from one of the petitioning creditors' briefs,

25   because I think it lays it out.

1        Section 5.5(b)(9) of the first lien credit

2    agreement provides that the written consent of each lender

3    that would be affected thereby is necessary for any

4    amendment that has the effect of modifying the definition of

5    requisite lenders.  Because the purported fourth amendment

6    had the effect of modifying the definition of requisite

7    lenders and affected every lender, by allowing Yucaipa to

8    become requisite lender for the first time, ComBest consent

9    alone, as then requisite lender, was insufficient to validly

10   (indiscernible) fourth amendment.

11        The third amendment, however, affected no lender,

12   but it only allowed Yucaipa to purchase very limited amounts

13   of term loans, and by Yucaipa's own admission, imposed

14   onerous restrictions on such purchases that prohibited

15   Yucaipa from ever becoming requisite lender.

16        The only party affected was Yucaipa, and as a

17   result, the consent of the requisite lender was sufficient,

18   and all the lenders did not have to agree.

19        Now, getting to the meat really of the argument,

20   and it goes to the definitions of term loan exposure, and

21   the definitions and changes in Section 2.1(e), which I think

22   are the critical element or the critical contractual

23   provision.  I think the effect of 2.1(e) is that all of the

24   Yucaipa debt cannot be used in determining who the requisite

25   lender is, which (indiscernible) it down to the $109 million

1    or so of debt over which Black Diamond and Spectrum must

2    have at least 50 percent.

3           The provisions among other things prohibited

4    Yucaipa from acquiring any revolving loans, and letters of

5    credit, which would use those to the extent they exist from

6    the denominator in figuring out the requisite lender.

7           And as a whole, the limitations as to the

8    (indiscernible) the inability to act in insolvency

9    proceedings, the requirement ignored, contributed capital,

10    as a whole, I think I find looking at the document as a

11    whole, remove Yucaipa from being able to act as the

12    requisite lender.

13           Upon acquiring the debt, Yucaipa subjected itself

14    to the first lien agreement and all of the amendments,

15    including the third amendment.  I think importantly though

16    even under the first amendment alone, as pointed out during

17    oral argument, Yucaipa cannot be the requisite lender

18    because it's not a lender as an implied term, as it's not an

19    original lender or not -- I have to put it, not prohibited

20    lender --

21           UNIDENTIFIED:  (indiscernible)

22           THE COURT:  Thank you.  So where are we?  That

23    gives us a numerator arguably of $56 million and a

24    denominator of $109 million, and we move to the issue of

25    whether Black Diamond and Spectrum can include the American

1    debt in their number to come out with over 50 percent.

2            I find that the American debt is certainly -- I

3    find that the American debt, or what I call the American

4    debt is part of the numerator in this case, and it's the

5    acquisition of that debt by Black Diamond's and/or Spectrum

6    is sufficient to include it in the numerator.

7            As a result of Justice Ramos' decision, Black

8    Diamond and Spectrum became requisite lender.  Now, that

9    hasn't been determined by a court of law until today, but

10   the facts that existed, that made them requisite lender that

11   is being identified today existed after Justice Ramos'

12   decision.  And after that point, they acted to appoint an

13   agent, and they did the recommendation that they were

14   supposed to do in appointing that agent.  So there's no

15   argument to be made that the American debt or -- well, I

16   disagree with and overrule the argument that the American

17   debt cannot be included in their number.

18            Back up a little bit here.  So having said all

19   that, I think we come to perhaps the crux of the argument,

20   and the most difficult piece of the argument to deal with.

21   And that's the Plevin (ph) and the 785 case issue about

22   enforceability.

23            In other words, are we limited to a situation

24   where the prohibition was simply that the debt could not be

25   sold to Yucaipa, which it was, but all that does is create a

1  breach of contract claim against the seller, and doesn't --

2  and it follows perhaps that all the limitations are not

3  really enforceable against Yucaipa.

4            And I've looked at those cases, and this case is a

5  very different case I believe from those.  The

6  (indiscernible) to some extent outside of the four corners

7  of the document to deal with the argument about

8  enforceability, but the facts I rely on I really are

9  undisputed and (indiscernible) summary judgment is

10  appropriate.

