# Exhibit 10

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ASHINC Corporation, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 12-11564 (CSS)<br><br>(Jointly Administered) |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., AS CO-ADMINISTRATIVE AGENT, AND SPECTRUM COMMERCIAL FINANCE LLC, AS CO-ADMINISTRATIVE AGENT,<br><br>          Plaintiffs,<br><br>v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., RONALD BURKLE, JOS OPDEWEEGH, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,<br><br>          Defendants. | Adv. Proc. No. _____ (CSS)<br><br>**COMPLAINT FOR (I) EQUITABLE SUBORDINATION, (II) BREACH OF CONTRACT, (III) BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING, AND (IV) TORTIOUS INTERFERENCE WITH CONTRACT** |

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).  The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. (collectively, "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum" and, together with Black Diamond, the "Individual Lender Plaintiffs") and Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC, each in its capacity as Co-Administrative Agent under the First Lien Facility (collectively, the "Agent Plaintiffs," and together with the Individual Lender Plaintiffs, the "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint for (I) Equitable Subordination, (II) Breach of Contract, (III) Breach of the Implied Duty of Good Faith and Fair Dealing, and (IV) Tortious Interference with Contract (the "Complaint") against Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, "Yucaipa"), Ronald Burkle ("Burkle"), Jos Opdeweegh ("Opdeweegh"), Derex Walker ("Walker"), Jeff Pelletier ("Pelletier"), Ira Tochner ("Tochner"), and Joseph Tomczak ("Tomczak," together with Opdeweegh, Walker, Pelletier, and Tochner, the "Yucaipa Directors" and the Yucaipa Directors together with Yucaipa and Burkle, the "Defendants"). The Plaintiffs expressly reserve the right to amend or supplement the parties to, and claims for relief in, the Complaint, and to assert and file additional claims, cross-claims and/or third-party complaints herein and in any related adversary proceeding, including, without limitation, *Allied Systems Holdings, Inc. v. American Money Management Corp. et al.*, Adv. Proc. No. 12-50947 (CSS) (Bankr. D. Del.) (the "Allied Action") and *The Official Committee of Unsecured Creditors of ASHINC Corporation v. Yucaipa American Alliance Fund I, L.P. et al.*, Adv. Proc. No. 13-50530 (CSS) (Bankr. D. Del.) (the "Committee Action"), which cannot be articulated as a result of the fact that the Plaintiffs have not yet been able to confirm or deny certain of the allegations in the related adversary proceedings, and/or due to the failure of the

complainants to particularize their claims in the related adversary proceedings, and/or due to the

fact that the Plaintiffs do not have copies of documents relating to certain of the allegations in the

related adversary proceedings. In support of the requested relief, the Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      This case arises from Yucaipa's intentional scheme to harm the lenders (the "First

Lien Lenders") under the Debtors' $265 million first lien credit facility (the "First Lien

Facility"), including the Individual Lender Plaintiffs.  Yucaipa held a controlling stake in the

Debtors' equity, controlled the Debtors' board of directors, wrongfully acquired majority of the

debt under the First Lien Facility and improperly declared itself the "Requisite Lender" under the

First Lien Facility and used the powers flowing from these positions for its own benefit to the

detriment of the First Lien Lenders.

2.      Initially, Yucaipa's scheme was designed to protect its equity stake from being

wiped out as a result of the legitimate exercise of the rights and remedies of the First Lien

Lenders after the occurrence and during the continuance of numerous defaults under the First

Lien Facility, including payment defaults.  Later, when it became clear its equity stake could not

be preserved because the Debtors were unquestionably insolvent, Yucaipa misused its alleged

position as Requisite Lender to negotiate a transaction with a strategic buyer to extract more

favorable terms for itself relative to the other First Lien Lenders.  Ultimately, Yucaipa's greed in

demanding a premium relative to the other First Lien Lenders (as opposed to agreeing to pro rata

treatment for all First Lien Lenders) killed the proposed transaction, caused harm to all of the

legitimate First Lien Lenders (who would have received payment in full on their First Lien Debt)

and led to the involuntary filing of the Debtors' current bankruptcy cases.

3.      In 2007, pursuant to a reorganization plan (the "2007 Plan") confirmed in the

Debtors' first bankruptcy case (the "2005 Bankruptcy Case"), Yucaipa converted its secured debt

into approximately 67% of the Debtors' equity and had the right to appoint outright three of the five directors on Debtors' Board of Directors (the "Board"). In reality, Yucaipa effectively had the power to appoint all five directors on the Debtors' Board, as it was able to select the Debtors' Chief Executive Officer (who would be the fourth director), as well as the fifth director, who, despite being selected by the creditors' committee in the first bankruptcy case, had to be "reasonably acceptable" to Yucaipa. Thus, given its controlling influence and express appointment and veto powers, even the two nominally "independent" directors were under Yucaipa's control. Accordingly, after the Debtors' emergence from their first bankruptcy case, Yucaipa controlled not only a super-majority of the outstanding equity, but it also effectively controlled 100% of the Debtors' Board.

4.      As part of the 2007 Plan, the Debtors emerged from the 2005 Bankruptcy Case with two credit facilities, comprised of a $265 million First Lien Facility and a $50 million second lien facility (the "Second Lien Facility").

5.      Not long after the Debtors emerged from the 2005 Bankruptcy Case in May 2007, under Yucaipa's control, their business prospects began to falter. By the second quarter of 2008, the Debtors were in default under the First Lien Facility and were nearing insolvency, if not already insolvent. Indeed, at that time, the Debtors were increasingly failing to meet various covenants and failing to pay principal and interest. The Debtors needed either an equity investment to fund their working capital needs and to service the outstanding debt, or a restructuring to reduce the Debtors' leverage and ease their cash requirements. Indeed, the First Lien Lenders pleaded with Yucaipa to provide such an infusion of equity for the benefit of all of the Debtors' stakeholders, including their creditors, their employees and their equity owners, or to negotiate a restructuring to de-lever the balance sheet.

6.      Yucaipa, however, refused to infuse equity capital or to negotiate a restructuring (the effect of which would wipe out its equity investment).  Instead, the Defendants crafted a scheme whereby Yucaipa would wrongfully seize control over the First Lien Facility so that, despite the occurrence and continuance of events of default (including payment defaults), Defendants would not have to be concerned about the First Lien Lenders' exercise of rights and remedies.  Through this scheme, Defendants thwarted any possibility of the Debtors entering into a voluntary restructuring or strategic combination that would dilute or eliminate Yucaipa's existing equity – even though entering into such a transaction would have been in the best interests of the Debtors and their stakeholders, including the First Lien Lenders.

7.      Defendants' scheme was implemented through a series of pre-meditated steps. First, Defendants pushed the existing First Lien Lenders to eliminate the prohibitions on Yucaipa's ability (as the controlling equity) to also own debt under the First Lien Facility (the "First Lien Debt") under the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, as amended (the "First Lien Credit Agreement").  Initially, the First Lien Credit Agreement contained an absolute prohibition on Yucaipa owning any First Lien Debt.  Subsequently, in April 2008, at Yucaipa's request, the First Lien Lenders agreed to permit Yucaipa to acquire only a strictly limited amount of the First Lien Debt, *provided further*, that (a) 50% of any First Lien Debt acquired by Yucaipa was required to be contributed to capital and (b) the remainder of the First Lien Debt acquired by Yucaipa would be subject to onerous limitations and restrictions that prevented Yucaipa from ever becoming the Requisite Lender (*i.e.*, the First Lien Lender that, under the First Lien Credit Agreement, has the power to exercise, or refrain from exercising, the First Lien Lenders' rights and remedies under the First Lien Credit Agreement).

