# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x

Yucaipa American Alliance Fund I, L.P., a
Delaware limited partnership, and Yucaipa
American Alliance (Parallel) Fund I, L.P., a
Delaware limited partnership,

                Plaintiffs,

     -against-

Richard A. Ehrlich, Stephen H. Deckoff, Leslie
A. Meier, Jeffrey A. Schaffer, BDCM
Opportunity Fund II, L.P., a Delaware limited
partnership, Black Diamond CLO 2005-1 Ltd.,
a Cayman Islands limited liability company,
and Spectrum Investment Partners, L.P., a
Delaware limited partnership,

            Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.:  15-cv-373 (SLR)

ECF Case

-------------------------------------------------------x

## YUCAIPA'S OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS OR STAY THE ACTION

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
John T. Dorsey, Esquire (No. 2988)
Michael R. Nestor, Esquire (No. 3526)
Sharon M. Zieg, Esquire (No. 4196)
Michael S. Neiburg, Esquire (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Maurice M. Suh (*Pro Hac Vice*)
Robert A. Klyman (*Pro Hac Vice*)
Kahn Scolnick (*Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
msuh@gibsondunn.com

*Attorneys for Plaintiffs Yucaipa American*
*Alliance Fund I, L.P., and Yucaipa American*
*Alliance (Parallel) Fund I, L.P.*

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT ................................................................. 1

II. LEGAL STANDARD ............................................................................ 5

III. FACTUAL BACKGROUND ................................................................. 5

IV. ARGUMENT ........................................................................................ 6

    A. *Noerr-Pennington* Does Not Immunize BD/S's Crimes and Fraudulent Conduct .............................................................................................. 6

        1. The *Noerr-Pennington* Doctrine Does Not Immunize BD/S From the Reach of Federal Criminal Statutes .................................................. 7

        2. Assuming that *Noerr-Pennington* Somehow Applies, Yucaipa's Allegations Fall Within the Sham, Pattern, and/or Misrepresentation Exceptions .......................................................................................... 8

    B. Yucaipa's Complaints Fits Squarely Within the Covenant Not to Sue's Exception for Gross Negligence and Willful Misconduct ...................................... 13

    C. Yucaipa Has Sufficiently Pleaded Its RICO Claim ................................. 15

        1. Yucaipa Has Standing to Sue under RICO .................................... 16

        2. Yucaipa Has Adequately Alleged BD/S's Racketeering Activity .................. 18

        3. The Bankruptcy Court's Dismissal of Yucaipa's Very Different Cross-Claim in 2012 Does Not Preclude Yucaipa's RICO Claim as a Matter of Collateral Estoppel or Otherwise ................................................ 20

        4. Yucaipa's RICO Allegations Readily Clear the *Iqbal-Twombly* Plausibility Hurdle ........................................................................... 21

    D. Even Assuming the Court Dismisses Yucaipa's RICO Claim, It Should Exercise Supplemental Jurisdiction over Yucaipa's State-Law Claims in the Interest of Judicial Economy and Convenience ....................................... 27

    E. Yucaipa Properly Alleges Claims for Tortious Interference and Fraud Under Delaware Law ..................................................................................... 28

    F. To Preserve Judicial Resources and Limit the Risk of Duplicative Litigation, the Court Should Allow This Action to Proceed Along with the Related Proceedings ......................................................................................... 29

V. CONCLUSION .................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alexander v. Nat'l Farmers Org.*,
687 F.2d 1173 (8th Cir. 1982) ...................................................................... 10

*Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*,
185 F.3d 154 (3d Cir. 1999) ........................................................................ 12

*Aronson v. Generation Mortg. Co.*,
No. 13-1702, 2014 WL 641622 (W.D. Pa. Feb. 19, 2014)....................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................... 5, 22, 27

*Banks v. Wolk*,
918 F.2d 418 (3d Cir. 1990) ........................................................................ 19

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,
229 F.3d 1135 (2d Cir. 2000) ........................................................................ 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................... 21, 27

*Brown v. Felsen*,
442 U.S. 127 (1979)........................................................................... 21

*Calabrese v. CSC Holdings, Inc.*,
No. 2:02-CV-5171 JS ARL, 2004 WL 3186787 (E.D.N.Y. July 19, 2004)............................ 7

*California Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)........................................................................... 7, 12

*Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 343 (1988)........................................................................... 27

*CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*,
357 F.3d 375 (3d Cir. 2004) ........................................................................ 28

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999) ...................................................................... 8, 9, 12

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
690 F.2d 1240 (9th Cir. 1982) ........................................................................ 9

*Emel v. Singleton*,
3:cv-09-0664, 2010 WL 1005264 (M.D. Pa. Feb. 11, 2010)...................................... 19

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) ........................................................................ 22

*Gelman v. State Farm Mut. Auto. Ins. Co.*,
583 F.3d 187 (3d Cir. 2009) ...................................................................... 22, 25

*Giles v. Phelan, Hallinan & Schmieg, L.L.P.*,
No. 11-6239 (JBS/KMW), 2013 WL 2444036 (D.N.J. June 4, 2013) ...................................... 8

*H.J. Inc. v. NW Bell Tel. Co.,*
    492 U.S. 229 (1989)..................................................................................... 19

*Hill v. Borough of Kutztown,*
    455 F.3d 225 (3d Cir. 2006) ........................................................................ 7

*Hoffman-La-Roche Inc. v. Genpharm Inc.,*
    50 F. Supp. 2d 367 (D.N.J. 1999) ................................................................ 9

*Hughes v. Consol-Penn. Coal Co.,*
    945 F.2d 594 (3d Cir. 1991) ........................................................................ 19

*Illinois ex rel. Madigan v. Telemarketing Assoc., Inc.,*
    538 U.S. 600 (2000).................................................................................. 2, 7

*In re Enter. Rent-a-Car Wage & Hour Emp't Practices Litig.,*
    735 F. Supp. 2d 277 (W.D. Pa. 2010) .......................................................... 14

*In re Exide Techs., Inc.,*
    299 B.R. 732 (D. Del. 2003)........................................................................ 24

*In re Flonase Antitrus Litig.,*
    795 F. Supp. 2d 300 (E.D. Pa. 2011) ........................................................ 9, 12

*Infinity Computer Prods., Inc. v. Brother Int'l Corp.,*
    909 F. Supp. 2d 415 (E.D. Pa. 2012) .......................................................... 29

*Johnson v. Goldstein,*
    864 F. Supp. 490 (E.D. Pa. 1994) ............................................................... 15

*Kehr Packages, Inc. v. Fidelcor, Inc.,*
    926 F.2d 1406 (3d Cir. 1991) ...................................................................... 19

*Klatch-Maynard v. Sugarloaf Twp.,*
    No. 3:06-cv-845, 2011 WL 532168 (M.D. Pa. Feb. 8, 2011)........................ 8

*Livingston Downs Racing Ass'n v. Jefferson Downs Corp.,*
    192 F. Supp. 2d 519 (M.D. La. 2001) .......................................................... 11

*LSC Assocs. v. Lomas & Nettleton Fin. Corp.,*
    629 F. Supp. 979 (E.D. Pa. 1986) ............................................................... 20

*Lum v. Bank of Am.,*
    361 F.3d 217 (3d Cir. 2004) ........................................................................ 10

*Lynch v. Capital One Bank,*
    No. 12-992, 2013 WL 2915734 (E.D. Pa. June 14, 2013)............................. 17

*Maio v. Aetna, Inc.,*
    221 F.3d 472 (3d Cir. 2000) ........................................................................ 17

*Mayer v. Belichik,*
    605 F.3d 223 (3d Cir. 2010) ...................................................................... 5, 6

*Mercatus Group LLC v. Lake Forrest Hosp.,*
    641 F.3d 834 (7th Cir. 2011) ....................................................................... 12

Page(s)

*Morrison v. Amway Corp.* (*In re Morrison*),
No. 08–03260, 2009 WL 1856064 (Bankr. S.D. Tex. June 26, 2009) .................................. 7, 8

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*,
101 F.3d 1492 (3d Cir. 1996) .......................................................................................... 27

*Official Committee of Unsecured Creditors of Allied Sys. Holdings, Inc. v. Gendregske*,
No. 13-cv-1010-SLR (D. Del. June 5, 2013).................................................................... 4

*Oswald v. Gibbons*,
2011 WL 2135619 (E.D. Pa. May 31, 2011).................................................................... 22

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ............................................................................................ 21

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures, Inc.*
508 U.S. 49 (1993)................................................................................................ 8, 9, 11

*Saint Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*,
795 F.2d 948 (11th Cir. 1986) ......................................................................................... 6

*Schmeusser v. Schmeusser*,
559 A.2d 1294 (Del. 1989).............................................................................................. 29

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)......................................................................................................... 16

*Slaney v. Int'l Amateur Athletic Fed'n*,
244 F.3d 580 (7th Cir. 2001) ........................................................................................... 22

