## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------------x

| | | |
|---|---|---|
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., | : : : : | |
| Plaintiffs, | : | Case No.: 15-cv-373 (SLR) |
| - against - | : : | ECF Case |
| RICHARD A. EHRLICH, STEPHEN H. DECKOFF, LESLIE A. MEIER, JEFFREY A. SCHAFFER, BDCM OPPORTUNITY FUND II, L.P., BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P., | : : : : : : | |
| Defendants. | : : | |

-------------------------------------------------------------x


## DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS OR STAY THE ACTION

**LANDIS RATH & COBB LLP**
919 Market Street, Suite 1800
Wilmington, Delaware 19801
(302) 467-4400

-and-

**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Defendants Richard A. Ehrlich, Stephen H. Deckoff, Leslie A. Meier, Jeffrey A. Schaffer, BDCM Opportunity Fund II, L.P., Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................2

I.    The *Noerr-Pennington* Doctrine Bars Yucaipa's Claims....................................2

    A.    *Noerr-Pennington* Applies to Yucaipa's Claims..................................2

    B.    The Sham Exception Does Not Apply ...................................................3

    C.    No Other Exception to *Noerr-Pennington* Applies Here .........................5

II.   Yucaipa's Complaint Is Barred by the Covenant Not to Sue ...............................7

III.  Yucaipa Has Failed to Adequately Allege a RICO Claim ..................................10

    A.    Yucaipa Lacks RICO Standing...............................................................10

    B.    Yucaipa Has Failed to Allege a Pattern of Racketeering Activity............12

    C.    Yucaipa Is Collaterally Estopped From Alleging That BD/S "Encouraged" Yucaipa to Buy First Lien Debt ...............................................14

    D.    Yucaipa's RICO Allegations Are Implausible .......................................15

IV.   This Court Should Decline to Exercise Supplemental Jurisdiction Over Yucaipa's State Law Claims.........................................................................18

V.    Yucaipa Fails to Adequately Allege State Law Claims .....................................19

VI.   If This Action Is Not Dismissed, It Should Be Stayed ......................................20

CONCLUSION ........................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*,
185 F.3d 154 (3d Cir. 1999) .................................................................................6

*Aronson v. Generation Mortgage Co.*,
No. Civ. A. 13-1702, 2014 WL 641622 (W.D. Pa. Feb. 19, 2014) ........................10

*Barnes Found. v. Twp. of Lower Merion*,
927 F. Supp. 874 (E.D. Pa. 1996) ........................................................................3

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*,
No 650150/2012, 2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013) ..................4, 18

*Borough of W. Mifflin v. Lancaster*,
45 F.3d 780 (3d Cir. 1995) .................................................................................18

*Bristol-Meyers Squibb Co. v. Immunex Corp.*,
84 F. Supp. 2d 574 (D.N.J. 2000) .........................................................................6

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) .............................................................................................6

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999) ..........................................................................5, 6, 7

*CollegeSource, Inc. v. AcademyOne, Inc.*,
597 Fed. App'x. 116 (3d Cir. 2015) ............................................................... 13-14

*Costa Cnty. Bldg. & Constr. Trades Council*,
31 F.3d 800 (9th Cir. 1994) ..................................................................................5

*Eli Lily & Co. v. Roussel Corp.*,
23 F. Supp. 2d 460 (D.N.J. 1988) .......................................................................14

*In re Enterprise Rent-a-Car Wage & Hour Emp't Practices Litig.*,
735 F. Supp. 2d 277 (W.D. Pa. 2010) ..................................................................10

*Giles v. Phelan, Hallinan & Schmeig, L.L.P.*,
No. Civ. A. 11-6239 (JBS), 2013 WL 2444036 (D.N.J. June 4, 2013) ..................11

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989) ...........................................................................................12

*Hindes v. Castle*,
    937 F.2d 868 (3d Cir. 1991)...............................................................12

*In re Innovatio IP Ventures, LLC Patent Litig.*,
    921 F. Supp. 2d 903 (N.D. Ill. 2013) ...................................................2

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
    458 F.3d 244 (3d Cir. 2006)................................................................14

*Knit With v. Knitting Fever, Inc.*,
    No. Civ. A. 08-4221, 2012 WL 2938992 (E.D. Pa. July 19, 2012)........12

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993)..................................................................10

*Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*,
    192 F. Supp. 2d 519 (M.D. La. 2001) ...................................................5

*Lynch v. Capital One Bank*,
    No. Civ. A. 12-992, 2013 WL 2915734 (E.D. Pa. June 14, 2013) .........12

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000)................................................................11

*Meyers v. Heffernan*,
    740 F. Supp. 2d 637 (D. Del. 2010) ......................................................4

*Nat'l Distillers & Chem. Corp. v. Dep't of Energy*,
    No. 79-399, 1980 WL 1057 (D. Del. Oct. 23, 1980) ......................10, 17

*Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs.*,
    77 N.Y.2d 490 (1991) ...........................................................................9

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993)........................................................................3, 4, 5

*Rafferty v. Halprin*,
    No. 90 Civ. 2751, 1991 WL 148798 (S.D.N.Y. 1991) .........................14

*Reg'l Multiple Listing Serv. of Minn. v. Am. Home Realty Network, Inc.*,
    960 F. Supp. 2d 958 (D. Minn. 2013)....................................................3

*Schmeusser v. Schmeusser*,
    559 A.2d 1294 (Del. 1989) ..................................................................19

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) .................................................................2

*Stephenson v. Capano Dev., Inc.*,
    462 A.2d 1069 (Del. 1983) .................................................................................................19

*Trustees of Univ. of Pa. v. St. Jude Children's Research Hosp.*,
    940 F. Supp. 2d 233 (E.D. Pa. 2013) .................................................................................3

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*,
    31 F.3d 800, 811 (9th Cir. 1994) .......................................................................................5

*Walter v. Palisades Collection, LLC*,
    480 F. Supp. 2d 797 (E.D. Pa. 2007) ...............................................................................12

*Weiss v. First Unum Life Ins. Co.*,
    482 F.3d 254 (3d Cir. 2007)..............................................................................................12

*Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*,
    No. Civ. A. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014)..................................8, 9

**Statutes**

18 U.S.C. § 1503(a) ...............................................................................................................13

## PRELIMINARY STATEMENT

As discussed in the Opening Brief, the allegations pled in the Complaint[1] starkly illustrate the often commented upon misuse of the RICO statute to attempt to turn a garden variety business dispute into something more. In addition to this well established basis for dismissing the RICO claims, Yucaipa's Complaint is barred by the *Noerr-Pennington* doctrine, which immunizes Black Diamond and Spectrum's ("BD/S") litigation-related conduct – *i.e.*, their prosecution of equitable subordination claims and other proceedings in the Bankruptcy Court – from civil liability. Yucaipa's Opposition[2] has failed to satisfy the very high burden of proving that those claims are a "mere sham" in order to overcome *Noerr-Pennington*. Moreover, Yucaipa attempts to pigeonhole those claims into purported exceptions to *Noerr-Pennington* that are not recognized in the Third Circuit.

Yucaipa's Complaint is also barred by the Covenant Not to Sue. As the Bankruptcy Court and Chancery Court have already held, because of the Covenant, Yucaipa cannot sue unless there has been a prior judicial determination that Black Diamond and/or Spectrum have committed gross negligence or willful misconduct. In its Opposition, Yucaipa argues that such an interpretation is "nonsensical," yet Yucaipa notably never appealed the decisions of either the Bankruptcy Court or Chancery Court confirming that interpretation.

Moreover, throughout its Opposition, Yucaipa attempts to satisfy the heavy burden required for pleading a claim under RICO by repeatedly hurling allegations lacking factual support to try to supply what it is missing – a plausible claim. Even accepting Yucaipa's empty allegations

---

[1] Unless otherwise noted herein, capitalized terms shall have the same meaning as set forth in Defendants' Memorandum of Law in Support of Their Motion to Dismiss or Stay the Action (D.I. 17) (the "Opening Brief").

[2] "Opposition" refers to Yucaipa's Opposition to Defendants' Motion to Dismiss or Stay the Action (D.I. 18).

as true, the Complaint alleges nothing more than a business dispute between sophisticated private equity firms and should be dismissed.

<u>ARGUMENT</u>

I.     **THE *NOERR-PENNINGTON* DOCTRINE BARS YUCAIPA'S CLAIMS**

A.     ***Noerr-Pennington* Applies to Yucaipa's Claims**

Yucaipa argues that the *Noerr-Pennington* doctrine does not apply because "BD/S's misconduct involves a series of violations of enumerated federal criminal statutes, which are predicate acts under RICO and fall well outside of *Noerr-Pennington*'s protection."  (Opp'n at 6.) Yucaipa's argument is an exercise in aggressive misdirection.  The principle here is that *Noerr-Pennington* results in the dismissal of any claim that is based on a defendant's petitioning activity regardless of what the alleged RICO predicate acts are, even when the alleged predicate acts are mail and wire fraud.  *See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 927, 942 (9th Cir. 2006) ("Given the *Noerr-Pennington* presumption, we are not convinced that the mail and wire fraud statutes reach" defendant's litigation-related activity); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013) (dismissing RICO claim under *Noerr-Pennington* notwithstanding alleged mail and wire fraud predicate acts).

Here, according to Yucaipa, the alleged RICO enterprise "has a common goal of subordinating Yucaipa's debt."  (Compl. ¶ 156.)  Further, Yucaipa specifically asserts that the equitable subordination of Yucaipa's debt is "the culmination of Defendants' scheme."  (Compl. ¶ 29.)  BD/S can only achieve that alleged "common goal" and the "culmination of [their] scheme" through *successful litigation* of their equitable subordination claims, which is protected activity under *Noerr-Pennington*.  Accordingly, Yucaipa's RICO claims must be dismissed.

**B.      The Sham Exception Does Not Apply**

Next, Yucaipa argues that BD/S's equitable subordination claims come within *Noerr-Pennington*'s exception for sham litigation because those claims are "objectively baseless." (Opp'n at 9.)  Yucaipa, however, wholly misstates the nature of the sham exception.  As the Supreme Court has held, in order for a suit to be a sham it must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993).[3]  In this regard, it is a compelling admission that Yucaipa has never moved to dismiss the equitable subordination claims asserted by BD/S, which it clearly would have done if they were objectively baseless.

The fact that the Committee, a reasonable litigant (which owes fiduciary duties to its constituents), concluded after its independent investigation pursuant to its statutory authority that Yucaipa's claims "are subject to equitable subordination" (Mumford Aff. Ex. 5 ¶ 6) shows that BD/S's substantially similar equitable subordination claims are not objectively baseless.[4]

---

[3] Yucaipa attempts to survive this motion to dismiss by arguing that the "question of whether litigation is a sham is generally a question of fact for the jury." (Opp'n at 9) (internal quotation marks omitted).  Yucaipa is incorrect.  *Noerr-Pennington*'s protection of petitioning activity would be eviscerated if a jury trial were needed to establish that the petitioning activity was not a sham.  Thus, the sham exception is routinely decided in the context of a motion to dismiss.  *See, e.g.*, *Trustees of Univ. of Pa. v. St. Jude Children's Research Hosp.*, 940 F. Supp. 2d 233, 247 (E.D. Pa. 2013) (granting motion to dismiss based upon *Noerr-Pennington* wherein court determined that underlying lawsuit was not a sham); *Barnes Found. v. Twp. of Lower Merion*, 927 F. Supp. 874, 877-78, 880 (E.D. Pa. 1996) (finding sham exception inapplicable and granting motion to dismiss); *see also Reg'l Multiple Listing Serv. of Minn. v. Am. Home Realty Network, Inc.*, 960 F. Supp. 2d 958, 979 (D. Minn. 2013) ("Whether a petitioning activity is objectively baseless for *Noerr-Pennington* purposes may be decided as a question of law.").

