NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3664
_____

YUCAIPA AMERICAN ALLIANCE FUND I, LP, a Delaware Limited
Partnership; YUCAIPA AMERICAN ALLIANCE PARALLEL FUND I, LP,
a Delaware Limited Partnership,
            Appellants

v.

RICHARD A. EHRLICH; STEPHEN H. DECKOFF; LESLIE A. MEIER;
JEFFREY A. SCHAFFER; BDCM OPPORTUNITY FUND II, LP, A Delaware
Limited Partnership; BLACK DIAMOND CLO 2005-1 LTD, a Cayman Islands Limited
Liability Company; SPECTRUM INVESTMENT PARTNERS, LP,
a Delaware Limited Partnership

_____

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1-15-cv-00373)
District Judge: Honorable Sue L. Robinson

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 4, 2017

Before: CHAGARES, SCIRICA, and FISHER, Circuit Judges

(Filed: November 15, 2017)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

SCIRICA, *Circuit Judge*

This case involves events surrounding the bankruptcies of Allied Systems Holdings, Inc. and a dispute between hedge funds who hold portions of Allied's first lien debt. Plaintiffs are two hedge funds managed by Yucaipa Companies, LLC, (collectively "Yucaipa"). Defendants are hedge funds managed by Black Diamond and Spectrum Investment Partners, and their employees (collectively "BD/S"). Yucaipa alleges BD/S engaged in a conspiracy to induce Yucaipa to take a detrimental position in Allied's bankruptcy, resulting in damages in the form of equitable subrogation of Yucaipa's first lien debt holdings by the bankruptcy court and resulting legal fees. Yucaipa asserts claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, as well as state law claims for fraud and tortious interference with business relations.

The District Court granted BD/S's motion to dismiss the RICO claims and declined to exercise supplemental jurisdiction over the remaining state law claims, and Yucaipa appealed. We will affirm.

I.

A.

The origins of this case lie in the first bankruptcy of Allied in 2007 in the United States Bankruptcy Court for the District of Delaware and a tangled web of resulting litigation. After the bankruptcy, Yucaipa became the majority shareholder of Allied under the plan of reorganization and controlled the board of directors. To finance the reorganization and emergence from bankruptcy, in May 2007, Allied borrowed $265 million of first lien debt from numerous lenders pursuant to a credit agreement. BD/S

were among the lenders, and held a minority stake in the first lien debt.

The terms of the credit agreement are essential to the present dispute. Under its terms, a lender or lenders holding 50% or more of the first lien debt can act as "requisite lenders" who have the authority to declare events of default, demand immediate payment by Allied of the balance of the loan, or commence foreclosure. As Allied's majority equity holder, Yucaipa was expressly forbidden by the terms of the credit agreement from acting as a requisite lender.

In 2008, Allied defaulted on the first lien debt and stopped making interest payments. Subsequently, Allied agreed to an amendment of the credit agreement, which gave Yucaipa the right to purchase first lien debt, but under certain restrictions, which continued to prevent Yucaipa from serving as the requisite lenders.

In February 2009, ComVest Investment Partners III, L.P., which is not a party to this suit, became the requisite lenders. Yucaipa negotiated directly with ComVest to acquire the majority of Allied's first lien debt. In addition, Yucaipa, as majority equity holder, caused Allied to enter a purported amendment to the credit agreement, which would have eliminated the restrictions on Yucaipa's ownership of Allied's first lien debt and allowed Yucaipa to become the requisite lenders. On the same day, Yucaipa declared itself the requisite lenders under the terms of the original credit agreement.

However, the proposed amendment was not approved by unanimous consent of the first lien debt lenders, as required by the original credit agreement. In January 2012, BD/S filed suit against Yucaipa in New York state court and successfully obtained a declaratory judgment that Yucaipa was not the requisite lenders because the purported

amendment to the credit agreement was void.

While the New York action was pending, in May 2012, BD/S filed involuntary petitions for bankruptcy against Allied in the United States Bankruptcy Court for the District of Delaware. In adversarial proceedings in the bankruptcy court, both Yucaipa and BD/S claimed to be the requisite lenders under the credit agreement. The bankruptcy court determined BD/S were the requisite lenders and the District Court affirmed this determination.