11            Yucaipa was involved in the negotiation and the

12  establishment of the first lien credit agreement as part of

13  the earlier bankruptcy.  And at all other times, has

14  controlled the equity and the board of directors.  And has

15  been intimately involved in every aspect of the debtor's

16  business, and the credit agreement issues since 2007.

17            To allow Yucaipa to be involved this heavily in

18  negotiating agreements with -- including those with

19  expressed limits on Yucaipa's rights, and wont' allow them

20  to buy the debt, the seller cannot sell to them in the first

21  place, and to (indiscernible) would be inequitable, you

22  know, to the (indiscernible) degree in my mind, and as a

23  result I find that at least under these facts and

24  circumstances, the Plevin and the 785 Holdings are not

25  applicable or inapposite.

1          I think I've covered all the points, I think I

2     have.  And just to reiterate the ruling, I'm going to grant

3     summary judgment, holding that the petitioning creditors are

4     requisite lenders under the first lien credit agreement.

5     And I think the best thing to do would be to have counsel

6     submit an order under certification of counsel.

7          MR. SAUER:  You Honor, may I may one comment or

8     ask a question?

9          THE COURT:  Yes.

10          MR. SAUER:  Thank you, Your Honor, Russell Sauer

11     of Latham & Watkins for Yucaipa.

12          One quick comment, there is absolutely no evidence

13     in the record, because it wouldn't be true, that Yucaipa

14     participated in the negotiations in the first lien credit

15     agreement, no evidence.  More importantly just for the

16     record I understand the ruling, I'm assuming the Court is

17     overruling all of our objections to the evidence that was

18     submitted not having been produced and that was produced on

19     reply without any authentication and without being

20     properly --

21          THE COURT:  Well, I think you actually made that

22     argument to (indiscernible) your objection to the entry of

23     that evidence, yes, it's overruled.

24          MR. SAUER:  Thank you.

25          THE COURT:  We obviously disagree on the first

1    point.  That's for district courts and courts of appeal are

2    for.

3              All right.  Anything else for today?  I guess we

4    do need to deal with this motion to shorten in connection

5    with the settlement motion.

6              MR. SAMIS:  Your Honor, we can certainly deal with

7    that first.  I was going to raise one other matter.  We have

8    a bar date that's looming on August 2.  We did submit a

9    certification of counsel on Friday that would allow Black

10   Diamond and Spectrum to file a consolidated proof of claim

11   as agent under the first lien credit agreement.

12             We received an objection from Mr. Klyman after we

13   had submitted that.  We turned around and withdrew it and

14   submitted a different certification of counsel actually

15   yesterday that basically made it a neutral as to who the

16   agent was, for the purpose of getting around that objection,

17   but still allow -- whoever the agent was determined to be,

18   to file a consolidated proof of claim.

19             We haven't seen an order hit yet on that, I do

20   have a copy of that order here in court.

21             THE COURT:  I haven't seen it, so you can

22   approach.

23             MR. SAMIS:  Thank you, Your Honor.  That was

24   submitted under certification yesterday, Your Honor.

25             (Pause)

1          THE COURT:  To back up on the enforceability

2     issue, and I understand counsel's comment about what may or

3     may not be in the record, I -- we can disagree on that and

4     (indiscernible) overly flip with my comment about appellate

5     courts, but I think that the -- in my mind at least, that

6     the summary judgment motion was -- the burden was met by

7     Black Diamond in establishing that they should be the

8     requisite lender.  And I didn't see anything that would

9     rebut that in that I really didn't see any kind of genuine

10    issue of material fact as to whether it should or should not

11    be enforceable.  I believe based on the record, which I

12    think would include really incontrovertible evidence that's

13    been in front of the Court prior, that Black Diamond or

14    excuse me, that Yucaipa was interested, but I stand by my

15    ruling.  I'm just mentioning that sort as a side.  I've

16    signed your order.  I assume there was no objection to the

17    COC?

18          MR. SAMIS:  I think we resolved that, Your Honor,

19    by the withdrawal of the original stipulation, order, and

20    replacement with what Your Honor just signed.