8.      Despite having engineered the amendment to the First Lien Credit Agreement that would permit its acquisition of First Lien Debt (the "Third Amendment"),[2] Yucaipa thereafter declined to purchase any First Lien Debt unless it could do so without any of the restrictions contained in the Third Amendment.

9.      To avoid the restrictions in the Third Amendment, Defendants launched a tender offer to acquire a majority of the First Lien Debt.  A condition to accepting the tender offer was that the selling First Lien Lender had to execute an amendment to the First Lien Credit Agreement allowing Yucaipa to purchase First Lien Debt without any limitation or restriction.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████  The existing First Lien Lenders knew full well that permitting the controlling shareholder to take control of the First Lien Facility could have disastrous consequences for them, since it would permit Yucaipa to preserve its equity stake by blocking the exercise of any rights or remedies of the First Lien Lenders notwithstanding the occurrence and continuance of events of default.  In fact, this was the very concern that drove the First Lien Lenders to prohibit Yucaipa from acquiring any First Lien Debt in the original First Lien Credit Agreement, and to impose the onerous restrictions on any First Lien Debt that Yucaipa was allowed to acquire as provided in the Third Amendment.

10.      Not surprisingly, Yucaipa's tender offer failed.  However, Defendants were not dissuaded and instead undertook a more surreptitious route to reach their goal of total and complete control of the Debtors and the First Lien Debt.  That is, after Yucaipa's tender offer

---

[2] The Third Amendment refers to that certain Amendment No. 3 To Credit Agreement and Consent, dated as of April 17, 2008, to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007.

failed in February 2009, Defendants approached ComVest Investment Partners III, L.P. ("ComVest"), who at that time held a majority of the First Lien Debt and thus constituted the Requisite Lender, to acquire ComVest's First Lien Debt.    Initially, ComVest rebuffed Defendants' overtures, preferring instead to negotiate with the Debtors to pursue either an asset sale or a restructuring that would convert the First Lien Debt into the Debtors' equity (which would wipe out Yucaipa's equity stake).    Defendants persisted and, by virtue of their control of the Debtors and the Board, and, in particular, through a combination of stonewalling any restructuring discussions with ComVest, refusing to allow the Debtors to pursue an asset sale, and directing the Debtors to cease paying interest on the First Lien Debt, convinced ComVest to sell its First Lien Debt. There was, however, a problem for Yucaipa.    To accomplish the sale of ComVest's First Lien Debt to Yucaipa, Yucaipa needed an amendment to the First Lien Credit Agreement that would lift the onerous restrictions imposed by the Third Amendment on Yucaipa's ownership of First Lien Debt. So, as a condition to the purchase and sale of the First Lien Debt, Defendants required ComVest to execute and deliver a further amendment to the First Lien Credit Agreement that, if effective, would permit Yucaipa to purchase First Lien Debt without any limitations or restrictions, and in particular to acquire the status of the Requisite Lender (a position that would allow Yucaipa to control, or prevent, the exercise of rights and remedies by the First Lien Lenders against the Debtors) (the "Purported Fourth Amendment").[3]

11.    On August 21, 2009, the Purported Fourth Amendment allegedly became effective and the Yucaipa/ComVest transaction closed.    By purchasing ComVest's outstanding debt, Defendants were able to improperly maneuver Yucaipa into a position where it held a controlling equity interest, Board control, and (purportedly) control of the First Lien Debt.    With

---

[3] The Purported Fourth Amendment refers to that certain Amendment No. 4 To Credit Agreement, dated as of August 21, 2009, to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007.

the powers emanating from these various positions, Defendants were able to do whatever was in their own self-interest, to the detriment of the other First Lien Lenders. Defendants exercised those powers without regard to, and to the significant detriment of, all of the First Lien Lenders.

12.     Once Yucaipa had allegedly taken control of the First Lien Debt, Defendants exercised Yucaipa's purported power as the Requisite Lender and controlling shareholder in ways that caused harm to the First Lien Lenders. For instance, when The CIT Group/Business Credit, Inc. ("CIT"), in its capacity as the prior Agent under the First Lien Credit Agreement, objected to the Purported Fourth Amendment and Yucaipa's acquisition of ComVest's First Lien Debt, Defendants used their power to cause the Debtors to bring suit against CIT and to paralyze CIT and the First Lien Lenders from the legitimate exercise of their rights and remedies, notwithstanding the occurrence and continuation of events of default (including payment and other covenant defaults). The litigation against CIT continued for almost two years (from November 2009 through December 2011) during which the First Lien Lenders were unable to pursue the legitimate exercise of rights and remedies due to Yucaipa's wrongful assertion that the Purported Fourth Amendment was valid and that it was the Requisite Lender.

13.     Further, as set forth below, Defendants used Yucaipa's position as the purported Requisite Lender to scuttle a transaction with a strategic buyer that would have provided full payment on the First Lien Debt to the First Lien Lenders. Beginning in late 2011, a principal competitor of the Debtors, Jack Cooper Transport Co. ("JCT"), expressed a strong interest in acquiring the Debtors' assets.

14.     The appropriate course of conduct would have been for the Debtors to negotiate a transaction with JCT. At that time, the Debtors were unquestionably insolvent, owed fiduciary duties to all of the Debtors' stakeholders, and had a duty to negotiate the highest and best

purchase price for the assets without regard for how those proceeds might be allocated. Rather than allowing the Debtors to undertake these negotiations, Yucaipa – purporting to act as the Requisite Lender – controlled the negotiations.

15.    Unfortunately, Yucaipa's primary concern was the maximization of its own recovery, with little or no regard for any other First Lien Lender. As such, it had no interest in allowing the Debtors to pursue a typical M&A type transaction with JCT. Instead, Yucaipa sought to pursue a sale of its First Lien Debt and alleged Requisite Lender status so that it could garner a premium for itself to the detriment of the other First Lien Lenders.

16.    Indeed, throughout the negotiations with JCT, Defendants insisted that Yucaipa receive par plus accrued interest for its First Lien Debt, while the other First Lien Lenders were left to "negotiate their own terms." (Yucaipa's Motion for Leave to File a Counterclaim for Equitable Subordination Under 11 U.S.C. § 510(c) or, in the Alternative, to Amend the Answer to Assert Additional Affirmative Defenses (the "Motion for Leave"), Adv. Pro. No. 13-50530 (Bankr. D. Del.), D.I. 320, Ex. A ¶ 50.) When the Individual Lender Plaintiffs legitimately demanded that they receive ratable treatment with Yucaipa for their First Lien Debt, Defendants refused, insisting instead on a disproportionate percentage of the consideration. As a result of Defendants' wrongful actions, the negotiations with JCT eventually broke down.

17.    As a result, rather than paying consideration in a transaction that would have satisfied all of the First Lien Debt in full (*i.e.*, in excess of $300 million), JCT eventually purchased substantially all of the Debtors' assets for only $135 million

18.    As described in more detail below, Defendants repeatedly engaged in inequitable conduct in an attempt to protect Yucaipa's equity investment and then to receive a more

favorable recovery on the First Lien Debt it wrongfully purchased, to the detriment of all First

Lien Lenders, including the Individual Lender Plaintiffs.  Specifically, Yucaipa:

(a)     improperly acquired First Lien Debt in violation of the First Lien Credit
        Agreement;

(b)     improperly used its purported debt holdings to declare itself the Requisite Lender,
        in clear violation of the First Lien Credit Agreement;

(c)     improperly used its status as purported Requisite Lender to neutralize the First
        Lien Lenders, giving the Debtors a "free pass" to ignore the provisions of the First
        Lien Credit Agreement requiring them to pay principal and interest and abide by
        certain financial and operating covenants;

(d)     improperly used its status as purported Requisite Lender to protect its equity
        investment by precluding a badly-needed restructuring of the Debtors; and

(e)     improperly used its status as purported Requisite Lender to insist on a
        disproportionate share of the consideration JCT was willing to pay for the sale of
        the Debtors' assets, which resulted in derailing the sale.