*Stephenson v. Capano Dev., Inc.*,
462 A.2d 1069 (Del. 1983).............................................................................................. 29

*Suppan v. Dadonna*,
203 F.3d 228 (3d Cir. 2000) ............................................................................................ 21

*Tri3 Enters., LLC v. Aetna, Inc.*,
535 F. App'x 192 (3d Cir. 2013) ................................................................................ 5, 14

*United Mine Workers v. Pennington*,
381 U.S. 657 (1965)......................................................................................................... 10

*United States v. Golden Acres, Inc.*,
684 F. Supp. 96 (D. Del. 1988).......................................................................................... 13

*United States v. Philip Morris USA, Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ........................................................................................ 7

*United States v. Starnes*,
644 F.2d 673 (7th Cir. 1981) ........................................................................................... 19

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*,
31 F.3d 800 (9th Cir. 1994) ............................................................................................. 11

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*,
712 F.3d 165 (3d Cir. 2013) ...................................................................................... 5, 15

Page(s)

*Walter v. Palisades Collection, LLC*,
   480 F. Supp. 2d 797 (E.D. Pa. 2007) ................................................................. 17

*Warren Gen. Hosp. v. Amgen Inc.*,
   643 F.3d 77 (3d Cir. 2011) .................................................................................... 5

*We, Inc. v. City of Phila.*,
   174 F.3d 322 (3d Cir.1999) ................................................................................... 7

*Webb v. Utah Tour Brokers Ass'n*,
   568 F.2d 670 (10th Cir. 1977) ............................................................................ 10

*Weiss v. First Unum Life Ins. Co.*,
   482 F.3d 254 (3d Cir. 2007) ................................................................................ 17

*Williams v. BASF Catalysts LLC*,
   765 F.3d 306 (3d Cir. 2014) .................................................................................. 5

*Yucaipa Am. Alliance Fund I, L.P. v. Ehrlich*,
   15-cv-916-DLC (S.D.N.Y. Feb. 6, 2015) ............................................................. 4

**Statutes**

18 U.S.C. § 1343 ................................................................................................... 2, 8

18 U.S.C. § 1503 ................................................................................................... 2, 8

18 U.S.C. § 152(2) ................................................................................................ 2, 8

18 U.S.C. § 152(3) ................................................................................................ 2, 8

18 U.S.C. § 152(6) ................................................................................................ 2, 8

18 U.S.C. § 341 ..................................................................................................... 2, 8

28 U.S.C. 1367(c) ................................................................................................... 27

Restatement (Second) of Torts § 768(1) ................................................................ 28

**Rules**

D. Del. L.R. 7.1.3(c) .............................................................................................. 13

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 5, 6

Fed. R. Civ. P. 12(d) ............................................................................................... 5

**Other Authorities**

Organized Crime Control Act, Pub. L. No. 91-452, § 904(a), 84 Stat. 922–947 (1970) .............. 16

Sanders, Alain. *Law:  Showdown at Gucci*, Time Magazine (Aug. 21, 1989) ............................ 16

# I.  PRELIMINARY STATEMENT

Yucaipa's Complaint alleges, in great detail and with supporting documentation, a sophisticated racketeering scheme carried out by Black Diamond and Spectrum ("BD/S") specifically intended to enrich themselves at Yucaipa's expense.  Beginning in 2009 and continuing to the present, BD/S's scheme has involved, among other things, the wrongful filing of an involuntary bankruptcy against Allied Systems Holdings, Inc. ("Allied") premised on deliberately false statements to the bankruptcy court, followed by a fraudulent and ongoing attempt to (i) strip Yucaipa of all rights as a lender, (ii) dilute Yucaipa's economic interest in certain real estate and other assets, and (iii) subordinate Yucaipa's recoveries on approximately $170 million in claims at issue in the Allied bankruptcy (D. Del. Bankr. No. 12-11564).

In seeking to dismiss Yucaipa's claims against them, BD/S attempt to point the finger back at Yucaipa, whom they accuse of misapplying RICO to a "garden variety" breach-of-contract dispute.  But BD/S fundamentally misapprehend the nature of the Yucaipa's claims, as well as RICO statute itself and Congress' inclusion of bankruptcy fraud among the predicate acts—the statute is perfectly suited to redress the very sort of criminal activity BD/S is engaging in here.  Moreover, BD/S's motion launches into a series of meritless legal arguments, irrelevant distortions of Yucaipa's factual assertions, and misstatements of the governing case law.  The Court should deny BD/S's motion to dismiss/stay and allow Yucaipa's Complaint to move forward.

*First*, because Yucaipa's claims relate in part to misconduct in litigation, BD/S argue that they are wholly immunized by the so-called *Noerr-Pennington* doctrine.  But it is beyond dispute that *Noerr-Pennington* does not (and cannot) trump Title 18 of the United States Code; this common-law protection cannot immunize a party who commits federal crimes, as BD/S and its

principals have done here. In particular, BD/S's scheme included illegal claims trading for the purpose of instituting an involuntary bankruptcy proceeding against Allied, in violation of 18 U.S.C. § 152(6); false statements and material omissions to the bankruptcy court, intended to conceal their illegal claims trading, in violation of 18 U.S.C. § 152(2) and (3); obstruction of justice in violation of 18 U.S.C. § 1503; and mail and wire fraud in violation of 18 U.S.C. §§ 341 & 1343. *Noerr-Pennington* simply has no application to these predicate acts—just as the First Amendment (which provides the outer boundaries of *Noerr-Pennington* protection) "does not shield fraud." *Illinois ex rel. Madigan v. Telemarketing Assoc., Inc.*, 538 U.S. 600, 612 (2000). And even assuming *arguendo* that there were some ostensible *Noerr-Pennington* protection for some of BD/S's misconduct, Yucaipa's allegations come within the doctrine's exceptions, including two exceptions that BD/S do not even address (the "pattern" and "misrepresentation" exceptions).

**Second**, BD/S seek to invoke the "Covenant Not to Sue" (the "Covenant") contained in Section 2.7(e) of the Third Amendment to the First Lien Credit Agreement. But as detailed in Yucaipa's Complaint and explained further below, Yucaipa's allegations fall squarely within the Covenant's exception for "gross negligence or willful misconduct." (Compl. Ex. 14.) BD/S's restrictive interpretation of this exception is nonsensical and contrary to public policy, as the Delaware Chancery Court has already found. The Court should reject BD/S's attempt to insulate themselves from liability for their criminal wrongdoing.

**Third**, BD/S attack Yucaipa's Complaint for supposed lack of ripeness, lack of a pattern of racketeering, and lack of plausibility. These challenges fall wide of the mark. Yucaipa has already suffered harm at the hands of BD/S, and the harm is ongoing (among other things, Yucaipa is expending substantial resources in the Allied bankruptcy and defending itself in

related proceedings). Yucaipa seeks equitable relief to prevent further harm, so its claims are sufficiently ripe for judicial resolution. Yucaipa also alleges a three-year racketeering scheme starting at latest in September 2011 (BD/S's first documented act of wire fraud) and concluding no sooner than August 2014 (the date on which BD/S ceased to obstruct justice in the Allied bankruptcy by withholding key documents). (Compl. ¶¶ 188, 193.) This readily satisfies the Third Circuit's requirements for a cognizable pattern of racketeering activity with close-ended continuity. Likewise, the existence of BD/S's scheme is not merely plausible; the detailed allegations set forth in the Complaint (backed by supporting documentation, including email correspondence among the Defendants) demonstrate that it actually occurred. Indeed, with respect to each of the supposedly "speculative" steps in BD/S's plan to harm Yucaipa, BD/S have either *already succeeded* in accomplishing these steps or are well on their way to accomplishing them.

*Fourth*, assuming for the sake of argument that Yucaipa's RICO claim were dismissed, the Court should still exercise supplemental jurisdiction over the remaining state-law claims for tortious interference and fraud, which Yucaipa properly alleges under Delaware law. With respect to the tortious interference claim, for example, Yucaipa explains in detail how BD/S employed wrongful means—including a series of misrepresentations and omissions—to scuttle a proposed transaction between Yucaipa and Jack Cooper Transport Company, Inc. ("JCT").

*Fifth*, BD/S argue that the Court should conserve judicial resources by staying this action pending resolution of the related bankruptcy adversary cases. On the contrary, the only way to avoid the risk of inefficient, duplicative litigation concerning many of the same underlying facts—and to ensure that the parties' entire dispute is resolved in a comprehensive, organized manner—is for the Court to allow this action to proceed together with BD/S's adversary action

against Yucaipa,[1] Yucaipa's counterclaims against BD/S, and the Unsecured Creditors' Committee's (the "UCC") adversary action against former Allied CEO and Board member Mark Gendregske.[2]

**Finally**, BD/S suggest that Yucaipa is seeking to re-litigate issues that have already been decided, and has engaged in improper forum-shopping with respect to a prior RICO claim filed in New York, although they do not explicitly seek dismissal on these grounds. (Mot. to Dismiss ("MTD") 1–2, 4.) But BD/S have it backwards. While there have been prior litigations involving the parties in this proceeding, no court has considered the parties' key claims of wrongdoing against the other—on the contrary, that other litigation is just beginning in this Court and the bankruptcy court.