[4] Yucaipa asks this Court to simply ignore the Committee Action because the Committee "also stands to benefit from the equitable subordination of Yucaipa's debt" (Opp'n at 10), but that is not the standard to be applied.  Every plaintiff "stands to benefit" from winning its lawsuit, but that obviously does not make every claim "objectively baseless," as Yucaipa's objection suggests.  Yucaipa also disputes the "alleged 'facts'" in the Committee Action, but that objection misses the point because *Noerr-Pennington*'s sham exception does not apply to every unproven claim.  Rather, it only reaches "objectively baseless" claims.  *See Prof'l Real Estate Inv.*, 508 U.S. at 60.

Similarly, the New York Court found that Yucaipa's improper attempt to usurp Requisite Lender status by attempting to enact the Purported Fourth Amendment was "of course, flatly prohibited under the Credit Agreement." *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, No 650150/2012, 2013 WL 1290394, at *5 (N.Y. Sup. Ct. Mar. 8, 2013). In addition, the Bankruptcy Court found that Yucaipa's attempt to avoid the terms of the Third Amendment, which it "heavily" negotiated, was "inequitable." (Mumford Aff., Ex. 8 at 129:17-25.). BD/S were successful in each of these litigations which, according to Yucaipa, were part of BD/S's RICO enterprise. BD/S's success therein establishes that the claims Yucaipa is challenging are not objectively baseless. *See Prof'l Real Estate Inv.*, 508 U.S. at 60 n.5 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham.").

Here, rather than discussing whether the equitable subordination claims are objectively baseless, Yucaipa instead focuses on a *single* sentence from an email of a third-party, T. Mike Riggs from JCT – which it takes out of context – as proof that BD/S were scheming to equitably subordinate Yucaipa's debt. (Opp'n at 9.) In the email, which is from 2009, Mr. Riggs asks Spectrum, "I thought you were going to check out the 'equitable subordination' angle." (Compl. Ex. 15.) In response, Spectrum simply responds, "Why?" (*Id.*) This single sentence from a third party sheds no light on whether BD/S's allegations concerning Yucaipa's misconduct were objectively baseless. In fact, even if this email were relevant and meant what Yucaipa says, it shows that Spectrum was checking out the *merits* of an equitable subordination claim, which again would be consistent with the standard in *Professional Real Estate Investors.*

Yucaipa also argues that this Court cannot consider the Committee Action on a motion to dismiss. (Opp'n at 10.) Yucaipa is incorrect, as this Court "may take judicial notice of documents from the docket of a bankruptcy proceeding in considering a motion to dismiss under Rule 12(b)(6)." *Meyers v. Heffernan*, 740 F. Supp. 2d 637, 640 n.4 (D. Del. 2010).

Because BD/S's equitable subordination claims against Yucaipa are not "objectively baseless," this Court need not consider BD/S's subjective intent. *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123 & n.10 (3d Cir. 1999). However, even if this Court did, Yucaipa cannot meet the subjective prong of the sham exception, which is focused on "whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor,' through the 'use of the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon.'" *Prof'l Real Estate Inv.*, 508 U.S. at 60-61. Here, the entire purported scheme alleged by Yucaipa requires BD/S to be successful in its equitable subordination claims, rather than simply filing them. (*See, e.g.*, Compl. ¶¶ 1-3, 7, 29, 31, 79-80, 123.) As such, even according to Yucaipa, BD/S's litigation filings could not subjectively have been a "mere sham."

## C.     No Other Exception to *Noerr-Pennington* Applies Here

Yucaipa argues that under an alleged "pattern" exception, *Noerr-Pennington* is not applicable because BD/S "have pursued three nearly identical and equally baseless actions since 2013." (Opp'n at 11.) This argument lacks merit for several reasons.

First, Yucaipa has failed to identify a *single* case from the Third Circuit that recognizes a so-called "pattern" exception to *Noerr-Pennington*. Second, Yucaipa's own cases show that even if a pattern exception were recognized in the Third Circuit, such an exception would not apply here. *See USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994) (declining to apply a pattern exception where the party asserting *Noerr-Pennington* protection had filed *twenty-nine* lawsuits); *Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 539-41 (M.D. La. 2001) (filing *nine* lawsuits raised a factual issue as to whether *Noerr-Pennington* applied). By contrast, here, Yucaipa complains of only three lawsuits, one of which was originally filed by BD/S on behalf of the Debtors' estate and then withdrawn and asserted in the Committee Action; thus, there are actually only two lawsuits.

Finally, even if two or three lawsuits were enough to trigger the exception, Yucaipa would still need to establish that the lawsuits were objectively baseless. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 512 (1972). As set forth above, Yucaipa cannot satisfy that burden.

Next, Yucaipa argues for a "misrepresentation" exception to *Noerr-Pennington*, which the Third Circuit has rejected. Yucaipa cites *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir. 1999), for the proposition that *Noerr-Pennington* will not apply where misrepresentations "infect the core" of the defendant's actions. (Opp'n at 12.) However, in *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154 (3d Cir. 1999), decided after *Cheminor*, the Third Circuit stated that the Supreme Court never held that "petitioning activity involving knowingly false information submitted to an adjudicative tribunal" was not entitled to *Noerr-Pennington* protection. *Id.* at 160. In fact, the Third Circuit pointed out that the Supreme Court had recently "cast doubt on whether such an exception exists under any circumstances." *Id.*; *see also Bristol-Meyers Squibb Co. v. Immunex Corp.*, 84 F. Supp. 2d 574, 578 (D.N.J. 2000) (allegations that party made knowingly false representations insufficient to defeat *Noerr-Pennington*).

Further, even if the Third Circuit did recognize a misrepresentation exception, that exception would be inapplicable here. Yucaipa argues for the misrepresentation exception by asserting that BD/S allegedly "filed false statements with the Bankruptcy Court and made false statements under oath." (Compl. ¶ 185.) The "false statements" Yucaipa references are the Ehrlich Affidavit and the Schaffer Affidavit and documents filed with the Bankruptcy Court, which allegedly conceal what Yucaipa characterizes as a "bribe" paid to Spectrum to induce it to support the filing of the involuntary petitions. (*Id.* ¶ 186.) Under *Cheminor*, however, a

misrepresentation does not automatically vitiate *Noerr-Pennington* immunity; rather, the misrepresented facts are disregarded for determining whether the petitioning activity is objectively baseless. *See Cheminor*, 168 F.3d at 123. Here, the purported misrepresentation is not at all relevant to BD/S's equitable subordination claims and thus has no effect on whether those claims are objectively baseless. Accordingly, the alleged misrepresentation by BD/S would not "infect the core" of their equitable subordination claims.