The bankruptcy court supervised an auction of Allied's remaining assets. Jack Cooper Holdings Corporation, which is not a party to this suit, purchased the bulk of Allied's assets. As the requisite lenders, BD/S submitted a credit bid to purchase the remainder of Allied's assets, which was approved by the bankruptcy court.

After the auction, Yucaipa filed suit in Delaware state court against BD/S and other Allied lenders to challenge the allocation of the remainder of Allied's assets. The Delaware court dismissed some of Yucaipa's claims on collateral estoppel grounds based on the prior decisions of the bankruptcy court. The remainder of the claims were stayed pending resolution of the bankruptcy.

Meanwhile, in the bankruptcy action, BD/S, as requisite lenders, sponsored a plan of reorganization, which was approved by the bankruptcy court. The plan included prosecution of claims against Yucaipa and its principals for breach of contract and breach of fiduciary duty, and sought equitable subordination of Yucaipa's first lien debt holdings. The bankruptcy action remains pending.

**B.**

After the reorganization plan was approved, Yucaipa filed this action in the District Court for the District of Delaware, alleging violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, conspiracy to violate RICO, and state law claims for fraud and tortious interference with business relations. Yucaipa alleges BD/S engaged in a scheme in which BD/S encouraged Yucaipa to purchase Allied's first lien debt from ComVest, then forced Allied into involuntary bankruptcy, in which BD/S caused the bankruptcy court to equitably subordinate Yucaipa's first lien debt holdings in favor of BD/S's minority stake in the first lien debt.

Yucaipa alleges the scheme began as early as 2009, when a Spectrum employee received an email from a third-party which stated "I thought you were going to check out the 'equitable subordination' angle." In addition, Yucaipa relies on an email from a Spectrum employee to a Black Diamond employee, which explained that it "looks like Yucaipa pushed the equity button here . . . you ready to roll." Yucaipa alleges these emails demonstrate a scheme, beginning in 2009, to file the involuntary petition for bankruptcy and result in the equitable subordination of Yucaipa's first lien debt.

In furtherance of this plan, Yucaipa alleges BD/S encouraged Yucaipa to purchase as much first lien debt as possible. Black Diamond's founder and principal met with Yucaipa's officers in August 2009, and allegedly provided assurances BD/S would work with Yucaipa after Yucaipa acquired ComVest's first lien debt. Yucaipa also relies on an email from February 2, 2011, in which a Black Diamond partner assured Yucaipa that "[o]n Allied, the strategy you outlined seemed right and you have our support."

5

In addition, Yucaipa alleges BD/S conspired to prevent Jack Cooper Holdings from purchasing Allied outright prior to the second bankruptcy, and instead encouraged the potential purchaser to wait to purchase Allied's assets following the involuntary bankruptcy. In support of this allegation, Yucaipa relies on emails between BD/S and Jack Cooper Holdings in May and December 2011.

Finally, Yucaipa alleges Black Diamond and Spectrum entered a cooperation agreement in January 2012, prior to the involuntary bankruptcy petition, in which both companies agreed to offer first refusal and participation rights to each other before transferring any Allied debt. As part of this agreement, Black Diamond agreed to transfer $4 million of its first lien debt to Spectrum for the same price Black Diamond originally paid for the debt, representing a substantial discount from market value. Because Spectrum already held enough of Allied's debt prior to the transfer to qualify as a petitioner for an involuntary bankruptcy, Yucaipa avers this transfer represented a bribe to encourage Spectrum to support Black Diamond in the resulting bankruptcy.

Yucaipa identifies the following predicate acts in support of its RICO claim:

- Yucaipa alleges the January 2012 cooperation agreement and $4 million transfer of first lien debt from Black Diamond to Spectrum constituted claims trading in relation to a bankruptcy proceeding in violation of 18 U.S.C. § 152(6).
- Yucaipa contends, in May 2012, BD/S lied in the petition for involuntary bankruptcy, as well as in various affidavits and declarations submitted to the bankruptcy court, and thus committed false oath and false declarations in relation to a bankruptcy proceeding in violation of 18 U.S.C. § 152(2)-(3).