21          THE COURT:  Okay.

22          MR. SAMIS:  Your Honor, with that, I guess I would

23    turn the podium over to Mr. Harris.

24          MR. HARRIS:  No, it's Mr. Klyman's motion.

25          MR. SAMIS:  I'm sorry, I thought there was an

1  agreement.  Okay.  Go ahead.

2           MR. KLYMAN:  Good afternoon, Your Honor, for the

3  record, Robert Klyman of Latham & Watkins on behalf of

4  Yucaipa.

5           Your Honor, after many months and a slog through

6  the awful negotiations, Yucaipa and the committee have

7  resolved the estate claims that were brought against

8  Yucaipa.  I won't bore you with all the details, that will

9  come out in the ultimate settlement.

10          THE COURT:  I did read the motion.

11          MR. KLYMAN:  Yeah.  And so it's our view, Your

12  Honor, that Black Diamond and Spectrum who are objecting to

13  shortened time, have known about the economic terms since at

14  least the 17th.  The other terms don't affect their

15  individual rights.  We were very careful and the committee

16  insisted that whatever rights Black Diamond and Spectrum had

17  would be preserved in their individual capacity to sue

18  Yucaipa, Yucaipa would have the benefit of all its defenses.

19          And Black Diamond and Spectrum have been

20  litigating this issue since before this case started, as

21  this Court well knows.  They don't need discovery and a

22  stretch out of the process to test the reasonableness of the

23  settlement.  And a 9019 motion is not a time or place for

24  this Court to conduct a mini trial on all the issues.

25          You're very familiar with the issues with this

1    case, they're very familiar, it's not going to take a lot of

2    evidence to show that this is at the low end of the

3    reasonableness, particularly given this Court's past

4    comments, the debtor's past comments, that we need to -- and

5    even Mr. Harris' comments that we need to clear out the

6    underbrush in order to go forward with the sale as quickly

7    as possible.

8           Pursuant to bid procedures that Black Diamond and

9    Spectrum lobbied for, got the debtor to agree to, and for

10   you to approve, bids are due, there's going to be an auction

11   soon and it's important for us to determine whether or not

12   we have peace with the committee, whether or not there's no

13   guarantee we're going to bid, but whether or not we are

14   going to bid, and what our -- how our claim is going to be

15   treated, at least from the estate perspective.

16          And what's important here, Your Honor, is again,

17   Black Diamond and Spectrum substantive rights are not being

18   prejudiced in terms of whatever rights they have.  They do

19   complain that they did not get a seat at the bargaining

20   table, in terms that they participated in mediation, we

21   tried that one-on-one conversations with them, but the

22   standing order that Your Honor entered did not give them the

23   right to negotiate at the bargaining table.  They had the

24   right to be consulted, which I think the evidence will show,

25   without discovery, that they were.

1    And, in fact, if they did delay the hearing in

2    order to obtain discovery, they don't identify in their

3    papers any discovery that they would actually want to seek.

4    If they take the depositions of committee members, the

5    committee members are likely to say, well, I acted on advice

6    of counsel, in terms of moving forward with the settlement,

7    they were intimately involved, they met, whatever.

8    You know, the issue is, it can be resolved at

9    argument without a delay, and without the benefit of giving

10   them, you know, wasteful depositions and additional document

11   requests.  Thank you, Your Honor.

12   THE COURT:  Thank you.

13   MR. LAGERMANN:  Good afternoon, Your Honor, Nick

14   Lagermann from Sidley Austin on behalf of the committee.

15   I'm not going to repeat what Mr. Klyman said, but

16   the committee obviously does also support having the

17   proposed settlement heard on the expedited schedule that we

18   had requested.

19   I would like to note though, as Mr. Klyman hinted

20   at, and I think is actually admitted in a footnote in the

21   petitioning creditors' objection, we did, in fact, consult

22   with the petitioning creditors with regard to this proposed

23   settlement.  They have known about the economics for a long

24   period of time.  And there is no obligation in the standing

25   order to have them have a quote/unquote seat at the table,

1    if you will.