19.     All told, Defendants' actions caused substantial damages to the First Lien Lenders

in an amount to be proven at trial.

20.     Accordingly, the Plaintiffs, on behalf of all First Lien Lenders, bring this action

for:  (i) equitable subordination of Yucaipa's purported First Lien Debt to the First Lien Debt

held by all other First Lien Lenders pursuant to section 510(c) of the Bankruptcy Code for harm

caused to all other First Lien Lenders; (ii) breach by Yucaipa of the First Lien Credit Agreement,

as amended by the Third Amendment; (iii) breach by Yucaipa of the duty of good faith and fair

dealing implied in the First Lien Credit Agreement; and (iv) tortious interference with contract

against the Yucaipa Directors and Burkle.

## JURISDICTION AND VENUE

21.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of

Bankruptcy Procedure.

22.     This Court has original jurisdiction under 28 U.S.C. § 1334(b), in that this is a civil proceeding relating to the underlying case arising under title 11 of the United States Code.

23.     This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(1)(b)(2)(A), (B), (K) and (O).

24.     This Court has personal jurisdiction over Defendants pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

25.     Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## THE PARTIES

26.     BDCM Opportunity Fund II, LP is a Delaware limited partnership, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830.

27.     Black Diamond CLO 2005-1 Ltd. is a Cayman Islands limited liability company, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich CT 06830.

28.     Spectrum Investment Partners, L.P. is a Delaware limited partnership, with its principal place of business at 1250 Broadway, New York, NY 10001.

29.     Black Diamond Commercial Finance, L.L.C. is a Delaware limited liability company, with its principal place of business at One Hundred Field Drive, Lake Forest, IL 60045-2596 and is Co-Administrative Agent under the First Lien Credit Agreement, bringing these claims on behalf of all First Lien Lenders.

30.     Spectrum Commercial Finance LLC is a Delaware limited partnership, with its principal place of business at 1250 Broadway, New York, NY 10001 and is Co-Administrative Agent under the First Lien Credit Agreement, bringing these claims on behalf of all First Lien Lenders.

31.     Upon information and belief, Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P. are Delaware limited partnerships headquartered at 9130 West Sunset Boulevard, Los Angeles, California 90069.

32.     Defendant Ronald Burkle, an individual, is, upon information and belief, the founder and Managing Partner of The Yucaipa Companies LLC, a private investment firm and, upon information and belief, at all relevant times, controlled the actions of Yucaipa and the Yucaipa Directors.

33.     Defendant Jos Opdeweegh is an individual who served as a director of the Debtors during the relevant time period herein.   Upon information and belief, Defendant Opdeweegh, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a director at the direction of and for the benefit of Yucaipa and Burkle.

34.     Defendant Derex Walker is an individual who served as a director of and Chairman of the Board of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Walker, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a driector at the direction of and for the benefit of Yucaipa and Burkle.

35.     Defendant Jeff Pelletier is an individual who served as a director of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Pelletier, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a director at the direction of and for the benefit of Yucaipa and Burkle.

36.     Defendant Ira Tochner is an individual who served as a director of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Tochner, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a director at the direction of and for the benefit of Yucaipa and Burkle.

37.     Defendant Joseph Tomczak is an individual who served as an officer and director of the Debtors during the relevant time period herein.  Upon information and belief, Defendant Tomczak, at all relevant times herein, was affiliated with Yucaipa or The Yucaipa Companies LLC and acted in his capacity as a director at the direction of and for the benefit of Yucaipa and Burkle.

## FACTUAL ALLEGATIONS

38.     The Debtors were, at all relevant times, leading providers of distribution and transportation services to the automotive industry in North America, primarily focused on the delivery of new automobiles from manufacturing facilities to dealerships.

(a)     **The Debtors' 2007 Bankruptcy, Yucaipa's Acquisition of the Majority of the Equity, and the Debtors' Secured Debt**

39.     The Debtors filed the 2005 Bankruptcy Case on July 31, 2005 in the United States Bankruptcy Court for the Northern District of Georgia.  In or about May 2006, Yucaipa purchased a majority stake of the Debtors' then existing senior unsecured notes at a substantial discount to their par value.

40.     When the Debtors emerged from bankruptcy in May 2007, Yucaipa was in total control of the Debtors.  As part of the 2007 Plan, Yucaipa converted its debt into approximately 67% of the issued and outstanding common stock of the reorganized Debtors (which it later increased to approximately 70%).  Yucaipa also had the right to appoint three of the five members of the Board, appoint the Chief Executive Officer (who was a fourth member of the

Board), and had approval rights over the fifth and final member of the Board, who was to be appointed by the creditors' committee in the 2005 Bankruptcy Case. As a result, Yucaipa had a permanent majority and, for all intents and purposes, the ability to exercise complete control of the Board.

41.     The Debtors exited the 2005 Bankruptcy Case with $315 million of exit financing comprised of a $265 First Lien Facility and a $50 million Second Lien Facility.

42.     The First Lien Facility was comprised of $180 million of term loans, a $35 million revolving credit facility from CIT and a $50 million letter of credit facility.

43.     The First Lien Facility is governed by the First Lien Credit Agreement, entered into by and among Allied Holdings, Inc. ("Holdings") and Allied Systems Ltd (LP) ("Systems"), as Borrowers, and certain subsidiaries of Holdings, as Guarantors, various lenders, Goldman Sachs Credit Partners L.P. ("Goldman Sachs"), as Lead Arranger and Syndication Agent, and CIT, as Administrative Agent and Collateral Agent.

44.     The Second Lien Facility was comprised of $50 million of term loans.

45.     The Second Lien Facility is governed by that certain Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007 (the "Second Lien Credit Agreement"), entered into by and among Holdings and Systems as Borrowers and certain subsidiaries of Holdings as Guarantors, various lenders, and Goldman Sachs, as Lead Arranger, Syndication Agent, Administrative Agent and Collateral Agent.

46.     In 2008, shortly after emergence from the 2005 Bankruptcy Case, the Debtors defaulted under both the First Lien Credit Agreement and Second Lien Credit Agreement. Specifically, and only by way of example among many other Events of Default, the Debtors

failed to pay required principal and interest payments – at times at Defendants'[4] express

insistence – even when the Debtors had the cash on hand to make the required payments.

> (b)     **The First Lien Credit Agreement Was Expressly Drafted and Always Intended to Prevent Yucaipa, as the Majority Equity Holder, from Gaining Control Over the Outstanding Debt**

47.     Given the size of Yucaipa's equity stake, its control of the Board and, indeed, its

control over all of the Debtors, the First Lien Credit Agreement provided that Yucaipa, as the

"Sponsor," could not acquire any First Lien Debt.  The purpose of the provision was clear – the

First Lien Lenders did not want to have the Sponsor/controlling shareholder as a Lender under

their First Lien Credit Facility with the ability to potentially interfere with the legitimate exercise

of rights and remedies designed to protect the interests of the true First Lien Lenders

48.     The First Lien Credit Agreement set forth a mechanism designed to ensure that a

majority of the legitimate holders of the First Lien Debt would be able to control most of the

actions taken by the lending group.  In particular, the First Lien Credit Agreement provides that

"Requisite Lenders" – defined as holders of debt under the First Lien Facility representing more

than 50% of the sum of the aggregate "Term Loan Exposure" of all lenders, the aggregate letter

of credit exposure, and the aggregate revolving credit exposure (First Lien Credit Agreement §

1.1) – have the power to make certain key decisions affecting all First Lien Lenders.

49.     Among other things, the Requisite Lenders under the First Lien Facility have the

authority to declare or not declare "Events of Default" under the First Lien Credit Agreement.