It is true that, before filing its Complaint here, Yucaipa filed a substantially similar RICO complaint against BD/S and others in the Southern District of New York (the "SDNY Action").[3] In seeking to dismiss or stay that SDNY Action, BD/S argued that the parties' dispute is rooted in the ongoing litigation surrounding Allied's dissolution and bankruptcy, taking place in this District—according to BD/S, it did not make sense to litigate in both the SDNY and the District of Delaware simultaneously. (D.I. 17, Mem. in Supp. of Mot. to Dismiss 34, No. 15-cv-916 DLC.) Thus, when the district court overseeing the SDNY Action gave Yucaipa the opportunity to amend its complaint in response to BD/S's motion to dismiss/stay, Yucaipa elected to dismiss

---

[1] Yucaipa has moved this Court to withdraw the reference in BD/S's separate adversary proceeding against Yucaipa (the "BD/S Action"), Adversary Proceeding No. 14-50971. That motion is fully briefed and is pending, as the bankruptcy court has already entered an order with respect to the core/non-core status of the claims in that adversary proceeding. (D.I. 1, 2, 8, No. 15-cv-00256-SLR.)

[2] *Official Committee of Unsecured Creditors of Allied Sys. Holdings, Inc. v. Gendregske*, No. 13-cv-1010-SLR (D. Del. June 5, 2013).

[3] *Yucaipa Am. Alliance Fund I, L.P. v. Ehrlich*, 15-cv-916-DLC (S.D.N.Y. Feb. 6, 2015).

that case and effectively amended its complaint by re-filing it in this Court—thus eliminating one of BD/S's principal objections.[4]

Therefore, the Court should deny BD/S's motion to dismiss and/or stay.

## II.    LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must construe Yucaipa's Complaint in a light favorable to Yucaipa, assume the veracity of Yucaipa's well-pleaded factual allegations, and then determine whether those allegations plausibly show that Yucaipa is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Mayer v. Belichik*, 605 F.3d 223, 229 (3d Cir. 2010). Further, this Court must draw all reasonable inferences in Yucaipa's favor. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 323 (3d Cir. 2014); *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 79–80 (3d Cir. 2011). And the Court's analysis is "generally confined to the four corners of the complaint . . . ." *Tri3 Enters., LLC v. Aetna, Inc.*, 535 F. App'x 192, 195 (3d Cir. 2013); *see W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 173 (3d Cir. 2013); Fed. R. Civ. P. 12(d).

## III.    FACTUAL BACKGROUND

BD/S devote several pages of their motion to articulating the false narrative that underlies their entire scheme against Yucaipa. They portray Yucaipa as a bad actor that, among other things, abused its "control" of Allied's board, "seize[d] control of" Allied's debt, and sought to "preserve its equity investment in Allied" by preventing other lenders from exercising their remedies. (*E.g.*, MTD 2–3 & n.6, 7–11.) Obviously, BD/S will be relying on that narrative in

---

[4]   BD/S are mistaken in suggesting that the SDNY's order granting Yucaipa the opportunity to amend its complaint somehow meant that the district judge had intended to grant BD/S's motion to dismiss. (MTD at 14.) Rather, as explained in the attached supporting Declaration of Kahn Scolnick ("Scolnick Declaration"), based on a review of the docket in other cases pending before the same district judge, it is apparent that the judge routinely issues such orders after a defendant files a Rule 12(b)(6) motion to dismiss. (Scolnick Dec.¶ 3, Ex. 2.)

seeking to prove their own claims against Yucaipa.  But as BD/S appear to acknowledge (MTD 7 n.12), their spin on the underlying facts has no place in a motion to dismiss pursuant to the applicable legal standard for Rule 12(b)(6), under which, as explained above, the Court must accept Yucaipa's well-pleaded allegations as true.  *Mayer*, 605 F.3d at 229.

For present purposes, suffice it to say that Yucaipa vigorously disagrees with BD/S's version of the facts, and Yucaipa intends to prove that at summary judgment or trial.  As set forth in Yucaipa's Complaint, and as the evidence will bear out, Yucaipa and Allied's directors acted at all times in good faith and in the best interest of Allied, as BD/S expressly acknowledged in contemporaneous internal communications.  Further, Yucaipa's purchase of the majority of Allied First Lien Debt was consistent with Yucaipa's belief in Allied as a going concern and its efforts to obtain the best result for all stakeholders.  (Compl. ¶ 118.)

## IV.    ARGUMENT

### A.    *Noerr-Pennington* Does Not Immunize BD/S's Crimes and Fraudulent Conduct

In invoking *Noerr-Pennington*, BD/S focus only on a single *exception* to that doctrine— the "sham" exception—which necessarily presumes the doctrine applies in the first instance.  Yet before a court needs to reach *Noerr-Pennington*'s exceptions, "it must first be clear that the general rule itself is applicable."  *Saint Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 955 (11th Cir. 1986).  In fact, *Noerr-Pennington* has no application here:  BD/S's misconduct involves a series of violations of enumerated federal criminal statutes, which are predicate acts under RICO and fall well outside of *Noerr-Pennington*'s protection.

Moreover, even assuming the doctrine were applicable to any of Yucaipa's allegations (which it is not), BD/S focus myopically on the "sham" exception.  They make no attempt to dispute the applicability of the separate "pattern" and "misrepresentation" exceptions, both of

which apply here. And in any event, Yucaipa's pleading also satisfies the "sham" exception, especially at this initial stage.

1.    **The *Noerr-Pennington* Doctrine Does Not Immunize BD/S From the Reach of Federal Criminal Statutes**

Where applicable, the *Noerr-Pennington* doctrine immunizes certain conduct that could reasonably be construed, under the First Amendment, as petitioning activity. *See, e.g.*, *Hill v. Borough of Kutztown*, 455 F.3d 225, 243 (3d Cir. 2006). Conversely, *Noerr-Pennington* does not protect conduct falling outside the First Amendment's scope. *We, Inc. v. City of Phila.*, 174 F.3d 322, 327 (3d Cir. 1999). Here, there is no conceivable First Amendment protection for BD/S's various misconduct, so *Noerr-Pennington* is necessarily inapposite.

The Supreme Court has clarified that "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972). Numerous courts have held that *Noerr-Pennington* does not protect bad-faith litigation activity or violations of the mail- and wire-fraud statutes. *See*, *e.g.*, *Calabrese v. CSC Holdings, Inc.*, No. 2:02-CV-5171 JS ARL, 2004 WL 3186787, at *2 (E.D.N.Y. July 19, 2004) (*Noerr-Pennington* inapplicable to RICO scheme involving fraudulent threats of legal action in violation of the Hobbs Act and mail- and wire-fraud statutes). Nor, of course, does the First Amendment immunize fraud itself. *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009); *see also Madigan*, 538 U.S. at 612. And *Noerr-Pennington* does not "appl[y] at all where the defendant's petition to the government was but an attempt to further a fraudulent scheme constructed prior to the petition and the fraudulent scheme rather than the petition forms the basis of [p]laintiff['s] claims." *Morrison v. Amway Corp.* (*In re Morrison*), No. 08–03260, 2009 WL 1856064, at *5 (Bankr. S.D. Tex. June 26, 2009).

Simply put, *Noerr-Pennington* does not apply to BD/S's various crimes and fraudulent conduct. As set forth in detail in Yucaipa's Complaint, BD/S filed their involuntary petition against Allied in May 2012 to further a pre-existing scheme to equitably subordinate Yucaipa's First Lien Claims and strip Yucaipa of its rights as a lender. *See In re Morrison*, 2009 WL 1856064 at *5. (Compl. ¶¶ 163–99.) In violation of 18 U.S.C. § 152(2), (3), (6), BD/S committed bankruptcy fraud—fraudulently trading claims in connection with their involuntary petition, and making false oaths and misleading declarations to the bankruptcy court to hide their misconduct. (Compl. ¶¶ 165–82.) They also obstructed justice in violation of 18 U.S.C. § 1503: From May 2012 to mid-2014, they failed to disclose to the bankruptcy court that they illegally traded claims and had entered into a pact targeting Yucaipa. (*Id.* ¶¶ 183–89.) And BD/S also committed mail and wire fraud in violation of 18 U.S.C. §§ 341 and 1343, by scheming to equitably subordinate Yucaipa's First Lien Claims. (*Id.* ¶¶ 190–99.) BD/S make no effort to explain how *Noerr-Pennington* applies to any of these predicate acts—in fact, it does not.[5]

## 2. Assuming that *Noerr-Pennington* Somehow Applies, Yucaipa's Allegations Fall Within the Sham, Pattern, and/or Misrepresentation Exceptions

The single *Noerr-Pennington* exception that BD/S invoke—the sham exception—applies to petitioning "not genuinely aimed at procuring favorable government action as opposed to a valid effort to influence government action." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures, Inc.*, 508 U.S. 49, 58 (1993) ("*PRE*").