## II. YUCAIPA'S COMPLAINT IS BARRED BY THE COVENANT NOT TO SUE

As set forth in the Opening Brief, Yucaipa's Complaint is barred by the Covenant Not to Sue contained in the Third Amendment[5] because all of its claims are "arising out of, in connection with, as a result of, or in any way related to" the Credit Agreement and there has not been a prior judicial determination that Black Diamond or Spectrum engaged in gross negligence or willful misconduct, as required by the Prior Determination Requirement. (Opening Br. at 18-20.) In its Opposition, Yucaipa argues that it is "nonsensical" to read the Prior Determination Requirement to mean that "before Yucaipa could seek redress, a different court first would have needed to rule in Yucaipa's favor on the same allegations." (Opp'n at 13-14.)[6] Yucaipa ignores, however, that this

---

[5] Yucaipa contends that it should not be subject to the Covenant Not to Sue because it is supposedly "undisputed" that Yucaipa "did not . . . purchase any First Lien Debt under the Third Amendment." (Opp'n at 13 n.10.) To the contrary, as the Bankruptcy Court found, "[u]pon acquiring the debt, Yucaipa subjected itself to . . . *the third amendment.*" (Mumford Aff., Ex. 8 at 127:13-15 (emphasis added).) Yucaipa attempts to circumvent that ruling by arguing that Yucaipa's appeal from that ruling is pending before this Court. However, unless and until this Court reverses the Bankruptcy Court's ruling that the Third Amendment is valid and applicable to Yucaipa, Yucaipa is bound by its terms. In any case, the only possibility other than Yucaipa having bought the debt under the Third Amendment, since the purported Fourth Amendment has been declared void *ab initio* in the New York Action, is that Yucaipa bought the debt under the un-amended Credit Agreement, which expressly did not allow Yucaipa to buy any debt at all. Thus, Yucaipa would be in an even worse position since it would have no rights to sue under that agreement.

[6] In its Opposition, in order to evade the Court's page limit, Yucaipa improperly attempts to incorporate approximately 30 additional pages of arguments from a brief it filed in Bankruptcy

interpretation of the Prior Determination Requirement has already been made by *two* courts – the Bankruptcy Court and Chancery Court.

Specifically, the Bankruptcy Court found that the Prior Determination Requirement "deals with the narrow situation of a finding at some time post signing of the covenant by a court that there's been willful misconduct or gross negligence . . . . I don't think that is done in the auspices of a lawsuit directly between [Yucaipa and BD/S], it has to come from somewhere else." (Mumford Aff. Ex. 6 at 105:6-13.) Similarly, the Chancery Court found that pursuant to the Prior Determination Requirement, "Yucaipa cannot sue [BD/S] in the absence of a final, non-appealable determination that [BD/S] acted with gross negligence or willful misconduct." *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. Civ. A. 9151-VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014). Notably, Yucaipa did not appeal either of those decisions, which applied the Covenant Not to Sue to dismiss Yucaipa's claims.

Moreover, Yucaipa does not even attempt to explain what the phrase "as determined by a court of competent jurisdiction by final and non-appealable judgment" could possibly mean other than that there must first be a judicial finding of gross negligence or willful misconduct before

---

Court (Scolnick Decl. Ex. 1 ("Yucaipa's Prior Brief")) concerning (i) the Covenant Not to Sue; (ii) collateral estoppel; and (iii) plausibility. (*See* Opp'n at 13, 20, 22 n.15.) Given that this Court already granted the parties a 10-page extension, increasing the page limit to 35, this Court should reject Yucaipa's improper and unfair attempt to expand its Opposition to 60 pages by incorporating arguments made in Yucaipa's Prior Brief. If, however, this Court deems it appropriate to consider the arguments in Yucaipa's Prior Brief, Defendants respectfully request that this Court also consider the arguments BD/S made in response to those contained in Yucaipa's Prior Brief, as set forth in pages 8-16 (Covenant Not to Sue), 21-23 (collateral estoppel), and 23-33 (plausibility) of BD/S's Reply Brief in Further Support of Their Motion to Dismiss Yucaipa's Counterclaim for Equitable Subordination (BD/S Action, D.I. 65), which is attached as Exhibit 1 to the Affirmation of Kerri K. Mumford in Further Support of Defendants' Motion to Dismiss or Stay the Action (the "Reply Aff."), dated July 2, 2015 and filed concurrently herewith.

Yucaipa can sue.[7] Yucaipa's interpretation of the Covenant Not to Sue – that the Covenant can be circumvented by merely alleging gross negligence or willful misconduct – would impermissibly render that phrase superfluous. *See Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs.*, 77 N.Y.2d 490, 497 (1991) (holding that a court "cannot and should not accept an interpretation that ignores the interplay of terms, and renders certain terms 'inoperable'").

Yucaipa further argues that Defendants' interpretation of the Covenant Not to Sue – the same interpretation applied by the Bankruptcy Court and the Chancery Court – would violate public policy because "it would *forever* shield intentionally fraudulent misconduct even though Yucaipa is the only party in the position to sue BD/S for their wrongdoing." (Opp'n at 14 (emphasis added).) That argument is without basis. Under the Prior Determination Requirement, Yucaipa *can* sue if another Lender obtains a judgment that Black Diamond and/or Spectrum committed gross negligence or willful misconduct, or if Yucaipa "alleges a unique harm." *Yucaipa Am. Alliance Fund I*, 2014 WL 5509787, at *15. Just because that has not occurred in *this* case does not mean that Yucaipa is "forever" barred from suing.