- Yucaipa avers that various BD/S statements to the bankruptcy court in May 2012 constituted obstruction of justice in violation of 18 U.S.C. § 1503.
- Yucaipa claims several emails sent among BD/S employees constitute wire fraud in violation of 18 U.S.C. § 1343 because they "facilitated the solicitation of Allied debtholders to join the involuntary petition and . . . illegal claims trading." Specifically, Yucaipa identifies emails from September 16, 2011, October 13, 2011, and March 21, 2012.
- Yucaipa alleges Black Diamond's transfer of claims to Spectrum in May 2012 constituted mail fraud in violation of 18 U.S.C. § 1341.

As noted, Yucaipa seeks damages in the form of lost profits due to the involuntary bankruptcy and equitable subrogation of its first lien debt holdings, as well as attorneys' fees and costs associated with the resulting litigation in state and federal courts.

### C.

BD/S filed a motion to dismiss in the District Court asserting, *inter alia*, (1) Yucaipa's RICO claims failed because (i) Yucaipa lacked RICO standing and (ii) Yucaipa had not adequately pled a pattern of racketeering activity, (2) Yucaipa's claims were barred by the *Noerr-Pennington* doctrine, and (3) Yucaipa's claims were barred by covenants not to sue contained in the credit agreement.

The District Court granted BD/S's motion to dismiss the RICO claims, concluding that Yucaipa lacked RICO standing and had failed to allege a pattern of racketeering activity, and declined to exercise jurisdiction over the remaining state law tort claims. *See Yucaipa American Alliance Fund I v. Ehrlich*, 204 F. Supp. 3d 765 (D. Del. 2016).

7

Yucaipa appealed, and argues that the District Court erred in dismissing the RICO claims.

## II.[1]

### A.

Yucaipa argues the District Court erred in concluding it lacked RICO standing. We disagree, and conclude the District Court correctly determined Yucaipa's alleged injuries were not a concrete financial loss and were contingent on the result of the pending bankruptcy litigation.

RICO provides a civil remedy for "any person injured in his business or property by reason of a violation of" the substantive provisions of the statute. 18 U.S.C. § 1964(c). "[T]he injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000). An injury that "necessarily is contingent upon the impact of events in the future which have not yet occurred" will not suffice. *Id.* at 495.

Yucaipa alleges two types of injury in this case. First, the loss of value of its first lien debt due to equitable subrogation in the bankruptcy proceeding, and second, attorneys' fees and expenses from the bankruptcy and related litigation. We agree with the District Court that neither injury will suffice for purposes of conferring standing for civil RICO liability under section 1964(c).

---

[1] The District Court had jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. §§ 1331 and 1367. We have jurisdiction over the District Court's final order dismissing all claims under 28 U.S.C. § 1291. We exercise plenary review of the District Court's orders granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

Yucaipa's first alleged injury is plainly contingent on the outcome of the pending bankruptcy proceeding, which is still ongoing. While BD/S has sought equitable subrogation of Yucaipa's holdings in the involuntary bankruptcy proceeding, the bankruptcy court has yet to adjudicate the issue or approve a plan of reorganization. Accordingly, Yucaipa's injury is not yet concrete and is conditional on the decisions of the bankruptcy court, as well as the result of any appeal.

As to Yucaipa's second alleged injury, we have not previously addressed whether attorneys' fees incurred as a result of an alleged RICO violation may alone constitute a RCIO injury.[2] We need not decide that question today, because the District Court correctly concluded that the attorneys' fees incurred as a result of the alleged RICO violations are also contingent on the outcome of pending litigation in the bankruptcy court.

Yucaipa avers that our precedents require only the fact of injury to satisfy RICO standing, and not that the amount of loss be quantifiable. We agree. *See Maio*, 221 F.3d at 484. But in this case, as the District Court noted, Yucaipa may suffer no injury at all depending on the outcome of the bankruptcy action. Yucaipa admits that it has sought reimbursement in the bankruptcy proceeding for attorneys' fees. In addition, Yucaipa may prevail in its parallel litigation in the District of Delaware and may recover fees. Thus, Yucaipa's claims for attorneys' fees are contingent on the outcome of all of the pending litigation and do not establish RICO standing.