2              To the contrary, in paragraph 10 of the standing

3    order, this Court ruled that the committee shall have

4    ultimate decision-making authority with regard to the claims

5    and prosecution of the committee adversary proceeding.

6              In addition, paragraph 12 of the standing order

7    gave each individual party, the committee, the petitioning

8    creditors, and actually also the debtors the ability to

9    settle the claim subject to a party's right to object under

10   Rule 9019.

11             The petitioning creditors, if they want to file an

12   objection, they are clearly more than able to do so, and we

13   think we will deal with that at the 9019 hearing.

14             I wanted to make one other point with regard to

15   discovery.  Again, we don't know exactly what they're

16   talking about with respect to discovery, but when this Court

17   appointed a mediator, you specifically included that all

18   mediation and related conversations would be subject to

19   Local Rule 9019-5, which includes 9019-5(d)(1), which we

20   believe would preclude discovery into settlement

21   communications.

22             Obviously we believe this is a fair and equitable

23   rule that prevents people from digging into mediation

24   related conversations.  But to the extent that there is

25   discovery in that regard, and we go past Rule 9019(d)(1),

1    frankly it would need to be a two-way street.  And my guess

2    is, is that's not -- that is exactly the reason why it is

3    inappropriate to have discovery to start going into what

4    people did or did not do in connection with mediation and

5    settlement communications.  Thank you, Your Honor.

6         MR. KELLEY:  Your Honor, Jeff Kelley for the

7    debtor.  I rise in support of the motion to shorten.  The

8    debtor obviously is interested in moving this case along as

9    quickly as possible, as I'm sure the Court is.  The case has

10   been moving quickly, events are transpiring in the near

11   future which are going to be very important to resolution,

12   and we would like to have this very important settlement

13   motion heard as quickly as possible.

14        The prospect of discovery and the estate paying

15   professionals to engage in discovery is not appealing, and

16   we join the committee in not understanding why discovery

17   would be necessary on this issue.  Thank you.

18        THE COURT:  You're welcome.  Mr. Harris.

19        MR. HARRIS:  Thank you, Your Honor.

20        Your Honor, as we laid out in our papers which we

21   filed yesterday morning, we got these papers last Friday

22   night at 11 something p.m.  We're here to talk about timing

23   right now, and when this should be heard.

24        The request that has been made by the settling

25   parties here is to effectively cut in half the period of

1    time for notice of a hearing like this, that is generally

2    required under the local rule, and if granted, would require

3    us to file a substantive objection to this settlement by

4    this Thursday, when everybody here has known that we were

5    preparing for obviously today's hearing, which was supposed

6    to have many more things on the agenda up until yesterday

7    afternoon, when certain of them got adjourned.

8            Physically, Your Honor, there's no way we can

9    actually comply with that timing.  And frankly, in

10   situations such as this, absent exigent circumstances

11   justified under the particular circumstances of the case,

12   frankly a notice period is often times many times longer

13   than what's included in the regular notice provisions, not

14   shortened by 50 percent.

15           Five business days, Your Honor, is simply not

16   sufficient time in the petitioning creditors or any other

17   party in interest, frankly, who might have a say, want to

18   have a say in this, to prepare and be in a position to

19   prosecute a substantive objection should they choose to do

20   that.

21           THE COURT:  What's the timing on the auction?

22           MR. HARRIS:  Bids are due on August 8th.  The

23   auction is scheduled for August 14th.  And the sale hearing

24   is scheduled for August 22nd.

25           THE COURT:  Mr. Klyman, what's the -- I understand

1  the comments about what Black Diamond knew and when they

2  knew it, and you know, all those other now antiquated

3  references, but regardless of sort of what happened with

4  what they knew, and how this shouldn't be a surprise, et

5  cetera, what is the specific reason why say the 5th as

6  opposed to the 19th, other than you want it done sooner

7  rather than later I guess?

8          MR. KLYMAN:  Well, there are a couple of reasons.

9  First, is the obvious, we want it done sooner rather than

10 later, since we've worked hard to get to the settlement.

11 But more substantively, I don't know Yucaipa is going to

12 bid, but if they do, Mr. Collins at the last hearing about

13 bid procedures said, we think it's important that all

14 bidders have an allowed claim.