(*Id.* §§ 8.1, 9.8.).  The Requisite Lenders also have the ability to direct the Administrative Agent

and Collateral Agent to act, or refrain from acting, upon the occurrence and continuance of an

Event of Default.

---

[4] This allegation as to Burkle, as are the other such allegations as to Burkle herein, is asserted upon information and belief, unless otherwise set forth.

50.     The First Lien Credit Agreement expressly prevented Yucaipa – as the Debtors' majority shareholder and "Sponsor" – from becoming a "Lender" under the First Lien Credit Agreement.  As a result, Yucaipa could also never become a Requisite Lender.  (*Id.* §§ 1.1, 10.6.)

51.     The First Lien Credit Agreement was amended or, in the case of the Purported Fourth Amendment, purportedly amended, on four occasions.  The Third Amendment and Purported Fourth Amendment are relevant to this proceeding.

    (c)    **Defendants Cause the Third Amendment to the First Lien Credit Agreement to be Executed by the Debtors to Permit Yucaipa to Purchase a Limited Amount of First Lien Debt**

52.     Not long after the Debtors emerged from the 2005 Bankruptcy Case, Yucaipa entered into discussions with CIT, in its capacity as Administrative Agent, concerning an amendment to the First Lien Credit Agreement that would permit Yucaipa to acquire First Lien Debt.  Although Yucaipa was not going to be a party to the amendment, it and its attorneys took the lead in negotiating and drafting the terms of the amendment.  By contrast, the Debtors took a back seat and allowed Yucaipa to dictate the terms of the negotiations.

53.     By April 2008, Yucaipa and CIT had reached agreement as to the terms of the Third Amendment, which amended the First Lien Credit Agreement such that Yucaipa, for the first time, could acquire debt under the First Lien Facility, but only under tight limitations and restrictions, as well as a requirement that half of any First Lien Debt acquired be contributed to capital.

54.     Under the Third Amendment, Yucaipa is the "Restricted Sponsor Affiliate," which is defined as the "Sponsor and its Affiliates" (under the First Lien Credit Agreement, the "Sponsor" is Yucaipa).  (First Lien Credit Agreement § 1.1.)  Accordingly, in light of being the Restricted Sponsor Affiliate under the terms of the Third Amendment, Yucaipa could, for the

first time, acquire certain First Lien Debt.  However, under the Third Amendment, Yucaipa was

precluded from becoming a Requisite Lender and, to the extent Yucaipa decided to acquire any

First Lien Debt, it would be subject to the following restrictions, among others:

- Yucaipa could not acquire more than the lesser of (a) 25% of the aggregate principal amount of the Term Loan Exposure held by all First Lien Lenders and (b) $50 million in principal amount of Term Loans (Third Amendment § 2.7(c));

- Within ten days of its acquisition of any Term Loans, Yucaipa was required to make a capital contribution to the Debtors of at least 50% of the aggregate principal amount of those Term Loans (*id.* § 2.7(e)); and

- Yucaipa could not exercise any voting rights that it would otherwise have as a First Lien Lender, including the right to consent to any amendment to the First Lien Credit Agreement or the right to vote its debt in any bankruptcy (*id.* §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)).

55.    Notwithstanding these restrictions, the fact that the Third Amendment permitted

Yucaipa, as the Sponsor, to acquire any of the First Lien Debt was a unique achievement for

Yucaipa.  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

56.    However, Yucaipa was not interested in acquiring any debt subject to the

restrictions that it negotiated in the Third Amendment.  Indeed, in these bankruptcy proceedings,

Yucaipa has admitted that it "never intended to purchase any debt claims that would make it

bound by the Third Amendment's provisions" and that it "never would have acquired any first

lien debt while the Third Amendment's restrictions and conditions limiting Yucaipa's potential

ownership rights existed." (Yucaipa's Amended Counterclaim and Cross-Claim for Declaratory

Judgment and Injunctive and Other Relief and Amended Answer to Debtors' Verified Complaint

(the "Cross-Claims"), Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 ¶¶ 25(a), 50.) Accordingly, dissatisfied with the terms of the Third Amendment that they solicited and negotiated, Defendants continued with their scheme to take total control over the First Lien Credit Agreement to the detriment of the legitimate First Lien Lenders.

      (d)    **Defendants Continue to Pursue Yucaipa's Acquisition of a Majority of the First Lien Debt**

      57.    Throughout 2008, Defendants were in continuous talks with CIT, as the Agent for the First Lien Lenders, as well as with various holders of the First Lien Debt, regarding the Defaults and Events of Default that had occurred and were continuing under the First Lien Credit Agreement. These discussions led Defendants to become concerned that the First Lien Lenders were not going to stand idly by, given the extensive Defaults and Events of Default that had occurred and were continuing – as well as the continued decline in the operational performance of the Debtors. Defendants were also concerned that the First Lien Lenders could begin to exercise their rights and remedies against the Debtors at any time. Defendants were desperate to prevent that from happening because such action could wipe out Yucaipa's equity stake.

      58.    Defendants were informed of the request by the existing First Lien Lenders that Yucaipa support the Debtors through the infusion of additional equity capital. ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

59.     Faced with the possibility of ██████████████████████
████████████████████████████████████ Defendants increased their efforts to
keep, and ultimately solidify, Yucaipa's total control over the Debtors. ██████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████

60.     ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████

61.     ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████

62.     Nevertheless, apparently undeterred by the extraordinary nature of its request, on
February 4, 2009, Yucaipa launched a tender offer to the existing holders of the First Lien Debt
that, if successful, would have permitted Yucaipa to acquire an unlimited amount of First Lien

Debt without any limitations or restrictions, and to become the Requisite Lender. Thus, pursuant to the tender offer, Yucaipa offered to purchase the outstanding First Lien Debt for approximately 13 to 15 cents on the dollar. As a condition to the acceptance of the tender, Yucaipa required any tendering First Lien Lender to execute a further amendment to the First Lien Credit Agreement that would have removed all of the limitations and restriction imposed on Yucaipa's ability to acquire and vote First Lien Debt under the Third Amendment, thus allowing Yucaipa to acquire an unlimited amount of First Lien Debt without any limitations or restrictions and to become the Requisite Lender.

63.      The then existing First Lien Lenders did not accept Yucaipa's offer to tender their First Lien Debt, and the proposed tender offer and amendment strategy failed.

(e)      **Defendants Initiate Their Backup Plan to Take Total Control Over the Debtors Utilizing ComVest to Enable Yucaipa to Become the Requisite Lender**

64.      Having failed in their efforts to convince the First Lien Lenders to permit Yucaipa to take total control over the First Lien Facility, Defendants initiated their backup plan to take complete control over the Debtors. Accordingly, Defendants turned their sights on another entity, ComVest – who was at that time the Requisite Lender – to give Defendants the total control they desired. ComVest had been threatening to move forward with the exercise of the rights and remedies of the First Lien Lenders and to force either a sale of the Debtors or a restructuring (which would wipe out Yucaipa's equity). Defendants needed to find a way to stop ComVest and the First Lien Lenders from proceeding on either path.

65.      To do this, Defendants engaged in a multi-step approach. First, Yucaipa engaged in discussions with ComVest to acquire ComVest's First Lien Debt. Second, Yucaipa – utilizing its control over the Board and management – stonewalled ComVest's efforts to pursue a sale or restructuring while at the same time asserting maximum pressure on ComVest and the other First

Lien Lenders by, *inter alia*, withholding payment of principal and interest due under the First Lien Credit Agreement.

66.     For example, at an August 3, 2009 Board meeting called for the purpose of discussing the Debtors' "liquidity, especially with respect to the approximately $4.8 million interest payment due to the First Lien Lenders the next day," the Board was advised that Defendant Walker "had suggested that the Company might be well-advised not to make the payment."