---

[5] Not one of the authorities cited by BD/S involves bankruptcy fraud or other similar violations of federal criminal statutes. *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 120 (3d Cir. 1999) (federal and state antitrust claims); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) (unpublished and noncitable) (alleging false statements to administrative bodies); *Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, No. 11-6239 (JBS/KMW), 2013 WL 2444036, at *3 (D.N.J. June 4, 2013) (alleging foreclosure-related scheme to defraud homeowners and state courts); *Klatch-Maynard v. Sugarloaf Twp.*, No. 3:06-cv-845, 2011 WL 532168, at *2, 4 (M.D. Pa. Feb. 8, 2011) (alleging conspiracy to violate civil rights).

The question of whether litigation is a sham "'is generally a question of fact for the jury[.]'" *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011); *see Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982) (whether conduct is a genuine effort to influence governmental action, or a mere sham, is a question of fact). Courts employ a two-step process: First, they ask whether the petition is "objectively baseless." *PRE*, 508 U.S. at 60–61; *Cheminor Drugs Ltd.*, 168 F.3d at122–23. And second, if the petition is objectively baseless, courts must examine the petitioner's "subjective motivation." *PRE*, 508 U.S. at 61; *see Cheminor*, 168 F.3d at 123. Typically, "the Court cannot make such factual determinations on a factual controversy roiled by a motion to dismiss." *Hoffman-La-Roche Inc. v. Genpharm Inc.*, 50 F. Supp. 2d 367, 380 (D.N.J. 1999).

Here, to the extent any of BD/S's misconduct is protected by *Noerr-Pennington* (and it is not), Yucaipa sufficiently alleges that such activities are objectively baseless. (Compl. ¶¶ 29, 118.) Indeed, Yucaipa does not rest on mere conclusory allegations of baselessness, but rather supports its claims by referring to specific evidence. Among other things, the "August 2009 Schaffer Email" between a third party who had previously been employed as the CEO of a Spectrum affiliate, on the one hand, and Spectrum's managing partner, on the other, indicated that BD/S were "check[ing] out the 'equitable subordination' angle" against Yucaipa in August 2009, even *before* Yucaipa had acquired any First Lien Claims. (*Id.* ¶ 84, Ex. 15.) This and other evidence supports a strong inference—particularly at the initial pleading stage—that BD/S had concocted a scheme against Yucaipa, and then attempted to twist the facts to fit their narrative, regardless of what Yucaipa actually did or did not do. The inference is further supported by the internal communications of BD/S, which reveal that they privately believed

Yucaipa was acting in good faith to add value to Allied even though they later publicly accused it of the opposite in furtherance of their scheme. (*Id.* ¶ 30.)[6]

BD/S next resort to bootstrapping: They claim that their equitable subordination claim cannot be objectively baseless because the UCC has made similar allegations against Yucaipa in a related action in which BD/S intervened—the "UCC Action" (D.I. 1, Adv. Proc. No. 13-50530; MTD 11–12, 17.) But BD/S omit that Yucaipa has vigorously contested (and continues to contest) those alleged "facts" in the UCC Action, and that the UCC also stands to benefit from the equitable subordination of Yucaipa's debt. And in any event, even if the existence of the UCC claims could be considered *evidence* tending to negate Yucaipa's allegations of baselessness, which it cannot, such evidence is not properly considered on a Rule 12(b)(6) motion. *Cf. Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (although the court may take notice of a prior judicial opinion, "it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion").

Further, Yucaipa also alleges that BD/S's subjective motivation was—and continues to be—improper. In particular, they knew their claim for equitable subordination was baseless, yet they pursued it regardless. (*See* Compl. ¶ 118 (alleging that BD/S "believed that Yucaipa was acting in good faith to maximize value for all stakeholders.").) Their motive was "simple greed," and the desire "to increase their share of the pie by knowingly making false accusations of

---

[6] BD/S argue that Yucaipa must demonstrate, at the pleading stage, that the Allied bankruptcy itself was objectively baseless. (MTD 16.) But Yucaipa's allegations focus on BD/S's attempts to equitably subordinate Yucaipa and strip it of its rights as a lender, not on whether Allied was technically in default. Moreover, even if some actions taken in a bankruptcy case might theoretically be protected by *Noerr-Pennington*, those actions are still relevant to show the "purpose or character" of BD/S's unlawful scheme. *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1196 (8th Cir. 1982), *quoting United Mine Workers v. Pennington*, 381 U.S. 657, 671 n.3 (1965); *see also Webb v. Utah Tour Brokers Ass'n*, 568 F.2d 670, 672, 676 (10th Cir. 1977) (certain court and administrative proceedings had evidentiary value as to defendants' objects and motives).

misconduct on the part of Yucaipa in order to 'equitably subordinate' [Yucaipa's First Lien Claims]." (*Id.* ¶ 2.) Not only do BD/S seek to "wipe out Yucaipa's First Lien Claims," they have also "abuse[d] their Requisite Lender status in the bankruptcy case (which they hijacked from Yucaipa) with the goal of further harming Yucaipa" (*id.* ¶ 82) by diluting its interests in certain real estate assets, among other things. *See PRE*, 508 U.S. at 60–61 (subjective motivation shown by "an attempt to interfere *directly* with the business relationships of a competitor, through the use of the governmental *process* . . . ." (internal citations and quotation marks omitted) (emphasis added)). Yucaipa's allegations satisfy the subjective component of the sham exception for pleading purposes.

Independent of the sham exception, *Noerr-Pennington*'s "pattern" exception applies when defendants have repeatedly filed lawsuits against plaintiffs, demonstrating a pattern of harassment by instituting legal proceedings without regard to their merits and with the goal of injuring plaintiffs. *See USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 810–11 (9th Cir. 1994); *Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 538 (M.D. La. 2001). Here, BD/S's scheme depends on harassing Yucaipa with meritless equitable subordination claims—they have pursued three nearly identical and equally baseless actions since 2013: (i) an initial adversary proceeding, which they dismissed in early 2013[7]; (ii) the UCC Action, in which they intervened in early 2013; and (iii) Adversary Proceeding No. 14-50971 (the "BD/S Action"), which they filed just last year. (*See* Compl. ¶¶ 146–48.) BD/S's subordination efforts seek to rewrite history by asserting that Yucaipa and the directors acted inequitably and mismanaged Allied; BD/S seek to make Yucaipa the scapegoat for a deteriorating company whose fortunes were tied to a

---

[7] Adv. Proc. No. 13-50499.

floundering auto industry. Yet, at the time, Black Diamond's founder supported Yucaipa's "Allied[] strategy," as it "seemed right." (*See id.* ¶ 118, Ex. 21.) The Court may reasonably infer, especially at the initial pleadings stage, that BD/S's goal in filing a pattern of equitable subordination claims was to injure Yucaipa, not to seek redress for what they regarded as a genuine wrong that had been committed against them. (*See id.* ¶¶ 29, 115, 118.)

Similarly, *Noerr-Pennington*'s "misrepresentation" exception can apply where defendants make material misrepresentations to a court intentionally and with knowledge of falsity. *See, e.g.*, *Mercatus Group LLC v. Lake Forrest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011). To determine whether this exception applies, the Court should inquire whether BD/S's actions would be objectively reasonable in the absence of the misrepresentations—or whether the misrepresentations "infect the core of [BD/S]'s claim[s] . . . ." *Cheminor Drugs*, 168 F.3d at 123. As Yucaipa has shown, BD/S's misrepresentations "infect the core" of the Allied bankruptcy and the efforts to subordinate Yucaipa's debt. BD/S's criminal conduct served as the basis for the involuntary filing itself. The BD/S Action is a final stage in BD/S's fraudulent scheme, and depends on BD/S's numerous misrepresentations and omissions to the bankruptcy court, including failing to disclose their improper claims trading and obstructing justice in concealing their bankruptcy fraud.[8]

---

[8] BD/S cannot argue that their misrepresentations were immaterial. *See Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*, 185 F.3d 154, 162 (3d Cir. 1999) (misrepresentation not material where it is "clear that the . . . decision makers were disinterested, conducted their own investigation, and afforded all interested parties an opportunity to set the record straight."). Further, the Court should not decide materiality on a motion to dismiss—whether BD/S abused the judicial process is left to "the factfinder to conclude." *Cal. Motor Transp.*, 404 U.S. at 513; *see In re Flonase Antitrus Litig.*, 795 F. Supp. 2d at 310 ("The question whether a petition is a sham 'is generally a question of fact for the jury[.]'").