Moreover, Yucaipa has not alleged a "unique" harm because, as it admitted in its SDNY Complaint, *all* the Lenders were harmed when BD/S allegedly "scuttled" the JCT deal. Yucaipa argues that this Court should simply ignore that prior admission because Yucaipa, having seen the motion to dismiss submitted by BD/S in the SDNY action, conveniently makes a 180 degree turn and now alleges that only Yucaipa was harmed. (Opp'n at 14-15.) However, even Yucaipa's *present* Complaint shows that Yucaipa was not uniquely harmed when the JCT deal fell through. In particular, Exhibit 4 to Yucaipa's present Complaint is a term sheet which states that JCT would

---

[7] The relevant text in the Covenant Not to Sue provides that Yucaipa "waives, any claim or cause of action against any Lender . . . except to the extent caused by such Lender's or Agent's gross negligence or willful misconduct . . . ***as determined by a court of competent jurisdiction by final and non-appealable judgment***." (Compl. Ex. 14, Third Amendment § 2.7(e) (emphasis added).)

purchase the debt **held by all the First Lien Lenders** "for a purchase price of up to par plus

accrued and unpaid interest." (Compl. Ex. 4.) That *same* Exhibit was the basis for Yucaipa's

allegation in the SDNY Complaint that "if the sale [to JCT] had proceeded as then contemplated it

would have maximized value for *all* stakeholders. *Under that March 2012 term sheet, each of the*

*First Lien Lenders (including Yucaipa and Defendants) would have benefitted on equal terms*."

(SDNY Compl. ¶ 24 & Ex. 7 (emphasis added).) While Yucaipa may now cleverly try to argue

that it can run away from its allegation in the SDNY action on the basis of a naked contrary

allegation before this Court, that is not the case here because of Exhibit 4. "[W]hen disparity exists

between a written exhibit incorporated in a complaint and allegations in the complaint, *the written*

*exhibit will control*." *See Nat'l Distillers & Chem. Corp. v. Dep't of Energy*, No. 79-399, 1980

WL 1057, at *3 (D. Del. Oct. 23, 1980).[8]

## III.    YUCAIPA HAS FAILED TO ADEQUATELY ALLEGE A RICO CLAIM

### A.    Yucaipa Lacks RICO Standing

As set forth in the Opening Brief, Yucaipa lacks RICO standing because its claim of a

scheme to equitably subordinate Yucaipa's First Lien Debt is not yet ripe. In its Opposition,

Yucaipa utterly fails to address the overwhelming weight of authority establishing that where

damages are contingent upon future events, including the outcome of bankruptcy proceedings,

RICO claims are not ripe. (*See* Opening Br. at 21-23 (citing cases).) [9]

---

[8] The cases cited by Yucaipa for the proposition that Yucaipa's prior allegations are not binding on
it in this action are not apposite. (*See* Opp'n at 14.) In neither *In re Enterprise Rent-a-Car Wage*
*& Hour Employment Practices Litigation*, 735 F. Supp. 2d 277 (W.D. Pa. 2010), nor *Aronson v.*
*Generation Mortgage Co.*, No. Civ. A. 13-1702, 2014 WL 641622 (W.D. Pa. Feb. 19, 2014), were
the allegations contradicted by an exhibit attached to the complaint and which also had been
attached to and supported the contrary allegations in the prior complaint.

[9] As Yucaipa concedes in its Opposition, the survival of Yucaipa's RICO conspiracy claim
depends on the adequacy of its underlying RICO claim. (Opp'n at 16 n.13.) Because Yucaipa has
failed to adequately allege a RICO violation under 18 U.S.C. § 1962(c), its RICO conspiracy claim

Despite the fact that the equitable subordination claims have not yet been adjudicated, Yucaipa argues that its RICO claims are nevertheless ripe because BD/S allegedly have "stripped Yucaipa of its property by arbitrarily reducing its ownership interest in certain real estate assets and denied Yucaipa its right to reimbursement of expenses."[10] (Opp'n at 17.) However, those purported losses also are still being litigated and are contingent upon the outcomes of proceedings in the Bankruptcy Court and Delaware Chancery Court. As such, until those purported losses are adjudicated, Yucaipa's RICO claims are not ripe.

Yucaipa also argues that it suffered $155 million in damages when BD/S "scuttled" the JCT deal. (Compl. ¶¶ 21, 124.) By the Complaint's own terms, however, the JCT deal was dependent upon numerous contingencies, which made closing the deal "uncertain." (*Id.* ¶ 124.) Such "uncertainty" is the antithesis of the "*concrete* financial loss" required for RICO standing. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 486-87, 494-96 (3d Cir. 2000) (injury that is contingent on future events does not confer RICO standing).

Finally, Yucaipa argues that it has RICO standing arising from its alleged out-of-pocket losses, such as attorneys' fees and costs spent in the Allied bankruptcy cases. (*See* Opp'n at 17.) However, in the numerous cases cited in the Opening Brief in which unripe RICO claims were dismissed for lack of standing because collection and/or bankruptcy cases were pending (*see* Opening Br. at 21-23), the plaintiffs in those cases undoubtedly incurred similar out-of-pocket costs, which were nevertheless insufficient to confer standing. In any event, neither the Complaint nor Yucaipa's Opposition specify any concrete amount of out-of-pocket losses. *See, e.g., Giles v.*

must be dismissed. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.").

[10] Yucaipa's ownership interest in the real estate assets is the subject of the action pending before the Chancery Court. Yucaipa raised its claims for reimbursement of expenses in the Bankruptcy Court in 2013 and has failed to pursue those claims even though they remain pending in that court.

*Phelan, Hallinan & Schmeig, L.L.P.*, No. Civ. A. 11-6239 (JBS), 2013 WL 2444036, at *10-11

(D.N.J. June 4, 2013) (finding no RICO standing arising from attorneys' fees); *Knit With v.*

*Knitting Fever, Inc.*, No. Civ. A. 08-4221, 2012 WL 2938992, at *5 (E.D. Pa. July 19, 2012)

(same).[11]

### B.     Yucaipa Has Failed to Allege a Pattern of Racketeering Activity

Yucaipa has failed to sufficiently allege a pattern of racketeering activity because the

alleged predicate acts span only nine months.  In its Opposition, Yucaipa attempts to tack on an

extra *four to six years* to the alleged pattern by relying primarily on two allegations.  First, Yucaipa

argues that BD/S's scheme ran "[f]rom at least in 2009 and continu[es] today."  (Opp'n at 18

(citing Compl. ¶ 1).)  However, Yucaipa has not alleged any predicate acts occurring earlier than

September 2011 or later than May 2012 (*see* Compl. ¶¶ 163-99).  As a matter of law, the duration

of the alleged pattern of racketeering activity begins on the date of the earliest alleged *predicate act*

– September 2011 emails between BD/S that allegedly constitute acts of wire fraud – not when the

alleged scheme was first contemplated.  *See, e.g., H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242

(1989); *Hindes v. Castle*, 937 F.2d 868, 875 (3d Cir. 1991).  Accordingly, the alleged racketeering

scheme is measured from September 2011, when the first alleged predicate act occurred.