---

[2] Other Courts of Appeals have recognized RICO claims for attorneys' fees, at least where the fees were incurred in defending against frivolous or fraudulent claims. *See Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988).

**B.**

Yucaipa maintains the District Court erred in determining Yucaipa had failed to allege a pattern of racketeering activity. We disagree, because the District Court correctly concluded that Yucaipa failed to allege a closed-ended continuity of RICO activity.

To allege a civil violation of RICO, plaintiff must demonstrate defendant engaged in "a pattern of racketeering activity." 18 U.S.C. § 1962(c). "[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates . . . amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241.

Yucaipa has abandoned its claims of open-ended continuity and relies only on allegations of a closed-ended continuity. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement . . . ." *Id.* at 242. We have previously explained "because 'duration is the *sine qua non* of continuity' in a closed-ended scheme, . . . twelve months [between RICO predicate acts] is not a substantial period of time." *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) (quoting *Hindes v. Castle*, 937 F.2d 868, 873 (3d Cir. 1991)).

The District Court concluded Yucaipa had failed to plead a closed-ended continuity by looking to the dates of the alleged predicate acts in the complaint. The

earliest predicate act identified in the complaint was an email sent on September 16, 2011, and the last predicate acts alleged were statements in the involuntary bankruptcy petition filed in May 2012. The District Court determined the alleged pattern of racketeering activity lasted only nine months and thus did not satisfy the closed-ended continuity requirement.

Yucaipa contends the District Court erred in calculating the length of the pattern of racketeering based on the first alleged predicate act, the email sent on September 16, 2011, which allegedly constituted wire fraud in violation of 18 U.S.C. § 1343. Instead, Yucaipa argues the closed-ended continuity should be deemed to begin with the 2009 emails from BD/S to Yucaipa because this is when the "underlying scheme" began.

Yucaipa relies on our decision in *Tabas v. Tabas*, in which we stated "in civil RICO complaints based on predicate acts of mail fraud 'the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice.'" 47 F.3d 1280, 1294 (3d Cir. 1995) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1414 (3d Cir. 1991)). In *Tabas*, we considered claims arising out of an alleged RICO conspiracy by a partner in a real estate firm and his business associates to defraud the estate of a deceased partner through mischaracterizing personal expenses as business expenses and receiving compensation not authorized by the partnership agreement. *Tabas*, 47 F.3d at 1282–85. The alleged predicate acts were instances of mail fraud, but we explained "[e]ach time defendants misrepresented the business nature of an expense, made a questionable charge, or received compensation to which they were not entitled, they lessened the income available to the" plaintiffs. *Id.* at 1294. We concluded the RICO

11

continuity included each of the fraudulent deductions from the assets of the partnership. *Id.*

Yucaipa asks us to extend the *Tabas* holding beyond fraudulent conduct to include conduct which did not violate any RICO predicate statute, but that allegedly led to losses due to subsequent RICO predicate acts. The activity prior to the alleged predicate acts Yucaipa seeks to use to show RICO continuity are emails and statements made by BD/S to Yucaipa in 2009, which encourage Yucaipa to acquire first lien debt from ComVest. As Yucaipa acknowledges, BD/S's actions in 2009 were not themselves RICO predicate acts. Nor did they serve to advance the alleged goal of the RICO conspiracy—to equitably subordinate Yucaipa's first lien debt in an involuntary bankruptcy that had not yet occurred. These discussions necessarily occurred before Yucaipa even held significant amounts of first lien debt, and thus cannot have been part of a conspiracy to equitably subordinate Yucaipa's first lien debt in favor of BD/S. These discussions are not comparable to the fraudulent actions of the defendants in *Tabas*, which caused direct harm to the plaintiffs, and we decline to extend *Tabas* to these facts.[3] Accordingly, we agree with the District Court's determination that Yucaipa failed to plead a closed-ended continuity based on RICO predicate acts occurring over a nine-month period.

### III.

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[3] After dismissing the RICO claims, the District Court declined to exercise supplemental jurisdiction over the state law tort claims. Yucaipa does not challenge this conclusion on appeal and we will affirm the dismissal of these claims without prejudice.

12