15         The settlement agreement provides for Yucaipa to

16 have an allowed claim vis a vis the debtor and the

17 committee.  Now, Black Diamond -- but that at least

18 eliminates some of the hurdles, and so we thought it

19 important as part of our calculation to have that resolved

20 prior to the date bids are due.

21         Now, there's no magic to bids being due on the 8th

22 or the 14th.  If you want to extend that date, my suggestion

23 to your court and Mr. Harris, is to extend the bid deadline

24 by a couple of days, or however long is appropriate, to fit

25 us within that window.

1           We're also trying to accommodate what we thought

2    was the availability of this Court after August 5th or 6th

3    or whatever.  So we would --

4           THE COURT:  That's a problem.  You know, it's

5    summer time.  So if I don't take care of you by the 7th, the

6    next available date is the 19th.

7           MR. HARRIS:  Your Honor, if I may?

8           THE COURT:  Yes.  Sorry, I interrupted you, Mr.

9    Harris.

10           MR. HARRIS:  The motion as it was originally filed

11   didn't lay out any exigent circumstances justifying

12   shortening as required by the local rule.  The only argument

13   that's been made about timing here really is the issue Mr.

14   Klyman just raised about how does this affect whatever bid

15   they may submit, if at all, and the requirement of the bid

16   procedures that if you're going to bid, some currency that

17   relates to your claim has to be allowed.

18           Mr. Klyman, first of all, says his client -- is

19   not sure his client is going to bid, so I'm not sure that's

20   a good reason why we should expedite this.  But putting that

21   aside, even if he does bid, it is not subject to argument

22   that even though the settlement agreement purports to give

23   them a quote/unquote allowed claim, that doesn't -- it's not

24   allowed within the bankruptcy, the meaning of that word as

25   used in the Bankruptcy Code, because it also says, but

1    that's subject to arguments brought by other creditors, it's

2    only binding on the committee and the debtors, and everybody

3    knows there's an equitable subordination cause of action

4    that is going to be prosecuted here.

5            So in evaluating the quality of that bid, the

6    debtors are going to have to take into account what value

7    that quote/unquote claim has under any set of circumstances,

8    whether the settlement agreement is approved, not approved,

9    or anything else.

10           So what other factors to be taken into account

11   relative to the knowledge that an equitable subordination

12   claim exists, can also be taken into account the fact that

13   okay, there's a settlement agreement that purports to

14   allowed this at $113 million.  It's just a calculation that

15   -- to get factored in the context of the auction, there's no

16   reason to expedite this.  It can be done the 19th, it can be

17   done in conjunction with the sale hearing on the 22nd.  But

18   trying to put it on for some time around the 5th, a) it's

19   physically impossible for my firm to actually put that case

20   together and get an objection on file by Thursday, and then

21   prosecute this next Monday, which is the timetable that they

22   are suggesting.

23           Your Honor, we think that some amount of discovery

24   is appropriate here, because on factual issues, and I'm not

25   looking to invade the cone of silence that sits around the

1    mediation, I'm not absolutely looking to go there, on the

2    other hand, the standard for approval of these settlement

3    does have a burden that has to be met by the proponent.

4    It's not, we went to mediation, and the mediator blessed

5    this.  That's not the standard and it never has been.

6           There needs to be a case that's put on.  There

7    needs to be a witness, there needs to be something that

8    supports the allegations that are made in favor of the

9    settlement.

10          And just by way of example, Your Honor, the

11   settlement agreement in multiple places talks about how the

12   benefit to the estate of this settlement is $58 million,

13   which is a wonderful headline number, except I don't think

14   that's right, and I'd like to understand -- if that's the

15   number you're using for purposes of your calculation and

16   conclusion that this somewhat falls within the range of

17   reasonableness, then I think we're entitled to inquire as to

18   how someone came to the conclusion this estate has actually

19   benefitted to the tune of $58 million, when 20 million of

20   what is being waived clearly is of zero value, and 21

21   million of what is being contributed, is clearly not worth

22   par, at least based on all the facts and circumstances that

23   are available to the parties as we sit here today.