67.     At that meeting, Defendant Walker "updated the Board on the status of negotiations with ComVest, stating that ComVest and Yucaipa were back in discussions," that Yucaipa believed a deal could be reached, but "warned, however, that it was critical that the Company have adequate liquidity to provide a sufficient runway for negotiations, and that a free fall into bankruptcy could be highly disruptive to the Company and to the ongoing negotiations." Defendant Walker further "advised that based upon his conversations with ComVest, he did not believe that failure to make the payment would lead to precipitous action by the lenders or anyone else" because, according to Defendant Walker, "ComVest, as the Requisite Lenders, would not seek to exercise any rights and would not allow others to do so given the current state of negotiations between ComVest and Yucaipa."

68.     At this same meeting, Scott Macaulay, the Debtors' chief financial officer, advised the Board that the Debtors had $16.5 million of cash on hand, of which $12.3 million was immediately available. Of that $12.3 million, $2 million was needed for insurance premium payments, leaving $10.3 million in immediately available cash on hand. Mr. Macaulay advised that making the interest payment of $4.8 million to the First Lien Facility lenders would leave the Debtors with $5.5 million of immediately available cash on hand. Accordingly, the Debtors

had sufficient funds available to make their payment and to stay current on their payment obligations under the First Lien Credit Agreement.

69.      Nevertheless, notwithstanding the fact that the Debtors had sufficient liquidity to pay debt service under the First Lien Facility, in order to facilitate Defendants' interests in negotiations with ComVest, Defendant Walker made a motion to the Board that the Debtors forego the quarterly interest payment that they owed the First Lien Lenders on August 4, 2009, which motion was carried by the Board unanimously.

(f)      **Defendants Complete Their Backup Plan to Take Total Control Over the Debtors' Financial Structure, as They Negotiate and Cause the Debtors to Execute the Purported Fourth Amendment**

70.      While Defendants were using their control of the Debtors to put pressure on ComVest by, *inter alia*, causing the Debtors to intentionally default on their payment obligations to ComVest and the other First Lien Lenders, Defendants continued negotiations with ComVest to complete their backup plan to acquire control over the First Lien Credit Facility.  Yucaipa's negotiating team consisted of Defendants Burkle, Walker, Tochner, and also Stephanie Bond, who was employed by Yucaipa, with a third-party, ███████████████████████ ██████████████████████, acting as a go-between with ComVest.

71.      ████████████████████████████████████████████████

████████████

██████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████



72.

73.     Defendants, desperate to forestall the First Lien Lenders' exercise of remedies, caused Yucaipa to pay a significant premium to acquire ComVest's First Lien Debt. ▮

74.     Although Yucaipa had struck a deal with ComVest to acquire all of ComVest's First Lien Debt and become the Requisite Lender, that transaction was prohibited by the terms of the Third Amendment.  So, to accomplish the contemplated purchase and sale, Yucaipa needed for there to be a further amendment to the First Lien Credit Agreement allowing Yucaipa to acquire an unlimited amount of First Lien Debt and eliminating any and all limitations and restrictions contained in the Third Amendment.  Thus, as a condition of the closing of the transaction, ComVest and the Debtors (at Yucaipa's direction) executed the Purported Fourth Amendment.

75.     The Purported Fourth Amendment (if valid and enforceable) would have eliminated all of the Third Amendment's restrictions on Yucaipa's ability to acquire First Lien Debt.  The Purported Fourth Amendment would have amended the First Lien Agreement's definitions of "Eligible Assignee" and "Term Loan Exposure" such that Yucaipa's ability to acquire certain First Lien Debt was no longer prohibited.  (Purported Fourth Amendment § 2.1(b).)  It further would have eliminated the voting restrictions for First Lien Debt acquired by Yucaipa, removed the cap on the amount that could be acquired, and eliminated the capital contribution requirement.  (*Id.* § 2.4(a).)  In sum, it would have permitted Yucaipa to become a "Lender" without any restrictions whatsoever, and with the ability to become the Requisite Lender – the exact antithesis of what the First Lien Lenders specifically provided under the original First Lien Credit Agreement.

76.     The Loan Purchase Agreement and the Assignment and Assumption Agreement (the "Fourth Amendment Agreements") were executed on August 21, 2009, simultaneously with the Purported Fourth Amendment itself.  Through the Fourth Amendment Agreements, Yucaipa purported to acquire and hold "$114,712,088.66 of Term Loans and $30,400,458.40 of LC

Commitments (*i.e.* deposits to support letter of credit), totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement." (Cross-Claims, Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 ¶ 17.) ███████████████████

███████████████████

77.     Following the execution of the Purported Fourth Amendment and the Fourth Amendment Agreements, Yucaipa contended that it was the Requisite Lender under the First Lien Credit Agreement.

(g)    **Defendants Use Yucaipa's Alleged Requisite Lender Status to Paralyze the First Lien Lenders**

78.     Operating under the Purported Fourth Amendment and the belief that they had succeeded in their plan to take control over the First Lien Credit Agreement, Defendants exercised the authority of the Requisite Lender. Defendants' actions as the purported Requisite Lender violated the First Lien Credit Agreement and the Third Amendment, and thereby prevented the First Lien Lenders from exercising any of their rights or remedies under the First Lien Credit Agreement, notwithstanding the occurrence and continuance of Defaults and Events of Default (including payment defaults), and notwithstanding the continuing decline in the Debtors' operational performance. Clearly, Defendants were determined to assert total control over the Debtors and the First Lien Credit Agreement such that no remedies could be exercised, no restructuring could take place, and no sale could occur, unless it was on terms acceptable to Defendants.

79.     Additionally, following the execution of the Purported Fourth Amendment, the Debtors, at Yucaipa's direction as controlling shareholder and with its "consent" as alleged Requisite Lender, refused to make regularly scheduled payments of principal and interest under the First Lien Facility. The Debtors, at Yucaipa's direction as controlling shareholder and with

its "consent" as alleged Requisite Lender, also failed to reimburse collateral accounts that secured the First Lien Facility's letter of credit facility, attempted to terminate certain control agreements, and attempted to retain excess cash all in violation of the terms of the First Lien Credit Agreement. These steps caused continuing harm and damage to the First Lien Lenders.

80.     Thus, Yucaipa, acting as the purported Requisite Lender, gave the Debtors a "free pass" to ignore the terms of the First Lien Credit Agreement that required the Debtors to pay principal and interest and abide by various financial and operating covenants.

(h)     **Litigation Surrounding the Purported Fourth Amendment**

81.     Although Yucaipa claimed to be the Requisite Lender under the Credit Agreement in light of the Purported Fourth Amendment, its claim to that position was contested first by CIT, in its capacity as the Administrative Agent, and later by the Individual Plaintiff Lenders, and was an issue in at least three separate proceedings (the third of which includes multiple adversary proceedings before this Court).

(i)     **The Georgia Litigation**

82.     Approximately one month after the execution of the Purported Fourth Amendment, the Individual Plaintiff Lenders objected to Yucaipa's acquisition of First Lien Debt and alleged status as Requisite Lender, and instructed CIT, in its capacity as Administrative Agent, to challenge the validity and enforceability of the Purported Fourth Amendment.

83.     Following CIT's objection to the Purported Fourth Amendment, in November, 2009, Yucaipa and the Debtors (at Yucaipa's direction), brought suit against CIT in the Superior Court of Fulton County, Georgia (the "Georgia Action"), seeking, among other things, a declaratory judgment that the Purported Fourth Amendment was valid and that Yucaipa was the Requisite Lender.    In response, CIT filed counterclaims seeking, among other things, a declaration that the Purported Fourth Amendment was invalid and stating claims for breach of

fiduciary duty against the Allied Board and aiding and abetting breach of fiduciary duty against Yucaipa.