In sum, even assuming *arguendo* that *Noerr-Pennington* covers any of Yucaipa's allegations, Yucaipa has pleaded the applicability of several exceptions sufficient to survive a motion to dismiss.[9]

**B.      Yucaipa's Complaints Fits Squarely Within the Covenant Not to Sue's Exception for Gross Negligence and Willful Misconduct**

In relying on the Covenant Not to Sue (MTD 18), BD/S recycle the same flawed points that they made in their motion to dismiss Yucaipa's counterclaim in the BD/S Action.  (*See* D.I. 41, Mot. to Dismiss Countercl. 12–16, Adv. Proc. No. 14-50971.)  In the interest of efficiency, Yucaipa respectfully refers the Court to its prior briefing on this argument (attached as Exhibit 1 to the Scolnick Declaration) and will not repeat the arguments here in full.  (*See* D.I. 56, Opp. to Mot. to Dismiss Countercl. 15–23, Adv. Proc. No. 14-50971.)[10]

To summarize here, the Covenant is not a "get out of jail free" card.  It does not preclude Yucaipa's claims that are "caused by [BD/S's] gross negligence or willful misconduct on or after the date [Yucaipa] becomes a Lender."  (Compl. Ex 14.)  BD/S's reading of the "Prior Determination Requirement" is nonsensical—in BD/S's view, before Yucaipa could seek

---

[9]   BD/S fail to mention, let alone argue, the pattern or misrepresentation exceptions in their motion. The Court should not allow them to selectively brief these exceptions by reserving two of them for a reply brief.  *See United States v. Golden Acres, Inc.*, 684 F. Supp. 96, 103–04 (D. Del. 1988) (waiver); *see also* D. Del. L.R. 7.1.3(c) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief.").

[10]  Yucaipa challenges the validity of the Third Amendment to the First Lien Credit Agreement (and therefore, the Covenant Not to Sue) in its pending appeal to this Court, which is now fully briefed as of the date of this opposition.  (Case Nos. 13-cv-01580-SLR, 13-cv-01583-SLR.)  BD/S also continue to mischaracterize the Third Amendment and Yucaipa's relationship to it in these various related cases.  They assert here that "[i]n 2008, Yucaipa orchestrated the passage of a Third Amendment to the Credit Agreement."  (MTD 7.)  As purported support for that assertion, they direct the Court to paragraph 73 of Yucaipa's Complaint.  (*Id.*)  But Yucaipa does not allege, in paragraph 73 or anywhere else, that it "orchestrated the passage" of the Third Amendment.  Just the opposite: Yucaipa alleges that other lenders "looked to Yucaipa as a potential buyer given its already substantial investment in Allied," and that "[i]n 2008, a majority of the [the lenders] approved [the Third Amendment]."  (Compl. ¶ 73.)  It is also undisputed that Yucaipa "did not . . . purchase any First Lien Debt under the Third Amendment" and was not a signatory to the Third Amendment.  (*Id.*)

redress, a different court first would have needed to rule in Yucaipa's favor on the same allegations. (MTD 19.) BD/S's erroneous construction is also impermissible as a matter of public policy because, if accepted, it would forever shield intentionally fraudulent misconduct even though Yucaipa is the only party in the position to sue BD/S for their wrongdoing. (*See* D.I. 56, Opp. to Mot. to Dismiss Countercl. 15–23, Adv. Proc. No. 14-50971.)

BD/S introduce one new argument here. In a lengthy footnote, they contend that Yucaipa cannot invoke the Covenant's public-policy exception because BD/S's misconduct did not harm Yucaipa in any unique way. (MTD 20 n.22.) They point to Yucaipa's prior allegation in the SDNY Action that "the sale [to JCT] would have maximized value for all stakeholders. Under [the] March 2012 term sheet, each of the first lien lenders (including Yucaipa and [BD/S]) would have benefitted on equal terms." (D.I. 1, Compl. ¶ 24, No. 15-cv-916 DLC.) According to BD/S, Yucaipa's prior allegation is tantamount to an admission that Yucaipa's injury was not unique. (MTD 20 n.22.) BD/S also argue that this prior allegation binds Yucaipa here. (*Id.*) They are wrong in multiple respects.

Purely as a matter of procedure, BD/S cannot rely on Yucaipa's abandoned pleadings in a separate action in a different district, in attempting to dismiss Yucaipa's allegations here. *See In re Enter. Rent-a-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d 277, 330 (W.D. Pa. 2010) (allegations in complaint from previous action not binding); *see also Aronson v. Generation Mortg. Co.*, No. 13-1702, 2014 WL 641622, at *1 (W.D. Pa. Feb. 19, 2014) (purportedly contradictory allegations from complaints in prior lawsuits cannot be considered on motion to dismiss); *cf. Tri3 Enters.*, 535 F. App'x at 195 (analysis on motion to dismiss is "generally confined to the four corners of the complaint . . . ."). Further, even if Yucaipa had made its prior allegations in this action (which it has not), at the motion-to-dismiss stage, an

amended complaint "supersedes the original and renders it of no legal effect, unless [it] specifically refers to or adopts the earlier pleading." *W. Run Student Hous. Assocs.*, 712 F.3d at 171. Thus, BD/S cannot rely on discarded allegations from the SDNY Action to support their attempt to invoke the Covenant here.[11]

Most importantly, however, Yucaipa's RICO Complaint does not solely address the lost opportunities resulting from BD/S killing off the JCT deal. Rather, the RICO allegations address a pattern of conduct—all directed specifically and solely at Yucaipa resulting in unique harm. This includes their attempt to equitably subordinate Yuciapa's debt, dilute Yucaipa's ownership interest in certain real estate and other assets, and generally eliminate Yucaipa's rights in favor of BD/S's rights. (Compl. ¶ 36.) No other creditor has sufficient debt to justify bringing this claim for relief; no other creditor holds equity in Allied such that BD/S could have mounted this effort against them; no other creditor has been denied its right to reimbursement of fees and expenses; no other creditor has had its ownership in certain real estate assets arbitrarily reduced; no other creditor has been targeted by BD/S and accused of engaging in equitable conduct. On account of Yucaipa's unique position, Yucaipa seeks affirmative equitable relief for that harm, which equitable relief addresses the unique harm suffered by Yucaipa. (*Id.*)

## C.    Yucaipa Has Sufficiently Pleaded Its RICO Claim

BD/S urge this Court to subject Yucaipa's RICO claim to some sort of heightened scrutiny because, they contend, this case involves a mere "garden variety business dispute."

---

[11]    Even assuming the Court were to consider Yucaipa's prior allegations in the SDNY Action, Yucaipa revised these allegations after reviewing further relevant information, and its understanding may continue to evolve. While BD/S insist the prior allegations are binding and preclusive here, they rely on an inapposite case in which the plaintiff used admissions in an answer against defendants as evidence *at trial. See Johnson v. Goldstein*, 864 F. Supp. 490, 493 (E.D. Pa. 1994). But "at the *motion to dismiss stage* . . . the plaintiff cannot be bound by allegations in the superseded complaint." *W. Run Student Hous. Assocs.*, 712 F.3d at 172–73 (emphasis added).

(MTD 1, 2, 20–21.) BD/S advance an unduly narrow conception of RICO that has no basis in the statutory text or the governing case law. Congress has instructed that RICO is to "be liberally construed to effectuate its remedial purposes." Organized Crime Control Act, Pub. L. No. 91-452, § 904(a), 84 Stat. 922–947 (1970). As RICO's principal drafter explained: "We don't want one set of rules for people whose collars are blue or whose names end in vowels, and another set for those whose collars are white and have Ivy League diplomas."[12] The Supreme Court has since removed any doubt about the reach of RICO in holding that the statute "makes it unlawful for 'any person'—not just mobsters"—to engage in racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985). BD/S's substantive attack on Yucaipa's RICO claim is entirely without merit.[13]

### 1.     Yucaipa Has Standing to Sue under RICO

BD/S argue that "Yucaipa does not have standing to assert RICO claims because its damages are contingent upon outcomes of the proceedings in Bankruptcy Court." (MTD 21.) BD/S are mistaken. They ignore the numerous allegations in the Complaint identifying significant harm that Yucaipa has already suffered at BD/S's hands.

In particular, as the Complaint makes clear, BD/S's "scheme *has already injured* Yucaipa and cost it more than $175 million in damages." (Compl. ¶ 33 (emphasis added).) BD/S's actions have resulted in Yucaipa's "loss of profit on the original JCT transaction scuttled by Defendants' wrongful involuntary bankruptcy filing." (*Id.*) And their scheme has already cost Yucaipa "millions in attorneys' fees and costs" in the bankruptcy proceedings they fraudulently

---

[12]   Sanders, Alain. *Law: Showdown at Gucci*, Time Magazine (Aug. 21, 1989).

[13]   BD/S also argue that Yucaipa's RICO conspiracy claim should be dismissed for identical reasons. (MTD 32.) But because Yucaipa's RICO claim survives BD/S's challenge, the RICO conspiracy claim does as well.

initiated—costs that continue to mount to this day. (*Id.* ¶¶ 33, 35.) Further, BD/S have stripped Yucaipa of its property by arbitrarily reducing its ownership interest in certain real estate assets and denied Yucaipa its right to reimbursement of expenses while paying their own. (*Id.* ¶¶ 132–39.)