Second, Yucaipa argues that BD/S "continue to obstruct justice" by, essentially, refusing to

admit that Spectrum bought First Lien Debt from Black Diamond for the purpose of filing the

involuntary petitions (the so-called "Involuntary Petition Payoff").  (Opp'n at 18 (citing Compl. ¶

---

[11] The cases cited by Yucaipa do not support its position that the payment of legal fees confers
RICO standing.  (*See* Opp'n at 17.)  *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254 (3d Cir.
2007), has nothing to do with attorneys' fees.  *Weiss* found that RICO standing existed where the
plaintiff "incurred fees and penalties *from the IRS*."  *Id.* at 258 n.2 (emphasis added).  In *Lynch v.
Capital One Bank*, No. Civ. A. 12-992, 2013 WL 2915734, at *3 (E.D. Pa. June 14, 2013), and
*Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797, 804 & n.11 (E.D. Pa. 2007), both courts
actually found that the attorneys' fees at issue did *not* confer RICO standing.

157); *see also* Compl. ¶¶ 183-89.) Yucaipa alleges that BD/S, as part of a "campaign to whitewash" the record of the Involuntary Petition Payoff, obstructed justice by (i) filing false affidavits in the Bankruptcy Court; (ii) redacting information concerning the Involuntary Petition Payoff; and (iii) failing to disclose the Cooperation Agreement through discovery and instead disclosing it as an exhibit to BD/S's opposition to Yucaipa's motion for leave to assert a counterclaim in the Bankruptcy Court.[12] (Compl. ¶¶ 183-89.)

These acts, even if found to be true, fall far short of being "obstruction of justice" predicate acts. The obstruction statute requires that a defendant "corruptly, or by threats or force, or by any threatening letter or communication, endeavor to influence, intimidate, or impede any . . . officer in or of any court of the United States . . . in the discharge of his duty." 18 U.S.C. § 1503(a). According to the Third Circuit, "only acts directly affecting parties, witnesses or jurors – and not other acts that may merely influence the proceedings – are cognizable" allegations which could rise to the level of supporting civil RICO liability for obstruction of justice. *See CollegeSource, Inc. v.*

---

[12] Yucaipa's allegation that the failure to disclose the Cooperation Agreement amounted to an "obstruction of justice" is particularly disingenuous. First, before the Cooperation Agreement was disclosed to Yucaipa, Yucaipa had already concocted its "Involuntary Petition Payoff" theory on the basis of an email produced in discovery in April 2013 in which Spectrum told Black Diamond that "[w]e cannot file an involuntary" until Spectrum's purchase of additional First Lien Debt from Black Diamond had closed. On the basis of that single sentence, Yucaipa filed a motion in the Committee Action in July 2014, seeking leave to file an untimely counterclaim on the ground that this single sentence was proof that this trade was a "bribe" to induce Spectrum into joining involuntary petitions. In opposition, BD/S submitted the Cooperation Agreement as evidence that the trade was not a "bribe" at all, but rather was in accordance with their agreement that if one bought any additional First Lien Debt, the purchasing party would offer the other party its pro rata share at the same price. Yucaipa now oddly claims that the disclosure of evidence *disproving* its "Involuntary Petition Payoff" theory – the Cooperation Agreement – is an "obstruction of justice" because it was disclosed in opposition to Yucaipa's motion for leave to assert a counterclaim, rather than in discovery. Second, Yucaipa omits the fact that the Cooperation Agreement had simply not *yet* been produced in discovery because, while the parties were still in the process of producing documents, the action was stayed for meditation (*see* Reply Aff. Ex. 2 (Committee Adv. Proc., D.I. No. 247)).

*AcademyOne, Inc.*, 597 Fed. App'x. 116, 126 (3d Cir. 2015) (submission of false affidavits insufficient to establish obstruction of justice as a RICO predicate act).

In addition, the law is clear that allegations of obstruction of justice in a pending proceeding cannot support a RICO claim brought in a *different* court. *See, e.g., Eli Lily & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 482-83, n.35 (D.N.J. 1988) ("to permit conduct in a pending action to serve as the basis of a RICO claim would improperly apply the RICO statute, invite forum shopping of a most pernicious sort and would embroil this Court in the supervision and review of proceedings" in other courts); *see also Rafferty v. Halprin*, No. 90 Civ. 2751, 1991 WL 148798, at *7 (S.D.N.Y. 1991) (holding that "[o]bstruction claims can and accordingly must be presented in the court in which the civil action giving rise to the alleged obstruction is pending" and noting that to allow otherwise, would be "an improper use of the civil RICO statute").

C.      **Yucaipa Is Collaterally Estopped From Alleging That BD/S "Encouraged" Yucaipa to Buy First Lien Debt**

In opposition to BD/S's collateral estoppel argument, Yucaipa argues that its Cross-Claims which were found to be implausible were "very different" from its RICO claims and that "the cross-claim allegations concerned only the validity of the Third and Fourth Amendments to the First Lien Credit Agreement." (Opp'n at 20, 21.)[13] The application of collateral estoppel, however, precludes a party from raising the same *issues*, not the same *claim*. *See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 248-49 (3d Cir. 2006).