24          I think that's a fair ground.  I don't think the

25   answer to that is subject to privilege.  And if I do invade

1    the privilege, I'm sure somebody will stop me.

2              THE COURT:  Okay.

3              MR. HARRIS:  So with that, Your Honor, I think a

4    little longer period here would be more appropriate.  Thank

5    you.

6              THE COURT:  Okay.  Thank you.  Mr. Buchbinder,

7    good afternoon.

8              MR. BUCHBINDER:  Good afternoon, Your Honor, Dave

9    Buchbinder on behalf of the United States Trustee.

10             I did not file a written objection to the motion

11   to shorten time for the very simple reason that I did not

12   see it until 8 o'clock this morning.  I had a leave day

13   yesterday.  I had an opportunity to read the underlying

14   motion, and the motion to shorten time, and I would have to

15   concur for different reasons, that the time that's being

16   requested is far too short to properly vet the issues.

17             Without belaboring the point, there appear to be a

18   number of issues within this settlement agreement that may

19   require objection, if not argument, and frankly today's

20   ruling may create additional issues with respect to the

21   settlement agreement.  I won't go there right now.

22             I'll just quote a notice, this motion was filed

23   literally at midnight Friday night, so it was 11:48 p.m. is

24   what my ECF notification says, and I suppose that's so

25   counsel can say they filed it Friday.  But the reality is,

1    this motion was filed Friday night at midnight, and it was

2    -- even though the application says, we're being really

3    nice, and we're serving people by overnight mail, the

4    reality is, they don't receive it till at least Monday

5    anyway.  So it's really only three and a half business days'

6    notice, because the objection deadline as proposed is noon

7    time on Thursday.

8              This is clearly inadequate under the

9    circumstances.

10             THE COURT:  Yeah.

11             MR. BUCHBINDER:  I appreciate the fact that the

12   debtor and Yucaipa and the committee are familiar with the

13   terms, and as the parties seem to have indicated, familiar

14   with them since the 17th of July, that's almost two weeks

15   ago.  The problem is, nobody else was aware of these terms

16   until this motion was filed, and there are other parties in

17   this case.

18             There doesn't appear any reasons for the reasons

19   that have been stated by parties here, why this shouldn't go

20   out on proper notice and be heard on full notice, and an

21   opportunity to object.  Thank you, Your Honor.

22             THE COURT:  Thank you.  All right.  I agree that

23   the time frame is way too short, that the (indiscernible) on

24   such short notice (indiscernible) give you something the

25   week of the 12th but I don't have the ability to do that.

1    (indiscernible) I don't think it's really necessary to be

2    done that quickly.

3            So I guess technically I'm going to deny the

4    motion to shorten, and I will hear the matter on Monday,

5    August 19th at 2 o'clock, and I'd like objections due by 4

6    o'clock on the 14th.

7            And since we have another hearing later that week,

8    let's leave the 19th for this motion, let's not make it an

9    omnibus date, it'll simply be this motion.  Okay?

10           And the Court will enter an order.

11           Anything else?

12      (No response)

13           THE COURT:  Very good.  Thank you, we're

14   adjourned.

15      (Whereupon, these proceedings were concluded at 2:05

16   p.m.)

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3                    RULINGS