84.    After two years of litigation in the Georgia Action – during which time the First Lien Lenders were completely paralyzed and unable to take action in respect of the numerous Events of Default that occurred and were continuing – CIT entered into a settlement agreement with the Debtors and Yucaipa, in which CIT capitulated that Yucaipa was the Requisite Lender. The settlement agreement, however, clearly provided that the settlement was made solely by CIT in its individual capacity and did not release any claims that may have existed on behalf of "any other person."

### (ii)    The New York Action

85.    On January 17, 2012, just weeks after the settlement of Yucaipa's and the Debtors' lawsuit against CIT, the Individual Lender Plaintiffs commenced an action (the "New York Action") against Yucaipa in the Supreme Court of the State of New York (the "New York Court") seeking a declaration that "(i) the purported Fourth Amendment is null and void, ineffective, and not binding," and (ii) that "Yucaipa is not the Requisite Lenders under the Credit Agreement."

86.    Yucaipa's motion to dismiss the New York Action was denied at a May 30, 2012 hearing without a written opinion, and the transcript of that hearing was "So Ordered" on August 2, 2012.

87.    The Individual Lender Plaintiffs moved for summary judgment on August 27, 2012. At oral argument on that motion on November 19, 2012, the court indicated it would grant the Individual Lender Plaintiffs' motion for summary judgment and that it would subsequently issue a written order.

88.     In its written decision, dated March 8, 2013, the New York Court held that the restrictions contained in the Third Amendment "precluded Yucaipa from becoming the Requisite Lender or exerting control over the other Lenders." *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at *5 (N.Y. Sup. Ct. Mar. 8, 2013).  The New York Court further held that Yucaipa's attempt to usurp Requisite Lender status through the Purported Fourth Amendment was "of course, flatly prohibited under the Credit Agreement" and therefore "the Purported Fourth Amendment is *invalid and of no force or effect.*" *Id.* at *5 (emphasis added).  Based on the foregoing, the New York Court unequivocally held that "***Yucaipa is not the Requisite Lender.***" *Id.* at *6 (emphasis added).

89.     On December 17, 2013, the New York Appellate Division affirmed the New York Court's finding that the Purported Fourth Amendment was void *ab initio* and that Yucaipa is not the Requisite Lender.  *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, 978 N.Y.S.2d 10, 11-12 (N.Y. App. Div. 2013).

90.     On January 17, 2014, conceding that the Appellate Division's decision did not disturb the New York Court's finding that the Purported Fourth Amendment was void *ab initio* and that Yucaipa is not the Requisite Lender, Yucaipa filed a motion for leave to appeal to the New York Court of Appeals.  The New York Court of Appeals subsequently denied the motion. As a result, Yucaipa has exhausted its appeals in the New York Action.

(i)     **Yucaipa, as the Alleged Requisite Lender, Usurps Negotiations with JCT With Catastrophic Results**

91.     JCT was a principal competitor of the Debtors and had long sought to acquire the Debtors' assets in a strategic combination that would consolidate the industry.

92.     In fact, JCT's Chairman (Michael Riggs) often remarked that acquiring the Debtors' assets and merging them with JCT would be the fulfillment of "a life dream."  At the

bankruptcy auction in September 2013, Riggs noted that he had been pursuing the Debtors for so long that "no one on the planet wants it [Allied] more than me."

93.     JCT ultimately acquired substantially all of the Debtors' assets in a Section 363 sale, which closed on December 27, 2013.  The price paid by JCT for substantially all of the Debtors' assets – $135 million – was far less than the value previously offered by JCT in proposals tendered in late 2011 and 2012, proposals that would have returned significantly greater value to the First Lien Lenders but for the Defendants' interference and inappropriate conduct.

94.     The significant deterioration in the value actually realized by the First Lien Lenders was the direct result of Yucaipa's wrongful usurpation of the negotiations with JCT. The negotiation of the JCT proposals, unfortunately, took place between JCT and Yucaipa (in its alleged capacity as Requisite Lender – which it was not), rather than with the "disinterested" members of the Board (or a special committee of the Board), whose responsibility would have been to negotiate the highest and best purchase price for the assets without immediate regard for how those proceeds might be allocated.

95.     Defendants, however, had a different agenda.  They had no interest in allowing the Debtors to pursue a typical M&A type transaction.  In fact, Defendants' strategy is confirmed by an e-mail from Riggs to the Individual Lender Plaintiffs in December 2011, in which Riggs explains that Yucaipa "is not interested in exploring a typical M&A type transaction" and instead wants JCT to "find a way to . . . buy their debt."

96.     Yucaipa, improperly using its alleged Requisite Lender position, wanted to pursue a sale of its First Lien Debt (instead of a typical M&A transaction) so that it could garner a premium for itself by demanding a disproportionate share of the consideration that JCT was

willing to pay, to the detriment of the other First Lien Lenders. The preferential and disparate treatment that Defendants were seeking to obtain for Yucaipa is reflected in documents produced during discovery. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

97.    When Individual Lender Plaintiffs legitimately requested that they receive ratable treatment with Yucaipa on account of the First Lien Debt they held, Yucaipa refused to yield, insisting instead on a disproportionate percentage of the consideration. As a result of Defendants' wrongful actions, the prospects for a transaction with JCT deteriorated dramatically.

98.    In February 2012, and again in March 2012, when it became evident that Defendants' intransigence was making it impossible to pursue a transaction with JCT that would benefit all of the First Lien Lenders equally, the Individual Lender Plaintiffs wrote letters to the Board demanding that the Board step in and take action consistent with its fiduciary obligations. Not surprisingly, the Yucaipa dominated board refused to act, leaving Defendants in the position of setting their own terms for allowing any JCT transaction to move forward. The terms Defendants set, however, continued to require disproportionately better treatment for Yucaipa and ultimately cratered any prospect for a transaction with JCT.

99.    Defendants' improper conduct in connection with the 2011/2012 negotiations with JCT forms part of the basis for Plaintiffs' claim for equitable subordination of Yucaipa's claims.  Equitable subordination is appropriate when, as here, there is evidence showing that creditors should recover less on their debts as a result of the defendant's misconduct.  Had Defendants not engaged in the inequitable conduct described above, JCT "would have paid each Lender in full (i.e., par plus accrued interest) for the $305.1 million of outstanding first lien debt."  (*See* Motion for Leave, Adv. Pro. No. 13-50530 (Bankr. D. Del.), D.I. 320, Ex. A ¶ 57.) Yucaipa's First Lien Debt claims should be equitably subordinated so as to compensate the harmed First Lien Lenders in an amount equal to the difference between (i) the actual recovery to First Lien Lenders (other than Yucaipa) from the proceeds of the JCT sale and (ii) the recovery that could have been realized had Yucaipa not wrongly appropriated discussions regarding a potential acquisition of the Debtors by JCT in late December 2011 (approximately 100% of a par recovery plus accrued interest).  As a result, Yucaipa's distribution as First Lien Lenders should be equitably subordinated and, to the extent already paid, then turned over to the Co-Administrative Agents on behalf of the non-Yucaipa First Lien Lenders until the non-Yucaipa First Lien Lenders are made whole.

100.    In addition, Defendants' wrongful conduct in connection with the JCT negotiations turned what would have been a quick and relatively inexpensive proceeding to accomplish a Section 363 sale to JCT into a protracted, and expensive, battle lasting nineteen months.  As a result, the Debtors were forced to incur $30 million in post-petition financing, reducing the amount available from the Debtors' assets for distribution to the First Lien Lenders. The non-Yucaipa First Lien Lenders were also forced to incur millions of dollars in legal fees in

connection with the bankruptcy cases and the New York Action made necessary by Yucaipa's wrongful acts.