As BD/S's own case law demonstrates, in order to satisfy RICO's standing requirement, Yucaipa only need allege that it "suffered an injury to business or property," meaning an "actual monetary loss, i.e., an out-of-pocket loss." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000). The "millions in attorneys' fees and costs" that Yucaipa has already lost due to BD/S's scheme is precisely the type of "out-of-pocket loss" that establishes standing. *See, e.g.*, *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 258 n.2 (3d Cir. 2007) (plaintiff satisfies RICO standing because his "[out-of-pocket] losses related to his having had to sell his home and personal property below the property's fair market value as well as having incurred fees and penalties from the IRS . . . ."); *Lynch v. Capital One Bank*, No. 12-992, 2013 WL 2915734, at *3 (E.D. Pa. June 14, 2013) (finding that attorney's fees can constitute an out-of-pocket monetary loss); *Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797 (E.D. Pa. 2007) (recognizing that out-of-pocket expenses like the payment of legal fees can be actionable injuries under RICO).

BD/S suggest that Yucaipa needs to wait until their scheme culminates in equitable subordination in order to bring suit. (MTD 21–22.) But nothing requires Yucaipa to sit idly by and wait for the bankruptcy court to adjudicate BD/S's equitable subordination theories before it can sue—in the interim Yucaipa would suffer harm to its reputation, and the payment of attorneys' fees to defend against BD/S's bogus claims, among other injuries (including the harm it has already suffered from the loss of the JCT deal, and the stripping of its property rights vis-à-

vis certain real estate assets).  In fact, Yucaipa is expressly seeking equitable relief to protect itself *from further harm*.  (Compl. at p. 68.)[14]

### 2.    Yucaipa Has Adequately Alleged BD/S's Racketeering Activity

BD/S next argue that "this action does *not* involve a criminal enterprise or a pattern of racketeering activity" of sufficient duration, and should therefore be dismissed.  (MTD 2.)  Yet once again, BD/S rely on selective excerpts from Yucaipa's Complaint, while ignoring Yucaipa's other allegations and the Complaint as a whole.

Yucaipa expressly alleges that BD/S's scheme has run "[f]rom at least in 2009 and continu[es] today."  (Compl. ¶ 1.)  While BD/S argue that "[t]he predicate acts at issue here took place over a nine-month period" (MTD 24), they ignore Yucaipa's explicit allegations that BD/S "continue to assert causes of action for equitable subordination against Yucaipa in adversary case number 13-50530 filed in the Allied bankruptcy case."  (Compl. ¶ 159.)  They also disregard the specific allegation that BD/S have not only "made false oaths and provided false declarations to the Bankruptcy Court," but "continue to obstruct justice."  (*Id.* ¶ 157.)  BD/S's "campaign to whitewash their record of coordination continued as litigation commenced between the parties"—and lasted until at least August of 2014.  (*Id.* ¶ 188 (alleging that BD/S agreed to withhold relevant documents from Yucaipa in the bankruptcy litigation, and that this agreement lasted until August 15, 2014).)

BD/S attempt to narrow the duration of their scheme by arguing that "Yucaipa's allegations of mail and wire fraud from September 2011 . . . should be rejected . . . because

---

[14]   That further harm continues to evolve even after Yucaipa filed its Complaint, and it includes BD/S's newly proposed bankruptcy plan.  This proposed plan seeks to disenfranchise Yucaipa, treats Yucaipa differently and worse than other lenders, and improperly serves as a tool to enhance BD/S's litigation posture in the adversary proceedings, among other harms to Yucaipa.  (*See* D.I. 2939, Main Bankr. Case No. 12-11564.)  Yucaipa is actively contesting it.

Yucaipa cannot tack on conclusory allegations of mail and wire fraud to add more time to its alleged pattern of racketeering conduct." (MTD 25-26, citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1418 (3d Cir. 1991).) But even "[w]holly truthful mailings or transmissions may fall within the ambit of the mail and wire fraud statutes if performed in connection with a scheme to defraud." *Emel v. Singleton*, 3:cv-09-0664, 2010 WL 1005264, at *15 (M.D. Pa. Feb. 11, 2010). Indeed, BD/S's own case law confirms that "each mailing that is incident to an essential part of the scheme constitutes a new violation," sufficient to extend the duration of the scheme. *Kehr Packages*, 926 F.2d at 1413 (internal quotation omitted). Here, Yucaipa specifically alleges that BD/S "engaged in multiple counts of wire fraud in violation of 18 U.S.C. § 1343" and "multiple counts of mail fraud in violation of 18 U.S.C. § 1341" beginning in September 2011 that were in furtherance of, and incident to, essential parts of their overall scheme to harm Yucaipa. (Compl. ¶¶ 192, 193, 197, 198.)

As a result, BD/S's actions were not a scheme lasting mere months, but a pattern of "fraudulent conduct lasting *years*." *Hughes v. Consol-Penn. Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991); *see also H.J. Inc. v. NW Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (the pattern element is a "fairly flexible concept," and "the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance").

BD/S also argue that their RICO scheme "does not constitute criminal activity, let alone pose a threat of continued criminal activity" because the "alleged pattern of racketeering activity has only one objective," and "only one intended victim." (MTD 25.) But the Third Circuit recognizes that alleging "only one victim in a single scheme is not necessarily dispositive." *Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir. 1990); *see also United States v. Starnes*, 644 F.2d 673, 678 (7th Cir. 1981) (explaining that there is no support for the argument that RICO

"require(s) a showing of separate and unrelated schemes").  Rather, courts have found that even schemes involving "only one transaction intended or one objective" sufficient when "defendants allegedly committed several racketeering acts to entice plaintiffs to enter that transaction."  *LSC Assocs. v. Lomas & Nettleton Fin. Corp.*, 629 F. Supp. 979, 981–82 (E.D. Pa. 1986).  Here, Yucaipa alleges a scheme lasting years—targeting itself as well as certain members of the Allied Board of Directors (Compl. ¶¶ 20, 79)—and constituting not only "false oaths and . . . false declarations to the Bankruptcy Court," but also BD/S's repeated obstruction of justice (*id.* ¶ 157).

Yucaipa has more than adequately alleged a pattern of racketeering activity.  The Court should allow this claim to go forward in discovery so that Yucaipa may uncover the full extent of BD/S's unlawful scheme.

### 3. The Bankruptcy Court's Dismissal of Yucaipa's Very Different Cross-Claim in 2012 Does Not Preclude Yucaipa's RICO Claim as a Matter of Collateral Estoppel or Otherwise

BD/S contend that the bankruptcy court's comments during the February 2013 hearing in a different case—regarding the plausibility of Yucaipa's cross-claim allegations in Adversary Proceeding No. 12-50947, which were made before the criminal conduct at issue in Yucaipa's Complaint was revealed through discovery produced in the spring of 2013—should be given collateral estoppel effect here, and require dismissal of Yucaipa's RICO claim with prejudice.  (MTD 26–29.)  BD/S made similar preclusion arguments in their pending motion to dismiss Yucaipa's counterclaim in the BD/S Action.  (*See* D.I. 41, Mot. to Dismiss Countercl. 16–18, Adv. Proc. No. 14-50971.)  In the interest of efficiency, Yucaipa respectfully refers the Court to Yucaipa's detailed response in its opposition to BD/S's pending motion (attached as Exhibit 1 to the Scolnick Declaration), and will not repeat that response here.  (D.I. 56, Opp. to Mot. to Dismiss Countercl. 4–14, Adv. Proc. No. 14-50971.)

In short, collateral estoppel requires an identity of issues.  *See Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000).  But that is not present here because the cross-claim allegations concerned only the validity of the Third and Fourth Amendments to the First Lien Credit Agreement.  Additionally, the bankruptcy court did not "actually and necessarily" decide that the relevant allegations were implausible.  *Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979) (issue to be precluded must necessarily have been decided in earlier decision).