Collateral estoppel is issue preclusion, not claim preclusion, and BD/S do not assert that collateral estoppel bars Yucaipa's RICO *claims* outright. Instead, Yucaipa is collaterally estopped from asserting the *issue* of the plausibility of its allegations that BD/S "encouraged" Yucaipa to

---

[13] If the Court considers the collateral estoppel arguments Yucaipa improperly seeks to incorporate from its Prior Brief (*see* footnote 6), Defendants respectfully request that the Court also consider pages 21 to 23 of Reply Aff. Ex. 1 in response to those arguments.

purchase First Lien Debt and then "secretly" directed CIT "to refuse to recognize Yucaipa as Requisite Lender."[14]  (Compl. ¶¶ 8, 83-91, 93.)  Yucaipa raised these very same issues in its Cross-Claims, and the Bankruptcy Court concluded that those allegations were not plausible.  (Mumford Aff., Ex. 6 at 104:18-22, 105:23-106:3.)

Yucaipa also argues that the Bankruptcy Court did not "actually and necessarily" decide that these "encouragement" and "secret direction" allegations were implausible.  (Opp'n at 21.)  To the contrary, the Bankruptcy Court's implausibility finding was necessary to its dismissal of Yucaipa's Cross-Claims on the basis of the Covenant Not to Sue under the Third Amendment.  In the Cross-Claims, Yucaipa had argued that applying the Third Amendment against Yucaipa would be inequitable because BD/S had allegedly "encouraged" Yucaipa to buy First Lien Debt and then "secretly directed" CIT not to recognize Yucaipa as the Requisite Lender.  In finding that the Third Amendment does apply to Yucaipa, the Bankruptcy Court "actually and necessarily" ruled on the issues of whether Yucaipa's "encouragement" allegations and allegations regarding CIT (the same allegations made here) were plausible and found that they were not plausible.  (Mumford Aff., Ex. 6 at 104:18-22, 105:23-106:3.)

### D.     Yucaipa's RICO Allegations Are Implausible

Contrary to Yucaipa's contention, BD/S do not take a "divide and conquer" approach to plausibility.  (Opp'n at 22.)  Instead, they illustrate that Yucaipa's *entire* story – viewed as a whole – is so full of holes that it cannot withstand scrutiny.  The success of the implausible "scheme" alleged by Yucaipa[15] depends on all of the following highly contingent events occurring: (i)

---

[14] Those two allegations correspond to "Step 1" and "Step 2" of Yucaipa's purported RICO scheme.  (Compl. ¶¶ 8-17.)

[15] If the Court considers the plausibility arguments Yucaipa improperly seeks to incorporate from its Prior Brief (*see* footnote 6), Defendants respectfully request that the Court also consider pages 23 to 33 of Reply Aff. Ex. 1 in response to those arguments.

convincing Yucaipa to spend $43 million[16] to buy a majority of First Lien Debt; (ii) invalidating

the Purported Fourth Amendment through litigation; (iii) obtaining a judicial declaration that BD/S

are the Requisite Lenders; (iv) acquiring Allied's assets through a credit bid; (v) prevailing in their

equitable subordination claims against Yucaipa; and (vi) having the value of the Allied assets they

acquired combined with the equitable subordination recovery exceed a "par plus accrued interest"

recovery that was offered to them by JCT years earlier.[17]

In response, Yucaipa argues that this multi-step scheme "has been largely successful to

date." (Opp'n at 26.) However, anyone can opportunistically look with hindsight at a series of

events that adversely affect them and allege that they were part of some pernicious "scheme."

Further, Yucaipa ignores the fact that BD/S were unsuccessful in a key element of the alleged

RICO scheme – acquiring Allied's assets through a credit bid – because they were outbid by JCT.

Moreover, the only way the purported "scheme" can succeed is if the Bankruptcy Court

finds that Yucaipa *actually did act inequitably*. If Yucaipa is found to have acted inequitably,

certainly there is no merit to its assertion that it is the victim of a scheme.

In response, Yucaipa argues that BD/S "targeted" Yucaipa not because it was "liable for

any wrongdoing," but instead because Yucaipa was "a convenient pawn" for equitable

subordination due to its status as an Allied insider. (Opp'n at 24.) This argument falls flat given

the Committee, after "a comprehensive investigation," independently found that "Yucaipa

---

[16] As set forth above, although Yucaipa may have spent $43 million to acquire First Lien Debt, the Bankruptcy Court found the allegation that BD/S convinced Yucaipa to buy that debt to be implausible (*see supra* Section III.C).

[17] Given the costs, expenses and time that would be required to pursue such an alleged multi-step scheme, as well as the incredibly unlikely scenario that BD/S would be successful in all of these steps, the return profile would have to be enormous to justify setting out on such a plan; however, the return profile here would not justify embarking on such a scheme since all BD/S could recover, if they were successful in their equitable subordination claims, is par plus accrued, which they would have received in the JCT transaction.

trampled upon the legitimate rights and expectations of the Debtors' secured and unsecured creditors [.]" (Mumford Aff. Ex. 5 ¶¶ 3, 6.)

Yucaipa further argues that BD/S could not have recovered par plus accrued interest from JCT (even though Yucaipa had alleged that they *could* in the SDNY Complaint). In the present Complaint, Yucaipa now alleges that there were various contingencies that had to take place before a deal with JCT could be consummated. (Opp'n at 25.) While this argument entirely undercuts Yucaipa's argument that the "scuttling" of the deal caused Yucaipa $155 million in concrete financial losses sufficient to confer RICO standing (*see supra* Section III.A), Yucaipa cannot escape the March 2012 term sheet (attached as an Exhibit to its present Complaint), which makes plain that JCT was willing to provide a "par plus accrued interest recovery" to "non-consenting lenders" and that BD/S stood to recover 100% of its First Lien Claims. (Compl. Ex. 4.) As discussed supra, at Section II, Yucaipa's allegation that contradicts an exhibit to its own Complaint (not to mention its own theory of damages) can and should be rejected. *See Nat'l Distillers & Chem. Corp.*, 1980 WL 1057, at *3.

Yucaipa next argues that it is plausible that BD/S "spent a year negotiating with JCT" because they were "buy[ing] time for their equitable subordination claim and to ensure the deal did not close." (Opp'n at 23.) That argument makes no sense. Why "buy time" for a year? To follow Yucaipa's own allegations and logic, BD/S could have "ensure[d] the deal would not close" by filing the involuntary petitions as soon as possible, rather than wasting time on "sham" negotiations.