4                                    Page        Line

5   First Omnibus Motion for an Order

6   Pursuant to Section 365 of the

7   Bankruptcy Code and Bankruptcy Rule

8   6006 Authorizing the Debtors to

9   Assume Certain Real Property Leases    --         --

10

11  Debtors' Fourth Motion Pursuant to

12  Bankruptcy Rules 9006(b) and 9027 for

13  Order Extending the Time to File

14  Notices of Removal of Civil Actions    --         --

15

16  Debtors' Fourth Motion for Extension

17  of Exclusive Periods During Which

18  Debtors May Propose and File Plans

19  of Reorganization and Solicit

20  Acceptances Thereof                    --         --

21

22  Debtors' Motion to Authorize Axis

23  Group, Inc. to Enter License Agreement

24  with City of New York                  --         --

25

1                    I N D E X

2

3                    RULINGS

4                              Page      Line

5    Motion of the Debtors Pursuant to 11

6    U.S.C. § 107(b)(1) of the Bankruptcy

7    Code, Bankruptcy Rule 9018, and Local

8    Rule 9018-1(b) to File Exhibit to Key

9    Employee Incentive Plan Under Seal      15         8

10

11   Petitioning Creditors' Motion to File

12   a Redacted Version of the Objection

13   of the Petitioning Creditors to the

14   Debtors' Motion for Order Authorizing

15   (I) Implementation of Key Employee

16   Incentive Plan for Certain Insiders

17   and (II) Payment of any Obligations

18   Arising Thereunder as Administrative

19   Expenses                                15         24

20

21

22

23

24

25

1                    I N D E X

2

3                    RULINGS

4                                    Page      Line

5    Motion for Authorization to Seal the

6    Unredacted Objection of the Official

7    Committee of Unsecured Creditors to

8    Motion for an Order Pursuant to

9    Sections 105(a), 363(b)(1) and

10   503(c)(3) of the Bankruptcy Code

11   Authorizing (I) Implementation of Key

12   Employee Incentive Plan for Certain

13   Insiders and (II) Payment of any

14   Obligations Arising Thereunder as

15   Administrative Expenses                --        --

16

17   Motion of Norman Fredrick Wessels,

18   Joyce Elaine Wessels, Gladys Ann

19   Walker, Michael Jay Meyer, and Dale

20   Woudstra and Tonia Woudstra for

21   Relief from the Automatic Stay to

22   Pursue Personal Injury Claims          --        --

23

24

25

1                    I N D E X

2

3                     RULINGS

4                                    Page        Line

5    Motion by James Joseph Pursuant to 11

6    U.S.C. §362 for Relief from the

7    Automatic Stay                          --          --

8

9    Motion and Joinder of Travis and

10   Erin Cogdill to Motion of Norman

11   Frederick Wessels, Joyce Elaine

12   Wessels, Gladys Ann Walker, Michael

13   Jay Meyer and Dale Woudstra and

14   Tonia Woudstra for Relief from the

15   Automatic Stay to Pursue Personal

16   Injury Claims                           --          --

17

18   Motion for an Order Pursuant to

19   Sections 105(a), 363(b)(1) and

20   503(c)(3) of the Bankruptcy Code

21   Authorizing (I) Implementation of Key

22   Employee Incentive Plan for Certain

23   Insiders and (II) Payment of any

24   Obligations Arising hereunder as

25   Administrative Expenses                 --          --

1                              I N D E X

2

3                              RULINGS

4                                        Page       Line

5    Motion of Yucaipa American Alliance

6    Fund I, L.P.'s and Yucaipa American

7    Alliance (Parallel) Fund I, L.P. for

8    Reconsideration and/or Amendment of

9    Final Order Granting Debtors' Motion

10   for Authorization to Obtain Post-

11   petition Secured Replacement DIP

12   Financing and Related Relief            --        --

13

14   Interim Fee Applications               16        19

15

16   Petitioning Creditors' Motion for

17   Summary Judgment Regarding the

18   Determination of Requisite Lenders

19   Under the First Lien Credit Agreement  120        11

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6
     Sherri L          Digitally signed by Sherri L Breach
                        DN: cn=Sherri L Breach, o, ou,
7                       email=digital1@veritext.com,
     Breach             c=US
                        Date: 2013.07.31 17:00:18 -04'00'
8

     SHERRI L. BREACH

9

     AAERT Certified Electronic Reporter & Transcriber

10

     CERT*D -397

11

12    I, Sheila G. Orms, certify that the foregoing is a correct

13    transcript from the official electronic sound recording of

14    the proceedings in the above-entitled matter.

15

16    Dated:  July 31, 2013

17
      Sheila            Digitally signed by Sheila Orms
18                      DN: cn=Sheila Orms, o, ou,
                        email=digital1@veritext.com,
      Orms              c=US
19                      Date: 2013.07.31 17:00:48
                        -04'00'
20     Signature of Approved Transcriber

21

      Veritext

22

      200 Old Country Road

23

      Suite 580

24

      Mineola, NY  11501

25