(j)     **Yucaipa Has Failed to Perform Under the Third Amendment**

101.    In the New York Action, the Purported Fourth Amendment was found to be invalid such that any reliance on the Purported Fourth Amendment now is misplaced. Accordingly, the Third Amendment is clearly the operative amendment to the First Lien Credit Agreement and its terms, including the contribution provisions and limitations upon Yucaipa's debt holdings, are binding and controlling.

102.    However, notwithstanding the ruling in the New York Action, Yucaipa refused to perform in accordance with the terms of the First Lien Credit Agreement, as amended by the Third Amendment.

(k)     **The Filing of These Bankruptcy Cases and Prior Proceedings in This Court**

103.    On May 18, 2012, the Individual Lender Plaintiffs filed these involuntary bankruptcy proceedings against the Debtors. Thereafter, the Debtors consented to the entry of an order for relief and filed voluntary petitions on behalf of their subsidiaries and affiliates.

104.    During the initial period of the chapter 11 cases, and even after the decision by the New York Court, Yucaipa continued to allege that it was the Requisite Lender under the First Lien Credit Agreement. To resolve the question, on July 9, 2013, the Individual Lender Plaintiffs filed a motion for summary judgment seeking a determination that they were the Requisite Lenders.

105.    On August 8, 2013, this Court granted the Individual Lender Plaintiffs' motion for summary judgment, holding that any First Lien Debt held by Yucaipa is subject to the terms of the Third Amendment, and that the Individual Lender Plaintiffs are the Requisite Lenders under the First Lien Credit Agreement.

106.    The Debtors subsequently conducted a court-approved auction to sell substantially all of their assets, including the collateral securing the First Lien Debt. Substantially all of the Debtors' assets were sold to JCT for a net recovery to First Lien Lenders of approximately $105 million (the "Sale Proceeds").[5] The Sale Proceeds were more than $100 million less than the amount offered by JCT in late 2011 and early 2012.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Equitable Subordination Pursuant to 11 U.S.C. § 510(c) Against Yucaipa for Harm to All First Lien and Second Lien Lenders**

107.    The Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 106 as if set forth fully herein.

108.    At all times relevant hereto, Yucaipa was either a statutory "insider" of the Debtors as such term is defined in 11 U.S.C. § 101(31) or, alternatively, a *de facto* insider of the Debtors.

109.    As more fully described above, Yucaipa, as an insider with effective control over the Debtors and the Board and in its capacity as alleged Requisite Lender, has engaged in inequitable misconduct that specifically harmed the First Lien Lenders (other than Yucaipa) in ways that are different from any harm suffered by the Debtors' other creditors by, among other things:

(a)    improperly acquiring First Lien Debt in violation of the First Lien Credit Agreement;

(b)    improperly using its purported First Lien Debt holdings to declare itself the Requisite Lender, in clear violation of the First Lien Credit Agreement;

(c)    improperly using its status as purported Requisite Lender to neutralize the First Lien Lenders, giving the Debtors a "free pass" to ignore the provisions of the First

---

[5] The gross proceeds from the JCT sale totaled approximately $135 million.

Lien Credit Agreement requiring it to pay principal and interest and abide by certain financial and operating covenants;

(d)   improperly using its status as purported Requisite Lender to protect its equity investment by precluding a badly-needed restructuring of the Debtors;

(e)   improperly using its status as purported Requisite Lender to insist on a disproportionate share of the consideration JCT was willing to pay for the sale of the Debtors' assets, which derailed the sale;

(f)   improperly usurping Requisite Lender status, causing the First Lien Lenders to incur unnecessary legal costs regarding the impropriety of Yucaipa's status as Requisite Lender and the invalidity of the Purported Fourth Amendment; and

(g)   improperly usurping Requisite Lender status, preventing the Debtors from consummating a sale, which in turn caused the Debtors and the First Lien Lenders to incur unnecessary legal costs.

110.   As a result of Yucaipa's conduct, the First Lien Lenders (other than Yucaipa) have been materially harmed.

111.   Granting the relief sought herein against Yucaipa is consistent with the Bankruptcy Code and is appropriate based on the indisputable facts of this case.

112.   Pursuant to 11 U.S.C. §510(c), all distributions to Yucaipa on account of its status as First Lien Lender should be subordinated to the claims of all other First Lien Lenders and, to the extent already distributed to Yucaipa, then turned over to the Co-Administrative Agents on behalf of the non-Yucaipa First Lien Lenders until the non-Yucaipa First Lien Lenders are made whole.

## Second Claim for Relief

### Breach of Contract Against Yucaipa

113.   The Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 112 as if fully set forth herein.

114.   As a holder of First Lien Debt, Yucaipa is bound by the terms of the First Lien Credit Agreement, as amended by the Third Amendment.

115.    The court in the New York Action declared that the Purported Fourth Amendment is invalid.  Accordingly, because the Purported Fourth Amendment has been found to be null and void, the Third Amendment is enforceable and its terms govern any holders of First Lien Debt, including Yucaipa.

116.    In addition, this Court has determined that the Third Amendment is binding on Yucaipa.  (Transcript of Proceedings Held on July 30, 2013, Adv. Proc. No. 13-50530 (Bankr. D. Del.), D.I. 297 at 127:13-15.)

117.    Yucaipa has breached the First Lien Credit Agreement, as amended by the Third Amendment, by acquiring more Term Loan Exposure than permitted under Section 10.6(c) of the Third Amendment.  Specifically, Section 10.6(c)(ii) provides, in relevant part:

> no Lender may sell, assign, transfer or otherwise convey any of its rights and obligations under this Agreement . . . and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) . . . the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate principal amount of the Term Loan Exposure . . . or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would exceed $50 million . . . .

118.    Thus, under the terms of the Third Amendment, at most, Yucaipa would be permitted to hold the lesser of $50 million or 25% of the aggregate principal amount of Term Loans.

119.    Yucaipa breached the First Lien Credit Agreement, as amended by the Third Amendment, by purchasing, and purporting to hold, $114,712,088.66 in Term Loans, which is substantially greater than the amount it is permitted to hold.

120.    In addition, the First Lien Credit Agreement, as amended by the Third Amendment, provides that Yucaipa may not purchase or hold any Revolving Loans or LC

Commitments.    (Third Amendment § 2.1(c).)    Yucaipa breached the First Lien Credit Agreement, as amended by the Third Amendment, by purchasing, and purporting to hold, $30,400,458.40 of LC Commitments.

121.    As a result of its impermissible acquisition of First Lien Debt, Yucaipa declared itself to be the Requisite Lender, with all the rights and powers granted thereto under the First Lien Credit Agreement.

122.    By improperly acting as the Requisite Lender, Yucaipa breached numerous other provisions of the First Lien Credit Agreement, as amended by the Third Amendment, including, but not limited to:

    (a)    Section 2.7(a) of the Third Amendment, which provides that Yucaipa "shall have no voting rights for all purposes under this Agreement (whether before, during, or after an Insolvency or Liquidation Proceeding) . . . with respect to their Term Loans."

    (b)    Section 2.7(b) of the Third Amendment, which provides that Yucaipa "shall not . . . make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders . . . ."

    (c)    Section 2.7(e)(iv) of the Third Amendment, which provides that Yucaipa "knowingly and irrevocably waives any and all rights to exercise any voting rights it would otherwise have as a Lender for all purposes under this Agreement . . . ."