4.     **Yucaipa's RICO Allegations Readily Clear the *Iqbal-Twombly* Plausibility Hurdle**

Relying on a strained reading of Yucaipa's Complaint, and sprinkling in several of their own competing factual assertions, BD/S argue that Yucaipa's RICO allegations are not sufficiently plausible.  (MTD 29.)  But the scheme alleged in Yucaipa's Complaint is not merely plausible, the allegations clearly set forth its occurrence.  Curiously, while BD/S express incredulity at the supposedly "speculative" nature of each step in their plan to harm Yucaipa (MTD 32), they overlook that have *already succeeded* in accomplishing most of these steps, leaving only the final step of equitably subordinating Yucaipa, which is well underway.  Yucaipa has pleaded this scheme in substantial detail, and amply corroborated it with supporting evidence, including emails between BD/S's principals.  Yucaipa's allegations easily clear the *Iqbal-Twombly* hurdle.

a.     **The Plausibility Standard in the Third Circuit**

A plaintiff's claims are plausible if "any reasonable reading of the complaint" entitles the plaintiff to relief.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  While the "'allegations must be enough to raise a right to relief above the speculative level,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the complaint does not have to establish all elements of the case; it need only "raise a reasonable expectation that discovery will reveal

evidence of the necessary element," *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (internal quotation omitted). The plausibility inquiry is "not akin to a probability requirement"—it concerns only whether the plaintiff has pled more than the "sheer possibility" of defendant's liability. *Iqbal*, 556 U.S. at 678. The plaintiff must show only that each allegation "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable . . . ." *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

### b. Yucaipa's Allegations Are Plausible

BD/S take a "divide and conquer" approach by challenging the plausibility of certain of Yucaipa's allegations in a vacuum—namely, the allegations that (1) BD/S's equitable subordination scheme began in 2009, (2) BD/S participated in the JCT negotiations for a year and a half, (3) Black Diamond needed to buy Spectrum's support for filing the involuntary bankruptcy, (4) Yucaipa did not act inequitably, (5) BD/S scuttled the JCT deal to preserve their equitable subordination claim, and (6) BD/S pursued a risky scheme. (MTD 29–32.) BD/S's approach to plausibility is itself improper. *See Oswald v. Gibbons*, 2011 WL 2135619, at *2 (E.D. Pa. May 31, 2011); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) ("[W]e examine the complaint as a whole . . . ."). But even if the Court were to focus on the plausibility of each of the following allegations separately, they are plausible and well documented.[15]

---

[15] As with other arguments, BD/S's argument here merely repeats points that they raised before—and that Yucaipa already disposed of—in the BD/S Action. (*See* D.I. 41, Mot. to Dismiss Countercl. 16–23, Adv. Proc. No. 14-50971.) Yucaipa respectfully refers the Court to the relevant section of its opposition to that motion, attached as Exhibit 1 to the Scolnick Declaration. (*See* D.I. 56, Opp. to Mot. to Dismiss Countercl. 31–40, Adv. Proc. No. 14-50971.) Yucaipa summarizes its responses here.

i.     **BD/S were lying in wait for the optimal time to file their equitable subordination claim.**  BD/S argue it is implausible that they would have begun scheming to equitably subordinate Yucaipa back in 2009 (even though the August 2009 Schaffer Email makes clear that they were), but then waited until 2012 to file their involuntary petition.  (MTD 29.)  But Yucaipa explained in the Complaint that the three-year lag was attributable to BD/S's need to strip Yucaipa of its Requisite Lender status before filing the involuntary petition—which required litigation in state courts.  (Compl. ¶¶ 92–100.)

ii.     **BD/S spent a year negotiating with JCT to buy time for their equitable subordination claim and to ensure the deal did not close.**  BD/S next argue that if their ultimate objective was to equitably subordinate Yucaipa's First Lien Claims, it is not plausible that they would have spent a year and a half negotiating a deal to sell away their own First Lien Debt to JCT, and with it, the right to equitably subordinate Yucaipa.  (MTD 29–30.)  But BD/S's negotiations with JCT were a sham, as Yucaipa details in its Complaint—BD/S were buying themselves time to initiate an involuntary proceeding and carry out their equitable subordination plan, which could not have worked if the JCT deal had closed.  (Compl. ¶¶ 100–101.)  Moreover, there is nothing contradictory about BD/S playing both sides simultaneously, and deciding at the last minute that the equitable subordination option had a bigger upside than the proposed JCT deal.

iii.     **Even though they had been conspiring since 2009, Black Diamond needed to secure Spectrum's support for the equitable subordination scheme with an illegal claims-trade.**  BD/S argue it is implausible that Black Diamond would have needed to secure Spectrum's support to equitably subordinate Yucaipa—with the Involuntary Petition Payoff—if the two companies had been colluding to enrich themselves at Yucaipa's expense since 2009.

(MTD 30.) But Yucaipa alleges that, at the time of the transaction, Black Diamond (which had more debt-trading prowess than Spectrum) held substantially more First Lien Claims than Spectrum and had purchased that debt at a rock-bottom price. (Compl. ¶ 101.) This made equitable subordination more attractive to Black Diamond than Spectrum, who may have looked less favorably on the scheme's risks, given Spectrum's relatively smaller holdings acquired at a relatively higher price. (*Id*.) To increase Spectrum's "skin in the game" and ensure its support for the involuntary petition, Black Diamond had to increase Spectrum's potential windfall by allowing Spectrum to purchase more First Lien Claims at a favorable price. (*Id*. ¶¶ 101–08.)

  **iv.** **BD/S targeted Yucaipa for equitable subordination in order to potentially obtain a windfall.** BD/S next argue it is not plausible that they would have targeted Yucaipa for equitable subordination if Yucaipa did nothing wrong, overlooking that in their private communications they expressed the belief that Yucaipa operated in good faith to add value to Allied. (MTD 30–31.) Their argument begs the question. It is plausible, and indeed likely, that BD/S chose to pursue their claim because Yucaipa was a convenient pawn—without regard to whether Yucaipa was liable for any actual wrongdoing. (Compl. ¶¶ 79–80, 123.) Yucaipa is an insider of Allied. BD/S do not deny their view that "when the defendant is an insider, the standard for finding inequitable conduct is less exacting." *In re Exide Techs., Inc.*, 299 B.R. 732, 744 (D. Del. 2003). Given this relatively lower bar to equitable subordination, BD/S targeted Yucaipa despite knowing Yucaipa's actual lack of culpability.

  Further, BD/S plausibly had another rationale for suing Yucaipa. They sought to threaten Yucaipa's good reputation, which they knew they might be able to leverage for settlement or other concessions. (Compl. ¶¶ 35, 200, 207.) If BD/S could obtain terms from Yucaipa that increased their share of the Allied estate above 22% of First Lien distributions (*see id*. ¶ 17), they

would naturally seek to foist such an agreement on Yucaipa. Thus, the Court may draw the "reasonable inference" that BD/S pursued such a strategy. *Gelman*, 583 F.3d at 190.

v.  **BD/S thwarted a deal with JCT in the hope that equitably subordinating Yucaipa's debt would provide a more lucrative payout.** BD/S also assert that it is implausible that they would have thwarted a supposedly "guaranteed" recovery in the proposed JCT deal to pursue a speculative equitable subordination claim. (MTD 31.) But this ignores Yucaipa's allegations that BD/S's ultimate recovery in the JCT deal was "uncertain," and dependent on contingencies like "JCT obtaining antitrust approval and raising sufficient financing . . . ." (Compl. ¶ 124.) Moreover, it ignores the fact that "the JCT deal was not an all-cash deal—it consisted of a large portion of unsecured debt" in JCT, the value of which was also unclear. (*Id.*)

BD/S focus on the terms of the proposed March 2012 Term Sheet between Yucaipa and JCT. (Compl. Ex. 4.) They argue that its "non-consenting lender" term shows that they would have received "up to" par plus accrued interest—*i.e.*, face value—for their First Lien Claims in that deal. (MTD 31.) But BD/S's own contemporaneous email correspondence shows that JCT was offering them *less than par* (in fact, JCT offered BD/S no more than $.75 on the dollar as of May 10, 2012). (*See* Compl. ¶ 99.) They also alleged in the BD/S Action that they would *not* have received par plus accrued in cash. (D.I. 1, Compl. ¶ 96, Adv. Proc. No. 14-50971.) Additionally, they were not a "non-consenting lender" in the March 2012 Term Sheet. Rather, *before closing* that deal, the term sheet required that BD/S consent to the deal and dismiss litigation they were pursuing against Yucaipa, and JCT expressly would have needed to purchase BD/S's First Lien Claims for an unspecified amount. (Compl. Ex. 4 at YUCAIPA831200.) The "non-consenting lender" provision applied only to those remaining lenders who might object to

the proposed bankruptcy court auction of Allied's assets to JCT—which necessarily could not have included BD/S in that scenario.

In light of these contingencies and uncertainties, it is highly plausible that BD/S would have rejected the JCT deal to pursue equitable subordination. BD/S purchased their First Lien Claims for substantial discounts to par value; they saw little downside to their scheme. (Compl. ¶¶ 72, 79–80.) The potential gains, on the other hand, were enormous. (*Id.* ¶¶ 79–80.) Their scheme, if successful, will allow them to push Yucaipa out of the way and to recover 50% of the Allied estate First Lien distributions—the full par value of their claims plus interest. They could not have accomplished that result in any iteration of the JCT deal.

vi. **BD/S's scheme has been largely successful to date.** BD/S argue that the scheme Yucaipa alleges is not plausible because it is too dependent on "highly contingent events . . . ." (MTD 32.) In fact, while this likely was not BD/S's intention in breaking their scheme down into "five highly unpredictable" steps in their motion (*id.*), doing so actually highlights how effective they have been thus far in their efforts to harm Yucaipa. The first four of those steps have *already* been successful: (1) they convinced Yucaipa to buy the majority of First Lien Claims, (2) they invalidated the Fourth Amendment in the New York litigation, (3) they joined together to file an involuntary petition and persuaded the bankruptcy court that they are the Requisite Lenders, and (4) they caused Allied's assets to be sold at a price that will leave the First Lien Debt unsatisfied. The fifth step, equitable subordination of Yucaipa's First Lien Claims, is already well underway. (Compl. ¶¶ 72, 79–80.) And this final step, if successful, will allow BD/S to "parlay an investment of less than $8 million into multiples of that amount—a massive windfall even for highly aggressive hedge funds like [BD/S]." (*Id.* ¶ 128.)