Moreover, if BD/S had begun scheming in 2009[18] to equitably subordinate Yucaipa's First

---

[18] BD/S's equitable subordination claim is based on numerous acts and omissions that occurred after 2009. Obviously, BD/S could not have come up with a scheme in 2009 to equitably

Lien Debt, it is not plausible that they would then inexplicably wait three years to carry out their objective. In response, Yucaipa argues that BD/S were "lying in wait" for all that time because they needed "to strip Yucaipa of its Requisite Lender status before filing the involuntary petition." (Opp'n at 23.) That argument is backwards because BD/S filed the involuntary bankruptcy petitions on May 17, 2012, almost a year *before* Yucaipa was stripped of its Requisite Lender status. *See BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013).

Finally, Yucaipa's "Involuntary Petition Payoff" allegations are not plausible. Yucaipa's sole basis for those allegations is an email chain running from October 2011 to March 2012, which *actually* reflects that the communications were administrative in nature – there is nothing regarding any "bribe" or "payoff."

For all of the above reasons, Yucaipa's purported RICO "scheme" is implausible.

## IV. THIS COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER YUCAIPA'S STATE LAW CLAIMS

Yucaipa contends that this Court should exercise supplemental jurisdiction over the state law claims even if it dismisses Yucaipa's RICO claim. (Opp'n at 27.) Under Third Circuit law, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added).

Here, to the contrary, it would not be unfair to dismiss Yucaipa's state law claims because neither party has invested significant resources in litigating them here. Further, judicial efficiency

subordinate Yucaipa's First Lien Debt based on Yucaipa's activities and omissions that took place in 2011 and 2012.

and comity would be promoted because Yucaipa already has state law claims related to the facts

pled in this action pending in Delaware Chancery Court and in the Bankruptcy Court.

## V.   YUCAIPA FAILS TO ADEQUATELY ALLEGE STATE LAW CLAIMS

Yucaipa argues that it has stated a claim for tortious interference with the JCT deal by

alleging that Defendants filed the involuntary petitions and engaged in "various wrongful means,

including unlawful claims trading, bankruptcy fraud, and mail and wire fraud." (Opp'n at 28.) As

discussed above, however, BD/S's litigation-related activity, such as filing the involuntary

petitions and allegedly false affidavits in the Bankruptcy Court, cannot form an independent basis

for liability under the *Noerr-Pennington* doctrine (*see supra* Section I), which applies equally to

these claims as it does to the RICO claims. Moreover, the emails that form the basis for Yucaipa's

mail and wire fraud allegations cannot support the tortious interference claim because the emails

contain no discussion of the JCT deal. (*See* Compl. Exs. 6, 25, 29, 30.)

Yucaipa further argues that it adequately alleged detrimental reliance for its fraud claim by

alleging it relied on the alleged misstatements to determine its "litigation position in the bankruptcy

action and other related proceedings."[19] (Opp'n at 29 (quoting Compl. ¶ 212).) Yucaipa, however,

makes no attempt to explain, let alone with the required specificity, how its "litigation position"

would have been different, nor how it was harmed in determining its "litigation position."

Accordingly, Yucaipa has failed to adequately allege how it relied upon or suffered any harm from

the alleged misstatements to the Bankruptcy Court.[20]

---

[19] As discussed in the Opening Brief, because the factual allegations that form the basis of
Yucaipa's fraud claim are squarely before the Bankruptcy Court in the BD/S Action, Yucaipa's
fraud claim should be dismissed to allow the Bankruptcy Court to adjudicate those allegations.

[20] The cases that Yucaipa cites are distinguishable. In *Schmeusser v. Schmeusser*, 559 A.2d 1294
(Del. 1989), a wife relied upon her husband's misrepresentations concerning the value of the
marital estate, and as a result, she did not receive her fair share in a divorce. *Id.* at 1295-1301. In
*Stephenson v. Capano Development, Inc.*, 462 A.2d 1069 (Del. 1983), a purchaser relied upon a

## VI.    IF THIS ACTION IS NOT DISMISSED, IT SHOULD BE STAYED

If any of Yucaipa's claims survive, this action should be stayed pending the resolution of related actions before the Bankruptcy Court. Yucaipa argues that judicial economy would be best served by allowing the related cases to proceed simultaneously in two separate courts. Yucaipa, however, puts the cart before the horse. It would be an utter waste of judicial resources to proceed with this action at the same time as the Committee Action and the BD/S Action because Yucaipa's RICO claims are premised on the resolution of the equitable subordination claims pending in the Committee Action and the BD/S Action. Similarly, the factual issues raised in Yucaipa's state law claims in this action – the alleged tortious interference with the JCT deal and the allegedly fraudulent affidavits – are currently at issue before the Bankruptcy Court in Yucaipa's counterclaims in the BD/S Action (the Court before which these affidavits were submitted and thus the Court that should address the claims connected with those affidavits). It makes little sense to waste judicial resources and risk inconsistent rulings by litigating those issues simultaneously in two different courts.

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons stated in Defendants' Opening Brief, Yucaipa's Complaint should be dismissed with prejudice, or alternatively stayed pending resolution of the bankruptcy actions.[21]

---

false advertisements for real property and as a result did not receive financing on the same terms as advertised. *See id.* at 1072, 1075. By contrast, here, Yucaipa has failed to allege how it was harmed when it relied on the alleged misstatements to determine its "litigation position."

[21] Yucaipa should not be given leave to replead its complaint. In its Opposition, Yucaipa did not even address the arguments in the Opening Brief that Yucaipa should not be given leave to amend, and Yucaipa concedes that it "effectively amended its [SDNY Complaint] by re-filing it in this Court." (Opp'n at 5.) Yucaipa should not be given a *third* bite at asserting another meritless RICO claim.

Dated: July 2, 2015
   Wilmington, Delaware

**LANDIS RATH & COBB LLP**


  /s/ Kerri K. Mumford
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**
Robert J. Ward
Adam C. Harris
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955