123.    Yucaipa's improper usurpation of Requisite Lender status breached the First Lien Credit Agreement, as amended by the Third Amendment, in at least the following ways:

    (a)    Yucaipa improperly acquired First Lien Debt in violation of the First Lien Credit Agreement;

    (b)    Yucaipa improperly used its purported debt holdings to declare itself the Requisite Lender, in clear violation of the First Lien Credit Agreement;

    (c)    Yucaipa improperly used its status as purported Requisite Lender to neutralize the First Lien Lenders, giving the Debtors a "free pass" to ignore the provisions of the First Lien Credit Agreement requiring them to pay principal and interest and abide by certain financial and operating covenants;

(d)     Yucaipa improperly used its status as purported Requisite Lender to protect its equity investment by precluding a badly-needed restructuring of the Debtors; and

(e)     Yucaipa's improper usurpation of Requisite Lender status caused the First Lien Lenders to incur unnecessary legal costs regarding the impropriety of Yucaipa's status as Requisite Lender and the invalidity of the Purported Fourth Amendment.

124.     In addition, starting in November or December 2011, Yucaipa, acting as the purported Requisite Lender, hijacked negotiations with JCT by insisting on terms that would benefit Yucaipa, rather than the Debtors, and by demanding that any deal disproportionately favor Yucaipa at the expense of the First Lien Lenders, including the Plaintiffs.    Yucaipa's improper usurpation of Requisite Lender status prevented the Debtors from consummating a sale with JCT, which in turn caused the Debtors and the First Lien Lenders to incur unnecessary legal costs.

125.     But for Yucaipa's wrongful usurpation of Requisite Lender status, JCT would have acquired the Debtors in late 2011 or early 2012 for an amount substantially in excess of $135 million.    Instead, the Debtors were forced to incur additional debt to fund a prolonged bankruptcy proceeding.

126.     As a result, the Plaintiffs have been harmed in an amount to be proven at trial.

### Third Claim for Relief

**Breach of the Duty of Good Faith and Fair Dealing Against Yucaipa**

127.     The Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 126 as if fully set forth herein.

128.     The covenant of good faith and fair dealing is implied in all contracts under New York law.  The covenant operates to prevent a party from acting arbitrarily or unreasonably, and thereby frustrating the benefits of the bargain that the other party reasonably expected.  The

implied covenant also applies when a contract confers discretion on a party and requires that the party exercising that discretion do so reasonably and in good faith.

129.    To the extent that Yucaipa's wrongful usurpation of Requisite Lender status and its subsequent actions as purported Requisite Lender were not explicitly prohibited by the First Lien Credit Agreement, as amended by the Third Amendment, they are a violation of the covenant of good faith and fair dealing which is implied in the First Lien Credit Agreement, as amended by the Third Amendment.

130.    Yucaipa breached the implied covenant of good faith and fair dealing by acting arbitrarily and unreasonably, by frustrating the benefits of the bargain that the First Lien Lenders reasonably expected, and by exercising discretion granted to it by the First Lien Credit Agreement in an unreasonable and bad faith manner, as set forth above.

131.    As a result, the Plaintiffs have been harmed by Yucaipa's wrongful actions in an amount to be proven at trial.

### Fourth Claim for Relief

### Tortious Interference with Contract Against the Yucaipa Directors and Burkle

132.    The Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 131 as if fully set forth herein.

133.    The First Lien Credit Agreement, as amended by the Third Amendment, is a valid contract that governs the rights of First Lien Lenders with respect to the First Lien Debt.

134.    The Yucaipa Directors and Burkle were aware of the First Lien Credit Agreement and its terms.

135.    The Yucaipa Directors and Burkle, in their individual capacities, intentionally and maliciously induced multiple breaches by Yucaipa of the First Lien Credit Agreement through their control of Yucaipa, including:

a) In August 2009, the Yucaipa Directors, and, upon information and belief, Burkle caused Yucaipa to purchase ComVest's First Lien Debt, in contravention of the First Lien Credit Agreement, as amended by the Third Amendment, which purchase purported to result in Yucaipa becoming the Requisite Lender. As a result, the First Lien Lenders were unable to exercise remedies available under the First Lien Credit Agreement.

b) In late 2011 and early 2012, the Yucaipa Directors and, upon information and belief, Burkle, caused Yucaipa, wrongfully acting as the Requisite Lender, to hijack ongoing negotiations with JCT by insisting on terms that would benefit Yucaipa, rather than the Debtors, and by demanding that any deal disproportionately favored Yucaipa at the expense of the Debtors' other First Lien Lenders, including the Individual Lender Plaintiffs. As a result, the Debtors were forced to incur additional debt to fund a prolonged bankruptcy proceeding.

136.    The intentional acts committed by the Yucaipa Directors and Burkle were significant factors in causing Yucaipa's breaches of the First Lien Credit Agreement and were without justification.

137.    The Yucaipa Directors and Burkle acted improperly and without privilege in inducing Yucaipa's breaches of the First Lien Credit Agreement.

138.    In inducing Yucaipa's breaches of the First Lien Credit Agreement, the Yucaipa Directors and Burkle exceeded the scope of their agency as Yucaipa managers, employees, and/or agents and were motivated by a malicious and bad faith purpose to injure Plaintiffs.

139.    In inducing Yucaipa's breaches of the First Lien Credit Agreement, the Yucaipa Directors and Burkle were not pursuing in good faith the legitimate profit-seeking activities of Yucaipa or the Debtors. Rather, they were pursing to benefit themselves individually at the expense of the Debtors and their stakeholders, including the First Lien Lenders.

140. Yucaipa's breaches of the First Lien Credit Agreement damaged the First Lien Lenders in at least the following ways:

(a) Yucaipa improperly acquired First Lien Debt in violation of the First Lien Credit Agreement;

(b) Yucaipa improperly used its purported debt holdings to declare itself the Requisite Lender, in clear violation of the First Lien Credit Agreement;

(c) Yucaipa improperly used its status as purported Requisite Lender to neutralize the First Lien Lenders, giving the Debtors a "free pass" to ignore the provisions of the First Lien Credit Agreement requiring them to pay principal and interest and abide by certain financial and operating covenants;

(d) Yucaipa improperly used its status as purported Requisite Lender to protect its equity investment by precluding a badly-needed restructuring of the Debtors;

(e) Yucaipa improperly used its status as purported Requisite Lender to insist on a disproportionate share of the consideration JCT was willing to pay for the sale of the Debtors' assets which resulted in derailing the sale.

(f) Yucaipa's improper usurpation of Requisite Lender status caused the First Lien Lenders to incur unnecessary legal costs regarding the impropriety of Yucaipa's status as Requisite Lender and the invalidity of the Purported Fourth Amendment.

(g) Yucaipa's improper usurpation of Requisite Lender status prevented the Debtors from consummating a sale, which in turn caused the debtors and the First Lien Lenders to incur unnecessary legal costs.

141. As a result, the Plaintiffs have suffered damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment

a) subordinating Yucaipa's claims as First Lien Lender, in total, against the Debtors to the claims of the other First Lien Lenders;

b) in favor of the Plaintiffs and against Yucaipa due to Yucaipa's breaches of the First Lien Credit Agreement in an amount to be proven at trial, plus pre-judgment interest;

c)      or, in the alternative, in favor of the Plaintiffs and against Yucaipa due to Yucaipa's breaches of the implied duty of good faith and fair dealing in an amount to be proven at trial, plus pre-judgment interest;

d)      in favor of the Plaintiffs and against the Yucaipa Directors and Burkle due to their' tortious interference with contract in an amount to be proven at trial, plus pre-judgment interest; and

e)      granting such other or further relief as is just, proper and equitable.

Dated: November 19, 2014
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____

Adam G. Landis (DE No. 3407)
Kerri K. Mumford (DE No. 4186)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
Robert J. Ward
David M. Hillman
919 Third Avenue
New York, NY  10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955

*Counsel to BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., Spectrum Investment Partners, L.P., Black Diamond Commercial Finance, L.L.C., As Co-Administrative Agent, and Spectrum Commercial Finance LLC, As Co-Administrative Agent*