\* \* \*

Courts should not dismiss well-pleaded allegations, even if it "strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Here, Yucaipa's allegations easily clear that pleading threshold, raising much more than the "sheer possibility" of BD/S's liability. *Iqbal*, 556 U.S. at 678.

**D.** **Even Assuming the Court Dismisses Yucaipa's RICO Claim, It Should Exercise Supplemental Jurisdiction over Yucaipa's State-Law Claims in the Interest of Judicial Economy and Convenience**

Assuming that Yucaipa's RICO claim were dismissed (it should not be), BD/S assert in conclusory fashion that the Court should decline to exercise supplemental jurisdiction over Yucaipa's remaining state law claims for tortious interference and fraud. (MTD 33.) But under 28 U.S.C. § 1367(c), such dismissal would be permissive, not mandatory. BD/S make no effort to explain *why* the Court should exercise its discretion to decline jurisdiction here. The Court should reject BD/S's invitation, as "the values of judicial economy, convenience, fairness, and comity" support supplemental jurisdiction here. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

This Court has separately pending before it Yucaipa's fully briefed motion to withdraw the reference in the BD/S Action. That action includes BD/S's *own* state-law claims. Assuming the Court grants Yucaipa's motion to withdraw the reference, it would be highly efficient and practical for a single court to hear Yucaipa's Complaint in this action and BD/S's state-law claims in that related action, and to adjudicate all these claims together. *Cf. New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1506 (3d Cir. 1996) (exercising supplemental jurisdiction over state law claim where merits had already been adjudicated). Conversely, it would make no sense for a *third* court—a Delaware state court—to consider these same facts and underlying allegations concurrently.

Thus, the Court should exercise supplemental jurisdiction.

**E.      Yucaipa Properly Alleges Claims for Tortious Interference and Fraud Under Delaware Law**

According to BD/S, Yucaipa fails to state a valid claim under Delaware law for tortious interference with the JCT deal.  Under Section 768 of the Restatement (Second) of Torts, BD/S contend that Yucaipa cannot recover if BD/S pursued their own competitive interest in killing that deal.  (MTD 33 (quoting from Yucaipa's Complaint, claiming that Yucaipa "admits that [BD/S] advanced their own economically competitive interests by allegedly backing out of the JCT deal to pursue a larger recovery on their debt holdings through involuntary bankruptcy.").)  BD/S misapprehend Section 768, however, and they continue to misread Yucaipa's Complaint.

Section 768 provides that "one who intentionally causes a third person not to enter into a prospective contractual relationship with another who is his competitor . . . does not interfere improperly with the other's relation [only] if . . . *the actor does not employ wrongful means* . . . ."  Restatement (Second) of Torts § 768(1) (emphasis added).  Wrongful means include fraud and frivolous civil suits.  *Id.* at cmt. e; *see also CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 388–89 (3d Cir. 2004) (interpreting § 768).  In fact, wrongful means include all means "that are themselves capable of forming the basis of liability for the defendant."  *CGB Occupational Therapy*, 357 F.3d 388 (internal quotation marks omitted).  Yucaipa alleges here that BD/S engaged in various wrongful means, including unlawful claims trading, bankruptcy fraud, and mail and wire fraud, as discussed above.  (Compl. ¶¶ 109–110.)  What is more, BD/S's wrongful means are independently actionable, and form Yucaipa's RICO predicate acts.  Section 768 therefore does not apply.

Similarly, with respect to Yucaipa's fraud claim, BD/S argue that Yucaipa fails to adequately plead reasonable reliance or damages because BD/S made false statements in its affidavits *to the bankruptcy court*, and not just to Yucaipa.  (MTD 34.)  But under Delaware law,

fraud may "consist . . . of overt misrepresentations [or omissions] made in order to cause damage to *third parties*, who act in reliance upon such statements [or omissions] . . . ." *Schmeusser v. Schmeusser*, 559 A.2d 1294, 1295 (Del. 1989) (emphasis added); *see Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Importantly, "third parties" in this context may include courts. *See Schmeusser*, 559 A.2d at 1296–1300 (party's misrepresentations to court also "clearly" constituted fraud on other party).

As in *Schmuesser*, BD/S's misrepresentations and omissions to the bankruptcy court were intended to harm Yucaipa, as well as the administration of justice in the bankruptcy proceeding. The purpose of BD/S's conduct was to persuade the court to treat Yucaipa differently as a lender, stripping it of its rights and equitably subordinating its claims. And Yucaipa relied on the validity of the bankruptcy itself in determining its "litigation position in the bankruptcy action and other related proceedings." (Compl. ¶ 212.) Thus, Yucaipa's allegations are consistent with Delaware law and state a cognizable claim for fraud.

**F.    To Preserve Judicial Resources and Limit the Risk of Duplicative Litigation, the Court Should Allow This Action to Proceed Along with the Related Proceedings**

Finally, BD/S argue in the alternative that the Court should stay this action to allow the Committee and BD/S Actions to proceed, in order to conserve judicial resources and limit the risks of duplicative litigation. (MTD 34.) But the Court would best serve those interests by allowing these actions to proceed together, or even exercising its broad discretion to *consolidate* them. *See Infinity Computer Prods., Inc. v. Brother Int'l Corp.*, 909 F. Supp. 2d 415, 419–21 (E.D. Pa. 2012) (denying defendant's motion to stay, and reasoning that if plaintiff filed multiple actions, consolidation would conserve resources and be most efficient).

As Yucaipa has previously explained, this Court has before it a number of related actions that depend on many of the same basic facts, and relate to many of the same underlying events.

It would make no sense to carve this action out separately, and hold it in abeyance until those other cases are resolved. For instance, the Court is considering the UCC's claim against former Allied CEO and Board member Mr. Gendregske, which will require findings on many of the same facts at issue in Yucaipa's Complaint against BD/S, and BD/S's complaint against the Yucaipa Directors. (D.I. 17, No. 13-cv-1010-SLR.)[16]

Nonetheless, this Court's and/or the bankruptcy court's findings in the various adversary proceedings will not resolve the entire dispute among the parties. The primary question in the adversary proceedings is whether Yucaipa or BD/S acted inequitably such that their Claims should be subordinated. Here, in contrast, Yucaipa principally alleges that BD/S's past and ongoing misconduct violates federal bankruptcy laws and criminal statutes.

The Court should resolve the parties' entire dispute—both the overlapping and the unique facts and legal theories between this action and the adversary proceedings—in one action. If the Court grants Yucaipa's pending motion to withdraw the reference over the BD/S Action, it will have nearly all parties and all claims before it (the only exception would be claims in the UCC Action against defendants other than Mr. Gengregske, which this Court would hear on appeal). In that scenario, the Court could efficiently manage the related litigations, and resolve the parties' competing bankruptcy claims (such as equitable subordination), state-law claims, and Yucaipa's RICO and fraud claims. In contrast, if the Court stays this action, it will splinter these cases apart again, all but ensuring a second trial on Yucaipa's RICO claims. The Court should reject BD/S's invitation to prolong and unduly complicate this litigation.

---

[16] Among other allegations, the Committee and BD/S claim that Mr. Gendregske, in his capacity as a member of the Allied Board, violated his fiduciary duties by permitting Yucaipa to negotiate and draft the Fourth Amendment to the First Lien Credit Agreement so that Yucaipa could acquire a majority of Allied's First Lien debt. (D.I. 71, Am. Compl ¶¶ 179–193, Adv. Proc. No. 13-50530.) Yucaipa's Complaint here covers those same facts—Yucaipa's purchase of debt under the Fourth Amendment—albeit with a different focus. (Compl. ¶¶ 83–91, 95–100.)

## V. CONCLUSION

For these reasons, BD/S's arguments lack merit, and the Court should deny their Motion to Dismiss and/or Stay.

Dated: June 22, 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ John T. Dorsey*
John T. Dorsey, Esq. (No. 2988)
Michael R. Nestor (No. 3526)
Sharon M. Zieg, Esq. (No. 4196)
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Maurice M. Suh
Robert A. Klyman
Kahn Scolnick
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
msuh@gibsondunn.com

Attorneys for Defendants
Yucaipa American Alliance Fund I, L.P., and
Yucaipa American Alliance (Parallel) Fund I, L.P.